Exhibit A

Deposition of Meagan Sullivan      Fishon, Pearlman & Yang v. Peloton Interactive, Inc.

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF NEW YORK

 3                         -   -   -

 4    ERIC FISHON, ALICIA PEARLMAN AND    :

 5    PATRICK YANG, individually and on   :

 6    behalf of all others similarly      :

 7    situated,                           :

 8            Plaintiffs,                  : CASE NO.

 9               vs.                       : 1:19-CV-11711

10    PELOTON INTERACTIVE, INC.,          :

11            Defendant.                   :

12                         -   -   -

13                 September 16, 2020

14                         -   -   -

15

16              Remote videotaped deposition of

17    MEAGAN SULLIVAN was taken pursuant to notice,

18    beginning at 12:20 p.m. Eastern Time, on the

19    above date before Gail L. Inghram Verbano,

20    Registered Diplomate Reporter, Certified

21    Realtime Reporter, Certified Shorthand

22    Reporter-CA (No. 8635)and Notary Public, there

23    being present via videoconferencing:

24                         -   -   -
```

```
 1    A P P E A R A N C E S:

 2    On behalf of Plaintiffs:
               AARON ZIGLER, ESQ.
 3             amz@kellerlenkner.com
               KELLER LENKNER, LLP
 4             150 North Riverside Plaza, Suite 4270
               Chicago, Illinois 60606
 5             312.741.5220

 6
      On behalf of Defendants:
 7             STEVEN N. FELDMAN, ESQ.
               sfeldman@hueston.com
 8             XIAOHAN CAI, ESQ.
               xcai@hueston.com
 9             HUESTON HENNIGAN, LLP
               523 West 6th Street, Suite 400
10             Los Angeles, California 90014
               213.788.4340
11    ALSO PRESENT:

12             KEN AMRHEIN, Legal Technician

13

14

15

16

17

18

19

20

21

22

23

24
```

1    five years?

2            A.      No.

3            Q.      Okay.  So did you do anything to

4    prepare for today's deposition, other than that

5    short conversation with counsel a few weeks ago?

6            A.      To prepare, no.

7            Q.      Yeah.  Did you review any

8    documents or anything like that?

9            A.      No.

10           Q.      Okay.  And you're here today

11   pursuant to a deposition subpoena; correct?

12           A.      Correct.

13           Q.      Okay.  Let's just do some quick

14   background.

15                   What's your birthdate?

16           A.      ■■■/87.

17           Q.      And where do you live?

18           A.      New York.

19           Q.      Where in New York?

20           A.      West Babylon, New York.

21           Q.      Okay.  And what do you do for a

22   living?

23           A.      I'm a nurse practitioner.

24           Q.      Okay.  And where do you work?

1          A.      I work in a hospital, and I work

2     in an office.

3                  (Whereupon, Sullivan Exhibit 1

4           marked for identification.)

5     BY MR. FELDMAN:

6          Q.      Okay.  Great.

7                  I'm just going to throw up for a

8     second Tab 5, which is a LinkedIn profile for

9     you, I believe.  I just want to ask you if it

10    looks accurate, if it is accurate.

11         A.      Yeah.

12         Q.      Is this accurate?

13         A.      That's me.

14         Q.      And if you -- and scrolling down,

15    you can see -- does it accurately reflect your

16    prior positions?

17         A.      It might not be completely

18    updated, but -- yeah, sure, yeah.

19         Q.      Okay, great.

20         A.      It's not 100 percent updated.

21         Q.      Okay, great.  But -- but accurate

22    as far as what we see?

23         A.      Yes, that's me.

24         Q.      Okay.  All right.  We can take

1     A.    When I was already interested in

2  the bike, doing my own research about the bike.

3     Q.    And you were aware, correct, that

4  there is a secondary market for buying Peloton

5  used bikes on eBay and craigslist and other

6  things; correct?

7     A.    Was I aware?

8     Q.    Yes.

9     A.    No; I didn't know if you could

10  even sell the -- I didn't know that you could

11  sell the bike.

12     Q.    Okay.  And how did you determine

13  that -- that you would be able to buy the bike

14  from your uncle and then get it to work for you?

15     A.    I figured if I had my own user

16  name and password and was paying monthly for the

17  subscription, that it wouldn't matter.  It's

18  my -- I'm paying per month for the -- for the

19  class, for the gym.  I don't -- you know, no one

20  is paying for it for me.  I'm not using someone

21  else's name.  I'm using my own name, my own

22  account, and that's what I did.

23           And I eventually canceled or --

24  the subscription that I used on my, you know,

 1   iPhone or my tablet, I said, I don't need this

 2   anymore.  And I joined around July 10th-ish or

 3   13th-ish of '17 and -- for the bike.

 4           Q.    Sitting here today, are you aware

 5   that you can sell a Peloton bike on craigslist

 6   and eBay and other places?

 7                 MR. ZIGLER:  Objection; assumes

 8          facts.

 9                 You can answer the question if

10          you know, Meagan.

11                 THE WITNESS:  I'm -- I don't --

12          am I aware that I could, like, sell my

13          bike?

14   BY MR. FELDMAN:

15           Q.    Sure.  Yes.

16           A.    I don't know.  Can I?

17           Q.    You've -- yes.

18           A.    Okay.

19           Q.    You -- you have sold other goods

20   on third-party marketplaces like Letsgo [sic],

21   haven't you?

22           A.    Have I?

23           Q.    Yes.

24           A.    You'd have to show me records.

```
 1              Q.      Have you ever sold anything on
 2      craigslist or eBay or any other site like that?
 3              A.      I've sold a kitchen table
 4      recently on Letgo.
 5              Q.      Okay.  So you're aware that you
 6      can sell items on a third-party marketplace like
 7      Letgo; right?
 8              A.      Yes.  But what items?
 9              Q.      Okay.  Have you ever considered
10      selling your Peloton bike?
11              A.      No.
12              Q.      Why not?
13              A.      I don't really have a reason.
14              Q.      You want to keep it; correct?
15              A.      I mean, I don't have a reason to
16      not -- you know, to get rid of it right now.
17              Q.      And why -- why is that?  Because
18      you -- you still continue to enjoy using it;
19      correct?
20              A.      With -- if and when I have time
21      to use it, I have it to use.
22              Q.      Okay.  And you enjoy using it
23      when you have that time to use it; correct?
24              A.      I mean, yeah, sure.  I -- I enjoy
```

```
 1   it.
 2         Q.     Okay.  So have you ever visited
 3   any website maintained by Peloton about how to
 4   buy a used Peloton bike or how to sell a used
 5   Peloton bike?
 6         A.     No.
 7               (Whereupon, Sullivan Exhibit 2
 8         marked for identification.)
 9   BY MR. FELDMAN:
10         Q.     Just, for example, I'll put up
11   Tab 6 for a second.  This is a web page on the
12   Peloton website on the support site; and the
13   title of it, as you can see once it pops up, is
14   "Buying a used Peloton bike."  And there's a
15   heading of "Where Can I Buy a Peloton Bike?"
16   And you can see there it explains, "Local online
17   marketplace."
18               Do you see that, "craigslist,
19   Facebook marketplace, Letgo"?
20               Do you see that?
21               MR. ZIGLER:  Hold on.  Steve, I'm
22         going to put on an objection here to the
23         lack of foundation.  You haven't laid
24         any foundation for when this was
```

Deposition of Meagan Sullivan                    Fishon, Pearlman & Yang v. Peloton Interactive, Inc.

1          MR. ZIGLER:  Objection --

2          THE WITNESS:  -- to me that her

3     class is not there anymore.  I cannot go

4     anymore on that memorable day or

5     experience.  I cannot see -- I don't

6     want to, like, see myself.  I don't even

7     like doing the Zoom.

8          But I don't -- I cannot watch the

9     Peloton class, do the Peloton class, the

10    memory of my friends, of us all being

11    there together, it's -- it's not there

12    anymore; and that bothers me.

13 BY MR. FELDMAN:

14    Q.    I see.

15          So one of the reasons why you're

16 upset and you've brought the suit against

17 Peloton is that the Jennifer Jacobs classes have

18 been taken down and including the one that you

19 actually were at with your friends that day,

20 where you met Jennifer Jacobs; is that correct?

21          MR. ZIGLER:  Objection as it

22    misstates prior testimony and it also

23    misstates the facts in --

24          MR. FELDMAN:  Aaron, hey, we're

```
1              going to -- we're going to have a
2              problem and have to call the judge,
3              because I'm not going to allow speaking
4              objections like this over and over
5              again.  You can say "objection" and
6              that's it.
7                      MR. ZIGLER:  All right.  So --
8                      MR. FELDMAN:  Go ahead.
9                      MR. ZIGLER:  -- you said that
10             Ms. Sullivan brought this suit against
11             Peloton.  She's an absent class member
12             here.  She hasn't brought anything
13             against Peloton, but --
14                     MR. FELDMAN:  Well, she actually
15             brought an arbitration against Peloton,
16             but that's -- but we -- we can talk
17             about that later.
18                     MR. ZIGLER:  Or -- can I --
19                     MR. FELDMAN:  I don't want to
20             argue with you, Aaron.
21     BY MR. FELDMAN:
22             Q.    Ms. Sullivan, I'm just asking you
23     a very simple question.  One of the reasons --
24     let me ask you this, Ms. Sullivan:
```

```
 1                      Are you planning to be a class
 2      member in the class action asserted against
 3      Peloton that we're here for today?
 4                      MR. ZIGLER:  Objection; calls for
 5              speculation.  It may invade the
 6              attorney-client privilege.  I don't
 7              know.  Probably a couple of others.
 8                      Go ahead, you can answer the
 9              question if you'd like.
10                      THE WITNESS:  I'm here as a
11              witness.  I'm here as a person.  I don't
12              have to be here.  No one is paying me to
13              be here.  I don't -- you know, it's --
14      BY MR. FELDMAN:
15              Q.      Okay.  One of the reasons you're
16      upset with Peloton is that the class that you
17      took with your friends has been taken down;
18      correct?
19              A.      I'm not upset.  I'm not losing
20      sleep over it.  It was just something that was
21      sentimental to me as a human being that I'm just
22      using as an example that it's -- doesn't -- it's
23      not the end all, be all, you know, reason.  It's
24      just one of the reasons.  I'm giving you an
```

```
 1                    (Simultaneous cross-talk.)

 2                    -- why did you ultimately only

 3      take four Jennifer Jacobs classes ever?

 4             A.     I don't really have a good reason

 5      for you, Steve.  I actually liked -- there's

 6      other coaches that I like better.

 7             Q.     Okay.  And isn't it true that

 8      aside from the May 26th, 2017, Jen Jacobs

 9      class, which you took more than once, the one

10      you were at, you never actually took any other

11      class twice on the Peloton service?

12             A.     I'm not sure.  I mean --

13             Q.     Well, I can show you the records.

14             A.     I could show you the records,

15      too.

16             Q.     Is it fair to say that you do not

17      as a practice retake Peloton classes?

18             A.     I retake the same instructors.

19             Q.     With new classes, the same

20      instructor with their new classes; correct?

21             A.     I take classes that have similar

22      music and similar instructors.

23             Q.     Right.  But new classes with

24      similar instructors and similar music.  You do
```

```
 1    not retake the same classes over and over again;

 2    correct?

 3            A.     Whether I have doesn't mean that

 4    I won't.

 5            Q.     Okay.  But you haven't to date

 6    been taking --

 7            A.     I don't think so.  You would --

 8    we have to go through all of --you know, my

 9    classes, we'd have to go through them together.

10            Q.     I have.  And we can pull them up.

11    But the fact is, you -- does it surprise you --

12    I mean, you're the one who has taken these

13    classes.

14            Would you -- does it sound

15    correct that you consistently take new classes?

16    You might have the same instructors that you

17    like to keep going back to or the same music

18    style.  But you do not retake classes, as a

19    practice?  You consistently take new classes

20    that are available on the Peloton service;

21    correct?

22            MR. ZIGLER:  Objection to form.

23            THE WITNESS:  I take classes that

24        I want to take that I think seem okay to
```

 1              me.   There have been times where there

 2              are classes that the first two minutes

 3              they're horrible.   What do I do?   I shut

 4              them off and I look for another class.

 5  BY MR. FELDMAN:

 6          Q.     Can you identify any specific ad

 7  you ever saw from Peloton that used the term

 8  "ever-growing"?

 9          A.     You've asked me this.   Without

10  using the word "ever-growing" and I have seen

11  multiple ads on TV that I cannot tell you deep,

12  fine details.   But one thing that I could tell

13  you is, one of the reasons that not just me,

14  other people have most likely bought this bike

15  is because Peloton said "ever-growing library."

16              Never said they were deleting

17  classes, getting rid of classes, whether it's

18  Jennifer Jacobs, whether it's the new treadmill

19  program -- nothing.   They never said they were

20  taking away classes.

21          Q.     Okay.   Just please focus on my

22  question.

23          A.     I am focusing on your question.

24          Q.     Have you ever seen a specific

```
 1          A.     I don't know.  Maybe, I think I

 2   read something about maybe, like -- no, I don't.

 3   I know -- I know that there was about 50 percent

 4   removed but I couldn't tell you how many were --

 5   were there.

 6          Q.     Okay.  And you don't have an

 7   understanding of how many were there at the end

 8   of 2019?

 9          A.     No, I'm sorry.

10          Q.     What do you want to get out of

11   being a class member in this litigation?

12              MR. ZIGLER:  Objection; lack of

13          foundation.  Assumes facts.

14              Go ahead.

15              THE WITNESS:  I never said I

16          wanted to get anything.

17   BY MR. FELDMAN:

18          Q.     Okay.  So you don't want to --

19   why are you -- why are you a class member of

20   this litigation if you don't want to get

21   anything?

22              MR. ZIGLER:  Objection; calls for

23          a legal conclusion, assumes facts.

24              THE WITNESS:  Why are you
```

```
 1   not an EDM ride.  The Jess King was not an EDM.

 2   And there was a Cody Rigsby ride that -- but,

 3   you know, I can't -- I'm just using that as an

 4   example.  They're -- they're not there anymore.

 5        Q.    When you agreed -- when you

 6   signed up for the Peloton service and bought

 7   your Peloton bike, you agreed to the terms of

 8   service; correct?

 9             MR. ZIGLER:  Objection to the

10        extent it calls for a legal conclusion.

11             THE WITNESS:  I'm sorry.  It's

12        windy.  Can you repeat that.  I'm sorry.

13   BY MR. FELDMAN:

14        Q.    When you signed up for the

15   Peloton service when you bought your Peloton

16   bike, you scrolled down and you clicked "agree

17   to the terms of service" before you could use

18   your bike; right?

19             MR. ZIGLER:  Same objection.

20             THE WITNESS:  I clicked a lot of

21        buttons so I probably clicked something.

22        But I -- I'm not 100 percent sure.

23   BY MR. FELDMAN:

24        Q.    Okay.  Any reason to doubt that
```

```
 1    you agreed to Peloton's terms of service before

 2    they let you use the product?

 3                    MR. ZIGLER:  Objection to the

 4           extent it calls for a legal conclusion,

 5           vague.

 6                    Go ahead.

 7                    THE WITNESS:  I lost my train of

 8           thought.  I'm sorry to everybody.

 9    BY MR. FELDMAN:

10           Q.    You agreed to the terms of

11    service for Peloton; correct?

12           A.    Maybe.  Maybe I did.

13                    MR. ZIGLER:  Objection to the

14           extent that it calls for a legal

15           conclusion.

16                    Go ahead.

17    BY MR. FELDMAN:

18           Q.    Okay.  I'll represent to you that

19    if you didn't, it wouldn't let you use the

20    Peloton service.

21                    Does that refresh your

22    recollection as to whether you agreed to the

23    terms of service?

24           A.    Most products, if you buy
```

 1      something, it will have you -- right, have some

 2      terms of agreement, I would -- I would think so.

 3                  I don't remember when and what I

 4      clicked, is what I'm saying to you.

 5          Q.      Okay.

 6          A.      As far as --

 7          Q.      Is there any amount -- go ahead,

 8      finish.

 9          A.      No, no.  As far as terms of

10      agreement, I don't -- I don't know.  Like, you'd

11      have to let me see it or -- I don't remember

12      exactly, like, what I -- what I may have read or

13      didn't.  It was probably a long time ago.

14          Q.      Okay.  Is there any amount of

15      classes that you believe Peloton is permitted to

16      take down, or you believe that the statements

17      that you saw and heard from people meant that

18      Peloton could never take down a single class

19      from the Peloton library?

20          A.      I -- from what I understand and

21      from what I've heard and what I believe, I did

22      not think that Peloton could or would take

23      classes down.

24          Q.      Okay.  At all, under any

```
 1    circumstance; correct?
 2            A.      I was never aware that they could
 3    or were going to.  Is that what you're asking
 4    me?
 5            Q.      No, I -- I understand what you're
 6    saying.  I'm asking you something different.  So
 7    you -- you believe that Peloton had promised to
 8    you that no classes would ever be taken down; is
 9    that correct?
10            A.      Yes, that is correct.
11            Q.      Okay.  Not even one; correct?
12            A.      Unless maybe there was some
13    reason why they would have had to take it down.
14    Like, maybe, like, one of the coaches got wild
15    and decided to, like, flash the studio.  I don't
16    know.  Maybe they'd take it down.
17                    But in reality, like, what would
18    be the other reasons for them taking it down?  I
19    know there were some explicit rides.  I don't
20    know if there's a reason why they, you know -- I
21    know from hearing some of the recent classes,
22    like, there are still some cuss words and things
23    like that.  So I don't think that's a reason
24    why, that the class was taken down.
```

```
 1                    But they never mentioned that
 2   they would be taking classes down.
 3           Q.     What about if licenses for music
 4   changed?  That could be a reason they might have
 5   to take down classes; right?
 6                    MR. ZIGLER:  Lack of foundation.
 7                    Go ahead if you can.
 8                    THE WITNESS:  I assume -- I
 9              assumed because of the other issue that
10              Peloton had with copyright to music was
11              one of the reasons why music and classes
12              came down.
13                    But, again, that is not my
14              problem as a person who is purchasing
15              product from Peloton.  That's not my
16              fault --
17   BY MR. FELDMAN:
18           Q.     What about server space?  What
19   about that Peloton has got a growing library and
20   all of a sudden fast forward five years from now
21   they've got 270,000 classes, you know, taking up
22   server space.  It's -- still your view is, they
23   can't take anything down; right?  They promised
24   you they wouldn't; is that correct?
```

```
1              MR. ZIGLER:  Can you stop
2         interrupting the witness, please?
3              Go ahead.
4              THE WITNESS:  Do we think that
5         maybe Peloton could have just let people
6         know that they were going to take down
7         these classes?
8    BY MR. FELDMAN:
9         Q.     The terms of service do, but we
10   don't have time to go through them.
11        A.     Okay.
12        Q.     But the terms of service
13   specifically say that Peloton has the right to
14   remove classes at any time at its sole
15   discretion.
16             Are you aware of that?
17        A.     No, I'm surprised we didn't go
18   over that.
19        Q.     Okay.  If -- so you -- I'll
20   represent to you that you did agree to terms of
21   service that did include the statement that
22   Peloton could remove classes at any time at its
23   sole discretion.
24             Does that change your opinion of
```

```
 1    this case now?
 2                   (Simultaneous cross-talk.)
 3                   MR. ZIGLER:  Objection --
 4                   THE WITNESS:  No, you would have
 5         to show it to me, because I don't
 6         recall.
 7    BY MR. FELDMAN:
 8         Q.     Okay.  Let's put it up.
 9         A.     I don't recall ever reading it,
10    is what I'm saying.  I --
11         Q.     Okay.  So --
12         A.     I don't recall answering.  I
13    don't remember -- I don't remember anything.  I
14    don't remember ever seeing that -- that it --
15    that Peloton wrote in their, like, whole
16    legality of -- of what you're showing me, these
17    documents, that it was going to say that they
18    could take classes down.  I don't remember
19    reading that ever.
20         Q.     Okay.  So would your -- would
21    your view in this case change if you saw that
22    you did click "agree to the terms of service"
23    and that the terms of service did say Peloton
24    could remove content at any time at its sole
```

1                    C E R T I F I C A T I O N

2

3

4                    I hereby certify that I have read

5    the foregoing transcript of my deposition

6    testimony, and that my answers to the questions

7    propounded, with the attached corrections or

8    changes, if any, are true and correct.

9

10          ------------------------------------
            MEAGAN SULLIVAN
11

12

13

14

15

16

17

18

19

20

21

22

23

24

Deposition of Meagan Sullivan                    Fishon, Pearlman & Yang v. Peloton Interactive, Inc.

```
  1                              -  -  -

  2                    E R R A T A    S H E E T

  3                              -  -  -

  4

  5    PAGE        LINE        CHANGE

  6    _____      _____      _____

  7    _____      _____      _____

  8    _____      _____      _____

  9    _____      _____      _____

 10    _____      _____      _____

 11    _____      _____      _____

 12    _____      _____      _____

 13    _____      _____      _____

 14    _____      _____      _____

 15    _____      _____      _____

 16    _____      _____      _____

 17    _____      _____      _____

 18    _____      _____      _____

 19    _____      _____      _____

 20    _____      _____      _____

 21    _____      _____      _____

 22    _____      _____      _____

 23    _____      _____      _____

 24    _____      _____      _____
```

```
1                CERTIFICATE OF SHORTHAND REPORTER

2

3                I, Gail Inghram Verbano,

4     Registered Diplomate Reporter, Certified

5     Realtime Reporter, Certified Shorthand Reporter

6     (CA) and Notary Public, the officer before whom

7     the foregoing proceedings were taken, do hereby

8     certify that the foregoing transcript is a true

9     and correct record of the proceedings; that said

10    proceedings were taken by me stenographically

11    and thereafter reduced to typewriting under my

12    supervision; and that I am neither counsel for,

13    related to, nor employed by any of the parties

14    to this case and have no interest, financial or

15    otherwise, in its outcome.

16

17

18          _____

19          Gail Inghram Verbano, CSR, RDR, CRR
            CA-CSR No. 8635
20

21

22

23

24
```