# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIC PASSMAN and ISHMAEL ALVARADO, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br> v.<br><br>PELOTON INTERACTIVE, INC.,<br><br>    Defendant. | Case No. 1:19-CV-11711-LJL<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Eric Passman and Ishmael Alvarado (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (collectively, the "Class," as more fully defined below), bring this Third Amended Class Action Complaint ("Complaint") against Defendant Peloton Interactive, Inc. ("Peloton" or "Defendant").   Plaintiffs make the following allegations upon personal knowledge as to their own acts, upon information and belief, and their attorneys' investigation as to all other matters, alleging as follows:

## I. <u>NATURE OF THE ACTION</u>

1. This action arises out of Peloton's misrepresentations and material omissions to Plaintiffs and the other Class members regarding the "ever-growing" size of its on-demand fitness class library and its subsequent removal of more than 50% of the classes in that library.

2. Peloton is an exercise equipment and media company that was founded in 2012 and is headquartered at 125 West 25th Street, 11th Floor, New York, New York 10001.  Peloton has claimed that it is "reinventing fitness with live & on-demand boutique studio classes you can take anytime with the Peloton Bike, Peloton Tread & Peloton digital."[1]

---

[1] *See* https://twitter.com/onepeloton (as accessed Dec. 6, 2019).

3.     Peloton's main products are its luxury stationary bicycle ("Peloton Bike") and luxury treadmill ("Peloton Tread") (collectively, "Peloton Hardware") that, through their built-in interactive touchscreens, allow users to watch live and pre-recorded (or "on-demand") fitness classes through a monthly subscription service associated with the Peloton Hardware, aiming to provide the experience of a live fitness class from the comfort of users' homes.

4.     Peloton's business initially started with its Peloton Bike, which offers live streaming and on-demand "spinning" classes from the comfort of consumers' homes.  "Spinning" classes are popular indoor cycling instruction classes, initially popularized in the mid-1990s, that consist of professional coaches providing real-time instruction, guidance, and encouragement to riders, over a soundtrack of popular and other songs.  Peloton has expanded this concept of interactive instructional fitness classes over soundtracks of popular music; e.g., to Peloton Tread and other weightlifting, strength training, outdoor running, yoga, meditation, stretching, and cardio-fitness classes.

5.     Peloton markets and sells its subscription-based, on-demand fitness library for a monthly price of $39 to purchasers of Peloton Hardware ("Peloton Membership").  In addition to the live and on-demand classes, the Peloton Membership provides, among other features, advanced metrics and a live interactive leaderboard that allows users to compete against each other.  The Peloton Membership's content is coextensive across all platforms and includes the same live and on-demand bike, treadmill, free weight, yoga, and other fitness classes on both the Peloton Hardware and other devices.

6.     On information and belief, all Peloton members must keep a credit card on file with Peloton in order to access the Peloton Membership.

7.      Peloton sees itself as a uniquely New York company.  Peloton's co-founder and former CEO, John Foley,[2] stated that "New York City is where Peloton started, and it will continue to be our home as we scale our business globally," while noting that New York City is where the best talent can be found at the "intersection of fitness, technology and media[.]"[3]  Peloton's executive offices, accounting and finance department, marketing departments, studios, content production, and all of its other significant operations, including its banking operations, are headquartered or otherwise based in New York.  In fact, New York is so central to Peloton's identity that, in its uniform contract with members from around the world, it requires that New York law apply to all aspects of those contractual relationships, to the exclusion of other states' laws.

8.      Any time a member purchases Peloton Hardware or a Peloton Membership, that member's payment is routed to Peloton's bank accounts in New York.

9.      These payments are recorded and managed by Peloton's Accounting and Finance department, located at Peloton's New York headquarters.

10.      Upon information and belief, Peloton does not accept cash as a form of payment.

11.      In exchange for these payments, the member gets access to the classes recorded, produced, and issued from Peloton's New York studios located at 140 West 23rd Street, New York, New York 10011 and 152 Christopher Street, New York, New York 10014.  During the Class Period, Peloton's classes were filmed in New York.

---

[2] On February 8, 2022, Mr. Foley announced that he would be stepping down as Peloton's CEO, and that he would be replaced by Barry McCarthy (former CFO at Spotify).

[3] *See* https://www.prnewswire.com/news-releases/peloton-to-expand-nyc-footprint-with-new-corporate-headquarters-at-hudson-commons-in-2020-300752307.html (last accessed Feb. 17, 2022).

12.     In order to acquire and retain members, Peloton purposefully and affirmatively engages in a variety of advertising and marketing campaigns originating from and/or approved by its Creative, Acquisition Marketing, Brand Marketing, and Retention Marketing departments, all located at Peloton's New York headquarters.

13.     In order to differentiate itself from other fitness companies that market and sell similar fitness hardware, in-studio workout classes, and instructional home workout media, Peloton's marketing departments aided in developing a campaign to promote access to an "ever-growing" digital library of fitness classes led by professional instructors, available on-demand 24 hours per day, 7 days per week, from the comfort of one's home, for a flat monthly subscription fee.  Approval for Peloton's "ever-growing library" representations occurred in New York, as well as, on information and belief, the formulation of Peloton's entire business model, including its "ever-growing" library.

14.     The purpose and effect of this marketing campaign is that Peloton members and prospective members choose Peloton over competing fitness products, at least in part, because of access to a constantly growing number of digital classes, helping to replicate the same experience of an in-person exercise studio where a class can never be the same twice.

15.     Peloton's "ever-growing" on-demand library is central to its marketing, because Peloton needs to ensure that customers spending thousands of dollars on the Peloton Hardware and Peloton Membership will not run out of new classes over time and will also be able to take and retake older classes.  The size of Peloton's on-demand digital library has always been, and

continues to be, central to Peloton's marketing[4] because "the hardware is only as good as the app and subscription that comes with it."[5]

16.     The importance of Peloton's "ever-growing" on-demand library to its business model is demonstrated by the company's pre-IPO filing, classifying Peloton as a "technology," "media," and "software" company.[6]   John Foley even described Peloton as a "media company" with "*10,000 classes on-demand*" (emphasis added).[7]   The company also invested $45 million to build the "best digital television streaming studio in the world."[8]

17.     Peloton's website touted its "thousands of boutique classes," and "ever-growing library of live and on-demand studio classes."[9]   Its website likewise represented that the Peloton Membership grants "unlimited access to a growing library of live streaming and on-demand classes, scenic rides, real-time performance tracking, and unlimited accounts for family and friends.   No classes offered by Peloton are off limits."[10]

18.     Music has been central to the Peloton class experience from the beginning.   Every on-demand and studio class includes a themed playlist curated by the instructor to match the tempo and intensity of the class.   Peloton recognizes that "[m]usic is an important element of the overall

---

[4] *See* https:///onepeloton.com/bike/classes (as accessed Dec. 6, 2019).

[5] *See* https://www.forbes.com/sites/bizcarson/2019/09/26/peloton-ceo-john-foley-faces-the-skeptics-again-this-time-buyers-in-its-8-billion-ipo/#3b8f0f6f4349 (last accessed Dec. 6, 2019).

[6] *See* https://fortune.com/2019/09/25/peloton-ipo-filing-media-company/ (last accessed Feb. 17, 2022).

[7] *See* https://www.bizjournals.com/newyork/news/2018/08/03/peloton-ceo-were-becoming-a-media-company.html (last accessed Dec. 6, 2019).

[8] *Id.*

[9] https://www.onepeloton.com/digital (as accessed Apr. 25, 2019); *see also* https://www.onepeloton.com/bike/classes.
("Thousands of On-Demand Rides. Take a class anytime, with our daily-updated, extensive on-demand library"); *id.* ("Thousands of rides on-demand. Rider anytime with thousands of classes to choose from on-demand.") (last accessed Dec. 6, 2019).

[10] *See* https://support.onepeloton.com/hc/en-us/articles/201039338-Rides-included-with-the-Peloton-subscription.

content that [it] make[s] available to [its] Members,"[11] and, in May 2017, Peloton introduced a new feature allowing members to find on-demand classes based on the type of music featured therein.[12]

19.    Peloton is a sophisticated software company that provides content protected by various intellectual property laws.  Peloton fully understands what the copyright laws require, having entered into sync licenses with certain other copyright holders, while, at the same time, using other musical works for free and without permission.[13]

20.    Peloton knew that it was, in part, building its on-demand library with copyrighted material for which it did not have the proper licenses.  Peloton thus knew or should have known that because it lacked the appropriate licenses for the music accompanying the classes in its on-demand digital library, its library cannot legitimately be "ever-growing" and was actually knowingly built, in material part, on an illegal foundation.

21.    In April 2018, Peloton received a cease-and-desist letter regarding its alleged copyright infringement of many songs appearing in classes in its on-demand class library.[14] Notwithstanding being placed on notice of its alleged copyright infringement, Peloton continued to promise an "ever-growing" class library to consumers and to heavily market that fact to its customers and prospective customers as a key Peloton selling point.

---

[11] SEC Form S-1 Registration Statement at 18, available at
https://www.sec.gov/Archives/edgar/data/1639825/000119312519230923/d738839ds1.htm.

[12] *See Find Your Favorite Genres with Our Brand-New Music Filtering Feature*, Cadence (May 26, 2017), https://cadence.pelotoncycle.com/find-favorite-genres-brand-new-music-filtering-feature/1907/ (as accessed Dec. 6, 2019).

[13] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 76, ¶ 1 (S.D.N.Y. Sept. 27, 2019).

[14] Peloton's classes consist of coaches providing real-time instruction, guidance, and encouragement to riders, over a soundtrack of popular and other songs.

22.     In March 2019, several members of the National Music Publishers Association ("NMPA") collectively filed a lawsuit against Peloton, seeking more than $150 million in damages, alleging that Peloton has been using their musical works for years in its workout videos without proper licensing, resulting in lost income for songwriters.  The lawsuit further alleged that "Peloton's infringement was and continues to be knowing and reckless" and that "Peloton fully understood what the copyright law required, having entered into sync licenses with certain other copyright holders, while trampling the rights of Plaintiffs by using their musical works for free and without permission."[15]

23.     Although Peloton denied that it was violating copyright laws and asserted counterclaims against the NMPA for antitrust violations and tortious interference with prospective business relations, on March 25, 2019, in the face of the NMPA's copyright infringement lawsuit, Peloton—for its own economic advantage and to the financial detriment of its customers— abruptly removed every class from its on-demand library that contained one or more of the allegedly copyright infringing songs.  In total, this resulted in the removal of more than half of the classes from its on-demand library.[16]

24.     The decision to remove the majority of Peloton's on-demand library was made in New York and effectuated in New York.

25.     Prior to March 25, 2019, the Peloton Membership made available more than 12,000 on-demand classes to its users.  Following Peloton's March 2019 purge of its on-demand library

---

[15] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 76, ¶ 1 (S.D.N.Y. Sept. 27, 2019).

[16] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 31, Counterclaims ¶ 59 (S.D.N.Y. Apr. 30, 2019); *see also id.*, Counterclaims ¶¶ 10, 42, 46, 52, 57.

from its New York headquarters, fewer than half that many on-demand classes remained available to users.[17]

26.     Peloton's abrupt removal of the infringing songs led to the removal of many thousands of classes—more than 50% of its on-demand digital library—greatly reduced the on-demand options upon which Peloton bases its marketing and uses as a differentiating factor to garner more customers and market share for both the Peloton Hardware and the Peloton Membership.[18]

27.     The copyright infringement lawsuit and subsequent purge of Peloton's on-demand library also significantly decreased the quality and quantity of popular music available on Peloton's workout class playlists, thus materially diminishing users' experience with both the Peloton Hardware and Peloton Membership.[19]  The infringing works included songs from popular artists such as Beyoncé, Michael Jackson, Madonna, Kanye West, Jay Z, Luke Bryan, and Justin Timberlake, to name a few.[20]  In addition to losing more than 50% of their on-demand classes, users lamented that the workouts in the new classes (those without the removed songs) don't "flow

---

[17] *See* https://imgur.com/XxdUOJn; *see also* https://docs.google.com/spreadsheets/d/1LAE9kDqxkj4CkZ7TzS7ce6g5cxkMUOMdDssxKWpS0ak/edit?usp=sharing.

[18] *See* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider (Mar. 27, 2019), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3

[19] *See* Natt Garun, *Peloton owners are pissed about bad music after copyright lawsuit*, The Verge (April 24, 2019, 1:47 p.m.), https://www.theverge.com/2019/4/24/18514036/peloton-music-copyright-fitness-studios-gym-on-demand-media-strategy (last accessed Feb. 17, 2022); *see also* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider US (March 27, 2019), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3 (last accessed Feb. 17, 2022).

[20] *See* Non-Exhaustive List of Works Infringed by Peloton, by Publisher (Ex. 1).  Tellingly, years later, Peloton has reintroduced classes with some of these same artists, having finally secured rights to use their music. For example, Peloton now markets that it has classes with music entirely from Beyoncé.  *See* https://blog.onepeloton.com/beyonce-collaboration/ (last accessed Feb. 17, 2022).

like they used to" and struggled to "find a playlist with 50 percent decent songs" after Peloton's removal of the infringing works.[21]

28.     Peloton's then-CEO, John Foley, falsely promised Peloton Membership subscribers that the removal of "classes" would "not affect your experience with (or the cost of) [Peloton's] service, or access to the kind of music you're used to hearing behind [Peloton's] instructors in the thousands of classes in [Peloton's] library."[22]  That representation, however, is demonstrably false, and Peloton never disclosed to its subscribers, including Plaintiffs and the other Class members, that it would be removing over half of the classes from its on-demand library.

29.     The NMPA later amended its complaint against Peloton alleging that it "found another 1,324 songs that have been streamed by Peloton instructors during classes without approval," which will likely result in Peloton's removal of additional classes from its on-demand library.[23]  The NMPA then sought over $300 million in damages for Peloton's knowing, widespread copyright infringement.[24]  Peloton later settled the lawsuit.[25]

30.     Despite being put on actual notice as early as April 9, 2018 that it was using infringing songs to build its digital library, Peloton's website—which Peloton knows is its primary source for marketing its Peloton Hardware and Peloton Membership—continued to market "an

---

[21] *See* Natt Garun, *Peloton owners are pissed about bad music after copyright lawsuit*, The Verge (April 24, 2019), https://www.theverge.com/2019/4/24/18514036/peloton-music-copyright-fitness-studios-gym-on-demand-media-strategy (last accessed Feb. 17, 2022).

[22] *See* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider (Mar. 27, 2019), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3 (last accessed Feb. 17, 2022).

[23] *See* https://observer.com/2019/09/peloton-music-licensing-lawsuit-ipo/ (last accessed Feb. 17, 2022).

[24] If Peloton removes additional classes from its on-demand library due to the expanded scope of the infringement allegations, the class alleged herein will increase commensurately.

[25] *See* https://www.prnewswire.com/news-releases/nmpa-and-peloton-announce-settlement-of-litigation-joint-collaboration-agreement-301012233.html  (last accessed Feb. 17, 2022).

expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors."[26]  It also notified consumers during the purchasing process that its "Bike packages" require a monthly Peloton Membership,[27] which includes "unlimited access to a growing library of live streaming and on-demand Peloton classes."[28]

31.    As part of Plaintiffs' and the other Class members' Peloton subscriptions, they expected and were entitled to use a substantial, on-demand class library that would continue to grow, as Peloton repeatedly represented.  Yet, when Peloton accepted Plaintiffs' and the other Class members' subscription payments, Peloton knew or should have known that Plaintiffs and the other Class members would not be able to use an ever-growing on-demand class library because the number of on-demand classes would be materially decreasing due to Peloton's wrongful conduct.

32.    Nonetheless, Peloton misrepresented and/or omitted that information from Plaintiffs and the other Class members, continued to represent to existing and potential subscribers that its on-demand digital library would be "ever-growing," and continued to charge full price for its Peloton Membership, despite knowing that its subscribers would necessarily not be receiving everything that Peloton represented they would receive.

33.    In a November 19, 2018 press release—months after Peloton received the cease and desist letter from the NMPA—Peloton represented that "Peloton produces nearly 24 hours of live content per day from its Peloton Bike and Peloton Tread Studios in NYC, ***and has more than 10,000 live and on-demand instructor-led indoor cycling, running, bootcamp, yoga and***

---

[26] *See* https://www.onepeloton.ca/app (as accessed Dec. 6, 2019).

[27] *See* https://www.onepeloton.com/shop/bike (as accessed Dec. 6, 2019).

[28] *See* https://www.onepeloton.com/shop/bike/subscription (as accessed Dec. 6, 2019).

***stretching classes for its Peloton Bike, Peloton Tread and Peloton Digital platforms.***  To date, Peloton has nearly one million Members, comprising Peloton Bike and Peloton Tread owners, iOS app users and in-studio riders, and expects to add millions more in the coming years." (emphasis added).[29]

34.     By misrepresenting that its on-demand digital library would be "ever-growing" and failing to disclose the imminent removal of over half of its on-demand library, Peloton—from and through its New York headquarters—entered into contractual relationships with Plaintiffs and the other Class members, engaged in financial transactions and accepted payments from Plaintiffs and the other Class members, and defrauded Plaintiffs and the other Class members, depriving them of the benefit of their bargain with Peloton, and/or unjustly enriching itself at Plaintiffs' and the other Class members' expense, as a result of Peloton's wrongful conduct alleged herein.  Plaintiffs, individually and on behalf of the other Class members they seek to represent, seek monetary damages, statutory penalties, and injunctive relief, asserting claims for Peloton's violation of New York's consumer protection and false advertising statutes, N.Y. Gen. Bus. Law §§ 349 and 350.

## II.     <u>PARTIES</u>

### A.     **Plaintiffs**

35.     Eric Passman is a citizen of New York, residing in Nassau County, New York. Plaintiff Passman, relying on Peloton's uniform representations about its "ever-growing" or "growing" on-demand library of fitness classes, entered into a transaction with New York-based Peloton, resulting in his purchase of a Peloton Bike and the Peloton Membership in February 2017, and has paid all required hardware, software, and subscription fees relating thereto.

---

[29] *See* https://www.prnewswire.com/news-releases/peloton-to-expand-nyc-footprint-with-new-corporate-headquarters-at-hudson-commons-in-2020-300752307.html (as accessed Dec. 5, 2019).

36.     Eric Passman's purchase of his Peloton membership subscription was made electronically, as were all his monthly fee payments.

37.     Ishmael Alvarado is a citizen of New York, residing in New York County, New York.  Plaintiff Alvarado, relying on of Peloton's uniform representations about its "ever-growing" or "growing" on-demand library of fitness classes, entered into a transaction with New York-based Peloton, resulting in the purchase in January 2019 of a subscription for a Peloton Bike that he and his wife purchased from a friend in New York.  Mr. Alvarado has paid all required software and subscription fees relating thereto.

38.     Ishmael Alvarado's purchase of his Peloton Membership subscription was made electronically, as were all his monthly fee payments.

39.     Plaintiff Passman and Plaintiff Alvarado (collectively "Plaintiffs") have continued to pay Peloton for subscription services since they acquired the Peloton hardware, and Plaintiffs have continued to pay those services electronically with their respective credit cards.

40.     Prior to purchasing the Peloton Hardware and commencing payment for the Peloton Membership subscription, neither Peloton nor its agents or representatives informed Plaintiffs that Peloton had been accused of violating any laws or that a substantial portion of its Peloton Membership's on-demand digital library would be (or might be) removed.

41.     Peloton's representations and material omissions regarding its on-demand library caused Plaintiffs to pay increased costs for the Peloton Hardware and corresponding Peloton Membership, which was worth less than represented because Peloton's representations and/or omissions regarding its on-demand digital library were deceptive and misleading and constituted false advertising.

42.     Peloton's representations and material omissions were part of the basis of the bargain, in that Plaintiffs attributed value to Peloton's promises regarding the nature and characteristics of its on-demand digital library and would not have purchased the Peloton Hardware and corresponding Peloton Membership, or would not have purchased it on the same terms, if they knew the truth that Peloton's on-demand digital library would shrink dramatically, by more than 50%.

**B.     Defendant**

43.     Peloton is a Delaware corporation, with its corporate headquarters and principal place of business located in New York City, New York.  Peloton is subject to the jurisdiction of this Court and may be served with process at its principal executive office located at 125 West 25th Street, 11th Floor, New York, New York.

44.     Peloton, from its New York headquarters, markets and sells its apparel, hardware accessories, hardware, and Subscription Service throughout the United States including in this District.  Peloton is registered with the New York State, Department of State to conduct business in New York.

45.     Peloton bills itself as "the largest interactive fitness platform in the world," claiming, as of June 30, 2021, to have more than 5.9 million members, and annual revenue of over $4 billion.  Peloton is publicly-traded on NASDAQ ("PTON") and as of the date of this Third Amended Complaint, had a market cap exceeding $10 billion.[30]

---

[30] Peloton's market capitalization has dropped significantly in recent months (approximately 75%) for various reasons, including increased competition.

### III.   JURISDICTION AND VENUE

46.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action, there is minimal diversity, and the amount in controversy exceeds $5 million, exclusive of interest and costs.

47.    The Court has personal jurisdiction over Peloton because it resides and is subject to general jurisdiction in this District.  The Court also has personal jurisdiction over Peloton, because it markets, distributes, and sells its apparel, hardware, accessories, and Subscription Service throughout the United States, including in this District, and the conduct complained of occurred in or was targeted at this District.  Additionally, Peloton's Terms of Service provides that all disputes not required to be arbitrated be adjudicated in New York, New York and are to be governed by New York law.[31]

48.    Venue is proper in this District, because Defendant resides in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. 28 U.S.C. § 1391(b)(1)-(2).

### IV.   PELOTON'S ARBITRATION CLAUSE

49.    Peloton has categorically denied that it used infringing songs in its on-demand classes and that it continues to violate copyright laws.[32]  Notwithstanding its contention that it had done nothing wrong, Peloton nonetheless chose to unilaterally gut its on-demand library for its own economic advantage and financial benefit to the material detriment of Plaintiffs and the other Class members.

---

[31] *See* Peloton Terms of Service at 21-22 (Ex. 2).

[32] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 87, ¶ 1 (S.D.N.Y. Oct. 11, 2019).

50.     Peloton felt empowered to cheat Plaintiffs and the other Class members by gutting its on-demand library for its own commercial protection and advantage because its Terms of Service contains a highly restrictive arbitration clause that provides that "any dispute, claim or controversy arising out of or relating to these Terms or the breach, termination, enforcement, interpretation or validity thereof or the use of the Services or Content (collectively, 'Disputes') will be resolved **solely by binding arbitration**. . . ." (emphasis added).[33]  Peloton's Terms of Service in effect during the Class Period were drafted by its outside legal counsel, Fenwick & West LLP, in New York.

51.     By stripping Plaintiffs and other Class members of their Seventh Amendment right to a jury trial and forcing them into individual arbitrations, Peloton believed it could advantage itself at consumers' expense without material legal consequences or exposure.  Pelton believed that very few, if any, of its customers would pursue arbitration because it knew that claimants are "highly unlikely to slog through a protracted arbitration process over a relatively low amount of money."[34]

52.     Peloton did not anticipate, however, that in the face of its misconduct more than 2,700 customers would file arbitration demands arising out of its self-serving purge of its on-demand library.

53.     Peloton's arbitration clause obligated it to pay "all filing, administration and arbitrator fees and expenses" associated with its customers' demands for arbitration.[35]

---

[33] *See* Ex. 2 at 18.

[34] *See* David Dayen, *Tech Companies Big Reveal: Hardly Anyone Files Arbitration Claims*, The American Prospect (Nov. 26, 2019), https://prospect.org/power/tech-companies-hardly-anyone-files-arbitration-claims/ (last accessed Feb. 17, 2022).

[35] *See* Ex. 2 at 19-20.

54.     Peloton, however, faced with far more arbitration demands than it expected when it instituted its anti-consumer arbitration clause, *refused to abide by the terms of its own arbitration clause*, ignoring the American Arbitration Association's ("AAA") requirement—and Peloton's contractually-mandated obligation—to pay filing fees for demands seeking less than $10,000.

55.     As a result, on November 14, 2019, AAA wrote a letter to Peloton, notifying it that AAA "decline[d] to proceed with administration of the parties' disputes" and that "either party may choose to submit its dispute to the appropriate court for resolution."[36]  Additionally, AAA notified Peloton that "AAA will decline to accept future consumer matters submitted  against or by [Peloton]" and requested that Peloton "remove AAA from its consumer arbitration agreements so that there is no confusion to Peloton's consumer customers."[37]

56.     When this action was first filed, Peloton had still not complied with AAA's request to remove AAA from its arbitration agreements, continuing instead to represent to its customers that they were subject to binding arbitration with AAA in order to deter customers from filing lawsuits.

57.     The arbitration clause, and all provisions contained therein, is an inextricable part of Peloton's Terms of Service with Plaintiffs and the other Class members.  Accordingly, as a result of Peloton's failure to comply with the terms of its arbitration clause and AAA's Consumer Arbitration Rules, Peloton's arbitration clause, including its class action waiver provision and all other provisions, is invalid as to all its customers—including Plaintiffs and the other Class members.[38]

---

[36] *See* November 14, 2019 AAA Letter to Peloton (Ex. 3).

[37] *Id.*

[38] *See* Ex. 3.

## V. FACTUAL ALLEGATIONS

**A. Peloton's "Ever-Growing" On-Demand Library Claim Is Essential To Its Business Model.**

58.     Peloton is an exercise equipment and media company that was founded in 2012. John Foley, its co-founder and former CEO, describes Peloton as a "fitness platform" where "fitness meets technology, meets media."[39]  Peloton has claimed that it "is reinventing fitness with live & on-demand boutique studio classes you can take anytime with the Peloton Bike, Peloton Tread & Peloton digital."[40]

59.     As of June 2021, Peloton claimed to have more than 5.9 million members.[41]  The company was valued at $4 billion after it closed a $550 million financing round in August 2018.[42] In late August 2019, Peloton filed to go public and in its Initial Public Offering ("IPO") it roughly doubled its private market valuation, being valued at about $8 billion.[43]  Peloton's value continued to grow, reaching a peak market capitalization of approximately $50 billion.[44]  More recently,

---

[39] *See*
http://media.licdn.com/embeds/media.html?src=https%3A%2F%2Fwww.youtube.com%2Fembed%2FFWXadxuOuSQ%3Ffeature%3Doembed&amp;url=https%3A%2F%2Fwww.youtube.com%2Fwatch%3Fv%3DFWXadxuOuSQ&amp;type=text%2Fhtml&amp;schema=youtube (last accessed Dec. 6, 2019).

[40] *See* https://twitter.com/onepeloton (as accessed Dec. 6, 2019).

[41] *See* https://investor.onepeloton.com/static-files/d84f3085-8c04-45d0-b6ab-0550de50c7ad (last accessed Feb. 17, 2022).

[42] *See* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider (Mar. 27, 2019, 10:30 a.m.), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3 (last accessed Feb. 17, 2022).

[43] *See* Jeremy C. Owens, *Peloton IPO: 5 things to know about the interactive exercise-machine company*, Market Watch (Sept. 28, 2019), https://www.marketwatch.com/story/peloton-ipo-five-things-to-know-about-the-interactive-exercise-machine-company-2019-08-28 (last accessed Feb. 17, 2022).

[44] *See* Svea Herbst-Bayliss, *Some big investors loaded up on Peloton as stock tumbled* (Feb. 14, 2022), https://www.reuters.com/business/retail-consumer/prominent-investors-stocked-up-peloton-stock-stumbled-late-2021-2022-02-14/ (last accessed Feb. 17, 2022).

faced with increasing competition and market changes, Peloton experienced a significant drop in its stock price, placing its current market cap at approximately $10 billion.[45]

60.     Peloton's business initially started with its Peloton Bike, which offers live streaming and on-demand "spinning" classes from the comfort of consumers' homes.  "Spinning" classes are popular indoor cycling instruction classes, initially popularized in the mid-1990s, that consist of professional coaches providing real-time instruction, guidance, and encouragement to riders, over a soundtrack of popular and other songs.  Peloton has expanded this concept of interactive instructional fitness classes, over soundtracks of popular music, to Peloton Tread and other weightlifting, strength training, outdoor running, yoga, meditation, stretching, and cardio-fitness classes.

61.     In 2014, Peloton released its eponymous stationary exercise bike at a price of $2,245.  The bike includes a 22-inch interactive touchscreen, which allows riders to watch live or pre-recorded classes, aiming to provide the experience of a spin class from the comfort of the users' homes.

62.     In January 2018, Peloton announced the release of its treadmill known as "Tread" for $4,295.  Similar to its stationary bike, Tread has a 32-inch interactive touchscreen, which allows runners to watch live or pre-recorded classes led by professional trainers.

63.     For consumers who purchase Peloton's Hardware, Peloton offers its Peloton Membership, which in addition to its live and on-demand fitness classes, includes Connected Fitness options such as instructor-curated training programs, live workout metrics, a detailed workout performance dashboard, and live and on-demand class interactive leaderboards.  Peloton Membership subscribers pay $39 per month for this service.  Peloton refers to customers that

---

[45] *See id.*

purchase the Peloton Hardware and corresponding Peloton Membership as "Connected Fitness Subscribers."

64.     On information and belief, all Peloton Hardware and Peloton Membership packages require electronic payment, with the proceeds deposited into Peloton's New York bank accounts.  As alleged herein, Peloton processed, deposited, and accounted for these payments in New York.

65.     Demonstrating the importance of its "ever-growing" library of on-demand fitness classes to its business model, the company's pre-IPO filing classifies Peloton as a "media" company and John Foley, Peloton's former CEO and co-founder, has described the company as a "media company" with "10,000 classes on-demand" and the "best digital television streaming studio in the world."[46]

66.     Peloton differentiates itself and its more expensive fitness hardware from other fitness companies by offering unlimited access to its "ever-growing" on-demand library of professional fitness classes available at the users' convenience.

67.     The purpose of this representation is to induce consumers into purchasing Peloton products, believing they will have a constantly growing catalogue of digital classes to choose from for their exercise routines.

68.     In its pre-IPO filings, Peloton claimed to have "disrupted the fitness industry by developing a first-of-its-kind subscription platform that seamlessly combines the best equipment, proprietary networked software, and world class streaming digital fitness and wellness content."[47]

---

[46] *Id.*

[47] *See* SEC Form S-1 Registration Statement, available at https://www.sec.gov/Archives/edgar/data/1639825/000119312519230923/d738839ds1.htm.

69.     Peloton has claimed that 92% of its Hardware ever sold still had an active Peloton Membership subscription attached as of June 30, 2019,[48] a percentage which, on information and belief, has remained consistent.  Thus, it is the subscription model that Peloton hopes will keep the company growing and allow its business model to scale.[49]  In order to maintain its subscriber retention rate, however, Peloton knows that it must make it "easy for Members to find a class that fits their interests based on class type, instructor, music genre, length, available equipment, area of physical focus, and level of difficulty.[50]

70.     Peloton's "continued business and revenue growth is dependent on [its] ability to continuously attract and retain Subscribers. . . ."[51]

## B.     Peloton's "Ever Growing" On-Demand Library Is Central to Its Marketing

71.     While other fitness companies market and sell similar fitness hardware for in-home use, provide in-studio classes where users pay on a per class basis, and home workout programs, Peloton has dominated the marketplace by aggressively marketing access to an "ever-growing" library of fitness classes led by professional instructors, available on-demand 24 hours per day, 7 days per week, from the comfort of the users' own homes for a flat monthly subscription fee.

72.     The "ever-growing" nature of Peloton's on-demand library is central to its marketing because Peloton must ensure that consumers spending thousands of dollars on Peloton Hardware and the Peloton Membership will be able to take and retake older classes without running out of new classes over time.

---

[48] *Id.*

[49] *See* https://www.pymnts.com/subscriptions/2019/pelotons-ipo-to-test-subscription-models-fitness/

[50] *See* SEC Form S-1 Registration Statement, available at https://www.sec.gov/Archives/edgar/data/1639825/000119312519230923/d738839ds1.htm (last accessed Feb. 17, 2022).

[51] *Id.*

73.     Peloton began representing on its website the "ever-growing" and "growing" nature of Peloton's on-demand class library at least as early as 2016.   Peloton included those representations on website pages about the Peloton Bike, the Peloton Tread, the Peloton Membership, classes, FAQs, financing, and possibly others.

74.     Peloton's marketing departments prominently touted its "thousands of boutique classes," and "ever-growing library of live and on-demand studio classes" on the Peloton website.[52]   Peloton's website likewise represented that its Subscription Service grants "unlimited access to a growing library of live streaming and on-demand classes, scenic rides, real-time performance tracking, and unlimited accounts for family and friends.   No classes offered by Peloton are off limits."[53]

75.     Peloton's marketing on its website is vital, because that is the central location where consumers obtain information about Peloton's products and services, and where most transactions occur.

76.     It is thus unsurprising that Pelton included its promises of an "ever-growing" or "growing" library on its website.   For example, as of October 26, 2017, Peloton's website, specifically the financing page, represented the following:[54]

---

[52] https://www.onepeloton.com/digital (as accessed Apr. 25, 2019); *see also* https://www.onepeloton.com/bike/classes ("Thousands of On-Demand Rides. Take a class anytime, with our daily-updated, extensive on-demand library"); *id.* ("Thousands of rides on-demand. Rider anytime with thousands of classes to choose from on-demand.") (as accessed Dec. 6, 2019).

[53] *See* https://support.onepeloton.com/hc/en-us/articles/201039338-Rides-included-with-the-Peloton-subscription.

[54] *See* https://web.archive.org/web/20171026044106/https://www.onepeloton.com/financing (last accessed February 11, 2022).

**UNLIMITED CLASSES**

Enjoy unlimited access to the world's
best instructors anytime, anywhere with
up to 14 daily live classes and an
evergrowing library of 6,000+
on-demand classes.

77.     As of November 2019, Peloton's website continued to market its digital library as "ever-growing" and "growing."  For example, the website for Peloton's app continued to market "an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors"[55]:

## The power of Peloton at your fingertips.

Explore an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors. Immerse yourself in our breathtaking studio experience anytime you want. Find a new favourite class just around the corner.

---

[55] *See* https://www.onepeloton.ca/app (as accessed Dec. 6, 2019).

78.     Further, in marketing its "Bike package" to consumers, Peloton continued to notify consumers that all packages "require a monthly Peloton Membership,"[56] which includes "unlimited access to a growing library of live streaming and on-demand Peloton classes"[57]:

### UNLIMITED ACCESS TO PELOTON CLASSES

With a Peloton Membership, you'll gain unlimited access to a growing library of live streaming and on-demand Peloton classes (cycling, running, bootcamp, floor, yoga and more), as well as performance tracking and unlimited profiles for family and friends.

Membership includes full access on a single Peloton Bike in one household, plus on-the-go access to Peloton Digital using our app. You may pause or cancel your membership at any time. See our Membership Terms for more details.

LEARN MORE

79.     Peloton's promise of an "ever-growing" and "growing" on-demand library of classes drives sales of not only monthly subscriptions, but also its flagship Peloton Bike and Peloton Tread products.

80.     The size and "ever-growing" nature of Peloton's on-demand digital library has always been, and continues to be, central to Peloton's marketing[58] because "the hardware is only as good as the app and subscription that comes with it."[59]

81.     Peloton's "ever-growing" and "growing" representations remained on Peloton's website for years, until late 2020, after this action was initially filed, when most instances appear to have been removed.

---

[56] See https://www.onepeloton.com/shop/bike (as accessed Dec. 6, 2019).

[57] See https://www.onepeloton.com/shop/bike/subscription (as accessed January 7, 2021).

[58] See https://onepeloton.com/bike/classes (last accessed Dec. 6, 2019).

[59] See https://www.forbes.com/sites/bizcarson/2019/09/26/peloton-ceo-john-foley-faces-the-skeptics-again-this-time-buyers-in-its-8-billion-ipo/#3b8f0f6f4349 (last accessed Dec. 6, 2019).

**C.    Peloton Knew That Its "Ever Growing" and "Growing" On-Demand Library Claims Were False And Misleading**

82.    Peloton is a sophisticated, multi-billion dollar company that specializes in providing consumers with digital content that is protected by various intellectual property laws. Peloton therefore knew or should have known that it was building its on-demand library with infringing songs and violating applicable copyright laws.

83.    Peloton fully understands what the copyright law requires, having entered into sync licenses with certain other copyright holders, while, at the same time, using other musical works for free and without permission.[60]   Peloton's knowing violation of copyright laws was part of "a strategy to build a music-centric brand that is now worth in excess of $6 billion" without having to pay for all the required licenses.[61]

84.    On April 9, 2018, Peloton was put on actual notice of its copyright infringement when it received a cease and desist letter from the NMPA notifying it of copyright infringement claims for Peloton's failure to receive proper licenses for some of the music playing in its on-demand fitness classes.

85.    Notwithstanding that fact, Peloton continued to promise an "ever-growing" library to consumers and to heavily market that fact to its customers and prospective customers as a key Peloton selling point.

86.    Implicit in Peloton's promise to provide an "ever-growing" on-demand library was that it would only place classes in the library that complied with applicable copyright law or that

---

[60] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 76, ¶ 1 (S.D.N.Y. September 27, 2019).

[61] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 90, at 1 (S.D.N.Y. Oct. 25, 2019).

it would pay back damages to copyright holders to ensure that the size of the on-demand library would not shrink.

87.     On March 25, 2019, in contravention of its promise to provide an "ever-growing" or "growing" library, Peloton abruptly removed more than half of its on-demand classes from its digital library.[62]  This decision to remove over half of Peloton's classes happened at Peloton's New York offices.

88.     Prior to March 25, 2019, Peloton's Membership made available more than 12,000 on-demand classes for its users.  Following Peloton's gutting of that on-demand library, fewer than half remained.[63]  All told, the abrupt removal of the infringing soundtracks led to Peloton's removal of many thousands of classes.[64]

89.     After Peloton's purge, the number of available on-demand classes was roughly equal to the number of on-demand classes that were available to consumers way back in January 2017.  Accordingly, contrary to its representations, Peloton's on-demand library, rather than being "ever-growing," was actually materially shrinking.

90.     Music is a central component of Peloton's workout classes and Peloton has deeply integrated music into the Peloton Membership interface—allowing users to search for workouts by music genre, as well as artist-specific playlists.  Users can also preview playlists for specific classes, "like" songs or playlists during their workouts, and save songs and playlists to their user

---

[62] See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc., No. 1:19-cv-02426-DLC, ECF No. 31, Counterclaims ¶ 59 (S.D.N.Y. Apr. 30, 2019); see also id., Counterclaims ¶¶ 10, 42, 46, 52, 57.

[63] See https://imgur.com/XxdUOJn (last accessed Dec. 5, 2019); see also https://docs.google.com/spreadsheets/d/1LAE9kDqxkj4CkZ7TzS7ce6g5cxkMUOMdDssxKWpS0ak/edit?usp=sharing (last accessed Dec. 5, 2019).

[64] See Mary Hanbury, Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious, Business Insider (Mar. 27, 2019), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3 (last accessed Feb. 17, 2022).

profiles.  Music is thus critical to consumers' use and enjoyment of the Peloton Hardware and Peloton Membership, and its loss was a real and actual injury to consumers.

91.    The copyright infringement lawsuit and Peloton's subsequent purge of its on-demand library significantly decreased the quality and quantity of popular artists and songs available on Peloton's workout class playlists, which in turn materially diminished subscribers' experience with the Peloton Hardware and Peloton Membership.[65]  The infringing works include some of the most popular artists and songs, both currently and of all time.  Peloton has removed songs by a wide array of popular artists including, without limitation, Beyoncé, Brittany Spears, Michael Jackson, Ariana Grande, Snoop Dogg, Dr. Dre, Katy Perry, Rihanna, Miley Cyrus, Motley Crue, Pink Floyd, Justin Bieber, David Bowie, Rascal Flatts, Bruno Mars, Selena Gomez, Maroon 5, Adele, Lady Gaga, Nicki Minaj, Whitney Houston, Justin Timberlake, Luke Bryan, Mariah Carey, Jay Z, Kanye West, Drake, and Madonna.[66]

92.    John Foley, Peloton's former CEO, based in New York, emailed subscribers and notified them that Peloton was removing classes featuring the allegedly infringing songs, but failed to disclose that this would result in removal of more than half of the on-demand classes in its digital library or that it would significantly decrease the quality and quantity of popular songs and artists available for its playlists.

93.    Instead, Mr. Foley falsely promised Plaintiffs and the other Class members that "[Peloton] can assure you that this will not affect your experience with (or the cost of) [Peloton's]

---

[65] *See* Natt Garun, *Peloton owners are pissed about bad music after copyright lawsuit*, The Verge (April 24, 2019), https://www.theverge.com/2019/4/24/18514036/peloton-music-copyright-fitness-studios-gym-on-demand-media-strategy (last accessed Feb. 17, 2022); *see also* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider US (March 27, 2019), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3 (last accessed Feb. 17, 2022).

[66] *See* Ex. 1.

service, or access to the kind of music you're used to hearing behind [Peloton's] instructors in the thousands of classes in [Peloton's] library."

94.     That representation, however, is demonstrably false and Peloton never disclosed to its subscribers, including Plaintiffs and the other Class members, that it would be removing more than half of the classes from its on-demand library.

95.     As of November 2019, Peloton's website continued to market its digital library as being "ever-growing" and "growing," despite knowing that the NMPA has recently amended its lawsuit alleging that it "found another 1,324 songs that have been streamed by Peloton instructors during classes without approval."[67]

96.     Therefore, despite Peloton's representations to the contrary, it knew or should have known that the size of its on-demand digital library could not legitimately be "ever-growing," but it continued to knowingly defraud its existing and potential customers—including Plaintiffs and the other Class members—for its own financial gain.

**D.     Peloton's Misrepresentations and Omissions Are Material to Consumers**

97.     Peloton's misrepresentations and omissions are material to Plaintiffs and the other Class members.  As part of Plaintiffs' and the other Class members' subscriptions, they expected and were entitled to use a class library that, as advertised by Peloton, would continue to grow as new classes were added every day.

98.     Had a reasonable consumer known that Peloton would (or might) remove a substantial number of classes from its on-demand class library, he/she would have been concerned about purchasing Peloton's products or services.

---

[67] *See* https://observer.com/2019/09/peloton-music-licensing-lawsuit-ipo/ (last accessed Dec. 5, 2019).

99.     Each additional on-demand fitness class adds incremental value to Plaintiffs' and the other Class members' subscriptions and, therefore, Peloton's gutting of its digital library materially lowered the value of Plaintiffs' and the other Class members' subscriptions.

100.     Peloton's emphasis on the importance of its content continues to this day, when, in the midst of laying off more than 2,800 employees, Peloton—in a move clearly intended to calm its subscriber base watching Peloton's downward spiral—announced that its roster of instructors and breadth and depth of its content would not be impacted.[68]

101.     Peloton further confirmed the importance and value of its content by offering each of its 2,800 terminated employees a free year of Peloton Membership.[69]

102.     When Peloton accepted Plaintiffs' and the other Class members' subscription payments in its New York bank accounts and then accepted and recorded those payments in its New York Accounting and Finance department, Peloton knew or should have known that Plaintiffs and the other Class members would not be able to use the full on-demand class library because the size of its on-demand library was materially decreasing.

103.     Nonetheless, Peloton withheld that information from Plaintiffs and the other Class members, and its New York-based Creative and Marketing departments continued to represent to existing and potential subscribers that the on-demand digital library would be "ever-growing," and continued to charge the same full price for its Peloton Membership, despite knowledge that subscribers would not be receiving everything Peloton represented that they would receive.

---

[68] *See* https://investor.onepeloton.com/news-releases/news-release-details/peloton-announces-comprehensive-program-reduce-costs-and-drive (last accessed February 10, 2022).

[69] *See* Kim Lyons, *Peloton fired 2,800 employees and gave them free Peloton memberships*, The Verge (Feb. 8, 2022) https://www.theverge.com/2022/2/8/22923480/peloton-severance-package-membership-layoffs (last accessed February 17, 2022).

104.    These actions were outside of normal business practices and Peloton knew or should have known that its representations would harm an average consumer.  Peloton knew it could not live up to the promise it made active and prospective members.

105.    By misrepresenting that its on-demand digital library would be "ever-growing" and failing to disclose the imminent removal of over half of that library, Peloton defrauded Plaintiffs and the other Class members, deprived Plaintiffs and the other Class members of the benefit of their bargain with Peloton, and/or unjustly enriched itself at Plaintiffs' and the other Class members' expense.

## VI.    CLASS ACTION ALLEGATIONS

106.    Plaintiffs Passman and Alvarado bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure individually and on behalf of a class defined as:

> All purchasers of the Peloton hardware and/or corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019.

(the "Class," unless otherwise noted).[70]

107.    Plaintiffs Passman and Alvarado also bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure individually and on behalf of a subclass defined as:

> All purchasers of the Peloton Hardware and/or the corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019 in the State of New York.

(the "New York Subclass").

---

[70] Plaintiffs recognize that this Court has already dismissed claims brought under New York General Business Law §§ 349 and 350 by non-New York plaintiffs. Plaintiffs are not presently looking to relitigate that issue, but include the assertion of a nationwide class in this Third Amended Complaint to preserve the issue for appeal.

108.    Excluded from the Classes are Peloton and any of its affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; Court staff assigned to this case.  Plaintiffs reserve the right to modify or amend the Class definitions, as appropriate, during the course of this litigation.

109.    This action has been brought and may properly be maintained on behalf of the Classes proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

110.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**  The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  The precise number of Class members is unknown to Plaintiffs, but may be ascertained from Peloton's books and records and is presumed to be not less than tens of thousands, if not hundreds of thousands, of people.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

111.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).**  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

      a.   whether Peloton engaged in the conduct alleged herein;

      b.   whether Peloton's alleged conduct violates applicable law;

      c.   whether Peloton engaged in false or misleading advertising;

      d.   whether Peloton's misrepresentations and omissions regarding the "ever-growing" nature of the Peloton Membership's class library were likely to deceive Class members in violation of N.Y. Gen. Bus. Law §§ 349 and 350;

e.   whether Peloton's misrepresentations and omissions regarding the "ever-growing" nature of the Peloton Membership's class library were material to a reasonable consumer;

f.   whether Class members overpaid for their Peloton Hardware and/or Peloton Membership as a result of the conduct alleged herein;

g.   whether Peloton's conduct violates public policy;

h.   whether Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

i.   the amount and nature of relief to be awarded to Plaintiffs and the other Class members.

112.   **Typicality – Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the other Class members' claims because Plaintiffs and the other Class members purchased Peloton's Hardware and/or subscribed to the Peloton Membership that falsely promised an "ever-growing" class library.  Each class in the on-demand library adds incremental value to Plaintiffs' and the other Class members' Peloton Hardware and/or Peloton Membership.  The value of Plaintiffs' and the other Class members' Peloton Hardware and/or Peloton Membership has therefore diminished and, as a result of Peloton's conduct, Plaintiffs and the other Class members overpaid for their Peloton Hardware and/or Peloton Membership.  Plaintiffs and the other Class members suffered damages as a direct and proximate result of the same wrongful conduct in which Peloton engaged.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other Class members' claims.

113.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**
Plaintiffs are adequate Class representatives because their interests do not conflict with the
interests of the other Class members who they seek to represent, Plaintiffs have retained counsel
competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute
this action vigorously.   Class members' interests will be fairly and adequately protected by
Plaintiffs and their counsel.

114.    **Declaratory and Injunctive Relief** – **Federal Rule of Civil Procedure 23(b)(2).**
Peloton has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class
members, thereby making appropriate final injunctive relief and declaratory relief, as described
below, with respect to the Class members as a whole.

115.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).**   A class action is
superior to any other available means for the fair and efficient adjudication of this controversy,
and no unusual difficulties are likely to be encountered in the management of this class action.
The damages or other financial detriment suffered by Plaintiffs and the other Class members are
relatively small compared to the burden and expense that would be required to individually litigate
their claims against Peloton, so it would be impracticable for the Class members to individually
seek redress for Peloton's wrongful conduct.   Even if the Class members could afford litigation
the court system could not.   Individualized litigation creates a potential for inconsistent or
contradictory judgments, and increases the delay and expense to all parties and the court system.
By contrast, the class action device presents far fewer management difficulties, and provides the
benefits of single adjudication, economy of scale, and comprehensive supervision by a single
court.

## VII.   CLAIMS ALLEGED

### FIRST CLAIM FOR RELIEF

**Violation of New York General Business Law,
N.Y. Gen. Bus. Law § 349
(brought on behalf of Plaintiffs Passman and Alvarado,
the Class, and the New York Subclass)**

116.    Plaintiffs Passman and Alvarado repeat and reallege the allegations in Paragraphs 1-115 above, as if fully alleged herein.

117.    Plaintiffs Passman and Alvarado bring this claim individually and on behalf of the other Class members, including the New York Subclass members.

118.    Plaintiffs Passman and Alvarado have standing to bring this claim individually and on behalf of the other Class members, because the representations at issue emanated from New York, and, in exchange for payments routed to Peloton's New York bank accounts, Plaintiffs Passman and Alvarado were given access to a digital library of classes recorded and produced by Peloton in New York; Plaintiffs Passman and Alvarado's access to over half these classes was likewise revoked in New York.  Further, Plaintiffs Passman and Alvarado have standing to bring this claim individually, on behalf of other Class members, and, specifically, on behalf of the New York Subclass members, because the underlying transactions at issue between Plaintiffs and Peloton happened entirely, or predominantly, in New York.

119.    New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

120.    Peloton engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, by misrepresenting that its Peloton Membership included access to an "ever-growing library of live and on-demand studio classes" and willfully failing to disclose that it would be removing over half

of its on-demand digital library, while persistently publishing marketing assertions (and omissions) to the contrary.

121.    Peloton knew or should have known that it lacked the appropriate copyright licenses for the music accompanying the classes in its library, and that its library could not legitimately be "ever-growing."

122.    Peloton received a cease-and-desist letter regarding its copyright infringement on April 9, 2018, but continued to promise the "ever-growing" library to consumers.  On March 25, 2019, shortly after getting sued for copyright infringement, Peloton abruptly removed more than half of its content from its on-demand digital library.

123.    Despite knowing that the size of its on-demand digital library had decreased by more than 50%, Peloton continued to promise on its website "an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors"[71] and "unlimited access to a growing library of live streaming and on-demand Peloton classes."[72]

124.    Peloton's representations and omissions were material because they were likely to deceive reasonable consumers about the "ever-growing" nature of its on-demand digital library.

125.    Peloton acted intentionally, knowingly, and maliciously to violate New York's General Business Law, and recklessly disregarded Plaintiffs Passman and Alvarado's rights, and the other Class members' (including the New York Subclass members') rights.  Peloton had actual knowledge on April 9, 2018 that it could not provide an "ever-growing" library to consumers but it nonetheless continued to promise and represent an "ever-growing" library.

---

[71] *See* https://www.onepeloton.ca/app (as accessed Nov. 26, 2019).

[72] *See* https://www.onepeloton.com/shop/bike/subscription (as accessed Nov. 26, 2019).

126.    As a direct and proximate result of Peloton's deceptive and unlawful acts and practices, Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members suffered a real and substantial injury they could not have reasonably avoided.

127.    Peloton deprived Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members, of the benefit of the bargain.  Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members, have suffered and will continue to suffer injury, ascertainable losses of money, and monetary and non-monetary damages because Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members, overpaid for Peloton's Hardware, because they did not know the truth that Peloton would gut its on-demand digital library, shrinking it by more than 50%, and that it would not be "ever-growing."

128.    Peloton's deceptive and unlawful acts and practices complained of herein affected all purchasers of Peloton's Hardware because the Peloton Hardware is only as good as the app and subscription that comes with it.

129.    Peloton's deceptive and unlawful acts and practices complained of herein affected all Peloton Membership subscribers.  The above deceptive and unlawful practices and acts by Peloton caused substantial injury to Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members, that they could not reasonably avoid.

130.    Plaintiffs Passman and Alvarado, individually and on behalf of the other Class members, including the New York Subclass members, seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 per violation (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

131.    Peloton's above-described deceptive and unlawful practices caused substantial injury to Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members, that they could not reasonably avoid. Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members, seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 per violation for each of Peloton's violations of N.Y. Gen. Bus. Law § 349 (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

132.    Each sale of the Peloton Hardware to Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members, constitutes a separate, independent, and willful violation of N.Y. Gen. Bus. Law § 349 through the above deceptive acts and practices in the conduct of its business.

133.    Each time Peloton accepted a Peloton Membership payment from Plaintiffs Passman and Alvarado, and/or one or more of the other Class members, including the other New York Subclass members, Peloton committed a separate, independent, and willful violation of N.Y. Gen. Bus. Law § 349 through the above deceptive acts and practices in the conduct of its business.

134.    Peloton should , therefore, be assessed a separate statutory penalty of $50 or actual damages (whichever is greater) for each independent violation, and all other such relief as may be just and proper that should be recovered by Plaintiffs Passman and Alvarado individually and on behalf of the other Class members, including the New York Subclass members.

## SECOND CLAIM FOR RELIEF

**Violation of New York General Business Law,
N.Y. Gen. Bus. Law § 350
(brought on behalf of Plaintiffs Passman and Alvarado,
the Class, and the New York Subclass)**

135.    Plaintiffs Passman and Alvarado repeat and reallege the allegations in Paragraphs 1-115, above, as if fully alleged herein.

136.    Plaintiffs Passman and Alvarado bring this claim individually and on behalf of the other Class members, including the New York Subclass members.

137.    Plaintiffs Passman and Alvarado have standing to bring this claim individually and on behalf of the other Class members because the representations at issue emanated from New York, and, in exchange for payments routed to Peloton's New York bank accounts, Plaintiffs Passman and Alvarado were given access to a digital library of classes recorded and produced by Peloton in New York; Plaintiffs Passman and Alvarado's access to over half of these classes was likewise revoked in New York.  Further, Plaintiffs Passman and Alvarado have standing to bring this claim individually, on behalf of other Class members, and specifically on behalf of the New York Subclass members, because the underlying transactions at issue between Plaintiffs and Peloton happened entirely, or predominantly, in New York.

138.    New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade, or commerce[.]"  False advertising includes "advertising including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light . . . representations [made] with respect to the commodity. . . ."  N.Y. Gen. Bus. Law § 350-a.

139.    Peloton caused to be made or disseminated, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which

by the exercise of reasonable care should have been known, to Peloton to be untrue and misleading to consumers, including to Plaintiffs Passman and Alvarado and other Class members, including New York Subclass members.

140.    Peloton misrepresented through advertisements on its website that its Peloton Membership included access to an "ever-growing library of live and on-demand studio classes" and, at the same time, willfully failed to disclose that it would be removing over half of its Peloton Membership's on-demand digital library.

141.    Peloton knew or should have known that it lacked the appropriate copyright licenses for the music accompanying the classes in its library, and that its library could not legitimately be "ever-growing."

142.    Peloton received a cease-and-desist letter regarding its copyright infringement on April 9, 2018 but continued to promise the "ever-growing" library to consumers.  On March 25, 2019, shortly after getting sued for copyright infringement, Peloton abruptly removed more than half of its on-demand content from its Peloton Membership's on-demand digital library.

143.    Despite knowing that the size of its on-demand digital library had decreased by more than 50%, Peloton continues to advertise on its website "an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors"[73] and "unlimited access to a growing library of live streaming and on-demand Peloton classes."[74]

144.    Peloton has violated N.Y. Gen. Bus. Law § 350 because the misrepresentations and omissions regarding the "ever-growing" nature of its on-demand library, were material and likely to deceive a reasonable consumer.

---

[73] *See* https://www.onepeloton.ca/app (as accessed Nov. 26, 2019).

[74] *See* https://www.onepeloton.com/shop/bike/subscription (as accessed Nov. 26, 2019).

145.     As a direct and proximate result of Peloton's false and misleading advertising, Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members suffered a real and substantial injury they could not have reasonably avoided.

146.     Peloton deprived Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members, of the benefit of the bargain.  Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members, have suffered and will continue to suffer injury, ascertainable losses of money, and monetary and non-monetary damages.

147.     Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members, overpaid for Peloton's Hardware because they did not know the truth that Peloton would gut its on-demand digital library, shrinking it by more than 50%, and that it would not be "ever-growing."

148.     Peloton's false and misleading advertising complained of herein affected all purchasers of Peloton's Hardware because the Peloton Hardware is only as good as the app and subscription that comes with it.

149.     Peloton's false and misleading advertising complained of herein affected all purchasers of Peloton's Membership.

150.     Peloton's above-described false and misleading advertising caused substantial injury to Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members that they could not reasonably avoid.

151.     Plaintiffs Passman and Alvarado, individually and on behalf of the other Class members, including the New York Subclass members seek all monetary and non-monetary relief

allowed by law, including actual damages or statutory damages of $500 per violation (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

152.    Peloton committed a separate and independent violation of N.Y. Gen. Bus. Law § 350 for each Peloton Hardware it sold while it made false advertisements pertaining or relating to the "ever-growing" and/or growing nature of its on-demand library.

153.    Each time Peloton accepted a Peloton Membership payment from Plaintiffs Passman and Alvarado, and/or one or more of the other Class members, including the other New York Subclass members, Peloton committed a separate and independent violation of N.Y. Gen. Bus. Law § 350 while it made false advertisements pertaining or relating to the "ever-growing" and/or "growing" nature of its on-demand library.

154.    Peloton should therefore be assessed statutory damages of $500 for each such violation, and all other such relief as may be just and proper.

## VIII.    ALLEGATIONS AND CLAIMS PRESERVED FOR APPEAL

155.    Plaintiffs and counsel for the putative Class do not intend to forfeit any right to appeal the dismissal of former plaintiff Alicia Pearlman's claims under Michigan or New York law, but are not repleading them here in an effort to avoid unnecessary duplicative litigation.

## IX.    REQUEST FOR RELIEF

Plaintiffs, individually and on behalf of the other Class members, including the New York Subclass members, respectfully request that the Court enter judgment in their favor and against Peloton as follows:

1.    Certifying the Classes as requested herein, designating Plaintiffs as class representatives, and appointing the undersigned counsel as Class Counsel;

2.      Declaring that Peloton is financially responsible for notifying the Class members of the pendency of this suit;

3.      Awarding statutory and/or actual damages to the maximum extent allowed, in an amount to be proven at trial;

4.      Requiring restitution and disgorgement of all profits and unjust enrichment Peloton obtained from Plaintiffs and the other Class members as a result of Peloton's unlawful, unfair, and/or fraudulent business practices;

5.      Awarding injunctive relief as permitted by law or equity, including enjoining Peloton from continuing the unlawful practices as set forth herein, and ordering Peloton to engage in a corrective advertising campaign;

6.      Awarding Plaintiffs' reasonable attorneys' fees, costs, and expenses;

7.      Awarding pre- and post-judgment interest on any amounts awarded; and

8.      Awarding such other and further relief as may be just and proper.

## X.    JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all causes of action so triable.

Dated:  February 18, 2022

*/s/ Greg G. Gutzler*
GREG G. GUTZLER
ggutzler@dicellolevitt.com
**DiCELLO LEVITT GUTZLER LLC**
444 Madison Avenue, Fourth Floor
New York, New York  10022
Telephone: (646) 933-1000

ADAM J. LEVITT
alevitt@dicellolevitt.com
ADAM PROM
aprom@dicellolevitt.com
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois  60602
Telephone: (312) 214-7900

ASHLEY C. KELLER (*pro hac vice*)
ack@kellerlenkner.com
BENJAMIN J. WHITING
ben.whiting@kellerlenkner.com
ALEX J. DRAVILLAS (*pro hac vice* to be sought)
ajd@kellerlenkner.com
**KELLER LENKNER LLC**
150 North Riverside Plaza, Suite 4270
Chicago, Illinois  60606
Telephone: (312) 741-5222

AARON M. ZIGLER
aaron@ziglerlawgroup.com
**ZIGLER LAW GROUP, LLC**
308 South Jefferson Street, Suite 333
Chicago, Illinois  60661
Telephone: (312) 673-8427

***Counsel for Plaintiffs and the Proposed Classes***