UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                         :

ERIC FISHON, et al.,                  :

                :

         Plaintiffs,     :

                :             19-cv-11711 (LJL)

    -v-               :

                :        <u>OPINION AND ORDER</u>

PELOTON INTERACTIVE, INC.,   :

                :

         Defendant.    :

                :

------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendant Peloton Interactive, Inc. ("Peloton" or "Defendant") moves, pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), to dismiss the Third Amended Complaint (the "Complaint"). For the following reasons, Peloton's motion to dismiss is denied.

## BACKGROUND

Familiarity with the Court's prior opinions resolving previous motions to dismiss in this case is assumed, and the relevant facts are reviewed here only in brief. For the purposes of this motion to dismiss, the Court accepts as true the well-pleaded allegations of the Complaint.

Peloton is an exercise equipment and media company that sells stationary bicycles ("Peloton Bike") and treadmills ("Peloton Tread"). Dkt. No. 195 ¶¶ 2–3. Peloton also offers a monthly subscription service that allows users of the Peloton Bike and Peloton Tread (together, "Peloton Hardware") to watch live or pre-recorded "on-demand" fitness classes. *Id.* ¶ 3. Purchasers of Peloton Hardware may buy this subscription—which contains library access, advanced metrics, and a feature that allows users to compete against each other—for $39 per month. *Id.* ¶ 5.

Peloton incorporates music into its classes, in that "[e]very on-demand and studio class

includes a themed playlist curated by the instructor to match the tempo and intensity of the class." *Id.* ¶ 18.  Peloton obtained licenses from certain copyright holders, but some of the music played in the classes was used without permission, *id.* ¶ 19; Peloton was thus "building its on-demand library with copyrighted material for which it did not have the proper licenses," *id.* ¶ 20. In April 2018, Peloton received a cease-and-desist letter regarding alleged copyright infringement of songs appearing in certain of the on-demand classes in its library.  *Id.* ¶ 21.  In March 2019, members of the National Music Publishers Association filed a lawsuit against Peloton alleging that, for years, Peloton had been using their music in its fitness-class videos without proper licensing and that this copyright infringement was knowing and reckless.  *Id.* ¶ 22.  Peloton denied that it was violating copyright laws and asserted counterclaims in that action for antitrust violations and tortious interference with prospective business relations.  *Id.* ¶ 23.  Notwithstanding this denial, on March 25, 2019, Peloton "abruptly removed every class from its on-demand library that contained one or more of the allegedly copyright infringing songs . . . result[ing] in the removal of more than half of the classes from its on-demand library." *Id.*  This "purge of Peloton's on-demand library . . . significantly decreased the quality and quantity of popular music available on Peloton's workout class playlists, . . . materially diminishing users' experience with both the Peloton Hardware and Peloton Membership."  *Id.* ¶ 27.

Peloton has described its library of fitness classes as "ever-growing" or "growing," *see id.* ¶¶ 16–17, and Plaintiffs assert that "Peloton's 'ever-growing' on-demand library is central to its marketing," *id.* ¶ 15.  Even after receiving notice via the cease-and-desist letter that Peloton was building its library of classes with infringing songs, Peloton continued to market "an expansive, ever-growing library of live and on-demand studio classes," *id.* ¶ 30 (internal

quotation marks omitted), and to refer to its subscriptions as including "unlimited access to a growing library of live streaming and on-demand Peloton classes," *id.* (internal quotation marks omitted).  Peloton also continued to accept subscription payments and charge full price for its subscription services notwithstanding that it knew or should have known that subscribers "would not be able to use the full on-demand class library because the number of on-demand classes was materially decreasing due to Peloton's wrongful conduct," *id.* ¶ 31 and knew that they "would necessarily not be receiving everything that Peloton represented they would receive," *id.* ¶ 32.

Plaintiffs Eric Passman ("Passman") and Ishmael Alvarado ("Alvarado" and together with Passman, "Plaintiffs") bring a class action complaint against Peloton, alleging that its statements that its library of classes was "ever-growing" were misrepresentations and that, through these misrepresentations and the failure to disclose the "imminent removal of over half of its on-demand library," Peloton defrauded them and other members of a proposed class, deprived them of the benefit of their bargain, and unjustly enriched itself at their expense.  *Id.* ¶ 34.  They allege that, as a result of Peloton's representations and material omissions, they overpaid for Peloton's goods and services, *id.* ¶ 41, and that:

> Peloton's representations and material omissions were part of the basis of the bargain, in that Plaintiffs attributed value to Peloton's promises regarding the nature and characteristics of its on-demand digital library and would not have purchased the hardware and corresponding [subscription], or would not have purchased it on the same terms, if they knew the truth that Peloton's on-demand digital library would shrink by more than 50%.

*Id.* ¶ 42.

Plaintiffs bring claims under New York consumer-protection statutes individually and on behalf of a class defined in the Complaint as "[a]ll purchasers of the Peloton Hardware and/or the corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019 in

the State of New York." *Id.* ¶ 107.[1]

## PROCEDURAL HISTORY

This is the third amended complaint in this action.  The first complaint was filed in

December 2019 by Eric Fishon ("Fishon"), Alicia Pearlman ("Pearlman"), and Patrick Yang,

individually and on behalf of all others similarly situated, bringing claims for violations of New

York General Business Law ("NYGBL") §§ 349 and 350, which relate to deceptive acts or

practices and false advertising.  Dkt. No. 1.  On August 4, 2020, and pursuant to an unopposed

request, the Court ordered the voluntary dismissal of Patrick Yang.  Dkt. No. 61.  On November

9, 2020, the Court granted a motion to dismiss the claims of Pearlman—a Michigan resident—

because she lacked statutory standing under the New York statute, but it denied a motion to

dismiss Fishon's claims.  *See Fishon v. Peloton Interactive, Inc.* (*"Fishon I"*), 2020 WL

6564755 (S.D.N.Y. Nov. 9, 2020).  In denying the motion to dismiss Fishon's claims, the Court

explained that a plaintiff bringing a claim under Sections 349 and 350 need not specifically

allege that the plaintiff saw the misleading statements because "[r]eliance is not an element of a

private cause of action under either statute."  *Id.* at *9.  Because reliance is not an element of the

claim, alleging that a plaintiff was injured by "rel[ying] on the misleading statement to her

detriment is not a '[t]hreadbare recital[] of the elements of a cause of action'" but rather "an

allegation of fact as to how she came to be injured."  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009)); *see also id.* at *10.

On January 21, 2021, Plaintiffs filed a first amended complaint.  Dkt. No. 81.  Peloton

---

[1] In the Complaint, Plaintiffs also state that they are bringing claims on behalf of "[a]ll purchasers of the Peloton hardware and/or corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019," *id.* ¶ 106, but clarify that they are not pursuing claims on behalf of this nationwide class but "includ[ing] the assertion of a nationwide class in this Third Amended Complaint to preserve the issue for appeal," *id.* n.70.

again moved to dismiss Pearlman's claims, again contending that Pearlman did not plead facts sufficient to show that she had statutory standing to sue under Sections 349 and 250 of the NYGBL. The Court, once again, dismissed Pearlman's claims under the NYGBL, explaining that her amendment failed to cure the deficiencies identified in the original complaint. *Fishon v. Peloton Interactive, Inc.* (*"Fishon II"*), 2021 WL 2941820, at *5 (S.D.N.Y. July 12, 2021). The Court did, however, grant leave for Pearlman to amend her complaint to plead her cause of action under Michigan law. *Id.*

On July 26, 2021, Plaintiffs filed a second amended complaint, with Fishon bringing claims under NYGBL §§ 349 and 350 and Pearlman bringing a claim under the Michigan Consumer Protection Act ("MCPA"), Mich. Comp. Laws Ann. § 445.901, *et seq.* On August 9, 2021, Defendant moved to dismiss Pearlman's claim in that complaint. Dkt. No. 107. On September 16, 2021, Fishon and Pearlman moved to certify the putative classes; Fishon moved for certification of a class of "[a]ll purchasers of the Peloton hardware and/or the corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019 in the State of New York," while Pearlman sought certification of a class of "[a]ll purchasers of the peloton hardware and/or the corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019 in the State of Michigan." Dkt. No. 118 at 9. The Court granted Defendant's motion to dismiss Pearlman's claim under the MCPA, concluding that Pearlman did not allege with the requisite specificity facts giving rise to her reliance on Peloton's statements that its on-demand library of fitness classes were "ever-growing," as was required under the Federal Rule of Civil Procedure Rule 9(b) standard applicable to her MCPA claim for which reliance was an essential element. *Fishon v. Peloton Interactive, Inc.*, 2022 WL 179771, at *8 (S.D.N.Y. Jan. 19, 2022). The Court also denied the motion for class certification by Fishon on the grounds that

Fishon was not an adequate class representative. *Id.* at *11–12.

Plaintiffs Passman and Alvarado, previously absent class members, filed the Complaint—the fourth in this action—on February 18, 2022.  Dkt. No. 195.  As before, Defendant has moved to dismiss the Complaint, and Plaintiffs oppose dismissal.

## LEGAL STANDARD

Defendant moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).

"A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate it,' . . . such as when . . . the plaintiff lacks constitutional standing to bring the action." *Cortlandt Street Recovery Corp. v. Hellas Telecomm., S.À.R.L.*, 790 F.3d 411, 417 (2d Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  "A motion to dismiss for lack of subject matter jurisdiction may 'raise a facial challenge based on the pleadings, or a factual challenge based on extrinsic evidence.'" *U.S. Airlines Pilots Ass'n ex rel. Cleary v. US Airways, Inc.*, 859 F. Supp. 2d 283 (E.D.N.Y. Mar. 16, 2012) (quoting *Guadango v. Wallack Ader Levithan Assoc.*, 932 F. Supp. 94, 95 (S.D.N.Y. 1996)).  In either event, the plaintiff bears the burden of establishing standing and "must allege facts that affirmatively and plausibly suggest that it has standing to sue." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011).  Where the jurisdictional challenge is facial, a court "draw[s] all facts—which [it] assume[s] to be true unless contradicted by more specific allegations or documentary evidence—from the complaint and from the exhibits attached thereto" and "construe all reasonable inferences to be drawn from those factual allegations in [the plaintiff's] favor." *Id.*

"Where the jurisdictional challenge is fact-based, the defendant may 'proffer[] evidence beyond the [p]leading,' and the plaintiff 'will need to come forward with evidence of [its] own to

controvert that presented by the defendant if the affidavits submitted on a 12(b) motion . . . reveal the existence of factual problems in the assertion of jurisdiction.'" *Monegro v. Street Insider Dot Com Inc.*, 2022 WL 445797, at *2 (S.D.N.Y. Feb. 11, 2022) (internal quotation marks and citation omitted) (quoting *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016)).  Where jurisdictional facts are in dispute, "the party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.'" *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (quoting *Makarova*, 201 F.3d at 113).  "If the extrinsic evidence presented by the defendant is material and controverted, the district court will need to make findings of fact in aid of its decision as to standing." *Carter*, 822 F.3d at 57; *see also APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) ("[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." (quoting *LeBlanc v. Cleveland*, 198 F.3d 353, 356 (2d Cir. 1999))).  "However, the plaintiffs are entitled to rely on the allegations in the [complaint] if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *Carter*, 822 F.3d at 57.

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 557 (2006)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Generally, a complaint need not allege "detailed factual allegations," but "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than

labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 50 U.S. at 555.

## DISCUSSION

Defendant argues that dismissal is warranted pursuant to Federal Rule of Civil Procedure 12(b)(1) because neither Passman nor Alvarado have standing since "they have not pled and cannot credibly plead that they suffered an injury fairly traceable to any of the allegedly misleading misstatements or omissions at issue in this case," *id.* at 1, and "there are no well-pled allegations that either Plaintiff suffered an injury caused by the allegedly deceptive advertisements," *id.* at 2.  Defendant contends that dismissal also is appropriate under Rule 12(b)(6) because the Complaint does not plead causation or allege that Peloton omitted material information by failing to disclose to its customers, before March 25, 2019, that it would remove classes, *id.*; and because Plaintiffs' claims are barred by the voluntary-payment doctrine, *id.* at 3.[2]  Plaintiffs disagree with Defendant's view of the merits and, as to standing, argue that they have adequately pleaded the injury necessary for standing in that they alleged that they paid price premiums for Peloton's products when they purchased those products before the "purge" of the music classes—injuries that the Court has already found to be sufficient to sustain the NYGBL claims—and that these injuries are fairly traceable to Peloton's misleading advertisements.  Dkt. No. 201 at 6–16.

---

[2] Defendant also argues that Plaintiffs have repleaded claims with respect to Pearlman that have already been dismissed and that the Court should dismiss those claims to the extent they are alleged in the Complaint.  In their opposition, Plaintiffs clarify that they are not asserting any claims that were previously dismissed.  Dkt. No. 201 at 23 n.14.  In light of this concession, the Court need not consider whether to dismiss such claims involving Pearlman; those claims are dismissed.

## I.     Article III Standing

"Article III of the Constitution limits federal courts to deciding 'Cases' and 'Controversies.'  For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019).  "To have standing, a plaintiff must 'present an injury that is concrete, particularized and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  "If a plaintiff fails to satisfy any of those elements, a federal court lacks subject-matter jurisdiction to hear the case and it must be dismissed." *Ross v. AXA Equitable Life Ins. Co.*, 115 F. Supp. 3d 424, 432 (S.D.N.Y. 2015).

The Court must resolve the question whether Plaintiffs have Article III standing before it considers Defendant's argument that Plaintiffs have not pleaded causation sufficient to state a claim under the NYGBL.  *See Coan v. Kaufman*, 457 F.3d 250, 256 (2d Cir. 2006) ("Article III standing . . . ordinarily should be determined before reaching the merits . . ."); *Borenkoff v. Buffalo Wild Ings, Inc.*, 2018 WL 502680, at *2 (S.D.N.Y. Jan. 19, 2018) ("Generally, a court must determine whether it has subject matter jurisdiction before proceeding to evaluate the merits of a plaintiff's cause of action.").  Defendant contends that Plaintiffs lack Article III standing for two independent reasons: Plaintiffs have not pleaded a cognizable injury, and Plaintiffs have not adequately plead that their alleged injuries are fairly traceable to the allegedly misleading advertisements.[3]

---

[3] Defendant also argues that Plaintiffs lack standing to bring a claim for injunctive relief, Dkt. No. 197 at 14, but in their opposition to the motion to dismiss, Plaintiffs withdrew this claim. Defendant's argument with respect to Plaintiffs' standing to seek injunctive relief is therefore moot, and the claim for injunctive relief will be dismissed.

The Court independently analyzes whether Plaintiffs have Article III standing.[4]  That inquiry is analytically distinct from the question whether the plaintiff has pleaded facts sufficient to sustain a claim under NYGBL §§ 349 and 350.  *See Axon v. Florida's Natural Growers, Inc.*, 813 Fed. App'x 701, 703–04 (2d Cir. 2020) (summary order) (analyzing separately whether a plaintiff had Article III standing and statutory standing under NYGBL §§ 349 and 350); *Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562, 576 (S.D.N.Y. 2021) (stating that while the plaintiff adequately pleaded an injury-in-fact for purposes of Article III standing, the question "whether [p]laintiff has properly alleged an injury for his N.Y.G.B.L. §§ 349 and 350 claims requires a separate inquiry"); *DaCorta v. AM Retail Group, Inc.*, 2018 WL 557909, at *6–7 (S.D.N.Y. Jan. 23, 2018) (holding that the plaintiff's allegation that she would not have made the purchase or would not have paid the amount she did if not for the alleged deception was sufficient to confer Article III standing but that plaintiff had failed to properly plead an injury for the purposes of NYGBL §§ 349 and 350); *Borenkoff*, 2018 WL 502680, at *3–4 (holding that, while the plaintiff had Article III standing—a conclusion the court reached with "serious reservations"—she had not stated a claim).  Holdings and statements regarding what allegations—made by other plaintiffs—were adequate to state a claim under Sections 349 and 350 may be instructive.  However, they are not dispositive with respect to whether these Plaintiffs have Article III standing.

---

[4] As Judge Furman wrote in evaluating a putative class action brought pursuant to New York law:

> it is insufficient for Plaintiffs to argue . . . that [a state law], standing alone, confers upon them an 'injury' sufficient to establish Article III standing.  Instead, Plaintiffs must establish that at least one of them has otherwise suffered an injury sufficient to entitle him to sue in federal court—namely, the 'invasion of a legally protected interest which is . . .  concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'

*Id.* (quoting *Lujan*, 504 U.S. at 560).

A.      **Injuries Alleged**

Plaintiffs allege that, by misrepresenting that its on-demand digital library would be "ever-growing" and not disclosing "the imminent removal of over half its on-demand library," Peloton "defrauded Plaintiffs and the other Class members, depriving them of the benefit of their bargain with Peloton and/or unjustly enriching itself at Plaintiffs' and the other Class members' expense." Dkt. No. 195 ¶ 34. Plaintiffs allege that they entered into transactions with Peloton "relying on Peloton's uniform representations about its 'ever-growing' or 'growing' on-demand library of fitness classes." *Id.* ¶¶ 35, 37. Plaintiffs further allege they were harmed in two separate ways: First, that "Peloton's representations and material omissions regarding its on-demand library caused Plaintiffs to pay increased costs for the Peloton Hardware and corresponding Peloton Membership, which was worth less than represented because Peloton's representations and/or omissions regarding its on-demand digital library were deceptive and misleading and constituted false advertising," *id.* ¶ 41; and second, "Peloton's representations and material omissions were part of the basis of the bargain, in that Plaintiffs attributed value to Peloton's promises regarding the nature and characteristics of its on-demand digital library and would not have purchased the Peloton Hardware and corresponding Peloton Membership, or would not have purchased it on the same terms, if they knew the truth that Peloton's on-demand digital library would shrink dramatically, by more than 50%," *id.* ¶ 42; *see also id.* ¶¶ 127, 146 (alleging that "Peloton deprived Plaintiffs . . . of the benefit of the bargain").

Stated otherwise, Plaintiffs allege they were harmed in two distinct but overlapping ways. First, regardless whether they personally relied on or even saw Defendant's misrepresentations, Defendant's misleading statements made consumers believe that there was value in Defendant's Hardware and/or subscriptions that was not there, thereby permitting Defendant to charge Plaintiffs a price for the Hardware and/or subscriptions that Defendant would not have been able

to command in the marketplace but for the misrepresentations.  Second, Plaintiffs personally were misled by Peloton's misrepresentations and as a result of those misrepresentations agreed to purchase their Hardware and/or subscriptions at a price they would not have—if they had purchased them at all—had they not been misled by Peloton's misrepresentations.  The second theory clearly implicates the Plaintiffs' personal reliance on the representations—by alleging that they would not have purchased their Hardware and/or subscription memberships at all or on the same terms "if they knew the truth that Peloton's on-demand digital library would shrink dramatically," *id.* ¶ 42, the complaint assumes that Plaintiffs knew something other than "the truth"—that is, that they were aware of Peloton's alleged misrepresentations and believed that the digital library would not shrink.  *See Sharpe v. A&W Concentrate Co.*, 2021 WL 3721392, at *2 (E.D.N.Y. July 23, 2021) (characterizing "an allegation that, absent the misrepresentation, the plaintiff 'would not have paid the same amount' for the product" as an allegation of reliance (quoting *Colpitts*, 2021 WL 981455, at *5)).

The Court first considers the argument there are insufficient allegations to support an "overpayment" theory of injury, which relates to Plaintiffs' first theory of injury—that they paid increased costs for products that were worth less than was represented—which the Court will refer to as a "price premium" injury.  Next, the Court will consider Defendant's argument that any injury alleged by Plaintiffs is not fairly traceable to Peloton's alleged misrepresentation.  As Defendant frames this argument, it is primarily based on the evidence in the record that Plaintiffs either were not aware of the relevant misrepresentations prior to making their purchases or did not rely on those representations in making their purchasing decisions and thus cannot sustain a claim under Plaintiffs' second theory of injury—that they were injured by buying a product on terms that they would not otherwise have agreed to had they personally not been deceived and

had access to fewer classes than they reasonably believed they would have at that time.  But it is also based on Passman's date that he purchased his bike and initially purchased his membership in February 2017, which Defendant argues is well before Peloton's representations allegedly became false in April of 2018.

### B.    Cognizable Injury

Defendant contends that Plaintiffs have not pleaded a cognizable injury sufficient to support standing.  It argues that Plaintiffs "have not included any specific factual allegations supporting an 'overpayment' theory of injury—including what price they paid for their Bikes, how the advertisements affected the price of Peloton's products, or how much any competitors charged for similar alternatives."  Dkt. No. 197 at 13.  It also argues that, to the extent Plaintiffs assert theories of injuries like a "diminished user experience" or failure to receive the "benefit of the bargain" after classes were purged in March of 2019, such injuries cannot support standing.  *Id.*  Plaintiffs do not appear to press these theories of standing injury in their opposition.  Rather, Plaintiffs respond that they were injured when they paid price premiums for Peloton's products and cite the Court's prior Opinion in support of its position that the complaint need not provide details about how the plaintiffs overpaid in order to sustain a claim under the NYGBL.  Dkt. No. 201 at 6–8.[5]

As Plaintiffs correctly point out, multiple courts have held that allegations that a plaintiff suffered a price premium injury is sufficient to support Article III standing at the motion to dismiss stage.  Dkt. No. 201 at 6–7 (citing *Guariglia v. Procter & Gamble Co.*, 2018 WL

---

[5] Plaintiffs also point to a conjoint analysis and associated damages report previously submitted to the Court in connection with a motion for class certification—reports which were challenged by Defendant and where the challenge was ultimately deemed to be moot—as "showi[ing] that the injury caused by Peloton's misrepresentations was . . . actual, concrete, and measurable."  *Id.* at 9.  These reports are not properly before the Court on a motion to dismiss, and the Court will not consider them.

1335356, at *12 (E.D.N.Y. Mar. 14, 2018) (noting, in the context of class standing, "that courts in this circuit 'have construed the payment of a premium price to be an injury in and of itself.'" (quoting *Belfiore v. Proctor & Gamble Co.*, 94 F. Supp. 3d 440, 447 (E.D.N.Y. 2015))); and *Sharpe*, 2021 WL 3721392, at *2); *see also Axon*, 813 Fed. App'x at 703–04 ("As for Article III standing, Axon has suffered an injury-in-fact because she purchased products bearing allegedly misleading labels and sustained financial injury—paying a premium—as a result.");  *Gold v. Eva Naturals, Inc.*, --- F. Supp. 3d ---, 2022 WL 566230, at *2 (E.D.N.Y. Feb. 16, 2022) ("[B]ased . . . on the allegations, the putative class members have all suffered a concrete injury because they paid a price premium for a purportedly 'natural' product."); *Kacocha v. Nestle Purina Petcare Co.*, 2016 WL 4367991, at *7 (S.D.N.Y. Aug. 12, 2016) (explaining that "the law is clear that economic injury—including that caused by paying a premium—is sufficient to establish injury for standing purposes" and holding that plaintiff has pleaded an "adequate injury for purposes of standing" where he "allege[d] that he 'paid a premium price' that he would not have had he 'known the truth'" (alteration adopted) (citation omitted)).  Those courts, however, have not addressed the precise question raised by Plaintiffs' first theory of injury—whether evidence that a consumer paid more than the market otherwise would have demanded in the absence of a misrepresentation can support standing in the absence of evidence of individualized reliance by the consumer on the representation.

Sharpe v. A&W Concentrate Company* is instructive on this point.  In that case, the plaintiffs testified that the allegedly false claim did not influence their decision to purchase the product at issue, but they also alleged that they paid a premium for the product.  *Sharpe*, 2021 WL 3721392, at *2; *see also Sharpe v. A&W Concentrate Company*, 1:19-cv-768-BMC (E.D.N.Y.), ECF No. 35 ¶ 64.  In concluding that the plaintiffs had Article III standing

notwithstanding the fact that the misrepresentations "did not mislead the plaintiffs," Judge Cogan

explained:

> [D]efendants misapprehend the injury.  True, a plaintiff "comfortably satisfies the
> injury-in-fact prong" with an allegation that, absent the misrepresentation, the
> plaintiff "would not have paid the same amount" for the product.  *Colpitts v. Blue
> Diamond Growers*, No. 20-cv-2487, 2021 WL 981455, at *5 (S.D.N.Y. March 16,
> 2021).  But even though this sort of reliance satisfies Article III, it does not follow
> that Article III requires this sort of reliance.
>
> For instance, "a manufacturer's misrepresentation may allow it to command a price
> premium and to overcharge customers systematically."  *Carriuolo v. Gen. Motors
> Co.*, 823 F.3d 977, 987 (11th Cir. 2016).  A manufacturer can do so when a product
> with the misrepresentation will "attract greater market demand" than a product
> without the misrepresentation.  *Id.*  A plaintiff thus suffers an injury when "a
> company marketed a product as having a 'unique quality' . . . the marketing allowed
> the company to charge a price premium for the product, and . . . the plaintiff paid
> the premium and later learned that the product did not, in fact, have the marketed
> quality."  *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 350 (S.D.N.Y. 2020).
> *That injury doesn't involve reliance, but it still satisfies Article III*.

*Sharpe*, 2021 WL 3721392, at *2 (emphasis added).

Judge Furman took a similar view in *In re AXA Equitable Life Insurance Company COI

Litigation ("In re AXA")*, 2020 WL 4694172 (S.D.N.Y. Aug. 13, 2020).  In evaluating whether a

person was "aggrieved" within the meaning of New York Insurance Law § 4226(a)(1)—an

inquiry that is co-extensive with the injury-in-fact requirement of Article III—the court

explained that "someone can be 'aggrieved'—that is, harmed—by a misrepresentation without

necessarily having relied on it."  *Id.* at *10.  It explained that "a misrepresentation can artificially

inflate the market price of a product, causing a plaintiff to pay more for it than she otherwise

would have—regardless of whether she even saw the misrepresentation."  *Id.*  The court offered

an example of this sort of harm:

> Imagine, for example, that a company sells a pen and advertises that it is a rugged
> writing instrument that can survive any environment, all the while knowing that the
> pen will break the first time it falls onto a hard surface.  Before it is released, the
> pen generates significant buzz due to its alleged ruggedness and, because the initial
> supply is limited, the company charges a high price.  One customer purchases the

pen at that high price not because it can withstand abuse, but because it looks just like a pen that a cherished relative used, and the customer intends to frame it. That customer is surely "aggrieved," even though the misrepresentation was irrelevant to the customer's decision to purchase the pen. But for the misrepresentation, the price of the pen may have been lower, and the customer would have paid less for it.

*Id.* n.7.

The logic of *Sharpe* and *In re AXA* apply with equal force here. Peloton allegedly misrepresented what Plaintiffs allege is a unique quality about its products—that they enabled access to a "growing" library of on-demand fitness classes—and this representation allegedly led to an "increased cost" that Plaintiffs paid for those products over and above what they were worth. Dkt. No. 195 ¶ 41; *see McNulty v. Polar Corp.*, 2020 WL 5658667, at *5 (S.D.N.Y. Sept. 23, 2020) ("Allegations that a product had significantly less value than it warranted constitute a classic price premium theory of injury that is plausible and cognizable." (internal quotation marks and citation omitted)). This quality is what Peloton used "to differentiate itself from other fitness companies that market and sell similar fitness hardware, in-studio workout classes, and instructional home workout media," Dkt. No. 195 ¶ 13, and "[t]he purpose and effect of this marketing campaign is that Peloton members and prospective members choose Peloton over competing fitness products, at least in part, because of access to a constantly growing number of digital classes," *id.* ¶ 14. By marketing its Hardware and subscription service as having this quality, Defendant was able to charge a price premium because "[e]ach additional on-demand fitness class adds incremental value to Plaintiffs' and the other Class members' subscriptions." *Id.* ¶ 99; *see also id.* ¶ 26 (alleging that Peloton uses its on-demand options "as a differentiating factor to garner more customers and market share for both the Peloton Hardware and the Peloton Membership"); *id.* ¶ 71 (alleging that "Peloton has dominated the marketplace by aggressively marketing access to an 'ever-growing' library of fitness classes"); ¶ 85 (alleging that,

notwithstanding its receipt of the cease-and-desist letter, Peloton continued "to heavily market [an 'ever-growing' library] to its customers and prospective customers as a key Peloton selling point"). It is immaterial for the purposes of Article III standing whether Plaintiffs themselves relied on the representation that drove up the prices of the Hardware and subscription services or valued those representations; Plaintiffs' allegations that they paid increased costs—a "price premium"—for these products as a result of the misrepresentation is sufficient to plead a cognizable injury for the purposes of constitutional standing.[6]

Defendant attempts to avoid this conclusion by pointing to what it says Plaintiffs did not plead—the price they paid for their bikes, how advertisements affected the price of Peloton's products, or how much competitors charged for similar products. This argument is unavailing at this stage. Plaintiffs need not plead that level of detail in order to have standing. As the Second Circuit has explained, a plaintiff's "failure to identify the prices of competing products to establish the premium she paid 'is not fatal to [her] claim' at this stage of the proceedings." *Axon*, 813 Fed. App'x at 704 (quoting *Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467, 481–82 (S.D.N.Y. 2014)); *Brown v. Kerry Inc.*, 2021 WL 5446007, at *4 n.4 (S.D.N.Y. Nov. 22, 2021) (explaining, in the context of Article III standing, that "a plaintiff is not required to point to *any* comparator products in order to successfully allege a price premium theory of injury"); *cf. Goldemberg*, 8 F. Supp. 3d at 482 ("[W]hile identifying the prices of

---

[6] Of course, general awareness of a misrepresentation is not irrelevant to a "price premium" injury. To establish an injury on a price premium basis, Plaintiffs will have to prove that sufficient consumers were aware of the advertised but false "unique quality" and assigned value to it such that the misrepresentation affected the price. Plaintiffs have pleaded facts that suggest there was value in an "ever-growing" on-demand library and that widespread misrepresentations regarding that quality inflated the price of the products. Nothing more is required at the motion to dismiss stage.

competing products in the Complaint would strengthen Plaintiff's allegation of injury [for the purposes of stating a claim under NYGBL § 349], . . . the failure to do so is not fatal to Plaintiff's claim."). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Duchimaza v. Niagara Bottling, LLC*, 2022 WL 3139898, at \*4 (S.D.N.Y. Aug. 5, 2022) (quoting *Lujan*, 504 U.S. at 561). And, contrary to Defendant's assertion, Plaintiffs *have* pleaded facts that speak to how the alleged misrepresentation affected the price of Peloton's products; Plaintiffs allege that each additional class in Peloton's on-demand library adds value to the subscription service and that Peloton's representations caused Plaintiffs to pay increased costs for the Hardware and the subscription service, which were "worth less than represented" because of the misrepresentations about the on-demand library. Dkt. No. 195 ¶ 41; *see also id.* ¶ 99. It is a reasonable inference from the pleaded facts that the products were subject to a price premium because Peloton's representations that the on-demand library would be "ever-growing" indicated to the market that there would be value associated with the products that resulted in an increased price when that value was not actually there. *Cf. DaCorta*, 2018 WL 557909, at \*9 (concluding that, although plaintiff properly pleaded injury for standing purposes, she did not properly plead injury under NYGBL §§ 349 and 350 where "allegations, alone do not, demonstrate *why* a premium was paid for the product or *how* the product failed to live up to its advertising).

For the above reasons, Defendant's argument that Plaintiffs failed to plead a cognizable injury based on their "overpayment" theory fails.

### C.    Injuries Fairly Traceable

Defendant next argues that "in order to show an injury-in-fact fairly traceable to the challenged conduct, Plaintiffs must show that the allegedly misleading advertisements caused

their purported injuries—which cannot occur as a matter of law if Plaintiffs did not see the advertisements prior to their purchases." Dkt. No. 197 at 9. Defendant contends that the "bare-bones allegations" that Plaintiffs "purchased Bikes and/or Membership subscriptions 'relying on' Peloton's representations" "cannot confer standing on *these* two Plaintiffs because they are directly undermined by other allegations specific to these Plaintiffs and by Plaintiffs' own deposition testimony" and that even the allegations of the Complaint regarding the link between Peloton's alleged misconduct and the Plaintiffs' injuries "are directly undermined by other allegations specific to these Plaintiffs and by Plaintiffs' own deposition testimony." *Id.* at 10.

Defendant is incorrect that the only way to demonstrate standing is to show that Plaintiffs saw and relied on the misrepresentations at issue. Just as the consumer who purchases a pen whose price is inflated by the false characterization of it as being rugged is injured as a result of the misrepresentation to the market even if he personally is oblivious to it, so too the consumer who purchases a Peloton subscription whose price is inflated as a result of a false marketing campaign suffers an injury traceable to that campaign even if the misrepresented fact was not important to her. Plaintiffs alleged both a sufficient injury in that they paid "increased costs"—a price premium—for Peloton products and that this injury was caused by Peloton's representations to the market about the size of its on-demand library. The Complaint alleges—and Defendant does not dispute—that both Plaintiffs have continued to pay for their monthly subscriptions "since they acquired the Peloton hardware," Dkt. No. 195 ¶ 39; *see also id.* ¶¶ 30 (explaining that "monthly" membership includes access to library of on-demand classes); 71 (referring to subscription fee as a "monthly" fee). Though Passman purchased his bike and initially purchased his membership subscription in February of 2017, this fact is immaterial for Article III standing purposes when Passman continuously made purchases of his subscription

from February 2017 until at least the filing of the Complaint in February 2022.  Thus, from the time Passman purchased his bike and membership in February 2017 until at least the filing of the Complaint in February of 2022 Passman made payments for his Peloton subscription.  *Id.* ¶ 41. The same holds true for Alvarado, who purchased a subscription in January 2019.  *Id.* ¶ 37.  This includes the class period that Plaintiffs allege Peloton was engaging in allegedly deceptive practices: from at least April 9, 2018, when "Peloton had actual knowledge . . . that it could not provide an 'ever-growing' library to consumers," *id.* ¶ 125, until at least March 25, 2019, when Peloton removed the classes from the on demand digital library.  It is at least during this time period that Plaintiffs allege they paid "increased costs" due to Peloton's misrepresentations.  *Id.* ¶ 41.  Paying a price premium is a sufficient injury for Article III standing, whether it is paid for a piece of Hardware or a subscription.  Nothing more is required for standing.

The parties spill much ink on the question whether Plaintiffs can support standing on a theory that they purchased Peloton products based on the alleged misrepresentation and would not have purchased those products or purchased the products on the same terms had they known the truth.  If Plaintiffs' entitlement to standing rested solely on a theory of injury for which reliance was required, the Court would find that Plaintiffs do not have standing to pursue these claims.  When a plaintiff purchases a product in reliance on an alleged misrepresentation and would have either not purchased the product or paid less for it if she had known the truth about the product, she suffers an injury sufficient to confer Article III standing.  *See Colpitts*, 527 F. Supp. 3d at 575 ("Such an allegation that a plaintiff would not have purchased a product or would not have paid the same amount comfortably satisfies the injury-in-fact prong of Article III standing."); *DaCorta v. AM Retail Grp., Inc.*, 2018 WL 557909, at *6 (S.D.N.Y. Jan. 23, 2018) ("The allegation that Plaintiff would not have made this purchase, or would not have paid the

amount she did, is sufficient for Article III injury." (internal quotation marks omitted)). However, the deposition testimony of both Passman and Alvarado contradict the Complaint's allegations in a material way, *see Carter*, 822 F.3d at 57, in that the testimony compels a finding that they did not rely on the misrepresentations at issue when making their purchasing decisions.

Alvarado alleges that he relied on Peloton's representations only with respect to his subscription purchase and not with respect to the purchase of his Peloton bike. *See* Dkt. No. 195 ¶ 37; *cf. id.* ¶ 127. Even with respect to the membership, however, Alvarado's testimony read as a whole undermines any claim that he relied on Peloton's alleged misrepresentations when making his Peloton purchases. Alvarado conveyed—both in his deposition and in a declaration submitted in support of Plaintiffs' opposition to the instant motion to dismiss—in a conclusory way that the "growing" nature of the library was important to his purchase of the bike and subscription. *See* Dkt. No. 198-1 at 86; Dkt. No. 201-2 ¶¶ 13–14. But during his deposition, Alvarado testified that his wife, whose idea it was to get the bike, "organized the whole thing" and that he "couldn't say yes or no" to the purchase. Dkt. No. 198-1 at 35, 39. Alvarado testified that "it was implied that [Peloton is] forever having a growth of products," *id.* at 72, and that he had heard the term "forever growing" "from probably one of the advertisements," *id.* at 85. However, he also testified that "[n]o one ever promised [him] anything, like, from Peloton in reference to their library and catalog of products." *Id.* at 72. He also declared that his deposition "testimony was given under oath, and remains accurate." Dkt. No. 201-2 ¶ 5. When asked at the deposition if "any advertisement informed [his] decision to purchase a subscription," Alvarado responded with an unequivocal "[n]o." Dkt. No. 198-1 at 79. The Court credits Alvarado's testimony that no advertisement informed his decision to purchase a subscription, that he did not make the decision to purchase the Peloton bike or the subscription, and that no one ever

promised him anything in reference to Peloton's library and finds—for the purposes of the Rule

12(b)(1) motion only—that he did not purchase Peloton's products in reliance on Peloton's

representations.  *See APWU*, 343 F.3d at 627 (explaining that "where jurisdictional facts are

placed in dispute, the court has the power and obligation to decide issues of fact by reference to

evidence outside the pleadings" (quoting *LeBlanc*, 198 F.3d at 356)).

Passman's testimony also belies any assertion that he relied on Peloton's representations

in making his purchases.  In his deposition, Passman testified that he purchased his bike and

subscription in February of 2017 after speaking to a sales representative in a Peloton storefront

who told him that the library is "going to get bigger and bigger 'cause you know, all—all the

rides that they do are—are recorded and on-demand" and that Passman would have "more and

more" which was a "big selling point" for him.  Dkt. No. 198-2 at 46.  Passman testified that

none of the commercials that he saw prior to buying his bike mentioned anything about music,

Peloton's library, or the specific size of Peloton's library.  *Id.* at 81.  And whether or not

Passman relied on representations that Peloton's library was "growing" at the time he purchased

his bike—when he began purchasing Peloton products—is immaterial because there are no well-

pleaded allegations that such statements were false at the time he made this purchase, and so he

could not state a claim for that time period.[7]   When asked whether any of Peloton's

---

[7] Plaintiffs do not allege when precisely Peloton knew it was building its on-demand library
without proper licenses, alleging that Peloton was put on "actual notice" of its copyright
infringement on April 9, 2018, *id.* ¶ 84, and that "when Peloton accepted Plaintiffs' and the other
Class members' subscription payments, Peloton knew or should have known that Plaintiffs and
the other Class members would not be able to use an ever-growing on-demand class library
because the number of on-demand classes would be materially decreasing due to Peloton's
wrongful conduct," *id.* ¶ 31.  And Plaintiffs allege that *someone else* alleged that Peloton had
been using musical works "for years" without proper licensing.  *Id.* ¶ 22.  But the Court is not
required to credit another entity's allegations where Plaintiffs do not make the same allegations
themselves—to do so would require the Court to assume the truth of the facts asserted in that
litigation instead of the facts asserted in this one.  *See Lonstein Law Office, P.C. v. Evanston Ins.*

advertisements, which he sees "all the time now," affected [his] decision to continue to pay for [his] Peloton subscription," Passman answered "[n]o, not at all." *Id.* at 82.  This testimony is supported by Passman's declaration that he relied on representations about the size of the on-demand library "to begin" purchasing Peloton products.  Dkt. No. 201-1 ¶ 10.  Thus, Passman's testimony establishes that he did not personally rely on any of the statements alleged to be false—the statements that he did rely upon are not alleged to be false when they were made, and the statements that were false when made were not relied upon by him.  Dkt. No. 198-2 at 82. As with Alvarado, the Court must conclude that Passman did not rely on Peloton's alleged misrepresentations when purchasing his Peloton products.

For the reasons previously stated, however, Plaintiffs' personal reliance on the alleged misrepresentation is irrelevant to their individual constitutional standing when they alleged—as they do here—that they were injured as a result of the effect that Defendant's misrepresentations had on the market and the price premium that those misrepresentations caused them to pay.

## II.     Failure to State a Claim

Defendant also moves for dismissal pursuant to Rule 12(b)(6), arguing that the Plaintiffs have failed to plead that any of their alleged injuries were caused by Peloton's allegedly misleading statements or omissions.

### A.     Affirmative Misrepresentations

Defendant argues that the Complaint does not support an inference that either Plaintiff was injured as a result of a deceptive practice, act, or advertisement by Defendant because

---

*Co.*, 2022 WL 72302, at 3 n.3 (Jan. 6, 2022) (explaining that the contents of complaints referred to and relied upon by the complaint in that action "are properly before the Court for what they allege, *but not for their truth*").  Without an allegation that Peloton was using material for which it did not have a license at the time of Passman's purchase, there can be no inference that any statements made by Plaintiffs at that time were deceptive or misleading in a material way.

neither saw the advertisements at issue prior to their purchases.  Acknowledging that the Court
previously has held that it is not necessary for a plaintiff specifically to allege that she saw an
advertisement if she can allege that she nonetheless relied upon it (in some other way),
Defendant contends that the Complaint "does not allege that *any* of the advertisements
reproduced in the pleading appeared on the website during the class period."  Dkt. No. 197 at 22.
Defendant points to three allegedly misleading advertisements made in the Complaint, appearing
in October 2017, November 2019, and December 2019 or January 2021, and argues that there is
no basis to infer that any of these advertisements could have influenced the Plaintiffs' purchasing
decisions given the timing and circumstances of their purchases.  *Id.* at 16.  It thereby attempts to
distinguish the Court's prior holding that a plaintiff can be exposed to a misrepresentation
without having seen it.  *Id.* at 15.  Defendant states that without "a plausible inference that either
Plaintiff would have stumbled upon any of the quoted representations . . . Plaintiffs have not pled
any facts sufficient to allege that they were injured by reason of the misleading advertisements."
*Id.*

Plaintiffs respond that they have alleged that Peloton began its "ever-growing" marketing
campaign in 2016,[8] which is before Passman or Alvarado purchased their products, and that
these representations—which were central to Peloton's marketing—were made "for years, until
late 2020."  Dkt. No. 201 at 17–18 (citing Dkt. No. 195 ¶¶ 73, 80, 81).  They also contend that,
even though the price premium theory of injury does not require allegations of exposure, they
have alleged that Plaintiffs were exposed to the misrepresentations; they cite to the portions of

---

[8] For the reasons explained in footnote 7, *supra*, there are no well-pleaded allegations that the
statements made by Peloton were misrepresentations prior to April of 2018.

the Complaint where Alvarado and Passman allege they relied on misrepresentations in

purchasing their products.  *Id.* at 18–19 (citing Dkt. No. 195 ¶¶ 35, 37).

Plaintiffs have the better of the argument.  "Under Sections 349 and 350, plaintiffs must

show that they were 'injured as a result of the deceptive practice, act or advertisement.'"  *Fishon*

*I*, 2020 WL 6564755, at *10 (quoting *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 525

(S.D.N.Y. 2003)).  Although a plaintiff "must show that the defendant's 'material deceptive act'

caused [her] injury," she need not show reliance.  *Stutman v. Chemical Bank*, 731 N.E.2d 608,

612 (N.Y. 2000) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*,

647 N.E.2d 741, 745 (N.Y. 1995)).  "[R]eliance is *not* an element of a section 349 claim."  *Id.*

Nor is it an element of a Section 350 claim.  *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d

675, 676 (N.Y. 2012) ("To the extent that the Appellate Division order imposed a reliance

requirement on General Business Law §§ 349 and 350, it was error.  Justifiable reliance by the

plaintiffs is not an element of the statutory claim.").  Thus, a plaintiff can plead both injury and

causation under GBL §§ 349 and 350, by alleging that defendant engaged in an "act or practice

[that was] deceptive or misleading in a material way and that plaintiff has been injured by reason

thereof."  *Oswego*, 647 N.E.2d at 744

A plaintiff can plead injury and causation for purposes of Sections 349 and 350 in at least

one of two ways.  First, the plaintiff can plead that she was exposed to a material deceptive act

and relied on that misrepresented fact to her detriment.  The plaintiff is directly injured when she

pays a higher price than she otherwise would have paid based on her belief in the fact that is

misrepresented.  *See Rodriguez v. Hanesbrands Inc.*, 2018 WL 2078116, at *4–5 (E.D.N.Y. Feb.

20, 2018), *report and recommendation adopted*, 2018 WL 1686105 (E.D.N.Y. Mar. 30, 2018)

(explaining that injuries caused by deceptive practices may be alleged "in one of two ways: by

alleging that (1) a plaintiff overpaid or paid a 'price premium' . . .; or (2) plaintiff did not receive the product she bargained for" and concluding that plaintiffs adequately alleged second theory of injury where they alleged that they were injured because "they did not receive the . . . product that defendant led them to believe they were buying," thereby purchasing a product with "considerably less value than was warranted" (internal quotation marks omitted)); *Lazaroff v. Paraco Gas Corp.*, 2011 WL 9962089, at *6 (Sup. Ct. Kings Cnty. Feb. 25, 2011) ("Plaintiff alleges that, had he understood the true amount of the product, he would not have purchased it, and that he and the purported members of the class paid a higher price per gallon/pound of propane and failed to receive what was promised and/or the benefit of his bargain . . . .  Thus, plaintiff has properly alleged an injury.").  That is the theory of injury pressed by Plaintiffs in *Fishon I*, which the Court addressed in that case.  Under it, a plaintiff must plead injury that she saw the misrepresentation or was exposed to it in some other way.  *See Fishon I*, 2020 WL 6564755, at *9–10.  In the absence of an allegation—and at the summary judgment stage, proof—that the Plaintiff was aware of the misrepresentation, she cannot establish that she relied upon it to her detriment.

Second and importantly, however, a plaintiff can also plead both injury and causation under GBL §§ 349 and 350, by alleging that the defendant's misleading or deceptive advertising campaign caused a price premium, that the price premium was charged both to those who saw and relied upon the false representations and those who did not, and that, as a result of the price premium, plaintiff was charged a price she would not otherwise have been charged but for the false campaign.  *See Eidelman v. Sun Prods. Corp.*, 2022 WL 1929250, at *1 (2d Cir. June 6, 2022) (summary order) ("One method of demonstrating actual injury in the consumable goods context is by showing that the plaintiff paid a 'price premium'—that is, as a result of the

26

defendant's deception, the plaintiff paid more for a product than he otherwise would have." );
*Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 288 (S.D.N.Y. 2014) ("A plaintiff
adequately alleges injury under [NY]GBL § 349 by claiming that he paid a premium for a
product based on the allegedly misleading representations."); *Greene v. Gerber Prods. Co.*, 262
F. Supp. 3d 38, 68 (E.D.N.Y. 2017) (holding that "allegations [were] sufficient to state an injury
under GBL sections 349 and 350 because they claim that [p]laintiff paid a premium for a product
based on [d]efendant's inaccurate representations" (alterations adopted) (internal quotation
marks and citation omitted)); *Ackerman v. Coca-Cola Co.*, 2010 WL 2925955, at *23 (E.D.N.Y.
July 21, 2010) (plaintiffs pleaded an injury as a result of a defendant's allegedly deceptive act or
practice where those plaintiffs alleged that they "paid a premium for a product based on
defendants' inaccurate representations"); *Zottola v. Eisai Inc.*, 564 F. Supp. 3d 302, 310 & n.6
(S.D.N.Y. 2021) (concluding that plaintiffs failed to plead a cognizable injury for the purposes of
NYGBL §§ 349 and 350 claims where there was no allegation that a misrepresentation affected
the product's price and explaining that "[t]o be sure, '[i]njury is adequately alleged under
NYGBL §§ 349 and 350 by a claim that a plaintiff paid a premium for a product based on
defendants' inaccurate representations.'" (quoting *Ackerman*, 2010 WL 2925955, at *23)
(alteration adopted)).

"Where … 'the consumer protection statute at issue supplies an objective test,' . . .
liability turns on what a *reasonable* consumer, not a particular consumer, would do." *Sharpe*,
2021 WL 3721392, at *4 (quoting *Ackerman v. Coca-Cola Co.*, 2013 WL 7044866, at *10
(E.D.N.Y. July 18, 2013)).  Because the test is objective and turns upon the reasonable
consumer, "reliance is not at issue, [and] the individual reason for purchasing a product becomes
irrelevant and subsumed under the reasonable consumer standard, i.e., whether the deception

27

could likely have misled someone, and not, whether it in fact did." *Hasemann v. Gerber Prods. Co.*, 331 F.R.D. 239, 266 (E.D.N.Y. 2019) (stating proposition in context of considering theory of injury that putative class members paid a price premium); *cf. Randolph v. Mondelēz Global LLC*, 2022 WL 953301, at *3 (S.D.N.Y. Mar. 30, 2022) (explaining that "since the test for deception under sections 349 and 350 is an objective one, and because reliance is not an element of the claims, the plaintiff's personal expectations do not establish that 'a reasonable consumer acting reasonably under the circumstances' would be misled by the label." (quoting *Oswego*, 647 N.E.2d at 745)).

The Court thus disagrees with the statements that appear in some cases that suggest that the only way a consumer can be injured as a result of a false marketing campaign is if she was personally exposed to that campaign and believed and relied to her detriment on the allegedly misrepresented fact. *See Goldemberg*, 8 F. Supp. 3d at 480 ("To properly allege causation, a plaintiff must state in his complaint that he has seen the misleading statements of which he complains before he came into possession of the products he purchased."); *Dash v. Seagate Tech. (U.S.) Holdings, Inc.*, 27 F. Supp. 357, 361 (E.D.N.Y. 2014) (same). The principle cited in these cases predates more recent authority and finds its genesis in *Gale v. International Business Machines Corp.*, 781 N.Y.S.2d 45 (2d Dep't 2004) ("*Gale*"), in which the Appellate Division considered a claim by a plaintiff—who experienced a disk-drive failure and a loss of data—that the defendant made misrepresentations that the disk drive was reliable and safe for storing data. *Id.*; *see also Gale v. Int'l Bus. Machines Corp.*, 2003 WL 26134558 (Sup. Ct. Suffolk Cnty. Mar. 7, 2003). The Appellate Division held that "the plaintiff failed to plead causation with sufficient specificity to withstand dismissal" where "he nowhere state[d] in his complaint that he saw any of these statements before he purchased or came into possession of his

hard drive." *Gale*, 781 N.Y.S. 2d at 47. The court continued "[i]f the plaintiff did not see any of these statements, they could not have been the cause of his injury, there being no connection between the deceptive act and the plaintiff's injury." *Id.* [9]

The rationale of *Gale* (if not a precise "eyeball" requirement) makes good sense and is binding where a plaintiff alleges she was injured because she relied to her detriment on the misleading fact. In that circumstance, her injury—the difference between the value of what she received and what he thought she was receiving—does not exist if she did not believe the two were different. And any such injury that did exist would not be caused by the defendant's misrepresentation if the misrepresentation did not form the basis for that belief. But neither *Gale* nor the subsequent cases that relied upon it considered whether an injury that implicates "reliance" is the *sole* basis upon which causation can be established much less whether it can be established on a market-based price premium theory.

More recent cases have considered that question and, in light of the New York Court of

---

[9] In *Bibicheff v. PayPal, Inc.*, 844 Fed. App'x 394 (2d Cir. Feb. 8, 2021), the Second Circuit affirmed the district court's dismissal of a Section 349 complaint, in part, because the plaintiff there did not allege that she saw the defendant's alleged misrepresentations until after the fraudulent activity and the resulting harm had occurred. *Id.* at 396. But that case cannot be read to impose an absolute standard that in every case a Section 349 plaintiff have seen the allegedly misleading representation in order to bring a claim. The plaintiff in *Bibcheff* was a business owner who claimed that the defendant PayPal had engaged in misleading practices by failing to monitor and investigate twelve fake accounts created under her name by her office manager who used the accounts to defraud her. *Id.* at 395. She sought to hold PayPal to the representation that was on its website that customers were protected against unauthorized transactions. *See Bibicheff v. PayPal, Inc.*, 2020 WL 2113373, at *1–2 (E.D.N.Y. May 4, 2020). But the plaintiff did not allege that she had purchased products or services from PayPal. *Id.* at *4. The only theory of relief thus could have been that the plaintiff used PayPal's services based on the representation of protection against unauthorized transactions. There thus would have been no occasion for the Second Circuit to consider *sua sponte* whether there was an alternative source of injury and of causation and in particular whether exposure is required in every case. It was sufficient to affirm the district court's order that the only theory of injury—one based upon reliance on the truth of the misrepresented fact—was not supported by the allegations of the complaint.

Appeals' holding in *Stutman* that reliance is not required under Section 349 and 350 and its caution not to conflate the two, *see Stutman*, 731 N.E.2d at 612–13; *Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D.125, 147 (S.D.N.Y. 2014), have concluded that reliance and therefore exposure are not critical to establishing causation.  In *Sharpe*, for example, the court confronted and rejected the identical argument framed in terms of whether the proposed class presented common questions of fact.  2021 WL 3721392, at *4.  Defendants argued that no class could be certified because each class member would have to show that he or she was exposed to the misleading misrepresentation.  *Id.*  The court rejected that claim and thereby the argument that for any individual exposure was a *sine qua non* for maintenance of a Section 349 and 350 claim:  "The argument is another attempt to sneak in reliance.  Where, as here, 'the consumer protection statute at issue supplies an objective test,' … liability turns on what a *reasonable* consumer, not a particular consumer, would do."  *Id.* (quoting *Ackerman*, 2013 WL 7044866, at *10).

Likewise, in *Hasemann*, the court held that a class could be certified notwithstanding that each individual member of the class was not uniformly exposed to the alleged misleading representation because the theory of injury was that each individual class member paid a price premium.  331 F.R.D. at 266.   The court stated "where reliance is not at issue, the individual reason for purchasing a product becomes irrelevant and subsumed under the reasonable consumer standard, i.e., whether the deception could likely have mislead someone, and not, whether it in fact did."  *Id.*   The claim that Section 349 and Section 350 required "an individual inquiry" into whether the plaintiff was deceived by the misrepresentations was "mistaken[]" and "incorrect due to the less individualistic and more objective nature of the statutory elements."  *Id.* The court concluded that "some amount of discovery is necessary"—in the absence of evidence that the misrepresentation received wide exposure, it would be difficult to show that the

consumer suffered actual harm.  *Id.*  However, to require that a particular plaintiff have actually

been exposed to the representation "would impermissibly depart from the objective standards of

sections 349 and 350 of the GBL, and would impermissibly read a seeing and a reliance

requirement into the statue."  *Id.* at 267.

In *In re AXA*, 2020 WL 4694172, at *11, as well, in analyzing a statute, Section 4226 of

the New York Insurance Law, that the court considered to be "substantially similar" to NYGBL

§§ 349 and 350, in that it did not require reliance but did require causation, the court concluded

that the plaintiff was not required "to prove that she reviewed and relied upon a

misrepresentation" and "must only do so if it is required by the particular injury and theory of

causation alleged."  *Id.*  If the "misrepresentation . . . artificially inflate[s] the market price of a

product, causing a plaintiff to pay more for it than she otherwise would have—regardless of

whether she even saw the misrepresentation," the plaintiff was "harmed [] by a misrepresentation

without necessarily having relied on it."  *Id.* at *10.  The court ultimately concluded that "given

the nature of the harms alleged in [that] case, each [p]laintiff may recover only if she actually

read, received, or became aware of a misrepresentation" because "people generally have no right

to the benefit of a promise of which they were completely unaware."  *Id.* at *11.  But in so doing,

he expressly distinguished such a "promise-based" theory of injury from the sort of price-

premium injury at issue here.  He called a "theory of causation . . . that 'the advertising and

labeling practice allowed a price premium to be charged'" a "market-price-based theory of

causation" and explained that such a theory, "unlike a promise-based theory, does not depend on

the consumer's awareness of the representation."  *Id.*

Finally, and most recently, the Second Circuit explained in *Eidelman*:

> The presence or absence of a price premium attributable to a defendant's alleged
> deception is objective and does not depend on whether a plaintiff could have or

would have in fact, purchased a lower-priced, truthfully marketed alternative.  To the contrary, the New York Court of Appeals has held that "reliance is *not* an element of a section 349 claim."  *Stutman*, 95 N.Y.2d at 30; *see also Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324 n.1 (2002) ("The standard for recovery under General Business Law § 350, while specific to false advertising, is otherwise identical to section 349.").

2022 WL 1929250, at *1.  Under this theory of injury, an individual's awareness of an alleged misrepresentation plays no role in the causation analysis because reliance plays no role in it.  On the basis of evidence of internal communications "implying that [d]efendants could charge a higher price because of the allegedly misleading claim . . . and reflecting that [d]efendants assigned considerable value to the claim that they allegedly used in a deceptive manner," the *Eidelman* court held that "a reasonable jury could conclude that some of the price premium which Eidelman paid was attributable to [d]efendant's alleged deception and Eidelman was therefore injured within the meaning of §§ 349 and 350."  *Id.* at *2.  Neither the plaintiff's awareness of the misrepresentation nor his reliance on it played a role in the conclusion that the facts could support a cognizable injury attributable to the defendant's conduct.

These cases persuade the Court that, while a reliance- or exposure-based theory of injury is one way to plead that a defendant's misrepresentation caused harm, it is not the only way.[10] The operative question is whether a plaintiff suffered an injury because of a defendant's misrepresentation; it is not whether that injury was tied to plaintiff's reliance on the misrepresentation.  Plaintiffs have alleged that Defendant made misrepresentations that would have mislead a reasonable consumer, that those misrepresentations were consumer-facing and

---

[10] The Court's Opinion in *Fishon I* does not require a contrary conclusion.  In that decision, the Court explained that an individual may allege that she was harmed by stating that she relied on a defendant's claim to her detriment and that an explicit allegation that she saw a misrepresentation was not necessary to sustain a claim *on that theory* because such awareness was implied.  *Fishon I*, 2020 WL 6564755, at *9.  The Court nowhere stated that this was the only way by which an individual could allege an injury caused by Defendant's actions.

had broad impact, and that as a result of those widespread misrepresentations that mislead reasonable consumers, they paid higher costs.  By alleging that they paid a higher price—"increased costs"—for their products because of Defendant's widespread misrepresentations about the value of the product, Plaintiffs have pleaded an injury that was attributable to Defendant's alleged misrepresentation, regardless whether they ever personally saw the representation.  It may be difficult in the end for Plaintiffs to prove those claims (or even to present sufficient facts to create a jury question), but Plaintiffs have pleaded enough to be permitted to try.

### B.    Materially Deceptive Omissions

Defendant also moves to dismiss the Complaint to the extent it relies upon a theory of actionable omission.  The Complaint alleges that Defendant made both material misrepresentations and deceptive omissions.  As Defendants put it, Plaintiffs allege "that, starting on April 9, 2018, Peloton deceptively failed to disclose that it (i) had been accused of violating 'any laws'; and therefore (ii) would be (or might be) removing over half of the classes in the on-demand library."  Dkt. No. 197 at 17 (citing Dkt. No. 195 ¶¶ 21, 30, 34, 40, 102–103, 120, 140).

Defendant argues that Plaintiffs cannot sustain a claim based on an omission theory because: (i) omissions are only actionable where a defendant had knowledge of material information and either failed to disclose or actively concealed such information at the time it made the alleged misstatements and there are no such allegations here; (ii) the omission did not make representations about Peloton's "growing" library false because those representations did not speak to "whether anyone had accused Peloton of violating any laws";  (iii) Peloton had no duty to disclose potential litigation from the cease-and-desist letter since such litigation was not substantially certain to occur and any such omission did not occur until April of 2019, after

Passman purchased his bike; and (iv) Peloton was entitled to investigate the issues giving rise to the cease-and-desist letter.  Dkt. No. 197 at 18; *see id.* at 17–19.  Those arguments lack merit at this stage.

Defendant is mistaken in its contention that an omission becomes a misrepresentation only in a situation in which it renders other statements made by a defendant misleading.  That assertion is based on the statement to that effect in *Henry v. Rehab Plus Inc.*, 404 F. Supp. 2d 435, 445 (E.D.N.Y. Dec. 13, 2005).  But that statement was made without considering the New York Court of Appeals' decision in *Oswego* and was based solely on citation to an inapposite opinion under the federal securities laws.  *Id.* (citing *Fogarazzo v. Lehman Bros.*, 341 F. Supp. 2d 274 (S.D.N.Y. 2004)).  In *Oswego*, however, the New York Court of Appeals stated that a Section 349 case could be based upon an omission "where the business alone possesses material information that is relevant to the consumer and fails to provide this information."  647 N.E.2d at 745.  "[T]he statute surely does not require businesses to ascertain consumers' individual needs and guarantee that each consumer has all relevant information specific to its situation."  *Id.* Moreover, even where the information is such that it would be important to the reasonable consumer, the defendant's "liability under the statute will depend, in part, on whether plaintiffs possessed or could reasonably have obtained the relevant information they . . . claim the [defendant] failed to provide."  *Id.*

Thus, as the weight of authority now understands the law, where a defendant fails to supply a consumer information that it alone possesses, and where that information would be material or important to a reasonable consumer and where the consumer could not have reasonably obtained the information other than through the defendant, Sections 349 and 350 provide a basis for relief.  *See, e.g.*, *In re Sling Media Slingbox Advertising Litig.*, 202 F. Supp.

3d 352, 359 (E.D.N.Y. Aug. 12, 2016) ("Omissions are actionable 'where the business alone possesses material information that is relevant to the consumer and fails to provide this information.'"); *Dixon v. Ford Motor Co.*, 2015 WL 6437612, at *9 n.8 (E.D.N.Y. Sept. 30, 2015) (declining to follow *Henry* for the proposition that "omission based GBL § 349 claims are only viable if the omission renders other affirmative statements made by a defendant misleading"); *Tomassini v. FCA U.S. LLC*, 2015 WL 386343, at *7 n.3 (N.D.N.Y. June 23, 2015) (explaining that the *Henry* court's "interpretation of the requirements of an omissions claim under § 349 runs contrary to the New York Court of Appeals' decision in *Oswego*"); *Woods v. Maytag Co.*, 2010 WL 4314313, at *15 (E.D.N.Y. Nov. 2, 2010) ("[W]hen a defendant exclusively possesses information that a reasonable consumer would want to know and could not discovery without difficulty, failure to disclose can constitute a deceptive or misleading practice.").

Plaintiffs thus have stated a claim for relief. Plaintiffs allege that Defendant failed to disclose information that was material to the reasonable consumers, that Defendant alone possessed, and that consumers did not have a means of obtaining. They also allege that these elements were present at some point during the relevant time period. Plaintiffs allege that Peloton, fully understanding what copyright law requires, committed a "knowing violation of copyright laws," Dkt. No. 195 ¶ 83, and "was put on actual notice of its copyright infringement" on April 9, 2018, *id.* ¶ 84. As Plaintiffs put it, "on the facts, the copyright infringement claims brought against Peloton did not amount to some vague potentiality for litigation—Peloton failed to obtain licensing for music in more than half of its on-demand class library" and there is therefore "nothing speculative" about the potential for litigation. Dkt. No. 201 at 20. Plaintiffs allege that Peloton defrauded them in part by "failing to disclose the imminent"—*i.e.*, at some

time before the actual—"removal of over half of its on-demand library," *id.* ¶ 34, and, when

accepting Plaintiffs' subscription payments, Peloton knew or should have known that Plaintiffs

would not be able to use the entire on-demand class library because the size of it was materially

decreasing but withheld that information from Plaintiffs, *id.* ¶¶ 102–103.  The Complaint alleges

facts that suggest the size of the on-demand library is material; the value of the on-demand

library is tied to the size of it.  *Id.* ¶ 99.  It thus alleges that, at some point during the class period

when Passman and Alvarado made subscription payments, Peloton possessed information

material to a reasonable consumer—that it was using unlicensed material that would be removed

from the library—and failed to provide that information to Plaintiffs.  Whether or not the facts

ultimately support Plaintiffs' theory, this is sufficient to state an omission-based claim for that

period and those payments.

### C.      Voluntary-Payment Doctrine

Defendant briefly argues that Plaintiffs' claims based on their subscription services fail

because Plaintiffs "have continued to pay Peloton for subscription services."  Dkt. No. 197 at 20

(quoting Dkt. No. 195 ¶ 39)).  Defendant invokes the "voluntary payment doctrine" to contend

that, because Plaintiffs continued to use their Peloton products and pay for their subscriptions for

years after learning that Peloton had removed certain classes, their claims are precluded.

The "voluntary payment doctrine" is a "common-law doctrine [that] bars recovery of

payments voluntarily made with full knowledge of the facts, and in the absence of fraud or

mistake of material fact or law."  *Spiro v. Healthport Techs., LLC*, 73 F. Supp. 3d 259, 276

(S.D.N.Y. 2014) (quoting *Dillon v. U-A Columbia Cablevision of Westchester, Inc.*, 790 N.E.2d

1155, 1156 (N.Y. 2003)).  "[T]his is a doctrine of New York common law . . . as well as an

affirmative defense, the application of which 'may be inappropriate at the motion to dismiss

stage.'"  *Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 197 (S.D.N.Y. 2019) (quoting

*Wurtz v. Rawlings Co., LLC*, 2014 WL 4961422, at \*6 (E.D.N.Y. Oct. 3, 2014)).  "The doctrine can bar both statutory claims under GBL § 349 and common law claims."  *Shelton v. CIOX Health, LLC*, 2018 WL 4211447, at \*2 (E.D.N.Y. July 20, 2018)).

The Complaint cannot be dismissed on the basis of the voluntary payment doctrine. Plaintiffs have not pleaded facts that would suggest they knew that the classes would be removed at the time they paid for their subscriptions.  "The pleadings . . . do not establish whether [Plaintiffs] knew or should have known that the [product prices] were not based on current . . . values, and [Plaintiffs were] not required to preemptively plead facts refuting the voluntary payment doctrine."  *Spagnola v. Chubb Corp.*, 574 F.3d 64, 73 (2d Cir. 2009).  Whether the doctrine will limit the recovery of Plaintiffs for payments made during certain time periods is a question not fit for resolution at this stage of the proceeding.

### D.    Nationwide Class Allegations

Peloton also briefly argues that claims brought on behalf of a putative "nationwide" class should be dismissed as that "class includes consumers who did not transact in New York and thus lack statutory standing to bring such claims."  Dkt. No. 197 at 22.  It contends that the claims brought by a putative nationwide class "should be dismissed for the same reasons the Court dismissed Pearlman's NYGBL claims—as defined, the putative 'nationwide' class includes consumers who did not transact in New York and thus lack statutory standing to bring such claims."  Dkt. No. 197 at 22.  Plaintiffs respond that striking the nationwide class claims would be premature and that dismissing absent class members at this stage of the proceedings— as opposed to named plaintiffs—is not within the Court's purview; since nonnamed class members are not parties to litigation before certification, they cannot be dismissed.  Dkt. No. 201 at 23–25.  In the Complaint, however, Plaintiffs include a footnote that states that:

> Plaintiffs recognize that this Court has already dismissed claims brought under New
> York General Business Law §§ 349 and 350 by non-New York plaintiffs. Plaintiffs
> are not presently looking to relitigate that issue, but include the assertion of a
> nationwide class in this Third Amended Complaint to preserve the issue for appeal.

Dkt. No. 195 ¶ 106 n.70.

The Court has the authority to address the question whether class members who did not purchase Peloton Hardware and/or the corresponding subscription in the State of New York can maintain a claim for violations of the NYGBL on a motion to dismiss or a motion to strike even though it "is usually addressed on a class certification motion." *In re Frito-Lay N. Am., Inc. All Natural Litig.*, 2013 WL 4647512, at *18 (E.D.N.Y. Aug. 29, 2013); *see also Szymczak v. Nissan N. Am., Inc.*, 2011 WL 7095432, at *12 (S.D.N.Y. Dec. 16, 2011) ("States have no interest in applying their consumer protection statutes to buyers who live out of state and whose purchases occur out of state. This issue, however, is usually resolved at the Rule 23 class certification stage, not on a motion to dismiss. . . . Courts, nonetheless, can address this claim in response to a Rule 12(b)(6) motion.").

The Court previously held that allegations virtually identical to those made now by these Plaintiffs regarding the location of Peloton's bank accounts and various departments were not sufficient to support statutory standing for a plaintiff who did not specify where the relevant transactions are processed, that she purchased her products in New York, or that she made any payment in New York. *Fishon II*, 2021 WL 2941820, at *3. The Court explained that allegations that a plaintiff "paid electronically and that all payments ultimately end up in a bank account in New York, . . . without more, is not sufficient to allege that any part of the transaction took place in New York." *Id.* at *4. The allegations of the Complaint are indistinguishable from those the Court considered in 2021 in connection with the first amended complaint. Just as the first amended complaint did, the Complaint alleges that: "Peloton sees itself as a uniquely New

York company" and its "significant operations, including its banking operations, are headquartered or otherwise based in New York," Dkt. No. 195 ¶ 7; Dkt. No. 81 ¶ 7; "[a]ny time a member purchases Peloton Hardware or a Peloton Membership, that member's payment is routed to Peloton's bank accounts in New York," Dkt. No. 195 ¶ 8; *see also* Dkt. No. 81 ¶ 8; that such "payments are recorded and managed by Peloton's Accounting and Finance department, located at Peloton's New York headquarters," Dkt. No. 195 ¶ 9; Dkt. No. 81 ¶ 9; that "Peloton does not accept cash as a form of payment," Dkt. No. 195 ¶ 10; Dkt. No. 81 ¶ 10; that the classes consumers get in exchange for their payments are "recorded, produced, and issued from Peloton's New York studios," Dkt. No. 195 ¶ 11; Dkt. No. 81 ¶ 11; that its "advertising and marketing campaigns originat[ed] from and/or [were] approved by its Creative, Acquisition Marketing, Brand Marketing, and Retention Marketing departments, all located at Peloton's New York headquarters," Dkt. No. 195 ¶ 12; Dkt. No. 81 ¶ 12; and that "[t]he decision to remove the majority of Peloton's on-demand library was made in New York and effectuated in New York," Dkt. No. 195 ¶ 24; Dkt. No. 81 ¶ 24.

The Complaint is clear that although the causes of action are said to be brought on behalf of "the Class," defined as "all purchasers of the Peloton hardware and/or corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019," Dkt. No. 195 at ¶ 106; *see also id.* at 33–40 (bringing causes of action on behalf of "the Class" and "New York Subclass" and requesting certification of "the Classes as requested herein"), Plaintiffs "include the assertion of a nationwide class in this Third Amended Complaint to preserve the issue for appeal" and not to "relitigate" the dismissal of claims brought by non-New York plaintiffs, *id.* ¶ 106 n.70.  Accordingly, the Court will adhere to its prior ruling regarding what is required for statutory standing and will strike the class allegations to the extent that they include consumers

who did not transact in New York.  Assuming all of the other requirements for Rule 23 are satisfied, the class will be limited to those persons who have statutory standing under the NYGBL as the Court has previously set forth those requirements and will not include consumers nationwide who did not purchase in New York.

## CONCLUSION

For the foregoing reasons, Peloton's motion to dismiss is DENIED except as otherwise set forth in this Opinion.

The Clerk of Court is respectfully directed to close Dkt. No. 196.

SO ORDERED.

Dated: August 11, 2022
New York, New York

_____
LEWIS J. LIMAN
United States District Judge