## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIC PASSMAN and ISHMAEL ALVARADO, individually and on behalf of all others similarly situated, | Case No. 1:19-CV-11711-LJL |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| v. | |
| PELOTON INTERACTIVE, INC., | **ORAL ARGUMENT REQUESTED** |
| Defendant. | |

**Dated:** October 17, 2022

## <u>TABLE OF CONTENTS</u>

I.      Introduction.............................................................................................................1

II.     Factual Background ................................................................................................2

III.    Standard for Class Certification..............................................................................6

IV.     The Proposed Class.................................................................................................7

V.      Argument .................................................................................................................7

        A.      The Proposed Class Meets the Rule 23(a) Requirements.......................8

                1.      Rule 23(a)(1): The Class is so numerous that it would be
                        impracticable to join each Class member as a party. ...................8

                2.      Rule 23(a)(2): This case involves common issues of law or fact
                        that can be proven class-wide. ....................................................8

                        a.      The materiality of Peloton's misrepresentations and
                                omissions is a question common to all Class members that
                                can be proven through common evidence. ......................9

                        b.      Whether Peloton had a duty to disclose that its use of
                                unlicensed music in its on-demand library may result in the
                                removal of half of its library and when, if Peloton had a
                                duty to disclose, that duty arose, are questions common to
                                all that can be proven through common evidence. .......11

                        c.      Whether Peloton's misrepresentations and omissions were
                                deceptive is a common question that can be proven through
                                common evidence. .......................................................11

                        d.      Whether Peloton's deceptive conduct injured all Class
                                members is a common question that can be proven through
                                common evidence. .......................................................12

                        e.      Class-wide damages can be established using common
                                proof....................................................................15

                3.      Rule 23(a)(3): Plaintiffs' claims are typical of the other Class
                        members' claims. .......................................................................16

                4.      Rule 23(a)(4): Plaintiffs will adequately represent the Class. ...................17

        B.      The Proposed Class Satisfies Rule 23(b)(3) ........................................20

      1.     Common questions of law and fact predominate over questions affecting individual Class members.............................................................20

      2.     A class action is superior to other methods of adjudication. .....................23

C.     The Proposed Class is Readily Ascertainable.........................................................24

D.     Class Counsel Satisfy Rule 23(g)'s Adequacy Requirements. .............................24

VI.     Conclusion .......................................................................................................................25

# **TABLE OF AUTHORITIES**

**Cases**                                                                            **Page(s)**

*Allegra v. Luxottica Retail N. Am.,*
 341 F.R.D. 373 (E.D.N.Y. 2022) ................................................................................. 10, 22

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
 568 U.S. 455 (2013) ........................................................................................................ 7, 9

*Barrows v. Becerra*,
 24 F.4th 116 (2d Cir. 2022) .......................................................................................... 7, 16

*Bechtel v. Fitness Equip. Svcs., LLC,*
 339 F.R.D. 462 (S.D. Ohio Sept. 12, 2021) ...................................................................... 13

*Belfiore v. Procter & Gamble Co.*,
 311 F.R.D. 29 (E.D.N.Y. 2015) ........................................................................................... 9

*Benson v. Newell Brands, Inc.*,
 No. 19 C 6836, 2021 WL 5321510 (N.D. Ill. Nov. 16, 2021) ........................................... 10

*Charron v. Wiener*,
 731 F.3d 241 (2d Cir. 2013) .............................................................................................. 18

*Comcast Corp. v. Behrend,*
 569 U.S. 27 (2013) ............................................................................................................. 15

*de Lacour v. Colgate-Palmolive Co.*,
 338 F.R.D. 324 (S.D.N.Y. 2021) ................................................................................ passim

*Dial Corp. v. News Corp.*,
 314 F.R.D. 108 (S.D.N.Y. 2015) ....................................................................................... 17

*Duran v. Henkel of Am., Inc.*,
 450 F.Supp.3d 337 (S.D.N.Y. 2020) ................................................................................. 12

*Ebin v. Kangadis Food Inc.*,
 297 F.R.D. 561 (S.D.N.Y.2014) ............................................................................ 11, 14, 17

*Eidelman v. Sun Prod. Corp.*,
 No. 21-1046-CV, 2022 WL 1929250 (2d Cir. June 6, 2022) ............................................ 13

*Fishon v. Peloton Interactive, Inc.*,
 No. 19-CV-11711 (LJL), 2022 WL 3284670 (S.D.N.Y. Aug. 11, 2022) ..................... passim

*Fishon v. Peloton Interactive, Inc.*,
 No. 19-CV-11711(LJL), 2020 WL 6564755 (S.D.N.Y. Nov. 9, 2020) .............................. 25

*German v. Fed. Home Loan Mortg. Corp.*,
    168 F.R.D. 145 (S.D.N.Y. 1996) ........................................................................... 19

*Green v. Wolf Corp.*,
    406 F.2d 291 (2d Cir. 1968) .................................................................................... 7

*Hasemann v. Gerber Prod. Co.*,
    331 F.R.D. 239 (E.D.N.Y. 2019) .................................................................... passim

*In re AXA Equitable Life Ins. Co. COI Litig.*,
    2020 WL 4694172 (S.D.N.Y. Aug. 13, 2020) ...................................................... 13

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
    334 F.R.D. 96 (E.D. Mich. 2019) .......................................................................... 10

*In re Literary Works in Elec. Databases Copyright Litig.*,
    654 F.3d 242 (2d Cir. 2011) .................................................................................. 17

*In re Petrobras*,
    Sec., 862 F.3d 250 (2d Cir. 2017) ........................................................................ 24

*In re Scotts EZ Seed Litig.*,
    304 F.R.D. 397 (S.D.N.Y. 2015) ...................................................... 9, 12, 14, 17

*In re Sling Media Slingbox Adver. Litig.*,
    202 F.Supp.3d 352 (S.D.N.Y. 2016) .................................................................... 11

*In re Sumitomo Copper Litig.*,
    182 F.R.D. 85 (S.D.N.Y. 1998) ............................................................................ 17

*Irvin v. Harris*,
    944 F.3d 63 (2d Cir. 2019) .................................................................................... 17

*Johnson v. Nextel Commc'ns Inc.*,
    780 F.3d 128 (2d Cir. 2015) .................................................................................... 6

*Jones v. Ford Motor Credit Co.*,
    No. 00CIV.8330RJHKNF, 2005 WL 743213 (S.D.N.Y. Mar. 31, 2005) .............. 19

*Kalish v. Karp & Kalamotousakis, LLP*,
    246 F.R.D. 461 (S.D.N.Y. 2007) ......................................................................... 18

*Kaplan v. S.A.C. Cap. Advisors, L.P.*,
    311 F.R.D. 373 (S.D.N.Y. 2015) ........................................................................... 7

*Kurtz v. Costco Wholesale Corp.*,
    768 F. App'x 39 (2d Cir. 2019) ............................................................................ 15

*Kurtz v. Costco Wholesale Corp.*,
   No. 17-cv-1856, 2020 WL 3480830 (2d Cir. June 26, 2020)................................................. 15

*Kurtz v. Kimberly-Clark Corp.*,
   321 F.R.D. 482 (E.D.N.Y. 2017) .......................................................................... 14, 15, 21

*Kurtz v. Kimberly-Clark Corp.*,
   414 F.Supp.3d 317 (E.D.N.Y. 2019) ................................................................................ 15

*Montera v. Premier Nutrition Corp.*,
   No. 16-CV-06980-RS, 2022 WL 1225031 (N.D. Cal. Apr. 26, 2022)................................... 13

*Nelson v. Mead Johnson Nutrition Co.*,
   270 F.R.D. 689 (S.D. Fla. 2010) ....................................................................................... 22

*Noble v. 93 Univ. Place Corp.*,
   224 F.R.D. 330 (S.D.N.Y. 2004) ...................................................................................... 18

*Orlander v. Staples, Inc.*,
   802 F.3d 289 (2d Cir. 2015)............................................................................................ 11

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*,
   772 F.3d 111 (2d Cir. 2014)............................................................................................... 8

*Pelman ex rel. Pelman v. McDonald's Corp.*,
   396 F.3d 508 (2d Cir. 2005)............................................................................................ 14

*Porsch v. LLR, Inc.*,
   380 F.Supp.3d 418 (S.D.N.Y. 2019)................................................................................ 10

*Price v. L'Oreal USA, Inc.*,
   No. 17 CIV. 614 (LGS), 2018 WL 3869896 (S.D.N.Y. Aug. 15, 2018)........................... 17, 24

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993)............................................................................................ 16

*Rubenstein v. Collins*,
   162 F.R.D. 534 (S.D. Tex. 1995) ..................................................................................... 19

*Scott v. Chipotle Mexican Grill, Inc.*,
   954 F.3d 502 (2d Cir. 2020)............................................................................................ 20

*Seijas v. Republic of Argentina*,
   606 F.3d 53 (2d Cir. 2010).............................................................................................. 24

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,
   659 F.3d 234 (2d Cir. 2011).............................................................................................. 6

*Sharpe v. A&W Concentrate Co.,*
  No. 19-CV-768 (BMC), 2021 WL 3721392 (E.D.N.Y. July 23, 2021) ....................... 9, 13, 21

*Stutman v. Chem. Bank,*
  95 N.Y.2d 24, 731 N.E.2d 608 (2000) .................................................................... 22

*Tyson Foods, Inc. v. Bouaphakeo,*
  577 U.S. 442 (2016) ............................................................................................ 8, 20

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338 (2011) ................................................................................................ 8

**Statutes**

N.Y. Gen. Bus. Law § 349 .................................................................................. passim

N.Y. Gen. Bus. Law § 350 .................................................................................. passim

**Rules**

Fed. R. Civ. P. 23(a) ................................................................................................ 8

Fed. R. Civ. P. 23(a)(1) ............................................................................................ 8

Fed. R. Civ. P. 23(a)(2) ........................................................................................ 8, 9

Fed. R. Civ. P. 23(b)(3) ............................................................................................ 7

Fed. R. Civ. P. 23(g)(i)-(iv) .................................................................................... 25

**Other Authorities**

RESTATEMENT (SECOND) OF TORTS § 538 (1977) ........................................................ 10

## I.     INTRODUCTION

Peloton became a household name, claiming wide swaths of the home fitness market with its eponymous stationary bicycle and treadmill—not because it invented the stationary bike or sold one at a lower price—but because of its "ever-growing" library of live and on-demand classes. In its rush to market, however, Peloton set these classes to music that it had no right to use. Despite full knowledge that its vaunted class library was built on a house of cards of unlicensed music, it nevertheless promoted its library as being "ever-growing" and "growing," while failing to inform consumers that Peloton was receiving cease-and-desist letters and threats of copyright infringement litigation that Peloton knew would eventually force it to slash that profit driving—and customer building—class library full of unlicensed music. It was only a matter of time until Peloton was called to task and the house of cards it had built came tumbling down.

Peloton's misrepresentations and omissions amount to precisely the type of consumer fraud that New York General Business Law ("GBL") was enacted to protect against. Peloton's fraudulent misstatements affected *all* of its purchasers and subscribers, due to the price premium they paid for the hardware they purchased as well as the membership subscriptions they paid for each month. Common questions, for which there are class-wide answers, form the heart of this case, including whether Peloton's misrepresentations and omissions regarding its "ever-growing" library of classes were likely to deceive Class members in violation of GBL, and whether Class members overpaid for the hardware and subscriptions that they purchased.

This is a textbook case for class certification, and Plaintiffs respectfully request their motion be granted.

## II.     FACTUAL BACKGROUND

Peloton's characterization of its library as being "ever-growing" and "growing" was a feature of its advertising for years; indeed, Peloton admits it was "a compelling way [Peloton] describe[d] the library." Dravillas Decl. Ex. 1,[1] Tisch-Blodgett Tr. 27:22-28:23[2]. But it was not just a *compelling* way; it was the *only* way. Indeed, "ever-growing" and "growing" were the *only* adjectives Peloton used to describe its class library that *any* of Peloton's own employees could recall. Ex. 2, Dillon-Curran Tr. 126:14-25; Ex. 3, Stanton Tr. 140:22-141:9. And with good reason. As Peloton's former head of marketing put it, representing the on-demand class library as "ever-growing" or "growing" was "something that prospects would be interested in." Ex. 1, Tisch-Blodgett Tr. 28:22-29:3.

Peloton's website is ███████████████████████████████ ██████████████████████████████ Ex. 2, Dillon-Curran Tr. 92:6-93:21██████████████ ████████████████████████ Ex. 5, Olson Tr. 119:13-17███████████ ████████████████████████████████████████████

It is thus no surprise that Peloton's "ever-growing" and "growing" library claims were prominently featured on its website for years.[3] For example, Peloton made the following claims on its website:

| **Added September 2017** | **Added July, 2018** |
|---|---|
| Enjoy unlimited access to the world's best instructors anytime, anywhere with up to 14 daily live classes and an evergrowing library of 6,000+ on demand classes.[4] | Experience unlimited access to the world's best instructors anytime, anywhere, with 15+ daily live classes and an ever-growing library of 9,000+ classes available on-demand.[5] |

---

[1] References to "Ex __" are to the Exhibits to the Declaration of Alex J. Dravillas in Support Of Plaintiffs' Motion For Class Certification filed contemporaneously with this brief.

[2] *See also* Ex. 1, Tisch-Blodgett Tr. 11:12-16 (Q: At various points in time Peloton referred publicly to its library of on-demand classes as "growing and ever-growing"; is that true? A: Yes, that is true.)

[3] Ex. 6; Ex. 7 (Peloton website documentation memorializing its changes over time containing the misrepresentations); *see also* Ex. 8 ("growing library").

[4] Ex. 9, Peloton technical documentation adding the quoted language to its website on September 5, 2017.

[5] Ex. 10, Peloton technical documentation adding the quoted language to its website on June 10, 2018.

But Peloton's fraudulent misrepresentations extended far beyond the limits of its highly successful website. For example, Peloton touted its "ever-growing" and "growing" library representations through numerous media channels. Ex. 11 (March 2017 Internet advertisement which states, "With a Peloton subscription on your device, you'll gain unlimited access to a growing library of live streaming and on-demand Peloton classes[.]"); Ex. 12 (December 2017 advertisement which states, "Enjoy unlimited access to the world's best instructors anytime, anywhere with up to 14 daily live classes and an ever-growing library of 6,000+ on-demand classes."); Ex. 13, (June 2018 advertisement: "Explore an ever-growing library of live and on-demand studio classes taught by elite NYC instructors."); Ex. 14 (January 2019 advertisement: "Get unlimited access to new live classes daily and an ever growing on-demand library[.]"); Ex. 15 (national radio and podcast scripts); Ex. 16 (timeline of Peloton's use of "ever-growing" in its advertisements). Moreover, Peloton emphasized the importance of the "ever-growing" library in its Instructor Guide, telling instructors to answer a question about the Peloton bike by saying, "*Most importantly*, the Peloton Console brings you on-demand access to an ever-growing library of the best fitness content anywhere." Ex. 17 (emphasis added).

The benefits of representing its class library as "ever-growing" are obvious: Peloton intended its "ever-growing" library representations "to signal to consumers that [Peloton was] producing a lot of live classes, and then those classes were being put in our on-demand library[.]" Ex. 2, Dillon-Curran Tr. 33:18-21. Peloton understood this value, and continued to make these representations, because "consumers appreciate variety." *Id.* 175:5-6. Peloton's widespread representations—albeit false and misleading—were quite successful. According to Peloton's 2017 Annual Membership Survey, the on-demand class offerings in Peloton's library ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████ Ex. 18, Greenawalt Tr. 85:4-9; *see also* Ex. 4 (2017 Annual

Membership Survey at PELFISH0124264).[6]

 To measure just how important the ever-growing library was to Peloton consumers (and to

Peloton's bottom line), Plaintiffs retained J. Michael Dennis, Ph.D. to design, conduct, and report

on a consumer survey to measure the extent to which Peloton's "ever-growing library" claim was

material to consumers, whether the claim resulted in a price premium to be paid by consumers,

and if so, the amount of that premium. (*See* Declaration of J. Michael Dennis, "Dennis Decl.",

ECF No. 227, ¶ 22). Dr. Dennis conducted his survey using the "choice-based conjoint

methodology." Such conjoint surveys are among the standard marketing research techniques for

quantifying consumer preferences for products and their constituent components, and they have

been widely relied upon in litigation. (Dennis Decl. ¶ 43). That is why ██████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ Here, Dr. Dennis used

conjoint methodology to measure the marketplace price premium solely attributable to Peloton's

use of the challenged "ever-growing library" claim. (Dennis Decl. ¶ 24).

 Dr. Dennis also sought to measure the materiality of Peloton's alleged omission—

specifically whether Peloton's knowledge of information about the possible reduction in the

number of classes would have caused concern in the minds of consumers. (*Id*. ¶¶95-97).

Dr. Dennis's study found that consumers attribute significant importance to Peloton's "ever-

---

[6] ████████████████████████████████████████████████████████████████████

██████████ *Compare* Ex. 4 (2017 Annual Membership Survey) *with* Ex. 19 (2018 Annual Membership Survey);
*see also* Ex. 18, Greenawalt Tr. 69:3-10 ("Q: How else would you identify questions that would be candidates to be
removed from the annual membership survey in addition to talking to other stakeholders? A: We might look at
previous surveys and questions that are a bit obvious in terms of what the answer is that we don't think are going to
change drastically year over year.").

growing library" representation in that they paid more for Peloton's products as a result of Peloton's use of its ever-growing library claims. (*Id*. ¶102). This is hardly surprising, given the representation's purpose of attracting consumers to Peloton's products over its competitors' offerings. Dr. Dennis also found that consumers perceived the "ever-growing library" representation to indicate that the number of classes would be constantly increasing in number, at least monthly, or even more often. (*Id*. ¶¶93, 103). Finally, Dr. Dennis found that a substantial share of consumers would have considered information about the possibility that the number of classes might be reduced as part of their purchase decision. (*Id*. ¶ 97).

Given its overwhelming popularity, it is completely unsurprising that Peloton failed to yield (much less disclose) the driving headwind of cease-and-desist notices, and continued using music that it had no right to use in its live and on-demand classes. Peloton remained so obstinate that the Company continued using that bootlegged music for nearly a year to churn out its classes and, most importantly for the purposes of this litigation, continuing to advertise far and wide that its on-demand library was "ever-growing." *See e.g.*, Ex. 21 (April 9, 2018 cease and desist letter from the NMPA); Ex. 22 (infringing music removed in March 2019); Ex. 23 (describing Peloton's "ever-growing on-demand library" in June 2019).

However, like every scheme, Peloton's misrepresentations were doomed to eventually come to light. As soon as the NMPA filed its copyright infringement suit, Peloton decided to protect itself, but hurt its customers, by slashing every single class that touched on the infringing songs, resulting in the elimination of thousands of on-demand classes. *See* Ex. 22 (executing the class purge "out of an abundance of caution" after being sued for infringement in March 2019). Peloton dropped ***more than half*** of the classes in its on-demand library between January 2019 and April 2019 (from approximately 14,200 classes to only about 7,000). Ex. 24 (chart of on-demand

library size over time). Following this drastic purge, it took Peloton *eighteen months* to get the library back to its previous size, during which time it offered neither regret, recompense, nor remuneration to the consumers who had purchased Peloton for its "ever-growing" class library. *Id.*

Even *after* the purge, Peloton continued to refer to its on-demand library as being "ever growing." *See* Ex. 23; *see also* Ex. 16. In fact, just as it had done with the cease-and-desist letters, Peloton put its head down and ignored the steady stream of customer complaints from users upset with the Company's deception, the lawsuit, and the gutted library. *See* Ex 18, Greenawalt Tr. 153:14-154:18 (Peloton's reactive messaging policy to a music complaint was to not give one, and if a member asked Peloton how many classes had been affected by the purge, Peloton would not tell them); *see also* Ex. 25 (April 29, 2019 "Reactive Messaging" memo). It wasn't until after Peloton had already purged half of its library that Peloton first considered whether it was time to tell the truth and stop boasting about its "ever-growing" library. Ex. 1, Tisch-Blodgett Tr. 31:5-33:21 (discussing removal of the "ever-growing" representation so as to be "factually accurate").[7]

## III.   STANDARD FOR CLASS CERTIFICATION

A party moving for class certification must demonstrate, by a preponderance of the evidence, that the putative class meets each of Rule 23's requirements. *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015). The Court must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each element of Rule 23 has been met. *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 251–52 (2d Cir. 2011). The merits of the underlying litigation are not to be tried during this stage and are relevant only to the extent

---

[7] Even when Plaintiffs and *thousands of others* tried to bring consumer protection claims against Peloton for its behavior through arbitration (and began winning), Peloton acted as it always acted—leave a problem alone and hope it goes away. *See Simpson v. Peloton*, Case No. 1:20-07630 (S.D.N.Y.), ECF No. 25 (confirming arbitration award).

that they are relevant in determining whether the Rule 23 prerequisites for class certification are satisfied. *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

District courts are afforded "substantial discretion in determining whether to grant class certification" so long as they apply "a liberal interpretation of Rule 23." *Kaplan v. S.A.C. Cap. Advisors, L.P.*, 311 F.R.D. 373, 378 (S.D.N.Y. 2015) (the Second Circuit instructs district courts "to adopt a liberal interpretation of Rule 23"). As such, district courts should err on the side of granting class certification as opposed to ruling against certification. *Barrows v. Becerra*, 24 F.4th 116, 130 (2d Cir. 2022) (the Second Circuit gives "greater deference to district court decisions granting class certification than to decisions declining to certify a class."). *Kaplan*, 311 F.R.D. at 378 (quoting *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968) ("if there is to be an error made, let it be in favor and not against the maintenance of the class action.").

## IV.    THE PROPOSED CLASS

Under Rule 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs Eric Passman and Ishmael Alvarado seek certification of a class (the "Class") defined as:

> All purchasers of the Peloton Hardware and/or the corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019 in the State of New York.[8]

## V.    ARGUMENT

Peloton's conduct here is ripe for class treatment of the GBL claims brought against it because that conduct affected tens of thousands of consumers across New York. As Plaintiffs' experts' reports show, the elements of Plaintiffs' claims, including whether Peloton's promise of

---

[8] Plaintiffs believe that certification of a nationwide class is appropriate given Peloton's terms mandating New York law and Peloton's extended operations in New York, which should satisfy any jurisdictional requirements of the New York GBL for consumers throughout the Country. *See* Plaintiffs' Opposition to Defendant's Motion to Dismiss Plaintiffs' Third Amended Complaint, ECF No. 201 (Plaintiff hereby incorporates by reference the arguments and evidence put forth in its prior motions and briefing). Although Plaintiffs understand that this Court does not share that position, Plaintiffs nevertheless preserve their position on that point for appeal.

an "ever-growing" and "growing" library of classes impacted the price of its products, can be proven by class-wide common evidence making those common questions predominate over any individual issue.

### A.  The Proposed Class Meets the Rule 23(a) Requirements

#### 1.  Rule 23(a)(1): The Class is so numerous that it would be impracticable to join each Class member as a party.

The proposed Class here consists of many thousands of consumers. Ex. 26. In this Circuit, when a class is larger than forty, "[n]umerosity is presumed." *Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014). The proposed Class thus satisfies Rule 23(a)(1).

#### 2.  Rule 23(a)(2): This case involves common issues of law or fact that can be proven class-wide.

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." To be common, the questions must be of "such a nature that [they are] capable of class-wide resolution," such that determination of their "truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Thus, commonality requires the putative class's claims to present an "issue [that] is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

Although a single common legal issue is sufficient for class certification, like numerous other false advertising consumer class actions, the issues here give rise to numerous common questions, the answers for which can be proven though generalized class-wide evidence. Those include: (1) whether Peloton's representations and omissions were material; (2) whether the representations and omissions were deceptive; and (3) whether Peloton's deceptions injured Class

members.[9] Those questions are susceptible to class-wide resolution, because they are determined under objective standards or focus on the defendant's actions. *See, e.g., Sharpe v. A&W Concentrate Co.,* No. 19-CV-768 (BMC), 2021 WL 3721392, at *4 (E.D.N.Y. July 23, 2021) ("[C]lasswide evidence can determine whether the 'made with aged vanilla' claim was false and, if so, whether it was likely to mislead a reasonable consumer."); *de Lacour v. Colgate-Palmolive Co.*, 338 F.R.D. 324, 337 (S.D.N.Y. 2021) ("Whether these ingredients are 'natural'; whether the 'natural' claim is false and/or misleading; and whether class members paid a premium … because of that advertising claim, are all common questions apt to drive resolution of this litigation."); *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 62 (E.D.N.Y. 2015) (finding common questions such as "What does defendant's 'flushable' representation mean to a reasonable consumer," "Is defendant's 'flushable' representation materially misleading," and "Did class members pay an unsupported premium as a result of the 'flushable' representation?"); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 405 (S.D.N.Y. 2015) ("A common question . . . is whether the 50% thicker claim is false and/or misleading. The answer to this question is common to all class members, and is apt to drive the resolution of this litigation."). Rule 23(a)(2) is thus satisfied here.

> **a.    The materiality of Peloton's misrepresentations and omissions is a question common to all Class members that can be proven through common evidence.**

The materiality of Peloton's misrepresentations and omissions is a common question, because materiality is determined by an objective "reasonable consumer" standard, not a subjective standard tied to any particular Class member's beliefs. *See Amgen*, 568 U.S. at 459 ("Because materiality is judged according to an objective standard, the materiality of [Defendant's] alleged misrepresentations and omissions is a question common to all members of the class[.]").

---

[9] Other common questions susceptible to class-wide evidence abound, including whether Peloton's representations are non-actionable puffery, to what extent Peloton advertised its library as "ever-growing" and "growing," and whether Peloton's Terms of Service excuses its deceptive conduct.

"In nearly all jurisdictions," the question of materiality "call[s] for an evaluation of whether a 'reasonable consumer' or 'reasonable person' likely would consider the information concealed to be important when making a purchasing decision." *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. 96, 115 (E.D. Mich. 2019); *See also*, RESTATEMENT (SECOND) OF TORTS § 538 (1977). New York is no exception. *See Allegra v. Luxottica Retail N. Am.,* 341 F.R.D. 373, 394 (E.D.N.Y. 2022) ("An "objective" standard is applied to the question of "materiality," such that plaintiff must show that the alleged act is "likely to mislead a reasonable consumer acting reasonably under the circumstances."); *Porsch v. LLR, Inc*., 380 F.Supp.3d 418, 428 (S.D.N.Y. 2019) ("LLR's practices are likely to mislead a reasonable consumer and were thus materially misleading.")); *see also Hasemann v. Gerber Prod. Co*., 331 F.R.D. 239, 274 (E.D.N.Y. 2019) ("The materiality of potentially deceptive representations is similarly subject to objective proof."). The materiality of Peloton's misrepresentations and omissions is thus a common question capable of being answered with class-wide proof for all.

As part of Dr. Dennis's investigation, he conducted a consumer perception survey that included an analysis of the extent to which the Defendant's omission that the on-demand library would not be "ever-growing," as alleged by Plaintiffs, was potentially material to consumers' purchasing behavior. (Dennis Decl. ¶ 95). He found that "a substantial share of consumers would have considered this information – that is, about the possibility that the number of classes might be reduced – as part of their purchase decision making of the Products." (*Id.* ¶97). *See Benson v. Newell Brands, Inc.*, No. 19 C 6836, 2021 WL 5321510, at *6 (N.D. Ill. Nov. 16, 2021) (accepting Dr. Dennis's study to find that plaintiffs can use common proof to establish materiality).

**b.      Whether Peloton had a duty to disclose that its use of unlicensed music in its on-demand library may result in the removal of half of its library and when, if Peloton had a duty to disclose, that duty arose, are questions common to all that can be proven through common evidence.**

A duty to disclose material facts arises when one party has exclusive knowledge. *See In re Sling Media Slingbox Adver. Litig*., 202 F.Supp.3d 352, 359 (S.D.N.Y. 2016) (omissions are actionable under the GBL "'where the business alone possesses material information that is relevant to the consumer and fails to provide this information.'"). Here, the facts concerning Peloton's music licensing practices and the status of its negotiations with the rights holders were known solely by Peloton. Peloton has designated information related to these issues as confidential, maintaining that public disclosure of these facts will cause it competitive harm. *See, e.g.*, Ex. 21 (April 9, 2018 cease and desist letter from the NMPA). It is simply not the case that some Class members knew that Peloton was relying on unlicensed music or that Peloton had received demands to discontinue its use. Moreover, Class members were unaware that such copyright troubles would lead to Peloton's purge of over half of its on-demand class library. On the other hand, evidence of Peloton's knowledge of these facts will prove each Class member's claim.

**c.      Whether Peloton's misrepresentations and omissions were deceptive is a common question that can be proven through common evidence.**

Like materiality, whether a misrepresentation or omission is deceptive is also determined by an objective standard: whether it is likely to deceive a reasonable consumer. *See Orlander v. Staples, Inc*., 802 F.3d 289, 300 (2d Cir. 2015) ("[t]he New York Court of Appeals has adopted an objective definition of 'misleading,' under which the alleged act must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'"). And because the standard is objective, whether Peloton's misrepresentations or omissions are likely to deceive can be shown through class-wide common evidence. *See Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 565

(S.D.N.Y.2014) (holding a common question in a consumer class action brought under the GBL is whether a product's manufacturer "defrauded purchasers" by making a specific claim on the product's label); *de Lacour*, 338 F.R.D. at 337 ("As other courts in this district have held, whether a label that is uniform across products is false and/or misleading is common to all class members and is apt to drive the resolution of the litigation, because the same generalized evidence will be used to prove plaintiffs' claims."); *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 405 ("A common question . . . is whether the [] claim is false and/or misleading. The answer to this question is common to all class members, and is apt to drive the resolution of this litigation.").

Dr. Dennis was able to isolate whether consumers would be deceived by Defendant's representations through consumer survey analysis, quantifying consumers' expectations based on Defendant's representations about an "ever-growing" library. (Dennis Decl. ¶ 86). He found that more than three quarters (76.5%) of consumers would believe an "ever-growing" library meant it would be increasing over time; this statistical evidence, in his words was "conclusive." (*Id.* ¶ 87).

### d.   Whether Peloton's deceptive conduct injured all Class members is a common question that can be proven through common evidence.

Plaintiffs' theory of liability is that Defendant's misrepresentations caused consumers to pay a price premium for its bikes, treads, and subscriptions. In other words, Plaintiffs allege that all Class members were harmed, because they paid a premium for an "ever-growing" library that they did not receive. A plaintiff suffers an injury when "a company marketed a product as having a 'unique quality' ... the marketing allowed the company to charge a price premium for the product, and ... the plaintiff paid the premium and later learned that the product did not, in fact, have the marketed quality." *Duran v. Henkel of Am., Inc*., 450 F.Supp.3d 337, 350 (S.D.N.Y. 2020).

This Court recently denied Peloton's motion to dismiss and recognized that paying increased costs—a price premium—for products as a result of misrepresentations is a cognizable

injury. *Fishon v. Peloton Interactive, Inc.*, No. 19-CV-11711 (LJL), 2022 WL 3284670, at *6-8 (S.D.N.Y. Aug. 11, 2022) (finding instructive *Sharpe*, 2021 WL 3721392, at *2 and *In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16-CV-740 (JMF), 2020 WL 4694172 (S.D.N.Y. Aug. 13, 2020)).[10] Further clarifying, this Court wrote that when asserting a price premium damage model, "Plaintiffs' *personal reliance on the alleged misrepresentation is irrelevant.*" *Fishon,* 2022 WL 3284670, at *11 (emphasis added).[11] *See also Eidelman v. Sun Prod. Corp.*, No. 21-1046-CV, 2022 WL 1929250, at *1 (2d Cir. June 6, 2022) (Summary Order) ("The presence or absence of a price premium attributable to a defendant's alleged deception is objective . . ."; reliance is not an element of a GBL §§ 349 or 350 claim).

To determine whether Peloton was able to obtain a premium because its library was marketed as "ever-growing," Plaintiffs' expert, Dr. Dennis, performed a choice-based conjoint survey. (Dennis Decl. ¶ 23). This conjoint methodology has been used for decades by academic researchers, industry marketing departments, and government agencies to determine the price premium attributable to particular product attributes, such as label claims. (*Id*. ¶ 43).

Numerous courts have approved of conjoint analysis as a methodology to determine the price attributable to specific product features. *See, e.g., Montera v. Premier Nutrition Corp.,* No. 16-CV-06980-RS, 2022 WL 1225031, at *4 (N.D. Cal. Apr. 26, 2022) (accepting Dennis's and Weir's conjoint analysis); *Bechtel v. Fitness Equip. Svcs., LLC,* 339 F.R.D. 462, 485-87 (S.D. Ohio Sept. 12, 2021) (accepting Weir's conjoint methodology and certifying class); *Sharpe*, 2021 WL

---

[10] This Court further found that "[i]t is a reasonable inference from the pleaded facts that the products were subject to a price premium because Peloton's representations that the on-demand library would be 'ever-growing' indicated to the market that there would be value associated with the products that resulted in an increased price when that value was not actually there." *Id*. at *9.

[11] This Court found that GBL §§ 349 and 350 neither require reliance nor exposure to the misrepresentations at issue, because "the test is objective and turns upon the reasonable consumer" and "[t]he operative question is whether a plaintiff suffered an injury because of a defendant's misrepresentation; it is not whether that injury was tied to plaintiff's reliance on the misrepresentation." *Id*. at *12-15.

3721392, at *9 (accepting Dr. Dennis's conjoint methodology and certifying class); *de Lacour*, 338 F.R.D. at 345 (accepting Dr. Dennis's and Wier's conjoint analysis and certifying class); *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 413–14 (accepting Weir's conjoint analysis methodology and certifying class); *Ebin*, 297 F.R.D. at 571 (accepting Weir's conjoint analysis methodology and certifying class).

Because Plaintiffs allege that all Class members paid a premium for a feature they did not receive, whether Peloton's deceptive conduct injured all Class members is a common question across the Class. *Ebin* provides an example. There plaintiff sought to certify a damages class of purchasers of a product labeled "100% olive oil," which was actually pomace. *Ebin*, 297 F.R.D. at 564. The court found that injury was a common issue subject to class-wide proof because all class members, suffered an injury: they "paid too much for it." *Id.* At 569. In another example, consumers of flushable wipes brought GBL §§ 349 and 350 claims regarding allegedly flushable wipes. *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 492-93 (E.D.N.Y. 2017). Defendant opposed class certification arguing that the existence of a price premium "depends on the purchaser's individual experience with the product after purchase." *Id.* At 531. Judge Weinstein rejected that premise: "Liability under [GBL] §§ 349–350 does not depend on whether class members relied upon the representation when they purchased the flushable wipes, nor does it depend on whether the product met their personal, subjective expectations. *Id*. At 531 (*citing Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005)). Rather, the "injury is the purchase price." *Id*. At 531 (internal quote omitted). The fact that some "consumers were satisfied with the product is irrelevant." *Id*. At 531 (internal quote omitted). "All consumers who paid a premium price for a mislabeled product are economically injured in the same way without regard to the motivations behind the purchases." *Id*. At 535.

Accordingly, in *Kurtz*, Judge Weinstein certified a class of purchasers. On appeal of that certification order, the Second Circuit issued a limited remand for the court to examine whether Plaintiffs could establish the injury and causation elements of their claims at trial with common evidence. *Kurtz v. Costco Wholesale Corp.*, 768 F. App'x 39, 41 (2d Cir. 2019) (summary order). On remand, Plaintiffs submitted the expert report of Colin Weir to support their contention that there is a market-wide price premium attributable to the flushable label on toilet wipes, and that every New York consumer paid a percentage amount more for flushable toilet wipes as a result of this characterization. *Kurtz v. Kimberly-Clark Corp.*, 414 F.Supp.3d 317, 326 (E.D.N.Y. 2019). Judge Weinstein found that Mr. Weir's report sufficiently demonstrated that common evidence can prove both causation and injury. *Id.* At 333. In the subsequent appeal, the Second Circuit agreed and affirmed certification of the Rule 23(b)(3) certification. *Kurtz v. Costco Wholesale Corp.*, No. 17-cv-1856, 2020 WL 3480830, at *4 (2d Cir. June 26, 2020) (summary order).

This case is no different. Dr. Dennis's and Mr. Weir's reports support Plaintiffs' contention that there is a price premium attributable to Peloton's misrepresentations and omissions that can be shown with class-wide evidence.

### e.    Class-wide damages can be established using common proof.

Finally, the Class's damages are capable of measurement on a class-wide basis. Plaintiffs' method for calculating damages on a class-wide basis must be consistent with their theory of liability by "measur[ing] only those damages attributable to that theory." *Comcast Corp. v. Behrend,* 569 U.S. 27, 35 (2013). Here, as discussed above, Plaintiffs and the other members of the Class were injured due to paying a price premium for their purchases of Peloton's bikes, treads, and membership subscriptions that Peloton advertised as including an "ever-growing" and "growing" on-demand class library. *See, e.g.*, *Fishon*, 2022 WL 3284670, at *6-8 (recognizing that paying a price premium for products as a result of misrepresentations is a cognizable injury).

Proof of damages for these claims under the GBL will be straightforward and uniform, in that Section 349(h) provides for the recovery of "actual damages or fifty dollars, whichever is greater," and Section 350(e)(3) provides for the recovery of "actual damages or $500, whichever is greater." Thus, while Dr. Dennis's conjoint analysis and Mr. Weir's analysis thereof establishes the price premium that each Class member paid for the "ever-growing" or "growing" library, (Dennis Decl. ¶¶76-78; Declaration of Colin Weir, "Weir Decl.," ECF Nos. 228 and 229 ¶ 38),[12] class-wide damages in this case can be determined simply with reference to the GBL's statutory damages provisions.

### 3.    Rule 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims.

Rule 23(a)(3) requires Plaintiffs' claims to be "typical" of other Class members' claims. Typicality "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Barrows*, 24 F.4th at 131. "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993); *accord Hasemann*, 331 F.R.D. at 268.

Here, Plaintiffs' claims are typical of the claims of the other Class members they seek to represent. Like all Class members, they paid for Peloton hardware, and then continued to pay for subscription membership during the Class period, during which time Peloton represented that its on-demand class library would be "ever growing." TAC ¶¶ 35, 37, 39, 73-78, 103-105; *see also* Ex. 27, Passman Tr. 33:22-35:3; Ex. 28, Alvarado Tr. Vol. I 43:10-15, 44:17-20. Whenever a

---

[12] The measure of that economic impact on the retail prices of Peloton's products and services caused by Peloton's deceptive acts and practices is a question common to all Class members that will be answered with common, as opposed to individualized, proof. (Weir Decl. ¶¶ 62-66).

defendant uses deceptive advertising to inflate a product's price, any consumer who purchases that product has been harmed in the same manner, and by the same conduct, as any other consumer. *Hasemann*, 331 F.R.D. at 269 ("Plaintiffs are arguing that the same course of events—the unlawful conduct of false labeling and marketing—resulted in price premiums for an entire product line. These arguments will be typical for the entire class of consumers that purchased anything from that product line . . ."); *de Lacour*, 338 F.R.D. at 337 (citing *Ebin*, 297 F.R.D. at 565-66 and *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 406).

As with commonality, the typicality requirement is readily satisfied in false-advertising class actions like this one, in large part because the differences in the specific purchase experiences of the named plaintiffs relative to the other class members do not defeat typicality. *See, e.g., Price v. L'Oreal USA, Inc.*, No. 17 CIV. 614 (LGS), 2018 WL 3869896, at *4 (S.D.N.Y. Aug. 15, 2018) (that the named plaintiffs may not have relied on the challenged claim in making their purchases does not defeat typicality, because GBL claims do not require actual reliance); *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 114 (S.D.N.Y. 2015) ("[d]ifferences in amounts or characteristics of the class representatives' purchases do not defeat typicality"); *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 94 (S.D.N.Y. 1998) ("[T]he simple fact that Class members may have purchased and sold copper futures at different times, for different purposes" does not defeat typicality).

### 4.    Rule 23(a)(4): Plaintiffs will adequately represent the Class.

Rule 23(a)(4) requires that the representative parties "will fairly and adequately protect the interests of the class." To be adequate, the named plaintiffs must be free from fundamental conflicts of interest and possess the ability and incentive to vigorously prosecute the action. *Irvin v. Harris*, 944 F.3d 63, 71 (2d Cir. 2019); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) ("the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests

17

of other class members.") Only fundamental conflicts will render a representative inadequate (and even then, the conflict may be cured by dividing a class into subclasses). *Charron v. Wiener*, 731 F.3d 241, 249-250 (2d Cir. 2013) (internal quotation omitted).[13]

Here, Plaintiffs share the same interests as each of the other Class members. Plaintiffs themselves are Class members; they are New York residents, where they bought their Peloton products and continuously paid their Peloton membership subscriptions in 2018, all while Peloton was representing its on-demand library as being "ever-growing" and "growing." Ex. 28, Alvarado Tr. Vol. I 35:23-41:1, 86:5-16; Ex. 27, Passman Tr. 31:18-34:16. They seek damages resulting from that misrepresentation and from Peloton's failure to disclose that it knew it would likely have to remove a substantial number of its on-demand classes due to its use of unlicensed music for the classes in its on-demand class library. Ex. 28, Alvarado Tr. Vol. I 70:14-71:9; Ex. 29, Alvarado Tr. Vol. II 78:3-15, 196:11-24; Ex. 27, Passman Tr. 89:18-91:16, 104:3-19. There are no fundamental conflicts between Plaintiffs and the other Class members they seek to represent.

Further, Messrs. Passman and Alvarado have demonstrated their commitment to actively pursuing this case. They have both given deposition testimony. They have reviewed and commented on pleadings. Ex. 30, Declaration of Eric Passman, "Passman Decl." ¶ 7; Ex. 31, Declaration of Ishmael Alvarado, "Alvarado Decl." ¶ 6. They have maintained frequent contact with Plaintiffs' counsel and committed to vigorously pursuing the claims of the Class, not just their individual interests. Passman Decl. ¶¶ 14-16; Alvarado Decl. ¶¶ 17-19. Both Plaintiffs understand their responsibilities to the Class going forward and are willing to see this action through to its end. Passman Decl. ¶¶ 14-15; Alvarado Decl. ¶¶ 17-18.

---

[13] The 2003 Amendments to Rule 23 shifted the evaluation of adequacy of counsel from Rule 23(a)(4) to Rule 23(g). *Kalish v. Karp & Kalamotousakis, LLP*, 246 F.R.D. 461, 463 (S.D.N.Y. 2007); *Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 339 (S.D.N.Y. 2004). That factor is evaluated in the following section.

Peloton's discovery to Mr. Alvarado focuses on a distant criminal history unrelated to the Class's claims against Peloton. Yet "a proposed class representative's interest may only be said to be in conflict with those of other class members where the class representative is vulnerable to unique defenses and sharp attacks *relevant to the issues in the litigation*." *German v. Fed. Home Loan Mortg. Corp.*, 168 F.R.D. 145, 155 (S.D.N.Y. 1996). Nothing in Mr. Alvarado's personal history, including his 2017 unlawful surveillance conviction, hinders his ability to represent the Class. *Jones v. Ford Motor Credit Co.,* No. 00CIV.8330RJHKNF, 2005 WL 743213, at *19 (S.D.N.Y. Mar. 31, 2005) ("[C]ourts that have disallowed prospective plaintiffs on the basis of prior convictions have done so only where a clear nexus existed between the conviction and the class claims."). This Court recently applied these principles in restricting Peloton's discovery into these matters. Memorandum and Order, ECF No. 220.

Mr. Passman is a retired New York city police detective and private investigator who has been pursuing these claims since he filed an arbitration against Peloton in 2019. He continues to be willing to be a class representative, participate in discovery, and supervise his attorneys. *See* Passman Decl. ¶ 15. Mr. Passman suffered a stroke on July 29, 2022, but he is on the road to recovery will not cede his representative duties. *Id.* ¶¶ 14-15. His health issues do not preclude his representation of the Class. *See, e.g., Rubenstein v. Collins*, 162 F.R.D. 534, 539 (S.D. Tex. 1995) ("plaintiff's unfortunate stroke has no bearing on her ability to represent the class."); *Murray v. New Cingular Wireless Servs.*[14]

---

[14] Notwithstanding his recent health issues, Mr. Passman has complied with Peloton's written discovery requests. However, his stroke has prevented him from sitting for a second deposition at this time. The Parties have agreed to extend the deadline by which Peloton may take a second deposition of Mr. Passman to November 30, 2022, and Mr. Passman is prepared to provide that testimony as soon as he is able. The Parties have asked this Court for permission to submit short supplemental briefs addressing his adequacy in December. ECF No. 217.

**B.      The Proposed Class Satisfies Rule 23(b)(3)**

Under Rule 23(b)(3), the Court may authorize class certification where: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Both requirements are met here.

**1.      Common questions of law and fact predominate over questions affecting individual Class members.**

The predominance inquiry asks whether Rule 23(a)(2)'s common questions "are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods*, 577 U.S. at 453. Predominance is satisfied when the common, class-wide issues are "more substantial than the issues subject only to individualized proof." *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 512 (2d Cir. 2020) (internal quotation omitted).

As discussed above, the predominant issues here are best resolved through generalized proof applicable to all Class members. The critical question that will drive resolution of this litigation is whether Peloton's representations of its on-demand class library as being "ever-growing" and "growing" are deceptive. Peloton made these representations in its nationwide advertising—particularly through its website, which was viewed millions of times by millions of people—and also through email, radio podcasts, and creative design initiatives. Ex. 2, Dillon-Curran Tr. 103:3-9; Exs. 11-14, 23, 32-38; Dravillas Decl. ¶40. As discussed above, whether those representations were false and deceptive will be determined though an objective standard, and on a class-wide basis. Already, Plaintiffs' expert Dr. Dennis has determined that "[t]he statistical evidence is conclusive that consumers perceived the challenged representation to mean that the number of classes in the library would increase over time." (Dennis Decl. ¶ 87).

Likewise, questions regarding the materiality of Peloton's representation are also governed by objective standards that can be shown class-wide. Dr. Dennis's study shows that "[t]he statistical evidence is conclusive that a substantial share of consumers would have considered this information—that is, about the possibility that the number of classes might be reduced—as part of their purchase decision making of the [Defendant's] Products." (*Id.* ¶ 97). Because Plaintiffs' claims are premised on Peloton's uniform conduct and governed by the GBL's objective standard, there are few, if any, individual questions that could be raised here. But, regardless of whatever individual issues Peloton might attempt to identify, the common factual and legal questions are so important that they predominate over any individual questions.

Plaintiffs anticipate that Peloton will oppose class certification by contending that, to establish causation, Plaintiffs will need to demonstrate that they and each of the other Class members saw or were exposed to Peloton's promises of an "ever-growing" and "growing" library of classes. But, as this Court and other courts have found, such an argument impermissibly tries to impose a reliance requirement (which Plaintiffs need not show) by another name. *Fishon*, 2022 WL 3284670, at *12-15 (GBL §§ 349 and 350 neither require reliance nor exposure to the misrepresentations at issue); *Sharpe*, 2021 WL 3721392, at *4 ("The argument is another attempt to sneak in reliance. Where, as here, 'the consumer protection statute at issue supplies an objective test,' the claims are 'ideal for class certification' because liability turns on what a reasonable consumer, not a particular consumer, would do."). Because Plaintiffs' claims do not require reliance, liability "does not depend on whether class members relied upon the [mis]representation when they purchased the [product at issue], nor does it depend on whether the product met their personal, subjective expectations." *Sharpe* at *2 (*quoting Kurtz*, 321 F.R.D. at 531).

Because reliance is not an element of a claim under GBL §§ 349 and 350, "[t]here is no requirement that a plaintiff show that a misrepresentation "had any effect on plaintiff's decision." *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 30, 731 N.E.2d 608, 612 (2000). For the same reason, Plaintiffs do not need to show that all Class members were exposed to Peloton's misrepresentation. *Allegra*, 341 F.R.D. at 406-409 (GBL does not require Plaintiffs to show that the entire class was exposed to the misrepresentations at issue); *Hasemann*, 331 F.R.D. at 274 ("[S]ections 349 and 350 of the GBL do not contain a viewing requirement or a reliance requirement, nor do they require individual determination of how a particular advertisement affected each putative class member."). All Class members were injured by the price premium they paid at the time of sale. The price premium attributable to Peloton's misrepresentations remained the same for the entire Class, whether they saw the representation or not.

> [A] deceptive practice allows a manufacturer or vendor to charge a premium for a product that the manufacturer would not be able to command absent the deceptive practice. Thus, even if an individual consumer does not rely on a deceptive practice when deciding to purchase that product, the consumer will have paid more for the product than she otherwise would have. Consequently, the consumer suffers damages.

*Hasemann*, 331 F.R.D. at 263 (*quoting Nelson v. Mead Johnson Nutrition Co*., 270 F.R.D. 689, 692 n.2 (S.D. Fla. 2010)).

Notwithstanding the foregoing, Plaintiffs acknowledge this Court's admonition that in order to establish a price premium at summary judgment, Plaintiffs will have to prove that a sufficient number of consumers were aware of the advertised but false "unique quality" and assigned value to it such that the misrepresentation affected the price. *Fishon*, 2022 WL 3284670, at *8, n.6, 15. But, even at the class certification stage of this case, Plaintiffs have corroborated the presence of Peloton's ever-growing misrepresentations on pages of its website that were viewed by millions of people. Dravillas Decl. ¶¶ 40-41.

Furthermore, Dr. Dennis's work supports the materiality of these claims and that they are likely to deceive reasonable consumers. His study was performed in accordance with accepted practices in the industry. He created a blind research questionnaire that collected data online from more than 1,000 interviewees. (Dennis Decl. ¶¶50, 62-63, 69). The questionnaire had been pretested and its research objectives disguised. (*Id.* ¶¶ 64, 66). Consumer perceptions were analyzed while avoiding the potential risk of focalism bias that could have introduced bias into the conjoint survey. (*Id.* ¶ 84). He discovered that "[a] substantial majority of consumers expected the number of classes in the library to increase over time because of the "ever-growing library" representation." (*Id.* ¶ 87). In fact, the statistical evidence was "conclusive that consumers perceived the challenged representation to mean that the number of classes in the library would increase over time." (*Id.*).

Because Plaintiffs' claims are premised on Defendant's uniform conduct and governed by the GBL that measures Defendant's compliance (or lack thereof) though objective standards, there are few if any individual questions that could be raised here. More importantly, however, given the large number and significant importance of the class-wide issues presented in the action, it is clear that the numerous common issues are more numerous and important—*i.e.*, they predominate—over any hypothetical individual issues.

### 2.    A class action is superior to other methods of adjudication.

Resolving Plaintiffs' and the other Class members' claims on a class-wide basis is superior to litigating thousands of individual actions. It would cost Class members much more to litigate their individual lawsuits than they could recover in damages. And litigation is the Class's only path to vindicate its claims. When thousands of Peloton's customers filed arbitration demands seeking redress for Peloton's conduct, Peloton refused to pay the required arbitration fees, and the American Arbitration Association wrote a letter to Peloton declining to administer the arbitrations,

stating that either party may submit its dispute to an appropriate court, and declined to accept future consumer matters submitted by or against Peloton. TAC ¶¶ 49-57.

Where proceeding individually would be prohibitive due to the minimal recovery, "the class action device is frequently superior to individual actions." *See Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010); *see also Price*, 2018 WL 3869896, at *11 ("Consumer class actions of this variety, designed to recover relatively small price premiums in comparison to the expense and burden of litigation, are clearly superior to the alternative of forcing consumers to litigate on principle."). The relatively small amount at issue for each Class member renders individual litigation infeasible, but a class action offers the potential for meaningful redress to the Class. Simply put, certification is appropriate, because this case can be tried in an efficient manner on a class-wide basis. *See de Lacour*, 338 F.R.D. at 345-46 (finding class action treatment superior); *Price*, 2018 WL 3869896, at *11 (same).

### C.     The Proposed Class is Readily Ascertainable.

The Second Circuit has made clear that ascertainability only requires a class to be "defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017). The Second Circuit's implied ascertainability requirement is readily met here. The proposed Class is based on the objective criteria of whether consumers made Peloton purchases in New York during a discrete time period. Class membership can readily be acquired from Peloton's own records, such as purchase orders and membership subscription records. Thus, the proposed Class can be readily identified and is ascertainable.

### D.     Class Counsel Satisfy Rule 23(g)'s Adequacy Requirements.

Under Rule 23(g), the Court must consider: (1) the work counsel has done, (2) counsel's experience handling class actions and other complex litigation, as well as the types of claims

asserted in the action, (3) counsel's knowledge of the applicable law, and (4) the resources counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(i)-(iv). All four factors demonstrate Class Counsel's adequacy here.

Indeed, Class Counsel have pursued this litigation since December 2019, fending off multiple motions to dismiss, *Fishon*, 2020 WL 6564755, at \*14 and *Fishon*, 2022 WL 3284670, at \*18, challenging the adequacy of Peloton's discovery and forcing Peloton to recommit to its discovery obligations, ECF No. 94, reviewing tens of thousands of documents, and deposing multiple current and former Peloton employees. *See* Exs. 41-43, Declarations of Benjamin J. Whiting, Adam J. Levitt, and Aaron M. Zigler. Class Counsel and their firms bring to this litigation extensive experience and knowledge from successfully litigating consumer class action claims like these for decades.

Each firm has and will dedicate significant resources to representing the Class, including, so far, the costs associated with designing and conducting a conjoint survey as well as two expert reports. (Dennis Decl. ¶ 2; Weir Decl. ¶7). Class Counsel has been vigorously litigating this case since before they filed the complaint and will continue to do so through final resolution. *See* Ex. 41, ¶¶ 4-6; Ex. 42, ¶¶ 8-9, 24-25; Ex. 43, ¶¶ 17-18. If appointed as Class Counsel, they will continue to adequately serve the Class's needs and pursue these claims through resolution.

## VI.    CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant their motion for class certification, certify the proposed Class, appoint Mr. Alvarado and Mr. Passman as Class Representatives, and appoint the undersigned counsel as Class Counsel.

Dated: October 17, 2022                        */s/ Benjamin J. Whiting*
                                               BENJAMIN J. WHITING
                                               ben.whiting@kellerpostman.com

ASHLEY C. KELLER (*pro hac vice*)
ack@kellerpostman.com
ALEX J. DRAVILLAS (*pro hac vice*)
ajd@kellerpostman.com
**KELLER POSTMAN LLC**
150 North Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Telephone: (312) 741-5222

ADAM J. LEVITT (*pro hac vice*)
alevitt@dicellolevitt.com
ADAM PROM (*pro hac vice*)
aprom@dicellolevitt.com
**DiCELLO LEVITT LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: (312) 214-7900

Greg G. Gutzler
ggutzler@dicellolevitt.com
Chuck Dender
cdender@dicellolevitt.com
**DiCELLO LEVITT LLC**
485 Lexington Avenue, Suite 1001
New York, New York 10017
Telephone: (646) 933-1000

AARON M. ZIGLER
aaron@ziglerlawgroup.com
**ZIGLER LAW GROUP, LLC**
308 South Jefferson Street, Suite 333
Chicago, Illinois 60661
Telephone: (312) 673-8427

*Counsel for Plaintiffs and the Proposed Class*