UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                      :

ERIC PASSMAN and ISHMAEL ALVARADO,     :
*individually and on behalf of all others similarly situated*, :
                                                      :

                  Plaintiffs,      :             19-cv-11711 (LJL)

                                                      :

          -v-                         :        OPINION AND ORDER

                                                         :

PELOTON INTERACTIVE, INC.,           :

                  Defendant.     :

------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Named Plaintiffs Eric Passman ("Passman") and Ishmael Alvarado ("Alvarado" and,

together with Passman, "Named Plaintiffs") move, pursuant to Federal Rule of Civil

Procedure 23, for an order certifying this case as a class action, appointing Named Plaintiffs as

class representatives, and appointing the law firms of Keller Postman LLC, DeCello Levitt LLC,

and Ziglar Law Group, LLC, as class counsel. Dkt. No. 226. Defendant Peloton Interactive, Inc.

("Peloton" or "Defendant"), moves for an order excluding the expert reports and testimony of J.

Michael Dennis and Colin B. Weir pursuant to Federal Rule of Evidence 702 and *Daubert v.

Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Dkt. No. 240.

      For the following reasons, the motion to exclude the expert reports and testimony of

Dennis and Weir is denied and the motion for class certification is denied.

## BACKGROUND

      The parties engaged in discovery for the purpose of filing and contesting the present

motion for class certification and the related motion to strike. *See* Dkt. No. 212. The following

facts are taken from the parties' submissions in connection with the motion for class certification

and the motion to strike "and the Court resolves factual disputes as necessary for the disposition of" the motions. *See Loc. 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York*, 2022 WL 17175798, at *1 (S.D.N.Y. Nov. 22, 2022) (quoting *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 258 (S.D.N.Y. 2018)).

Named Plaintiffs bring this action against Defendant alleging violations of New York's consumer fraud statutes, New York General Business Law ("NYGBL") Sections 349 and 350. Defendant is an exercise equipment and media company that sells stationary bicycles ("Peloton Bike") and treadmills ("Peloton Tread") online, over the phone, and in showrooms. Dkt. No. 250-2 at 5, 7–8. In addition to selling the Peloton Bike and Peloton Tread (collectively, "Peloton Hardware"), Defendant also sells monthly subscriptions ("Peloton Memberships"), which allow subscribers to watch live and pre-recorded (or "on-demand") fitness classes through Peloton Hardware's built-in interactive touchscreens. *Id.* at 5–6. Peloton also sells a digital application that allows users to take classes on non-Peloton Hardware. Dkt. No. 250-3. Passman purchased a Peloton Bike and one-year Peloton Membership directly from Defendant in early 2017. Dkt. No. 257-6 at 4–5, 7. Alvarado purchased a used Peloton Bike with his wife from a friend in January 2019 and purchased a Peloton Membership. Dkt. No. 250-4 at 36–37, 40–41; Dkt. No. 257-1 ¶ 3.

The action stems from statements made by Defendant on its website and other media that it offered subscribers an "ever-growing" or "growing"[1] library of live and on-demand studio classes (the "Challenged Statement"). *See, e.g.*, Dkt. Nos. 232-14, 232-15, 232-15, 232-16,

---

[1] The Court previously found that these two terms conveyed functionally identical messages. Dkt. No. 65 at 15. Thus, the Court analyzes both terms together as the "Challenged Statement." Neither Named Plaintiffs nor Defendant propose, at least for the purposes of this motion, that they be treated separately.

232-17; *see also* Dkt. No. 253-3 at 1–3.  The Challenged Statement appeared in only a subset of Peloton's advertisements, *see* Dkt. No. 253-4 (appendix of sample advertisements), and did not appear in any television advertisements, *see* Dkt. No. 250-10 at 136.  In April 2018, while it was making the Challenged Statement, Defendant received a cease-and-desist letter regarding its alleged copyright infringement of songs appearing in classes in its on-demand class library.  Dkt. No. 232-22.  In March 2019, several members of the National Music Publishers' Association collectively filed a lawsuit against Defendant.  *See* Dkt. No. 232-23.  On March 25, 2019, in response to that lawsuit, Defendant removed approximately 6,500 on-demand classes from its library, leaving approximately 7,000 classes available to its members.  *Id.*; Dkt. No. 255-10.

Named Plaintiffs bring this action on behalf of a class defined as "[a]ll purchasers of the Peloton Hardware and/or the corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019 [(the "Class Period")] in the State of New York."  Dkt. No. 195 ("Third Amended Complaint") ¶ 106.  As currently pleaded, Named Plaintiffs allege that Defendant's representation that its library was "ever-growing" was false and misleading, because, at the time it made the Challenged Statement, it knew that it would be removing a large proportion of its on-demand digital library.  *See generally* Third Amended Complaint ¶¶ 116–54.  As a result, each of the putative class members suffered injury caused by the Challenged Statement by overpaying for Peloton Hardware and Peloton Memberships.  *See id.*

## PROCEDURAL HISTORY

This case was initiated by complaint in December 2019 by Eric Fishon, Alicia Pearlman, and Patrick Yang, individually and on behalf of all others similarly situated, bringing claims for violations of NYGBL Sections 349 and 350.  Dkt. No. 1.  On August 4, 2020, and pursuant to an unopposed request, the Court ordered the voluntary dismissal of Yang.  Dkt. No. 61.  On November 9, 2020, the Court granted a motion to dismiss the claims of Pearlman—a Michigan

resident—without prejudice because she lacked statutory standing under the New York statute, but it denied a motion to dismiss Fishon's claims. *See Fishon v. Peloton Interactive, Inc.*, 2020 WL 6564755 (S.D.N.Y. Nov. 9, 2020).

On January 21, 2021, plaintiffs Fishon and Pearlman filed a first amended complaint. Dkt. No. 81. Peloton again moved to dismiss Pearlman's claims, contending that Pearlman had not pleaded facts sufficient to show that she had statutory standing to sue under NYGBL Sections 349 and 350. Dkt. Nos. 88–89. The Court, once again, dismissed Pearlman's claims under the NYGBL, explaining that the amendment failed to cure the deficiencies identified in the original complaint. *Fishon v. Peloton Interactive, Inc.*, 2021 WL 2941820, at *5 (S.D.N.Y. July 12, 2021). The Court, however, granted leave for Pearlman to amend her complaint to plead her cause of action under Michigan law. *Id.*

On July 26, 2021, Plaintiffs filed a second amended complaint, with Fishon bringing claims under NYGBL Sections 349 and 350 and Pearlman bringing a claim under the Michigan Consumer Protection Act ("MCPA"), Michigan Compiled Laws § 445.901, *et seq.* Dkt. No. 106. On August 9, 2021, Defendant moved to dismiss Pearlman's claims in that complaint. Dkt. No. 107. On September 16, 2021, Fishon and Pearlman moved to certify the putative classes; Fishon moved for certification of a class of "[a]ll purchasers of the Peloton hardware and/or the corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019 in the State of New York," while Pearlman sought certification of a class of "[a]ll purchasers of the Peloton hardware and/or the corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019 in the State of Michigan." Dkt. No. 118 at 9. The Court granted Defendant's motion to dismiss Pearlman's claim under the MCPA, concluding that Pearlman did not allege with the requisite specificity facts supporting her reliance on

Peloton's statements that its on-demand library of fitness classes was "ever-growing," as was required under the Federal Rule of Civil Procedure Rule 9(b) standard applicable to her MCPA claim for which reliance was an essential element. *Fishon v. Peloton Interactive, Inc.*, 2022 WL 179771, at *8 (S.D.N.Y. Jan. 19, 2022). The Court also denied the motion for class certification by Fishon on the grounds that Fishon was not an adequate class representative. *Id.* at *11–12.

On February 18, 2022, Named Plaintiffs Passman and Alvarado, previously absent class members, filed the Third Amended Complaint. Dkt. No. 195. Defendant moved to dismiss the Third Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), Dkt. Nos. 196–97, 202, and Plaintiffs opposed that motion, Dkt. No. 201. On August 11, 2022, the Court denied the motion to dismiss the Third Amended Complaint. Dkt. No. 207; *see Fishon v. Peloton Interactive, Inc.*, 2022 WL 3284670 (S.D.N.Y. Aug. 11, 2022).

On October 17, 2022, Named Plaintiffs filed this motion to certify the class, supported by the declaration of Alex J. Dravillas, the expert declarations of Dennis and Weir, and a memorandum of law. Dkt. Nos. 226–33. On November 14, 2022, Defendant filed a memorandum of law in opposition to the motion for class certification and its motion to strike Plaintiff's expert declarations and supporting memoranda of law; the motion and the opposition to the motion for class certification were supported by the declarations of Megan A. Behrman and the expert declarations of Joel H. Steckel, PhD, Rebecca Kirk Fair, and Bruce A. Strombom, PhD. Dkt. Nos. 241–59. On November 30, 2022, Plaintiffs filed a reply memorandum of law in further support of its motion for class certification, an affidavit of Dravillas, and reply affidavits of Charles F. Dender and Benjamin F. Whiting. Dkt. Nos. 263–66. Named Plaintiffs also filed a response to the motion to strike the expert reports along with declarations of Dravillas and reply declarations of Dennis and Weir. Dkt. Nos. 268–73. On December 16, 2022, Defendant filed a

supplemental memorandum of law in opposition to the motion for class certification and a supporting declaration, Dkt. Nos. 274–75, to which Named Plaintiffs responded and filed opposing declarations on December 27, 2022, Dkt. Nos. 277–79.  On December 22, 2022, Defendant filed a reply memorandum of law in further support of its motion to strike the expert reports.  Dkt. No. 276.

On April 12, 2023, the Court heard oral argument on the motions.  *See* Minute Entry, April 12, 2023.

## DISCUSSION

The Court first considers Defendant's *Daubert* motion.  Having resolved the *Daubert* motion, the Court then turns to the question of whether a class can be certified.

## I.    Defendant's *Daubert* Motion

Defendant argues that the opinions of Dennis and Weir are not helpful to the trier of fact, irrelevant, and unreliable.  Dkt. No. 252 at 1–2.  Defendant thus moves to exclude the testimony of Dennis and Weir at the class-certification stage.  *Id.* at 2.  Named Plaintiffs counter that the expert testimony of Dennis and Weir is relevant, helpful to the trier of fact, and reliable, and that the issues that Defendant raises about their testimony go to the weight of the evidence at the merits stage, not the admissibility of the evidence at the class-certification stage.  Dkt. No. 267 at 1–2.

Under Federal Rule of Evidence 702, a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)).  That rule requires the proponent to establish and the trial judge to find "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589.  This "gatekeeping obligation" applies "to all expert testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

"The objective of [the gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony.  It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. Relevancy is determined by whether the proffered evidence "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." *Amorgianos v. Amtrak*, 303 F.3d 256, 265 (2d Cir. 2002).  Reliability is determined by considering if (1) "the testimony is based on sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods;" and (3) "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702; *see also Amorgianos*, 303 F.3d at 266 (citing this standard).

Courts are to adhere to a "liberal standard of admissibility for expert opinions," *Nimely v. City of New York*, 414 F.3d 381, 395–96 (2d Cir. 2005), beginning with "a presumption that expert evidence is admissible," *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015) (citing *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995)).  However, a court still must determine that the evidence is "sufficiently reliable so as to be admissible."

*Amorgianos*, 303 F.3d at 268.  "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."  *Id.* at 267.  "[I]t is critical that an expert's analysis be reliable at every step."  *Id.*  Even "[i]f the witness is relying solely or primarily on experience, [she still] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Alto v. Sun Pharmaceutical Indus., Inc.*, 2021 WL 4803582, at *2 (S.D.N.Y. Oct. 13, 2021) (internal quotation marks omitted) (quoting *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 473 n.148 (S.D.N.Y. 2010)).

Though there is some question of whether a *Daubert* analysis is appropriate at the class-certification stage, *see Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 393 (S.D.N.Y. 2018) ("[T]he Second Circuit has not resolved whether and to what extent *Daubert* applies at the class certification stage."), "the heavy weight of authority militat[es] towards a *Daubert* inquiry at class certification," *In re Namenda Indirect Purchaser Antitrust Litig.*, 2021 WL 100489, at *8 (S.D.N.Y. Jan. 12, 2021); *see also Wal-Mart Stores, Inc.*, 564 U.S. 338, 354 (2011) (noting in dicta that the Court "doubt[s] that" "*Daubert* did not apply to expert testimony at the certification stage of class-action proceedings" but not settling the question).  However, the *Daubert* "inquiry is guided by the purpose for which the evidence is introduced—establishing the various class certification requirements."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 471 (S.D.N.Y. 2018).  "In other words, '[t]he question is not . . . whether a jury at trial should be permitted to rely on [the expert's] report to find facts as to liability, but rather whether [the Court] may utilize it in deciding whether the

requisites of Rule 23 have been met.'" *Ge Dandong v. Pinnacle Performance Ltd.*, 2013 WL

5658790, at *13 (S.D.N.Y. Oct. 17, 2013) (alterations in original) (quoting *In re Visa

Check/Mastermoney Antitrust Litig.*, 192 F.R.D. 68, 77 (S.D.N.Y. 2000)).  Thus, a court's

decision to consider an expert report at the class-certification stage is not dispositive of the

question whether the report will be received at the merits stage.

The Court first addresses the challenges to Dennis's surveys and declaration and then

addresses the challenges to Weir's declaration.

### A.      Dr. J. Michael Dennis

Dennis is Senior Vice President at the National Opinion Research Center, a survey

research organization.  Dkt. No. 227 ¶ 8.  He holds bachelor's and master's degrees from the

University of Texas, Austin, and a PhD in political science from the University of Chicago.  *Id.*

¶ 17.  He has worked as a survey research expert for more than twenty years, and authored more

than sixty articles, conference and seminar papers, and book chapters.  *Id.* ¶ 14.  He has

published articles in a number of academic journals.  *Id.* ¶ 15.

Dennis conducted a consumer perceptions survey to analyze whether Defendant's alleged

misstatement and omission would be important to consumers.  *Id.* ¶ 22.  He also conducted a

price premium survey, also known as a conjoint survey,[2] to measure the extent to which the

market-clearing price for Peloton Bikes and Memberships would have been different in the but-

for scenario where Defendant did not use the "ever-growing library" representation in its

advertising and marketing.  *Id.* ¶ 23.  Defendant seeks to exclude Dennis's conjoint analysis

---

[2] In a conjoint survey, participants are presented with a "choice exercise" in which they are
typically shown a set of three-to-four hypothetical products, which are comprised of several
different attributes, including the product's brand, features, and price.  Dkt. No. 227 ¶ 44.  The
survey participants are then asked to choose which of the products, if any, they would purchase.
*Id.*  Each participant reveals her preference for specific attributes through these choices, which
provide data from which a price premium for these attributes can be calculated.  *Id.* ¶¶ 46–47.

because it fails to isolate the price premium associated with the Challenged Statement.  Dkt. No. 252 at 7.  Defendant further argues that Dennis's analysis only focuses on the demand side of the equation and does not account for supply-side factor.  *Id.* at 11.  As a result, Defendant argues, Dennis's "analysis is not consistent with Plaintiffs' theory of liability and should be excluded" under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  Dkt. No. 252 at 7–10.  Defendant challenges Dennis's perception survey as methodologically flawed.  *Id.* at 18–19.  Named Plaintiffs argue that this analysis is better suited to the Rule 23(b)(3) context, Dkt. No. 267 at 9, and that any alleged flaws in Dennis's methodology should go to the weight of the evidence, not the admissibility of the surveys, *see id.* at 19–22.  The Court agrees with Named Plaintiffs.

The Supreme Court in *Comcast Corp. v. Behrend* held that Rule 23(b)(3) requires that the proposed methodology for calculating damages be consistent with the class's theory of liability and capable of measuring these damages on a classwide basis.  569 U.S. at 36–38; *see also In re U.S. Foodservice Pricing Litig.*, 729 F.3d 108, 123 n.8 (2d Cir. 2013).  District courts must thus "entertain arguments against [a plaintiff's] damages model that [bear] on the propriety of class certification" in its Rule 23(b)(3) analysis.  *Comcast Corp.*, 569 U.S. at 34.  It follows that, even if the Court were ultimately to conclude that Dennis's model was inconsistent with Named Plaintiffs' theory of liability, the model nonetheless is relevant at the class-certification stage. The relevant question at the class-certification stage is not the exact amount of damages suffered by each putative class member as a result of Defendant's conduct.  *See id.* at 35 ("Calculations need not be exact."); *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) (same); *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 550 (E.D.N.Y. 2017) ("Plaintiffs need not prove exactly what their damages will be.").  Rather, the relevant question is whether Named

Plaintiffs have presented a model for damages that is consistent with their theory of liability.  *See In re U.S. Foodservice Pricing Litig.*, 729 F.3d at 123 n.8 ("[C]ourts should examine the proposed damages methodology at the certification stage to ensure that it is consistent with the classwide theory of liability and capable of measurement on a classwide basis.").  Dennis's analysis is helpful in that regard; it permits the Court to address the question of whether Named Plaintiffs have put forward a workable model for calculating damages and thus to determine whether Named Plaintiffs have carried their burden of establishing predominance under Rule 23(b)(3).  The Court thus accepts Dennis's testimony regarding his price-premium survey for that purpose.  *See McMorrow v. Mondelez Int'l, Inc.*, 2021 WL 859137, at *9 (S.D. Cal. Mar. 8, 2021) ("The criticism that 'the methodology does not satisfy the requirement articulated in *Comcast . . . i.e.*, that damages be capable of measurement on a classwide basis . . . does not affect the admissibility of [an expert's] opinions.'" (alterations in original) (citation omitted)); *In re 5-Hour Energy Mktg. & Sales Pracs. Litig.* ("*In re 5-Hour Energy*"), 2017 WL 2559615, at *5 (C.D. Cal. June 7, 2017) ("Because the issue of whether [the expert] has put forward a workable model to assess damages on a class-wide basis is closely intertwined with the Rule 23(b) predominance analysis, the Court declines to address the reliability of [the expert]'s methodologies in a *Daubert* motion, and instead accepts [the expert]'s expert report and testimony for the limited purpose of deciding the predominance issue."); *Forth Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 130 (S.D.N.Y. 2014) (the question of "whether the method that [plaintiffs' expert] uses to assess the damages will be applicable on a classwide basis . . . is properly considered as part of the Rule 23(b) issue of whether questions common to the class predominate over individual issues, not to the validity of

[the expert's] methods as a matter of the admissibility of his expert testimony under the Federal Rules of Evidence.").

Defendant also challenges Dennis's consumer perception survey as "inherently unreliable" because it suffers from methodological errors.  Dkt. No. 252 at 18.  Among the issues that Defendant identifies with the survey are (1) the perception survey does not reflect a realistic marketplace, *id.* at 18; and (2) the instructions were "vague, leading, and prone to biased responses in favor of [Named] Plaintiffs' theory of the case," *id.* at 19.  Named Plaintiffs counter that these issues go to the weight that the Court should afford the evidence, not its admissibility. Dkt. No. 267 at 18.

The Court finds it unnecessary to address these issues on this motion.  To resolve this motion, the Court need not determine that Dennis's survey is sufficiently reliable for a jury to hear it; the pertinent question is whether it is sufficiently reliable for the Court to consider it in determining whether the Rule 23 criteria are met.  Thus, the posture of *Daubert* motions at the class-certification stage is similar to the posture of *Daubert* motions at a bench trial.  That is, the judge is acting both as gatekeeper and factfinder.  *See* 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 702.02 (2d ed. 2021) ("In a bench trial, the judge acts as both gatekeeper and factfinder.  The judge must determine both whether expert evidence is admissible under Rule 702 and whether it is credible.").  "When the gatekeeper and the trier of fact are the same, the court may admit evidence subject to the ability later to exclude it or disregard it, if the evidence turns out not to meet the standard of reliability under Rule 702."  *Id.* Under those circumstances, "the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702."  *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006); *see also Howard University v.*

*Borders*, 2022 WL 3568477, at *5 (S.D.N.Y. Aug. 17, 2022); *Town & Country Linen Corp. v. Ingenious Designs LLC*, 2022 WL 2757643, at *2–3 (S.D.N.Y. July 14, 2022).  The Court thus is able to assess the weaknesses, or lack thereof, of Dennis's survey without determining whether to formally exclude it.  As the Honorable Judge Valerie E. Caproni cogently put it, "there is no need for the Court to 'gate-keep expert testimony from [itself].'"  *Matter of Manhattan by Sail*, 436 F. Supp.3d 803, 810 (S.D.N.Y. 2020) (quoting *Joseph S. v. Hogan*, 2011 WL 2848330, at *2 (E.D.N.Y. July 15, 2011)); *see also Bic Corp. v. Far E. Source Corp.*, 23 F. App'x 36, 39 (2d Cir. 2001) (summary order) ("[T]he admission of evidence in a bench trial is rarely ground for reversal, for the trial judge is presumed to be able to exclude improper inferences from his or her own decisional analysis.").

### B.     Colin B. Weir

Weir is Plaintiffs' damages expert.  He holds a Master of Business Administration degree from Northeastern University and is the President of Economics and Technology, Inc.  Dkt. No. 228 at ECF p. 2; *id.* ¶ 1.  Weir worked with Dennis to develop parts of his price-premium survey.  *Id.* ¶ 32.  He also uses Dennis's survey data and the historical sales of Peloton products to calculate damages.  *Id.* ¶¶ 51–61.

Defendant argues that Weir's testimony is inadmissible for two reasons.  First, Defendant argues that Weir's testimony "should be excluded because it derives from Dr. Dennis' flawed analysis."  Dkt. No. 252 at 22 (cleaned up).  Second, Defendant claims that "Weir's damages calculations . . . do not require 'expertise' beyond third-grade arithmetic."  *Id.* at 7; *see also id.* at 17 (noting that Weir's damages calculations "does not assist the trier of fact . . . [and] should be excluded").  The Court rejects both arguments at this stage.

The Court already found that Dennis's testimony will be helpful in its predominance analysis.  Because the Court will consider Dennis's testimony, it will also consider Weir's

testimony for the limited purpose of determining whether Named Plaintiffs have carried their burden of establishing predominance under Rule 23(b)(3).  As to Defendant's second argument, courts distinguish between damages calculations that are so simple as to be unhelpful to the trier of fact from those that, although simple, rely on more complex analysis not otherwise accessible to the factfinder.  *Compare FPP, LLC v. Xaxis US, LLC*, 2017 WL 11456572, at *2 (S.D.N.Y. Feb. 13, 2017) ("By drawing solely on figures that would be in evidence before the trier of fact and then performing simple arithmetic on those figures, [the proposed expert] is not deploying 'specialized knowledge' to 'help the trier of fact' in any way." (citation omitted)), *and Valley v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2023 WL 2918982, at *9 (S.D.N.Y. Apr. 12, 2023) (same), *with Perez v. Rash Curtis & Assocs.*, 2019 WL 1491694, at *4 (N.D. Cal. Apr. 4, 2019) (concluding that "[w]hile a juror may be able to do simple math calculations, it would be unreasonable to expect jurors to" gather the inputs necessary for those calculations), *and In re Scotts EZ Seed Litig.*, 2017 WL 3396433, at *11 (S.D.N.Y. Aug. 8, 2017) (recognizing that although expert's statutory damage calculations under NYGBL Sections 349 and 350 is "hardly a complicated analysis, [the expert's] testimony and explanation of his calculations will assist the trier of fact in understanding how he calculated the number of 'violations' . . . and how that translates into a total damages amount").  Here, the Court finds that Weir's testimony falls into the latter category; although his damages calculations reflect basic arithmetic, his testimony provides the Court with analysis and data that is necessary to explain this arithmetic and that would not otherwise be available.  Weir explains what a conjoint analysis is and some of the economic principles behind it, Dkt. No. 228 ¶¶ 16–29; he expresses his opinion on the validity of the survey, including its incorporation of supply-side considerations, *id.* ¶¶ 35–50; he estimates total sales for the Peloton Bike and Tread using data provided by Defendant, *id.* ¶¶ 51–53; and he

uses Dennis's survey results and the sales data to calculate damages, *id.* ¶¶ 51–61.  It is thus not the case that Weir "simply adopted the opinions of others and performed grade-school arithmetic counsel can do on an easel."  *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 5148390, at *5 (N.D. Cal. Nov. 6, 2017).  Weir compiled data that the Court would need to conduct this grade-school arithmetic.  For the reasons stated above and discussed further below in the discussion of predominance, the Court need not conclude that Weir's damages testimony would be admissible at trial in order for it to consider Weir's report for purposes of class certification.  Thus, the Court will not preclude Weir's testimony on that basis.

## II.    The Motion for Class Certification

Named Plaintiffs move to certify a class defined as "[a]ll purchasers of the Peloton Hardware and/or the corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019."  Dkt. No. 230 at 7.  Defendant challenges the motion, arguing that (1) Named Plaintiffs are inadequate and atypical class representatives; (2) Named Plaintiffs have failed to establish that common issues predominate; and (3) proposed class counsel is inadequate. *See* Dkt. No. 251 at 1–2; Dkt. No. 274 at 1–3.

Under Federal Rule of Civil Procedure 23(a), plaintiffs may sue on behalf of a class where: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  These "familiar requirement[s] of Rule 23(a)[ ] [are] commonly referred to as numerosity, commonality, typicality, and adequacy of representation."  *In re Monster Worldwide, Inc. Secs. Litig.*, 251 F.R.D. 132, 134 (S.D.N.Y. 2008).

A party seeking class certification must also demonstrate compliance with one of the three requirements of Rule 23(b).  *See Wal-Mart Stores, Inc.*, 564 U.S. at 345.  One such requirement mandates "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "The 'predominance' requirement of Rule 23(b)(3) 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"  *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 594 (1997)).  If a court certifies a class, it must appoint class counsel, and, in doing so, it must consider the adequacy of counsel.  Fed. R. Civ. P. 23(g).

"[A] district court may not grant class certification without making a determination that all of the Rule 23 requirements are met."  *In re Initial Public Offerings Secs. Litig.*, 471 F.3d 24, 40 (2d Cir. 2006).  "Rule 23 does not set forth a mere pleading standard."  *Wal-Mart Stores, Inc.*, 564 U.S. at 350.  Instead, the party moving for class certification "must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc."  *Id.*; *see also Johnson v. Nextel Comms., Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) ("The party seeking class certification bears the burden of establishing by a preponderance of the evidence . . . each of Rule 23's requirements.").  Accordingly, a court must only certify a class "after a rigorous analysis" reveals that the "prerequisites of Rule 23(a) [and the relevant prerequisites of Rule 23(b)] have been satisfied."  *Wal-Mart Stores, Inc.*, 564 U.S. at 350–51 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).  This analysis often requires courts to touch on "aspects of the merits in order to resolve preliminary matters . . . [because a] 'class determination generally

involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *id.* at 351 (quoting *Falcon*, 457 U.S. at 160).  Thus, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).  "[F]ailure to prove any element [of Rule 23] precludes certification."  *Ansari v. N.Y. Univ.*, 179 F.R.D. 112, 114 (S.D.N.Y. 1998).

The Court addresses each of Rule 23's requirements in turn and concludes that Named Plaintiffs have not carried their burden of demonstrating that the requirements for class certification have been met.

### A.      Rule 23(a) Requirements

#### 1.      Rule 23(a)(1): Numerosity

The parties do not dispute that the numerosity requirements of Rule 23(a) have been satisfied.  *Compare* Dkt. No. 230 at 8 (arguing that the class "consists of many thousands of consumers" and thus that the numerosity requirement has been met), *with* Dkt. No. 251 (not addressing the numerosity requirement).  The numerosity inquiry focuses on whether the class is so large "that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Although "'numerosity' is not simply a numbers game," "[c]ourts have long applied a presumption that a class of forty members is sufficiently numerous that joinder of all members would be impracticable."  *Huang v. Shanghai City Corp*, 2022 WL 1468450, at *5 (S.D.N.Y. May 10, 2022) (citing *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)); *see also Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014), *as amended* (Nov. 12, 2014) ("Numerosity is presumed for classes larger than forty members.").  Here, the proposed class numbers in the thousands, *see* Dkt. No. 232-27; joinder of all class

members would thus be impracticable, *see, e.g.*, *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 546 (S.D.N.Y. 2021) (finding that joinder of class in "the thousands" was impracticable).

### 2.    Rule 23(a)(2): Commonality

The "commonality" inquiry requires that there be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The inquiry depends upon there being "a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc.*, 564 U.S. at 350.  "[W]hat matters to class certification is not the raising of common questions . . .  but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Barrows v. Becerra*, 24 F.4th 116, 131 (2d Cir. 2022) (quoting *Wal-Mart*, 564 U.S. at 350 (emphasis in original)).  "[F]or purposes of Rule 23(a)(2) even a single common question will do."  *Wal-Mart Stores, Inc.*, 564 U.S. at 359 (cleaned up).  Here, the Court finds that there are at least two common questions—materiality and falsity—and thus that Named Plaintiffs have satisfied the Rule 23(a)(2) requirement.

The materiality prong of NYGBL Sections 349 and 350 requires an objective inquiry. The relevant question is whether the alleged act is "likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007))); *see also Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) (stating that under Section 349, "'[d]eceptive acts' are defined objectively as acts likely to mislead a reasonable consumer acting reasonably under the circumstances." (alteration accepted) (quoting *Boule v. Hutton*, 328 F.3d 84, 94 (2d Cir. 2003))); *cf. Amgen Inc.*, 568 U.S. at 459 ("[M]ateriality is judged according to an

objective standard.").  Defendant argues that "the circumstances" under which a court must analyze materiality include how individual consumers purchased the product in question, from whom, and with what exposure to the allegedly misleading advertisement.  Defendant argues that, because the class of consumers includes individuals "who purchased different products, in different ways, from different suppliers, for different amounts, and after exposure to different (or no) ads," there is no single "reasonable consumer."  Dkt. No. 251 at 18.

Defendant's argument confuses the question of whether a *reasonable* consumer would likely be misled by an allegedly false advertisement with the separate question—relevant where reliance is at issue—of whether an individual consumer was misled by the advertisement.  The former question rests on an analysis of the "challenged advertisement as a whole, including disclaimers and qualifying language."  *Mantikas v. Kellogg Co.*, 910 F.3d 633, 636 (2d Cir. 2018); *see also Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 53 (E.D.N.Y. 2015) ("Courts view each allegedly misleading statement in light of its context on the product label or advertisement as a whole.  The entire mosaic is viewed rather than each tile separately." (internal quotation marks and citations omitted)); *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 288 (S.D.N.Y. 2014) (citing *Frito–Lay N. Am., Inc. All Natural Litig.*, 2013 WL 4647512, at *16 (E.D.N.Y. Aug. 29, 2013) for the proposition that "in resolving the reasonable consumer inquiry, one must consider the entire context of the label" (alteration, internal quotation marks, and citation omitted)).  The inquiry demands an objective analysis of the understandings a reasonable consumer would draw from a challenged statement, not the significance of that challenged statement to an individual consumer's purchasing decision.  *See Rivera v. Navient Solutions, LLC*, 2020 WL 4895698, at *10 (S.D.N.Y. Aug. 19, 2020) ("A Section 349 claim asks whether

the language . . . would have been . . .  misleading to a reasonable consumer, and not to the plaintiff before the Court based on his or her own idiosyncratic facts.").

To be sure, the nature of the product can influence how a reasonable consumer is expected to interact with the allegedly false statement.  In *Mantikas v. Kellogg Co.*, 910 F.3d 633, for example, the Second Circuit analyzed whether the statements "WHOLE GRAIN" and "MADE WITH WHOLE GRAIN" on the box of Cheez-It crackers were misleading.  *See id.* at 634–35.  The plaintiffs argued that the statements were misleading "because they communicate to the reasonable consumer that the grain in the product is predominantly, if not entirely, *whole* grain," when in fact the crackers are made with "predominantly enriched white flour."  *Id.* at 637 (emphasis in original).  The defendant countered that the statements could not be misleading because the ingredients list, on the side of the box, made clear that the crackers were not predominantly whole grain.  *Id.*  The Circuit rejected this argument, holding that "a reasonable consumer should not be expected to consult the Nutrition Facts panel on the side of the box to correct misleading information set forth in large bold type on the front of the box."  *Id.*

Defendant, instead, would have the Court focus on the point at which the consumer purchases the product; Defendant points to the fact that class members "purchased different products, in different ways, from different suppliers, for different amounts, and after exposure to different (or no) ads."  Dkt. No. 251 at 18.  However, Defendant does not identify any way in which these factors would affect a reasonable consumer's understanding of the Challenged Statement.  To adopt Defendant's argument would be to conflate the materially misleading nature of the Challenged Statement with the injury resulting from the alleged statement.  The factors Defendant identifies may be relevant to a finding of whether and the degree to which class members were injured, but Defendant has not demonstrated that they shape how a

reasonable consumer would interact with the Challenged Statement such that Named Plaintiffs should be deemed atypical of the class.[3]

Taken to its logical conclusion, few if any consumer fraud class actions brought under New York law—or any fraud classes for that matter—would survive the class-certification stage. In nearly every false advertising case, consumers purchase "different products, in different ways, from different suppliers, for different amounts, and after exposure to different (or no) ads." Dkt. No. 251 at 18. Individuals purchase products with credit cards and cash, from stores and online, in bulk and individually, on sale and for full price. The circumstances under which a purchasing decision are made are various. As described above, what is relevant to the analysis is not the number of products purchased, their exact identity, or the circumstances under which they were purchased; what matters is the nature of the allegedly false statement and how consumers interact with the false statement and therefore understand it. Thus, courts generally have no difficulty finding named plaintiffs typical of a class so long as the challenged statement is consistent across the class.

---

[3] Defendant cites *Fink v. Time Warner Cable*, 714 F.3d 739 (2d Cir. 2013), for the proposition that the reasonable consumer test must consider the intricacies of each consumer's purchasing decision. *See* Dkt. No. 251 at 14 (the relevant reasonable consumer for Alvarado is one who "saw no ads, made no decision to purchase, and whose wife received a 'pretty good deal'" (citation omitted)). However, the language that Defendant draws from *Fink* does not reach as broadly as Defendant would have the Court believe. In *Fink*, the Second Circuit held: "[I]n determining whether a reasonable consumer would have been misled by a particular advertisement, context is crucial." *Fink*, 714 F.3d at 742. However, the opinion makes clear that the Second Circuit is referring to the *context* of the advertisement itself, not the broader context in which the consumer viewed the advertisement and purchased the product. The very next sentence reads: "For example, under certain circumstances, the presence of a disclaimer or similar clarifying language may defeat a claim of deception." *Id.* Thus, the Circuit, in upholding a district court's grant of a motion to dismiss under NYGBL Section 349, admonished the plaintiffs for failing selectively quoting language from the offending advertisement and failing to submit the advertisement in full. *See id.* at 741–42.

The cases that Defendant cites are inapposite; each focuses on the allegedly false statement, not on the purchasing decision of the individual class members. In *Singleton v. Fifth Generation, Inc.*, 2017 WL 5001444, at \*17 (N.D.N.Y. Sept. 27, 2017), the court held that the question of whether the representation that Tito's vodka was "handmade," a statement that appeared on its labels, was misleading was an objective question subject to common proof. However, the court rejected the inclusion of representations that "varied significantly" and that therefore were not suitable for class treatment. *Id.* at \*17 n.17; *see also Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002) ("Where there are material variations in *the nature of the misrepresentations made to each member* of the proposed class, however, class certification is improper because plaintiffs will need to submit proof of the statements made to each plaintiff, the nature of the varying material misrepresentations, and the reliance of each plaintiff upon those misrepresentations in order to sustain their claims." (emphasis added)). At most, these cases support the proposition that when there are different allegedly false statements, there can be no single "reasonable consumer" for materiality purposes across all different statements. Here, however, there is only a single allegedly false statement at issue, the Challenged Statement. Thus, these cases are inapplicable.

Defendant also argues that the falsity of the Challenged Statement is not a common question susceptible to classwide proof because Named Plaintiffs have not demonstrated "that there is [a] controlling definition of the term 'ever-growing.'" Dkt. No. 251 at 16. Defendant highlights the survey of Dennis, which found that 76.5% of respondents thought that "ever growing" meant "increase over time." *Id.* (citing Dkt. No. 227 ¶¶ 88, 90). Named Plaintiffs counter that whether the Challenged Statement is false—that is whether it is misleading or

deceptive—is an objective question and thus subject to classwide proof.  Dkt. No. 230 at 11–12; Dkt. No. 263 at 4–5.  Defendant's argument misunderstands what the falsity analysis demands.

Whether or not a statement is misleading, like whether or not a statement is material, requires an objective inquiry.  *See Orlander*, 802 F.3d at 300.  Thus, the inquiry is susceptible to classwide proof:  In order for a plaintiff to prevail in a consumer fraud case, she must establish that the statement at issue was misleading to a reasonable consumer.  *See Hasemann v. Gerber Prod. Co.*, 331 F.R.D. 239, 265 (E.D.N.Y. 2019) (noting that the relevant question under Sections 349 and 350 is "whether the deception could likely have misled someone, and not, whether it in fact did").  Evidence that actual consumers, in fact, interpreted the challenged statement in line with "the plaintiffs' proffered theory of deception" is relevant to, and may be necessary for, the ultimate conclusion that a reasonable consumer would have been deceived. *See In re KIND LLC "Healthy & All Natural" Litig.*, 2022 WL 4125065, at *7 (S.D.N.Y. Sept. 9, 2022) (holding that at summary judgment, plaintiffs must offer evidence of a reasonable consumer's understanding of challenged statement).  It would not be "enough for a plaintiff to assert, based on his or her own subjective belief that [defendant]'s statement . . . conveyed the alleged implied [false] message," if there were not also evidence that that same understanding was shared by a reasonable consumer.  *Hughes v. Ester C Co.*, 220 F. Supp. 3d 862, 871 (E.D.N.Y. Sept. 4, 2018); *see also Morales v. Conopco, Inc.*, 2016 WL 6094504, at *4 (E.D. Cal. Oct. 18, 2016) ("[Plaintiffs'] individual testimony is insufficient to establish whether defendant's representations on its products would deceive a reasonable consumer").  By the same token, a plaintiff need not show that she understood the statement in a misleading way to demonstrate

that a reasonable consumer would have been misled.[4]  Thus, the fact that consumers may have interpreted the statement differently does not preclude certification.

Differences in understanding among class members might bear on the question whether Named Plaintiffs can establish that the Challenged Statement caused the class members an injury.  If there is no common understanding of a statement, then it might be difficult for a class to prove that it suffered an injury in the form of a price premium or the individual plaintiff to prove that she relied on the demonstrably false understanding of the statement when relying on the statement in her purchasing decision.  But the answer to the question whether a statement is false cannot differ from case to case or be based upon whether the case is prosecuted on an individual or a class basis; it turns upon an objective analysis that applies across cases.  To hold otherwise, would require courts to relitigate the question of objective falsity in every case and allow for individual plaintiffs to bring serial litigation, thereby undermining the very reason why the New York Court of Appeals adopted an objective standard for materiality and falsity.  *See Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995) (noting that "an objective definition of deceptive acts and practices" under Section 349 avoids "the potential for a tidal wave of litigation against businesses that was not intended by the Legislature").

Defendant cites a single, out-of-circuit case to support its proposition that a lack of uniform definition of an allegedly false statement would preclude class certification.  *See In re 5-Hour Energy*, 2017 WL 2559615, at *8–9.[5]  In *In re 5-Hour Energy*, the court stated that

_____

[4] Evidence that the individual plaintiff did not have a misleading understanding of the challenged statement would of course be relevant to other questions, including causation and injury and (where applicable) reliance.

[5] Although *In re 5-hour Energy* did not specifically analyze New York law, the court there concluded that "Plaintiffs have shown, and Defendants do not dispute, that the state consumer

"[p]redominance . . . fails for lack of a common definition of the term 'energy.'" *Id.* at *8. The decision is not persuasive here.  The court in *In re 5-Hour Energy* was considering whether the allegedly false statement was *material* to the purported class, not whether falsity was a common issue.  *See id.* ("Where plaintiffs fail to establish a controlling definition for a key term in an alleged misstatement, courts have found that materiality is not susceptible to common proof."); *see also id.* at *9 ("Without a common definition or common understanding of the term, the Court cannot conclude that materiality is susceptible to common proof.").[6]  Nor does the decision call into question this Court's holding that materiality is an objective question that is common across all class members.  The court there surveyed the evidence that different consumers took different understandings from the same challenged statements in the course of reaching its conclusion that plaintiffs had not established what the court called "a class-wide presumption of materiality" that was necessary to "establish reliance or causation with common proof."  *Id.*  The case is thus best understood to address the evidence necessary to show that reliance or causation is a common question—a question that the Court addresses under the rubric of predominance. *See infra* pp. 46–65.  It is not best understood as a case regarding the meaning of either falsity or materiality in a consumer fraud statute.

---

laws remaining in this case follow a reasonable consumer standard and so a class-wide inference of reliance and causation is available to Plaintiffs."  2017 WL 2559615, at *7.  Thus, the analysis is relevant to NYGBL Sections 349 and 350, which, as discussed, also follow a reasonable consumer standard for materiality.

[6] Even if the court's analysis were relevant to the falsity question, the analysis would undermine, not support, Defendant's contention.  The court in *In re 5-Hour Energy* also found that "some plaintiffs have even shown a specific rate of acceptance of the proposed definition of a disputed term in the consumer marketplace."  2017 WL 2559615, at *8 (collecting cases).  Notably, the "specific rates" that the court highlighted in those cases are significantly below the 76.5% of respondents who, Dennis found, thought that "ever growing" meant "increase over time."  Thus, even if the Court accepts the propositions underlying that case, they do not lend support to Defendant's argument.

Because the Court finds that questions of both materiality and falsity are common to the class, Named Plaintiffs have satisfied the Rule 23(a)(2) requirement.

### 3.   Rule 23(a)(3): Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "The typicality requirement is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees."  *Georgine v. Amchem Prod., Inc.*, 83 F.3d 610, 631 (3d Cir.1996), *aff'd sub nom.*, *Amchem Prod., Inc.*, 521 U.S. 591.  Thus, typicality "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."  *Robidoux*, 987 F.2d at 936; *see also Barrows*, 24 F.4th at 131 ("Typicality requires that the claims of the class representatives be typical of those of the class, and is satisfied when each member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." (quoting *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001), *abrogated on other grounds by Wal-Mart Stores, Inc.*, 564 U.S. 338)). Typicality, however, "does not require a showing that the named plaintiffs' claims are identical to those of the class members."  *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 209 F.R.D. 353, 356 (S.D.N.Y. 2002).  "Since the claims only need to share the same essential characteristics, and need not be identical, the typicality requirement is not highly demanding." *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 155 (S.D.N.Y. 2002).

The parties contest whether typicality has been satisfied.  Named Plaintiffs argue that the typicality requirement is satisfied because "[l]ike all Class members, [Named Plaintiffs] paid for Peloton [H]ardware, and then continued to pay for subscription membership during the Class [P]eriod, during which time Peloton represented that its on-demand class library would be 'ever

growing.'"  Dkt. No. 230 at 16.  Defendant counters that there is no typical plaintiff in this action because the proposed class includes persons who purchased three different products (the Peloton Bike, Peloton Tread, and Peloton Membership) at different prices and in different ways using different payment methods, having seen different ads.  Dkt. No. 251 at 12.  For example, Alvarado's wife purchased a used Peloton Bike from a friend at a discount while Passman purchased his Peloton Bike and Peloton Membership at a store in early 2017, before the Class Period, and paid for a full year Peloton Membership in advance.  *Id.* at 12–13.  Defendant also argues that Named Plaintiffs are subject to unique defenses.  *Id.* at 13–15.  Plaintiff has the better argument; both Alvarado and Passman satisfy Rule 23's typicality requirement.

As a general matter, courts have consistently held in consumer fraud cases that "[p]laintiffs may have been exposed to different advertisements or labels, and purchased different amounts of different . . . products, does not defeat typicality."  *Hasemann v. Gerber Prod. Co.*, 331 F.R.D. at 269 (collecting cases); *see also In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 94 (S.D.N.Y. 1998) (collecting cases to support the court's conclusion that, in a commodities fraud case, "the simple fact that Class members may have purchased and sold copper futures at different times, for different purposes," does not make plaintiffs atypical).  This is because the core question in consumer fraud cases is whether the allegedly false statement caused the class members an injury; while the precise identity and number of items purchased may affect the magnitude of a class member's injury, those factors alone generally do not affect the existence of the injury so long as the challenged statement is consistent across products.  *See de Lacour v. Colgate-Palmolive Co.*, 338 F.R.D. 324, 337 (S.D.N.Y. 2021), *leave to appeal denied*, 2021 WL 5443265 (2d Cir. Sept. 16, 2021) (finding that the named plaintiffs, who only purchased deodorant, were typical of the potential class members, purchasers of deodorant *and*

toothpaste, because, under New York law, "each class member's claim arises from the same course of events: the purchase of a product that is advertised as 'natural.' Because Plaintiffs allege that they paid a price premium as a result of this claim, the alleged injury is the same as that of toothpaste purchasers." (citation omitted)).

Here, too, the fact that Named Plaintiffs purchased different products would not, standing alone, defeat typicality. The price-premium theory of liability in this case rests on the falsity and materiality of the Challenged Statement and its effect on the price of the Peloton products. Thus, the nature of the alleged injury for all class members who purchased a Peloton product during the Class Period, whether the product was a Peloton Bike, Peloton Tread, or Peloton Membership, and regardless of how they purchased the relevant Peloton product, would be the same, though the extent of their injuries and damages may vary. Stated differently, each class member's claims "arise[] from the same course of events and each class member [will] make[] similar legal arguments to prove the defendant's liability." *Robidoux*, 987 F.2d at 936. This is enough for typicality.[7]

---

[7] The one case that Defendant cites in support of its proposition that there is "no typical plaintiff," *Solomon v. Bell Atlantic Corp.*, 777 N.Y.S.2d 50, 55 (1st Dep't 2004), is inapplicable to this case. *See* Dkt. No. 251 at 19. There, the First Department held that NYGBL Sections 349 and 350 required proof of individualized reliance. *See Solomon*, 777 N.Y.S.2d at 55 ("[C]ertification of a class for purposes of an action brought under GBL §§ 349 and 350 may be appropriate where the plaintiffs allege that all members of the class were exposed to the same misrepresentations."). Thus, the court concluded that the parallel typicality requirement under New York CPLR § 901(a)(3) was not satisfied because "[t]he record reflects differences among the individual plaintiffs as to which advertisements they saw, whether they saw any ads or obtained information by which to evaluate DSL service from other sources, whether they received billing credits, whether they read the terms and conditions and agreed to them, the nature and extent of their injuries, and the damages they claim." *Id.* at 57. This Court, however, explicitly rejected Defendant's argument that individualized reliance is required under NYGBL Sections 349 and 350 and permitted Named Plaintiffs to proceed on a price-premium theory. *See* Dkt. No. 207 at 23–32. Thus, it is irrelevant for typicality purposes, whether there are individualized differences among the Plaintiffs here concerning the advertisements they saw and other information they received. Additionally, as discussed above and contrary to the court's

Defendant presents a slightly more nuanced argument as to why typicality is defeated in this case:  Because the purchasing decisions and circumstances of the potential class members differed so widely, Named Plaintiffs cannot be typical as to the materiality requirement of NYGBL Sections 349 and 350, which, Defendant argues, requires a consideration of each plaintiff's individual circumstances.  *See* Dkt. No. 251 at 13.  As Defendant implicitly notes, the typicality requirement of Rule 23(a)(3) is related to the commonality requirement of Rule 23(a)(2).  "The crux of both requirements is to ensure that 'maintenance of a class action is economical and [that] the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'"  *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (internal citations omitted) (quoting *Falcon*, 457 U.S. at 157 n.13).  In this way, Defendant's argument that there is no typical plaintiff merges with its argument that materiality is not a common question susceptible to class wide proof.  As Defendant's frame the issue, "[t]hese differences [among the Named Plaintiffs and class members] preclude a finding of typicality because the materiality of Peloton's conduct is assessed by asking whether it would be 'likely to mislead a reasonable consumer acting reasonably'" under each Plaintiff's individual circumstances.  *See* Dkt. No. 251 at 13 (quoting *Solomon*, 777 N.Y.S.2d at 54).  Because, as Defendant argues, the class of consumers include individuals "who purchased different products, in different ways, from different suppliers, for different amounts, and after exposure to different (or no) ads," there is no single "reasonable consumer" and, as a result, neither Named Plaintiff can be typical of a reasonable consumer. Dkt. No. 251 at 12–13, 18.

_____

holding in *Solomon*, the extent of Named Plaintiffs' injuries is not relevant in the typicality analysis here, so long as the cause of the injury arise from the same course of events, which the Court concludes it does.

As previously noted, however, whether or not a statement is material is an objective question, subject to a reasonable consumer standard.  *See supra* pp. 18–19.  It does not turn upon what would be important to the named plaintiff coming before the Court.  That holding, made in the context of the Court's commonality findings, is equally applicable in connection with the typicality analysis.  Named Plaintiffs' idiosyncrasies—and the idiosyncrasies of their purchasing decisions—are irrelevant to the typicality of the Named Plaintiffs with respect to the materiality of the Challenged Statement.

Defendant also argues that both Named Plaintiffs are subject to unique defenses. Defendant contends that Alvarado is subject to two unique defenses:  First, because Alvarado's wife purchased the Peloton Bike using her Venmo account, Defendant argues that the litigation will focus on whether Alvarado has standing to bring this case.  Dkt. No. 251 at 14.  Second, Defendant argues that because Alvarado purchased the Peloton Bike secondhand, the litigation will thus focus on whether the price-premium theory applies to secondhand purchases.[8]  *Id.* at 14–15.  Defendant also contends that because Passman purchased his Peloton Bike and year-long Peloton membership prior to the Class Period, "he cannot establish that the alleged misstatement caused him to suffer an injury or were material to a reasonable person in his circumstances."  *Id.* at 15.  Defendant's arguments lack merit.

"[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation."  *Gary Plastic Packaging*

---

[8] Defendant also argues that Alvarado's unique position—he "saw no ads, made no decision to purchase, and [his] wife received a 'pretty good deal'"—will make another unique defense a focus of litigation concerning questions of materiality for a "reasonable person" like him.  Dkt. No. 251 at 14.  But as described above, these factors are not relevant to the reasonable-consumer materiality analysis.  Thus, this does not reflect a unique defense that would make Alvarado atypical.

*Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990), *abrogated on other grounds by Microsoft Corp. v. Baker*, 582 U.S. 23 (2017); *see Bowling v. Johnson & Johnson*, 2019 WL 1760162, at *4 (S.D.N.Y. Apr. 22, 2019) (Nathan, J.) (noting that the issue of unique defenses is "relevant to both Rule 23's typicality and adequacy of representation requirements" (citation omitted)).  "The relevant inquiry is not whether a unique defense ultimately will succeed on the merits.  Rather, courts consider whether any unique defenses will 'unacceptably detract from the focus of the litigation to the detriment of absent class members.'"  *de Lacour*, 338 F.R.D. at 338 (quoting *In re Omnicom Grp., Inc., Sec. Litig.*, 2007 WL 1280640, at *4 (S.D.N.Y. Apr. 30, 2007)); *see also Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000) ("[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.").  However, "if the proffered unique defenses 'seem to rest on little more than speculation'" the Court need not consider them in its Rule 23(a) analysis.  *See Bowling*, 2019 WL 1760162, at *4 (citation omitted).

Alvarado acknowledges that his wife was the motivating factor behind the purchase of the Peloton Bike and that funds for the Peloton Bike came from his wife's Venmo account, which was linked to her bank account.  Dkt. No. 250-4 at 39; Dkt. No. 257-1 ¶ 7.  However, Alvarado declares that the money for the Peloton Bike came from a joint account funded by his income.  Dkt. No. 257-1 ¶¶ 4–10.  To establish standing, a "plaintiff must allege 'a personal stake in the outcome of the controversy' and 'cannot rest [a] claim to relief on the legal rights or interests of third parties.'"  *Meimaris v. Royce*, 2021 WL 5170725, at *2 (2d Cir. Nov. 8, 2021) (summary order) (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)); *see also Warth*, 422 U.S. at 499 ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot

rest his claim to relief on the legal rights or interests of third parties."). As the Second Circuit has held, "a spouse does not have standing merely on the basis of her marital status to sue for an injury suffered by her spouse." *Meimaris*, 2021 WL 5170725 at *2 (citing *Leonhard v. United States*, 633 F.2d 599, 618 (2d Cir. 1980)). Under New York law, items purchased with marital funds are marital property. *See Spathis v. Spathis*, 960 N.Y.S.2d 384, 387 (1st Dep't 2013). Additionally, "[p]roperty acquired during the marriage is presumed to be marital property and the party seeking to overcome such presumption has the burden of proving that the property in dispute is separate property." *Hymowitz v. Hymowitz*, 991 N.Y.S.2d 57, 62 (2d Dep't 2014) (citation omitted). It would seem, that Alvarado would have standing if he could establish that the funds used to purchase the Peloton Bike were marital property, whereas he would not have standing if Defendant can demonstrate that Alvarado's Peloton Bike was purchased with the separate property of his wife. *See Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976) (noting that a named plaintiff must have standing as an individual to sue on behalf of a class). There is no reason to believe, however, that this issue is likely to become a focus of the litigation or to detract either from the ardor with which Named Plaintiffs would prosecute the case or the jury's understanding of the case. The issue is relatively confined and will lend itself to a straightforward resolution. It thus hardly "threaten[s] to become the focus of the litigation." *Baffa*, 222 F.3d at 59; *see also In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 406 (S.D.N.Y. 2015) (finding that arguably unique defenses did not defeat typicality because neither would become the focus on the litigation). Moreover, it is undisputed that Alvarado purchased a Peloton Membership during the class period. Thus, he at least has standing to bring this lawsuit as a purchaser of a Peloton Membership.

The fact that Alvarado purchased his Peloton Hardware secondhand presents somewhat of a closer question.  As Defendant persuasively argues, whether or not, and how, "the 'price premium' theory applies to . . . [the] secondhand purchase" of Peloton Hardware could become a focus of the litigation.  However, the class is defined broadly enough to include purchasers of secondhand Peloton Hardware.  Thus, this question will not be atypical of other class members; other secondhand purchasers will be subject to identical defenses.  Defendant's argument goes better to the question whether there would be conflicts between claims of the secondhand purchasers of Peloton Hardware and those who purchase from Peloton itself and whether the Court should appoint a subclass.  Rule 23(c)(5) states that "[w]hen appropriate, a class may be divided into subclasses that are each treated as a class under this rule"; *see also Cnty. of Suffolk v. Long Island Lighting Co.*, 710 F. Supp. 1407, 1417 (E.D.N.Y. 1989), *aff'd*, 907 F.2d 1295 (2d Cir. 1990) (Weinstein, J.) ("The court has considerable discretion to create subclasses in order to manage intra-class conflicts if and when they should arise.").  Any conflict here would arise in the context of damages and the proportion of the damages attributable to the primary purchase of Peloton Hardware that secondhand purchasers are entitled to.  However, "[c]ourts in this district have found that potential issues related to differential damages does not preclude class certification." *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 276 (S.D.N.Y. 2008); *see also In re J.P. Morgan Stable Value Fund ERISA Litig.*, 2017 WL 1273963, at *10 (S.D.N.Y. Mar. 31, 2017) (same); *Long Island Lighting Co.*, 710 F. Supp. at 1417 ("The fact that conflicts among class members may arise at the settlement or damages stage of the litigation does not require that class certification be denied.").  If conflicts do arise, the Court can address those conflicts by appointing damage subclasses at that point.

Passman's supposed unique defense is anything but.  Defendant argues that because Passman purchased his bike and a year-long membership before the Class Period, he will not be able to establish injury and materiality.  Dkt. No. 251 at 21.  However, Defendant does not dispute that Passman paid for his monthly Peloton Membership during the Class Period.  *See id.* at 21 n.15.  As the Court found in its August 11, 2022 Opinion and Order, this fact alone established that Passman suffered the requisite injury for Article III standing purposes.  Dkt. No. 207 at 19–20.  It is no different here:  Defendant's contention that Passman cannot establish that the Challenged Statement caused him an injury or that it was material is not a unique defense because it is directly rebutted by the fact that he purchased the monthly memberships— at an allegedly inflated cost as a result of the Challenged Statement—during the Class Period. Anticipating this argument, Defendant contends that "his claims are still subject to unique defenses because it is unlikely that the challenged representation would be material to someone who had already purchased his [Peloton] Bike and [Peloton] Membership prior to the proposed class period."  Dkt. No. 251 at 21 n.15.  But this argument misses the point:  The class is defined as "All purchasers of the Peloton Hardware and/or the corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019 in the State of New York."  Third Amended Complaint ¶ 106.  Thus, the class, by definition, includes individuals who purchased Peloton Hardware before the Class Period, and continued to purchase the Membership during the Class Period.  Contrary to Defendant's contention, whether or not the Challenged Statement was material to the purchasers of monthly memberships is "not unique"; it "is a central, not atypical, issue in this action."  *Cross v. Dickstein Partners, Inc.*, 172 F.R.D. 108, 113 (S.D.N.Y. 1997).[9]

---

[9] Nor does the fact that neither Alvarado nor Passman purchased new Peloton Hardware during the Class Period preclude certification.  Though there may be tension between those seeking to recover for overpaying for Peloton Memberships and those seeking to recover for overpaying for

Because the Court finds that Named Plaintiffs' claims arise from the same course of events and will make similar legal arguments as the other class members, the Court concludes that the typicality requirement of Rule 23(a)(3) has been satisfied.

### 4.      Rule 23(a)(4): Adequacy

Rule 23(a)(4) requires that the Named Plaintiffs "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  "[T]wo factors generally inform [the inquiry]" of whether a named class representative is adequate under Rule 23: "(1) absence of conflict and (2) assurance of vigorous prosecution." *Irvin v. Harris*, 944 F.3d 63, 71 (2d Cir. 2019) (quoting *Robinson*, 267 F.3d at 170); *see also In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) ("Adequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." (citation omitted)).  "In evaluating [the adequacy] requirement, courts consider whether the class representatives are familiar with the action and 'whether they are of sufficient moral character to represent a class.'" *Zivkovic v. Laura Christy LLC*, 329 F.R.D. 61, 71–72 (S.D.N.Y. 2018) (quoting *Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 125 (S.D.N.Y. 2011)).  Typicality "tend[s] to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about . . . conflicts of interest."[10] *Falcon*, 457 U.S. at 158 n.13.

---

the significantly more expensive Peloton Hardware, these conflicts go to damages and, as discussed, thus do not bear directly on the issue of certification.

[10] Issues concerning the adequacy of class counsel are analyzed pursuant to Rule 23(g). *See Kalish v. Karp & Kalamotousakis, LLP*, 246 F.R.D. 461, 463 (S.D.N.Y. 2007) ("The 2003 Amendments to Rule 23 changed [the adequacy of class counsel] framework somewhat, shifting the court's examination of the adequacy of counsel to coincide with its new duty to appoint class counsel under Rule 23(g).").

"The adequacy of the proposed class representative . . . directly implicates the due process rights of absent class members who will be bound by the judgment." *Gordon v. Sonar Capital Mgmt. LLC*, 92 F. Supp. 3d 193, 198 (S.D.N.Y. 2015) (citations omitted); *see also Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 519 (2d Cir. 2020) ("Rule 23's requirements of adequacy and typicality are intended to protect the due process rights of absent class members."); *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2d Cir. 1968) ("[C]ourts have expressed particular concern for the adequacy of representation in a class suit because the judgment conclusively determines the rights of absent class members."). Thus, "[t]he adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *AmChem Prods., Inc.*, 521 U.S. at 625. "To judge the adequacy of representation, courts may consider the honesty and trustworthiness of the named plaintiff." *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (citing *Kline v. Wolf*, 702 F.2d 400, 402–03 (2d Cir. 1983)); *cf. Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549 (1949) (explaining that, when a representative sues on behalf "of a class comprising all who are similarly situated[,] [t]he interests of all in the redress of the wrongs are taken into his hands, dependent upon his diligence, wisdom and integrity"). "Such considerations of trustworthiness and credibility . . . are restricted to their relevance to issues in the litigation." *In re NYSE Specialists Secs. Litig.*, 240 F.R.D. 128, 144 (S.D.N.Y. 2007). *See generally Fishon*, 2022 WL 179771, at *10.

Courts also consider the knowledge and involvement of class representatives in the adequacy analysis. "[T]he Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). "A class representative must 'not simply lend[] his name to a

suit controlled entirely by the class attorney,' as the class is 'entitled to an adequate representative, one who will check the otherwise unfettered discretion of counsel in prosecuting the suit.'" *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. at 135 (quoting *Beck v. Status Game Corp.*, 1995 WL 422067, at *4, 6 (S.D.N.Y. 1995)).  "To discharge this duty of control, the class representative must possess a minimal degree of knowledge regarding the action and also have a general understanding of the nature of class-action litigation." *Scott v. New York City Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 355 (S.D.N.Y. 2004) (citations omitted).  Thus, "a class representative must be aware of the basic facts underlying the lawsuit and not likely to abdicate his obligations to fellow class members." *Gordon*, 92 F. Supp. 3d at 200 (internal quotation marks and citation omitted).  The Second Circuit has expressed a "general disfavor of 'attacks on the adequacy of a class representative based on the representative's ignorance.'" *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 42 (2d Cir. 2009) (quoting *Baffa*, 222 F.3d at 61).  Only "where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys" can "class certification . . . properly be denied." *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077–78 (2d Cir. 1995) (citation omitted); *see also Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 212 (S.D.N.Y. 2021) (Nathan, J.) ("[D]enial of class certification on the grounds of inadequacy should only occur in the most extreme instances.").

### a.     Ishmael Alvarado

Defendant argues that Alvarado is inadequate because he has been uninvolved in the lawsuit, lacks a basic understanding of his claims and responsibilities as a class representative, and is dishonest, as evidenced by his inconsistent statements in this case and his criminal record.

Dkt. No. 251 at 7.  Named Plaintiffs counter that Alvarado has demonstrated that he understands

his role in the case and has a basic understanding of the claims.  Dkt. No. 263 at 8–9.  Further,

Named Plaintiffs argue that Alvarado's criminal history does not bear on his adequacy and the

inconsistencies in his testimony merely reflect the fallibility of memory.  *Id.* at 9–10.

Alvarado's criminal history does not alone disqualify him from acting as class

representative.  It is undisputed that Alvarado has a lengthy criminal history, including at least

seven convictions spanning thirty-five years.  *See* Dkt. No. 256-4 at 5–6.  He has been convicted

of peeping, breaking or entering, simple assault, first degree burglary, third-degree rape, second-

degree criminal trespass, third degree attempted burglary, public lewdness, and unlawful

surveillance.  *Id.*  However, as this Court has already noted, a person who has been convicted of

a crime is not, by virtue of that fact, forever disabled from acting as a class representative.  *See*

Dkt. No. 220 at 2.  Certain types of class actions could never be prosecuted if status as a

convicted criminal made a representative inadequate.  Instead, a "clear nexus" must exist

between the conviction and the class claims.  *Jones v. Ford Motor Credit Co.*, 2005 WL 743213,

at *19 (S.D.N.Y. Mar. 31, 2005).  For example, courts have held proposed class representatives

to be inadequate where they have had convictions for fraud or other forms of dishonesty or

deception, or who had extensive and recent criminal histories.  Dkt. No. 220 at 2 (collecting

cases).  Defendant, acknowledging that Alvarado's criminal history "does not *alone* render him

inadequate," seeks to establish a "clear nexus" between Alvarado's criminal history and his role

as a class representative by arguing that this history reflects a "pattern of deception and false

statements."  Dkt. No. 251 at 11 (emphasis in original).  Defendant's argument might have some

force if Alvarado's convictions were more current and they spoke directly to whether Alvarado

could be entrusted with protecting the interests of the absent class members.  However, the

convictions that Defendant highlights are all from at least sixteen years ago and none appear to have required proof of any false statements.  *Cf.* Fed. R. Evid. 609.  As a result, Alvarado's criminal history does not make him inadequate.

However, Alvarado is an inadequate class representative for another reason.  His demonstrated lack of understanding of the case and of his role and responsibilities make him an inadequate fiduciary for the interests of the absent class members.  The record establishes that Alvarado's knowledge of these issues was wholly deficient.  Though Alvarado understood that he was "representing other consumers of this product, which is our membership with Peloton," Dkt. No. 256-2 at 66, he did not understand what representing a class involves.  He testified at his second deposition that he does not know what the responsibilities of a class representative involve.  When asked whether he had "any responsibilities as a class representative," he responded "I don't understand the question.  What do you mean 'responsibilities'?  I'm responsible for providing food for my kids, paying rent, going to work, providing service to my clients.  I don't know what it means to be responsible as a class action representative." *Id.* at 73.  When he was again asked whether there are "any duties . . . that you're supposed to fulfill as a class representative," he answered flatly, "no." *Id.* at 74.

Named Plaintiffs try to minimize the impact of this deposition testimony.  They point to the fact that Alvarado also testified that he has spoken to his lawyers at least a dozen times, *id.* at 89, and Alvarado's lawyer, Charles F. Dender, in a declaration, confirms these phone calls and attests to a vibrant texting relationship between the two of them, Dkt. No. 265 ¶¶ 4–8.  But the due process concerns related to class representatives are not ameliorated by the quantity of communications between a named plaintiff and his counsel; if that were so, any attorney could satisfy these concerns through frequent contact with named plaintiffs, irrespective of the nature

of those contacts.  *See Baffa*, 222 F.3d at 62 (noting that district courts must not focus on "how many times" a named plaintiff meets with his attorneys and instead must focus on "the substance of these meetings . . . [and] what was accomplished during [these] meetings").  And in key respects, Alvarado's testimony suggests that his communications with his lawyers did not engage with the substance of the case.  He admitted that he has never reviewed the Third Amended Complaint or any other documents in this case.  Dkt. No. 256-2 at 77–79, 82–83.  And he testified that he submitted a signature page for his interrogatories before reviewing them and reviewed his interrogatories only "very briefly . . . [for] five minutes."  *See id.* at 49–52.  And he testified that his involvement in the lawsuit was primarily related to preparing for his two depositions.  *Id.* at 64–65.

This is not a situation, as Dender suggests, where "had questions . . . been clarified to account for [Alvarado's] background as a non-lawyer, it would have revealed that [] Alvarado was familiar with all the documents he signed and that he can serve as a class representative in this matter."  Dkt. No. 265 ¶ 12.  Alvarado's lack of familiarity with legal concepts is not disabling; Alvarado is permitted to rely on his attorneys to understand important legal intricacies of the case.  *See Hawaii Structural Ironworkers Pension Tr. Fund, Inc.*, 338 F.R.D. at 212 (noting that in more complex cases, like securities actions, a named plaintiff "may properly depend on class counsel to understand the details of the case").  However, the deposition reveals that Defendant did ask Alvarado questions about his responsibilities as a class representative and the legal documents filed in this case in multiple ways and in plain English.  And yet Alvarado indicated that he did not know of his responsibilities and had not reviewed any of the legal documents.  Dender declares the opposite—that he and Alvarado "reviewed materials relevant to these proceedings and discussed in detail his duties as a class representative."  Dkt. No. 265

¶¶ 8–9.  In fact, Dender declares that they discussed these topics the day before Alvarado's deposition.  *Id.*  But the fact that Dender discussed these topics with Alvarado does not suggest that Alvarado is adequate to represent the interests of the class and to hold his lawyers to account.  If anything, they suggest the opposite; at his deposition, Alvarado, who the day before was apparently shown key documents and discussed his duties as a class representative, was unable to recall his responsibilities or ever having reviewed the documents.

"Once the action has been certified to proceed as a class action, it is incumbent on the class representatives to be alert for, and to report to the court, any conflict of interest on the part of class counsel, as for example, counsel's greater concern for receiving a fee than for pursuing the class claims."  *Maywalt*, 67 F.3d at 1078.  Alvarado has not demonstrated that he understands this weighty responsibility or that he has the willingness or ability to monitor class counsel.[11] His deposition demonstrates the opposite.  The Court thus finds his representation inadequate.

### b.    Eric Passman

The same, however, cannot be said about Passman.  Defendant argues that Passman is inadequate because he has not reviewed key documents, lacks an understanding of the allegations, and has given inconsistent answers at his deposition and in his declarations and interrogatories.  Dkt. No. 274 at 1–3.  Named Plaintiffs counter that Passman is "an exceedingly adequate class representative" who has demonstrated involvement in this case and adequately understands the claims.  Dkt. No. 277 at 1–3.  The Court agrees with Named Plaintiffs that Passman is adequate.

---

[11] Alvarado's inability to monitor counsel is supported by the fact that Alvarado was the purported class representative in another action, *Alvarado v. Messerli & Kramer, P.A.*, No. 06-cv-6197 (S.D.N.Y. Aug. 15, 2006), apparently without his knowledge.  *See* Dkt. No. 256-2 at 99–100.

Passman has demonstrated an adequate understanding of the facts of this case.  Although Passman at first said that the case was about music infringement, Dkt. No. 275-1 at 48, he understands how Peloton's alleged infringement is related to this case.  As he described it, Peloton removed "a lot of music from the Peloton library" and "the people that bought Peloton was expecting a whole library of music.  And they did not get that."  *Id.* at 48–49.  As a result, Passman testified, individuals suffered an injury because "[t]hey paid with the idea of getting X amount of music, X amount of songs, and they didn't get it."  *Id.* at 49.  Though perhaps not the most detailed or nuanced understanding of the claims in this case, Passman has demonstrated an understanding of the "basic facts underlying the lawsuit," *Gordon*, 92 F. Supp. 3d at 200 (internal quotation marks and citation omitted).  Thus, this is not a "flagrant case[], where the putative class representative[s] display[s] an alarming unfamiliarity with the suit." *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 51 (S.D.N.Y. 2012) (internal citation omitted); *cf. Scott*, 224 F.R.D. at 356 (finding purported class representative inadequate because, *inter alia*, "he did not know what allegations were contained in the complaint").

Like Alvarado, Passman suggested that he has not reviewed key documents in this case. *See* Dkt. No. 275-1 at 53–54 (acknowledging that he has not reviewed the Third Amended Complaint and other key filings or his declarations).  However, unlike Alvarado, Passman demonstrated a knowledge of his responsibilities as a class representative.  Alvarado testified that his "role in this lawsuit . . . would be to ensure that the attorneys are, for lack of a better word, doing their jobs and involved in it and [to] keep other people abreast of what's happening, if that's necessary."  *Id.* at 43.  Nor do the minor inconsistencies between Passman's deposition and his declarations that Defendant identifies indicate that Passman is "so lacking in credibility that [he is] likely to harm the[] case," *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. at 51 (citation

omitted).  *See Cazares v. AVA Rest. Corp.*, 2017 WL 1229727, at *6 (E.D.N.Y. Mar. 31, 2017)

("[I]nconsistencies or inaccuracies in the named plaintiff's statements may reflect either a

misunderstanding, or may raise an issue as to plaintiff's credibility, but do not necessarily

disqualify him as an adequate class representative.").  Thus, the Court concludes that Passman is

an adequate class representative under Rule 23(a)(4).  *See Hawaii Structural Ironworkers*

*Pension Tr. Fund, Inc.*, 338 F.R.D. at 213 (finding purported class representative adequate,

despite Federal Rule of Civil Procedure 30(b)(6) deponent's acknowledgment that he did not

read the complaint and inability to answer "important questions about the case," because he

demonstrated "an understanding of the basic facts that gave rise to this action as well [as] the

basic nature of the claims in this case" and "[m]ost importantly, he evinced an understanding of

how a class action works, the fact that [the named plaintiff] is a representative of this class action

and [the named plaintiff's] duties in that role, and affirmed [the named plaintiff's] willingness to

carry out those duties").

## B.      Rule 23(b) Requirements: Predominance

Two requirements must be satisfied before a class is certified under Rule 23(b)(3).  First,

common issues must predominate over individual issues.  "The 'predominance' requirement of

Rule 23(b)(3) 'tests whether proposed classes are sufficiently cohesive to warrant adjudication

by representation.'"  *Scott*, 954 F.3d at 512 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S.

at 623).  "The predominance inquiry is a core feature of the Rule 23(b)(3) class mechanism . . . .

Where individualized questions permeate the litigation, those 'fatal dissimilarit[ies]' among

putative class members 'make use of the class-action device inefficient or unfair.'"  *In re*

*Petrobras Secs.*, 862 F.3d 250, 270 (2d Cir. 2017) (quoting *Amgen Inc.*, 568 U.S. at 470).  It "is

satisfied 'if resolution of some of the legal or factual questions that qualify each class member's

case as a genuine controversy can be achieved through generalized proof, and if these particular

issues are more substantial than the issues subject only to individualized proof.'"  *Id.* (quoting *Moore*, 306 F.3d at 1252).  "Predominance is not simply an exercise in tallying up issues; it is a qualitative inquiry that entails 'careful scrutiny' of the nature and significance of a case's common and individual issues."  *Haley v. Tchrs. Ins. & Annuity Ass'n of Am.*, 54 F.4th 115, 121 (2d Cir. 2022) (quoting *In re Petrobras Secs.*, 862 F.3d at 271); *see also In re Petrobras Secs.*, 862 F.3d at 271 ("This analysis is 'more qualitative than quantitative,' and must account for the nature and significance of the material common and individual issues in the case." (citations and alteration omitted)).  Second, a court must find that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "[T]he superiority determination involves, either explicitly or implicitly, a comparison of the class action—representative litigation—as a procedural mechanism to available alternatives."  2 Newberg and Rubenstein on Class Actions § 4:64 (6th ed. 2022).

Named Plaintiffs argue that all core issues in this case—including the materiality of Peloton's misrepresentations and omissions, whether these misrepresentations and omissions were false, whether Peloton had a duty to disclose that it might remove classes from its library, and whether Peloton injured the class members and the damages resulting from that injury—are susceptible to common proof.  *See* Dkt. No. 230 at 9–16.  As a result, Named Plaintiffs contend that the "common issues are more numerous and important—*i.e.*, they predominate—over any hypothetical individual issues."  *Id.* at 23.  Defendant counters that individual issues predominate with respect to falsity, materiality, injury, and damages.  Dkt. No. 251 at 16–24.  The Court finds that because the questions of causation and injury and of damages are not common among the putative class members, individual questions predominate and a Rule 23(b)(3) class cannot be certified.

1.      **Materiality and Falsity**

As discussed, Defendant argues that the issue of materiality of the alleged misstatements and omissions is not susceptible to common proof because class members purchased different products, in different ways.  Dkt. No. 251 at 18.  The Court largely addressed Defendant's argument in its analysis of commonality and found that materiality is an objective inquiry subject to classwide proof.  *See supra* pp. 18–22; *see also Amgen Inc.*, 568 U.S. at 459 ("Because materiality is judged according to an objective standard, the materiality of . . . alleged misrepresentations and omissions is a question common to all members of the class.").  Defendant argues that the materiality of the Challenged Statement cannot be resolved on a common basis for all putative class members because Named Plaintiffs have not explained "how materiality can be measured with common proof."  Dkt. No. 251 at 18.  But Named Plaintiffs are not required to proffer at this stage the evidence that they will offer at trial to show that the Challenged Statement would be material to a reasonable consumer.  It is sufficient that the answer to the question of whether the Challenged Statement was material with respect to one member of the class will be identical with respect to every member of the class.  The "reasonable consumer" standard does not differ depending on which purchaser brings suit.  The question of materiality can thus be resolved "in one stroke."  *Wal-Mart Stores*, 564 U.S. at 350.  If the evidence offered by Named Plaintiffs fails to persuade the factfinder that the Challenged Statement would be material to a reasonable consumer, that conclusion will be binding on all putative class members.  "[W]hat [Peloton] alleges is a fatal similarity—an alleged failure of proof as to an element of the plaintiffs' cause of action."  *Amgen Inc.*, 568 U.S. at 470 (cleaned up); *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 457 (2016).  These questions are properly addressed to the factfinder at summary judgment or during a trial, not on a motion to certify the class.  *Amgen Inc.*, 568 U.S. at 470.

The same is true of falsity, which the Court has also found demands an objective inquiry common to the purported class. *See supra* pp. 22–25. Thus, the falsity analysis also represents a question common to the class, which will stand or fall based on the proof the Named Plaintiffs are able to muster at summary judgment and trial.

### 2.  Misrepresentation: Causation and Injury Resulting From the Challenged Statement

Named Plaintiffs argue that both the purported class's injury and its damages are common questions susceptible to common proof. *See* Dkt. No. 230 at 12–16. Specifically, they contend that Dennis's conjoint analysis establishes that there was a "price premium attributable to Peloton's misrepresentations and omissions that can be shown with class-wide evidence" and that damages can be established solely by reference to the statutory damage provisions of Sections 349 and 350. *Id.* at 15–16 (citing NYGBL §§ 349(h), 350-e(3)). Defendant counters that Dennis's and Weir's analyses do nothing to establish that "a price premium actually existed"—that is, that the class members were injured—because they do not consider the class's exposure to the alleged misrepresentation and the damages model suffers from irreconcilable flaws, including a failure to consider supply side factors and to isolate the impact of the Challenged Statement. Dkt. No. 251 at 19–20 (citation omitted). The Court agrees with Defendant and finds that Named Plaintiffs' failure to offer evidence that the Challenged Statement caused a price premium—or to propose a methodology which could be used to demonstrate a price premium—and their failure to propose a model capable of measuring the damages attributable to their theory of liability demonstrate that they have not carried their burden of establishing that causation, injury, and damages are common issues susceptible to common proof. As a result, predominance is defeated. In this subsection, the Court addresses

the parties' arguments with respect to causation and injury; in the following subsection, it addresses their arguments with respect to damages.

A plaintiff in an action brought under NYGBL Sections 349 and 350 can plead injury and causation "in at least one of two ways." Dkt. No. 207 at 25. First, she "can plead that she was exposed to a material deceptive act and relied on that misrepresented fact to her detriment." *Id.* In such a case, the "plaintiff is directly injured when she pays a higher price than she otherwise would have paid based on her belief in the fact that is misrepresented." *Id.* (citing *Rodriguez v. Hanesbrands Inc.*, 2018 WL 2078116, at *4–5 (E.D.N.Y. Feb. 20, 2018), *report and recommendation adopted*, 2018 WL 1686105 (E.D.N.Y. Mar. 30, 2018)). Alternatively, a plaintiff can pursue a "price premium" theory of injury and causation "by alleging that the defendant's misleading or deceptive advertising campaign caused a price premium, that the price premium was charged both to those who saw and relied upon the false representations and those who did not, and that, as a result of the price premium, plaintiff was charged a price she would not otherwise have been charged but for the false campaign." *Id.* at 26. Under the price-premium theory, the plaintiff is injured by purchasing products in a market where costs are artificially inflated by defendant's false or misleading representations. These two theories of injury are alternatives to one another; a plaintiff who has purchased at a price that has been inflated by defendant's statement need not also show that she personally relied on the misrepresentation. Under the price-premium theory, however, the plaintiff must still show that the alleged misstatement *caused* the price premium. *See Weiner*, 2010 WL 3119452, at *5 ("[A] private action brought under § 349 does not require proof of actual reliance. The plaintiff, however, must show that the defendant's material deceptive act caused the injury." (alteration in original and internal quotation marks omitted) (first quoting *Pelman ex rel. Pelman v.*

*McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) and then quoting *Stutman v. Chem. Bank*, 731 N.E.2d 608, 612 (N.Y. 2000))); *see also In re AXA Equitable Life Ins. Co. COI Litig.*, 2020 WL 4694172, at *11 (S.D.N.Y. Aug. 13, 2020) (concluding, when analyzing a statute "substantially similar" to the one at issue here, that the price-premium theory of liability is a "theory of causation").

Named Plaintiffs in this case pleaded sufficient facts to allege that they suffered an injury as a result of a price premium charged by Defendant. The Court accordingly refused to dismiss their Sections 349 and 350 claims for Defendant's affirmative misrepresentation on those grounds.[12] Dkt. No. 207 at 32–33. The existence of a price-premium thus is critical to Named Plaintiffs' motion for class certification, as Named Plaintiffs acknowledge. *See* Dkt. No. 230 at 21–22. If Named Plaintiffs can demonstrate that a price premium existed, then whether or not any individual class member saw and relied on the Challenged Statement in purchasing Peloton products becomes irrelevant. Each putative class member would suffer an injury by virtue of purchasing at a price that was artificially inflated by the market-wide impact of the Challenged Statement and this injury might be susceptible to common proof and calculation. If, on the other hand, there was no price premium or there is no way to show that there was a price premium, then individual questions would predominate. However, the price-premium theory does not absolve Named Plaintiffs of the obligation to demonstrate that at least some class members saw the alleged misrepresentation and paid a price greater than what they otherwise would have been willing to pay based on the misrepresentation. If the misrepresentation did not affect the

---

[12] Named Plaintiffs thus assert a price-premium theory of liability at the class-certification stage. *See* Dkt. No. 230 at 12 ("Plaintiffs' theory of liability is that Defendant's misrepresentations caused consumers to pay a price premium for its bikes, treads, and subscriptions. In other words, Plaintiffs allege that all Class members were harmed, because they paid a premium for an 'ever-growing' library that they did not receive.").

purchasing decision of any member of the putative class, then there could not have been a price premium that affected all members of the class.  Thus, the members of the putative class whom Named Plaintiffs seek to represent would have the right to show that she actually relied on the Challenged Statement to her detriment and Defendant would have the right to show, as to that individual purchaser, that she did not actually take notice of or rely on it when purchasing Peloton products.  *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283 (2014) (finding, in the securities class action context, that "[t]here is no dispute that at least such indirect proof of price impact [which, as discussed below, is analogous to the "price premium" advanced by Named Plaintiffs here] is needed to ensure that the questions of law or fact common to the class will predominate." (internal quotation marks omitted) (quoting *Amgen Inc.*, 568 U.S. at 467)); *Marotto v. Kellogg Co.*, 2020 WL 509035, at *2 (S.D.N.Y. Jan. 31, 2020) (refusing to certify a class when the offending statement appeared in "microscopic text . . . on the back of only 20% of released labels" because the plaintiff "provided no evidence that a price premium exists based on the alleged misrepresentations"); *Weiner v. Snapple Beverage Corp.*, 2010 WL 3119452, at *10 (S.D.N.Y. Aug. 5, 2010) (holding that predominance requirement not met when plaintiffs failed to offer appropriate methodology to demonstrate price-premium theory of causation and injury because, as a result, "individual issues concerning causation and injury would be so substantial and burdensome that it cannot be said that common issues predominate").

Defendant has presented both affirmative evidence that the Challenged Statement did not, in fact, cause a price premium and it has presented compelling evidence that Named Plaintiffs have failed to carry their burden in the predominance analysis of demonstrating that a price premium existed.  Unlike in many false advertising cases, where the allegedly false statement

appears directly on the product label or packaging and the consumer thus would inevitably be exposed to the statement at the point of purchase, *see, e.g.*, *Mantikas*, 910 F.3d at 634 (Cheez-It crackers package labeled with "whole grain" or "made with whole grain"), no purchaser of a Peloton product need have been exposed to the Challenged Statement and the evidence suggests that many of the purchasers were not exposed to the Challenged Statement.  The Challenged Statement did not appear in every Peloton advertisement and did not appear on all of Peloton's marketing materials.  Rather, the Challenged Statement appeared in a relatively small subset of Peloton's advertisements, *see* Dkt. No. 253-4 (appendix of sample advertisements), and did not appear in any television advertisements, *see* Dkt. No. 250-10 at 136, which represented Defendant's largest advertising channel during the Class Period, *see* Dkt. No. 253-9.  The Challenged Statement also appeared on only four of the 269 pages of Pelton's website, onepeloton.com, the primary place where consumers purchase Peloton products.  *See* Dkt. No. 232-41; Dkt. No. 232-4 at ECF p. 25.

Moreover, even when the Challenged Statement appeared in Defendant's advertising or marketing materials, it did not appear alone or as the most prominent marketing message.  It appeared in the context of other marketing messages.  Named Plaintiffs point, for example, to one of Peloton's webpages that contained the Challenged Statement, but that webpage read: "Experience unlimited access to the world's best instructors anytime, anywhere, with 15+ daily live classes and an ever-growing library of 9,000+ classes available on-demand."  Dkt. No. 230 at 2; *see also, e.g.*, Dkt. Nos. 232-14, 232-15, 232-15, 232-16, 232-17.  Through this one example, the breadth of the messages that Defendant portrayed in each advertisement becomes apparent.  It is true that Defendant conveyed the Challenged Statement (that there was an "ever-growing" library), but Defendant also communicated that a Peloton Membership offered

unlimited access to instructors anytime and anywhere, that the instructors were the "world's best," that a purchaser of a Peloton product would gain access to over fifteen live classes each day and an existing library of over 9,000 classes on-demand.  Each of those statements conveyed a marketing message of potential value to Peloton purchasers, and Named Plaintiffs do not assert that any of those statements were, at the time they were made, false.  There is no inherent reason why a potential Peloton purchaser would have notice and ascribed value to the statement that the library was "growing," in the face of all the other features available to those who purchase Peloton Memberships.

In fact, Defendant has offered persuasive expert evidence that very few viewers of the Peloton website (where the Challenged Statement appeared) actually noticed the Challenged Statement and that there is no reason to believe that they ascribed any significance to it. Defendant's expert Rebeca Kirk Fair conducted a survey in an attempt to measure "whether and to what extent consumers notice the at-issue 'ever-growing' language of Peloton's on-demand class library."  Dkt. No. 247 ¶ 18.  Kirk Fair is a Managing Principal at the Analysis Group, Inc., a consulting firm.  *Id.* ¶ 4.  She received a Bachelor of Arts from Middlebury College and a Master of Business Administration in finance and applied economics from the MIT Sloan School of Management.  *Id.*  She has worked on 350 intellectual property, false advertising, class certification, and antitrust litigations and investigations, and has served as an expert witness in matters involving the design, implementation, and analyses of consumer surveys, studying usage, preferences, and perceptions among businesses and consumers, and statistical sampling.  *Id.* ¶¶ 5, 7.  For this case, Kirk Fair conducted two surveys, one for the Peloton Bike and the other for the Peloton Membership.[13]  *Id.* ¶¶ 28, 39.  The test and control groups in the Peloton Bike survey

---

[13] Kirk Fair refers to the survey for the Peloton Membership as a survey for "the Peloton App."

were shown webpages advertising the Peloton Bike and the test and control groups in the Peloton

Membership survey were shown webpages advertising the Peloton Membership. *Id.* ¶ 28. The

webpages shown to the test and control group in each survey were identical in every respect,

except the control group was shown a webpage without the Challenged Statement, while the test

group was shown the same webpage with the Challenged Statement. *Id.* ¶¶ 27–28, 31–32.

Named Plaintiffs have not challenged either Kirk Fair's credentials or her methodology.[14]

        The results of her analysis are powerful. Kirk Fair found that only 0.7% of the Peloton

Bike test group and 1.3% of the Peloton Membership test group noticed the Challenged

Statement and that there was no statistically significant difference between the two groups with

respect to their conclusions about the Peloton products after viewing the webpages. *Id.* ¶ 43.

Kirk Fair's analysis thus suggests that even if a large proportion of Peloton consumers saw the

_____

*See, e.g.*, Dkt. No. 247 ¶ 22. However, in context, it is clear that the Peloton App that Kirk Fair references is the Peloton Membership that Named Plaintiffs identify in their Third Amended Complaint. *Compare id.* ¶ 32 (showing webpage for library of classes, including strength, yoga, and outdoor running classes), *with* Third Amended Complaint ¶ 5 ("The Peloton Membership's content is coextensive across all platforms and includes the same live and on-demand bike, treadmill, free weight, yoga, and other fitness classes on both the Peloton Hardware and other devices.")

[14] Named Plaintiffs present evidence, through a reply declaration of Dennis, that Kirk Fair's survey is flawed. *See* Dkt. No. 271 ¶¶ 120–73. In summary, Dennis argues that (1) survey participants are not as attentive to language as those actually considering purchasing Peloton products, *id.* ¶ 130; (2) the respondents already had formed beliefs about Peloton products and thus were not receptive to new messages, *id.* ¶¶ 131–32; and (3) Kirk Fair's filtering methodology depressed the number of respondents that would have indicated they noticed the "ever-growing" claim, *id.* ¶¶ 133–37. He thus concludes that these "flaws . . . render her data useless for assessing [Named] Plaintiffs' allegations." *Id.* ¶ 129. Notably, Named Plaintiffs do not seek to exclude Kirk Fair's survey under *Daubert*. The critiques thus go to the weight of Kirk Fair's analysis and not to whether her analysis should be considered at all. *See Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 739 (S.D.N.Y. 2011) ("[E]rrors in survey methodology usually go to weight of the evidence."). And, as discussed, Named Plaintiffs have not carried their burden and provided no evidence to the contrary that would suggest that consumers would have recognized and assigned value to the Challenged Statement in context.

Challenged Statement on Peloton's website, as Named Plaintiffs contend, they did not focus on the Challenged Statement and ascribe any value to it.

Finally, as previously noted, Named Plaintiffs' own survey suggests that individuals who saw the Challenged Statement ascribed different meanings to that statement.  Dennis, Named Plaintiffs' expert, conducted a consumer perceptions survey that measured how respondents interpreted the Challenged Statement.  *See* Dkt. No. 227 ¶¶ 83–94.  The survey found that 76.5% of respondents interpreted the Challenged Statement to mean that the number of classes in the Peloton library would increase over time.  *Id.* ¶¶ 86, 88.  Of these respondents, 61.8% expected the number of classes to increase because no classes would be removed from the library, while 31.4% believed that more classes would be added than removed.  *Id.* ¶¶ 89–90.  Finally, the 76.5% of respondents differed as to whether they thought that the number of classes would increase each day, week, month, or year: 79.8% interpreted the statement to mean the number of classes would increase each day, week, or month, while 3.7% thought the increase would be annual (the remainder had no view).  *Id.* ¶¶ 92–93.  The Court has found that this evidence is not fatal to the question of whether materiality presents a common question at this stage; materiality is an objective inquiry and thus subject to common proof.  *See supra* at 18–22.  But this evidence does bear on whether the Challenged Statement could have caused a price impact.  That many had differing views over what the Challenged Statement meant and took different meaning from it suggests both that the statement did not have a powerful marketing impact and that those who saw the Challenged Statement may not have interpreted it in such a way as to give rise to a price premium.  In summary, to establish that there was a price premium, Named Plaintiffs would have to demonstrate: (1) that advertising and marketing materials containing the Challenged Statement were seen by sufficient consumers; (2) that those consumers recognized the Challenged

Statement among the other messages communicated by the advertising and marketing materials; (3) that the consumers who recognized the Challenged Statement interpreted it in such a way that it was false or misleading; and (4) that the consumers assigned value to the Challenged Statement.  Defendant has presented compelling evidence that none of these conditions hold, which Named Plaintiffs have not adequately refuted.

In fact, Defendant has presented evidence that there could not have been a price premium as a result of the Challenged Statement.  The price of each of the Peloton Membership, Peloton Bike, and the Peloton Tread remained constant both before, during, and for almost eighteen months after the Class Period.  *See* Dkt. No. 244 ¶ 98.  In particular, the price for the Peloton Membership, the Peloton Bike, and the Peloton Tread did not increase after Defendant first made the Challenged Statement in May 2016.  *See id.* ¶ 99 & fig. 6.  Nor did the price decrease for eighteen months after Defendant removed the classes in March 2019 and for the five months after Defendant ceased to make the Challenged Statement in April 2020.  *Id.*  Defendant added monthly subscribers to its Peloton Hardware products at approximately the same rate both before and after the classes were removed from the library.  *Id.* ¶ 100 & fig. 7.  Those results could perhaps be explained away if there were other confounding factors, including if Defendant offered something additional of value to consumers after the takedown or if sales fell markedly. *See* Dkt. No. 272 ¶ 77 (statement of Named Plaintiff's expert, Weir, that data is unreliable because Defendant did not "control[] for . . . confounding factors.").  But, contrary to the assertion by Named Plaintiffs, Defendant's expert analysis looked to whether there were any such confounding factors and found none.  *See id.* ¶ 96 ("[T]here is no evidence of offsetting impacts from other economic factors, such as changes in Peloton's advertising expenditures and changes in the prices of products of key competitors, that would mask the claimed price

premium.").  Named Plaintiffs argue that Defendant could have presented a more robust

methodology.  However, it is not Defendant's burden to demonstrate that there was no price

premium.  The burden of demonstrating that there was a price premium (and thus that the

predominance requirements of Rule 23(b)(3) have been met) falls squarely on Named Plaintiffs.

*See Johnson*, 780 F.3d at 137 ("The party seeking class certification bears the burden of

establishing by a preponderance of the evidence . . . each of Rule 23's requirements.").  And

Named Plaintiffs have not presented any evidence that suggests that there were confounding

factors that would have affected the price of Peloton products in such a way as to precisely offset

the price impact of the Challenged Statement.  Defendant's analysis is strongly suggestive of the

conclusion that there was no price impact.

The evidence that Named Plaintiffs do offer to support the argument that there was a

price premium as a result of the Challenged Statement is not convincing.  Named Plaintiffs point

to Dennis's conjoint analysis and to data from a web-traffic analytics provider to support their

claim that a price premium existed for Peloton products.  But, while Dennis's survey may have

sufficient analytic rigor for the Court to consider it on the motion for class certification (and thus

for it to have been found relevant and reliable under *Daubert* at this stage), it is not sufficient to

show that there was a price premium and does not represent to a methodology by which a price

premium could be demonstrated.  Dennis conducted a conjoint survey, to measure the extent to

which the market-clearing price for Peloton Bikes and Memberships would have been different

in the but-for scenario in which Defendant did not use the "ever-growing library" representation

in its advertising and marketing.  Dkt. No. 227 ¶ 23.  He used the conjoint survey, which reveals

a participant's willingness to pay for specific attributes of the Peloton products, including those

referenced in the Challenged Statement, to calculate a price premium for the Peloton Bike and

Peloton Membership of 15.4% and 27.7%, respectively. *Id.* ¶ 78.

Dennis's analysis, however, does not show that there was a price premium associated

with or caused by the Challenged Statement because he presumed that individuals who

purchased Peloton products saw and noticed the Challenged Statement such that a price premium

could have existed. Dennis's survey presumes that consumers noticed the Challenged Statement

in advertisements and marketing materials and used this assumption to calculate a price premium

based on the Challenged Statement. *See id.* ¶ 74 (noting that his calculation of the price

premium measured "the straightforward scenario whereby a consumer makes a purchase

between two products—one with the challenged 'ever-growing library' representation and the

identical product without the representation"). And, as discussed, this presumption is not

supported by the evidence. If an insufficient number of consumers saw or noticed the

Challenged Statement, there would not have been a price premium at all and Dennis's model

(which assumes, by design, that individuals saw the Challenged Statement) could not be used to

demonstrate that a price premium existed. Dennis contends that

> [T]o the extent continued discovery requires me to duplicate my methodology with
> different inputs regarding the then-known percentage of plaintiffs that did see the
> challenged language, that is something that can be done. That is, research questions
> regarding the percentage of Peloton customers that did see the challenged language
> does not constitute a criticism of the reliability of my conjoint survey analysis. It
> is merely one of adjusting the input for that percentage as the case develops.

*Id.* ¶ 29. But whether or not the faulty assumption that Peloton consumers noticed the

Challenged Statement is a valid "criticism" of Dennis's *methodology* is beside the point.

Dennis's methodology does not, and cannot, demonstrate whether Peloton customers were

exposed to the Challenged Statement and, if they were exposed to the Challenged Statement,

noticed it among the other advertising and marketing materials. Thus, while Dennis's model

might be used to demonstrate the size of the price premium if a price premium exists, it says nothing about the threshold question of whether sufficient consumers recognized the Challenged Statement such that a price premium existed.  As Defendant's expert Strombom put it, "neither Mr. Weir nor Dr. Dennis provides any reliable methodology to determine what portion, if any, of the putative class was exposed to and aware of the Challenged Statement, let alone demonstrate that a sufficient number of the putative class were exposed to and aware of the Challenged Statement such that there could be any measurable price premium associated with the Challenged Statement at all."  Dkt. No. 244 ¶ 92.

Dennis argues in his reply declaration that he was not required to determine if a sufficient number of consumers saw the Challenged Statement for there to have been a price premium.  *See* Dkt. No. 271 ¶ 26 ("I am not obligated as the consumer survey research expert to prove that class members were exposed to and considered the challenged 'ever-growing library' claim.  As I understand the scope of my assignment as testifying consumer survey research expert, I am justified in assuming that the Defendant committed the harmful act of using the 'ever-growing library' language in its marketing and advertising.").  While it might not have been Dennis's responsibility based on his contract with Named Plaintiffs to determine whether sufficient class members were exposed to the Challenged Statement such that a price premium existed, it was Named Plaintiffs' burden to do so.  Named Plaintiffs have not met that burden, either with Dennis's testimony or with the testimony of another expert.

Dennis's conjoint analysis suffers from another fatal flaw; even assuming that the Challenged Statement was seen by all Peloton customers, Dennis's model does not establish that the price premium he calculates is attributable to the Challenged Statement.  Dennis's survey analyzed the price premium resulting from the statement "Ever-Growing Library of Classes."

*See* Dkt. No. 227 ¶ 60; *see also* Dkt. No. 258-2 at 153 ("My survey clearly does what it does.  I test the phrase 'ever-growing library of class.' . . . I'm not testing the specific phrase 'ever-growing.'").  It thus measured the value that a consumer would place on two different representations:  The fact that a purchaser of a Peloton product will have access to a library of classes and the fact that this library of classes will be "ever-growing."  However, Named Plaintiffs do not dispute that Defendant's library of classes offers its customers significant value.  *See, e.g.*, Third Amended Complain ¶ 5 (acknowledging that the very purpose of a Peloton Membership, and by extension Peloton Hardware, is to access Peloton's "on-demand fitness library"); *id.* ¶¶ 1, 15.  To the degree that Named Plaintiffs' theory is that consumers derive additional value from the fact that the library is "ever-growing," Dennis's model does not prove that theory because it does not disentangle the library of classes that was Peloton's innovation from the fact that this library was "ever-growing."  Thus, from the model that Named Plaintiffs have offered, it is impossible to determine what portion, if any, of the price premium it calculates for the Peloton Bike and Peloton Membership is attributable to the Challenged Statement.  The model thus cannot carry Named Plaintiffs' burden of demonstrating that a price premium exists as a result of the Challenged Statement, and thus that injury and causation are susceptible to common proof.

In their briefing and at argument, Named Plaintiffs sought to cure this deficiency in their analysis with evidence of website traffic data, which they argue "supports . . . a finding" that "a sufficient number of putative class members have been exposed to Peloton's misrepresentation to warrant a price premium."  Dkt. No. 267 at 14–15.  Specifically, Named Plaintiffs present data from Semrush, Inc., a data analytics provider that monitors, compiles, and analyzes website traffic data.  *See* Dkt. No. 232 ¶ 41; Dkt. No. 232-41.  The data suggests that between July 2017

through June 2019, a period that does not correspond to the Class Period, there were approximately 4.5 million unique visitors to Defendant's webpages that contained the Challenged Statement.  Dkt. No. 232-41.  During this time, Defendant sold approximately 360,000 Peloton Bikes and Peloton Treads.  Dkt. No. 250-9.  Named Plaintiffs thus argue that they have met their burden that a sufficient number of consumers were aware of the Challenged Statement for the Court to conclude that a price premium existed.  *See* Dkt. No. 230 at 22.

The Semrush, Inc. data, however, does not establish that any individuals who purchased a Peloton product saw the Challenged Statement, much less that they noticed the Challenged Statement, before making the purchase.  The Semrush, Inc. data suggests that between approximately 5.5% and 10.99% of the individuals who visited Defendant's website between July 2017 and June 2019 viewed the four webpages that contained the Challenged Statement: 5.55% individuals who visited Peloton's website visited www.onepeloton.com/shop/bike, 2.62% persons visited www.onepeloton.com/tread, 1.64% persons visited www.onepeloton.com/digital, and 1.18% visited www.onepeloton.com/financing.  Thus, assuming that no two individuals visited more than one of these webpages, at most, 10.99% of those who visited Defendant's website could have been exposed to the Challenged Statement.  But that evidence does not establish that these individuals were actually exposed to the Challenged Statement, and, if they did, that they noticed the Challenged Statement among the other marketing and advertising messages such that they assigned it any value.  The data also does not establish whether any of the individuals who visited the websites purchased a Peloton product or did so proximate to the visit, such that the Challenged Statement would have made a difference in the purchasing decision.  Thus, even if the data could be established that some number of individuals who purchased a Peloton product during the Class Period visited one of the four webpages in advance

of the purchasing decision, it does not establish that the Challenged Statement was at all relevant to the purchasing decision such that the Challenged Statement caused a price premium for Peloton products.

In response, Named Plaintiffs argue that "Peloton's criticisms of Plaintiffs' experts—including that, in Peloton's view, not enough people were exposed to the misrepresentation to impact price—are more appropriately reserved for trial." Dkt. No. 263 at 7.  They note that fact discovery in this case is still open.  Dkt. No. 282 at 20.  The Court rejects that argument on both factual and legal grounds.

As a matter of fact, Named Plaintiffs have had ample time and opportunity to develop the evidence of that there was a price premium as a result of the Challenged Statement, if such evidence exists.  On February 20, 2020, the Court approved a two-stage fact-discovery process, including roughly six months of discovery geared towards "threshold issues related to class certification and the scope of the case."  Dkt. No. 25 at 2.  The Court recognized that the discovery would be extensive and would "require the collection, review, and production of Peloton's corporate records and likely will involve multiple Peloton custodians."  *Id.*  On July 9, 2020, the Court extended the time allowed for class-certification discovery significantly to "be completed by 12 weeks after ruling on Defendant's Motion to Dismiss."  Dkt. No. 53 at 2.  The Court granted two more extensions of fact discovery for class certification until August 16, 2021. *See* Dkt. No. 95.  After the Court denied class certification on January 19, 2022, it stayed further discovery pending its decision on the motion to dismiss the Third Amended Complaint.  *See* Minute Entry, May 9, 2022.  After its August 11, 2023 Opinion and Order, the Court permitted limited additional class discovery of the two Named Plaintiffs.  Dkt. No. 212.

Named Plaintiffs would have known that the Court expected evidence to be presented in the motion for class certification that there was a price premium and generally what form that evidence would need to take.  In its August 11, 2022 Opinion and Order, the Court foreshadowed the showing required to establish that there was a price premium and thus that Named Plaintiffs suffered an injury caused by Defendant's misrepresentation.  As the Court held, Named Plaintiffs must show that "Defendant made misrepresentations that would have mislead a reasonable consumer, that those misrepresentations were consumer-facing and had broad impact, and that as a result of those widespread misrepresentations that mislead reasonable consumers, they paid higher costs."  Dkt. No. 207 at 32–33; *see also id.* at 17 n.6 ("To establish an injury on a price premium basis, Plaintiffs will have to prove that sufficient consumers were aware of the advertised but false 'unique quality' and assigned value to it such that the misrepresentation affected the price.").  But Named Plaintiffs did not present this evidence in its motion for class certification despite having roughly two years of discovery to gather it.  If Named Plaintiffs miscalculated by not submitting discovery requests geared towards demonstrating a price premium, the Court cannot save them from this miscalculation.  *Cf. Ritchie Risk-Linked Strategies Trading (Ir.), Ltd. v. Coventry First LLC*, 282 F.R.D. 76, 79 (S.D.N.Y. 2012) ("A party seeking to reopen expert discovery must show that the tardy submission of its desired expert report was not caused by the party's own lack of diligence."); *see also Rubik's Brand Ltd. v. Flambeau, Inc.*, 329 F.R.D. 55, 58 (S.D.N.Y. 2019) (same); *Fournier v. Erickson*, 253 F. Supp. 2d 664, 665 (S.D.N.Y. 2003) (refusing to reopen discovery because "no suitable explanation as to why [the requested] deposition was not pursued at the appropriate time has been provided").

More fundamentally, as a matter of law, Named Plaintiffs were required to offer evidence that there are common questions of fact and law under Rule 23(a) and that these questions predominate under Rule 23(b)(3), not merely a theory on which common issues could be based. This requirement is not new; as the Supreme Court reiterated in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Id.* at 250 (quoting *Falcon*, 457 U.S. at 160). Specifically, the Court held that Rule 23(a) requires a "rigorous analysis" that "[f]requently . . . will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc.*, 564 U.S. at 350–51 (citation omitted). "The same analytical principles govern Rule 23(b)." *Comcast Corp.*, 569 U.S. at 34. Although "[m]erits questions may . . . only [be considered] to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied," *Amgen Inc.*, 568 U.S. at 466, as this Court found, whether or not a price premium exists goes to the heart of whether individualized questions of fact and law predominate over common ones, and thus whether certification is appropriate. It should have come as no surprise to Named Plaintiffs that the Court would have to examine the merits with respect to whether a price premium existed for Peloton products at the class-certification stage, and that they bore the burden of demonstrating that a price premium existed.

Nor is the requirement to demonstrate a price premium at the class-certification stage unique to NYGBL claims. Securities-fraud class actions represent an analogous context where the Supreme Court has squarely held that this determination is appropriate at the class-certification stage. In securities-fraud class actions members of the class claim that they have been defrauded into purchasing securities based on a market-wide price impact resulting from a defendant's misrepresentation  Although the framing of the issue and the nature of the analysis

differs in the two contexts, the factual question presented is essentially the same: whether the misrepresentation or omission infected market prices such that injury can be demonstrated by a market-wide increase in price.[15]  In *Basic v. Levinson*, 485 U.S. 224 (1988), the Court held that plaintiffs could demonstrate reliance in securities class actions brought under Rule 10b–5 either by demonstrating direct, individualized reliance on a misrepresentation, *see id.* at 242; *see also Amgen Inc.*, 568 U.S. at 461 ("'The traditional (and most direct) way' for a plaintiff to demonstrate reliance 'is by showing that he was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation.'" (citation omitted)), or by asserting a rebuttable "presumption of reliance" based on the notion that the fraud impacted the market and caused a price increase, *id.* at 248–50; *see also Halliburton Co.*, 573 U.S. at 269 (rejecting defendant's contention that "plaintiffs should *always* have to prove direct reliance and that the *Basic* Court erred in allowing them to invoke a presumption of reliance instead" (emphasis in original)).  This rebuttable presumption of a price impact is similar to the price-premium theory that Named Plaintiffs advance here.  The fraud-on-the-market presumption is premised on there being a market-wide "price impact" caused by the alleged misrepresentation. *See Basic*, 485 U.S. at 247.  Because "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of [a] price" that reflects publicly available

---

[15] Securities fraud cases are based on principles of the common law of fraud.  *See Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*, 747 F. Supp. 2d 406, 414 (S.D.N.Y. 2010), *aff'd sub nom. Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 F. App'x 636 (2d Cir. 2012) ("Courts in the Second Circuit have found that the elements of common law fraud are 'essentially the same' as those that must be pleaded to establish a claim under Section 10(b) and Rule 10b–5." (citation omitted)).  There are also important similarities between New York's consumer-fraud statute and common-law fraud.  *See Gaidon v. Guardian Life Ins. Co. of Am.*, 725 N.E.2d 598, 603, 606 (1999) (noting that "[a]lthough General Business Law § 349 claims have been aptly characterized as similar to fraud claims," they are "critically different" because common-law fraud requires a plaintiff to prove scienter).

information, "reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b–5 action." *Id.* But, as the Supreme Court made clear in *Halliburton Co. v. Erica P. John Fund, Inc.*, it is both appropriate and necessary at the class-certification stage for courts to examine indirect evidence that a defendant's misrepresentation had a price impact, and direct evidence[16] that no such price impact existed, even "though such proof is also highly relevant at the merits stage." *Halliburton Co.*, 573 U.S. at 283. That is because the question of whether there is a price impact is fundamental to the predominance analysis under Rule 23(b) and thus the existence of a price impact "must . . . be proved at the class certification stage." *Id.* at 282; *see also id.* at 283 (noting that whether a price impact exists "has everything to do with the issue of predominance at the class certification stage").

A similar conclusion follows here. Named Plaintiffs rely on a price-premium theory to overcome what would otherwise be an individualized inquiry requiring each member of the putative class to demonstrate actual reliance on the Challenged Statement. That individualized inquiry would defeat predominance under Rule 23(b)(3) and thus class certification. *See supra* pp. 48–49; *Marotto*, 2020 WL 509035, at *2; *Weiner*, 2010 WL 3119452, at *10. If the Court is to saddle Defendant with the potentially *in terrorem* effect of class certification, *see AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011) (noting "the risk of 'in terrorem' settlements that class actions entail" (citation omitted)); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d at 545 (noting, in the context of Rule 23(b)(3)'s superiority requirement, that arguments for superiority are "properly evaluated against a concern regarding

---

[16] This direct evidence includes "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, [which is] sufficient to rebut the presumption of reliance." *Halliburton Co.*, 573 U.S. at 269 (alteration in original) (quoting *Basic*, 485 U.S. at 248).

the *in terrorem* effect that a certified class may have"), and with the "hydraulic pressure" to

settle such lawsuits, *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 148 (2d Cir.

2001) (Jacobs, J., dissenting),[17] and if the Court is to saddle members of the putative class with

the binding effect of an opt-out only class action which would preclude them from pursuing their

claims on an individual basis, Named Plaintiffs must demonstrate to the Court that there existed

a price premium for Peloton products caused by the Challenged Statement.  *See Ault v. J.M.*

*Smucker Co.*, 310 F.R.D. 59, 67 (S.D.N.Y. 2015) (noting that a plaintiff must offer "evidence

that a price premium actually existed" as a result of the allegedly false statement).  They have

failed to do so.  For that reason alone, the motion for class certification fails.

### 3.   Misrepresentation: Damages Resulting From the Challenged Statement

Named Plaintiffs also have not demonstrated that there exists a model capable of

measuring the damages attributable to their theory of liability.  In *Comcast*, the Supreme Court

held that a model presented as evidence that damages are susceptible to classwide proof at the

class-certification stage "must measure only those damages attributable to" a plaintiff's "theory"

of injury.  *Comcast Corp.*, 569 U.S. at 35; *see also In re U.S. Foodservice Pricing Litig.*, 729

F.3d at 123 n.8 ("[C]ourts should examine the proposed damages methodology at the

certification stage to ensure that it is consistent with the classwide theory of liability and capable

of measurement on a classwide basis."); *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82

(2d Cir. 2015) ("[T]he plaintiffs must be able to show that their damages stemmed from the

defendant's actions that created the legal liability." (citation omitted)); *Roach v. T.L. Cannon*

*Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) ("Comcast held that a model for determining classwide

---

[17] Judge Jacobs's dissent in *In re Visa Check/MasterMoney Antitrust Litig.* was cited with approval in *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 81 (2d Cir. 2004).

damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury."). "[T]he fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification." *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008); *see also Roach*, 778 F.3d at 407, 409. But "it is nonetheless a factor that we must consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues." *McLaughlin*, 522 F.3d at 231; *see also Roach*, 778 F.3d at 408 ("*Comcast* reiterated that damages questions should be considered at the certification stage when weighing predominance issues.").

Here, Named Plaintiffs' model does not measure the damages attributable to the Challenged Statement and thus runs afoul of the dictates of *Comcast*. Named Plaintiffs argue that Dennis's conjoint analysis and Weir's damages calculations based on the conjoint analysis "prove[]" that "damages can be calculated for each class member with common proof." Dkt. No. 263 at 6. But, as discussed above, Dennis's conjoint analysis does not isolate the price premium resulting from the Challenged Statement; rather, Dennis's survey measures the value of the Challenged Statement and the fact that Defendant maintains a library of classes. Thus, the damages model does not measure "only those damages attributable to" Named Plaintiffs' "theory" of injury. *Comcast Corp.*, 569 U.S. at 35.

"Courts routinely reject price premium methodologies under *Comcast* when the proposed methodologies do not attempt to isolate the premium due only to the allegedly misleading marketing statement." *Famular v. Whirlpool Corp.*, 2019 WL 1254882, at *11 (S.D.N.Y. Mar. 19, 2019) (collecting cases); *see also Price v. L'Oreal USA, Inc.*, 2021 WL 4459115, at *4 (S.D.N.Y. Sept. 29, 2021) (same); *McMorrow v. Mondelez Int'l, Inc.*, 2020 WL 1157191, at *8–

66

9 (S.D. Cal. Mar. 9, 2020).  Dennis's model has not isolated the premium due to the Challenged

Statement and Named Plaintiffs have not presented a model that suggests doing so is possible.[18]

The Court rejects Named Plaintiffs' model for a second, independent reason: it does not

consider the impact of supply-side factors.  Under New York law, "the fair market value is the

price for which the [item] would sell if there was a willing buyer who was under no compulsion

to buy and a willing seller under no compulsion to sell."  *Keator v. State*, 244 N.E.2d 248, 249

(N.Y. 1968); *see also Arthur Properties, S.A. v. ABA Gallery, Inc.*, 2011 WL 5910192, at *3

(S.D.N.Y. Nov. 28, 2011) ("By definition, the fair market value of an asset such as a work of art,

a used car, a piece of real estate, and many other assets is 'the price that a willing buyer and a

willing seller would agree to in an arm's length transaction.'" (quoting *United States v. Broad.*

*Music, Inc.*, 426 F.3d 91, 95 (2d Cir. 2005))).  As described, Dennis performed a conjoint

analysis to calculate the price premium allegedly caused by the Challenged Statement and Weir

used this conjoint analysis to calculate damages.  Dennis's survey "measure[d] the extent which

the market-clearing price for the Peloton-branded bikes and for the 'All-Access Membership'

subscription for the live and on-demand classes would have been any different in the but-for

---

[18] Named Plaintiffs argue that *McMorrow* and *Price* are distinguishable.  *See* Dkt. No. 267 at 10
(first citing *McMorrow v. Mondelez Int'l, Inc.*, 2020 WL 1157191 (S.D. Cal. Mar. 9, 2020), and
then citing *Price*, 2021 WL 449115).  In those cases, the damages expert exposed survey
participants to a statement that contained two descriptions of the product, one of which was
allegedly false and the other of which accurately described the product.  *Id.*  Here, by contrast,
Named Plaintiffs argue that the "ever-growing library of classes" statement contains both an
adjective—the Challenged Statement—which is allegedly false, and a noun—"library"—which
is unchallenged.  *Id.*  As a result, it is impossible to "isolate the adjective 'ever-growing' from
'library of classes,' for consumers could not decipher what is 'ever-growing.'"  *Id.*  But Named
Plaintiffs fail to explain why the fact that the misleading phrase is contained in an adjective
rather than a noun should make a difference in the ability to isolate the impact of the Challenged
Statement.  Named Plaintiffs' expert plainly could have surveyed consumers to determine
whether the difference between a library of thousands of classes and a library of thousands of
classes that was "ever-growing" would make a difference to the consumers' purchasing
decisions.  He did not.

scenario that Defendant did not use the 'ever-growing library' representation in its advertising and marketing." Dkt. No. 227. However, Dennis's and Weir's analyses assumed that supply would have been fixed, or perfectly inelastic; that is, they did not consider the fact that Defendant would have been willing to sell fewer Peloton products at decreased prices. Dkt. No. 244 ¶¶ 68, 71; Dkt. No. 272 (acknowledging that "Dr. Dennis and I [Weir] calculate . . . the *willingness to pay of the marginal consumer*" (emphasis in original)); *see also In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 235 (S.D.N.Y. 2019) (noting that a conjoint analysis "focuses only on changes to the demand side of the equation . . . [*i.e.*,] how *consumers' willingness to pay* would be affected by the disclosure" of the omission or the falsity of the misrepresentation (emphasis in original)). As a result, the model only measures the putative class members' willingness to pay, not Defendant's willingness to sell, and thus does not measure the market price in the "but for" world in which the misleading elements of the Challenged Statement were not made. Because Defendant might have responded to the decreased demand by producing fewer Peloton products, the damages of the putative class members would presumably be less than Dennis and Weir calculated. *See* Dkt. No. 244 ¶ 69. Thus, the model proposed by Named Plaintiffs does not measure the damages recoverable under their theory of liability. *See, e.g.*, *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015) (refusing to certify a class in part because conjoint analysis did not consider market supply); *cf. In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 500 F. Supp. 3d 940, 949 (N.D. Cal. 2020), *aff'd sub nom. Schell v. Volkswagen AG*, 2022 WL 187841 (9th Cir. Jan. 20, 2022) ("[D]istrict courts across the country have excluded choice-based conjoint analyses [under Federal Rule of Evidence 702] that fail to accurately account for supply-side considerations." (citation omitted)).

Named Plaintiffs argue that they did include supply-side factors in their analysis; their model considers both the known quantity supplied of Peloton's products and the actual historical pricing of those products.  Dkt. No. 272 ¶ 13.  Named Plaintiffs are correct that these are "supply-side factors."  However, as Defendant's expert persuasively argues, they are not the supply-side factors in the but-for world where Defendant did not use the Challenged Statement.  Dkt. No. 244 ¶ 81 ("By definition, historical prices reflect the influence of supply-side factors in the actual world, *not* the influence of supply-side factors in the but-for world where Peloton removed the Challenged Statement.").  Nor do they consider how competitors would have reacted to a decrease in demand for Peloton products, which could in turn affect the supply of Peloton products.  *Id.* ¶¶ 75–76.  By neglecting to account for changes in supply, Named Plaintiffs have failed to present a model that measures only damages attributable to their theory of injury.

Weir claims that considering the willingness to sell will underestimate the degree of damages because it ignores the fact that the items "*have already been sold*."  Dkt. No. 272 at ¶¶ 41–42 (emphasis in original); *see also id.* ¶¶ 43–46.  Weir gives as an example a product that was advertised as curing joint pain that did not actually cure joint pain.  *Id.* ¶ 41.  If a producer's willingness to sell is considered in the analysis, the producer would argue that it would never sell the product for anything less than the cost to produce it, limiting the recovery of consumers to the difference between the product's price and the cost of production, even though the consumers received zero dollars of value from the faulty joint cream.  *Id.*  This argument, however, proves too much.  It presumes that each individual purchased the joint cream for its ability to relieve pain.  In the hypothetical world where the product has only one feature and it is purchased solely because of that feature, there would be no need for plaintiffs to pursue relief on a price-premium

theory.  The product advertises itself.  Each consumer would have actually relied on the promise that the product was what it claimed to be and thus each consumer would be able to recover for the full price it paid for the product.

The price-premium theory of injury and damages proceeds on a different basis.  It provides a basis for recovery for all consumers, whether or not they were aware of the product feature that was falsely advertised, on the notion that each consumer paid more for the product than she would have in the but-for world, even though that consumer received exactly what she bargained for and her willingness to pay would be identical in the but-for situation.  In other words, it assumes that the price of the product was artificially inflated for all purchasers as a result of the misleading statement.  It is on that basis that the Named Plaintiffs pursue relief here. Neither can claim that he received less than what he bargained for or that he would not have been willing to part with the same sum of money if the Challenged Statement were not made.  In that but-for world, each Named Plaintiff still would not have seen the Challenged Statement and would have been just as willing to pay the price he had for the Peloton products.  It is only on the theory that Named Plaintiffs would not have had to pay the amount that they did—that Defendant would have offered its product at a lower price—that Named Plaintiffs would be entitled to recover any damages.  But, if that is the theory of recovery, it inherently asks what price the seller (here, Peloton) would have been willing to sell its products for in the but-for world in which it had not made the Challenged Statement.  And that question, in turn, inherently rests both on the marginal buyer's willingness to pay and Defendant's willingness to sell.  If, in the world where Defendant did not make the Challenged Statement, it would have offered fewer Peloton products for sale, then the effect on price of removing the Challenged Statement would have been at least partially offset by the decrease in quantity supplied.  It is still possible that

Named Plaintiffs, and others who seek to recover on a price-premium theory and who suffered no injury as a result of their actual reliance on the Challenged Statement, would have paid more than they otherwise would have had the Challenged Statement not been made, but Dennis's and Weir's analysis does not measure the degree to which they overpaid in this but-for world because it holds supply fixed.

Though individualized damage assessments need not defeat predominance under Rule 23(b)(3), the Second Circuit has emphasized that courts must consider whether damages are ascertainable on a common basis. *See Roach*, 778 F.3d at 408. That Named Plaintiffs' model does not "actually measure damages that result from the class's asserted theory of injury," *id.* at 407, provides additional support for the Court's conclusion that individual issues predominate over common ones and thus that Named Plaintiffs have not satisfied the requirements of Rule 23(b)(3).[19]

---

[19] Named Plaintiffs also argue that they have demonstrated that "[p]roof of damages for these claims . . . will be straightforward and uniform" because NYGBL Sections 349 and 350 have statutory damages provisions. However, Sections 349 and 350 require the Court to compare Named Plaintiffs' actual damages to the statutory award. *See* NYGBL § 349(h) (private right of action for "actual damages or fifty dollars, whichever is greater"); *id.* § 350-e(3) (private right of action "to recover his or her actual damages or five hundred dollars, whichever is greater"). Even if the Court were to conclude that it need not determine the actual damages suffered by the putative class members, common questions would not predominate over individual ones because Named Plaintiffs would still have to demonstrate injury and causation. *See Ackerman v. Coca-Cola Co.*, 2013 WL 7044866, at *20 n.32 (E.D.N.Y. July 18, 2013) ("In order to receive the statutory amount, each class member would still have to prove causation, i.e., that he or she paid a premium for vitaminwater."); *Pagan v. Abbott Lab'ys, Inc.*, 287 F.R.D. 139, 149 (E.D.N.Y. 2012) ("The existence of a minimum amount of statutory damages does not assist the Plaintiffs in overcoming the hurdle of affirmatively demonstrating commonality, because, as explained above, the Plaintiffs need to first show that the class members have been injured or harmed in the same way.").

### 4. Omission: Causation, Injury, and Damages Resulting From the Material Omission

Named Plaintiffs also allege that Defendant caused the purported class injury by "failing to disclose the imminent removal of over half of its on-demand library."  Third Amended Complaint ¶ 34.  The Court's August 11, 2022 Opinion and Order permitted this theory of liability to proceed because "as the weight of authority now understands [New York] law, where a defendant fails to supply a consumer information that it alone possesses, and where that information would be material or important to a reasonable consumer and where the consumer could not have reasonably obtained the information other than through the defendant, Sections 349 and 350 provide a basis for relief."  Dkt. No. 207 at 34; *see also Oswego*, 647 N.E.2d at 745 (stating that a Section 349 case could be based upon an omission "where the business alone possesses material information that is relevant to the consumer and fails to provide this information").  However, the Rule 23(b)(3) analysis for this theory of liability demonstrates that individual issues will predominate for much the same reasons as Named Plaintiffs' misrepresentation theory of liability:  Defendant has not demonstrated that a price premium existed as a result of the omission or that damages are susceptible to common proof.

The only data that Named Plaintiffs present with respect to Defendant's alleged omission is a consumer perception survey conducted by Dennis, which was designed to measure the materiality of Defendant's alleged omission.  *See* Dkt. No. 230 at 10.  This survey asked participants whether they would be "concerned" if "a legal action would cause [Defendant] to remove" between 10% and 50%, selected at random "of their on-demand classes in their library."  Dkt. No. 227 ¶¶ 95–96.  Dennis's survey revealed that 48.9% of respondents would be either extremely or moderately concerned if Defendant were forced to remove 50% of their classes, a figure that approximates the number of classes that were actually removed by Defendant as a

result of a legal action.  *Id.* ¶¶ 95, 97.  Based on this data, Dennis concludes that "a substantial

share of consumers would have considered this information—that is, about the possibility that

the number of classes might be reduced—as part of their purchase decision making of the

products."  *Id.* ¶ 97 (cleaned up).  However, this survey, which was designed to measure

materiality, says little about whether a price premium existed based on the Challenged

Statement.  If a consumer is "concerned" by the removal of the on-demand classes from

Peloton's library, it does not necessarily follow that these concerns would have caused

consumers not to purchase Peloton products, resulting in a price premium.  Dennis

acknowledged that his survey was not designed to measure "a purchase likelihood of whether

these consumers would purchase this product"; he was "measuring something else."  Dkt.

No. 258-2 at 73.  The Court thus finds Dennis's survey unreliable insofar as Named Plaintiffs

would seek to use it to demonstrate that a price premium existed as a result of Defendant's

misrepresentation.

      In fact, the only data that was presented to the Court suggests that there was no price

premium as a result of the omission.  As discussed, the price of Peloton products stayed the same

for nearly eighteen months after the Class Period, *see* Dkt. No. 244 ¶ 98, and, according to

Defendant's designated witness on the issue of the consumers to the removal of the classes, there

were only "a single-digit number of subscription cancellations that were directly attributable

to . . . the on-demand classes removed from [Peloton's] library in March 2019," Dkt. No. 255-8

at 201.  Nor does Dennis's conjoint model and Weir's damages analysis purport to measure the

price impact of Defendant's omission; at most, they measure the price impact of the "ever-

growing library" statement, which is not tantamount to an alleged omission that the number of

classes in the library would shrink by approximately 50%.

Because the Court finds the individual issues predominate over common ones, it concludes that Named Plaintiffs have not established that the purported class satisfies the predominance requirement of Rule 23(b)(3).[20]

## CONCLUSION

Defendant's motion to strike is DENIED and Named Plaintiffs' motion for class certification is DENIED.  Because the Court finds that the parties' letter motions to seal are consistent with the Court's prior sealing orders, *see* Dkt. Nos. 169, 193, 222, the motions to seal are GRANTED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 225, 226, 239, 240, 262.


SO ORDERED.

Dated: May 2, 2023
      New York, New York

                                      LEWIS J. LIMAN
                            United States District Judge

---

[20] "[A] court that certifies a class must appoint class counsel" at the same time it certifies the class, and the court is thus required to consider the adequacy of class counsel in its class certification decision.  Fed. R. Civ. P. 23(g); *see also* 1 Newberg and Rubenstein on Class Actions § 3:84.  The Second Circuit "has also 'recognized an implied requirement of ascertainability in Rule 23,' which demands that a class be 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'"  *In re Petrobras Sec.*, 862 F.3d at 260 (citations omitted).  Because the Court finds that common issues of fact and law do not predominate over individual issues, it does not appoint, or address the adequacy of, class counsel and does not address the ascertainability of the proposed class.