1:19-cv-11711-LGS

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Sep 02, 2025

# No. 25-

IN THE

# United States Court of Appeals
# for the Second Circuit

IN RE PELOTON INTERACTIVE, INC.,

*Petitioner.*

ON PETITION FOR A WRIT OF MANDAMUS TO THE
UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK
NO. 1:19-CV-11711-LGS, THE HONORABLE LORNA G. SCHOFIELD

## PETITION FOR A WRIT OF MANDAMUS

Mark W. Mosier
Andrew Soukup
Abby Wright
Alexander J. Cave
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Tel: 202-662-6000
mmosier@cov.com
asoukup@cov.com
awright@cov.com
acave@cov.com

*Attorneys for Petitioner*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellant Peloton Interactive, Inc. certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... iv

INTRODUCTION ................................................................................ 1

REQUESTED RELIEF ....................................................................... 4

STATEMENT OF THE ISSUES.......................................................... 4

STATEMENT OF FACTS ................................................................... 5

    A.    Original Plaintiffs Sue and Do Not Object to Judge Liman's Presiding After His Disclosure of Financial Conflict and Divestment................................................................................. 5

    B.    The Parties Continue Litigating Before Judge Liman for Several Years Without Objection, Even Following a Second Disclosure. ............................................................................ 6

    C.    New Plaintiffs File the Third Amended Complaint, Which Involves Only New York Parties and Claims. ..................... 7

    D.    Nearly Four Years After the First Disclosure, Plaintiffs Decline to Waive and Judge Liman Recuses.................................... 8

    E.    Without Addressing Peloton's Jurisdictional Challenge, the District Court Vacates Years' Worth of Orders and Strikes the Amended Complaints. ......................................................... 9

ARGUMENT .................................................................................... 11

I.    Peloton Has a Clear and Indisputable Right to Mandamus......................... 12

    A.    The District Court Clearly Erred in Failing to Adjudicate Subject-Matter Jurisdiction Before the Merits, and Thereby Exercising Jurisdiction It Did Not Have. ........................... 12

        1.    The district court was obligated to assess subject-matter jurisdiction before exercising judicial power. ........................ 12

        2.    The district court disregarded its obligation to first assess subject-matter jurisdiction. ...................................... 13

3. Subject-matter jurisdiction was lacking under the then-operative complaint, which involved only New York parties and claims.................................................. 15

B. The District Court Clearly Erred and Abused Its Discretion in Disregarding Plaintiffs' Waiver of the Right to Seek Relief. ............ 18

1. Plaintiffs knowingly and strategically chose to litigate before Judge Liman with full knowledge of the conflicts. ...... 19

2. By failing to timely object, Plaintiffs waived any right to seek relief. .............................................................. 20

3. The district court clearly erred by disregarding Plaintiffs' waiver as irrelevant. ............................................... 24

4. The district court clearly abused its discretion in vacating prior orders based on a categorical analysis that failed to account for Plaintiffs' strategic choices.................................. 25

II. The Other Mandamus Factors Show Peloton Is Entitled to Relief. ............. 31

A. Should this Court Dismiss Peloton's Pending Appeal, Peloton Will Be Left with No Other Adequate Means of Relief. ................... 31

B. Mandamus Is Appropriate Given the District Court's Failure to Address Subject-Matter Jurisdiction Before Undoing Five Years of Litigation............................................................. 33

CONCLUSION ................................................................................. 35

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*In re A.H.*,
    999 F.3d 98 (2d Cir. 2021) ...............................................................11

*Apple v. Jewish Hosp. & Med. Ctr.*,
    829 F.2d 326 (2d Cir. 1987) ...............................................21, 23, 29

*Bacher ex rel. Bacher v. Boehringer Ingelheim Pharms., Inc.*,
    110 F.4th 95 (2d Cir. 2024) ...............................................................15

*Bay Shore Union Free Sch. Dist. v. Kain*,
    485 F.3d 730 (2d Cir. 2007) ...............................................................16

*Caribbean Trading & Fid. Corp. v. Nigerian Nat. Petroleum Corp.*,
    948 F.2d 111 (2d Cir. 1991) ...............................................................31

*Cheney v. U.S. Dist. Ct.*,
    542 U.S. 367 (2004)............................................................................11

*Cunningham Charter Corp. v. Learjet, Inc.*,
    592 F.3d 805 (7th Cir. 2010) ..............................................................17

*In re Depuy Orthopaedics, Inc.*,
    870 F.3d 345 (5th Cir. 2017) ..............................................................27

*ExxonMobil Oil Corp. v. TIG Ins. Co.*,
    44 F.4th 163 (2d Cir. 2022) ......................................................*passim*

*Hertz Corp v. Friend*,
    559 U.S. 77 (2010)..............................................................................13

*Hunter v. McMahon*,
    75 F.4th 62 (2d Cir. 2023) ..................................................................13

*In Touch Concepts, Inc. v. Cellco P'ship*,
    788 F.3d 98 (2d Cir. 2015) ..................................................................15

*In re Int'l Bus. Machs. Corp.*,
    45 F.3d 641 (2d Cir. 1995) ...............................................19, 21, 24, 29

iv

*Johnson v. Advance Am.*,
549 F.3d 932 (4th Cir. 2008) ............................................................16

*In re Kellogg Brown & Root, Inc.*,
756 F.3d 754 (D.C. Cir. 2014) ..........................................................32

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994) ..........................................................................12

*Liljeberg v. Health Servs. Acquisition Corp.*,
486 U.S. 847 (1988) ..............................................21, 28, 29, 30, 31

*Linde v. Arab Bank, PLC*,
706 F.3d 92 (2d Cir. 2013) ...............................................................32

*Litovich v. Bank of Am. Corp.*,
106 F.4th 218 (2d Cir. 2024) ......................................................*passim*

*Ex parte McCardle*,
74 U.S. (7 Wall.) 506 (1868) ............................................................13

*Mohawk Indus., Inc. v. Carpenter*,
558 U.S. 100 (2009) ..........................................................................32

*Richardson Greenshields Sec., Inc. v. Lau*,
825 F.2d 647 (2d Cir. 1987) .............................................................31

*Roche v. Evaporated Milk Ass'n*,
319 U.S. 21 (1943) ..............................................................11, 14, 15

*Royal Canin U. S. A., Inc. v. Wullschleger*,
604 U.S. 22 (2025) ..............................................................12, 14, 15

*In re S.E.C. ex rel. Glotzer*,
374 F.3d 184 (2d Cir. 2004) .......................................................32, 33

*State Farm Fire & Cas. Co. v. Tashire*,
386 U.S. 523 (1967) ..........................................................................17

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ....................................................12, 13, 14, 15

*Taylor v. Vt. Dep't of Educ.*,
 313 F.3d 768 (2d Cir. 2002) ...............................................25

*In re United States*,
 945 F.3d 616 (2d Cir. 2019) ...............................................33

*United States v. Amico*,
 486 F.3d 764 (2d Cir. 2007) ...........................................23, 25, 26, 30

*United States v. Bayless*,
 201 F.3d 116 (2d Cir. 2000) ...............................................21

*United States v. Brinkworth*,
 68 F.3d 633 (2d Cir. 1995) ...............................................22, 23

*United States v. Nobel*,
 696 F.2d 231 (3d Cir. 1982) ...............................................23

*United States v. Sineneng-Smith*,
 590 U.S. 371 (2020)...............................................30

*United States v. Yonkers Bd. of Educ.*,
 946 F.2d 180 (2d Cir. 1991) ...............................................22

*United States v. Yu-Leung*,
 51 F.3d 1116 (2d Cir. 1995) ...............................................24

*Wright Transp., Inc. v. Pilot Corp.*,
 841 F.3d 1266 (11th Cir. 2016) ...............................................17

## CONSTITUTIONAL PROVISIONS

U.S. Const. Art. III, § 2, cl. 1 ...............................................16

## STATUTES

28 U.S.C. § 455(a) ...............................................9, 20

28 U.S.C. § 1332(d) ...............................................2

28 U.S.C. § 1332(d)(2)(A)...............................................16, 18

vi

**RULES**

Fed. R. Civ. P. 12(h)(3)......................................................................13, 15

**OTHER AUTHORITIES**

2 Newberg and Rubenstein on Class Actions § 6:14 (6th ed.)................................16

# **INTRODUCTION**

In October 2020, only a few months into this putative class action, Judge Liman notified the parties of a financial conflict before promptly purging that conflict. Plaintiffs at the time—a New York citizen and a Michigan citizen ("Original Plaintiffs")—did not seek Judge Liman's recusal or object to him continuing to preside. They again failed to do so after Judge Liman disclosed, and promptly purged, another financial conflict the following year. They instead pressed forward without objection, strategically choosing to proceed before him rather than seek his recusal.

With the filing of a third amended complaint, Original Plaintiffs dropped out of the case. A new pair of plaintiffs—both New York citizens ("New Plaintiffs")— joined the case, also with full knowledge of the disclosed conflicts. Yet they too pushed ahead without objection, opting to have Judge Liman decide Defendant Peloton Interactive, Inc.'s ("Peloton's") (fourth) motion to dismiss, and their own motion for class certification. After Judge Liman denied both motions, Peloton moved for summary judgment, and the parties fully briefed that motion.

Following a decision of this Court directing his recusal in an unrelated case last year, Judge Liman offered the parties an opportunity to expressly waive the conflicts he had previously disclosed and purged. At that point, with their motion for class certification and Rule 23(f) petition denied, and facing summary judgment,

1

New Plaintiffs had a change of heart. Though they lodged no objection in the preceding four years following Judge Liman's first disclosure, New Plaintiffs now declined to waive. The case was reassigned and New Plaintiffs seized their opportunity, asking the newly assigned judge to vacate every order Judge Liman had issued, including decisions on four motions to dismiss and two motions for class certification.

In opposing this sweeping request, Peloton pointed out that Plaintiffs had waived any right to seek relief based on Judge Liman's conflicts by their calculated choice to litigate before him without objection for years. Vacatur was unwarranted, Peloton explained, because it would reward Plaintiffs' gamesmanship. But Peloton's first and principal argument was that under the then-operative Third Amended Complaint, the court lacked subject-matter jurisdiction because the complaint sought New York-class relief for New York plaintiffs claiming violations of New York law by a New York defendant. Neither a federal question nor the minimal diversity required for jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), were present.

Without a word about jurisdiction, the district court proceeded straight to the merits of New Plaintiffs' motion, ignoring entirely its obligation to assure itself of jurisdiction before addressing New Plaintiffs' request to start the case over.

But that was not all.  Waving aside Plaintiffs' strategic choices as "beside the point," the court fixated on the disclosed and purged financial conflicts without ever considering the equities at stake.  Those conflicts, the court held, demanded vacatur of all Judge Liman's substantive decisions.  And it further struck, *sua sponte*, all three amended complaints, restoring the original Complaint as the operative pleading.  That step had the bizarre consequence of removing New Plaintiffs, bringing the Original Plaintiffs (including the Michigan plaintiff diverse from Peloton) back into the case, and resurrecting the minimal diversity that New Plaintiffs had destroyed.

The district court's extraordinary order warrants extraordinary relief.  The court disregarded fundamental limitations on judicial power by skipping jurisdiction to adjudicate the merits, in violation of well-established precedent.  Then, exercising jurisdiction it did not have—and at minimum, of which it had not assured itself—it brushed aside Plaintiffs' plain-as-day waiver.  And to top it off, the court replaced the required case-specific remedial inquiry with a categorical analysis that would demand vacatur in every case of financial conflict.  This was an exercise of judicial power, with neither jurisdiction nor justification, that unwound *five years* of litigation and returned the case to square one.

Peloton's right to relief from this Court is clear and indisputable.  Peloton has filed a notice of appeal under the collateral order doctrine.  *See Fishon v. Peloton*

*Interactive, Inc.*, No. 25-1415. But should this Court conclude that it lacks appellate jurisdiction, it should issue a writ of mandamus given the remarkable circumstances of this case.

## **REQUESTED RELIEF**

If this Court concludes that it lacks appellate jurisdiction under the collateral order doctrine, it should issue a writ of mandamus directing the district court to vacate its order and dismiss for lack of subject-matter jurisdiction. In the alternative, Peloton requests a writ directing the district court to reverse its order on the merits, or, at minimum, to vacate its order and adjudicate Peloton's challenge to subject-matter jurisdiction under the Third Amended Complaint before addressing plaintiffs' vacatur motion on the merits.

## **STATEMENT OF THE ISSUES**

1.      Whether the district court clearly erred in addressing the merits of New Plaintiffs' vacatur request without addressing Peloton's challenge to subject-matter jurisdiction and in declining to dismiss for lack of subject-matter jurisdiction.

2.      Whether the district court clearly erred in failing to hold on the merits that Plaintiffs had waived any right to seek relief for a violation of 28 U.S.C. § 455(a) by choosing to litigate, without objection, before Judge Liman for years despite knowledge of his purged conflicts.

3.    Whether the district court clearly abused its discretion in vacating prior dispositions of four dispositive motions and two motions for class certification and in striking three amended complaints, in light of Plaintiffs' repeated choice to proceed before Judge Liman.

## STATEMENT OF FACTS

**A.    Original Plaintiffs Sue and Do Not Object to Judge Liman's Presiding After His Disclosure of Financial Conflict and Divestment.**

In 2019, Eric Fishon and Alicia Pearlman ("Original Plaintiffs") filed a putative class action against Peloton.[1]  They alleged that Peloton violated New York consumer protection law by marketing its library of on-demand fitness classes as "growing" or "ever-growing."  *See* ADD-1-40.[2]  The case was assigned to Judge Liman.  Dkt. 16.

Peloton moved to dismiss.  Dkt. 29.  In 2020, while that motion was pending, Judge Liman learned his wife owned Peloton stock.  He immediately notified the parties, and she promptly divested.  ADD-41-42.  Original Plaintiffs did not object

---

[1] Patrick Yang was also a plaintiff on the original Complaint, but voluntarily dismissed his claims soon thereafter.  *See* Dkt. 58-61.

[2] All citations to "ADD." refer to the Addendum submitted with this Petition. Citations to "Dkt." refer to the proceedings in *Fishon v. Peloton Interactive, Inc.*, No. 1:19-cv-11711 (S.D.N.Y.).

to Judge Liman's continuing to preside or request his recusal following this disclosure.

Soon thereafter, the district court partially granted Peloton's motion as to Pearlman, a Michigan citizen and resident, holding that she lacked statutory standing to bring claims under New York law.  ADD-66-71.  But it denied the motion as to Fishon, a New York citizen and resident, holding that New York law does not require proof of reliance on the allegedly misleading statement.  ADD-60-61, 71.

### B.    The Parties Continue Litigating Before Judge Liman for Several Years Without Objection, Even Following a Second Disclosure.

In 2021, Original Plaintiffs amended their Complaint and Peloton partially moved to dismiss.  ADD-73-114; Dkt. 88.  Original Plaintiffs raised no objection to Judge Liman's deciding the motion, which he granted with prejudice.  The order allowed Pearlman to plead claims under Michigan law, which she did in the Second Amended complaint.  ADD-118-25, 126-73.

Peloton again partially moved to dismiss.  Dkt. 107.  While that motion was pending, Judge Liman disclosed that a broker had purchased Peloton stock for a joint account, and he and his wife promptly divested.  ADD-174-75.  Even after this second disclosure, Original Plaintiffs did not request Judge Liman's recusal or otherwise object.  Instead, less than three weeks later, they filed a motion to certify two classes.  Dkt. 117.  Judge Liman ruled on both motions several months later,

dismissing Pearlman's Michigan law claims and denying class certification.  ADD-185-202.

### C.    New Plaintiffs File the Third Amended Complaint, Which Involves Only New York Parties and Claims.

In 2022, Plaintiffs' counsel filed a Third Amended Complaint, but Original Plaintiffs did not join it.  Rather, Plaintiffs' counsel recruited two new plaintiffs, Eric Passman and Ishmael Alvarado ("New Plaintiffs").  ADD-203-44.  New Plaintiffs alleged that they were domiciled in New York, ADD-213-14 ¶¶ 35, 37, and that Peloton's principal place of business was in New York, ADD-215 ¶ 43.  Though they pleaded both nationwide and New York classes, they asserted claims only under New York law, ADD-235-42 ¶¶ 116-54, and disclaimed any intent to seek certification of the nationwide class, ADD-231 ¶¶ 106 & n.70, 107.

For the fourth time, Peloton moved to dismiss.  Dkt. 196.  Like Original Plaintiffs, New Plaintiffs did not object to Judge Liman's deciding the motion or otherwise presiding.  In August 2022, the district court denied Peloton's motion with respect to Plaintiffs' New York-only class.  ADD-251-81, 284.  But in light of Plaintiffs' statement that they would not seek certification of a nationwide class, Judge Liman struck their nationwide class allegations.  ADD-283-84.

New Plaintiffs then moved to certify a New York class, but Judge Liman denied that request.  Dkt. 226; ADD-285-358.

New Plaintiffs filed a Rule 23(f) petition in this Court, which made no argument regarding Judge Liman's conflicts. That motion was denied, ADD-359, and the parties fully briefed Peloton's motion for summary judgment on New Plaintiffs' individual claims seeking approximately $1,000 in statutory penalties, Dkt. 294, 301, 307, 314.

### D. Nearly Four Years After the First Disclosure, Plaintiffs Decline to Waive and Judge Liman Recuses.

In 2024, this Court held in an unrelated case that Judge Liman should have recused himself based on his wife's ownership of a party's stock. *See Litovich v. Bank of Am. Corp.*, 106 F.4th 218 (2d Cir. 2024). Shortly after, the district court clerk sent a letter to the parties recounting Judge Liman's prior disclosures. The letter recognized that since those disclosures, "no parties ha[d] suggested that Judge Liman's impartiality might be questioned, nor ha[d] anyone objected to Judge Liman's continuing to preside over this case or suggested that he should disqualify himself." ADD-360. And it stated that "[g]iven the substantial time that has passed since Judge Liman's disclosures and the lack of objection or request for recusal from any party, the parties may have impliedly waived any argument that Judge Liman should recuse himself from the case." ADD-361. But the clerk explained that Judge Liman decided to "provide the parties an opportunity to execute, or decline to execute, a formal waiver." *Id.*

8

Despite their prior calculated acquiescence, New Plaintiffs—awaiting Judge Liman's summary judgment ruling—declined to execute a formal waiver. Judge Liman recused, and the case was reassigned to Judge Schofield. Dkt. 333, 338.

### E. Without Addressing Peloton's Jurisdictional Challenge, the District Court Vacates Years' Worth of Orders and Strikes the Amended Complaints.

Following reassignment, New Plaintiffs moved for vacatur or *de novo* review of "the entirety of the recused judge's rulings" based an alleged violation of 28 U.S.C. § 455, which governs judicial recusals. Dkt. 338 at 2, 25. Peloton opposed. It argued principally that the filing of the Third Amended Complaint—in which a putative class of New York plaintiffs alleged claims under New York law against a New York defendant—divested the district court of subject-matter jurisdiction. Peloton further argued that Plaintiffs had waived any right to seek relief for a 28 U.S.C. § 455 violation, and that, at any rate, vacatur was unwarranted given Plaintiffs' strategic delay in seeking relief. ADD-376-83, 391-93.

More than five years after this case began, the district court granted New Plaintiffs' motion on May 2, 2025. ADD-397-409. The court did not rule on or even mention Peloton's challenge to jurisdiction. Instead, the court concluded that Judge Liman had violated § 455(a), which mandates recusal when a judge's "impartiality might reasonably be questioned"; that whether Plaintiffs had "waived

any violation of § 455(a)" was "beside the point"; and that "[v]acatur of the prior rulings is the appropriate remedy in this case."  ADD-402-09.

The court thus vacated the previous orders disposing of each of Peloton's motions to dismiss (ADD-43-72, 115-25, 176-202, 245-284) and denying class certification (ADD-176-202, 285-358), while indicating that "[d]iscovery and other orders" would be "reviewed de novo as necessary."  ADD-408.  The court also struck the First, Second, and Third Amended Complaints (ADD-73-114, 126-73, 203-44), even though New Plaintiffs had not even requested that relief.  ADD-408.  This reinstated the original Complaint as the operative pleading and removed New Plaintiffs from the case, replacing them with Original Plaintiffs, who had dropped out of the case years before.[3]  Plaintiffs' counsel then filed a new complaint—styled as the "First" Amended Complaint—changing the parties yet again by dropping Fishon, re-adding New Plaintiffs, and adding Jill Schneider, a brand new plaintiff.  Dkt. 351.

Peloton timely appealed the district court's order, and plaintiffs moved to dismiss for lack of appellate jurisdiction.  *See Fishon v. Peloton Interactive, Inc.*,

---

[3] As Plaintiffs recognized, the district court's order effectively set this case back to "square one" by reinstating the original Complaint.  Dkt. 346 at 1.  The only decisions left in place (for now) were discovery orders.  The parties dispute whether additional discovery will be needed should the case proceed.

No. 25-1415. The district court stayed all proceedings pending resolution of the appeal. Dkt. 355 at 5.

Given its clear entitlement to relief from this Court, while Peloton opposes Plaintiffs' motion to dismiss because this Court has appellate jurisdiction, Appellant's Opp'n Mot. Dismiss, *Fishon v. Peloton Interactive, Inc.*, No. 25-1415, it also files this mandamus petition in the alternative. In the event this Court determines it lacks appellate jurisdiction under the collateral order doctrine, this Court should grant mandamus.

## **ARGUMENT**

Through a writ of mandamus, an appellate court may "confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943). A court may issue the writ if (1) "the petitioners' 'right to issuance of the writ is clear and indisputable,'" (2) "the petitioners have 'no other adequate means to attain the relief [they] desire[],'" and (3) "[it is] 'satisfied that the writ is appropriate under the circumstances.'" *In re A.H.*, 999 F.3d 98, 105 (2d Cir. 2021) (quoting *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380-81 (2004)). Peloton has a clear and indisputable right to relief, which is appropriate given the extraordinary circumstances of this case. And should this Court conclude that it lacks jurisdiction,

in whole or in part, over Peloton's separately filed appeal, Peloton will have no other means to obtain that relief.

## I.    Peloton Has a Clear and Indisputable Right to Mandamus.

### A.    The District Court Clearly Erred in Failing to Adjudicate Subject-Matter Jurisdiction Before the Merits, and Thereby Exercising Jurisdiction It Did Not Have.

When New Plaintiffs filed their vacatur motion, the operative complaint asserted claims by New York plaintiffs, under New York law, against a New York defendant.  In its opposition, Peloton challenged the district court's subject-matter jurisdiction.  Disregarding foundational limits on judicial power and violating well-established precedent, the district court failed to adjudicate (or even mention) that jurisdictional challenge, which would have resulted in dismissal, before proceeding to the merits.  That was clear error.

#### 1.    The district court was obligated to assess subject-matter jurisdiction before exercising judicial power.

"Federal courts … are courts of limited jurisdiction."  *Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 26 (2025) (cleaned up).  "They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (cleaned up).

Subject-matter jurisdiction is the "statutory or constitutional *power* to adjudicate the case."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).

"Without jurisdiction," the Supreme Court has accordingly explained, "the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Id.* at 94 (internal quotation marks omitted) (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)). Reflecting these constitutional limitations, the Court has squarely rejected the practice of "assuming jurisdiction for the purpose of deciding the merits," for that practice "carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers." *Id.* (cleaned up).

It follows that federal "[c]ourts have an independent obligation to determine whether subject-matter jurisdiction exists," and to dismiss when it does not. *Hertz Corp v. Friend*, 559 U.S. 77, 94 (2010); *see also, e.g.*, *Hunter v. McMahon*, 75 F.4th 62, 66 (2d Cir. 2023); Fed. R. Civ. P. 12(h)(3). Indeed, the constitutional principles at stake are of such significance that the obligation applies "even when no party challenges" jurisdiction. *Hertz*, 559 U.S. at 94.

### 2. The district court disregarded its obligation to first assess subject-matter jurisdiction.

Despite its clear duty to address Peloton's challenge to subject-matter jurisdiction, ADD-376-79, before the merits, the district court failed to address its jurisdiction or even acknowledge Peloton's argument on this score. Indeed, it did so even though Peloton had alerted the district court to the Supreme Court's decision

13

in *Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22 (2025), and its significance to Peloton's jurisdictional arguments, while the motion was pending. ADD-395-96. The district court instead proceeded to adjudicate the merits of New Plaintiffs' motion and enter sweeping and unwarranted relief. *See infra* pp. 18-31. In taking that course, the district court employed the approach the Supreme Court has expressly forbid. *Steel Co.*, 523 U.S. at 94. Because the "traditional use of the writ" is to "confine an inferior court to a lawful exercise of its prescribed jurisdiction," *Roche*, 319 U.S. at 26, the district court's failure to address its subject-matter jurisdiction was clear and indisputable error warranting mandamus relief.

The district court's error here was even more problematic than the error the Supreme Court recognized in *Steel Co.* For one thing, the merits determinations the district court made with its assumed jurisdiction *favored* the parties invoking jurisdiction; the merits were therefore not simply an alternative ground for dismissing the case. *See Steel Co.*, 523 U.S. at 93 (explaining that courts of appeals justified their approach because "the prevailing party on the merits would be the same as the prevailing party were jurisdiction denied"). For another, as explained more fully in Peloton's opposition to Plaintiffs' motion to dismiss its appeal, the district court reinstated the original Complaint, which had diverse parties, thereby permanently dodging the question of jurisdiction over the Third Amended Complaint unless this Court grants review now. *See* Appellant's Opp'n Mot.

14

Dismiss, *Fishon v. Peloton Interactive, Inc.*, No. 25-1415; *cf., e.g.*, *Royal Canin*, 604 U.S. at 35 ("jurisdiction follows from (and only from) the operative pleading").

To correct the district court's disregard for the constitutional limits of its authority and to protect against "ultra vires" action on the merits by the district court, *Steel Co.*, 523 U.S. at 102, this Court should at minimum grant mandamus directing the district court to vacate its order and adjudicate Peloton's jurisdictional challenge.

### 3. Subject-matter jurisdiction was lacking under the then-operative complaint, which involved only New York parties and claims.

Had the district court fulfilled its obligation to assess subject-matter jurisdiction, it would have dismissed the case for a lack thereof rather than order a do-over with different parties. *See, e.g.*, *In Touch Concepts, Inc. v. Cellco P'ship*, 788 F.3d 98, 101 (2d Cir. 2015); Fed. R. Civ. P. 12(h)(3). That the district court proceeded to exercise jurisdiction that it lacked and adjudicate the merits underscores the gravity of its failure to assess jurisdiction and is a clear error warranting mandamus in its own right. *See Roche*, 319 U.S. at 26.

New Plaintiffs failed to carry their burden "of demonstrating that jurisdiction is proper." *Bacher ex rel. Bacher v. Boehringer Ingelheim Pharms., Inc.*, 110 F.4th 95, 101 n.2 (2d Cir. 2024). As relevant here, the sole jurisdictional statute on which the Third Amended Complaint relied—CAFA, *see* ADD-216 ¶ 46—applies only if "any member of a class of plaintiffs is a citizen of a State different from any

defendant," § 1332(d)(2)(A); that is, only if the minimal diversity required under the Constitution exists.  New Plaintiffs alleged that they were domiciled in and thus citizens of New York.  *See* ADD-213-14 ¶¶ 35, 37.  But they likewise alleged that Peloton, whose principal place of business and headquarters are in New York, is too. ADD-215 ¶ 43.[4]  CAFA jurisdiction could only exist under the Third Amended Complaint, then, if some *other* putative class member was "a citizen of a State different from any defendant."  § 1332(d)(2)(A).

Indeed, without a non-New York citizen plaintiff, jurisdiction would not only lack statutory basis—it would be unconstitutional.  Under Article III, "the judicial power does not extend to suits between citizens of the same state unless the case 'arises under this Constitution or the Laws of the United States,' or involves several other now obscure scenarios … which are not implicated by the instant dispute." *Bay Shore Union Free Sch. Dist. v. Kain*, 485 F.3d 730, 736 (2d Cir. 2007) (cleaned up) (quoting U.S. Const. Art. III, § 2, cl. 1).  The Third Amended Complaint raised no federal question, *see* ADD-235-42 ¶¶ 116-54; diversity—specifically minimal

---

[4] It makes no difference that Peloton is incorporated in and thus a citizen of Delaware too.  *See* ADD-215 ¶ 43; *Johnson v. Advance Am.*, 549 F.3d 932, 936 (4th Cir. 2008) ("Accordingly, we reject its argument that its dual citizenship entitles it to rely on its Delaware citizenship to establish minimal diversity under CAFA."); 2 Newberg and Rubenstein on Class Actions § 6:14 n.6 (6th ed.).

diversity—was a constitutional necessity. *See State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 531 (1967).

The Third Amended Complaint provides no indication that any putative class member is not a New York citizen. Originally, it included allegations respecting both a nationwide class, ADD-231 ¶ 106, and a class limited to New York purchasers, *id.* ¶ 107. But it also indicated that New Plaintiffs did not intend to seek certification of the former. Specifically, New Plaintiffs "recognize[d]" that the district court had dismissed New York claims brought by non-New York plaintiffs and explained that they were "not presently looking to relitigate that issue" and wished merely to preserve it for appeal. *Id.* ¶ 106 n.70. The district court accordingly struck the nationwide class allegations, leaving them without any operative force. ADD-283-84.

In any event, jurisdiction would have been lacking even if the district court had not struck the nationwide class allegations, because would-be CAFA class actions may be "dismissed for lack of jurisdiction if those claims contain frivolous attempts to invoke CAFA jurisdiction or lack the expectation that a class may be eventually certified." *Wright Transp., Inc. v. Pilot Corp.*, 841 F.3d 1266, 1271 (11th Cir. 2016); *see also Cunningham Charter Corp. v. Learjet, Inc.*, 592 F.3d 805, 807 (7th Cir. 2010) (Posner, J.). That was the situation here, where New Plaintiffs included, but immediately disclaimed, nationwide class allegations.

17

The only operative allegations of the Third Amended Complaint thus involved New York plaintiffs, suing on behalf of a New York class, asserting claims under New York law, against a New York defendant. Those allegations do not establish that any putative class member "is a citizen of a State different from any defendant." § 1332(d)(2)(A). The district court was therefore without subject-matter jurisdiction, and this Court should grant a writ of mandamus directing the district court to dismiss the case.

**B.    The District Court Clearly Erred and Abused Its Discretion in Disregarding Plaintiffs' Waiver of the Right to Seek Relief.**

The district court's jurisdictional errors enabled it to vacate years' worth of prior orders and all three amended complaints, substantively setting the case back to square one through ultra vires action. The district court's vacatur order was clearly wrong on the merits, which constitutes an independent basis upon which to grant mandamus.

Plaintiffs repeatedly and unmistakably chose to litigate this case—including dispositive and class certification motions—for several years before Judge Liman despite knowledge of his purged financial conflicts. Yet the district court refused to even consider whether Plaintiffs had waived any right to seek relief, believing that Judge Liman's *recusal* somehow opened the door for Plaintiffs to seek *vacatur*. Again, this was clear error. And the district court also clearly abused its discretion in issuing a sweeping vacatur order. This Court mandates a case-specific remedial

analysis, and all of the relevant factors here militate against vacatur. This Court should not countenance Plaintiffs' strategy of "holding back a recusal application as a fall-back position in the event of adverse rulings on pending matters." *In re Int'l Bus. Machs. Corp.*, 45 F.3d 641, 643 (2d Cir. 1995) ("*IBM*"). To do so would expose Peloton to severe prejudice and degrade the integrity of the judicial system.

### 1. Plaintiffs knowingly and strategically chose to litigate before Judge Liman with full knowledge of the conflicts.

Original Plaintiffs learned of Judge Liman's initial financial conflict and divestiture in October and November 2020, respectively. ADD-41-42. At that time, the original Complaint was still operative, none of the orders the district court ultimately vacated had been issued, and only one of the motions leading to those orders had been filed: Peloton's then-pending motion to dismiss the original Complaint. Dkt. 29; ADD-43-72.

Original Plaintiffs could have objected and sought recusal then. But they instead chose to proceed before Judge Liman. Indeed, Original Plaintiffs have *never* objected to his presiding, even as he disposed of two more motions to dismiss and a motion for class certification, *see* ADD-115-25, 176-202, issued various other orders over the course of 16 months, and disclosed a second financial conflict, *see* ADD-174-75.

As for New Plaintiffs, they joined the case with full cognizance of Judge Liman's previous financial conflicts. And they too chose to litigate before him—for

19

the next *two and a half years*—without objection or any request for relief related to the conflicts. In that period, Judge Liman disposed of Peloton's motion to dismiss the Third Amended Complaint, ADD-245-84, and New Plaintiffs' own motion for a class certification, ADD-285-358. Indeed, although New Plaintiffs filed a Rule 23(f) petition in this Court, they made no argument to this Court regarding Judge Liman's conflicts. ADD-359.

New Plaintiffs finally objected only in late July 2024—after denial of New Plaintiffs' class certification motion and Rule 23(f) petition, and with Peloton's summary judgment motion pending—when Judge Liman *sua sponte* indicated that he might recuse if either party belatedly declined to waive the conflicts. *See* ADD-360-63. The district court clerk's letter to that effect observed that to date, "no parties ha[d] suggested that Judge Liman's impartiality might be questioned, nor has anyone objected to Judge Liman's continuing to preside over this case or suggested that he should disqualify himself." ADD-360.

### 2. By failing to timely object, Plaintiffs waived any right to seek relief.

Section 455(a) mandates that a judge recuse "in any proceeding in which his impartiality might reasonably be questioned." When a judge does not do so, or does not do so early enough, further relief, such as vacatur of rulings the judge issued after he should have recused, is sometimes—though not always—warranted. *See, e.g.*, *ExxonMobil Oil Corp. v. TIG Ins. Co.*, 44 F.4th 163, 172 (2d Cir. 2022).

But litigants may not sleep on their rights to seek relief. The Supreme Court has recognized that "delay" may "foreclose relief based on a violation of § 455(a)." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 869 (1988). And to prevent parties from "holding back a recusal application as a fall-back position in the event of adverse rulings on pending matters," *IBM*, 45 F.3d at 643, this Court requires litigants to raise disqualification claims "at the earliest possible moment after obtaining knowledge" of the relevant facts, *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 333 (2d Cir. 1987). That principle naturally extends to forms of relief beyond recusal itself. In particular, as relevant here, if parties waive the right to seek the prospective remedy of recusal by failing to do so in a timely fashion, the same must be true of the additional, more drastic retrospective remedy of vacating rulings the judge issued after recusal should have happened.

Here, Plaintiffs' prolonged and knowing delay in seeking relief effected a "renunciation … implicitly through behavior" of any right to do so. *United States v. Bayless*, 201 F.3d 116, 127 (2d Cir. 2000). All four factors relevant to the inquiry—whether "(1) the movant has participated in a substantial manner in trial or pre-trial proceedings, (2) granting the motion would represent a waste of judicial resources, (3) the motion was made after the entry of judgment, and (4) the movant can demonstrate good cause for delay," *Apple*, 829 F.2d at 334 (cleaned up)—overwhelmingly indicate waiver.

*First*, Plaintiffs' participation following Judge Liman's disclosures was plainly "substantial."  Without ever objecting, Plaintiffs filed key motions—including class certification and Rule 702 motions—for Judge Liman's decision. And New Plaintiffs—the plaintiffs who finally sought vacatur years after Judge Liman's financial conflict disclosures—chose to *join the case* knowing of those disclosures.

*Second*, immense judicial resources have been invested in this case.  When New Plaintiffs objected, a motion for summary judgment was fully briefed and had been pending.  That motion followed four complaints, four motions to dismiss, two motions for class certification, and fulsome discovery (including expert discovery)—all overseen by Judge Liman.  By granting Plaintiffs' motion for vacatur, the district court allowed Plaintiffs to undo *five years'* worth of litigation. In doing so, Plaintiffs and the district court effected an abject waste of judicial resources.  *See United States v. Yonkers Bd. of Educ.*, 946 F.2d 180, 183 (2d Cir. 1991).  And even more waste would result if these issues are not adjudicated now, given the potential for yet another rewinding if Peloton is forced to bring a post-judgment appeal and then prevails.

*Third*, the fact that judgment has not yet been entered is not alone enough to render Plaintiffs' request for relief timely.  *See, e.g.*, *United States v. Brinkworth*, 68

F.3d 633, 639-40 (2d Cir. 1995) (finding recusal motion untimely despite being filed before entry of judgment).

*Fourth*, and most importantly, there is no good reason for Plaintiffs' delay, and they have not identified one, rendering their request for relief "presumptively untimely." *Apple*, 829 F.2d at 334*; see also Brinkworth*, 68 F.3d at 639 (good cause is the "crux" of the analysis); *United States v. Amico*, 486 F.3d 764, 775 (2d Cir. 2007) (good cause is the "pivotal factor"). Again, Original Plaintiffs could have objected and sought relief as early as October 2020. And New Plaintiffs knew of the alleged conflicts when they chose to join the case yet litigated before Judge Liman without objection for two and a half years, indicating their acquiescence to his continued involvement and establishing waiver. *See, e.g.*, *United States v. Nobel*, 696 F.2d 231, 236-37 (3d Cir. 1982) (holding that failure to timely object established waiver where "information disclosed was sufficient to put defense counsel on notice" of judicial conflict).

New Plaintiffs' assertion below that they could not have known to seek relief before *Litovich* is unavailing. *See* Dkt. 341 at 7-8. *Litovich* did not revolutionize recusal doctrine—Plaintiffs always could have raised a § 455(a) objection. At any rate, *Litovich* is not directly on point. There, unlike here, the parties were not made aware of the judge's conflict until *after* the relevant decision was issued. 106 F.4th at 223.

In truth, Plaintiffs' decision to litigate before Judge Liman was strategic. Shortly after the first disclosure, Judge Liman refused to dismiss Original Plaintiffs' New York-law claims, holding that New York law does not require proof of reliance on the allegedly misleading "ever-growing" statement. ADD-60-61, 71. That ruling was highly favorable to Plaintiffs regarding not only liability, but also class certification—if Plaintiffs needed to show reliance, individualized issues would almost certainly predominate over common ones. Embracing that ruling, Plaintiffs chose to proceed with Judge Liman, while holding back a request for vacatur as a "fall-back position" that would allow them to nullify subsequent "adverse rulings" and facilitate a do-over of the case. *IBM*, 45 F.3d at 643; *cf. United States v. Yu-Leung*, 51 F.3d 1116, 1119-20 (2d Cir. 1995) (expressing skepticism of late recusal request where, as here, alleged conflict arose *before* judge ruled in *favor* of party seeking recusal). It was not until class certification was denied and Peloton's motion for summary judgment on New Plaintiffs' four-figure individual claims was pending that they sought to start the case over.

### 3. The district court clearly erred by disregarding Plaintiffs' waiver as irrelevant.

The district court dismissed as "beside the point" Peloton's argument that Plaintiffs waived any right to seek relief based on a § 455(a) violation and did not consider at all the implications of Plaintiffs' actions for their ability to seek vacatur. It observed that because "the recusal and reassignment process has already

24

occurred," there was no need to analyze the "procedural propriety"—that is, the timeliness—of the recusal itself. ADD-405-06.

But that reasoning cannot withstand scrutiny. Judge Liman's recusal may have mooted the question of whether Plaintiffs waived a right to seek the prospective remedy of *recusal*. But it certainly did not moot the question of whether Plaintiffs waived a right to seek *vacatur* as a retrospective remedy for Judge Liman's failure to recuse himself earlier. *Cf. Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768 (2d Cir. 2002), *abrogated on unrelated grounds by Doe v. Franklin Square Union Free Sch. Dist.*, 100 F.4th 86 (2d Cir. 2024) (explaining that objections to § 455(a) violations can be waived despite statutory language placing the obligation on judges to *sua sponte* recuse). Indeed, Plaintiffs did not even request such relief when Judge Liman offered them the opportunity to execute an express waiver. They simply declined to execute the waiver—triggering recusal, but nothing else. The district court's clear legal error in conflating waiver of the right to seek vacatur with an untimely recusal request warrants mandamus relief.

**4.    The district court clearly abused its discretion in vacating prior orders based on a categorical analysis that failed to account for Plaintiffs' strategic choices.**

Even assuming Plaintiffs did not waive their right to seek relief, the district court clearly abused its discretion in granting sweeping vacatur. "Section 455 does not specify any particular remedy" for violations. *Amico*, 486 F.3d at 777. This

Court has explained, therefore, that "a new, unconflicted judge *may*, but is not *required* to, vacate … any decisions rendered by the conflicted judge." *ExxonMobil*, 44 F.4th at 172 (emphases added).   "Whether vacatur is appropriate must be evaluated on a case-by-case basis." *Id.*   That case-by-case analysis entails the consideration of three factors:  "the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Id.* (cleaned up); *see also, e.g.*, *Litovich*, 106 F.4th at 226-27.  "While not a traditional harmless-error analysis, this test looks to the relative harm to the parties, the public, and the judicial process." *Amico*, 486 F.3d at 777.

The district court did not perform the case-specific analysis precedent requires; it instead made what amounted to a categorical judgment that vacatur is *always* required in the case of financial conflicts.  Had it instead conducted the required analysis, the district court would have found that none of the relevant factors favor vacatur of Judge Liman's prior orders or the striking of the amended pleadings.  The district court thus clearly abused its discretion by unwinding the case and restarting it with plaintiffs who dropped out of the case long ago.

*First*, keeping Judge Liman's orders and the amended pleadings in place would have created no injustice.  There is no unfairness in requiring Plaintiffs to live with the consequences of their repeated strategic decisions, made across several

years, to litigate before Judge Liman without objection. But serious injustice *does* flow to Peloton from the district court's decision to vacate Judge Liman's orders and strike the amended pleadings, thereby forcing Peloton to re-do years of litigation, this time against a set of plaintiffs that had chosen to drop out of the case.

Judge Liman's stockholding is, of course, no fault of Peloton's. Nor is it Peloton's fault that Plaintiffs, with eyes wide open, allowed the litigation to proceed and substantial rulings to stack up for years before about-facing and seeking vacatur of those same rulings. Or that Judge Liman offered to consider recusal when he did, or that New Plaintiffs—after years of silence—took him up on the offer. There is simply "no reason to force" Peloton "to relitigate the entire case, likely causing significant delay"—not to mention expense and undue settlement pressure—"in the absence of any basis to conclude that doing so would lead to a more just outcome." *ExxonMobil*, 44 F.4th at 173-74; *see also In re Depuy Orthopaedics, Inc.*, 870 F.3d 345, 353 (5th Cir. 2017).

The district court's analysis of this factor was woefully incomplete. The court simply declared that, "consistent with the focus of § 455(a) on avoiding the appearance of impropriety, and to avoid questions as to the impartiality of the rulings, this factor weighs in favor of vacatur." ADD-407. But that assessment accounts only for the fact of a § 455(a) violation, and ignores *all* case-specific

considerations here, in direct contravention of this Court's clear instruction. *See ExxonMobil*, 44 F.4th at 172.

*Second*, "the risk that the denial of relief will produce injustice in other cases," *id.* (cleaned up), similarly counsels against vacatur. In *Litovich*, this Court—cognizant of the risk that "federal judges will fail to recuse themselves in future cases"—opted to enforce § 455(a) through vacatur to "urg[e] [the Court's] peers 'to more carefully examine possible grounds for disqualification and to promptly disclose them when discovered.'" 106 F.4th at 227 (quoting *Liljeberg*, 486 U.S. at 868). But any similar deterrent effect here would be "minimal … because the district court disclosed the conflict as soon as [the judge] became aware of it, and because [Plaintiffs] ha[ve] had ample opportunity to challenge [the judge]'s rulings" across years of litigation yet did not do so. *ExxonMobil*, 44 F.4th at 174; *see* ADD-41, 174. That is especially so because this Court's decision in *Litovich* is already providing that effect, as the timing of Judge Liman's recusal shortly after that decision indicates.

To conclude that vacatur was grossly inappropriate and inequitable here therefore does not condone the judicial behavior at issue, nor implicitly encourage it in future cases. On the contrary, granting mandamus relief would serve to reaffirm this Court's directive that when litigants become aware of possible grounds for judicial recusal, they must seek relief in a timely fashion rather than hold back such

request for use in the event of adverse rulings.  *See IBM*, 45 F.3d at 643.  It is
rewarding Plaintiffs' efforts to have it both ways that would threaten to "produce
injustice in other cases," *ExxonMobil*, 44 F.4th at 172 (quoting *Liljeberg*, 486 U.S.
at 864), by weakening the rule that a litigant must "raise its claim of a district court's
disqualification at the earliest possible moment after obtaining knowledge of facts
demonstrating the basis for such a claim," *Apple*, 829 F.2d at 333.

Again, the district court's analysis failed to account for any of these case-
specific considerations.  The court said simply that "adherence to the strictures of
§ 455 and vacatur of rulings that violate § 455(a) encourage compliance with the
statute and reasonable diligence in avoiding cases that present a conflict."  ADD-
407.  Like the court's analysis of the first factor, that reasoning would mean vacatur
is *always* necessary when a judge violates § 455(a), which is simply not the case.
*See ExxonMobil*, 44 F.4th at 172.

*Third*, "the risk of undermining the public's confidence in the judicial
process," *id.* (cleaned up), again militates against vacatur.  The task before the
district court, and now this Court, was to "determine how best to move forward and
preserve the public's confidence in our federal courts."  *Id.* at 174.  Had Plaintiffs
timely objected to the financial conflicts *when they were disclosed*, the calculus
would be very different.  *See, e.g.*, *Litovich*, 106 F.4th at 227-28.  But Plaintiffs
instead knowingly and voluntarily elected to litigate dispositive motions, motions

29

for class certification, and more—for years—before Judge Liman notwithstanding his disclosures. The conflicts here "were resolved and laid to rest quickly, easily, and in a manner in which the public would find created no appearance of partiality" in light of the parties' mutual decision to disregard them and keep litigating before Judge Liman. *Amico*, 486 F.3d at 778. No diminished confidence in the courts lingered. Indeed, the actions of both parties reflected complete confidence in the proceedings.

Setting this case back years, however, would "undermin[e] the public's confidence in the judicial process." *ExxonMobil*, 44 F.4th at 172 (quoting *Liljeberg*, 486 U.S. at 864). Rewarding Plaintiffs' efforts to game the system and thereby providing future litigants with incentive to copy their strategy undermines basic principles of fairness. And the district court's decision not only to vacate Judge Liman's orders, but also to reanimate the original Complaint—swapping out New Plaintiffs for Original Plaintiffs—undermines confidence all the more. "Our system" of justice, after all, "is designed around the premise that parties represented by competent counsel know what is best for them," and that "courts are essentially passive instruments of government." *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020) (cleaned up).

The district court's analysis on this score was simply that "because the conflicts at issue here raise the appearance of impropriety, measures must be taken

to maintain public trust and discourage similar issues in future cases." ADD-407.
But again, that would mean vacatur is required in *all* cases of financial conflict. That implication simply cannot be squared with this Court's three-factor, case-specific test for determining "*[w]hether* vacatur is appropriate." *ExxonMobil*, 44 F.4th at 172; *see also Litovich*, 106 F.4th at 228. And vacatur is certainly *not* appropriate in a case involving financial conflict where the party seeking vacatur "did not make a timely request for relief," or "it would otherwise be unfair" to the other party. *Liljeberg*, 486 U.S. at 868. The district court engaged in a clear abuse of its discretion in issuing its sweeping vacatur order.

## II.    The Other Mandamus Factors Show Peloton Is Entitled to Relief.

### A.    Should this Court Dismiss Peloton's Pending Appeal, Peloton Will Be Left with No Other Adequate Means of Relief.

Peloton filed this petition to allow the Court to review the district court's errors even if it decides to dismiss, in full or in part, Peloton's pending appeal in case No. 25-1415 for lack of appellate jurisdiction. Should the Court do so, Peloton would have no other adequate means of relief— a direct appeal after final judgment would be ineffective and subject Peloton to irreparable harm and prejudice. *Cf. Caribbean Trading & Fid. Corp. v. Nigerian Nat. Petroleum Corp.*, 948 F.2d 111, 115 (2d Cir. 1991) ("We have often deemed it appropriate to treat an appeal dismissed for lack of jurisdiction as a petition for a writ of mandamus."); *Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 652 (2d Cir. 1987) (same).

As Peloton explains more fully in its opposition to Plaintiffs' motion to dismiss its appeal, *see* Appellant's Opp'n Mot. Dismiss, *Fishon v. Peloton Interactive, Inc.*, No. 25-1415, delaying review until after final judgment would irrevocably destroy Peloton's right to adjudication of its challenge to subject-matter jurisdiction before further rulings on the merits—an interest grounded in constitutional limits on the exercise of judicial power. *See supra* pp. 12-13. This is "the type of harm that is deemed irreparable for mandamus purposes" because it "involves an interest that is both important to and distinct from the resolution of the merits of the case." *Linde v. Arab Bank, PLC*, 706 F.3d 92, 117 (2d Cir. 2013). And here, "the need for relief is more pressing than it would be absent a jurisdictional issue." *In re S.E.C. ex rel. Glotzer*, 374 F.3d 184, 188 (2d Cir. 2004) ("*Glotzer*") (petitioner "assert[ed] that the court entirely lacked jurisdiction to consider the motion" below).

Moreover, any appeal after a future final judgment would be "too late" to remedy the prejudice that the district court's order has and will continue to impose. *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 761 (D.C. Cir. 2014); *see also, e.g.*, *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 110-11 (2009). Should the district court's order stand, Peloton will be forced to re-litigate the case to final judgment on the merits based, presumably, on the (second) "First" Amended Complaint Plaintiffs filed after Peloton noticed its appeal. Dkt. 351. That will impose great expense on

Peloton and will deprive it of the jurisdictional dismissal it would have received had the district court heeded its duty to assess subject-matter jurisdiction. And even successful review after final judgment would lead to a repeat of similar harms, requiring a *second* do-over of the case. That is plainly inadequate relief, given the absurd result and complete waste of party and judicial resources. This Court's immediate intervention would halt this process, including by eliminating the risk of duplicative appeals.

**B.** **Mandamus Is Appropriate Given the District Court's Failure to Address Subject-Matter Jurisdiction Before Undoing Five Years of Litigation.**

Because the district court ignored a serious question as to its jurisdiction—striking at the heart of constitutional separation of powers—exercising mandamus would "reaffirm a principle of fundamental importance" that "the role of the court is to ensure, to the extent possible, that justice is done in accordance with the law—not in derogation of it." *In re United States*, 945 F.3d 616, 628 (2d Cir. 2019). Such a "principle is worthy" of mandamus jurisdiction. *Id.* Resolution of that jurisdictional issue—and, if necessary, of the district court's decision to reward Plaintiffs' gamesmanship despite clear precedent to the contrary—through mandamus will thus "aid in the administration of justice." *Glotzer*, 374 F.3d at 188.

Further, "the question of law presented by this petition is both novel and significant." *Id.* at 187. The district court refused to consider whether it had

jurisdiction, acted ultra vires to enter sweeping relief Plaintiffs had waived any right

to seek and which was unwarranted in any event, and along the way mooted the very

jurisdictional question it had ignored.  Mandamus is therefore appropriate.

## **<u>CONCLUSION</u>**

This Court should grant Peloton's petition for a writ of mandamus.


Dated: August 28, 2025            Respectfully submitted,

*/s/ Mark W. Mosier*
Mark W. Mosier
Andrew Soukup
Abby Wright
Alexander J. Cave
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Tel: 202-662-6000
mmosier@cov.com
asoukup@cov.com
awright@cov.com
acave@cov.com

*Attorneys for Petitioner*
*Peloton Interactive, Inc.*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

Pursuant to Federal Rules of Appellate Procedure 21(d) and 32, the undersigned hereby certifies that this document complies with this Court's type-volume limit because, excluding the parts of the document exempted by Federal Rules of Appellate Procedure 21(a)(2)(C) and 32(f), this document contains 7,783 words. The undersigned further certifies that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman size 14 font.

*/s/ Mark W. Mosier*
Mark W. Mosier

# No. 25-____

IN THE

# United States Court of Appeals
## for the Second Circuit

*IN RE* PELOTON INTERACTIVE, INC.,

*Petitioner.*

ON PETITION FOR A WRIT OF MANDAMUS TO THE
UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK
NO. 1:19-CV-11711-LGS, THE HONORABLE LORNA G. SCHOFIELD

## ADDENDUM TO PETITION FOR A WRIT OF MANDAMUS
## Volume 1 of 2 (Pages ADD-1 to ADD-284)

Mark W. Mosier
Andrew Soukup
Abby Wright
Alexander J. Cave
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Tel: 202-662-6000
mmosier@cov.com
asoukup@cov.com
awright@cov.com
acave@cov.com

*Attorneys for Petitioner*

i

# TABLE OF CONTENTS

**Page**

Original Complaint, Dated December 23, 2019
(Dkt. 1)...………………………………….....   ADD-1

First Stock Disclosure Order, Dated October 15,
2020 (Dkt. 63)...…………………………....   ADD-41

First Order Regarding Notice of Stock Disposal,
Dated November 2, 2020 (Dkt. 64)…………...   ADD-42

Opinion and Order Regarding Defendant's
Motion to Dismiss Original Complaint, Dated
November 9, 2020 (Dkt. 65)………………….   ADD-43

First Amended Complaint, Dated January 21,
2021 (Dkt. 81)……………….......................   ADD-73

Opinion and Order Regarding Defendant's
Motion to Dismiss First Amended Complaint,
Dated July 12, 2021 (Dkt. 102)………………   ADD-115

Second Amended Complaint, Dated July 26,
2021 (Dkt. 106)……………………………….   ADD-126

Second Stock Disclosure Notice, Dated August
25, 2021 (Dkt. 110)…………………………...   ADD-174

Second Notice of Stock Disposal, Dated August
31, 2021 (Dkt. 112)…………………………...   ADD-175

ii

Page

Opinion and Order Regarding Defendant's Motion to Dismiss Second Amended Complaint and Plaintiffs' Motion for Class Certification, Dated January 19, 2022 (Dkt. 168)……………………………………….. ADD-176

Third Amended Complaint, Dated February 18, 2022 (Dkt. 195)……………………………… ADD-203

Opinion and Order Regarding Defendant's Motion to Dismiss Third Amended Complaint, Dated August 11, 2022 (Dkt. 207)…………… ADD-245

Opinion and Order Regarding Plaintiffs' Motion for Class Certification, Dated May 2, 2023 (Dkt. 284)……………………………….….... ADD-285

Second Circuit Mandate Denying Plaintiffs' Rule 23(f) Petition, Dated September 15, 2023 (Dkt. 287)……………………………….. ADD-359

Letter from the Clerk of Court Regarding Waiver of Judicial Disqualification, Dated July 30, 2024 (Dkt. 332)……………………………… ADD-360

Defendant's Opposition to Plaintiffs' Motion to Vacate and Retain Jurisdiction, Dated November 6, 2024 (Dkt. 340)……………….... ADD-364

Letter to Court Regarding Notice of Supplemental Authority, Dated January 17, 2025 (Dkt. 342)……………………………… ADD-395

**iii**

**Page**

Opinion and Order Regarding Plaintiffs' Motion
to Vacate and Retain Jurisdiction, Dated May
2, 2025 (Dkt. 345)……………………………. ADD-397

Notice of Appeal, Dated May 30, 2025
(Dkt. 348)………………………………….. ADD-410

ADD-1

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIC FISHON, ALICIA PEARLMAN, and PATRICK YANG, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| PELOTON INTERACTIVE, INC., | |
| Defendant. | |

Plaintiffs Eric Fishon, Alicia Pearlman, and Patrick Yang (collectively, "Plaintiffs"),

individually and on behalf of all others similarly situated (collectively, the "Class," as more fully

defined below), bring this class action complaint against Defendant Peloton Interactive, Inc.

("Peloton" or "Defendant").  Plaintiffs make the following allegations upon personal knowledge

as to their own acts, upon information and belief, and their attorneys' investigation as to all other

matters, alleging as follows:

### I.    NATURE OF THE ACTION

1.    This action arises out of Peloton's misrepresentations and material omissions to

Plaintiffs and the other Class members regarding the "ever-growing" size of its on-demand

fitness class library and its recent impermissible and self-serving deletion of approximately 57%

of that library.

ADD-2

2.      Peloton is an exercise equipment and media company that was founded in 2012.

Peloton claims that it "is reinventing fitness with live & on-demand boutique studio classes you

can take anytime with the Peloton Bike, Peloton Tread & Peloton digital."[1]

3.      Peloton's main products are its luxury stationary bicycle ("Peloton Bike") and

luxury treadmill ("Peloton Tread") (collectively, "hardware") that, through their built-in

interactive touchscreens, allow users to watch live and pre-recorded (or "on-demand") fitness

classes through a monthly subscription service, aiming to provide the experience of a live fitness

class from the comfort of users' homes.  In addition, Peloton sells a subscription-only app known

as Peloton Digital, which allows users without the Peloton hardware to access the live streaming

and on-demand fitness library.

4.      Peloton's business initially started with its Peloton Bike, which offers live

streaming and on-demand "spinning" classes from the comfort of consumers' homes.

"Spinning" classes are popular indoor cycling instruction classes, initially popularized in the

mid-1990s, that consist of professional coaches providing real-time instruction, guidance, and

encouragement to riders, over a soundtrack of popular and other songs.  Peloton has recently

expanded this concept of interactive instructional fitness classes, over soundtracks of popular

music, to Peloton Tread and other weightlifting, strength training, outdoor running, yoga,

meditation, stretching, and cardio-fitness classes.

5.      While other fitness companies market and sell similar fitness hardware, in-studio

workout classes, and instructional home workout media, Peloton differentiates itself by

marketing access to an "ever-growing" digital library of fitness classes led by professional

---

[1] *See* https://twitter.com/onepeloton (last accessed Dec. 6, 2019).

ADD-3

instructors, available on-demand 24 hours per day, 7 days per week, from the comfort of one's home for a flat monthly subscription fee.

6.    Peloton's "ever-growing" on-demand library is central to its marketing because it needs to ensure that customers spending thousands of dollars on the Peloton hardware and accompanying workout classes will not run out of new classes over time and will also be able to take and retake older classes.  The size of the on-demand digital library has always been, and continues to be, central to Peloton's marketing[2] because "the hardware is only as good as the app and subscription that comes with it."[3]

7.    The importance of Peloton's "ever-growing" on-demand library to its business model is demonstrated by the company's pre-IPO filing, classifying Peloton as a "technology," "media," and "software" company.[4]  John Foley, its CEO and co-founder, has described Peloton as a "media company akin to Netflix" with "*10,000 classes on-demand*" (emphasis added).[5]  The company also recently invested $45 million to build the "best digital television streaming studio in the world."[6]

8.    Peloton markets and sells its subscription-based, on-demand fitness library for a monthly price of $39 to purchasers of the Peloton Bike and Peloton Tread ("Peloton Membership"), which, in addition to the live and on-demand classes, provides, among other features, advanced metrics and a live interactive leaderboard that allows users to compete against

---

[2] *See* https:///onepeloton.com/bike/classes (last accessed Dec. 6, 2019).

[3] *See* https://www.forbes.com/sites/bizcarson/2019/09/26/peloton-ceo-john-foley-faces-the-skeptics-again-this-time-buyers-in-its-8-billion-ipo/#3b8f0f6f4349 (last accessed Dec. 6, 2019).

[4] *See* https://fortune.com/2019/09/25/peloton-ipo-filing-media-company/

[5] *See* https://www.bizjournals.com/newyork/news/2018/08/03/peloton-ceo-were-becoming-a-media-company.html (last accessed Dec. 6, 2019).

[6] *Id.*

3

ADD-4

each other.  Subscribers to the Peloton app ("Peloton Digital") pay a monthly price of $19.49 for access to Peloton's live streaming and on-demand library (together, the "Subscription Service").[7] The Subscription Service's content is coextensive across all platforms and includes the same live and on-demand bike, treadmill, free weight, yoga, and other fitness classes.

9.      Peloton's website touted its "thousands of boutique classes," and "ever-growing library of live and on-demand studio classes."[8]  Its website likewise represented that its Subscription Service grants "unlimited access to a growing library of live streaming and on-demand classes, scenic rides, real-time performance tracking, and unlimited accounts for family and friends.  No classes offered by Peloton are off limits."[9]

10.     Music has been central to the Peloton class experience from the beginning. Every on-demand and studio class includes a themed playlist curated by the instructor to match the tempo and intensity of the class.  Peloton recognizes that "[m]usic is an important element of the overall content that [it] make[s] available to [its] Members,"[10] and, in May 2017, Peloton introduced a new feature allowing members to find on-demand classes based on the type of music featured therein.[11]

---

[7] *See* https://www.onepeloton.com/membership

[8] https://www.onepeloton.com/digital (as of Apr. 25, 2019); *see also* https://www.onepeloton.com/bike/classes ("Thousands of On-Demand Rides. Take a class anytime, with our daily-updated, extensive on-demand library"); *id.* ("Thousands of rides on-demand. Rider anytime with thousands of classes to choose from on-demand.").

[9] *See* https://support.onepeloton.com/hc/en-us/articles/201039338-Rides-included-with-the-Peloton-subscription.

[10] SEC Form S-1 Registration Statement at 18, available at https://www.sec.gov/Archives/edgar/data/1639825/000119312519230923/d738839ds1.htm

[11] *See Find Your Favorite Genres with Our Brand-New Music Filtering Feature*, Cadence (May 26, 2017), https://cadence.pelotoncycle.com/find-favorite-genres-brand-new-music-filtering-feature/1907/.

11.    Peloton is a sophisticated software company that provides content protected by various intellectual property laws.  Peloton fully understands what the copyright laws require, having entered into sync licenses with certain other copyright holders, while at the same time using other musical works for free and without permission.[12]  Peloton knew that it was, in part, building its on-demand library with copyrighted material for which it did not have the proper licenses.  Peloton thus knew or should have known that because it lacked the appropriate licenses for the music accompanying the classes in its on-demand digital library, its library cannot legitimately be "ever-growing" and was actually knowingly built, in material part, on an illegal foundation.

12.    In April 2018, Peloton received a cease-and-desist letter regarding its alleged copyright infringement of many songs appearing in classes in its on-demand class library.[13] Notwithstanding being placed on notice of its alleged copyright infringement, Peloton continued to promise an "ever-growing" library to consumers and to heavily market that fact to its customers and prospective customers as a key Peloton selling point.

13.    In March 2019, several members of the National Music Publishers Association ("NMPA") collectively filed a lawsuit against Peloton seeking more than $150 million in damages, alleging that Peloton has been using their musical works for years in its workout videos without proper licensing, resulting in lost income for songwriters.  The lawsuit further alleges that "Peloton's infringement was and continues to be knowing and reckless" and that "Peloton fully understood what the copyright law required, having entered into sync licenses with certain

---

[12] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 90, ¶ 1 (S.D.N.Y. Sept. 27, 2019).

[13] Peloton's classes consist of coaches providing real-time instruction, guidance, and encouragement to riders, over a soundtrack of popular and other songs.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 54 of 465
Case 1:19-cv-11711-LGS    Document 336    Filed 09/02/25    Page 54 of 465

ADD-6

Case 1:19-cv-11711-LJL    Document 1    Filed 12/23/19    Page 6 of 40

other copyright holders, while trampling the rights of Plaintiffs by using their musical works for free and without permission."[14]

14.    Although Peloton denies that it is violating copyright laws and asserts counterclaims against the NMPA for antitrust violations and tortious interference with prospective business relations, on March 25, 2019, in the face of the NMPA's copyright infringement lawsuit, Peloton—for its own economic advantage and to the financial detriment of its customers—abruptly removed every class from its on-demand library that contained one or more of the allegedly copyright infringing songs.  In total, this resulted in the removal of more than half of the classes from its on-demand library.[15]

15.    Prior to March 25, 2019, Peloton's Subscription Service had 10,017 on-demand classes available to its users.  Following Peloton's self-serving decimation of its on-demand library, less than half of the classes remained available to users.[16]  Peloton's abrupt removal of the infringing soundtracks led to the removal of an estimated 5,739 classes, approximately 57% of its on-demand digital library, thereby greatly reducing the on-demand options upon which Peloton bases so much of its marketing and uses as a differentiating factor to garner more customers.[17]

---

[14] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 76, ¶ 1 (S.D.N.Y. Sept. 27, 2019).

[15] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 31, Counterclaims ¶ 59 (S.D.N.Y. Apr. 30, 2019); *see also id.*, Counterclaims ¶¶ 10, 42, 46, 52, 57.

[16] *See* https://imgur.com/XxdUOJn; *see also* https://docs.google.com/spreadsheets/d/1LAE9kDqxkj4CkZ7TzS7ce6g5cxkMUOMdDssxKWpS0ak/edit?usp=sharing.

[17] *See* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider (Mar. 27, 2019, 10:30 a.m.), https://www.businessinsider.com/pelotonremoves-classes-member-outcry-2019-3

16.     The copyright infringement lawsuit and subsequent purge of Peloton's on-demand

library has also significantly decreased the quality and quantity of popular music available on

Peloton's workout class playlists, which has materially diminished users' experience with the

hardware and Subscription Service.[18]  The infringing works include songs from popular artists

such as Beyoncé, Michael Jackson, Madonna, Kanye West, Jay Z, Luke Bryan, and Justin

Timberlake, to name a few.[19]  In addition to losing more than 50% of their on-demand classes,

users have lamented that the workouts in the new classes (those without the removed songs)

don't "flow like they used to" and have struggled to "find a playlist with 50 percent decent

songs" since Peloton's removal of the infringing works.[20]

17.     Peloton's CEO falsely promised subscribers to its Subscription Service that the

removal of "classes" would "not affect your experience with (or the cost of) [Peloton's] service,

or access to the kind of music you're used to hearing behind [Peloton's] instructors in the

thousands of classes in [Peloton's] library."[21]  That representation, however, is demonstrably

false and Peloton never disclosed to its subscribers, including Plaintiffs and the other Class

members, that it would be removing over half of the classes from its on-demand library.

---

[18] *See* Natt Garun, *Peloton owners are pissed about bad music after copyright lawsuit*, The Verge (April 24, 2019, 1:47 p.m.), https://www.theverge.com/2019/4/24/18514036/peloton-music-copyright-fitness-studios-gym-on-demand-media-strategy; *see also* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider US (March 27, 2019), https://www.businessinsider.sg/peloton-removes-classes-member-outcry-2019-3/.

[19] *See* Exhibit A: Non-Exhaustive List of Works Infringed by Peloton, by Publisher (Ex. 3).

[20] *See* Natt Garun, *Peloton owners are pissed about bad music after copyright lawsuit*, The Verge (April 24, 2019, 1:47 p.m.), https://www.theverge.com/2019/4/24/18514036/peloton-music-copyright-fitness-studios-gym-on-demand-media-strategy.

[21] *See* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider (Mar. 27, 2019, 10:30 a.m.), https://www.businessinsider.com/pelotonremoves-classes-member-outcry-2019-3

18.     Recently, the NMPA amended its complaint against Peloton alleging that it "found another 1,324 songs that have been streamed by Peloton instructors during classes without approval," which will likely result in Peloton's removal of additional classes from its on-demand library.[22]  The NMPA is now seeking over $300 million in damages for Peloton's knowing, widespread copyright infringement.[23]

19.     Despite being put on actual notice as early as April 9, 2018 that it was using infringing songs to build its digital library, Peloton's website continues to market "an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors."[24] It also notifies consumers during the purchasing process that its "Bike packages" require a monthly Peloton Membership,[25] which includes "unlimited access to a growing library of live streaming and on-demand Peloton classes."[26]

20.     As part of Plaintiffs' and the other Class members' Peloton subscriptions, they expected and were entitled to use a substantial, on-demand class library that would continue to grow, as Peloton repeatedly represented.  Yet, when Peloton accepted (and continues to accept) Plaintiffs' and the other Class members' subscription payments, Peloton knew or should have known that Plaintiffs and the other Class members would not be able to use the full on-demand class library because the number of on-demand classes was materially decreasing due to Peloton's wrongful conduct.

---

[22] *See* https://observer.com/2019/09/peloton-music-licensing-lawsuit-ipo/

[23] If Peloton removes additional classes from its on-demand library due to the expanded scope of the infringement allegations, the class alleged herein will increase commensurately.

[24] *See* https://www.onepeloton.ca/app (last accessed Dec. 6, 2019).

[25] *See* https://www.onepeloton.com/shop/bike (last accessed Dec. 6, 2019).

[26] *See* https://www.onepeloton.com/shop/bike/subscription (last accessed Dec. 6, 2019).

ADD-9

21.     Nonetheless, Peloton misrepresented and/or omitted that information from Plaintiffs and the other Class members, continued to represent to existing and potential subscribers that its on-demand digital library would be "ever-growing," and continued to charge full price for its Subscription Service, despite knowing that its subscribers would necessarily not be receiving everything that Peloton represented they would receive.

22.     In a November 19, 2018 press release—months after Peloton received the cease and desist letter from the NMPA—Peloton represented that "Peloton produces nearly 24 hours of live content per day from its Peloton Bike and Peloton Tread Studios in NYC, ***and has more than 10,000 live and on-demand instructor-led indoor cycling, running, bootcamp, yoga and stretching classes for its Peloton Bike, Peloton Tread and Peloton Digital platforms.*** To date, Peloton has nearly one million Members, comprising Peloton Bike and Peloton Tread owners, iOS app users and in-studio riders, and expects to add millions more in the coming years." (emphasis added).[27]

23.     By misrepresenting that its on-demand digital library would be "ever-growing" and failing to disclose the imminent removal of over half of its on-demand library, Peloton defrauded Plaintiffs and the other Class members, deprived them of the benefit of their bargain with Peloton, and/or unjustly enriched themselves at Plaintiffs' and the other Class members' expense. Plaintiffs, individually and on behalf of the other Class members they seek to represent, seek monetary damages, statutory penalties, and injunctive relief, asserting claims for Peloton's violation of New York's consumer protection and false advertising statutes, N.Y. Gen. Bus. Law §§ 349 and 350, breach of contract, and unjust enrichment.

---

[27] *See* https://www.prnewswire.com/news-releases/peloton-to-expand-nyc-footprint-with-new-corporate-headquarters-at-hudson-commons-in-2020-300752307.html (last accessed Dec. 5, 2019).

## II.    PARTIES

**A.    Plaintiffs**

24.    Eric Fishon is a citizen of New York, residing in Suffolk County, New York. Plaintiff Fishon, relying on Peloton's uniform representations about its "ever-growing" on-demand library of fitness classes, purchased a Peloton Bike and the Peloton Membership in January 2018, and a Peloton Tread in November 2018, and has paid all required hardware, software, and subscription fees relating thereto.

25.    Alicia Pearlman is a citizen of Michigan, residing in Oakland County, Michigan. Plaintiff Pearlman, relying on Peloton's uniform representations about its "ever-growing" on-demand library of fitness classes, purchased Peloton's hardware and the Peloton Membership in November 2018, and has paid all required hardware, software, and subscription fees relating thereto.

26.    Patrick Yang is a citizen of California, residing in Los Angeles County, California.  Plaintiff Yang, relying on Peloton's uniform representations about its "ever-growing" on-demand library of fitness classes, purchased Peloton's hardware and the Peloton Membership in November 2018, and has paid all required hardware, software, and subscription fees relating thereto.

27.    Prior to purchasing the Peloton hardware and commencing payment for the Peloton Membership subscription, neither Peloton nor its agents or representatives informed Plaintiffs that Peloton had been accused of violating any laws or that approximately 57% of its Subscription Service's on-demand digital library would be removed.

28.    Peloton's representations and material omissions regarding its on-demand library caused Plaintiffs to pay increased costs for the Peloton hardware and corresponding Peloton Membership, which was worth less than represented because Peloton's representations and/or

ADD-11

omissions regarding its on-demand digital library were deceptive and misleading and constituted false advertising.  Peloton's representations and material omissions were part of the basis of the bargain, in that Plaintiffs attributed value to Peloton's promises regarding the nature and characteristics of its on-demand digital library and would not have purchased the hardware and corresponding Peloton Membership, or would not have purchased it on the same terms, if they knew the truth that Peloton's on-demand digital library would shrink by 57%.

**B.    Defendant**

29.    Peloton is a Delaware corporation, with its corporate headquarters and principal place of business located in New York City, New York.  Peloton is subject to the jurisdiction of this Court and may be served with process at its principal executive office located at 125 West 25th Street, 11th Floor, New York, New York.

30.    Peloton markets and sells its apparel, hardware accessories, hardware, and Subscription Service throughout the United States including in this District.  Peloton is registered with the New York State, Department of State to conduct business in New York.

31.    Peloton bills itself as "the largest interactive fitness platform in the world," claiming, as of September 30, 2019, to have more than 1.6 million members, and 2019 revenues of $915 million.  Peloton is publicly traded on NASDAQ ("PTON") and as of the date of this Complaint, had a market cap of $8.26 billion.

**III.    JURISDICTION AND VENUE**

32.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action, there is minimal diversity, and the amount in controversy exceeds $5 million, exclusive of interest and costs.

33.    The Court has personal jurisdiction over Peloton because it resides and is subject to general jurisdiction in this District.  The Court also has personal jurisdiction over Peloton,

because it markets, distributes, and sells its apparel, hardware, accessories, and Subscription

Service throughout the United States, including in this District, and the conduct complained of

occurred in or was targeted at this District.  Additionally, Peloton's Terms of Service provides

that all disputes not required to be arbitrated be adjudicated in New York, New York.[28]

34.    Venue is proper in this District, because Defendant resides in this District and a

substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this

District. 28 U.S.C. § 1391(b)(1)-(2).

## IV.    PELOTON'S ARBITRATION CLAUSE

35.    Peloton categorically denies that it used infringing songs in its on-demand classes

and that it continues to violate copyright laws.[29]  Notwithstanding its contention that that it has

done nothing wrong, Peloton nonetheless chose to unilaterally gut its on-demand library for its

own economic advantage and financial benefit to the  material detriment of Plaintiffs and the

other Class members.

36.    Peloton felt empowered to cheat Plaintiffs and the other Class members by gutting

its on-demand library for its own commercial protection and advantage because its Terms of

Service contains a highly restrictive arbitration clause that provides that "any dispute, claim or

controversy arising out of or relating to these Terms or the breach, termination, enforcement,

interpretation or validity thereof or the use of the Services or Content (collectively, 'Disputes')

will be resolved **solely by binding arbitration**. . . ." (emphasis added).[30]

---

[28] *See* Peloton Terms of Service at 21-22 (Ex. 1).

[29] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 87, ¶ 1 (S.D.N.Y. Oct. 11, 2019).

[30] *See* Ex. 1 at 18.

37.    Due to the empowerment from affirmatively stripping Plaintiffs and the other

Class members of their Seventh Amendment right to a jury trial and forcing them into secret,

individual arbitrations, Peloton believed that it could advantage itself at consumers' expense

without material legal consequences or exposure.  Pelton believed that very few, if any, of its

customers would pursue arbitration because it knows that claimants are "highly unlikely to slog

through a protracted arbitration process over a relatively low amount of money" and the "total

number of consumer claims resolved through arbitration across the entire economy in the third

quarter of 2019 was 1,483—a new high but also a relatively small number in a nation of over

330 million."[31]

38.    Peloton did not anticipate, however, that, in the face of its misconduct, more than

2,700 customers would file arbitration demands arising out of its self-serving purge of its on-

demand library.

39.    Under the terms of Peloton's arbitration clause, it was obligated to pay "all filing,

administration and arbitrator fees and expenses" associated with its customers' demands for

arbitration.[32]

40.    Pelton, however, faced with far more arbitration demands than it expected when

it instituted its anti-consumer arbitration clause, *refused to abide by the terms of its own*

*arbitration clause*, ignoring the American Arbitration Association's ("AAA") requirement—and

Peloton's contractually-mandated obligation to pay all filing costs—to pay filing fees for

demands seeking less than $10,000.

---

[31] *See* David Dayen, *Tech Companies Big Reveal: Hardly Anyone Files Arbitration Claims*, The American Prospect (Nov. 26, 2019), https://prospect.org/power/tech-companies-hardly-anyone-files-arbitration-claims/

[32] *See* Ex. 1 at 19-20.

41.    As a result, on November 14, 2019, AAA wrote a letter to Peloton, notifying it

that AAA "decline[d] to proceed with administration of the parties' disputes" and that "either

party may choose to submit its dispute to the appropriate court for resolution."[33]  Additionally,

AAA notified Peloton that "AAA will decline to accept future consumer matters submitted

against or by [Peloton]" and requested that Peloton "remove AAA from its consumer arbitration

agreements so that there is no confusion to Peloton's consumer customers."[34]

42.    As of the date of the filing of this Complaint, Peloton has refused to comply with

AAA's request to remove AAA from its arbitration agreements and it continues to represent to

its customers that they are subject to binding arbitration with AAA in order to deter customers

from filing lawsuits.[35]

43.    The arbitration clause, and all provisions contained therein, is an inextricable part

of Peloton's Terms of Service with Plaintiffs and the other Class members.  Accordingly, as a

result of Peloton's failure to comply with the terms of its arbitration clause and AAA's

Consumer Arbitration Rules, Peloton's arbitration clause, including its class action waiver

provision and all other provisions, is invalid as to all its customers—including Plaintiffs and the

other Class members.[36]

---

[33] *See* November 14, 2019 AAA Letter to Peloton (Ex. 2).

[34] *Id.*

[35] *See* https://www.onepeloton.com/terms-of-
service?utm_campaign=RET_US_19_YWS_BIKE_MEMBERS_1201&utm_medium=email&utm_sourc
e=Eloqua&elqTrackId=a1efde8fcc3f477bb3d231c8ff281911&elq=dd8570e241714d9eb186f68f1559700b
&elqaid=2202&elqat=1&elqCampaignId=1245&elqcst=272&elqcsid=33 (last accessed Dec. 6, 2019).

[36] *See* Ex. 2.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 63 of 465
Case 1:19-cv-11711-LGS    Document 550    Filed 09/02/25    Page 63 of 465

ADD-15

Case 1:19-cv-11711-LJL    Document 1    Filed 12/23/19    Page 15 of 40

## V.    FACTUAL ALLEGATIONS

**A.    Peloton's "Ever-Growing" On-Demand Library Claim Is Essential To Its Business Model.**

44.    Peloton is an exercise equipment and media company that was founded in 2012. John Foley, its co-founder and CEO, describes Peloton as a "fitness platform" where "fitness meets technology, meets media."[37]  Peloton claims that it "is reinventing fitness with live & on-demand boutique studio classes you can take anytime with the Peloton Bike, Peloton Tread & Peloton digital."[38]

45.    As of August 2019, Peloton claimed to have 1.4 million members.[39]  The company was recently valued at $4 billion after it closed a $550 million financing round in August 2018.[40]  In late August 2019, Peloton filed to go public and in its Initial Public Offering ("IPO") it roughly doubled its private market valuation, being valued at about $8 billion.[41]  Peloton's current market cap is approximately $8.26 billion.

46.    Peloton's business initially started with its Peloton Bike, which offers live streaming and on-demand "spinning" classes from the comfort of consumers' homes. "Spinning" classes are popular indoor cycling instruction classes, initially popularized in the

---

[37] *See* http://media.licdn.com/embeds/media.html?src=https%3A%2F%2Fwww.youtube.com%2Fembed%2FFWXadxuOuSQ%3Ffeature%3Doembed&amp;url=https%3A%2F%2Fwww.youtube.com%2Fwatch%3Fv%3DFWXadxuOuSQ&amp;type=text%2Fhtml&amp;schema=youtube (last accessed Dec. 6, 2019).

[38] *See* https://twitter.com/onepeloton (last accessed Dec. 6, 2019).

[39] *See* https://www.pymnts.com/subscriptions/2019/pelotons-ipo-to-test-subscription-models-fitness/ (last accessed Dec. 6, 2019).

[40] *See* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider (Mar. 27, 2019, 10:30 a.m.), https://www.businessinsider.com/pelotonremoves-classes-member-outcry-2019-3

[41] *See* Jeremy C. Owens, *Peloton IPO: 5 things to know about the interactive exercise-machine company*, Market Watch (Sept. 28, 2019, 11:11 a.m.), https://www.marketwatch.com/story/peloton-ipo-five-things-to-know-about-the-interactive-exercise-machine-company-2019-08-28

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 64 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 64 of 465

ADD-16

Case 1:19-cv-11711-LJL    Document 1    Filed 12/23/19    Page 16 of 40

mid-1990's, that consist of professional coaches providing real-time instruction, guidance, and encouragement to riders, over a soundtrack of popular and other songs. Peloton has recently expanded this concept of interactive instructional fitness classes, over soundtracks of popular music, to Peloton Tread and other weightlifting, strength training, outdoor running, yoga, meditation, stretching, and cardio-fitness classes.

47.    In 2014, Peloton released its eponymous stationary exercise bike at a price of $2,245. The bike includes a 22-inch interactive touchscreen, which allows riders to watch live or pre-recorded classes, aiming to provide the experience of a spin class from the comfort of the users' homes.

48.    In January 2018, Peloton announced the release of its treadmill known as "Tread" for $4,295. Similar to its stationary bike, Tread has a 32-inch interactive touchscreen, which allows runners to watch live or pre-recorded classes led by professional trainers.

49.    For consumers who purchase Peloton's hardware, Peloton offers its Peloton Membership, which in addition to its live and on-demand fitness classes, includes Connected Fitness options such as instructor-curated training programs, live workout metrics, a detailed workout performance dashboard, and live and on-demand class interactive leaderboards. Peloton Membership subscribers pay $39 per month for this service. Peloton refers to customers that purchase the Peloton hardware and corresponding Peloton Membership as "Connected Fitness Subscribers."

50.    Recognizing the limited opportunity for growth due to a crowded market space and the high price point of its hardware, in July 2018 Peloton released Peloton Digital, which provides subscribers access to the same live and on-demand fitness classes without having to

purchase the Peloton hardware.  Peloton Digital members pay $19.49 per month for this service.[42]

51.    Peloton Digital allows Peloton to market its Subscription Service to consumers who already have a (non-Peloton) treadmill or stationary bike as well as those who prefer to use Peloton's outdoor, free weight, yoga, and other fitness classes.  The  content provided by the Peloton Membership and Peloton Digital subscriptions are coextensive and include the same live and on-demand fitness classes.[43]  Since the Peloton Digital app does not provide the Connected Fitness options and integrated experience with the Peloton hardware, the appeal of the Peloton Digital app is its "ever-growing" on-demand library of fitness classes.

52.    Demonstrating the importance of its "ever-growing" library of on-demand fitness classes to its business model, the company's pre-IPO filing classifies Peloton as a "media" company and John Foley, Peloton's CEO and co-founder, has described the company as a "media company akin to Netflix" with "10,000 classes on-demand" and the "best digital television streaming studio in the world."[44]

53.    Peloton differentiates itself and its more expensive fitness hardware from other fitness companies by offering unlimited access to its "ever-growing" on-demand library of professional fitness classes available at the users' convenience.

54.    In its pre-IPO filings Peloton claims to have "disrupted the fitness industry by developing a first-of-its-kind subscription platform that seamlessly combines the best equipment,

---

[42] *See* https://www.bizjournals.com/newyork/news/2018/08/03/peloton-ceo-were-becoming-a-media-company.html (last accessed Dec. 6, 2019).

[43] *Id.*

[44] *See* https://www.bizjournals.com/newyork/news/2018/08/03/peloton-ceo-were-becoming-a-media-company.html

ADD-18

proprietary networked software, and world class streaming digital fitness and wellness content."[45]

55.    Peloton claims that 92% of its hardware ever sold still has an active Peloton Membership subscription attached as of June 30, 2019. [46]  Thus, it is the subscription model that Peloton hopes will keep the company growing and allow its business model to scale.[47]  In order to maintain its subscriber retention rate, however, Peloton knows that it must make it "easy for Members to find a class that fits their interests based on class type, instructor, music genre, length, available equipment, area of physical focus, and level of difficulty.[48]

56.    Peloton's "continued business and revenue growth is dependent on [its] ability to continuously attract and retain Subscribers. . . ."[49]

**B.    Peloton's "Ever Growing" On-Demand Library Is Central to Its Marketing**

57.    While other fitness companies market and sell similar fitness hardware for in-home use, provide in-studio classes where users pay on a per class basis, and home workout programs, Peloton has dominated the marketplace by aggressively marketing access to an "ever-growing" library of fitness classes led by professional instructors, available on-demand 24 hours per day, 7 days per week, from the comfort of the users' own homes for a flat monthly subscription fee.

---

[45] *See* SEC Form S-1 Registration Statement, available at
https://www.sec.gov/Archives/edgar/data/1639825/000119312519230923/d738839ds1.htm

[46] *See* SEC Form S-1 Registration Statement, available at
https://www.sec.gov/Archives/edgar/data/1639825/000119312519230923/d738839ds1.htm

[47] *See* https://www.pymnts.com/subscriptions/2019/pelotons-ipo-to-test-subscription-models-fitness/

[48] [48] *See* SEC Form S-1 Registration Statement, available at
https://www.sec.gov/Archives/edgar/data/1639825/000119312519230923/d738839ds1.htm

[49] *Id.*

58.    The "ever-growing" nature of Peloton's on-demand library is central to its marketing because Peloton must ensure that consumers spending thousands of dollars on the Peloton Bike or Peloton Tread and accompanying subscriptions will be able to take and retake older classes without running out of new classes over time.  Likewise, Peloton must ensure Peloton Digital subscribers that it will have enough new classes in each workout category to keep subscribers renewing their subscriptions.

59.    Until recently, Peloton's website prominently touted its "thousands of boutique classes," and "ever-growing library of live and on-demand studio classes."[50]  Its website likewise represented that its Subscription Service grants "unlimited access to a growing library of live streaming and on-demand classes, scenic rides, real-time performance tracking, and unlimited accounts for family and friends. No classes offered by Peloton are off limits."[51]

60.    As of November 2019, Peloton's website continues to market its digital library as "ever-growing" and "growing."  For example, the website for Peloton's app continues to market "an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors"[52]:

## The power of Peloton at your fingertips.

Explore an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors. Immerse yourself in our breathtaking studio experience anytime you want. Find a new favourite class just around the corner.

---

[50] https://www.onepeloton.com/digital (as of Apr. 25, 2019); *see also* https://www.onepeloton.com/bike/classes ("Thousands of On-Demand Rides. Take a class anytime, with our daily-updated, extensive on-demand library"); *id.* ("Thousands of rides on-demand. Rider anytime with thousands of classes to choose from on-demand.").

[51] *See* https://support.onepeloton.com/hc/en-us/articles/201039338-Rides-included-with-the-Peloton-subscription.

[52] *See* https://www.onepeloton.ca/app (last accessed Dec. 6, 2019).

19

61.    Further, in marketing its "Bike package" to consumers, Peloton continues to notify consumers that all packages "require a monthly Peloton Membership,"[53] which includes "unlimited access to a growing library of live streaming and on-demand Peloton classes"[54]:



### UNLIMITED ACCESS TO PELOTON CLASSES

With a Peloton Membership, you'll gain unlimited access to a growing library of live streaming and on-demand Peloton classes (cycling, running, bootcamp, floor, yoga and more), as well as performance tracking and unlimited profiles for family and friends.

Membership includes full access on a single Peloton Bike in one household, plus on-the-go access to Peloton Digital using our app. You may pause or cancel your membership at any time. See our Membership Terms for more details.

LEARN MORE

62.    Peloton's promise of an "ever-growing" on-demand library of classes drives sales of not only monthly subscriptions, but also its flagship Peloton Bike and Peloton Tread products.

63.    The size and "ever-growing" nature of Peloton's on-demand digital library has always been, and continues to be, central to Peloton's marketing[55]  because "the hardware is only as good as the app and subscription that comes with it."[56]

**C.    Peloton Knew That Its "Ever Growing" and "Growing" On-Demand Library Claims Were False And Misleading**

64.    Peloton is a sophisticated multi-billion-dollar company that specializes in providing consumers with digital content that is protected by various intellectual property laws. Peloton therefore knew or should have known that it was building its on-demand library with infringing songs and violating applicable copyright laws.

---

[53] *See* https://www.onepeloton.com/shop/bike (last accessed Dec. 6, 2019).

[54] *See* https://www.onepeloton.com/shop/bike/subscription (last accessed Dec. 6, 2019).

[55] *See* https://onepeloton.com/bike/classes (last accessed Dec. 6, 2019).

[56] *See* https://www.forbes.com/sites/bizcarson/2019/09/26/peloton-ceo-john-foley-faces-the-skeptics-again-this-time-buyers-in-its-8-billion-ipo/#3b8f0f6f4349 (last accessed Dec. 6, 2019).

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 69 of 465
Case 1:19-cv-11711-LGS    Document 550    Filed 09/02/25    Page 69 of 465

ADD-21

Case 1:19-cv-11711-LJL    Document 1    Filed 12/23/19    Page 21 of 40

65.    Peloton fully understands what the copyright law requires, having entered into sync licenses with certain other copyright holders, while, at the same time, using other musical works for free and without permission.[57]  Peloton's knowing violation of copyright laws was part of "a strategy to build a music-centric brand that is now worth in excess of $6 billion" without having to pay for all the required licenses.[58]

66.    On April 9, 2018, Peloton was put on actual notice of its copyright infringement when it received a cease and desist letter from the NMPA notifying it of copyright infringement claims for Peloton's failure to receive proper licenses for some of the music playing in its on-demand fitness classes.

67.    Notwithstanding that fact, Peloton continued to promise an "ever-growing" library to consumers and to heavily market that fact to its customers and prospective customers as a key Peloton selling point.

68.    Implicit in Peloton's promise to provide an "ever-growing" on-demand library was that it would only place classes in the library that complied with applicable copyright law or that it would pay back damages to copyright holders to ensure that the size of the on-demand library would not shrink.

69.    On March 25, 2019, in contravention of its promise, Peloton abruptly removed more than half of its on-demand classes from its digital library.[59]

---

[57] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 90, ¶ 1 (S.D.N.Y. September 27, 2019).

[58] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 90, at 1 (S.D.N.Y. Oct. 25, 2019).

[59] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 31, Counterclaims ¶ 59 (S.D.N.Y. Apr. 30, 2019); *see also id.*, Counterclaims ¶¶ 10, 42, 46, 52, 57.

70.    Prior to March 25, 2019, Peloton's Subscription Service had 10,017 on-demand classes available for its users.  Following Peloton's announcement, only 4,278 classes remained available to users.[60]  Thus, the abrupt removal of the infringing soundtracks led to the removal of an estimated 5,739 classes, approximately 57% of its Subscription Service's on-demand digital library.[61]

71.    After the purge of its on-demand classes from its on-demand library, the number of available on-demand classes was roughly equal to the number of on-demand classes that were available to consumers in January 2017.  Accordingly, contrary to its representations, Peloton's on-demand library, rather than being "ever-growing," was actually materially shrinking.

72.    Music is a central component of Peloton's workout classes and Peloton has deeply integrated music into the Subscription Service's interface—allowing users to search for workouts by music genre, as well as artist-specific playlists.  Users can also preview playlists for specific classes, "like" songs or playlists during their workouts, and save songs and playlists to their user profile.  Music is thus critical to consumers' use and enjoyment of the hardware and Subscription Service.

73.    The copyright infringement lawsuit and Peloton's subsequent purge its on-demand library has also significantly decreased the quality and quantity of popular artists and songs available on Peloton's workout class playlists, which has materially diminished

---

[60] *See* https://imgur.com/XxdUOJn (last accessed Dec. 5, 2019); *see also* https://docs.google.com/spreadsheets/d/1LAE9kDqxkj4CkZ7TzS7ce6g5cxkMUOMdDssxKWpS0ak/edit?usp=sharing (last accessed Dec. 5, 2019).

[61] *See* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider (Mar. 27, 2019, 10:30 a.m.), https://www.businessinsider.com/pelotonremoves-classes-member-outcry-2019-3

ADD-23

subscribers' experience with the hardware and Subscription Service.[62]  The infringing works

include some of the most popular artists and songs, both currently and of all time.  Peloton has

removed songs by a wide array of popular artists including, without limitation, Beyoncé, Brittany

Spears,  Michael Jackson, Ariana Grande, Snoop Dogg, Dr. Dre, Katy Perry, Rihanna, Miley

Cyrus, Motley Crue, Pink Floyd, Justin Bieber, David Bowie, Rascal Flatts, Bruno Mars, Selena

Gomez, Maroon 5, Adele, Lady Gaga, Nicki Minaj, Whitney Houston, Justin Timberlake, Luke

Bryan, Mariah Carey, Jay Z, Kanye West, Drake, and Madonna. [63]

74.     John Foley, Peloton's CEO, emailed subscribers and notified them that Peloton

was removing classes featuring the allegedly infringing songs, but did not disclose that this

would result in removal of over half of the on-demand classes in its digital library or that it

would significantly decrease the quality and quantity of popular songs and artists available for its

playlists.

75.     Instead, Foley falsely promised Plaintiffs and the other Class members that

"[Peloton] can assure you that this will not affect your experience with (or the cost of)

[Peloton's] service, or access to the kind of music you're used to hearing behind [Peloton's]

instructors in the thousands of classes in [Peloton's] library."

76.     That representation, however, is demonstrably false and Peloton never disclosed

to its subscribers, including Plaintiffs and the other Class members, that it would be removing

over half of the classes from its on-demand library.

---

[62] *See* Natt Garun, *Peloton owners are pissed about bad music after copyright lawsuit*, The Verge (April 24, 2019, 1:47 p.m.), https://www.theverge.com/2019/4/24/18514036/peloton-music-copyright-fitness-studios-gym-on-demand-media-strategy; *see also* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider US (March 27, 2019), https://www.businessinsider.sg/peloton-removes-classes-member-outcry-2019-3/.

[63] *See* Ex. 3.

ADD-24

77.    As of November 2019, Peloton's website continues to market its digital library as being "ever-growing" and "growing,"  despite knowing that the NMPA has recently amended its lawsuit alleging that it "found another 1,324 songs that have been streamed by Peloton instructors during classes without approval."[64]

78.    Therefore, despite Peloton's representations to the contrary, it knows or should know that the size of its on-demand digital library cannot legitimately be "ever-growing," but it continues to knowingly defraud its existing and potential customers—including Plaintiffs and the other Class members—for its own financial gain.

**D.    Peloton's Misrepresentations and Omissions Are Material to Consumers**

79.    Peloton's misrepresentations and omissions are material to Plaintiffs and the other Class members.  As part of Plaintiff's and the other Class members' subscriptions, they expected and were entitled to use a class library that, as advertised by Peloton, would continue to grow as new classes were added every day.

80.    Each additional on-demand fitness class adds incremental value to Plaintiffs' and the other Class members' subscriptions and, therefore, Peloton's gutting of its digital library materially lowered the value of Plaintiffs' and the other Class members' subscriptions.

81.    When Peloton accepted Plaintiffs' and the other Class members' subscription payments, Peloton knew or should have known that Plaintiffs and the other Class members would not be able to use the full on-demand class library because the size of its on-demand library was materially decreasing.

82.    Nonetheless, Peloton withheld that information from Plaintiffs and the other Class members, continued to represent to existing and potential subscribers that the on-demand digital

---

[64] *See* https://observer.com/2019/09/peloton-music-licensing-lawsuit-ipo/ (last accessed Dec. 5, 2019).

ADD-25

library would be "ever-growing," and continued to charge full price for its Subscription Service, despite knowledge that subscribers would not be receiving everything Peloton represented that they would receive.

83.    By misrepresenting that its on-demand digital library would be "ever-growing" and failing to disclose the imminent removal of over half of that library, Peloton defrauded Plaintiffs and the other Class members, deprived Plaintiff and Class members of the benefit of their bargain with Peloton, and/or unjustly enriched itself at Plaintiffs' and the other Class members' expense.

### VI.    CLASS ACTION ALLEGATIONS

84.    Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure individually and on behalf of a class defined as:

> All purchasers of the Peloton hardware and/or corresponding
> Peloton Membership subscription from April 9, 2018 through
> March 25, 2019.

(the "Class," unless otherwise noted).

85.    Excluded from the Class are Peloton and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case.  Plaintiffs reserve the right to modify or amend the Class definitions, as appropriate, during the course of this litigation.[65]

86.    This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

---

[65] There are currently five disputes in arbitration in the State of Kansas.  Plaintiffs believe that these claimants are members of the Class, and that the claimants are seeking a stay of arbitration. If claimants' request for a stay is denied, Plaintiffs reserve the right to add these disputes to the exclusion categories listed here.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 74 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 74 of 465

ADD-26

Case 1:19-cv-11711-LJL    Document 1    Filed 12/23/19    Page 26 of 40

87.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**  The members of the

Class are so numerous and geographically dispersed that individual joinder of all Class members

is impracticable.  The precise number of Class members is unknown to Plaintiffs, but may be

ascertained from Peloton's books and records and is presumed to be not less than in the hundreds

of thousands of people.  Class members may be notified of the pendency of this action by

recognized, Court-approved notice dissemination methods, which may include U.S. Mail,

electronic mail, Internet postings, and/or published notice.

88.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2)**

**and 23(b)(3).**  This action involves common questions of law and fact, which predominate over

any questions affecting individual Class members, including, without limitation:

a.   whether Peloton engaged in the conduct alleged herein;

b.   whether Peloton's alleged conduct violates applicable law;

c.   whether Peloton engaged in false or misleading advertising;

d.   whether Peloton's misrepresentations and omissions regarding the "ever-
     growing" nature of the Subscription Service's class library were likely to
     deceive Class members in violation of N.Y. Gen. Bus. Law §§ 349 and 350;

e.   whether Peloton's misrepresentations and omissions regarding the "ever-
     growing" nature of the Subscription Service's class library were material to a
     reasonable consumer;

f.   whether Class members overpaid for their Subscription Service as a result of
     the conduct alleged herein;

g.   whether Peloton's conduct violates public policy;

    h.  whether Class members are entitled to damages, restitution, restitutionary

        disgorgement, equitable relief, statutory damages, exemplary damages, and/or

        other relief; and

    i.  the amount and nature of relief to be awarded to Plaintiffs and the other Class

        members.

89.    **Typicality – Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the other Class members' claims because Plaintiffs and the other Class members purchased Peloton's hardware and/or subscribed to Peloton's Subscription Service that falsely promised an "ever-growing" class library.  Each class in the on-demand library adds incremental value to Plaintiffs' and the other Class members' hardware and/or Subscription Service.  The value of Plaintiffs' and the other Class members' hardware and/or Subscription Service has therefore diminished and, as a result of Peloton's conduct, Plaintiffs and the other Class members overpaid for Peloton's hardware and/or Subscription Service.  Plaintiffs and the other Class members suffered damages as a direct and proximate result of the same wrongful conduct in which Peloton engaged.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other Class members' claims.

90.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**  Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members who they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.  Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 76 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 76 of 465

ADD-28

Case 1:19-cv-11711-LJL    Document 1    Filed 12/23/19    Page 28 of 40

91.    **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).**
Peloton has acted or refused to act on grounds generally applicable to Plaintiffs and the other
Class members, thereby making appropriate final injunctive relief and declaratory relief, as
described below, with respect to the Class members as a whole.

92.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).**  A class action is
superior to any other available means for the fair and efficient adjudication of this controversy,
and no unusual difficulties are likely to be encountered in the management of this class action.
The damages or other financial detriment suffered by Plaintiffs and the other Class members are
relatively small compared to the burden and expense that would be required to individually
litigate their claims against Peloton, so it would be impracticable for the Class members to
individually seek redress for Peloton's wrongful conduct.  Even if the Class members could
afford litigation the court system could not.  Individualized litigation creates a potential for
inconsistent or contradictory judgments and increases the delay and expense to all parties and the
court system.  By contrast, the class action device presents far fewer management difficulties,
and provides the benefits of single adjudication, economy of scale, and comprehensive
supervision by a single court.

## VII.    CLAIMS ALLEGED

### FIRST CLAIM FOR RELIEF

**Violation of New York General Business Law,
N.Y. Gen. Bus. Law § 349**

93.    Plaintiffs repeat and allege the allegations in Paragraphs 1-92, above, as if fully
alleged herein.

94.    Plaintiffs bring this claim individually and on behalf of the other Class members.

ADD-29

95.     New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

96.     Peloton engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, by misrepresenting that its Subscription Service included access to an "ever-growing library of live and on-demand studio classes" and willfully failing to disclose that it would be removing over half of its Subscription Service's on-demand digital library.

97.     Peloton knew or should have known that it lacked the appropriate copyright licenses for the music accompanying the classes in its library, and that its library could not legitimately be "ever-growing."

98.     Peloton received a cease-and-desist letter regarding its copyright infringement on April 9, 2018 but continued to promise the "ever-growing" library to consumers.  On March 25, 2019, Peloton abruptly removed more than half of its on-demand content from its Subscription Service's on-demand digital library.

99.     Despite knowing that the size of its on-demand Digital Library had decreased by 57%, Peloton continues to promise on its website "an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors"[66] and "unlimited access to a growing library of live streaming and on-demand Peloton classes."[67]

100.     Peloton's representations and omissions were material because they were likely to deceive reasonable consumers about the "ever-growing" nature of its Subscription Service's on-demand digital library.

_____

[66] *See* https://www.onepeloton.ca/app (last accessed Nov. 26, 2019).

[67] *See* https://www.onepeloton.com/shop/bike/subscription (last accessed Nov. 26, 2019).

ADD-30

101.    Peloton acted intentionally, knowingly, and maliciously to violate New York's

General Business Law, and recklessly disregarded Plaintiff and the other Class members' rights.

Peloton had actual knowledge on April 9, 2018 that it could not provide an "ever-growing"

library to consumers, but it nonetheless continued to promise and represent an "ever-growing"

library.

102.    As a direct and proximate result of Peloton's deceptive and unlawful acts and

practices Plaintiffs and the other Class members suffered injury.  Peloton deprived Plaintiffs and

the other Class members of the benefit of the bargain.  Plaintiffs and the other Class members

have suffered and will continue to suffer injury, ascertainable losses of money, and monetary and

non-monetary damages because Plaintiffs and the other Class members overpaid for Peloton's

hardware , because they did not know the truth that Peloton would gut its on-demand digital

library, shrinking it by 57%, and that it would not be "ever-growing."

103.    Peloton's deceptive and unlawful acts and practices complained of herein affected

all purchasers of Peloton's hardware because the Peloton hardware is only as good as the app and

subscription that comes with it.

104.    Peloton's above-described deceptive and unlawful practices caused substantial

injury to Plaintiffs and the other Class members that they could not reasonably avoid.  Plaintiffs

and the other Class members seek all monetary and non-monetary relief allowed by law,

including actual damages or statutory damages of $50 per violation for each of Peloton's

violations of N.Y. Gen. Bus. Law § 349 (whichever is greater), treble damages, injunctive relief,

and attorney's fees and costs.

105.   Each sale of the Peloton hardware to Plaintiffs and the other Class members constitutes a separate, independent, and willful violation of N.Y. Gen. Bus. Law § 349 through the above deceptive acts and practices in the conduct of its business.

106.   Peloton should, therefore, be assessed a separate statutory penalty of $50 or actual damages (whichever is greater) for each independent violation, and all other such relief as may be just and proper should be recovered by Plaintiffs individually and on behalf of the other Class members.

**SECOND CLAIM FOR RELIEF**

**Violation of New York General Business Law,
N.Y. Gen. Bus. Law § 349.**

107.   Plaintiffs repeat and allege the allegations in Paragraphs 1-92, above, as if fully alleged herein.

108.   Plaintiffs bring this claim individually and on behalf of the other Class members.

109.   New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

110.   Peloton engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, by misrepresenting that its Subscription Service included access to an "ever-growing library of live and on-demand studio classes" and willfully failing to disclose that it would be removing over half of its Subscription Service's on-demand digital library, while persistently publishing marketing assertions (and omissions) to the contrary.

111.   Peloton knew or should have known that it lacked the appropriate copyright licenses for the music accompanying the classes in its library, and that its library could not legitimately be "ever-growing."

112.    Peloton received a cease-and-desist letter regarding its copyright infringement on April 9, 2018 but continued to promise the "ever-growing" library to consumers.  On March 25, 2019, Peloton abruptly removed more than half of its on-demand content from its Subscription Service's on-demand digital library.

113.    Despite knowing that the size of its on-demand Digital Library had decreased by 57%, Peloton continues to promise on its website "an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors"[68] and "unlimited access to a growing library of live streaming and on-demand Peloton classes."[69]

114.    Peloton's representations and omissions were material because they were likely to deceive reasonable consumers about the "ever-growing" nature of its Subscription Service's on-demand digital library.

115.    Peloton acted intentionally, knowingly, and maliciously to violate New York's General Business Law, and recklessly disregarded Plaintiffs and the other Class members' rights. Peloton had actual knowledge on April 9, 2018 that it could not provide an "ever-growing" library to consumers, but it continued to promise an "ever-growing" library nonetheless

116.    As a direct and proximate result of Peloton's deceptive and unlawful acts and practices Plaintiffs and the other Class members suffered injury.  Peloton deprived Plaintiffs and the other Class members of the benefit of the bargain.  Plaintiffs and the other Class members have suffered and will continue to suffer injury, ascertainable losses of money, and monetary and non-monetary damages because Plaintiffs and the other Class  members overpaid for Peloton's

---

[68] See https://www.onepeloton.ca/app (last accessed Dec. 6, 2019).

[69] See https://www.onepeloton.com/shop/bike/subscription (last accessed Dec. 6, 2019).

ADD-33

Subscription Service because they did not know the truth that Peloton would gut its on-demand digital library, shrinking it by 57%, and that it would not be "ever-growing."

117.    Peloton's deceptive and unlawful acts and practices complained of herein affected all subscribers of the Peloton Subscription Service.  The above deceptive and unlawful practices and acts by Peloton caused substantial injury to Plaintiffs and the other Class members that they could not reasonably avoid. Plaintiffs and the other Class members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 per violation (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

118.    Each time Peloton accepted a subscription payment from Plaintiffs and/or one or more of the other Class members, Peloton committed a separate, independent, and willful violation of N.Y. Gen. Bus. Law § 349 through the above deceptive acts and practices in the conduct of its business.

119.    Peloton should, therefore, be assessed a separate statutory penalty of $50 for each independent violation, and all other such relief as may be just and proper should be recovered by Plaintiffs individually and on behalf of the other Class members.

ADD-34

### THIRD CLAIM FOR RELIEF

**Violation of New York General Business Law,**
**N.Y. Gen. Bus. Law § 350**

120.    Plaintiffs repeat and allege the allegations in Paragraphs 1-92, above, as if fully alleged herein.

121.    Plaintiffs bring this claim individually and on behalf of the other Class members.

122.    New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade, or commerce[.]"  False advertising includes "advertising including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light . . . representations [made] with respect to the commodity. . . ." N.Y. Gen. Bus. Law § 350-a.

123.    Peloton caused to be made or disseminated, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known, to Peloton to be untrue and misleading to consumers, including Plaintiffs and the other Class members.

124.    Peloton misrepresented through advertisements on its website that its Subscription Service included access to an "ever-growing library of live and on-demand studio classes" and, at the same time, willfully failed to disclose that it would be removing over half of its Subscription Service's on-demand digital library.

125.    Peloton knew or should have known that it lacked the appropriate copyright licenses for the music accompanying the classes in its library, and that its library could not legitimately be "ever-growing."

126.    Peloton received a cease-and-desist letter regarding its copyright infringement on April 9, 2018 but continued to promise the "ever-growing" library to consumers.  On March 25,

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 83 of 465
Case 1:19-cv-11711-LGS    Document 550    Filed 09/02/25    Page 83 of 465

ADD-35

Case 1:19-cv-11711-LJL    Document 1    Filed 12/23/19    Page 35 of 40

2019, Peloton abruptly removed more than half of its on-demand content from its Subscription Service's on-demand digital library.

127.    Despite knowing that the size of its on-demand digital library had decreased by 57%, Peloton continues to advertise on its website "an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors"[70] and "unlimited access to a growing library of live streaming and on-demand Peloton classes."[71]

128.    Peloton has violated N.Y. Gen. Bus. Law § 350 because the misrepresentations and omissions regarding the "ever-growing" nature of its Subscription Service's on-demand library, were material and likely to deceive a reasonable consumer.

129.    As a direct and proximate result of Peloton's false and misleading advertising Plaintiffs and the other Class members suffered injury.  Peloton deprived Plaintiff and the other Class members of the benefit of the bargain.  Plaintiffs and the other Class members have suffered and will continue to suffer injury, ascertainable losses of money, and monetary and non-monetary damages. Plaintiffs and the other Class members overpaid for Peloton's Subscription Service because they did not know the truth that Peloton would gut its on-demand digital library, shrinking it by 57%, and that it would not be "ever-growing."

130.    Peloton's false and misleading advertising complained of herein affected all purchasers of Peloton's hardware.

131.    The above false and misleading advertising by Peloton caused substantial injury to Plaintiffs and the other Class members that they could not reasonably avoid.

---

[70] *See* https://www.onepeloton.ca/app (last accessed Nov. 26, 2019).

[71] *See* https://www.onepeloton.com/shop/bike/subscription (last accessed Nov. 26, 2019).

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 84 of 465
Case 1:19-cv-11711-LGS    Document 336    Filed 09/02/25    Page 84 of 465

ADD-36

Case 1:19-cv-11711-LJL    Document 1    Filed 12/23/19    Page 36 of 40

132.    Plaintiffs, individually and on behalf of the other Class members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $500 per violation (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

133.    Peloton committed a separate and independent violation of N.Y. Gen. Bus. Law § 350 for each false advertisement pertaining or relating to the "ever-growing" and/or growing nature of its on-demand library.

134.    Peloton should therefore be assessed statutory damages of $500 for each such violation, and all other such relief as may be just and proper should be recovered by the State.

## FOURTH CLAIM FOR RELIEF

### Violation of New York General Business Law,
### N.Y. Gen. Bus. Law § 350

135.    Plaintiffs repeat and allege the allegations in Paragraphs 1-92, above, as if fully alleged herein.

136.    Plaintiffs bring this claim individually and on behalf of the other Class members.

137.    New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade, or commerce[.]"  False advertising includes "advertising including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light . . . representations [made] with respect to the commodity. . . ." N.Y. Gen. Bus. Law § 350-a.

138.    Peloton caused to be made or disseminated, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Peloton, to be untrue and misleading to consumers, including Plaintiffs and the other Class members.

36

ADD-37

139.    Peloton misrepresented through advertisements on its website that its Subscription Service included access to an "ever-growing library of live and on-demand studio classes" and, at the same time, willfully failed to disclose that it would be removing over half of its Subscription Service's on-demand digital library.

140.    Peloton knew or should have known that it lacked the appropriate copyright licenses for the music accompanying the classes in its library, and that its library could not legitimately be "ever-growing."

141.    Peloton received a cease-and-desist letter regarding its copyright infringement on April 9, 2018 but continued to promise the "ever-growing" library to consumers.  On March 25, 2019, Peloton abruptly removed more than half of its on-demand content from its Subscription Service's on-demand digital library.

142.    Despite knowing that the size of its on-demand digital library had decreased by 57%, Peloton continues to advertise on its website "an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors"[72] and "unlimited access to a growing library of live streaming and on-demand Peloton classes."[73]

143.    Peloton has violated N.Y. Gen. Bus. Law § 350 because the misrepresentations and omissions regarding the "ever-growing" nature of its Subscription Service's on-demand library, were material and likely to deceive a reasonable consumer.

144.    As a direct and proximate result of Peloton's false and misleading advertising Plaintiffs and the other Class members suffered injury.  Peloton deprived Plaintiff and the other Class members of the benefit of the bargain.  Plaintiffs and the other Class members have

---

[72] *See* https://www.onepeloton.ca/app (last accessed Nov. 26, 2019).

[73] *See* https://www.onepeloton.com/shop/bike/subscription (last accessed Nov. 26, 2019).

suffered and will continue to suffer injury, ascertainable losses of money, and monetary and non-monetary damages because Plaintiffs and the other Class members overpaid for Peloton's Subscription Service because they did not know the truth that Peloton would gut its on-demand digital library, shrinking it by 57%, and that it would not be "ever-growing."

145.    Peloton's false and misleading advertising complained of herein affected all purchasers of Peloton's subscribers to Peloton's Subscription Service.

146.    The above false and misleading advertising by Peloton caused substantial injury to Plaintiffs and the other Class members that they could not reasonably avoid.

147.    Plaintiffs, individually and on behalf of the other Class members, seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $500 per violation (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

148.    Peloton committed a separate and independent violation of N.Y. Gen. Bus. Law § 350 for each false advertisement pertaining or relating to the "ever-growing" and/or growing nature of its on-demand library.

149.    Peloton should therefore be assessed statutory damages of $500 for each such violation, and all other such relief as may be just and proper.

### VIII.    <u>REQUEST FOR RELIEF</u>

Plaintiffs, individually and on behalf of the other Class members, respectfully request that the Court enter judgment in their favor and against Peloton as follows:

1.    Certifying the Class as requested herein, designating Plaintiffs as class representatives, and appointing the undersigned counsel as Class Counsel;

ADD-39

2.      Declaring that Peloton is financially responsible for notifying the Class members

of the pendency of this suit;

3.      Awarding actual and/or statutory damages to the maximum extent allowed, in an

amount to be proven at trial;

4.      Requiring restitution and disgorgement of all profits and unjust enrichment

Peloton obtained from Plaintiffs and the other Class members as a result of Peloton's unlawful,

unfair, and/or fraudulent business practices;

5.      Awarding injunctive relief as permitted by law or equity, including enjoining

Peloton from continuing the unlawful practices as set forth herein, and ordering Peloton to

engage in a corrective advertising campaign;

6.      Awarding Plaintiffs' reasonable attorneys' fees, costs, and expenses;

7.      Awarding pre- and post-judgment interest on any amounts awarded; and

8.      Awarding such other and further relief as may be just and proper.

## IX.    JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all causes of action so triable.

Dated:  December 23, 2019          */s/ Greg G. Gutzler*
GREG G. GUTZLER
ggutzler@dicellolevitt.com
**DiCELLO LEVITT GUTZLER LLC**
444 Madison Avenue, Fourth Floor
New York, New York  10022
Telephone: (646) 933-1000

ADAM J. LEVITT
alevitt@dicellolevitt.com
ADAM PROM (*pro hac vice* to be sought)
aprom@dicellolevitt.com
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois  60602
Telephone: (312) 214-7900

ADD-40

ASHLEY C. KELLER (*pro hac vice* to be sought)
ack@kellerlenkner.com
J. DOMINICK LARRY (*pro hac vice* to be sought)
nl@kellerlenkner.com
**KELLER LENKNER LLC**
150 North Riverside Plaza, Suite 4270
Chicago, Illinois  60606
Telephone: (312) 741-5220

*Counsel for Plaintiffs and the Proposed Class*

ADD-41

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------------X
                                                        :
ERIC FISHON and ALICIA PEARLMAN, individually           :
and on behalf of all others similarly situated,         :
                                                        :
                                  Plaintiffs,           :
                                                        :
          -v-                                           :
                                                        :
PELOTON INTERACTIVE, INC.,                               :
                                                        :
                                  Defendant.            :
                                                        X
-------------------------------------------------------------------
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _10/15/2020_

19-cv-11711 (LJL)

ORDER

LEWIS J. LIMAN, United States District Judge:

    I have become aware that my wife holds shares in Defendant Peloton Interactive, Inc. She intends to divest herself of the shares. Under Canon 3C(4) of the Code of Conduct for United States Judges, recusal is not required in this situation if divestment is made and it would not be in the public interest for me to recuse myself. The Court will provide notice as soon as the divestment occurs.

    SO ORDERED.

Dated: October 15, 2020
      New York, New York

                                 LEWIS J. LIMAN
                            United States District Judge

ADD-42

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                  :

ERIC FISHON and ALICIA PEARLMAN, individually  :
and on behalf of all others similarly situated,

                                  :

                  Plaintiffs,      :

                                  :

          -v-                    :

                                  :

PELOTON INTERACTIVE, INC.,         :

                                  :

                  Defendant.      :

                                  :
------------------------------------------------------------------X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
DOC #:_____
DATE FILED:__11/2/2020__

19-cv-11711 (LJL)

ORDER

LEWIS J. LIMAN, United States District Judge:

      The parties are hereby provided notice that it has disposed of the Peloton shares that created the conflict of interest and that it has therefore purged itself of the conflict.  The Court intends to continue to preside over this case.

      SO ORDERED.

Dated: November 2, 2020
      New York, New York

                                LEWIS J. LIMAN
                       United States District Judge

ADD-43

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __11/9/2020__
```

-------------------------------------------------------------------X
                                          :

ERIC FISHON, et al.,                          :

                                          :

                      Plaintiffs,        :                    19-cv-11711 (LJL)

              -v-                        :                 OPINION AND ORDER

PELOTON INTERACTIVE, INC.          :

                      Defendant.        :

                                          :
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

       Defendant Peloton Interactive, Inc. ("Peloton") moves, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the complaint against it for failure to state a claim for relief. For the following reasons, Defendant's motion to dismiss is granted with respect to Plaintiff Alicia Pearlman ("Pearlman"). Defendant's motion to dismiss is denied with respect to Plaintiff Eric Fishon ("Fishon").

## BACKGROUND

       Peloton sells at-home stationary bicycles ("Peloton Bike") and treadmills ("Peloton Tread") that stream live and on-demand fitness classes. Compl. ¶ 3. For access to the content library, users pay a separate monthly subscription fee. *Id.* Peloton does not offer distinct categories of membership for users of the Peloton Bike or the Peloton Tread; all members pay the same monthly fee for access to the entire content library. *Id.*

       Certain Peloton advertisements described the library of fitness classes as "ever-growing." *Id.* ¶ 5. In April 2018, Peloton received a cease-and-desist letter from the National Music Publishers Association ("NMPA"), regarding Peloton's use of songs in its on-demand class

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 92 of 465
Case 1:19-cv-11711-LGS    Document 550    Filed 09/02/25    Page 92 of 465

ADD-44

Case 1:19-cv-11711-LJL   Document 65   Filed 11/09/20   Page 2 of 30

library.  *Id.* ¶¶ 11-12, 65-66.  Peloton continued to market its class library as "ever-growing."  *Id.*
¶¶ 9, 12, 67-68, 77, 82.  In March of 2019, however, Peloton removed approximately 5,739
classes, or nearly 57% of the total available classes, from its library in response to a lawsuit filed
by members of the NMPA, alleging that Peloton had used copyrighted music for years without
proper licensing.  *Id.* ¶¶ 13-15.

Plaintiffs allege that they purchased a Peloton Tread and a Peloton Bike, as well as a
subscription to Peloton's content services.  Plaintiffs allege that Peloton's description of its
library as "ever-growing" was deceptive and misleading.  Further, Plaintiffs allege that they
purchased Peloton products and subscriptions to its digital library "in reliance on [the] promise"
that the digital library would be "ever-growing."  Dkt. No. 36 at 1.  According to Plaintiffs, the
decreased number of classes as well as the decrease in the quantity of music available on
workout class playlists "has materially diminished users' experience with the Peloton bike
subscription service."  *Id.*  at 3.  Plaintiffs allege that Peloton knew it was building its on-demand
library with copyrighted material for which it had not obtained the media rights.  *Id.* at 2.
Plaintiffs additionally allege that the class removals were inevitable and that Peloton should have
affirmatively disclosed to members the likelihood of those removals at an earlier date.  Compl.
¶¶ 82-83.  If they had known the truth, Plaintiffs claim, they never would have purchased a
Peloton bike or subscription on the same terms.  Dkt. No. 36 at 1.

Plaintiffs sue Peloton under the New York General Business Law (the "NYGBL") §§ 349
and 350.  Section 349 of the NYGBL prohibits deceptive acts and practices, while Section 350
prohibits false advertising.  "The only difference between the two is that Section 350 more
narrowly targets deceptive or misleading advertisements, while Section 349 polices a wider
range of business practices."  *Cline v. TouchTunes Music Corp.*, 211 F. Supp. 3d 628, 636

(S.D.N.Y. 2016).

Peloton moves to dismiss Plaintiffs' complaint, raising six principal arguments in support of its motion.  First, Peloton argues that Plaintiffs' claims are barred as a matter of law because Peloton's Terms of Service disclosed that Peloton reserved the right to remove class content "at any time, in its sole discretion."  Compl., Ex. 1 § 15.  Second, Peloton argues that its statement that its library is "ever-growing" was non-actionable puffery.  Third, Peloton argues that even if the "ever-growing" statement were not puffery, it is not misleading because it is true.  Fourth, Peloton argues that Plaintiffs have failed to allege that Peloton's deceptive statement caused their injury as required under the NYGBL.  Fifth, Peloton argues that Plaintiffs have failed to allege that they suffered any injury or loss.  Sixth, Peloton argues that Plaintiffs lack statutory standing under the NYGBL because they have not pleaded a sufficient nexus between their transactions and New York state.

Peloton also argued in its briefing that Plaintiff Patrick Yang's claims should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for lack of Article III standing.  Yang voluntarily dismissed his claims without prejudice during the pendency of this motion, Dkt. No. 59, rendering these argument moot.

## DISCUSSION

In order to survive a motion to dismiss, a complaint must contain sufficient facts to allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Lynch v. City of New York*, 952 F.3d 67, 74 (2d Cir. 2020).  In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court "accept[s] all factual allegations as true, and draw[s] all reasonable inferences in the plaintiff's favor."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  A complaint must offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 94 of 465
Case 1:19-cv-11711-LGS    Document 550    Filed 09/02/25    Page 94 of 465

ADD-46

Case 1:19-cv-11711-LJL    Document 65    Filed 11/09/20    Page 4 of 30

enhancement" in order to survive dismissal. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 557

(2007). "Asking for plausible grounds . . . does not impose a probability requirement at the

pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery

will reveal evidence of illegal agreement." *Id*. at 556.

Sections 349 and 350 were enacted in 1970 and 1963, respectively, to prevent deceptive

and misleading acts, practices and advertising in the State of New York.  Originally, both

sections were enforceable only by the New York Attorney General. *See Rivera v. Navient*

*Solutions, LLC*, 2020 WL 4895698, at *6 (S.D.N.Y. Aug. 19, 2020).  In 1980, however, the New

York legislature amended the statute—without changing its substantive prohibitions—to provide

a private right of action to individuals injured by reason of a violation of its provisions. *Id*.  In its

current form, "New York's Consumer Protection Act—General Business Law article 22-A—was

enacted to provide consumers with a means of redress for injuries caused by unlawfully

deceptive acts and practices." *Goshen v. Mutual Life Ins. Co.*, 774 N.E.2d 1190, 1194 (N.Y.

2002).  In order to state a claim under either Section 349 or 350, a plaintiff must allege: (1) that

the defendant's acts were consumer oriented, (2) that the acts or practices are deceptive or

misleading in a material way, and (3) that the plaintiff has been injured as a result. *Goldemberg*

*v. Johnson & Johnson Consumer Cos., Inc.*, 8 F. Supp. 3d 467, 478 (S.D.N.Y. 2014).  A

deceptive act or practice is one "likely to mislead a reasonable consumer acting reasonably under

the circumstances." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,

647 N.E.2d 741, 745 (N.Y. 1995).  All that must be alleged at the pleading stage is that "on

account of a materially misleading practice, [Plaintiffs] purchased a product and did not receive

the full value of [their] purchase." *Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (2d Cir. 2015)

(citing *Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892 (N.Y. 1999)).

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 95 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 95 of 465

ADD-47

New York law prohibits both material omissions as well as affirmative representations. *Krobath v. S. Nassau Communities Hosp.*, 115 N.Y.S.3d 389, 392-93 (2d Dep't 2019).  In order to state an omission claim, a plaintiff must allege that the defendant possessed material information and failed to disclose that information.  *Cummings v. FCA US LLC*, 401 F. Supp. 3d 288, 307 (N.D.N.Y. 2019).

**I.     Terms of Service**

Defendant argues, first, that Peloton's Terms of Service authorized Peloton to remove content from its library at any time and that consequently Plaintiffs cannot maintain a claim that Peloton's advertising of an "ever-growing" library was false or deceptive.  Peloton's 2018 Terms of Service state, in relevant part:

> Peloton reserves the right to modify the Peloton Service, including, but not limited to updating, adding to, enhancing, modifying, removing or altering any Content or features of the Peloton Service, at any time, in its sole discretion. . . . Peloton . . . does not guarantee that any Content available on the Peloton Service . . . will continue to be available for any length of time.  Peloton provides the Peloton Service on an "AS IS" and "AS AVAILABLE" basis.

Dkt. No. 31, Ex. 1.

Defendant argues that because Plaintiffs agreed to these terms when they subscribed to Peloton's service, Defendant cannot be held liable for deceptive practices for conduct authorized by the terms.  According to Defendant, even if the "ever-growing" statement was deceptive, the Terms of Service overcome the deception because Peloton reserved the right to remove content at any time.  Nor can Defendant be held liable for its failure to disclose the purportedly inevitable class removals, for the same reason.  Defendant points to a number of cases that it argues support the proposition that New York courts dismiss claims under the NYGBL where the defendant expressly disclosed its right to take the actions of which a plaintiff complains.

Plaintiffs respond that disclaimers are insufficient to dismiss Section 349 and 350 claims.

ADD-48

*See Goshen*, 746 N.Y.S.2d at 865 (holding that defendants' contractual terms and conditions, including a product disclaimer, did not bar plaintiffs' claims for deceptive practices or establish a defense as a matter of law).; *see also Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 675 (N.Y. 2012) (holding that disclaimers set forth in defendant's catalogs did not establish a defense at the 12(b)(6) stage).

Defendant's arguments are based on a non-sequitur.  Peloton's Terms of Service may have protected it from a breach of contract or similar claim for the removal of a particular class or group of classes.  However, the Terms of Service do not relieve Peloton from a deceptive marketing claim based on the allegation that Peloton advertised its library as ever-growing while knowing that it would be diminishing or shrinking in size.

The Second Circuit addressed an analogous question in *Mantikas v. Kellogg Co.*, 910 F.3d 633 (2d Cir. 2018).  There, plaintiffs claimed that defendant had engaged in deceptive and misleading acts and practices in violation of Sections 349 and 350 by conspicuously labelling its snack products as "WHOLE GRAIN" and "MADE WITH WHOLE GRAIN"; in fact, the grain was predominantly, if not entirely, enriched white flour.  *Id.* at 636.  Defendants argued that the complaint should be dismissed for failure to allege deception because the front panel of the same advertising disclosed the precise number of grams of whole grain per serving and a side panel listing the product's ingredients disclosed "enriched white flour" was the first and predominant ingredient.  The district court agreed and dismissed the complaint.  The Second Circuit reversed.

In reversing the district court's decision in *Mantikas*, the Second Circuit laid down the operative legal principles that guide this Court's analysis here.  First, although "an allegedly misleading statement must be viewed in light of its context on the product label or advertisement as a whole," *id.* at 636 (internal quotations and citations omitted), the allegedly clarifying

6

language on the front of the box disclosing the precise number of grams of whole grain "d[id]
not dispel the inference communicated by the front of the package that the grain in 'whole grain'
crackers is predominantly whole grain." *Id.* at 637.  Second, a reasonable consumer confronted
with the language on the front of the box "should [not] be expected to look beyond misleading
representations on the front of the box to discover the truth from the ingredient list in small print
of the side of the box." *Id.* (*quoting Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (2d Cir.
2008)).  A reasonable consumer would expect the more detailed information to "confirm[] other
representations on the packaging" and not to negate it.  *Id.*; *see also Rivera*, 2020 WL 4895698,
at *9 (holding that misleading representations made in a billing statement were not excused by
contradictory statements in the fine print).

    Those dual principles are fatal to Defendant's claim here.  First, the language in the
Terms of Service do not dispel the false inference allegedly created by Defendant's advertising.
Defendant's advertising created the inference for reasonable consumers that Peloton's library
was ever-growing; that it would increase in size.  The Terms of Service made clear to purchasers
that they had no right to expect that any particular class or group of classes would remain
available to them.  It does not speak to the size of the collection.  The two representations are not
inconsistent with one another and the latter does not dispel the false inference created by the
former.  Peloton could have increased the size of its library even while removing particular
classes.  The Terms of Service do not disclose that Peloton might remove over half of its library
without simultaneously replacing that half with even more classes.  *See, e.g.*, *Rivera*, 2020 WL
4895698, at *8 ("[I]f a consumer were confused by the language . . . on the first page of the
billing statement, the language on the second and third page of the billing statement would not
necessarily dispel the confusion.").

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 98 of 465
Case 1:19-cv-11711-LGS    Document 559    Filed 09/02/25    Page 98 of 465

ADD-50

Case 1:19-cv-11711-LJL    Document 65    Filed 11/09/20    Page 8 of 30

Second, even if the Terms of Service could be construed to put a reasonable consumer on notice that Peloton intended to remove over half of its classes if that information was displayed prominently alongside the representation that Peloton's library was ever-growing, the Terms of Service did not receive such prominent attention.  As alleged in Plaintiffs' Complaint, the "ever-growing" statement appeared in marketing materials on Peloton's website.  Compl. ¶ 60.  The language stating that Peloton had discretion to remove courses from its library, on the other hand, was contained in the fine print of the Terms of Service that Peloton's customers agreed to after they saw the website, at the time of purchase and when accessing Peloton's content library. Dkt. No. 30 at 5.  They were not part of the advertisement as a whole.  *See, e.g.*, *Mantikas*, 910 F.3d at 636 ("In determining whether a reasonable consumer would have been misled by a particularly advertisement, context is crucial."); *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 53 (E.D.N.Y. Oct. 5, 2015) ("Courts 'view each allegedly misleading statement in light of its context on the product label or advertisement as a whole.") (quoting *Delgado v. Ocwen Loan Servicing,* LLC, 2014 WL 4773991, at *8 (E.D.N.Y. Sept. 24, 2014)).  A reasonable consumer, having viewed Peloton's advertisements on its website and having decided to purchase a Peloton product based on the understanding that the library would grow "should not be expected to discover the truth" and that such understanding was false from the Terms of Service.  *Mantikas*, 910 F.3d at 637.

This conclusion is squarely in line with the authority cited by Plaintiffs that under New York law, terms and conditions cannot as a matter of law overcome deceptive marketing practices.  In *Goshen*, for instance, a defendant DSL service provider made certain representations in its advertising regarding the quality of its internet service but also made disclaimers in its service agreement stating that "the service is provided on an 'as is' or 'as

ADD-51

available' basis."  746 N.Y.S.2d at 862.  The New York Court of Appeals held that these disclaimers were not sufficient to establish a defense as a matter of law because the service was allegedly "defective due to malfunctions largely or wholly within defendants' control" and the defendants allegedly "knew this to be the case and [the] promotional representations were therefore knowingly deceptive."  *Id.* at 865.

Plaintiffs also point to *Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151 (S.D.N.Y. 2014), where a court in this District came to the same conclusion regarding actions under the NYGBL. There, defendant job search website represented that the website's experts "pre-screen all jobs so they're always $100K+."  *Id*. at 169.  The plaintiff alleged that this statement was untrue, and the defendant argued that it could not be sued under the NYGBL because its terms of service stated that "the information and materials were provided on an 'as is' or 'as available basis.'"  *Id*. at 168.  Relying upon *Goshen*, the Court found that disclaimers in a service agreement do not establish a defense as a matter of law.  *Id*. at 169; *see also Orellana v. Macy's Retail Holdings, Inc.*, 2018 WL 3368716, at *14-15 (S.D.N.Y. July 10, 2018) ("[A] misrepresentation is not cured as a matter of law by a contradictory disclaimer, at least where the subject matter of the misrepresentation is within the defendant's control").

The conclusion is consistent not only with common sense but also with the regulatory regime established by New York's Consumer Protection Act.  That statute is intended to protect public rights and gives the New York Attorney General authority to enforce it, even without a showing of injury.  *See Rivera*, 2020 WL 4895698, at *6.  It is clear that the delivery of a Terms of Service to an individual consumer would not disable the New York Attorney General from investigating and prosecuting a company from making the sort of allegedly misleading statements made on its website by Defendant here and charging that they constituted

9

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 100 of 465
Case 1:19-cv-11711-LGS    Document 55Ō    Filed 09/02/25    Page 100 of 465

ADD-52

Case 1:19-cv-11711-LJL   Document 65   Filed 11/09/20   Page 10 of 30

"[d]eceptive acts or practices."  N.Y. Gen Bus. L. § 349.  It follows that, while the Terms of

Service may be relevant at trial to issues of causation, it cannot defeat a claim that Peloton's

advertising was deceptive and false.

Finally, the cases Defendant cites are not directly applicable to this case, because none of

them concern a claim for false advertising or deceptive marketing.  None of the cases cited by

Defendant address a situation where terms of service contradicted a representation made in a

defendant's promotional materials.  In *A.N.R. Inv. Co. Ltd. v. HSBC Private Bank*, 25 N.Y.S.3d

78, 81 (1st Dep't 2016), for example, the court held only that a plaintiff could not bring a breach

of contract claim based upon a defendant's terms of service where the terms of service expressly

authorized the conduct of which the plaintiff complained.  Similarly, in *Derbaremdiker v.

Applebee's Intern., Inc.*, 2012 WL 4482057, at *5-*6 (E.D.N.Y. Sept. 26, 2012), the court

concluded that the description the rules of a sweepstakes as described on the back of a receipt

was neither misleading, nor did it contradict the full disclosures made on the sweepstakes'

website and in its official rules.  The other cases cited by Defendant are inapposite for similar

reasons.  *See Shovak v. Long Island Commercial Bank*, 858 N.Y.S.2d 660, 662-63 (2d Dep't

2008) (holding that a mortgage broker's yield spread premium was not a deceptive practice

under the NYGBL where the practice was fully disclosed in the contract); *Zuckerman v. BMG

Direct Mktg., Inc.*, 737 N.Y.S.2d 14 (1st Dep't 2002) (holding that "a disclosure that a specified

amount will be charged for shipping and handling cannot cause a reasonable consumer to believe

that such amount necessarily is equal to or less than the seller's actual shipping and handling

costs"); *Sands v. Ticketmaster-New York, Inc.*, 616 N.Y.S.2d 362, 363 (1st Dep't 1994) (holding

that defendant's fees could not be found "excessive" under Section 349 of the NYGBL where

those fees were "always disclosed by [defendant]").  None of these cases holds that a business

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 101 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 101 of 465

ADD-53

Case 1:19-cv-11711-LJL    Document 65    Filed 11/09/20    Page 11 of 30

which makes a false or misleading representation in an advertisement to attract customers can be relieved of liability for that deceptive act under Section 349 by a disclosure made to that same consumer only later in the business's terms of service, much less that it can be relieved of liability where the terms of service do not directly dispel the false impression created by the advertisement.

## II.    Puffery

Defendant next argues that its statement that the library was "ever-growing" constituted non-actionable puffery.  Under the NYGBL, "[p]uffery is defined as exaggerated general statements that make no specific claims on which consumers could rely."  *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 528 n.14 (S.D.N.Y. 2003).  Puffery "is a subjective statement or claim that cannot be proven true or false."  *Davis v. Avvo, Inc.*, 345 F. Supp. 3d 534, 541 (S.D.N.Y. 2018); *see Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 159 (2d Cir. 2007) (holding that a claim is puffery when it consists of "subjective claims about products, which cannot be proven either true or false").  "Puffery is not actionable under sections 349 and 350."  *In re Scotts EZ Seed Litig.*, 2013 WL 2303727, at *11 (S.D.N.Y. May 22, 2013).

Plaintiffs respond that the "ever-growing" statement was not mere puffery.  Dkt. No. 36 at 8.  According to Plaintiffs, the statements were not vague claims nor "unvarnished bluster." *Id*.  Peloton's promise that the class library would be "ever-growing" was not an opinion, nor was it vague and non-specific.  It did not necessarily mean that all the classes available at any particular time would remain available at a future time or prevent Peloton from removing a specific class or group of classes.  But it was nonetheless a measurable claim, promising that the class library in aggregate would continue to grow.  Because the promises of an "ever-growing" library were objective, testable statements, they are therefore actionable.

Defendant's promise that its library of courses was "ever-growing" was not mere puffery.

ADD-54

"Puffery includes generalized or exaggerated statements which a reasonable consumer would not interpret as a factual claim upon which he could rely." *Lugones v. Pete and Gerry's Organic, LLC*, 440 F. Supp. 3d 226, 240 (S.D.N.Y. 2020) (quoting *Kommer v. Ford Motor Co.*, 2017 WL 3251598, at *3 (N.D.N.Y. July 28, 2017)). It can also include "an exaggeration or overstatement expressed in broad, vague, and commendatory language, as distinguished from misdescriptions or false representations of specific characteristics of a product." *Id.* On the other hand, representations that make a "factual claim" or that make a "concrete representation[]" are not puffery. *Id.* at 241.

In *Lugones*, for instance, a court in this District held that defendant's advertising that used the expressions "WE LOVE OUR HENS, YOU'LL LOVE OUR EGGS," and "BETTER LIVES FOR HENS MEAN BETTER EGGS FOR YOU" were "paradigmatic examples of puffery." *Id.* On the other hand, the same defendant's statement that "[o]ur hens can peck, perch, and play on plenty of green grass," was not puffery, because it made a "factual claim . . . upon which a reasonable consumer could rely." *Id.* at 241-42. Similarly, in *In re Scotts EZ Seed Litigation*, the court determined that the defendant's representations that its product was "WaterSmart"; "Drought tolerant"; "GrowsAnywhere! Guaranteed!"; "Makes the Most of Every Drop"; and "Grows in Tough Conditions! Guaranteed!" were non-actionable puffery, because all of them were "generalized or vague, and thus 'should not have been relied upon as an inducement to purchase'" the product. 2013 WL 2303727, at *7 (S.D.N.Y. May 22, 2013) (quoting *Nigro v. Lee*, 882 N.Y.S.2d 346, 347 (3d Dep't 2009)). On the other hand, the court determined that defendant's representations that "EZ Seed grows grass 50% thicker with half the water compared to ordinary seed" and that "EZ Seed is developed to thrive in virtually every condition—harsh sun, dense shade, and even spreads to repair wear and tear" were not puffery

12

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 103 of 465
Case 1:19-cv-11711-LGS    Document 55    Filed 09/02/25    Page 103 of 465

ADD-55

because they made a promise that the product would "perform in specific measurable ways." *Id*;

*see also*, *In re Ford Fusion & C-MAX Fuel Econ. Litig.*, 2017 WL 3142078, at *10 (S.D.N.Y.

July 24, 2017) (holding that claim of better gas mileage was not puffery because it was not a

"subjective claim which cannot be proved either true or false, nor is it a vague statement of a

product's superiority."); *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 457

(S.D.N.Y. 2017) (holding that claims discussing vehicles' "world class engineering" and

"advanced safety and security features," not puffery because they could be "objectively

measured").

On its face and accepting the allegations of the complaint as true, the statement that

Peloton's library was "ever-growing" is an objective, factual statement.  A reasonable consumer

could understand it to mean that the library would "become larger or greater over a period of

time" or "increase."  That statement is factual and quantifiable and testable.  The library either

increased in size or it shrunk.  Thus, Peloton's statements do not constitute puffery as a matter of

law.

### III.    Deceptive or Misleading

Next, Defendant argues that the term "ever-growing" is not deceptive or misleading.  In

order to state a claim under NYGBL Sections 349 and 350, a plaintiff must plead that the

defendant's statements were "likely to mislead a reasonable consumer acting reasonably under

the circumstances."  *Michelo v. Nat'l Collegiate Student Loan Tr. 2007-2*, 419 F. Supp. 3d 668,

701 (S.D.N.Y. 2019) (quoting *Oswego*, 85 N.Y.2d at 26 (1995)).  Although a court may make

this determination as a matter of law, *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir.

2013), "[o]rdinarily, the question of whether a business practice is deceptive is a question of fact

not appropriately resolved on a motion to dismiss."  *Hertz Corp. v. Accenture LLP*, 2019 WL

5537997, at *4 (S.D.N.Y. Oct. 25, 2019); *see also Webra v. Cree, Inc.*, 2020 WL 1322887, at *8

(S.D.N.Y. Mar. 20, 2020) (holding that a determination whether allegedly misleading statements were truthful was "not appropriate at this early stage of the proceedings, before the parties have had an opportunity to conduct discovery and assess the veracity of defendant's statements"); *Lugones*, 2020 WL 871521, at *9 (S.D.N.Y. Feb. 21, 2020) ("There is significant authority supporting the idea that it is inappropriate for a court to decide whether a reasonable consumer could be misled at the Rule 12(b)(6) stage").

Defendant insists that, the removal of over half of its classes notwithstanding, its library is, in fact, "ever-growing." Dkt. No. 30 at 14-15. It argues that it never made any guarantee that "its content library would maintain any specific size or would offer Plaintiffs access to every class ever provided by Peloton." *Id*. at 15. Instead, the statement that the library is "ever-growing" was merely a representation that it consistently added new content to its content library. It was not, according to Defendant, a representation about the aggregate size of the library. Defendant avers that it continues to add new content constantly, producing nearly 24 hours of live content per day. Dkt. No. 15 at 15. Thus, the amount of content is always growing because new content is always being added, even if the total size of the overall content library decreases. *Id*. at 16.

The Court concludes that the Complaint sufficiently alleges a deceptive or misleading act and advertisement. On a motion to dismiss, the Court considers whether the complaint plausibly alleges that a reasonable consumer would ascribe the meaning that plaintiffs allege they ascribed to it. *See Rivera*, 2020 WL 4895698, at *8 (S.D.N.Y. Aug. 19, 2020) (holding that dismissal under 12(b)(6) was not appropriate where the Court could not conclude "as a matter of law, that [defendant's] language would *not* be misleading to a reasonable consumer."). Where a representation is capable of two possible reasonable interpretations, the misleading one should

ADD-57

not be rejected simply because there is an alternative, non-misleading interpretation.  *See Kacocha v. Nestle Purina Petcare Co.*, 2016 WL 4367991, at *14 (S.D.N.Y. Aug. 12, 2016) ("[A]mple case law exists allowing § 349 claims over allegedly deceptively labeled consumer goods to progress beyond the motion-to-dismiss stage, largely based on the view that the question of what might deceive the reasonable consumer is a question of fact.").

Plaintiffs forcefully and persuasively argue that a statement that a library is "ever-growing" is not tantamount to a claim that the library is ever-changing.  A consumer attracted to a grocery store by its advertisement of a growing selection of foodstuffs would be surprised to learn on each visit that the number of products on sale was decreasing, although the store was replacing the items it removed with a smaller number of new products.  The same, as alleged, for a purchaser of Peloton products.  The plain meaning of "ever-growing" is "always increasing or expanding in size."  Dkt. No. 36 at 11.  Even if Peloton did add new content every day, it would "not be accurate to describe a library with more than 10,000 classes on one day and less than 4,500 the next as "growing."  *Id*.  The Oxford English Dictionary defines "ever-growing" as "[t]hat grows continually; constantly increasing."  *Ever-growing*, *Oxford English Dictionary* (2d ed. 1989).  Miriam-Webster defines growing as "increasing in size or amount."  *Growing*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2014).  Its antonym is "shrinking."  *Grow*, *Oxford American Writer's Thesaurus* (3d ed. 2012).  A reasonable consumer thus would not understand as a matter of law when he or she purchased the Peloton product based on the representation that the library was ever-growing that the library was shrinking in size at the same time Peloton was adding new classes.  The motion to dismiss is denied.

**IV.    Causation**

Defendant argues that Plaintiffs have failed to plead causation.  According to Defendant, Plaintiffs failed to allege that Peloton's "ever-growing" statement or its alleged failure to disclose

15

ADD-58

the class removals in advance caused them any injury.  This is so, Defendant argues, because Plaintiffs nowhere plead that they ever saw an advertisement featuring the "ever-growing" statement.  Dkt. No. 30 at 16.  Instead, Defendant reasons, Plaintiff state the "inadequate, bare legal conclusion that they 'relied on Peloton's uniform representations about its 'ever-growing' on-demand library of fitness classes' prior to purchasing Peloton's products."  *Id.* (quoting Compl. ¶¶ 24-26).  According to Defendant, this allegation of reliance is not sufficient to plead the causation necessary to support a claim under Section 349 or Section 350, because Plaintiffs would have to allege that they saw the advertisements in order properly to plead causation under either Section 349 or Section 350.

Defendant draws some support from the district court opinion in *Goldemberg*.  There, in ruling on a motion to dismiss for failure to plead causation, the court stated that "to properly allege causation [under Section 349], a plaintiff must state in his complaint that he has seen the misleading statements of which he complaints before he came into possession of the products he purchased."  8 F. Supp. 3d at 480.  The court went on to observe that "if Plaintiff did not see the website and Facebook page beforehand, he could not have been injured by them."  *Id.*  Judge Román's dictum has been repeated in other decisions in this District and the Eastern District of New York.  *See, e.g.*, *Bustamante v. Atrium Medical Corp.*, 2020 WL 583745, at *3 (S.D.N.Y. Feb. 6, 2020); *Oden v. Boston Scientific Corp.*, 330 F. Supp. 3d 877, 902 (E.D.N.Y. 2018); *Stoltz v. Fage Dairy Processing Indus., S.A.*, 2015 WL 5579872, at *22 (E.D.N.Y. Sept. 22, 2015).

The proposition that a plaintiff must allege in her complaint that she saw a deceptive statement in order to allege that statement caused her injury, however, is not supported by the holding in *Goldemberg* and appears not to be a complete or correct statement of law.  The *Goldemberg* plaintiff himself did not specifically allege that he saw the allegedly misleading

ADD-59

advertisement.  Instead, he alleged that he "relied" on the defendant's representations that its

products were "natural."  8 F. Supp. at 472.  The court held that the allegation was sufficient to

state a claim under Section 349, because it was reasonable to infer from plaintiff's allegation that

"Defendant's false, misleading, and deceptive misrepresentations and omissions, as described

herein . . . have already deceived and misled Plaintiff," and that "Plaintiff saw the . . . website

and Facebook page described previously in the Complaint, and was thus deceived into

purchasing the products in question."  *Id*. at 480.

Other cases quoting the *Goldemberg* dictum also have concluded that a complaint can

state a claim under Section 349 without specifically stating that the plaintiff saw the misleading

statements.  *See, e.g.*, *Cummings v. FCA US LLC*, 201 F. Supp. 3d 288, 306 (N.D.N.Y. 2019)

(holding that an allegation that a plaintiff purchased a class vehicle based on the defendant's

representations "plausibly suggests that Plaintiff saw at least these particular statements before

purchasing the Class Vehicle."); *Dash v. Seagate Technology (U.S.) Holdings, Inc.*, 27 F. Supp.

3d 357, 361 (E.D.N.Y. 2014) ("Plaintiff describes in detail the allegedly misleading and

deceptive statements contained on the Drive's packaging upon which he relied in purchasing the

product.  The reasonable inference to be drawn from such allegation is that Plaintiff saw the

misleading statements and, as a result of such, purchased the Drive at issue.  Accordingly,

causation is sufficiently pled.").

Indeed, while *Goldemberg* cites to the Appellate Division's decision in *Gale v.*

*International Business Machines Corp.*, 781 N.Y.S.2d 45 (2d Dep't 2004) for the proposition

that the complaint must state that the plaintiff saw the misleading advertisement to state a claim

under Section 349, the authority to which the *Gale* court cites does not support its statement.  In

*Pelman ex. rel. Pelman v. McDonald's Corp.*, the defendant attempted to argue that claims the

ADD-60

plaintiffs brought under Sections 349 and 350 had to be dismissed because the plaintiffs did not allege that they saw the advertisements described in their complaint. 2003 WL 22052778, at *7 (S.D.N.Y. Sept. 3, 2003). The court held that the plaintiffs did not need to allege reliance on the defendant's deceptive claims in the context of a claim under Section 349, making the holding for which it was cited in *Gale* inapposite. The court did hold that reliance was required for a Section 350 claim, but that holding was later reversed in a separate case by the New York Court of Appeals. *See Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 676 (N.Y. 2012) ("To the extent that the Appellate Division order imposed a reliance requirement on General Business Law §§ 349 and 350 claims, it was error. Justifiable reliance by the plaintiff is not an element of the statutory claim.").

The conclusion that a plaintiff need not state explicitly in her complaint that she saw the misleading advertisement is consistent with *Twombly/Iqbal* and the Second Circuit's holding in *Pelman ex rel. Pelman v. McDonald's Corp.*, that Section 349 claims are subject only to the "bare-bones notice-pleading requirements of Rule 8(a)" and not "the pleading-with-particularity requirements of Rule 9(b)." 396 F.3d 508, 511 (2d Cir. 2005). Reliance is not an element of a private cause of action under either statute which on their face requires only proof that the plaintiff "has been injured by reason of [a] violation of this section." N.Y. Gen. Bus L. § 349(h); *see Stutman v. Chemical Bank*, 731 N.E.2d 608, 612 (N.Y. 2000) ("[A]s we have repeatedly stated, reliance is not an element of a section 349 claim."); *Oswego*, 647 N.E.2d at 745 (N.Y. 1995) (Section 349 "does not require proof of justifiable reliance."); *see also Gale*, 781 N.Y.S.2d at 46 (2d Dep't 2004) ("Reliance is not an element of a claim under General Business Law § 349."); *Pelman*, 2003 WL 22052778, at *7 (S.D.N.Y. Dec. 3, 2003) ("[I]t is not necessary to allege reliance on defendant's deceptive practices in the context of a § 349 claim."). It thus

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 109 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 109 of 465

ADD-61

follows that an allegation that the defendant was injured because she relied on the misleading

statement to her detriment is not a "[t]hreadbare recital[] of the elements of a cause of action."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  It is an allegation of fact as to how she came to be

injured that—if proven—supports the establishment of that element.  While an allegation that the

plaintiff saw the misleading advertisement is sufficient to plead the "by reason of" requirement,

it is not necessary.  The manner in which the plaintiff came to rely upon the deceptive act—and

whether it can be proved—is a further issue of proof and not something that needs to be pleaded

in detail for a complaint to proceed.

Following the New York Court of Appeals decision in *Koch*, the same conclusion applies

to claims under Section 350.  *See Koch*, 967 N.E.2d at 676.  Plaintiffs have reproduced an

example of one of Peloton's advertisements in their Complaint.  Compl. at ¶¶ 60-61.  They have

also alleged that they relied upon the "ever-growing" representation in purchasing their Peloton

products and subscriptions.  Compl. at ¶¶ 24-26.  The allegation that they relied on Peloton's

representations coupled with the advertisement is sufficient to support an inference that they

were injured by reason of the false claims in the advertisements.  *See Cummings v. FCA US LLC*,

201 F. Supp. 3d 288, 306 (N.D.N.Y. 2019) (holding that an allegation that a plaintiff purchased a

class vehicle based on certain of the defendant's representations "plausibly suggests that Plaintiff

saw at least these particular statements before purchasing the Class Vehicle.").  Nothing more is

required.

## V.    Injury

Defendant argues that Plaintiffs have failed to allege adequately that they were injured as

a result of Defendant's deceptive practices.  It argues that a barebones allegation that the

Plaintiffs would not have purchased Peloton Products had they known of the alleged

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 110 of 465
Case 1:19-cv-11711-LGS    Document 356    Filed 09/02/25    Page 110 of 465

ADD-62

Case 1:19-cv-11711-LJL    Document 65    Filed 11/09/20    Page 20 of 30

misrepresentation is legally insufficient to permit a complaint to go forward.  Dkt. No. 36 at 1;

Dkt No. 41 at 12.  Defendant also argues that Plaintiffs cannot plausibly allege paid more for

Peloton products than they would have paid had the misrepresentation not been made and had

they known the Peloton library was not "ever-growing."  It states that, because all Peloton

members pay the same flat fee to access Peloton's content library, there is "no basis to claim

there is or was ever a "premium" or extra amount charged or paid for the classes Peloton

ultimately removed from the content library," Dkt. No. 30 at 17, and that there were no "lower

value options that offer a comparable number and quality of classes" because "Peloton is a

unique company offering unparalleled products and classes."  Dkt No. 41 at 13.

        Under Sections 349 and 350, plaintiffs must show that they were "injured as a result of

the deceptive practice, act or advertisement."  *Pelman*, 237 F. Supp. 2d at 525.  "An actual injury

claim under [s]ection 349 typically requires a plaintiff to allege that, on account of a materially

misleading practice, she purchased a product and did not receive the full value of her purchase."

*Gerber*, 262 F. Supp. 3d at 68 (quoting *Izquierdo v. Mondelez Int'l, Inc.*, 2016 WL 6459832, at

*7 (S.D.N.Y. Oct. 26, 2016)).  "This prong may be satisfied through an allegation that a plaintiff

overpaid for the product, or, stated differently, 'by a claim that a plaintiff paid a premium for a

product based on [the] defendants' inaccurate representations.'"  *Id*. (quoting *Ackerman v. Coca-

Cola Co.*, 2010 WL 2925955, at *23)).  *See also Belcastro v. Burberry Ltd.*, 2017 WL 744596, at

*3 (S.D.N.Y. Feb. 23, 2017) (holding that an injury "may be shown by allegations that the

plaintiff paid a 'price premium' because of the defendant's misrepresentation or by allegations

that the plaintiff did not receive the product for which he bargained"); *Weisblum v. Prophase

Labs, Inc.*, 88 F. Supp. 3d 283, 292 (S.D.N.Y. 2015) (holding that a claim that "plaintiff paid a

premium for a product based on defendants' inaccurate representations" could go forward);

ADD-63

*Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 288-89 (S.D.N.Y. 2014) (finding a sufficiently pleaded Section 349 injury where a plaintiff alleged that he would not have paid the price charged for fat-free milk had he known it contained fat); *Ebin v. Kangadis Food Inc.*, 2013 WL 6504547, at *4-*5 (S.D.N.Y. Dec. 11, 2013) (denying a motion to dismiss where the plaintiffs argued they had paid a premium for "100% Pure Olive Oil" that actually contained "olive-pomace oil"); *Jernow v. Wendy's Intern., Inc.*, 2007 WL 4116241, at *3 (S.D.N.Y. Nov. 15, 2007) ("Under New York law, a premium could constitute an actual injury compensable under Section 349").

Plaintiffs have pled enough to satisfy the *Twombly/Iqbal* standards.  *See Pelman*, 396 F.3d at 511 (claims under NYGBL 349 and 350 are subject only to the notice pleading requirements of Rule 8).  The Complaint alleges that "Plaintiffs attributed value to Peloton's promises regarding the nature and characteristics of its on-demand digital library and would not have purchased the hardware and corresponding Peloton Membership, or would not have purchased it on the same terms, if they knew the truth."  Compl. ¶ 28.  No more is necessary at this stage.

Defendant's reliance on *Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892 (N.Y. 1999) and *In re Target Corp. Customer Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154 (D. Minn. 2014), is unavailing.  *Small* does not stand for the broad proposition that it is legally insufficient for a plaintiff in federal court to plead that it would not have purchased the subject product had it known that defendant's claims were misrepresentations.  The *Small* plaintiffs alleged that cigarette manufacturers misrepresented the addictive qualities of their cigarettes but eschewed any claim that they were injured by addiction; they "abandoned the addiction component of the legal theory of their cases."  720 N.E.2d at 621.  Finding that "addiction [was] inescapably the

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 112 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 112 of 465

ADD-64

Case 1:19-cv-11711-LJL    Document 65    Filed 11/09/20    Page 22 of 30

cornerstone of plaintiffs' legal claims," the New York Court of Appeals concluded that, in the

absence of any allegation that they were harmed by the addictive quality of the cigarettes (*i.e.*,

the subject of the misrepresentation), plaintiffs had no plausible theory that they were injured by

the misrepresentations regarding addiction.  *Id.*

In *Target Corp.*, after sustaining consumer protection claims, the court dismissed in part a

claim for unjust enrichment based on an overcharge theory.  Plaintiffs there were the victims of a

massive data breach caused by defendant's failure to maintain adequate data security as had been

represented.  66 F. Supp. 3d at 1168.  They claimed that defendant was unjustly enriched by its

misrepresentation in two respects: First, plaintiffs paid a premium to defendants for adequate

data security they never received; and second, plaintiffs agreed to shop at defendant's stores and

pay it money for goods they never would have purchased had they known of the

misrepresentation.  The court held that the first theory was factually implausible.  "Target

charged all shoppers the same price for the goods they buy whether the customer pays with a

credit card, debit card, or cash." *Id.* at 1178.  However, only the credit- and debit-card customers

were offered data security; data security is irrelevant for a cash customer.  *Id.*  Accordingly, on

the facts there, the complaint made clear that no customers were charged or paid a premium for

data security.  *Id.*  At the same time, however, the court permitted the complaint to go forward

and sustained the claim that Plaintiff adequately pled injury based on the allegation that they

would not have shopped at Target but for the misrepresentation.  It is not entirely clear that

*Target*'s holding on the law of unjust enrichment, which looks to the benefit a defendant

accrued, applies to a claim of injury under New York's General Business Law, which looks to

the harm to a plaintiff.

Neither case supports Defendant's claim here that the case should be dismissed for failure

to state a claim.  Unlike in *Small*, in this case, Plaintiffs do allege that they were injured by the

misrepresentation—they had access to a smaller number of classes than they reasonably believed

they would have access to at the time of purchase.  Accordingly, there is a "connection between

the misrepresentation and . . . harm from, or failure of, the product."  720 N.E.2d at 898.  And, as

for *Target Corp.*, even assuming its reasoning applies to the New York General Business Law,

there is no comparator group of consumers alleged here who paid the same price for Peloton's

products and received the ever-growing library that was represented.  The injury is alleged to

have been suffered equally and across-the-board.  Thus, while it may be that at the proof stage

Plaintiffs will face challenges establishing either of their theories of injuries, they have alleged

enough at this stage to "raise a reasonable expectation that discovery will reveal evidence"

supporting their claim.  *Twombly*, 550 U.S. at 556 (2007); *accord Mattrix Initiatives, Inc. v.

Siracusano*, 563 U.S. 27, 46 (2011).[1]

---

[1] The other cases cited by Defendant are similarly unavailing.  Like *Target*, *In re Sci.
Applications Int'l Corp. (SAIC) Backup Tap Data Theft Litig.*, 45 F. Supp. 3d 14 (D.D.C. 2014)
concerned a data breach.  Plaintiffs alleged that they had forfeited the value of their insurance
premiums, which should have been used to pay for better security.  *Id*. at 30.  The court held that
plaintiffs' claims were not sufficient to support the injury-in-fact requirement for Article III
standing, because the "claim that some indeterminate part of their premiums went toward paying
for security measures . . . [was] too flimsy to support standing."  *Id*.  The Court concluded that
the "Plaintiffs [had] not alleged facts that show that the market value of their insurance coverage
(plus security services) was somehow less than what they paid."  *Id*.  Here, Plaintiffs have at
least alleged that they did not receive a service for which they paid.  The same is true of *Carlsen
v. Gamestop, Inc.*, 112 F. Supp. 3d 855 (D. Minn. 2015).  There, a plaintiff subscriber to a
website that provided news about the video game industry sued, alleging that the website had
shared his personally identifiable information with a third party website.  The plaintiff alleged
that he had overpaid for his subscription, because he would not have paid as much had he known
his information would have been shared.  *Id*. at 861.  As in *SAIC*, the court found that the
plaintiff had not alleged an injury, because he had not adequately described "the value that [he]
did not receive."  *Id*. at 863.  "There was no identified or identifiable injury like lost dollars due
to a recalled product or an identifiably less valuable product like a hybrid product."  *Id*. at 864.
This holding is not applicable to the instant case, because Plaintiffs here have identified
something they paid for that was less valuable that what was warranted.

23

VI.    **Statutory Standing**

Finally, Defendant argues that Plaintiffs have failed to plead statutory standing under the NYGBL for Plaintiff Alicia Pearlman.  Peloton argues that Pearlman, a resident of Michigan, makes insufficient allegations to invoke the protections of New York's consumer protection law. It argues that the only two territorial allegations Pearlman makes about New York are that (1) Peloton's principal place of business is in New York and (2) Peloton's Terms of Service select New York law to govern and New York as the forum for dispute resolution, and provide that all notices must be sent to New York offices.  Compl. ¶¶ 93-119.  These allegations, it contends, are insufficient to support the application of Sections 349 and 350.  For their part, Plaintiffs do not dispute the limitations of their territorial allegations but argue that from the facts pleaded, the Court can infer that the underlying transaction giving rise to Pearlman's claim occurred in New York.

The text of Sections 349 of the NYGBL reflects that the statute has a territorial limitation. It declares: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."  N.Y. Gen. Bus. Law § 349.  Section 350 likewise states that: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."  *Id*. § 350.

In *Goshen*, the New York Court of Appeals considered the application of Sections 349 and 350 to claims brought by out-of-state plaintiffs.  774 N.E.2d at 1193.  The case decided two consolidated actions.  *Id.*  One was brought by a Florida resident who purchased an insurance policy from a New York-domiciled corporation, Metropolitan Life Insurance, in Florida.  *Id*. at 1193-94.  The second was brought by a mix of plaintiffs, including out-of-state plaintiffs, who alleged that a digital subscriber line internet service with its primary place of business in New

York had deceptively exaggerated the speed of its internet services in its advertising. *Id*. at 1194. In both cases, plaintiffs claimed that the deceptive acts and false advertising that deceived them originated in New York and that the deceptive scheme was "hatched" in New York. *Id*. at 1195.

The court held that such allegations by an out-of-state plaintiff were insufficient to give rise to statutory standing to bring a claim under New York's consumer protection statutes—hatching or originating a misleading marketing campaign in the state even when the defendant was a New York resident did not "in and of itself constitute an actionable deceptive act or practice under the statute." *Id*. The court reached that conclusion from the language of the statutes which referred to deceptive acts or false advertising "in the conduct of any business, trade or commerce, or in the furnishing of any service" in New York; the language "in this state" referred to the conduct of business, trade or commerce or the furnishing of services in New York. *Id*. The court also reasoned that "[t]o apply the statute to out-of-state transactions . . . would lead to an unwarranted expansive reading of the statute, contrary to legislative intent, and potentially leading to nationwide, if not global application of General Business Law § 349." *Id*. at 1196. It expressed concern that the application of the statute to out-of-state transactions "would tread on the ability of other states to regulate their own markets and enforce consumer protection laws." *Id*. It thus held that the intent of the statute was "to protect consumers in their transactions that take place in New York State." *Id*. Application of the statute did not turn on "the residency of the parties." *Id*. "It was not intended to police the out-of-state transactions of New York companies, nor was it intended to function as a per se bar to out-of-state plaintiffs' claims of deceptive acts leading to transactions within the state." *Id*. The court thus dismissed claims that Florida residents were misled by misrepresentations conveyed to them by a New York-domiciled corporation based on a misleading advertising campaign hatched in New York: the Florida

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 116 of 465
Case 1:19-cv-11711-LGS    Document 356    Filed 09/02/25    Page 116 of 465

ADD-68

Case 1:19-cv-11711-LJL    Document 65    Filed 11/09/20    Page 26 of 30

plaintiffs received the misleading information in Florida, made their purchases in Florida, and paid a premium in Florida.  Thus, "any deception took place in Florida."  *Id.*

Following *Goshen*, in *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115 (2d Cir. 2013), the Second Circuit resolved a split of authority that developed over the meaning and application of *Goshen*.  Specifically, courts divided over whether *Goshen* limited New York's consumer protection statutes to deceptions that occurred in New York or whether the application of the statutes depended on whether the underlying transaction giving rise to the claim took place in New York.  The court held that the appropriate test was not based on where the deception took place or "the residency of the parties" but on "the location of the transaction, and in particular the strength of New York's connection to the allegedly deceptive transaction."  *Cruz*, 720 F.3d at 122.

In *Cruz*, the plaintiff, a Virginia resident, alleged that the defendant FCDirectDealer, LLC ("FXDD"), which was headquartered in New York City, violated Sections 349 and 350 by failing to disclose in its promotional, marketing, and advertising materials the actual risks of participating in the foreign exchange market and several allegedly dishonest or deceptive practices in which it was engaged.  *Id.* at 119.  The court held that plaintiff alleged "a series of allegedly deceptive transactions that occurred in New York and that implicat[ed] the interests of New York" because: (1) FXDD was paid in New York; (2) it refused to disburse funds from customer accounts until it received a redemption form at its New York office; (3) it required all customer communications including objections to trades to be sent to its New York office; and (4) its contract specified that New York law would govern all disputes and that all disputes were to be adjudicated in New York courts.  *Id.* at 123-24.  The Second Circuit ruled that "[b]ased on these various alleged ties" the allegations were sufficient to show that "at this stage, 'some part

26

ADD-69

of the underlying transaction . . . occur[red] in New York State,' giving Cruz statutory standing

to sue for deceptive practices and false advertising under sections 349 and 350."  *Id.* at 124

(quoting *Mountz v. Global Vision Prods., Inc.*, 770 N.Y.S.2d 603, 608 (Sup. Ct. 2003)).

Measured against the standards of *Goshen* and *Cruz*, Pearlman's allegations are

insufficient to state a claim under Section 349 or Section 350.  The allegation that Peloton's

principal place of business is in New York is plainly insufficient on its own to support

application of New York's consumer protection laws.  The *Goshen* court held definitively that

application of the statutes did not turn on "the residency of the parties," 774 N.E.2d at 1196, and

the Second Circuit repeated that proposition in *Cruz*.  720 F.3d at 122.

Pearlman's claim is not appreciably assisted by the allegation that the Terms of Service

contain New York choice-of-law and choice-of-forum clauses and require notices to be sent to

Peloton's New York offices.  Parties include New York choice-of-law or choice-of-forum

clauses in their form contracts for all kinds of reasons, including New York's tradition of well-

developed commercial law and efficient commercial courts and because it is efficient for a

nationwide business to select a single law and a single forum that will apply to all of its

transactions, even those that occur outside of New York.  *See, e.g.*, *New York Law as the Gold

Standard Choice for Global Business Contracts*, 91 N.Y. State Bar J. 13, 14 (2019) ("The

substantive benefits to international and domestic business of New York law and New York

courts and arbitral tribunals have made it a common choice for business contracts around the

globe.").  The fact that Peloton, a New York-based corporation, chose New York law and a New

York forum to apply to all of its transactions thus does not give rise to a reasonable inference that

the transaction by which Pearlman, a Michigan resident, purchased a Peloton product occurred in

New York.  Nor, for similar reasons, does the notice provision support a claim.  That provision,

ADD-70

like the remainder of the dispute resolution clauses, applies only *after* a consumer has purchased a product. But there is no claim that Peloton has engaged in misleading practices in its dispute resolution and thus these clauses cannot alone give rise to an inference that the preceding transaction as to which an alleged fraud did take place occurred in New York.

*Cline v. TouchTunes Music Corp.*, 211 F. Supp. 3d 628 (S.D.N.Y. 2016), which both parties cite is directly on point. That case involved Section 349 and 350 claims by several separate sets of customers against a New York-based defendant engaged in the sale of music over a digital jukebox. Two sets of plaintiffs purchased the defendant's product through credit card transactions that they effected either through an App or by entering credit card information into the defendant's jukebox. The third set of plaintiffs paid cash in the state where the jukeboxes were located. The court held that Section 349 applied to the first two sets of plaintiffs. Id. at 633-35. The customer payments were processed in New York, the music servers were based in New York, and the TouchTunes Terms of Use Agreement provided that disputes between the user and defendants would be governed by the law of the state of New York and had to be brought in New York. That was sufficient to create a fair inference that the transaction occurred in New York. *Id*.

By contrast, the *TouchTunes* court held that the plaintiffs from Montana and North Dakota who made their purchases only in cash did not have an NYGBL claim even if it was assumed that the cash was mailed to New York "because the payment for services and collection of the cash takes place where the jukeboxes are located." *Id.* at 634. It is that holding that is dispositive here. The court held that the New York identity of "the ultimate recipient of the[] out-of-state payments, a governing law-choice of forum provision in a 'click-wrap' agreement on out-of-state electronic jukeboxes, and the location of [defendants'] servers [were not] legally

28

sufficient to make out a claim under either Section 349 or 350." *Id.* at 635.

The *TouchTunes* decision is consistent both with *Cruz*, where the court relied on the presence of a New York choice of law and a forum selection clause as only one of a group of "various alleged ties" and with other decisions in this District. *See 4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 547-48 (S.D.N.Y. 2014) ("[E]ven though choice-of-law and forum-selection provisions may be indicative of a transaction in New York when other factors are presents, the mere fact that parties agreed to be bound by New York law and to resolve their disputes in courts in New York does not, in itself, provide any indication as to where the transaction occurred.").

Pearlman does not allege that any part of her transaction took place in New York.  She does not allege that she purchased her Peloton product in New York, that she paid through an electronic or credit card transaction that was only accepted in New York, or even what product specifically she purchased.  Compl. ¶ 25. For these reasons, Pearlman's claims under the NYGBL are dismissed.

**CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss is GRANTED with respect to Plaintiff Alicia Pearlman.  Defendant's motion to dismiss is DENIED with respect to Plaintiff Eric Fishon.

The Clerk of Court is respectfully directed to close Dkt. No. 30.

SO ORDERED.

Dated: November 9, 2020
       New York, New York                              _____
                                                          LEWIS J. LIMAN

United States District Judge

ADD-73

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIC FISHON and ALICIA PEARLMAN, individually and on behalf of all others similarly situated, | Case No. 1:19-CV-11711-LJL |
| Plaintiffs, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| PELOTON INTERACTIVE, INC., | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiffs Eric Fishon and Alicia Pearlman (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (collectively, the "Class," as more fully defined below), bring this First Amended Class Action Complaint ("Complaint") against Defendant Peloton Interactive, Inc. ("Peloton" or "Defendant"). Plaintiffs make the following allegations upon personal knowledge as to their own acts, upon information and belief, and their attorneys' investigation as to all other matters, alleging as follows:

## I.    NATURE OF THE ACTION

1.    This action arises out of Peloton's misrepresentations and material omissions to Plaintiffs and the other Class members regarding the "ever-growing" size of its on-demand fitness class library and its impermissible and self-serving deletion of more than 50% of that library.

2.    Peloton is an exercise equipment and media company that was founded in 2012 and which is headquartered at 125 West 25th Street, New York, New York 10001. Peloton claims that it "is reinventing fitness with live & on-demand boutique studio classes you can take anytime

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 122 of 465
Case 1:19-cv-11711-LGS    Document 336    Filed 09/02/25    Page 122 of 465

ADD-74

Case 1:19-cv-11711-LJL    Document 81    Filed 01/21/21    Page 2 of 42

with the Peloton Bike, Peloton Tread & Peloton digital."[1]

3.    Peloton's main products are its luxury stationary bicycle ("Peloton Bike") and luxury treadmill ("Peloton Tread") (collectively, "hardware") that, through their built-in interactive touchscreens, allow users to watch live and pre-recorded (or "on-demand") fitness classes through a monthly subscription service, aiming to provide the experience of a live fitness class from the comfort of users' homes.  In addition, Peloton sells a subscription-only app known as Peloton Digital, which allows users without the Peloton hardware to access the live streaming and on-demand fitness library.

4.    Peloton's business initially started with its Peloton Bike, which offers live streaming and on-demand "spinning" classes from the comfort of consumers' homes.  "Spinning" classes are popular indoor cycling instruction classes, initially popularized in the mid-1990s, that consist of professional coaches providing real-time instruction, guidance, and encouragement to riders, over a soundtrack of popular and other songs.  Peloton has recently expanded this concept of interactive instructional fitness classes, over soundtracks of popular music, to Peloton Tread and other weightlifting, strength training, outdoor running, yoga, meditation, stretching, and cardio-fitness classes.

5.    Peloton markets and sells its subscription-based, on-demand fitness library for a monthly price of $39 to purchasers of the Peloton Bike and Peloton Tread ("Peloton Membership"), which, in addition to the live and on-demand classes, provides, among other features, advanced metrics and a live interactive leaderboard that allows users to compete against each other.  Subscribers to Peloton Digital pay a monthly price of $19.49 for access to Peloton's

---

[1] *See* https://twitter.com/onepeloton (last accessed Dec. 6, 2019).

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 123 of 465
Case 1:19-cv-11711-LGS    Document 356    Filed 09/02/25    Page 123 of 465

ADD-75

Case 1:19-cv-11711-LJL    Document 81    Filed 01/21/21    Page 3 of 42

live streaming and on-demand library (together, the "Subscription Service").[2]  The Subscription

Service's content is coextensive across all platforms and includes the same live and on-demand

bike, treadmill, free weight, yoga, and other fitness classes.

6.    On information and belief, all Peloton members must keep a credit card on file with

Peloton in order to access the Subscription Service.

7.    Peloton sees itself as a uniquely New York company.  Peloton's co-founder and

CEO, John Foley, stated that "New York City is where Peloton started, and it will continue to be

our home as we scale our business globally," while noting that New York City is where the best

talent can be found at the "intersection of fitness, technology and media[.]"[3]  Peloton's executive

offices, accounting and finance department, marketing departments, studios, content production,

and all of its other significant operations, including its banking operations, are headquartered or

otherwise based in New York.  In fact, New York is so central to Peloton's identity that, in its

uniform contract with members from around the world, it requires that New York law apply to all

aspects of those contractual relationships, to the exclusion of other states' laws.

8.    Any time a member purchases Peloton hardware, a Peloton Membership, Peloton

Digital, or the Subscription Service, that member's payment is routed to Peloton's bank accounts

in New York.

9.    These payments are recorded and managed by Peloton's Accounting and Finance

department, located at Peloton's New York headquarters.

10.    Upon information and belief, Peloton does not accept cash as a form of payment.

---

[2] *See* https://www.onepeloton.com/membership

[3] *See* https://www.prnewswire.com/news-releases/peloton-to-expand-nyc-footprint-with-new-corporate-headquarters-at-hudson-commons-in-2020-300752307.html

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 124 of 465
Case 1:19-cv-11711-LGS    Document 356    Filed 09/02/25    Page 124 of 465

ADD-76

Case 1:19-cv-11711-LJL   Document 81   Filed 01/21/21   Page 4 of 42

11.    In exchange, the member gets access to the classes recorded, produced, and issued from Peloton's New York studios located at 140 West 23rd Street, New York, New York  10011 and 152 Christopher Street, New York, New York 10014.  During the class period, Peloton's classes were filmed in New York.

12.    In order to acquire and retain members, Peloton purposefully and affirmatively engages in a variety of advertising and marketing campaigns originating from and/or approved by its Creative, Acquisition Marketing, Brand Marketing, and Retention Marketing departments, all located at Peloton's New York headquarters.

13.    In order to differentiate itself from other fitness companies that market and sell similar fitness hardware, in-studio workout classes, and instructional home workout media, Peloton's marketing departments aided in developing a campaign to promote access to an "ever-growing" digital library of fitness classes led by professional instructors, available on-demand 24 hours per day, 7 days per week, from the comfort of one's home, for a flat monthly subscription fee.  Approval for Peloton's "ever-growing library" representations occurred in New York, as well as, on information and belief, the formulation of Peloton's entire business model, including its "ever-growing" library.

14.    The purpose and effect of this marketing campaign is that Peloton members and prospective members choose Peloton over competing fitness products, at least in part, because of access to a constantly growing number of digital classes, helping to replicate the same experience of an in-person exercise studio where a class can never be the same twice.

15.    Peloton's "ever-growing" on-demand library is central to its marketing, because Peloton needs to ensure that customers spending thousands of dollars on the Peloton hardware and Peloton monthly workout class subscriptions will not run out of new classes over time and will

also be able to take and retake older classes.  The size of Peloton's on-demand digital library has always been, and continues to be, central to Peloton's marketing[4] because "the hardware is only as good as the app and subscription that comes with it."[5]

16.    The importance of Peloton's "ever-growing" on-demand library to its business model is demonstrated by the company's pre-IPO filing, classifying Peloton as a "technology," "media," and "software" company.[6]  John Foley, Peloton's CEO and co-founder, has described Peloton as a "media company akin to Netflix" with "*10,000 classes on-demand*" (emphasis added).[7]  The company also recently invested $45 million to build the "best digital television streaming studio in the world."[8]

17.    Peloton's website touted its "thousands of boutique classes," and "ever-growing library of live and on-demand studio classes."[9]  Its website likewise represented that its Subscription Service grants "unlimited access to a growing library of live streaming and on-demand classes, scenic rides, real-time performance tracking, and unlimited accounts for family and friends.  No classes offered by Peloton are off limits."[10]

---

[4] *See* https://onepeloton.com/bike/classes (last accessed Dec. 6, 2019).

[5] *See* https://www.forbes.com/sites/bizcarson/2019/09/26/peloton-ceo-john-foley-faces-the-skeptics-again-this-time-buyers-in-its-8-billion-ipo/#3b8f0f6f4349 (last accessed Dec. 6, 2019).

[6] *See* https://fortune.com/2019/09/25/peloton-ipo-filing-media-company/

[7] *See* https://www.bizjournals.com/newyork/news/2018/08/03/peloton-ceo-were-becoming-a-media-company.html (last accessed Dec. 6, 2019).

[8] *Id.*

[9] https://www.onepeloton.com/digital (as of Apr. 25, 2019); *see also* https://www.onepeloton.com/bike/classes ("Thousands of On-Demand Rides. Take a class anytime, with our daily-updated, extensive on-demand library"); *id.* ("Thousands of rides on-demand. Rider anytime with thousands of classes to choose from on-demand.") (last accessed Dec. 6, 2019).

[10] *See* https://support.onepeloton.com/hc/en-us/articles/201039338-Rides-included-with-the-Peloton-subscription.

18.    Music has been central to the Peloton class experience from the beginning.  Every on-demand and studio class includes a themed playlist curated by the instructor to match the tempo and intensity of the class.  Peloton recognizes that "[m]usic is an important element of the overall content that [it] make[s] available to [its] Members,"[11] and, in May 2017, Peloton introduced a new feature allowing members to find on-demand classes based on the type of music featured therein.[12]

19.    Peloton is a sophisticated software company that provides content protected by various intellectual property laws.  Peloton fully understands what the copyright laws require, having entered into sync licenses with certain other copyright holders, while, at the same time, using other musical works for free and without permission.[13]

20.    Peloton knew that it was, in part, building its on-demand library with copyrighted material for which it did not have the proper licenses.  Peloton thus knew or should have known that because it lacked the appropriate licenses for the music accompanying the classes in its on-demand digital library, its library cannot legitimately be "ever-growing" and was actually knowingly built, in material part, on an illegal foundation.

21.    In April 2018, Peloton received a cease-and-desist letter regarding its alleged copyright infringement of many songs appearing in classes in its on-demand class library.[14]

---

[11] SEC Form S-1 Registration Statement at 18, available at
https://www.sec.gov/Archives/edgar/data/1639825/000119312519230923/d738839ds1.htm

[12] *See Find Your Favorite Genres with Our Brand-New Music Filtering Feature*, Cadence (May 26, 2017), https://cadence.pelotoncycle.com/find-favorite-genres-brand-new-music-filtering-feature/1907/ (last accessed Dec. 6, 2019).

[13] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 90, ¶ 1 (S.D.N.Y. Sept. 27, 2019).

[14] Peloton's classes consist of coaches providing real-time instruction, guidance, and encouragement to riders, over a soundtrack of popular and other songs.

6

Notwithstanding being placed on notice of its alleged copyright infringement, Peloton continued to promise an "ever-growing" class library to consumers and to heavily market that fact to its customers and prospective customers as a key Peloton selling point.

22.    In March 2019, several members of the National Music Publishers Association ("NMPA") collectively filed a lawsuit against Peloton, seeking more than $150 million in damages, alleging that Peloton has been using their musical works for years in its workout videos without proper licensing, resulting in lost income for songwriters.  The lawsuit further alleged that "Peloton's infringement was and continues to be knowing and reckless" and that "Peloton fully understood what the copyright law required, having entered into sync licenses with certain other copyright holders, while trampling the rights of Plaintiffs by using their musical works for free and without permission."[15]

23.    Although Peloton denied that it was violating copyright laws and asserted counterclaims against the NMPA for antitrust violations and tortious interference with prospective business relations, on March 25, 2019, in the face of the NMPA's copyright infringement lawsuit, Peloton—for its own economic advantage and to the financial detriment of its customers— abruptly removed every class from its on-demand library that contained one or more of the allegedly copyright infringing songs.  In total, this resulted in the removal of more than half of the classes from its on-demand library.[16]

24.    The decision to remove the majority of Peloton's on-demand library was made in New York and effectuated in New York.

---

[15] See *Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 76, ¶ 1 (S.D.N.Y. Sept. 27, 2019).

[16] See *Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 31, Counterclaims ¶ 59 (S.D.N.Y. Apr. 30, 2019); *see also id.*, Counterclaims ¶¶ 10, 42, 46, 52, 57.

25.    Prior to March 25, 2019, Peloton's Subscription Service had more than 12,000 on-demand classes available to its users.  Following Peloton's self-serving decimation of its on-demand library from its New York headquarters, less than half of its on-demand classes remained available to users.[17]

26.    Peloton's abrupt removal of the infringing soundtracks led to the removal of an many thousands of classes, more than 50% of its on-demand digital library, thereby greatly reducing the on-demand options upon which Peloton bases so much of its marketing and uses as a differentiating factor to garner more customers.[18]

27.    The copyright infringement lawsuit and subsequent purge of Peloton's on-demand library has also significantly decreased the quality and quantity of popular music available on Peloton's workout class playlists, which has materially diminished users' experience with the hardware and Subscription Service.[19]  The infringing works include songs from popular artists such as Beyoncé, Michael Jackson, Madonna, Kanye West, Jay Z, Luke Bryan, and Justin Timberlake, to name a few.[20]  In addition to losing more than 50% of their on-demand classes, users have lamented that the workouts in the new classes (those without the removed songs) don't

---

[17] *See* https://imgur.com/XxdUOJn; *see also* https://docs.google.com/spreadsheets/d/1LAE9kDqxkj4CkZ7TzS7ce6g5cxkMUOMdDssxKWpS0ak/edit?usp=sharing.

[18] *See* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider (Mar. 27, 2019), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3

[19] *See* Natt Garun, *Peloton owners are pissed about bad music after copyright lawsuit*, The Verge (April 24, 2019, 1:47 p.m.), https://www.theverge.com/2019/4/24/18514036/peloton-music-copyright-fitness-studios-gym-on-demand-media-strategy; *see also* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider US (March 27, 2019), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3

[20] *See* Exhibit A: Non-Exhaustive List of Works Infringed by Peloton, by Publisher (Ex. 3).

"flow like they used to" and have struggled to "find a playlist with 50 percent decent songs" since Peloton's removal of the infringing works.[21]

28.    Peloton's CEO falsely promised subscribers to its Subscription Service that the removal of "classes" would "not affect your experience with (or the cost of) [Peloton's] service, or access to the kind of music you're used to hearing behind [Peloton's] instructors in the thousands of classes in [Peloton's] library."[22]  That representation, however, is demonstrably false, and Peloton never disclosed to its subscribers, including Plaintiffs and the other Class members, that it would be removing over half of the classes from its on-demand library.

29.    The NMPA amended its complaint against Peloton alleging that it "found another 1,324 songs that have been streamed by Peloton instructors during classes without approval," which will likely result in Peloton's removal of additional classes from its on-demand library.[23] The NMPA then sought over $300 million in damages for Peloton's knowing, widespread copyright infringement.[24]  Peloton later settled the lawsuit.[25]

30.    Despite being put on actual notice as early as April 9, 2018 that it was using infringing songs to build its digital library, Peloton's website continued to market "an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors."[26]  It

---

[21] *See* Natt Garun, *Peloton owners are pissed about bad music after copyright lawsuit*, The Verge (April 24, 2019), https://www.theverge.com/2019/4/24/18514036/peloton-music-copyright-fitness-studios-gym-on-demand-media-strategy.

[22] *See* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider (Mar. 27, 2019), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3

[23] *See* https://observer.com/2019/09/peloton-music-licensing-lawsuit-ipo/

[24] If Peloton removes additional classes from its on-demand library due to the expanded scope of the infringement allegations, the class alleged herein will increase commensurately.

[25] *See* https://www.prnewswire.com/news-releases/nmpa-and-peloton-announce-settlement-of-litigation-joint-collaboration-agreement-301012233.html

[26] *See* https://www.onepeloton.ca/app (last accessed Dec. 6, 2019).

also notifies consumers during the purchasing process that its "Bike packages" require a monthly Peloton Membership,[27] which includes "unlimited access to a growing library of live streaming and on-demand Peloton classes."[28]

31.     As part of Plaintiffs' and the other Class members' Peloton subscriptions, they expected and were entitled to use a substantial, on-demand class library that would continue to grow, as Peloton repeatedly represented.  Yet, when Peloton accepted (and continues to accept) Plaintiffs' and the other Class members' subscription payments, Peloton knew or should have known that Plaintiffs and the other Class members would not be able to use the full on-demand class library because the number of on-demand classes was materially decreasing due to Peloton's wrongful conduct.

32.     Nonetheless, Peloton misrepresented and/or omitted that information from Plaintiffs and the other Class members, continued to represent to existing and potential subscribers that its on-demand digital library would be "ever-growing," and continued to charge full price for its Subscription Service, despite knowing that its subscribers would necessarily not be receiving everything that Peloton represented they would receive.

33.     In a November 19, 2018 press release—months after Peloton received the cease and desist letter from the NMPA—Peloton represented that "Peloton produces nearly 24 hours of live content per day from its Peloton Bike and Peloton Tread Studios in NYC, ***and has more than 10,000 live and on-demand instructor-led indoor cycling, running, bootcamp, yoga and stretching classes for its Peloton Bike, Peloton Tread and Peloton Digital platforms.***  To date, Peloton has nearly one million Members, comprising Peloton Bike and Peloton Tread owners, iOS

---

[27] *See* https://www.onepeloton.com/shop/bike (last accessed Dec. 6, 2019).

[28] *See* https://www.onepeloton.com/shop/bike/subscription (last accessed Dec. 6, 2019).

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 131 of 465
Case 1:19-cv-11711-LGS    Document 558    Filed 09/02/25    Page 131 of 465

ADD-83

Case 1:19-cv-11711-LJL    Document 81    Filed 01/21/21    Page 11 of 42

app users and in-studio riders, and expects to add millions more in the coming years." (emphasis added).[29]

34.    By misrepresenting that its on-demand digital library would be "ever-growing" and failing to disclose the imminent removal of over half of its on-demand library, Peloton—from and through its New York headquarters—entered into contractual relationships with Plaintiffs and the other Class members, engaged in financial transactions and accepted payments from Plaintiffs and the other Class members, and defrauded Plaintiffs and the other Class members, depriving them of the benefit of their bargain with Peloton, and/or unjustly enriching itself at Plaintiffs' and the other Class members' expense, as a result of Peloton's wrongful conduct alleged herein.  Plaintiffs, individually and on behalf of the other Class members they seek to represent, seek monetary damages, statutory penalties, and injunctive relief, asserting claims for Peloton's violation of New York's consumer protection and false advertising statutes, N.Y. Gen. Bus. Law §§ 349 and 350, breach of contract, and unjust enrichment.

## II.    PARTIES

### A.    Plaintiffs

35.    Eric Fishon is a citizen of New York, residing in Suffolk County, New York. Plaintiff Fishon, relying on Peloton's uniform representations about its "ever-growing" on-demand library of fitness classes, entered into a transaction with New York-based Peloton, resulting in his purchase of a Peloton Bike and the Peloton Membership in January 2018, and a Peloton Tread in November 2018, and has paid all required hardware, software, and subscription fees relating thereto.

---

[29] See https://www.prnewswire.com/news-releases/peloton-to-expand-nyc-footprint-with-new-corporate-headquarters-at-hudson-commons-in-2020-300752307.html (last accessed Dec. 5, 2019).

36.    Eric Fishon's purchase of his Peloton membership was made electronically, as have all his monthly fee payments.

37.    Alicia Pearlman is a citizen of Michigan, residing in Oakland County, Michigan. Plaintiff Pearlman, relying on Peloton's uniform representations about its "ever-growing" on-demand library of fitness classes, entered into a transaction with New York-based Peloton, resulting in her purchase of Peloton's hardware and the Peloton Membership in November 2018, and has paid all required hardware, software, and subscription fees relating thereto.

38.    Alicia Pearlman's purchase of her Peloton membership was made electronically, as have all her monthly fee payments.

39.    Both Plaintiffs have continued to pay Peloton for subscription services since they acquired the Peloton hardware, and both Plaintiffs have continued to pay those services electronically with a credit card.

40.    Prior to purchasing the Peloton hardware and commencing payment for the Peloton Membership subscription, neither Peloton nor its agents or representatives informed Plaintiffs that Peloton had been accused of violating any laws or that more than 50% of its Subscription Service's on-demand digital library would be removed.

41.    Peloton's representations and material omissions regarding its on-demand library caused Plaintiffs to pay increased costs for the Peloton hardware and corresponding Peloton Membership, which was worth less than represented because Peloton's representations and/or omissions regarding its on-demand digital library were deceptive and misleading and constituted false advertising.

42.    Peloton's representations and material omissions were part of the basis of the bargain, in that Plaintiffs attributed value to Peloton's promises regarding the nature and

characteristics of its on-demand digital library and would not have purchased the hardware and corresponding Peloton Membership, or would not have purchased it on the same terms, if they knew the truth that Peloton's on-demand digital library would shrink by more than 50%.

**B.    Defendant**

43.    Peloton is a Delaware corporation, with its corporate headquarters and principal place of business located in New York City, New York.  Peloton is subject to the jurisdiction of this Court and may be served with process at its principal executive office located at 125 West 25th Street, 11th Floor, New York, New York.

44.    Peloton, from its New York headquarters, markets and sells its apparel, hardware accessories, hardware, and Subscription Service throughout the United States including in this District.  Peloton is registered with the New York State, Department of State to conduct business in New York.

45.    Peloton bills itself as "the largest interactive fitness platform in the world," claiming, as of September 30, 2020, to have more than 3.6 million members, and 2020 revenues of $1.8 billion.  Peloton is publicly-traded on NASDAQ ("PTON") and as of the date of this Complaint, had a market cap exceeding $44 billion.

**III.    JURISDICTION AND VENUE**

46.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action, there is minimal diversity, and the amount in controversy exceeds $5 million, exclusive of interest and costs.

47.    The Court has personal jurisdiction over Peloton because it resides and is subject to general jurisdiction in this District.  The Court also has personal jurisdiction over Peloton, because it markets, distributes, and sells its apparel, hardware, accessories, and Subscription Service throughout the United States, including in this District, and the conduct complained of

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 134 of 465
Case 1:19-cv-11711-LGS    Document 356    Filed 09/02/25    Page 134 of 465

ADD-86

Case 1:19-cv-11711-LJL    Document 81    Filed 01/21/21    Page 14 of 42

occurred in or was targeted at this District. Additionally, Peloton's Terms of Service provides that all disputes not required to be arbitrated be adjudicated in New York, New York and are to be governed by New York law.[30]

48.    Venue is proper in this District, because Defendant resides in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. 28 U.S.C. § 1391(b)(1)-(2).

## IV.    PELOTON'S ARBITRATION CLAUSE

49.    Peloton categorically denies that it used infringing songs in its on-demand classes and that it continues to violate copyright laws.[31]  Notwithstanding its contention that that it has done nothing wrong, Peloton nonetheless chose to unilaterally gut its on-demand library for its own economic advantage and financial benefit to the material detriment of Plaintiffs and the other Class members.

50.    Peloton felt empowered to cheat Plaintiffs and the other Class members by gutting its on-demand library for its own commercial protection and advantage because its Terms of Service contains a highly restrictive arbitration clause that provides that "any dispute, claim or controversy arising out of or relating to these Terms or the breach, termination, enforcement, interpretation or validity thereof or the use of the Services or Content (collectively, 'Disputes') will be resolved **solely by binding arbitration**. . . ." (emphasis added).[32]  Peloton's Terms of Service in effect during the Class Period were drafted by its outside legal counsel, Fenwick & West LLP, in New York.

---

[30] *See* Peloton Terms of Service at 21-22 (Ex. 1).

[31] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 87, ¶ 1 (S.D.N.Y. Oct. 11, 2019).

[32] *See* Ex. 1 at 18.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 135 of 465
Case 1:19-cv-11711-LGS    Document 358    Filed 09/02/25    Page 135 of 465

ADD-87

Case 1:19-cv-11711-LJL    Document 81    Filed 01/21/21    Page 15 of 42

51.     Due to the empowerment from affirmatively stripping Plaintiffs and the other Class

members of their Seventh Amendment right to a jury trial and forcing them into secret, individual

arbitrations, Peloton believed that it could advantage itself at consumers' expense without material

legal consequences or exposure.  Pelton believed that very few, if any, of its customers would

pursue arbitration because it knows that claimants are "highly unlikely to slog through a protracted

arbitration process over a relatively low amount of money" and the "total number of consumer

claims resolved through arbitration across the entire economy in the third quarter of 2019 was

1,483—a new high but also a relatively small number in a nation of over 330 million."[33]

52.     Peloton did not anticipate, however, that, in the face of its misconduct, more than

2,700 customers would file arbitration demands arising out of its self-serving purge of its on-

demand library.

53.     Under the terms of Peloton's arbitration clause it was obligated to pay "all filing,

administration and arbitrator fees and expenses" associated with its customers' demands for

arbitration.[34]

54.     Peloton, however, faced with far more arbitration demands than it expected when

it instituted its anti-consumer arbitration clause, *refused to abide by the terms of its own arbitration

clause*, ignoring the American Arbitration Association's ("AAA") requirement—and Peloton's

contractually-mandated obligation to pay all filing costs—to pay filing fees for demands seeking

less than $10,000.

---

[33] *See* David Dayen, *Tech Companies Big Reveal: Hardly Anyone Files Arbitration Claims*, The
American Prospect (Nov. 26, 2019), https://prospect.org/power/tech-companies-hardly-anyone-files-
arbitration-claims/

[34] *See* Ex. 1 at 19-20.

55.     As a result, on November 14, 2019, AAA wrote a letter to Peloton, notifying it that AAA "decline[d] to proceed with administration of the parties' disputes" and that "either party may choose to submit its dispute to the appropriate court for resolution."[35]   Additionally, AAA notified Peloton that "AAA will decline to accept future consumer matters submitted  against or by [Peloton]" and requested that Peloton "remove AAA from its consumer arbitration agreements so that there is no confusion to Peloton's consumer customers."[36]

56.     As of the date of the initial filing of this action, Peloton had refused to comply with AAA's request to remove AAA from its arbitration agreements and it continued to represent to its customers that they were subject to binding arbitration with AAA in order to deter customers from filing lawsuits.

57.     The arbitration clause, and all provisions contained therein, is an inextricable part of Peloton's Terms of Service with Plaintiffs and the other Class members.  Accordingly, as a result of Peloton's failure to comply with the terms of its arbitration clause and AAA's Consumer Arbitration Rules, Peloton's arbitration clause, including its class action waiver provision and all other provisions, is invalid as to all its customers—including Plaintiffs and the other Class members.[37]

## V.    FACTUAL ALLEGATIONS

**A.    Peloton's "Ever-Growing" On-Demand Library Claim Is Essential To Its Business Model.**

58.     Peloton is an exercise equipment and media company that was founded in 2012. John Foley, its co-founder and CEO, describes Peloton as a "fitness platform" where "fitness meets

---

[35] *See* November 14, 2019 AAA Letter to Peloton (Ex. 2).

[36] *Id.*

[37] *See* Ex. 2.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 137 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 137 of 465

ADD-89

Case 1:19-cv-11711-LJL    Document 81    Filed 01/21/21    Page 17 of 42

technology, meets media."[38]  Peloton claims that it "is reinventing fitness with live & on-demand boutique studio classes you can take anytime with the Peloton Bike, Peloton Tread & Peloton digital."[39]

59.    As of September 2020, Peloton claimed to have more than 3.6 million members.[40] The company was valued at $4 billion after it closed a $550 million financing round in August 2018.[41]  In late August 2019, Peloton filed to go public and in its Initial Public Offering ("IPO") it roughly doubled its private market valuation, being valued at about $8 billion.[42]  Peloton's value has continued its exponential growth, with a current market cap exceeding $44 billion.

60.    Peloton's business initially started with its Peloton Bike, which offers live streaming and on-demand "spinning" classes from the comfort of consumers' homes.  "Spinning" classes are popular indoor cycling instruction classes, initially popularized in the mid-1990s, that consist of professional coaches providing real-time instruction, guidance, and encouragement to riders, over a soundtrack of popular and other songs.  Peloton has recently expanded this concept of interactive instructional fitness classes, over soundtracks of popular music, to Peloton Tread and other weightlifting, strength training, outdoor running, yoga, meditation, stretching, and cardio-fitness classes.

---

[38] *See*
http://media.licdn.com/embeds/media.html?src=https%3A%2F%2Fwww.youtube.com%2Fembed%2FFWXadxuOuSQ%3Ffeature%3Doembed&amp;url=https%3A%2F%2Fwww.youtube.com%2Fwatch%3Fv%3DFWXadxuOuSQ&amp;type=text%2Fhtml&amp;schema=youtube (last accessed Dec. 6, 2019).

[39] *See* https://twitter.com/onepeloton (last accessed Dec. 6, 2019).

[40] *See* https://investor.onepeloton.com/investor-relations (last accessed Jan. 7, 2021).

[41] *See* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider (Mar. 27, 2019, 10:30 a.m.), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3

[42] *See* Jeremy C. Owens, *Peloton IPO: 5 things to know about the interactive exercise-machine company*, Market Watch (Sept. 28, 2019), https://www.marketwatch.com/story/peloton-ipo-five-things-to-know-about-the-interactive-exercise-machine-company-2019-08-28

61.    In 2014, Peloton released its eponymous stationary exercise bike at a price of $2,245.  The bike includes a 22-inch interactive touchscreen, which allows riders to watch live or pre-recorded classes, aiming to provide the experience of a spin class from the comfort of the users' homes.

62.    In January 2018, Peloton announced the release of its treadmill known as "Tread" for $4,295.  Similar to its stationary bike, Tread has a 32-inch interactive touchscreen, which allows runners to watch live or pre-recorded classes led by professional trainers.

63.    For consumers who purchase Peloton's hardware, Peloton offers its Peloton Membership, which in addition to its live and on-demand fitness classes, includes Connected Fitness options such as instructor-curated training programs, live workout metrics, a detailed workout performance dashboard, and live and on-demand class interactive leaderboards.  Peloton Membership subscribers pay $39 per month for this service.  Peloton refers to customers that purchase the Peloton hardware and corresponding Peloton Membership as "Connected Fitness Subscribers."

64.    Recognizing the limited opportunity for growth due to a crowded market space and the high price point of its hardware, in July 2018 Peloton released Peloton Digital, which provides subscribers access to the same live and on-demand fitness classes without having to purchase the Peloton hardware.  Peloton Digital members pay $19.49 per month for this service.[43]

65.    On information and belief, both these subscription packages require electronic payment, with the proceeds deposited into Peloton's New York bank accounts.

---

[43] *See* https://www.bizjournals.com/newyork/news/2018/08/03/peloton-ceo-were-becoming-a-media-company.html (last accessed Dec. 6, 2019).

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 139 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 139 of 465

ADD-91

66.      Peloton Digital allows Peloton to market its Subscription Service to consumers who already have a (non-Peloton) treadmill or stationary bike as well as those who prefer to use Peloton's outdoor, free weight, yoga, and other fitness classes.  The content provided by the Peloton Membership and Peloton Digital subscriptions are coextensive and include the same live and on-demand fitness classes.[44]  Because the Peloton Digital app does not provide the Connected Fitness options and integrated experience that the Peloton hardware offers, the appeal of the Peloton Digital app is its "ever-growing" on-demand library of fitness classes.

67.      Demonstrating the importance of its "ever-growing" library of on-demand fitness classes to its business model, the company's pre-IPO filing classifies Peloton as a "media" company and John Foley, Peloton's CEO and co-founder, has described the company as a "media company akin to Netflix" with "10,000 classes on-demand" and the "best digital television streaming studio in the world."[45]

68.      Peloton differentiates itself and its more expensive fitness hardware from other fitness companies by offering unlimited access to its "ever-growing" on-demand library of professional fitness classes available at the users' convenience.

69.      The purpose of this representation is to induce consumers into purchasing Peloton products, believing they will have a constantly growing catalogue of digital classes to choose from for their exercise routines.

---

[44] *Id.*

[45] *Id.*

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 140 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 140 of 465

ADD-92

Case 1:19-cv-11711-LJL    Document 81    Filed 01/21/21    Page 20 of 42

70.    In its pre-IPO filings, Peloton claimed to have "disrupted the fitness industry by developing a first-of-its-kind subscription platform that seamlessly combines the best equipment, proprietary networked software, and world class streaming digital fitness and wellness content."[46]

71.    Peloton claims that 92% of its hardware ever sold still has an active Peloton Membership subscription attached as of June 30, 2019.[47]  Thus, it is the subscription model that Peloton hopes will keep the company growing and allow its business model to scale.[48]  In order to maintain its subscriber retention rate, however, Peloton knows that it must make it "easy for Members to find a class that fits their interests based on class type, instructor, music genre, length, available equipment, area of physical focus, and level of difficulty.[49]

72.    Peloton's "continued business and revenue growth is dependent on [its] ability to continuously attract and retain Subscribers. . . ."[50]

**B.    Peloton's "Ever Growing" On-Demand Library Is Central to Its Marketing**

73.    While other fitness companies market and sell similar fitness hardware for in-home use, provide in-studio classes where users pay on a per class basis, and home workout programs, Peloton has dominated the marketplace by aggressively marketing access to an "ever-growing" library of fitness classes led by professional instructors, available on-demand 24 hours per day, 7 days per week, from the comfort of the users' own homes for a flat monthly subscription fee.

---

[46] *See* SEC Form S-1 Registration Statement, available at
https://www.sec.gov/Archives/edgar/data/1639825/000119312519230923/d738839ds1.htm

[47] *Id.*

[48] *See* https://www.pymnts.com/subscriptions/2019/pelotons-ipo-to-test-subscription-models-fitness/

[49] *See* SEC Form S-1 Registration Statement, available at
https://www.sec.gov/Archives/edgar/data/1639825/000119312519230923/d738839ds1.htm

[50] *Id.*

ADD-93

74.    The "ever-growing" nature of Peloton's on-demand library is central to its marketing because Peloton must ensure that consumers spending thousands of dollars on the Peloton Bike or Peloton Tread and accompanying subscriptions will be able to take and retake older classes without running out of new classes over time.  Likewise, Peloton must ensure Peloton Digital subscribers that it will have enough new classes in each workout category to keep subscribers renewing their subscriptions.

75.    Until recently, Peloton's marketing departments prominently touted its "thousands of boutique classes," and "ever-growing library of live and on-demand studio classes" on the Peloton website.[51]  Peloton's website likewise represented that its Subscription Service grants "unlimited access to a growing library of live streaming and on-demand classes, scenic rides, real-time performance tracking, and unlimited accounts for family and friends.  No classes offered by Peloton are off limits."[52]

76.    As of November 2019, Peloton's website continued to market its digital library as "ever-growing" and "growing."  For example, the website for Peloton's app continues to market "an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors"[53]:

## The power of Peloton at your fingertips.

Explore an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors. Immerse yourself in our breathtaking studio experience anytime you want. Find a new favourite class just around the corner.

---

[51] https://www.onepeloton.com/digital (as of Apr. 25, 2019); *see also* https://www.onepeloton.com/bike/classes ("Thousands of On-Demand Rides. Take a class anytime, with our daily-updated, extensive on-demand library"); *id.* ("Thousands of rides on-demand. Rider anytime with thousands of classes to choose from on-demand.") (last accessed Dec. 6, 2019).

[52] *See* https://support.onepeloton.com/hc/en-us/articles/201039338-Rides-included-with-the-Peloton-subscription.

[53] *See* https://www.onepeloton.ca/app (last accessed Dec. 6, 2019).

77.    Further, in marketing its "Bike package" to consumers, Peloton continued to notify consumers that all packages "require a monthly Peloton Membership,"[54] which includes "unlimited access to a growing library of live streaming and on-demand Peloton classes"[55]:

UNLIMITED ACCESS TO PELOTON CLASSES

With a Peloton Membership, you'll gain unlimited access to a growing library of live streaming and on-demand Peloton classes (cycling, running, bootcamp, floor, yoga and more), as well as performance tracking and unlimited profiles for family and friends.

Membership includes full access on a single Peloton Bike in one household, plus on-the-go access to Peloton Digital using our app. You may pause or cancel your membership at any time. See our Membership Terms for more details.

LEARN MORE

78.    Peloton's promise of an "ever-growing" on-demand library of classes drives sales of not only monthly subscriptions, but also its flagship Peloton Bike and Peloton Tread products.

79.    The size and "ever-growing" nature of Peloton's on-demand digital library has always been, and continues to be, central to Peloton's marketing[56] because "the hardware is only as good as the app and subscription that comes with it."[57]

**C.    Peloton Knew That Its "Ever Growing" and "Growing" On-Demand Library Claims Were False And Misleading**

80.    Peloton is a sophisticated, multi-billion dollar company that specializes in providing consumers with digital content that is protected by various intellectual property laws. Peloton therefore knew or should have known that it was building its on-demand library with infringing songs and violating applicable copyright laws.

---

[54] *See* https://www.onepeloton.com/shop/bike (last accessed Dec. 6, 2019).

[55] *See* https://www.onepeloton.com/shop/bike/subscription (last accessed January 7, 2021).

[56] *See* https://onepeloton.com/bike/classes (last accessed Dec. 6, 2019).

[57] *See* https://www.forbes.com/sites/bizcarson/2019/09/26/peloton-ceo-john-foley-faces-the-skeptics-again-this-time-buyers-in-its-8-billion-ipo/#3b8f0f6f4349 (last accessed Dec. 6, 2019).

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 143 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 143 of 465

ADD-95

Case 1:19-cv-11711-LJL    Document 81    Filed 01/21/21    Page 23 of 42

81.     Peloton fully understands what the copyright law requires, having entered into sync licenses with certain other copyright holders, while, at the same time, using other musical works for free and without permission.[58]  Peloton's knowing violation of copyright laws was part of "a strategy to build a music-centric brand that is now worth in excess of $6 billion" without having to pay for all the required licenses.[59]

82.     On April 9, 2018, Peloton was put on actual notice of its copyright infringement when it received a cease and desist letter from the NMPA notifying it of copyright infringement claims for Peloton's failure to receive proper licenses for some of the music playing in its on-demand fitness classes.

83.     Notwithstanding that fact, Peloton continued to promise an "ever-growing" library to consumers and to heavily market that fact to its customers and prospective customers as a key Peloton selling point.

84.     Implicit in Peloton's promise to provide an "ever-growing" on-demand library was that it would only place classes in the library that complied with applicable copyright law or that it would pay back damages to copyright holders to ensure that the size of the on-demand library would not shrink.

85.     On March 25, 2019, in contravention of its promise, Peloton abruptly removed more than half of its on-demand classes from its digital library.[60]  This decision to remove over half of Peloton's classes happened at Peloton's New York offices.

---

[58] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 90, ¶ 1 (S.D.N.Y. September 27, 2019).

[59] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 90, at 1 (S.D.N.Y. Oct. 25, 2019).

[60] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 31, Counterclaims ¶ 59 (S.D.N.Y. Apr. 30, 2019); *see also id.*, Counterclaims ¶¶ 10, 42, 46, 52, 57.

ADD-96

86.     Prior to March 25, 2019, Peloton's Subscription Service more than 12,000 on-demand classes available for its users.  Following Peloton's announcement, less than half of the classes remained available to users.[61]  Thus, the abrupt removal of the infringing soundtracks led to Peloton's removal of many thousands of classes, more than 50% of its Subscription Service's on-demand digital library.[62]

87.     After Peloton's purge of more than half of its on-demand library, the number of available on-demand classes was roughly equal to the number of on-demand classes that were available to consumers in January 2017.  Accordingly, contrary to its representations, Peloton's on-demand library, rather than being "ever-growing," was actually materially shrinking.

88.     Music is a central component of Peloton's workout classes and Peloton has deeply integrated music into the Subscription Service's interface—allowing users to search for workouts by music genre, as well as artist-specific playlists.  Users can also preview playlists for specific classes, "like" songs or playlists during their workouts, and save songs and playlists to their user profiles.  Music is thus critical to consumers' use and enjoyment of the hardware and Subscription Service, and its loss was a real and actual injury to consumers.

89.     The copyright infringement lawsuit and Peloton's subsequent purge its on-demand library significantly decreased the quality and quantity of popular artists and songs available on Peloton's workout class playlists, which materially diminished subscribers' experience with the

---

[61] *See* https://imgur.com/XxdUOJn (last accessed Dec. 5, 2019); *see also* https://docs.google.com/spreadsheets/d/1LAE9kDqxkj4CkZ7TzS7ce6g5cxkMUOMdDssxKWpS0ak/edit?usp=sharing (last accessed Dec. 5, 2019).

[62] *See* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider (Mar. 27, 2019), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3

24

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 145 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 145 of 465

ADD-97

hardware and Subscription Service.[63]  The infringing works include some of the most popular artists and songs, both currently and of all time.  Peloton has removed songs by a wide array of popular artists including, without limitation, Beyoncé, Brittany Spears,  Michael Jackson, Ariana Grande, Snoop Dogg, Dr. Dre, Katy Perry, Rihanna, Miley Cyrus, Motley Crue, Pink Floyd, Justin Bieber, David Bowie, Rascal Flatts, Bruno Mars, Selena Gomez, Maroon 5, Adele, Lady Gaga, Nicki Minaj, Whitney Houston, Justin Timberlake, Luke Bryan, Mariah Carey, Jay Z, Kanye West, Drake, and Madonna. [64]

90.    John Foley, Peloton's CEO, based in New York, emailed subscribers and notified them that Peloton was removing classes featuring the allegedly infringing songs, but failed to disclose that this would result in removal of more than half of the on-demand classes in its digital library or that it would significantly decrease the quality and quantity of popular songs and artists available for its playlists.

91.    Instead, Foley falsely promised Plaintiffs and the other Class members that "[Peloton] can assure you that this will not affect your experience with (or the cost of) [Peloton's] service, or access to the kind of music you're used to hearing behind [Peloton's] instructors in the thousands of classes in [Peloton's] library."

92.    That representation, however, is demonstrably false and Peloton never disclosed to its subscribers, including Plaintiffs and the other Class members, that it would be removing more than half of the classes from its on-demand library.

---

[63] *See* Natt Garun, *Peloton owners are pissed about bad music after copyright lawsuit*, The Verge (April 24, 2019), https://www.theverge.com/2019/4/24/18514036/peloton-music-copyright-fitness-studios-gym-on-demand-media-strategy; *see also* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider US (March 27, 2019), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3

[64] *See* Ex. 3.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 146 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 146 of 465

ADD-98

Case 1:19-cv-11711-LJL   Document 81   Filed 01/21/21   Page 26 of 42

93.    As of November 2019, Peloton's website continued to market its digital library as being "ever-growing" and "growing," despite knowing that the NMPA has recently amended its lawsuit alleging that it "found another 1,324 songs that have been streamed by Peloton instructors during classes without approval."[65]

94.    Therefore, despite Peloton's representations to the contrary, it knows or should know that the size of its on-demand digital library cannot legitimately be "ever-growing," but it continues to knowingly defraud its existing and potential customers—including Plaintiffs and the other Class members—for its own financial gain.

**D.    Peloton's Misrepresentations and Omissions Are Material to Consumers**

95.    Peloton's misrepresentations and omissions are material to Plaintiffs and the other Class members.  As part of Plaintiffs' and the other Class members' subscriptions, they expected and were entitled to use a class library that, as advertised by Peloton, would continue to grow as new classes were added every day.

96.    Each additional on-demand fitness class adds incremental value to Plaintiffs' and the other Class members' subscriptions and, therefore, Peloton's gutting of its digital library materially lowered the value of Plaintiffs' and the other Class members' subscriptions.

97.    When Peloton accepted Plaintiffs' and the other Class members' subscription payments in its New York bank accounts and then accepted and recorded those payments in its New York Accounting and Finance department, Peloton knew or should have known that Plaintiffs and the other Class members would not be able to use the full on-demand class library because the size of its on-demand library was materially decreasing.

---

[65] *See* https://observer.com/2019/09/peloton-music-licensing-lawsuit-ipo/ (last accessed Dec. 5, 2019).

98.    Nonetheless, Peloton withheld that information from Plaintiffs and the other Class

members, and its New York-based Creative and Marketing departments continued to represent to

existing and potential subscribers that the on-demand digital library would be "ever-growing," and

continued to charge full price for its Subscription Service, despite knowledge that subscribers

would not be receiving everything Peloton represented that they would receive.

99.    These actions were outside of normal business practices and Peloton knew or

should have known that its representations would harm an average consumer.  Peloton knew it

could not live up to the promise it made active and prospective members.

100.    By misrepresenting that its on-demand digital library would be "ever-growing" and

failing to disclose the imminent removal of over half of that library, Peloton defrauded Plaintiffs

and the other Class members, deprived Plaintiffs and the other Class members of the benefit of

their bargain with Peloton, and/or unjustly enriched itself at Plaintiffs' and the other Class

members' expense.

### VI.    CLASS ACTION ALLEGATIONS

101.    Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the

Federal Rules of Civil Procedure individually and on behalf of a class defined as:

> All purchasers of the Peloton hardware and/or corresponding
> Peloton Membership subscription from April 9, 2018 through
> March 25, 2019.

(the "Class," unless otherwise noted).

102.    Excluded from the Class are Peloton and any of its members, affiliates, parents,

subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their

immediate family members; Court staff assigned to this case.  Plaintiffs reserve the right to modify

or amend the Class definitions, as appropriate, during the course of this litigation.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 148 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 148 of 465

ADD-100

103.    This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

104.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**  The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  The precise number of Class members is unknown to Plaintiffs, but may be ascertained from Peloton's books and records and is presumed to be not less than hundreds of thousands of people.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

105.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).**  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    a.    whether Peloton engaged in the conduct alleged herein;

    b.    whether Peloton's alleged conduct violates applicable law;

    c.    whether Peloton engaged in false or misleading advertising;

    d.    whether Peloton's misrepresentations and omissions regarding the "ever-growing" nature of the Subscription Service's class library were likely to deceive Class members in violation of N.Y. Gen. Bus. Law §§ 349 and 350;

    e.    whether Peloton's misrepresentations and omissions regarding the "ever-growing" nature of the Subscription Service's class library were material to a reasonable consumer;

    f.    whether Class members overpaid for their Subscription Service as a result of the conduct alleged herein;

g.  whether Peloton's conduct violates public policy;

h.  whether Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

i.  the amount and nature of relief to be awarded to Plaintiffs and the other Class members.

106.  **Typicality – Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the other Class members' claims because Plaintiffs and the other Class members purchased Peloton's hardware and/or subscribed to Peloton's Subscription Service that falsely promised an "ever-growing" class library.  Each class in the on-demand library adds incremental value to Plaintiffs' and the other Class members' hardware and/or Subscription Service.  The value of Plaintiffs' and the other Class members' hardware and/or Subscription Service has therefore diminished and, as a result of Peloton's conduct, Plaintiffs and the other Class members overpaid for Peloton's hardware and/or Subscription Service.  Plaintiffs and the other Class members suffered damages as a direct and proximate result of the same wrongful conduct in which Peloton engaged.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other Class members' claims.

107.  **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**  Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members who they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.  Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

ADD-102

108.    **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).**
Peloton has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class
members, thereby making appropriate final injunctive relief and declaratory relief, as described
below, with respect to the Class members as a whole.

109.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).**    A class action is
superior to any other available means for the fair and efficient adjudication of this controversy,
and no unusual difficulties are likely to be encountered in the management of this class action.
The damages or other financial detriment suffered by Plaintiffs and the other Class members are
relatively small compared to the burden and expense that would be required to individually litigate
their claims against Peloton, so it would be impracticable for the Class members to individually
seek redress for Peloton's wrongful conduct.  Even if the Class members could afford litigation
the court system could not.  Individualized litigation creates a potential for inconsistent or
contradictory judgments, and increases the delay and expense to all parties and the court system.
By contrast, the class action device presents far fewer management difficulties, and provides the
benefits of single adjudication, economy of scale, and comprehensive supervision by a single
court.

## VII.    CLAIMS ALLEGED

### FIRST CLAIM FOR RELIEF

**Violation of New York General Business Law,
N.Y. Gen. Bus. Law § 349**

110.    Plaintiffs repeat and reallege the allegations in Paragraphs 1-109, above, as if fully
alleged herein.

111.    Plaintiffs bring this claim individually and on behalf of the other Class members.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 151 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 151 of 465

ADD-103

112.    Plaintiffs have standing to bring this claim individually and on behalf of the other Class members because the underlying transactions at issue between Plaintiffs and Peloton happened entirely, or predominantly, in New York.  The representations at issue emanated from New York, and, in exchange for payments routed to Peloton's New York bank accounts, Plaintiffs were given access to a digital library of classes recorded and produced by Peloton in New York; Plaintiffs' access to over half these classes was likewise revoked in New York.

113.    New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

114.    Peloton engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, by misrepresenting that its Membership and Subscription Service included access to an "ever-growing library of live and on-demand studio classes" and willfully failing to disclose that it would be removing over half of its on-demand digital library.

115.    Peloton knew or should have known that it lacked the appropriate copyright licenses for the music accompanying the classes in its library, and that its library could not legitimately be "ever-growing."

116.    Peloton received a cease-and-desist letter regarding its copyright infringement on April 9, 2018, but continued to promise the "ever-growing" library to consumers.  On March 25, 2019, shortly after getting sued for copyright infringement, Peloton abruptly removed more than half of its content from its on-demand digital library.

117.    Despite knowing that the size of its on-demand digital library had decreased by more than 50%, Peloton continued to promise on its website "an expansive, ever-growing library

ADD-104

of live and on-demand studio classes taught by world-class instructors"[66] and "unlimited access to a growing library of live streaming and on-demand Peloton classes."[67]

118.    Peloton's representations and omissions were material because they were likely to deceive reasonable consumers about the "ever-growing" nature of its on-demand digital library.

119.    Peloton acted intentionally, knowingly, and maliciously to violate New York's General Business Law, and recklessly disregarded Plaintiff and the other Class members' rights. Peloton had actual knowledge on April 9, 2018 that it could not provide an "ever-growing" library to consumers but it nonetheless continued to promise and represent an "ever-growing" library.

120.    As a direct and proximate result of Peloton's deceptive and unlawful acts and practices, Plaintiffs and the other Class members suffered a real and substantial injury they could not have reasonably avoided.  Peloton deprived Plaintiffs and the other Class members of the benefit of the bargain.  Plaintiffs and the other Class members have suffered and will continue to suffer injury, ascertainable losses of money, and monetary and non-monetary damages because Plaintiffs and the other Class members overpaid for Peloton's hardware, because they did not know the truth that Peloton would gut its on-demand digital library, shrinking it by more than 50%, and that it would not be "ever-growing."

121.    Peloton's deceptive and unlawful acts and practices complained of herein affected all purchasers of Peloton's hardware because the Peloton hardware is only as good as the app and subscription that comes with it.

122.    Peloton's above-described deceptive and unlawful practices caused substantial injury to Plaintiffs and the other Class members that they could not reasonably avoid.  Plaintiffs

---

[66] *See* https://www.onepeloton.ca/app (last accessed Nov. 26, 2019).

[67] *See* https://www.onepeloton.com/shop/bike/subscription (last accessed Nov. 26, 2019).

and the other Class members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 per violation for each of Peloton's violations of N.Y. Gen. Bus. Law § 349 (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

123.    Each sale of the Peloton hardware to Plaintiffs and the other Class members constitutes a separate, independent, and willful violation of N.Y. Gen. Bus. Law § 349 through the above deceptive acts and practices in the conduct of its business.

124.    Peloton should, therefore, be assessed a separate statutory penalty of $50 or actual damages (whichever is greater) for each independent violation, and all other such relief as may be just and proper should be recovered by Plaintiffs individually and on behalf of the other Class members.

## SECOND CLAIM FOR RELIEF

### Violation of New York General Business Law, N.Y. Gen. Bus. Law § 349.

125.    Plaintiffs repeat and reallege the allegations in Paragraphs 1-109, above, as if fully alleged herein.

126.    Plaintiffs bring this claim individually and on behalf of the other Class members.

127.    Plaintiffs have standing to bring this claim individually and on behalf of the other Class members because the underlying transactions at issue between Plaintiffs and Peloton happened entirely, or predominantly, in New York.  The representations at issue emanated from New York, and, in exchange for payments routed to Peloton's New York bank accounts, Plaintiffs were given access to a digital library of classes recorded and produced by Peloton in New York; Plaintiffs' access to over half these classes was likewise revoked in New York.

ADD-106

128.    New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

129.    Peloton engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, by misrepresenting that its Membership and Subscription Service included access to an "ever-growing library of live and on-demand studio classes" and willfully failing to disclose that it would be removing over half of its on-demand digital library, while persistently publishing marketing assertions (and omissions) to the contrary.

130.    Peloton knew or should have known that it lacked the appropriate copyright licenses for the music accompanying the classes in its library, and that its library could not legitimately be "ever-growing."

131.    Peloton received a cease-and-desist letter regarding its copyright infringement on April 9, 2018, but continued to promise the "ever-growing" library to consumers.  On March 25, 2019, shortly after getting sued for copyright infringement, Peloton abruptly removed more than half of its content from its on-demand digital library.

132.    Despite knowing that the size of its on-demand digital library had decreased by more than 50%, Peloton continues to promise on its website "an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors"[68] and "unlimited access to a growing library of live streaming and on-demand Peloton classes."[69]

133.    Peloton's representations and omissions were material because they were likely to deceive reasonable consumers about the "ever-growing" nature of its on-demand digital library.

---

[68] *See* https://www.onepeloton.ca/app (last accessed Dec. 6, 2019).

[69] *See* https://www.onepeloton.com/shop/bike/subscription (last accessed Dec. 6, 2019).

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 155 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 155 of 465
ADD-107

Case 1:19-cv-11711-LJL    Document 81    Filed 01/21/21    Page 35 of 42

134.    Peloton acted intentionally, knowingly, and maliciously to violate New York's General Business Law, and recklessly disregarded Plaintiffs' and the other Class members' rights. Peloton had actual knowledge on April 9, 2018 that it could not provide an "ever-growing" library to consumers but it continued to promise an "ever-growing" library nonetheless.

135.    As a direct and proximate result of Peloton's deceptive and unlawful acts and practices, Plaintiffs and the other Class members suffered injury.  Peloton deprived Plaintiffs and the other Class members of the benefit of the bargain.  Plaintiffs and the other Class members have suffered and will continue to suffer injury, ascertainable losses of money, and monetary and non-monetary damages because Plaintiffs and the other Class members overpaid for Peloton's Membership and Subscription Service because they did not know the truth that Peloton would gut its on-demand digital library, shrinking it by more than 50%, and that it would not be "ever-growing."

136.    Peloton's deceptive and unlawful acts and practices complained of herein affected all subscribers of the Peloton Membership and Subscription Service.  The above deceptive and unlawful practices and acts by Peloton caused substantial injury to Plaintiffs and the other Class members that they could not reasonably avoid.  Plaintiffs and the other Class members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 per violation (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

137.    Each time Peloton accepted a Membership or Subscription Service payment from Plaintiffs and/or one or more of the other Class members, Peloton committed a separate, independent, and willful violation of N.Y. Gen. Bus. Law § 349 through the above deceptive acts and practices in the conduct of its business.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 156 of 465
Case 1:19-cv-11711-LGS   Document 336   Filed 09/02/25   Page 156 of 465

ADD-108

Case 1:19-cv-11711-LJL   Document 81   Filed 01/21/21   Page 36 of 42

138.   Peloton should, therefore, be assessed a separate statutory penalty of $50 for each independent violation, and all other such relief as may be just and proper should be recovered by Plaintiffs individually and on behalf of the other Class members.

### THIRD CLAIM FOR RELIEF

**Violation of New York General Business Law,
N.Y. Gen. Bus. Law § 350**

139.   Plaintiffs repeat and reallege the allegations in Paragraphs 1-109, above, as if fully alleged herein.

140.   Plaintiffs bring this claim individually and on behalf of the other Class members.

141.   Plaintiffs have standing to bring this claim individually and on behalf of the other Class members because the underlying transactions at issue between Plaintiffs and Peloton happened entirely, or predominantly, in New York.  The representations at issue emanated from New York, and, in exchange for payments routed to Peloton's New York bank accounts, Plaintiffs were given access to a digital library of classes recorded and produced by Peloton in New York; Plaintiffs' access to over half these classes was likewise revoked in New York.

142.   New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade, or commerce[.]"   False advertising includes "advertising including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light . . . representations [made] with respect to the commodity. . . ."  N.Y. Gen. Bus. Law § 350-a.

143.   Peloton caused to be made or disseminated, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known, to Peloton to be untrue and misleading to consumers, including Plaintiffs and the other Class members.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 157 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 157 of 465

ADD-109

Case 1:19-cv-11711-LJL    Document 81    Filed 01/21/21    Page 37 of 42

144.    Peloton misrepresented through advertisements on its website that its Membership and Subscription Service included access to an "ever-growing library of live and on-demand studio classes" and, at the same time, willfully failed to disclose that it would be removing over half of its Subscription Service's on-demand digital library.

145.    Peloton knew or should have known that it lacked the appropriate copyright licenses for the music accompanying the classes in its library, and that its library could not legitimately be "ever-growing."

146.    Peloton received a cease-and-desist letter regarding its copyright infringement on April 9, 2018 but continued to promise the "ever-growing" library to consumers.  On March 25, 2019, shortly after getting sued for copyright infringement, Peloton abruptly removed more than half of its on-demand content from its on-demand digital library.

147.    Despite knowing that the size of its on-demand digital library had decreased by more than 50%, Peloton continues to advertise on its website "an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors"[70] and "unlimited access to a growing library of live streaming and on-demand Peloton classes."[71]

148.    Peloton has violated N.Y. Gen. Bus. Law § 350 because the misrepresentations and omissions regarding the "ever-growing" nature of its on-demand library, were material and likely to deceive a reasonable consumer.

149.    As a direct and proximate result of Peloton's false and misleading advertising, Plaintiffs and the other Class members suffered injury.  Peloton deprived Plaintiffs and the other Class members of the benefit of the bargain.  Plaintiffs and the other Class members have suffered

---

[70] *See* https://www.onepeloton.ca/app (last accessed Nov. 26, 2019).

[71] *See* https://www.onepeloton.com/shop/bike/subscription (last accessed Nov. 26, 2019).

and will continue to suffer injury, ascertainable losses of money, and monetary and non-monetary damages.  Plaintiffs and the other Class members overpaid for Peloton's Membership and Subscription Service, because they did not know the truth that Peloton would gut its on-demand digital library, shrinking it by more than 50%, and that it would not be "ever-growing."

150.    Peloton's false and misleading advertising complained of herein affected all purchasers of Peloton's hardware.

151.    The above false and misleading advertising by Peloton caused substantial injury to Plaintiffs and the other Class members that they could not reasonably avoid.

152.    Plaintiffs, individually and on behalf of the other Class members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $500 per violation (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

153.    Peloton committed a separate and independent violation of N.Y. Gen. Bus. Law § 350 for each false advertisement pertaining or relating to the "ever-growing" and/or growing nature of its on-demand library.

154.    Peloton should therefore be assessed statutory damages of $500 for each such violation, and all other such relief as may be just and proper.

### FOURTH CLAIM FOR RELIEF

**Violation of New York General Business Law,**
**N.Y. Gen. Bus. Law § 350**

155.    Plaintiffs repeat and reallege the allegations in Paragraphs 1-109, above, as if fully alleged herein.

156.    Plaintiffs bring this claim individually and on behalf of the other Class members.

157.    Plaintiffs have standing to bring this claim individually and on behalf of the other Class members because the underlying transactions at issue between Plaintiffs and Peloton

ADD-111

happened entirely, or predominantly, in New York.  The representations at issue emanated from New York, and in exchange for payments routed to Peloton's New York bank accounts, Plaintiffs were given access to a digital library of classes recorded and produced by Peloton in New York; Plaintiffs' access to over half these classes was likewise revoked in New York.

158.    New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade, or commerce[.]"  False advertising includes "advertising including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light . . . representations [made] with respect to the commodity. . . ."  N.Y. Gen. Bus. Law § 350-a.

159.    Peloton caused to be made or disseminated, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Peloton, to be untrue and misleading to consumers, including Plaintiffs and the other Class members.

160.    Peloton misrepresented through advertisements on its website that its Membership and Subscription Service included access to an "ever-growing library of live and on-demand studio classes" and, at the same time, willfully failed to disclose that it would be removing over half of its Subscription Service's on-demand digital library.

161.    Peloton knew or should have known that it lacked the appropriate copyright licenses for the music accompanying the classes in its library, and that its library could not legitimately be "ever-growing."

162.    Peloton received a cease-and-desist letter regarding its copyright infringement on April 9, 2018 but continued to promise the "ever-growing" library to consumers.  On March 25,

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 160 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 160 of 465

ADD-112

2019, shortly after getting sued for copyright infringement, Peloton abruptly removed more than half of its on-demand content from its on-demand digital library.

163.    Despite knowing that the size of its on-demand digital library had decreased by more than 50%, Peloton continues to advertise on its website "an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors"[72] and "unlimited access to a growing library of live streaming and on-demand Peloton classes."[73]

164.    Peloton has violated N.Y. Gen. Bus. Law § 350 because the misrepresentations and omissions regarding the "ever-growing" nature of its on-demand library, were material and likely to deceive a reasonable consumer.

165.    As a direct and proximate result of Peloton's false and misleading advertising, Plaintiffs and the other Class members suffered injury.  Peloton deprived Plaintiffs and the other Class members of the benefit of the bargain.  Plaintiffs and the other Class members have suffered and will continue to suffer injury, ascertainable losses of money, and monetary and non-monetary damages because Plaintiffs and the other Class members overpaid for Peloton's Membership and Subscription Service because they did not know the truth that Peloton would gut its on-demand digital library, shrinking it by more than 50%, and that it would not be "ever-growing."

166.    Peloton's false and misleading advertising complained of herein affected all purchasers of Peloton's Membership and Subscription Service.

167.    The above false and misleading advertising by Peloton caused substantial injury to Plaintiffs and the other Class members that they could not reasonably avoid.

---

[72] *See* https://www.onepeloton.ca/app (last accessed Nov. 26, 2019).

[73] *See* https://www.onepeloton.com/shop/bike/subscription (last accessed Nov. 26, 2019).

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 161 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 161 of 465

ADD-113

Case 1:19-cv-11711-LJL    Document 81    Filed 01/21/21    Page 41 of 42

168.    Plaintiffs, individually and on behalf of the other Class members, seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $500 per violation (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

169.    Peloton committed a separate and independent violation of N.Y. Gen. Bus. Law § 350 for each false advertisement pertaining or relating to the "ever-growing" and/or growing nature of its on-demand library.

170.    Peloton should therefore be assessed statutory damages of $500 for each such violation, and all other such relief as may be just and proper.

## VIII.    REQUEST FOR RELIEF

Plaintiffs, individually and on behalf of the other Class members, respectfully request that the Court enter judgment in their favor and against Peloton as follows:

1.    Certifying the Class as requested herein, designating Plaintiffs as class representatives, and appointing the undersigned counsel as Class Counsel;

2.    Declaring that Peloton is financially responsible for notifying the Class members of the pendency of this suit;

3.    Awarding statutory and/or actual damages to the maximum extent allowed, in an amount to be proven at trial;

4.    Requiring restitution and disgorgement of all profits and unjust enrichment Peloton obtained from Plaintiffs and the other Class members as a result of Peloton's unlawful, unfair, and/or fraudulent business practices;

5.    Awarding injunctive relief as permitted by law or equity, including enjoining Peloton from continuing the unlawful practices as set forth herein, and ordering Peloton to engage in a corrective advertising campaign;

41

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 162 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 162 of 465

ADD-114

Case 1:19-cv-11711-LJL    Document 81    Filed 01/21/21    Page 42 of 42

6.      Awarding Plaintiffs' reasonable attorneys' fees, costs, and expenses;

7.      Awarding pre- and post-judgment interest on any amounts awarded; and

8.      Awarding such other and further relief as may be just and proper.

## IX.      JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all causes of action so triable.

Dated:  January 21, 2021                          */s/ Greg G. Gutzler*
                                                  GREG G. GUTZLER
                                                  ggutzler@dicellolevitt.com
                                                  **DiCELLO LEVITT GUTZLER LLC**
                                                  444 Madison Avenue, Fourth Floor
                                                  New York, New York  10022
                                                  Telephone: (646) 933-1000

                                                  ADAM J. LEVITT
                                                  alevitt@dicellolevitt.com
                                                  ADAM PROM
                                                  aprom@dicellolevitt.com
                                                  **DiCELLO LEVITT GUTZLER LLC**
                                                  Ten North Dearborn Street, Sixth Floor
                                                  Chicago, Illinois  60602
                                                  Telephone: (312) 214-7900

                                                  ASHLEY C. KELLER (*pro hac vice*)
                                                  ack@kellerlenkner.com
                                                  BENJAMIN J. WHITING (*pro hac vice* to be sought)
                                                  ben.whiting@kellerlenkner.com
                                                  ALEX J. DRAVILLAS (*pro hac vice* to be sought)
                                                  ajd@kellerlenkner.com
                                                  **KELLER LENKNER LLC**
                                                  150 North Riverside Plaza, Suite 4270
                                                  Chicago, Illinois  60606
                                                  Telephone: (312) 741-5222

                                                  AARON M. ZIGLER
                                                  aaron@ziglerlawgroup.com
                                                  **ZIGLER LAW GROUP, LLC**
                                                  308 South Jefferson Street, Suite 333
                                                  Chicago, Illinois  60661
                                                  Telephone: (312) 673-8427

                                                  ***Counsel for Plaintiffs and the Proposed Class***

ADD-115

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X

                                     :

ERIC FISHON and ALICIA PEARLMAN, individually  :
and on behalf of all others similarly situated,

                                     :

                   Plaintiffs,    :           19-cv-11711 (LJL)

                                     :

        -v-                     :        OPINION AND ORDER

                                     :

PELOTON INTERACTIVE, INC.,            :

                                   :

                   Defendants.    :

--------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

     Defendant Peloton Interactive, Inc. ("Defendant" or "Peloton") moves, pursuant to

Federal Rule of Civil Procedure 12(b)(6), to dismiss partially Plaintiffs' first amended complaint

("Amended Complaint" or "AC"), Dkt. No. 81, for failure to state a claim for relief.  For the

following reasons, Defendant's motion is granted.

## BACKGROUND

     The central facts alleged in the Amended Complaint remain substantially the same as

those alleged in the original complaint:  Peloton sells at-home stationary bicycles ("Peloton

Bike") and treadmills ("Peloton Tread") that stream live and on-demand fitness classes.  AC ¶ 3.

For access to the content library, users pay a monthly subscription fee.  *Id*.  Peloton offers no

distinct categories of membership; all members pay the same monthly fee for access to the entire

content library.  *Id*. ¶ 5.  Every Peloton class includes a themed playlist curated by the instructor

to match the tempo and intensity of the class.  *Id*. ¶ 18.

     Peloton ran certain advertisements describing its library of fitness classes as

"ever-growing."  *Id*. ¶ 13.  In April 2018, however, Peloton received a cease-and-desist letter

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 164 of 465
Case 1:19-cv-11711-LGS    Document 356    Filed 09/02/25    Page 164 of 465

ADD-116

from the National Music Publishers Association ("NMPA") regarding Peloton's use of songs in its on-demand class library. *Id.* ¶ 21. In March 2019, several members of the NMPA filed a lawsuit against Peloton, seeking more than $150 million in damages, alleging that Peloton had been using musical works without proper licensing. *Id.* ¶ 22. In the face of the lawsuit, Peloton removed all classes from its on-demand library that contained one or more of the allegedly infringing songs, constituting over 50% of the total available classes. *Id.* ¶ 23.

Plaintiffs sue Peloton under the New York General Business Law (the "NYGBL") §§ 349 and 350, alleging that they were misled by Peloton's representations that its class library was "ever-growing." Section 349 of the NYGBL prohibits deceptive acts and practices, while Section 350 prohibits false advertising.

Plaintiff Alicia Pearlman ("Pearlman") is a citizen and resident of Michigan. *Id.* ¶ 37. Pearlman purchased a Peloton Membership and hardware in November 2018. *Id.* She alleges that she relied upon Peloton's representation that its content library was "ever-growing" when she purchased her hardware and her subscription. *Id.* Pearlman alleges that Peloton's "representations and material omissions regarding its on-demand library caused [her] to pay increased costs for the Peloton hardware and corresponding Peloton Membership, which was worth less than represented because Peloton's representations and/or omissions regarding its on-demand library were deceptive and misleading and constituted false advertising." *Id.* ¶ 41. She further alleges that "Peloton's representations and material omissions were part of the basis of the bargain, in that [she] attributed value to Peloton's promises regarding the nature and characteristics of its on-demand library and would not have purchased the hardware and corresponding Peloton Membership, or would not have purchased it on the same terms, if [she] knew the truth that Peloton's on-demand digital library would shrink by more than 50%." *Id.*

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 165 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 165 of 465

ADD-117

Case 1:19-cv-11711-LJL    Document 102    Filed 07/12/21    Page 3 of 11

¶ 42.

## PROCEDURAL HISTORY

Plaintiffs filed their original complaint on December 23, 2019.  Dkt. No. 1.  Peloton

moved to dismiss the complaint on March 13, 2020.  Dkt. No. 29.  By Opinion and Order dated

November 9, 2020, the Court granted the motion to dismiss in part and denied in part.  As

relevant here, the Court granted the motion to dismiss with respect to Pearlman's claims.  The

Court held that Pearlman's two territorial allegations—namely that (1) Peloton's principal place

of business is in New York and that (2) Peloton's Terms of Service select New York law to

govern and New York as the forum for dispute resolution—were not sufficient to support

statutory standing under the NYGBL for Pearlman as a Michigan resident who did not allege that

she purchased her Peloton hardware in New York.  The Court dismissed Pearlman's claims,

concluding that "Pearlman does not allege that any part of her transaction took place in New

York.  She does not allege that she purchased her Peloton product in New York, that she paid

through an electronic or credit card transaction that was only accepted in New York, or even

what product specifically she purchased."  Dkt. No. 65 at 29.

Following the Court's Order, Plaintiffs received discovery concerning the statutory

standing of Peloton's out of state customers.  Dkt. No. 78.  On January 15, 2021, Plaintiffs

sought leave to file an amended complaint containing allegations from that fact discovery.  Dkt.

No. 78.  Defendant consented to Plaintiffs' request on January 20, 2021, and stated its intention

to file a partial motion to dismiss the proposed amended complaint.  Dkt. No. 79.  The Court

granted leave on January 20, 2021.  Dkt. No. 80.

Plaintiffs filed the Amended Complaint on January 21, 2021.  Dkt. No. 81.  Defendant

filed a motion to dismiss the Amended Complaint with respect to Pearlman on February 4, 2021.

Dkt. No. 89.  Plaintiff responded on February 18, 2021, Dkt. No. 90, and Defendant replied on

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 166 of 465
Case 1:19-cv-11711-LGS     Document 556     Filed 09/02/25     Page 166 of 465

ADD-118

February 25, 2021.  Dkt. No. 92.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal.  *Twombly*, 550 U.S. at 555, 557.  The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

## DISCUSSION

The text of Sections 349 and 350 of the NYGBL reflect a territorial limitation.  Section 349 declares: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."  N.Y. Gen. Bus. Law § 349.  Section 350 likewise states that "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."  *Id.* § 350.  At the motion to dismiss phase, the question is whether "some part of the underlying transaction . . . occur[red] in New York State."  *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 124

4

(2d Cir. 2013) (quoting *Mountz v. Global Vision Prods., Inc.*, 770 N.Y.S.2d 603, 608 (Sup. Ct. 2003)).

The Amended Complaint includes the following allegations in support of Pearlman's claim to statutory standing:

- Pearlman "rel[ied] on Peloton's uniform representations about its "ever-growing" on-demand library of fitness classes, entered into a transaction with New York-based Peloton, resulting in her purchase of Peloton's hardware and Peloton Membership in November 2018, and has paid all required hardware, software, and subscription fees relating thereto." Dkt. No. 81 ¶ 37.

- Pearlman's purchase of her Peloton membership was made electronically, as were all her monthly fee payments. *Id.* ¶ 38.

- Pearlman has "continued to pay Peloton for subscription services since [she] acquired the Peloton hardware, and . . . [has] continued to pay for those services electronically with a credit card." *Id.* ¶ 39.

- When a member purchases Peloton hardware, a Peloton Membership, Peloton Digital, or the Subscription Service, that member's payment is routed to Peloton's bank accounts in New York. *Id.* ¶ 8.

- Those payments are recorded and managed by Peloton's Accounting and Finance department, located in New York. *Id.* ¶ 9.

- Peloton does not accept cash as a form of payment. *Id.* ¶ 10.

- Peloton "sees itself as a uniquely New York company." *Id.* ¶ 7.

- Peloton records, produces and issues classes from studios in New York. *Id.* ¶ 11.

- Peloton "purposefully and affirmatively" engages in a variety of advertising and marketing campaigns originating from and/or approved by its Creative, Acquisition Marketing, Brand Marketing, and Retention Marketing departments, all located at Peloton's New York headquarters. *Id.* ¶ 12.

- The decision to remove the majority of Peloton's on-demand library was made in New York and "effectuated" in New York. *Id.* ¶ 24.

These allegations are not sufficient to support statutory standing for Pearlman, for much the same reasons the Court outlined it its previous Opinion and Order. As the Court previously held, the NYGBL is intended to protect consumers "in their transactions that take place in New

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 168 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 168 of 465

ADD-120

York State." Dkt. No. 65 at 25.  The appropriate test under the NYGBL is not where the alleged

deception took place or where the parties reside, but instead "the location of the transaction, and

in particular the strength of New York's connection to the allegedly deceptive transaction."  *Id*.

at 26.

The Court's previous opinion stated what facts Pearlman would need to allege in order to

establish statutory standing.  The Court indicated that she would need to state (1) what product

specifically she purchased and (2) that she purchased her Peloton product in New York or that

she paid through an electronic or credit card transaction that was only accepted in New York.

Pearlman has failed to do either one of these things.

First, Pearlman still has not identified what "hardware" she purchased from Peloton.  She

does not indicate whether she purchased a Bike, a Tread, or some other piece of equipment from

Peloton.  Pearlman's failure to correct this aspect of her complaint is puzzling, as this

information is presumably readily accessible to her.  Pearlman raises no arguments in her

opposition brief responsive to this part of the Court's prior opinion.

Second, Pearlman has again failed to allege that her purchase and subscription to the

Peloton service had a sufficient nexus to New York to give rise to an NYGBL claim.  With

respect to her purchase and subscription, Pearlman alleges only that she "paid all required

hardware, software, and subscription fees" and that she paid and continues to pay for her

membership subscription "electronically with a credit card."  *Id*. ¶ 39.  Pearlman has not

specified where those transactions are processed or whether any component of those transactions

took place in New York.  She does not allege that she made any payment in New York, that she

purchased her hardware or subscription in New York, or that her payment was processed on a

server in New York.  Instead, Pearlman alleges that, when a member purchases Peloton

6

hardware, a Membership or a Subscription, the payment is routed to Peloton's bank accounts in New York. But that fact alone cannot support statutory standing. If it could, then any corporation holding a bank account in New York into which payments were received would be subject to liability under the NYGBL for activity anywhere in the world, which would expand the scope of the NYGBL far beyond the New York legislature's intent. *See Cline v. TouchTunes Music Corp.*, 211 F. Supp. 3d 628, 635 (S.D.N.Y. 2016) (holding that the fact that out-of-state payments ultimately were received in New York did not give rise to NYGBL standing). The same is true for Pearlman's allegation that payments to Peloton are "recorded and managed by Peloton's Accounting and Finance department, located in New York." Dkt. No. 81 ¶ 9. Allowing an NYGBL claim to go forward on this basis could subject any business based in New York to liability under the NYGBL for global conduct; there is no reason why a New York-based corporation's decision to place its accounting and finance function in New York should give rise to New York liability for a transaction otherwise taking place entirely out-of-state. *See Goshen v. Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1196 (N.Y. 2002) ("To apply the statute to out-of-state transactions . . . would lead to an unwarranted expansive reading of the statute, contrary to legislative intent, and potentially leading to nationwide, if not global application of General Business Law § 349.").

As the Court held in its prior opinion, Pearlman had to allege that some part of her specific transaction took place in New York. She has not done so. She has alleged that she paid electronically and that all payments ultimately end up in a bank account in New York, but that, without more, is not sufficient to allege that any part of the transaction took place in New York. *See TouchTunes*, 211 F. Supp. 3d at 633-35 (holding that the NYGBL applied to out-of-state credit card payments on digital jukeboxes where the payments were processed in New York, but

7

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 170 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 170 of 465

ADD-122

Case 1:19-cv-11711-LJL    Document 102    Filed 07/12/21    Page 8 of 11

not to cash payments made on the same jukeboxes). Pearlman still has made no specific jurisdictional claims about her purchase. She does not state where she purchased her hardware and subscription, where she saw the allegedly deceptive advertisements, where her purchase and transaction were processed, or where the servers hosting Peloton's class library are located. Without a connection between her specific transaction and New York—beyond Peloton's business being based there—Pearlman has no statutory standing.

Pearlman's remaining new allegations support factual findings about Peloton that the Court already found were insufficient to support statutory standing under the NYGBL. Pearlman simply expands upon the earlier bases that the Court previously found deficient. She emphasizes again that Peloton is based in New York, that the deceptive scheme was "hatched" in New York, that customer payments are routed to New York, and that Peloton's Terms of Service contained choice of law and forum selection clauses favoring New York. She includes allegations that Peloton "sees itself as a uniquely New York company" and that its CEO stated that "New York is where Peloton started, and it will continue to be our home as we scale our business globally." Dkt. No. 81 ¶ 7. These allegations merely expand upon the already-established fact that Peloton is a New York based business, a fact which the Court held in its prior opinion was insufficient for statutory standing under the NYGBL. *See Wright v. Publishers Clearing House, Inc.*, 439 F. Supp. 3d 102, 110 (E.D.N.Y. 2020) (holding that the allegations in an amended complaint were "merely clever re-articulations of the allegation that the Defendants operate their principal place of business in New York").

Other allegations are repetitious of those allegations the Court found inadequate in its previous Opinion. The fact that the allegedly deceptive conduct was organized and perpetrated in Peloton's New York headquarters does not support a finding of statutory standing. *See*

ADD-123

*Goshen*, 774 N.E.2d at 1195 (holding that the fact that a New York resident devised a misleading marketing campaign in New York did not "in and of itself constitute an actionable deceptive act or practice under the [NYGBL]").  The fact that Peloton's Terms of Service require that New York law apply to all aspects of the contractual relationship and that lawsuits be resolved in a New York forum is likewise insufficient, as the Court observed in its prior opinion.  *See* Dkt. No. 65 at 27 ("The fact that Peloton, a New York-based corporation, chose New York law and a New York forum to apply to all of its transactions . . . does not give rise to a reasonable inference that the transaction by which Pearlman, a Michigan resident, purchased a Peloton product occurred in New York.").

Pearlman responds that her "materially expanded allegations" show that "New York is where Peloton's top-level business decisions are made, where its marketing decisions are made, where its deceptive advertising and false representations are finalized, where those acts ultimately emanate from, where it interacts with customers through its app and website, where all of its payment processes are devised, and where the revenues from those transactions ultimately flow."  Dkt. No. 90 at 1.  Such allegations are not sufficient.  All of these allegations merely go to show that Peloton is based in New York—a fact which no one disputes and which is not enough to subject it to New York law for a transaction taking place elsewhere.  In order for statutory standing to arise, Peloton's residency is not the issue—the issue is the location of the underlying transaction.  Likewise, Pearlman misstates the standard when she argues that the requirements for statutory standing are satisfied by a showing that "for each transaction, the payment actually reached New York."  Dkt. No. 90 at 8.  As discussed above, such a standard would extend NYGBL liability to any transaction that resulted in monies flowing to a New York bank account—an unwarranted expansion of NYGBL liability.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 172 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 172 of 465

ADD-124

Case 1:19-cv-11711-LJL    Document 102    Filed 07/12/21    Page 10 of 11

Pearlman additionally claims that statutory standing should be found based on the accumulation of factors present here, even if none of those factors would be sufficient to support a finding of statutory standing on its own.  According to Pearlman, where a defendant (1) selects New York law as controlling; (2) communicates and sells its products from New York; and (3) is paid in New York via electronic payment transactions from out-of-state, a plaintiff has statutory standing under the NYGBL.  Pearlman argues that "[c]ase after case" supports statutory standing on those facts.  But, as discussed above, the connection Pearlman draws between the payments and New York is too slender to support statutory standing.  The only connection she draws is that the payments she made ultimately found their way to Peloton in New York and were recorded there.  But courts have held that that is not enough.  *See, e.g*, *Wright*, 439 F. Supp. 3d at 110 (holding that the allegation that the defendant received payment in New York was merely a restatement of the allegation that New York was the defendant's principal place of business); *TouchTunes*, 211 F. Supp. 3d at 635 (holding that the New York residency of "the ultimate recipient of the[] out-of-state payments" was not sufficient to establish standing).  In the absence of a stronger nexus between the transaction and New York, Pearlman's claim cannot go forward.

Pearlman has already had one opportunity to amend the complaint.  Even after discovery, she has failed to allege that she has statutory standing to pursue her claims under the NYGBL.  *See, e.g.*, *Pierce v. Fordham Univ.*, 2016 WL 3093994, at *7 (S.D.N.Y. June 1, 2016) ("[I]f Plaintiff had better facts to allege, it is safe to assume that she would have alleged them.  That is, Plaintiff fails to give 'any indication that [she] is in possession of facts that would cure the problems identified in this opinion.'") (quoting *Clark v. Kitt*, 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014)) (alterations in original); *see also*, *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) ("Leave to amend is especially inappropriate where, as here,

plaintiffs' proposed amendments merely recycled versions of claims which had already fallen victim to a motion to dismiss.").  Because Pearlman has failed to cure the deficiencies the Court found in the original complaint, further amendment is not warranted, and Pearlman's New York claims are dismissed with prejudice.

Pearlman has additionally requested leave to amend the complaint to plead claims under the Michigan Consumer Protection Act.  Leave to amend should be "freely give[n] . . . when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "[T]he 'permissive standard' of Rule 15 'is consistent with [the Second Circuit's] strong preference for resolving disputes on the merits.'"  *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (per curiam)).  Because Pearlman has not yet had an opportunity to plead her case under Michigan law and because Peloton has not articulated any bad faith or any prejudice it would suffer from the amendment, the Court grants leave to amend the complaint to plead those claims.

## CONCLUSION

For the following reasons, Pearlman's claims under the NYGBL are DISMISSED with prejudice.  Pearlman has leave to amend the complaint to plead her claims under Michigan law within fourteen days of this Order.  The Clerk of Court is respectfully directed to close the motions at Dkt. Nos. 84 and 88.

SO ORDERED.

Dated: July 12, 2021
     New York, New York

                       LEWIS J. LIMAN
                  United States District Judge

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 174 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 174 of 465

ADD-126

Case 1:19-cv-11711-LJL    Document 106    Filed 07/26/21    Page 1 of 48

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ERIC FISHON and ALICIA PEARLMAN, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>PELOTON INTERACTIVE, INC.,<br><br>        Defendant. | Case No. 1:19-CV-11711-LJL<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Eric Fishon and Alicia Pearlman (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (collectively, the "Class," as more fully defined below), bring this Second Amended Class Action Complaint ("Complaint") against Defendant Peloton Interactive, Inc. ("Peloton" or "Defendant"). Plaintiffs make the following allegations upon personal knowledge as to their own acts, upon information and belief, and their attorneys' investigation as to all other matters, alleging as follows:

I.    **NATURE OF THE ACTION**

1.    This action arises out of Peloton's misrepresentations and material omissions to Plaintiffs and the other Class members regarding the "ever-growing" size of its on-demand fitness class library and its impermissible and self-serving deletion of more than 50% of that library.

2.    Peloton is an exercise equipment and media company that was founded in 2012 and which is headquartered at 125 West 25th Street, New York, New York 10001. Peloton claims that it "is reinventing fitness with live & on-demand boutique studio classes you can take anytime

with the Peloton Bike, Peloton Tread & Peloton digital."[1]

3.     Peloton's main products are its luxury stationary bicycle ("Peloton Bike") and luxury treadmill ("Peloton Tread") (collectively, "hardware") that, through their built-in interactive touchscreens, allow users to watch live and pre-recorded (or "on-demand") fitness classes through a monthly subscription service, aiming to provide the experience of a live fitness class from the comfort of users' homes.  In addition, Peloton sells a subscription-only app known as Peloton Digital, which allows users without the Peloton hardware to access the live streaming and on-demand fitness library.

4.     Peloton's business initially started with its Peloton Bike, which offers live streaming and on-demand "spinning" classes from the comfort of consumers' homes.  "Spinning" classes are popular indoor cycling instruction classes, initially popularized in the mid-1990s, that consist of professional coaches providing real-time instruction, guidance, and encouragement to riders, over a soundtrack of popular and other songs.  Peloton has recently expanded this concept of interactive instructional fitness classes, over soundtracks of popular music, to Peloton Tread and other weightlifting, strength training, outdoor running, yoga, meditation, stretching, and cardio-fitness classes.

5.     Peloton markets and sells its subscription-based, on-demand fitness library for a monthly price of $39 to purchasers of the Peloton Bike and Peloton Tread ("Peloton Membership"), which, in addition to the live and on-demand classes, provides, among other features, advanced metrics and a live interactive leaderboard that allows users to compete against each other.  Subscribers to Peloton Digital pay a monthly price of $19.49 for access to Peloton's

---

[1] *See* https://twitter.com/onepeloton (last accessed Dec. 6, 2019).

live streaming and on-demand library (together, the "Subscription Service").[2]  The Subscription Service's content is coextensive across all platforms and includes the same live and on-demand bike, treadmill, free weight, yoga, and other fitness classes.

6.      On information and belief, all Peloton members must keep a credit card on file with Peloton in order to access the Subscription Service.

7.      Peloton sees itself as a uniquely New York company.  Peloton's co-founder and CEO, John Foley, stated that "New York City is where Peloton started, and it will continue to be our home as we scale our business globally," while noting that New York City is where the best talent can be found at the "intersection of fitness, technology and media[.]"[3]  Peloton's executive offices, accounting and finance department, marketing departments, studios, content production, and all of its other significant operations, including its banking operations, are headquartered or otherwise based in New York.  In fact, New York is so central to Peloton's identity that, in its uniform contract with members from around the world, it requires that New York law apply to all aspects of those contractual relationships, to the exclusion of other states' laws.

8.      Any time a member purchases Peloton hardware, a Peloton Membership, Peloton Digital, or the Subscription Service, that member's payment is routed to Peloton's bank accounts in New York.

9.      These payments are recorded and managed by Peloton's Accounting and Finance department, located at Peloton's New York headquarters.

10.      Upon information and belief, Peloton does not accept cash as a form of payment.

---

[2] *See* https://www.onepeloton.com/membership

[3] *See* https://www.prnewswire.com/news-releases/peloton-to-expand-nyc-footprint-with-new-corporate-headquarters-at-hudson-commons-in-2020-300752307.html

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 177 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 177 of 465

ADD-129

11.    In exchange, the member gets access to the classes recorded, produced, and issued from Peloton's New York studios located at 140 West 23rd Street, New York, New York  10011 and 152 Christopher Street, New York, New York 10014.  During the class period, Peloton's classes were filmed in New York.

12.    In order to acquire and retain members, Peloton purposefully and affirmatively engages in a variety of advertising and marketing campaigns originating from and/or approved by its Creative, Acquisition Marketing, Brand Marketing, and Retention Marketing departments, all located at Peloton's New York headquarters.

13.    In order to differentiate itself from other fitness companies that market and sell similar fitness hardware, in-studio workout classes, and instructional home workout media, Peloton's marketing departments aided in developing a campaign to promote access to an "ever-growing" digital library of fitness classes led by professional instructors, available on-demand 24 hours per day, 7 days per week, from the comfort of one's home, for a flat monthly subscription fee.  Approval for Peloton's "ever-growing library" representations occurred in New York, as well as, on information and belief, the formulation of Peloton's entire business model, including its "ever-growing" library.

14.    The purpose and effect of this marketing campaign is that Peloton members and prospective members choose Peloton over competing fitness products, at least in part, because of access to a constantly growing number of digital classes, helping to replicate the same experience of an in-person exercise studio where a class can never be the same twice.

15.    Peloton's "ever-growing" on-demand library is central to its marketing, because Peloton needs to ensure that customers spending thousands of dollars on the Peloton hardware and Peloton monthly workout class subscriptions will not run out of new classes over time and will

also be able to take and retake older classes. The size of Peloton's on-demand digital library has always been, and continues to be, central to Peloton's marketing[4] because "the hardware is only as good as the app and subscription that comes with it."[5]

16.    The importance of Peloton's "ever-growing" on-demand library to its business model is demonstrated by the company's pre-IPO filing, classifying Peloton as a "technology," "media," and "software" company.[6] John Foley, Peloton's CEO and co-founder, has described Peloton as a "media company akin to Netflix" with "*10,000 classes on-demand*" (emphasis added).[7] The company also recently invested $45 million to build the "best digital television streaming studio in the world."[8]

17.    Peloton's website touted its "thousands of boutique classes," and "ever-growing library of live and on-demand studio classes."[9] Its website likewise represented that its Subscription Service grants "unlimited access to a growing library of live streaming and on-demand classes, scenic rides, real-time performance tracking, and unlimited accounts for family and friends. No classes offered by Peloton are off limits."[10]

---

[4] *See* https://onepeloton.com/bike/classes (last accessed Dec. 6, 2019).

[5] *See* https://www.forbes.com/sites/bizcarson/2019/09/26/peloton-ceo-john-foley-faces-the-skeptics-again-this-time-buyers-in-its-8-billion-ipo/#3b8f0f6f4349 (last accessed Dec. 6, 2019).

[6] *See* https://fortune.com/2019/09/25/peloton-ipo-filing-media-company/

[7] *See* https://www.bizjournals.com/newyork/news/2018/08/03/peloton-ceo-were-becoming-a-media-company.html (last accessed Dec. 6, 2019).

[8] *Id.*

[9] https://www.onepeloton.com/digital (as of Apr. 25, 2019); *see also* https://www.onepeloton.com/bike/classes
("Thousands of On-Demand Rides. Take a class anytime, with our daily-updated, extensive on-demand library"); *id.* ("Thousands of rides on-demand. Rider anytime with thousands of classes to choose from on-demand.") (last accessed Dec. 6, 2019).

[10] *See* https://support.onepeloton.com/hc/en-us/articles/201039338-Rides-included-with-the-Peloton-subscription.

18.    Music has been central to the Peloton class experience from the beginning.  Every on-demand and studio class includes a themed playlist curated by the instructor to match the tempo and intensity of the class.  Peloton recognizes that "[m]usic is an important element of the overall content that [it] make[s] available to [its] Members,"[11] and, in May 2017, Peloton introduced a new feature allowing members to find on-demand classes based on the type of music featured therein.[12]

19.    Peloton is a sophisticated software company that provides content protected by various intellectual property laws.  Peloton fully understands what the copyright laws require, having entered into sync licenses with certain other copyright holders, while, at the same time, using other musical works for free and without permission.[13]

20.    Peloton knew that it was, in part, building its on-demand library with copyrighted material for which it did not have the proper licenses.  Peloton thus knew or should have known that because it lacked the appropriate licenses for the music accompanying the classes in its on-demand digital library, its library cannot legitimately be "ever-growing" and was actually knowingly built, in material part, on an illegal foundation.

21.    In April 2018, Peloton received a cease-and-desist letter regarding its alleged copyright infringement of many songs appearing in classes in its on-demand class library.[14]

---

[11] SEC Form S-1 Registration Statement at 18, available at
https://www.sec.gov/Archives/edgar/data/1639825/000119312519230923/d738839ds1.htm

[12] *See Find Your Favorite Genres with Our Brand-New Music Filtering Feature*, Cadence (May 26, 2017), https://cadence.pelotoncycle.com/find-favorite-genres-brand-new-music-filtering-feature/1907/ (last accessed Dec. 6, 2019).

[13] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 90, ¶ 1 (S.D.N.Y. Sept. 27, 2019).

[14] Peloton's classes consist of coaches providing real-time instruction, guidance, and encouragement to riders, over a soundtrack of popular and other songs.

6

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 180 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 180 of 465

ADD-132

Case 1:19-cv-11711-LJL   Document 106   Filed 07/26/21   Page 7 of 48

Notwithstanding being placed on notice of its alleged copyright infringement, Peloton continued to promise an "ever-growing" class library to consumers and to heavily market that fact to its customers and prospective customers as a key Peloton selling point.

22.    In March 2019, several members of the National Music Publishers Association ("NMPA") collectively filed a lawsuit against Peloton, seeking more than $150 million in damages, alleging that Peloton has been using their musical works for years in its workout videos without proper licensing, resulting in lost income for songwriters.  The lawsuit further alleged that "Peloton's infringement was and continues to be knowing and reckless" and that "Peloton fully understood what the copyright law required, having entered into sync licenses with certain other copyright holders, while trampling the rights of Plaintiffs by using their musical works for free and without permission."[15]

23.    Although Peloton denied that it was violating copyright laws and asserted counterclaims against the NMPA for antitrust violations and tortious interference with prospective business relations, on March 25, 2019, in the face of the NMPA's copyright infringement lawsuit, Peloton—for its own economic advantage and to the financial detriment of its customers— abruptly removed every class from its on-demand library that contained one or more of the allegedly copyright infringing songs.  In total, this resulted in the removal of more than half of the classes from its on-demand library.[16]

24.    The decision to remove the majority of Peloton's on-demand library was made in New York and effectuated in New York.

---

[15] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 76, ¶ 1 (S.D.N.Y. Sept. 27, 2019).

[16] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 31, Counterclaims ¶ 59 (S.D.N.Y. Apr. 30, 2019); *see also id.*, Counterclaims ¶¶ 10, 42, 46, 52, 57.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 181 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 181 of 465

ADD-133

Case 1:19-cv-11711-LJL    Document 106    Filed 07/26/21    Page 8 of 48

25.    Prior to March 25, 2019, Peloton's Subscription Service had more than 12,000 on-demand classes available to its users.  Following Peloton's self-serving decimation of its on-demand library from its New York headquarters, less than half of its on-demand classes remained available to users.[17]

26.    Peloton's abrupt removal of the infringing soundtracks led to the removal of an many thousands of classes, more than 50% of its on-demand digital library, thereby greatly reducing the on-demand options upon which Peloton bases so much of its marketing and uses as a differentiating factor to garner more customers.[18]

27.    The copyright infringement lawsuit and subsequent purge of Peloton's on-demand library has also significantly decreased the quality and quantity of popular music available on Peloton's workout class playlists, which has materially diminished users' experience with the hardware and Subscription Service.[19]  The infringing works include songs from popular artists such as Beyoncé, Michael Jackson, Madonna, Kanye West, Jay Z, Luke Bryan, and Justin Timberlake, to name a few.[20]  In addition to losing more than 50% of their on-demand classes, users have lamented that the workouts in the new classes (those without the removed songs) don't

---

[17] *See* https://imgur.com/XxdUOJn; *see also* https://docs.google.com/spreadsheets/d/1LAE9kDqxkj4CkZ7TzS7ce6g5cxkMUOMdDssxKWpS0ak/edit?usp=sharing.

[18] *See* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider (Mar. 27, 2019), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3

[19] *See* Natt Garun, *Peloton owners are pissed about bad music after copyright lawsuit*, The Verge (April 24, 2019, 1:47 p.m.), https://www.theverge.com/2019/4/24/18514036/peloton-music-copyright-fitness-studios-gym-on-demand-media-strategy; *see also* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider US (March 27, 2019), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3

[20] *See* Exhibit A: Non-Exhaustive List of Works Infringed by Peloton, by Publisher (Ex. 3).

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 182 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 182 of 465

ADD-134

Case 1:19-cv-11711-LJL   Document 106   Filed 07/26/21   Page 9 of 48

"flow like they used to" and have struggled to "find a playlist with 50 percent decent songs" since Peloton's removal of the infringing works.[21]

28.    Peloton's CEO falsely promised subscribers to its Subscription Service that the removal of "classes" would "not affect your experience with (or the cost of) [Peloton's] service, or access to the kind of music you're used to hearing behind [Peloton's] instructors in the thousands of classes in [Peloton's] library."[22]   That representation, however, is demonstrably false, and Peloton never disclosed to its subscribers, including Plaintiffs and the other Class members, that it would be removing over half of the classes from its on-demand library.

29.    The NMPA amended its complaint against Peloton alleging that it "found another 1,324 songs that have been streamed by Peloton instructors during classes without approval," which will likely result in Peloton's removal of additional classes from its on-demand library.[23] The NMPA then sought over $300 million in damages for Peloton's knowing, widespread copyright infringement.[24]   Peloton later settled the lawsuit.[25]

30.    Despite being put on actual notice as early as April 9, 2018 that it was using infringing songs to build its digital library, Peloton's website continued to market "an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors."[26]   It

---

[21] *See* Natt Garun, *Peloton owners are pissed about bad music after copyright lawsuit*, The Verge (April 24, 2019), https://www.theverge.com/2019/4/24/18514036/peloton-music-copyright-fitness-studios-gym-on-demand-media-strategy.

[22] *See* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider (Mar. 27, 2019), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3

[23] *See* https://observer.com/2019/09/peloton-music-licensing-lawsuit-ipo/

[24] If Peloton removes additional classes from its on-demand library due to the expanded scope of the infringement allegations, the class alleged herein will increase commensurately.

[25] *See* https://www.prnewswire.com/news-releases/nmpa-and-peloton-announce-settlement-of-litigation-joint-collaboration-agreement-301012233.html

[26] *See* https://www.onepeloton.ca/app (last accessed Dec. 6, 2019).

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 183 of 465
Case 1:19-cv-11711-LGS    Document 596    Filed 09/02/25    Page 183 of 465

ADD-135

Case 1:19-cv-11711-LJL    Document 106    Filed 07/26/21    Page 10 of 48

also notifies consumers during the purchasing process that its "Bike packages" require a monthly

Peloton Membership,[27] which includes "unlimited access to a growing library of live streaming

and on-demand Peloton classes."[28]

31.     As part of Plaintiffs' and the other Class members' Peloton subscriptions, they

expected and were entitled to use a substantial, on-demand class library that would continue to

grow, as Peloton repeatedly represented.  Yet, when Peloton accepted (and continues to accept)

Plaintiffs' and the other Class members' subscription payments, Peloton knew or should have

known that Plaintiffs and the other Class members would not be able to use the full on-demand

class library because the number of on-demand classes was materially decreasing due to Peloton's

wrongful conduct.

32.     Nonetheless, Peloton misrepresented and/or omitted that information from

Plaintiffs and the other Class members, continued to represent to existing and potential subscribers

that its on-demand digital library would be "ever-growing," and continued to charge full price for

its Subscription Service, despite knowing that its subscribers would necessarily not be receiving

everything that Peloton represented they would receive.

33.     In a November 19, 2018 press release—months after Peloton received the cease

and desist letter from the NMPA—Peloton represented that "Peloton produces nearly 24 hours of

live content per day from its Peloton Bike and Peloton Tread Studios in NYC, ***and has more than***

***10,000 live and on-demand instructor-led indoor cycling, running, bootcamp, yoga and***

***stretching classes for its Peloton Bike, Peloton Tread and Peloton Digital platforms.***  To date,

Peloton has nearly one million Members, comprising Peloton Bike and Peloton Tread owners, iOS

---

[27] *See* https://www.onepeloton.com/shop/bike (last accessed Dec. 6, 2019).

[28] *See* https://www.onepeloton.com/shop/bike/subscription (last accessed Dec. 6, 2019).

app users and in-studio riders, and expects to add millions more in the coming years." (emphasis added).[29]

34.     By misrepresenting that its on-demand digital library would be "ever-growing" and failing to disclose the imminent removal of over half of its on-demand library, Peloton—from and through its New York headquarters—entered into contractual relationships with Plaintiffs and the other Class members, engaged in financial transactions and accepted payments from Plaintiffs and the other Class members, and defrauded Plaintiffs and the other Class members, depriving them of the benefit of their bargain with Peloton, and/or unjustly enriching itself at Plaintiffs' and the other Class members' expense, as a result of Peloton's wrongful conduct alleged herein.  Plaintiffs, individually and on behalf of the other Class members they seek to represent, seek monetary damages, statutory penalties, and injunctive relief, asserting claims for Peloton's violation of New York's consumer protection and false advertising statutes, N.Y. Gen. Bus. Law §§ 349 and 350, breach of contract, and unjust enrichment.

## II.    PARTIES

### A.    Plaintiffs

35.     Eric Fishon is a citizen of New York, residing in Suffolk County, New York. Plaintiff Fishon, relying on Peloton's uniform representations about its "ever-growing" on-demand library of fitness classes, entered into a transaction with New York-based Peloton, resulting in his purchase of a Peloton Bike and the Peloton Membership in January 2018, and a Peloton Tread in November 2018, and has paid all required hardware, software, and subscription fees relating thereto.

---

[29] *See* https://www.prnewswire.com/news-releases/peloton-to-expand-nyc-footprint-with-new-corporate-headquarters-at-hudson-commons-in-2020-300752307.html (last accessed Dec. 5, 2019).

ADD-137

36.    Eric Fishon's purchase of his Peloton membership was made electronically, as have all his monthly fee payments.

37.    Alicia Pearlman is a citizen of Michigan, residing in Oakland County, Michigan. Plaintiff Pearlman, relying on Peloton's uniform representations about its "ever-growing" on-demand library of fitness classes, entered into a transaction with New York-based Peloton, resulting in her purchase of Peloton's hardware and the Peloton Membership in November 2018, and has paid all required hardware, software, and subscription fees relating thereto.

38.    Alicia Pearlman's purchase of her Peloton membership was made electronically, as have all her monthly fee payments.

39.    Both Plaintiffs have continued to pay Peloton for subscription services since they acquired the Peloton hardware, and both Plaintiffs have continued to pay those services electronically with a credit card.

40.    Prior to purchasing the Peloton hardware and commencing payment for the Peloton Membership subscription, neither Peloton nor its agents or representatives informed Plaintiffs that Peloton had been accused of violating any laws or that more than 50% of its Subscription Service's on-demand digital library would be removed.

41.    Peloton's representations and material omissions regarding its on-demand library caused Plaintiffs to pay increased costs for the Peloton hardware and corresponding Peloton Membership, which was worth less than represented because Peloton's representations and/or omissions regarding its on-demand digital library were deceptive and misleading and constituted false advertising.

42.    Peloton's representations and material omissions were part of the basis of the bargain, in that Plaintiffs attributed value to Peloton's promises regarding the nature and

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 186 of 465
Case 1:19-cv-11711-LGS    Document 5S6    Filed 09/02/25    Page 186 of 465

ADD-138

Case 1:19-cv-11711-LJL    Document 106    Filed 07/26/21    Page 13 of 48

characteristics of its on-demand digital library and would not have purchased the hardware and corresponding Peloton Membership, or would not have purchased it on the same terms, if they knew the truth that Peloton's on-demand digital library would shrink by more than 50%.

**B.    Defendant**

43.    Peloton is a Delaware corporation, with its corporate headquarters and principal place of business located in New York City, New York.  Peloton is subject to the jurisdiction of this Court and may be served with process at its principal executive office located at 125 West 25th Street, 11th Floor, New York, New York.

44.    Peloton, from its New York headquarters, markets and sells its apparel, hardware accessories, hardware, and Subscription Service throughout the United States including in this District.  Peloton is registered with the New York State, Department of State to conduct business in New York.

45.    Peloton bills itself as "the largest interactive fitness platform in the world," claiming, as of September 30, 2020, to have more than 3.6 million members, and 2020 revenues of $1.8 billion.  Peloton is publicly-traded on NASDAQ ("PTON") and as of the date of this Complaint, had a market cap exceeding $44 billion.

**III.    JURISDICTION AND VENUE**

46.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action, there is minimal diversity, and the amount in controversy exceeds $5 million, exclusive of interest and costs.

47.    The Court has personal jurisdiction over Peloton because it resides and is subject to general jurisdiction in this District.  The Court also has personal jurisdiction over Peloton, because it markets, distributes, and sells its apparel, hardware, accessories, and Subscription Service throughout the United States, including in this District, and the conduct complained of

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 187 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 187 of 465

ADD-139

Case 1:19-cv-11711-LJL   Document 106   Filed 07/26/21   Page 14 of 48

occurred in or was targeted at this District.  Additionally, Peloton's Terms of Service provides that all disputes not required to be arbitrated be adjudicated in New York, New York and are to be governed by New York law.[30]

48.    Venue is proper in this District, because Defendant resides in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. 28 U.S.C. § 1391(b)(1)-(2).

## IV.    PELOTON'S ARBITRATION CLAUSE

49.    Peloton categorically denies that it used infringing songs in its on-demand classes and that it continues to violate copyright laws.[31]  Notwithstanding its contention that that it has done nothing wrong, Peloton nonetheless chose to unilaterally gut its on-demand library for its own economic advantage and financial benefit to the material detriment of Plaintiffs and the other Class members.

50.    Peloton felt empowered to cheat Plaintiffs and the other Class members by gutting its on-demand library for its own commercial protection and advantage because its Terms of Service contains a highly restrictive arbitration clause that provides that "any dispute, claim or controversy arising out of or relating to these Terms or the breach, termination, enforcement, interpretation or validity thereof or the use of the Services or Content (collectively, 'Disputes') will be resolved **solely by binding arbitration**. . . ." (emphasis added).[32]  Peloton's Terms of Service in effect during the Class Period were drafted by its outside legal counsel, Fenwick & West LLP, in New York.

---

[30] *See* Peloton Terms of Service at 21-22 (Ex. 1).

[31] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 87, ¶ 1 (S.D.N.Y. Oct. 11, 2019).

[32] *See* Ex. 1 at 18.

51.     Due to the empowerment from affirmatively stripping Plaintiffs and the other Class members of their Seventh Amendment right to a jury trial and forcing them into secret, individual arbitrations, Peloton believed that it could advantage itself at consumers' expense without material legal consequences or exposure.  Pelton believed that very few, if any, of its customers would pursue arbitration because it knows that claimants are "highly unlikely to slog through a protracted arbitration process over a relatively low amount of money" and the "total number of consumer claims resolved through arbitration across the entire economy in the third quarter of 2019 was 1,483—a new high but also a relatively small number in a nation of over 330 million."[33]

52.     Peloton did not anticipate, however, that, in the face of its misconduct, more than 2,700 customers would file arbitration demands arising out of its self-serving purge of its on-demand library.

53.     Under the terms of Peloton's arbitration clause it was obligated to pay "all filing, administration and arbitrator fees and expenses" associated with its customers' demands for arbitration.[34]

54.     Peloton, however, faced with far more arbitration demands than it expected when it instituted its anti-consumer arbitration clause, *refused to abide by the terms of its own arbitration clause*, ignoring the American Arbitration Association's ("AAA") requirement—and Peloton's contractually-mandated obligation to pay all filing costs—to pay filing fees for demands seeking less than $10,000.

---

[33] *See* David Dayen, *Tech Companies Big Reveal: Hardly Anyone Files Arbitration Claims*, The American Prospect (Nov. 26, 2019), https://prospect.org/power/tech-companies-hardly-anyone-files-arbitration-claims/

[34] *See* Ex. 1 at 19-20.

ADD-141

55.     As a result, on November 14, 2019, AAA wrote a letter to Peloton, notifying it that AAA "decline[d] to proceed with administration of the parties' disputes" and that "either party may choose to submit its dispute to the appropriate court for resolution."[35]    Additionally, AAA notified Peloton that "AAA will decline to accept future consumer matters submitted  against or by [Peloton]" and requested that Peloton "remove AAA from its consumer arbitration agreements so that there is no confusion to Peloton's consumer customers."[36]

56.     As of the date of the initial filing of this action, Peloton had refused to comply with AAA's request to remove AAA from its arbitration agreements and it continued to represent to its customers that they were subject to binding arbitration with AAA in order to deter customers from filing lawsuits.

57.     The arbitration clause, and all provisions contained therein, is an inextricable part of Peloton's Terms of Service with Plaintiffs and the other Class members.  Accordingly, as a result of Peloton's failure to comply with the terms of its arbitration clause and AAA's Consumer Arbitration Rules, Peloton's arbitration clause, including its class action waiver provision and all other provisions, is invalid as to all its customers—including Plaintiffs and the other Class members.[37]

## V.    FACTUAL ALLEGATIONS

**A.    Peloton's "Ever-Growing" On-Demand Library Claim Is Essential To Its Business Model.**

58.     Peloton is an exercise equipment and media company that was founded in 2012. John Foley, its co-founder and CEO, describes Peloton as a "fitness platform" where "fitness meets

---

[35] *See* November 14, 2019 AAA Letter to Peloton (Ex. 2).

[36] *Id.*

[37] *See* Ex. 2.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 190 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 190 of 465

ADD-142

technology, meets media."[38]  Peloton claims that it "is reinventing fitness with live & on-demand boutique studio classes you can take anytime with the Peloton Bike, Peloton Tread & Peloton digital."[39]

59.    As of September 2020, Peloton claimed to have more than 3.6 million members.[40] The company was valued at $4 billion after it closed a $550 million financing round in August 2018.[41]  In late August 2019, Peloton filed to go public and in its Initial Public Offering ("IPO") it roughly doubled its private market valuation, being valued at about $8 billion.[42]  Peloton's value has continued its exponential growth, with a current market cap exceeding $44 billion.

60.    Peloton's business initially started with its Peloton Bike, which offers live streaming and on-demand "spinning" classes from the comfort of consumers' homes.  "Spinning" classes are popular indoor cycling instruction classes, initially popularized in the mid-1990s, that consist of professional coaches providing real-time instruction, guidance, and encouragement to riders, over a soundtrack of popular and other songs.  Peloton has recently expanded this concept of interactive instructional fitness classes, over soundtracks of popular music, to Peloton Tread and other weightlifting, strength training, outdoor running, yoga, meditation, stretching, and cardio-fitness classes.

---

[38] *See* http://media.licdn.com/embeds/media.html?src=https%3A%2F%2Fwww.youtube.com%2Fembed%2FFWXadxuOuSQ%3Ffeature%3Doembed&amp;url=https%3A%2F%2Fwww.youtube.com%2Fwatch%3Fv%3DFWXadxuOuSQ&amp;type=text%2Fhtml&amp;schema=youtube (last accessed Dec. 6, 2019).

[39] *See* https://twitter.com/onepeloton (last accessed Dec. 6, 2019).

[40] *See* https://investor.onepeloton.com/investor-relations (last accessed Jan. 7, 2021).

[41] *See* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider (Mar. 27, 2019, 10:30 a.m.), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3

[42] *See* Jeremy C. Owens, *Peloton IPO: 5 things to know about the interactive exercise-machine company*, Market Watch (Sept. 28, 2019), https://www.marketwatch.com/story/peloton-ipo-five-things-to-know-about-the-interactive-exercise-machine-company-2019-08-28

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 191 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 191 of 465

ADD-143

61.    In 2014, Peloton released its eponymous stationary exercise bike at a price of $2,245.  The bike includes a 22-inch interactive touchscreen, which allows riders to watch live or pre-recorded classes, aiming to provide the experience of a spin class from the comfort of the users' homes.

62.    In January 2018, Peloton announced the release of its treadmill known as "Tread" for $4,295.  Similar to its stationary bike, Tread has a 32-inch interactive touchscreen, which allows runners to watch live or pre-recorded classes led by professional trainers.

63.    For consumers who purchase Peloton's hardware, Peloton offers its Peloton Membership, which in addition to its live and on-demand fitness classes, includes Connected Fitness options such as instructor-curated training programs, live workout metrics, a detailed workout performance dashboard, and live and on-demand class interactive leaderboards.  Peloton Membership subscribers pay $39 per month for this service.  Peloton refers to customers that purchase the Peloton hardware and corresponding Peloton Membership as "Connected Fitness Subscribers."

64.    Recognizing the limited opportunity for growth due to a crowded market space and the high price point of its hardware, in July 2018 Peloton released Peloton Digital, which provides subscribers access to the same live and on-demand fitness classes without having to purchase the Peloton hardware.  Peloton Digital members pay $19.49 per month for this service.[43]

65.    On information and belief, both these subscription packages require electronic payment, with the proceeds deposited into Peloton's New York bank accounts.

---

[43] *See* https://www.bizjournals.com/newyork/news/2018/08/03/peloton-ceo-were-becoming-a-media-company.html (last accessed Dec. 6, 2019).

ADD-144

66.    Peloton Digital allows Peloton to market its Subscription Service to consumers who already have a (non-Peloton) treadmill or stationary bike as well as those who prefer to use Peloton's outdoor, free weight, yoga, and other fitness classes.   The content provided by the Peloton Membership and Peloton Digital subscriptions are coextensive and include the same live and on-demand fitness classes.[44]  Because the Peloton Digital app does not provide the Connected Fitness options and integrated experience that the Peloton hardware offers, the appeal of the Peloton Digital app is its "ever-growing" on-demand library of fitness classes.

67.    Demonstrating the importance of its "ever-growing" library of on-demand fitness classes to its business model, the company's pre-IPO filing classifies Peloton as a "media" company and John Foley, Peloton's CEO and co-founder, has described the company as a "media company akin to Netflix" with "10,000 classes on-demand" and the "best digital television streaming studio in the world."[45]

68.    Peloton differentiates itself and its more expensive fitness hardware from other fitness companies by offering unlimited access to its "ever-growing" on-demand library of professional fitness classes available at the users' convenience.

69.    The purpose of this representation is to induce consumers into purchasing Peloton products, believing they will have a constantly growing catalogue of digital classes to choose from for their exercise routines.

---

[44] *Id.*

[45] *Id.*

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 193 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 193 of 465

ADD-145

70.    In its pre-IPO filings, Peloton claimed to have "disrupted the fitness industry by developing a first-of-its-kind subscription platform that seamlessly combines the best equipment, proprietary networked software, and world class streaming digital fitness and wellness content."[46]

71.    Peloton claims that 92% of its hardware ever sold still has an active Peloton Membership subscription attached as of June 30, 2019.[47]  Thus, it is the subscription model that Peloton hopes will keep the company growing and allow its business model to scale.[48]  In order to maintain its subscriber retention rate, however, Peloton knows that it must make it "easy for Members to find a class that fits their interests based on class type, instructor, music genre, length, available equipment, area of physical focus, and level of difficulty.[49]

72.    Peloton's "continued business and revenue growth is dependent on [its] ability to continuously attract and retain Subscribers. . . ."[50]

**B.    Peloton's "Ever Growing" On-Demand Library Is Central to Its Marketing**

73.    While other fitness companies market and sell similar fitness hardware for in-home use, provide in-studio classes where users pay on a per class basis, and home workout programs, Peloton has dominated the marketplace by aggressively marketing access to an "ever-growing" library of fitness classes led by professional instructors, available on-demand 24 hours per day, 7 days per week, from the comfort of the users' own homes for a flat monthly subscription fee.

---

[46] *See* SEC Form S-1 Registration Statement, available at
https://www.sec.gov/Archives/edgar/data/1639825/000119312519230923/d738839ds1.htm

[47] *Id.*

[48] *See* https://www.pymnts.com/subscriptions/2019/pelotons-ipo-to-test-subscription-models-fitness/

[49] *See* SEC Form S-1 Registration Statement, available at
https://www.sec.gov/Archives/edgar/data/1639825/000119312519230923/d738839ds1.htm

[50] *Id.*

ADD-146

74.    The "ever-growing" nature of Peloton's on-demand library is central to its marketing because Peloton must ensure that consumers spending thousands of dollars on the Peloton Bike or Peloton Tread and accompanying subscriptions will be able to take and retake older classes without running out of new classes over time.  Likewise, Peloton must ensure Peloton Digital subscribers that it will have enough new classes in each workout category to keep subscribers renewing their subscriptions.

75.    Until recently, Peloton's marketing departments prominently touted its "thousands of boutique classes," and "ever-growing library of live and on-demand studio classes" on the Peloton website.[51]  Peloton's website likewise represented that its Subscription Service grants "unlimited access to a growing library of live streaming and on-demand classes, scenic rides, real-time performance tracking, and unlimited accounts for family and friends.  No classes offered by Peloton are off limits."[52]

76.    As of November 2019, Peloton's website continued to market its digital library as "ever-growing" and "growing."  For example, the website for Peloton's app continues to market "an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors"[53]:

## The power of Peloton at your fingertips.

Explore an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors. Immerse yourself in our breathtaking studio experience anytime you want. Find a new favourite class just around the corner.

---

[51] https://www.onepeloton.com/digital (as of Apr. 25, 2019); *see also* https://www.onepeloton.com/bike/classes ("Thousands of On-Demand Rides. Take a class anytime, with our daily-updated, extensive on-demand library"); *id.* ("Thousands of rides on-demand. Rider anytime with thousands of classes to choose from on-demand.") (last accessed Dec. 6, 2019).

[52] *See* https://support.onepeloton.com/hc/en-us/articles/201039338-Rides-included-with-the-Peloton-subscription.

[53] *See* https://www.onepeloton.ca/app (last accessed Dec. 6, 2019).

77.    Further, in marketing its "Bike package" to consumers, Peloton continued to notify consumers that all packages "require a monthly Peloton Membership,"[54] which includes "unlimited access to a growing library of live streaming and on-demand Peloton classes"[55]:

## UNLIMITED ACCESS TO PELOTON CLASSES

With a Peloton Membership, you'll gain unlimited access to a growing library of live streaming and on-demand Peloton classes (cycling, running, bootcamp, floor, yoga and more), as well as performance tracking and unlimited profiles for family and friends.

Membership includes full access on a single Peloton Bike in one household, plus on-the-go access to Peloton Digital using our app. You may pause or cancel your membership at any time. See our Membership Terms for more details.

LEARN MORE

78.    Peloton's promise of an "ever-growing" on-demand library of classes drives sales of not only monthly subscriptions, but also its flagship Peloton Bike and Peloton Tread products.

79.    The size and "ever-growing" nature of Peloton's on-demand digital library has always been, and continues to be, central to Peloton's marketing[56] because "the hardware is only as good as the app and subscription that comes with it."[57]

## C.    Peloton Knew That Its "Ever Growing" and "Growing" On-Demand Library Claims Were False And Misleading

80.    Peloton is a sophisticated, multi-billion dollar company that specializes in providing consumers with digital content that is protected by various intellectual property laws. Peloton therefore knew or should have known that it was building its on-demand library with infringing songs and violating applicable copyright laws.

---

[54] *See* https://www.onepeloton.com/shop/bike (last accessed Dec. 6, 2019).

[55] *See* https://www.onepeloton.com/shop/bike/subscription (last accessed January 7, 2021).

[56] *See* https://onepeloton.com/bike/classes (last accessed Dec. 6, 2019).

[57] *See* https://www.forbes.com/sites/bizcarson/2019/09/26/peloton-ceo-john-foley-faces-the-skeptics-again-this-time-buyers-in-its-8-billion-ipo/#3b8f0f6f4349 (last accessed Dec. 6, 2019).

ADD-148

81.    Peloton fully understands what the copyright law requires, having entered into sync licenses with certain other copyright holders, while, at the same time, using other musical works for free and without permission.[58]  Peloton's knowing violation of copyright laws was part of "a strategy to build a music-centric brand that is now worth in excess of $6 billion" without having to pay for all the required licenses.[59]

82.    On April 9, 2018, Peloton was put on actual notice of its copyright infringement when it received a cease and desist letter from the NMPA notifying it of copyright infringement claims for Peloton's failure to receive proper licenses for some of the music playing in its on-demand fitness classes.

83.    Notwithstanding that fact, Peloton continued to promise an "ever-growing" library to consumers and to heavily market that fact to its customers and prospective customers as a key Peloton selling point.

84.    Implicit in Peloton's promise to provide an "ever-growing" on-demand library was that it would only place classes in the library that complied with applicable copyright law or that it would pay back damages to copyright holders to ensure that the size of the on-demand library would not shrink.

85.    On March 25, 2019, in contravention of its promise, Peloton abruptly removed more than half of its on-demand classes from its digital library.[60]  This decision to remove over half of Peloton's classes happened at Peloton's New York offices.

---

[58] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 90, ¶ 1 (S.D.N.Y. September 27, 2019).

[59] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 90, at 1 (S.D.N.Y. Oct. 25, 2019).

[60] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 31, Counterclaims ¶ 59 (S.D.N.Y. Apr. 30, 2019); *see also id.*, Counterclaims ¶¶ 10, 42, 46, 52, 57.

86.    Prior to March 25, 2019, Peloton's Subscription Service more than 12,000 on-demand classes available for its users.  Following Peloton's announcement, less than half of the classes remained available to users.[61]  Thus, the abrupt removal of the infringing soundtracks led to Peloton's removal of many thousands of classes, more than 50% of its Subscription Service's on-demand digital library.[62]

87.    After Peloton's purge of more than half of its on-demand library, the number of available on-demand classes was roughly equal to the number of on-demand classes that were available to consumers in January 2017.  Accordingly, contrary to its representations, Peloton's on-demand library, rather than being "ever-growing," was actually materially shrinking.

88.    Music is a central component of Peloton's workout classes and Peloton has deeply integrated music into the Subscription Service's interface—allowing users to search for workouts by music genre, as well as artist-specific playlists.  Users can also preview playlists for specific classes, "like" songs or playlists during their workouts, and save songs and playlists to their user profiles.  Music is thus critical to consumers' use and enjoyment of the hardware and Subscription Service, and its loss was a real and actual injury to consumers.

89.    The copyright infringement lawsuit and Peloton's subsequent purge its on-demand library significantly decreased the quality and quantity of popular artists and songs available on Peloton's workout class playlists, which materially diminished subscribers' experience with the

---

[61] *See* https://imgur.com/XxdUOJn (last accessed Dec. 5, 2019); *see also* https://docs.google.com/spreadsheets/d/1LAE9kDqxkj4CkZ7TzS7ce6g5cxkMUOMdDssxKWpS0ak/edit?usp=sharing (last accessed Dec. 5, 2019).

[62] *See* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider (Mar. 27, 2019), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3

hardware and Subscription Service.[63]  The infringing works include some of the most popular artists and songs, both currently and of all time.  Peloton has removed songs by a wide array of popular artists including, without limitation, Beyoncé, Brittany Spears,  Michael Jackson, Ariana Grande, Snoop Dogg, Dr. Dre, Katy Perry, Rihanna, Miley Cyrus, Motley Crue, Pink Floyd, Justin Bieber, David Bowie, Rascal Flatts, Bruno Mars, Selena Gomez, Maroon 5, Adele, Lady Gaga, Nicki Minaj, Whitney Houston, Justin Timberlake, Luke Bryan, Mariah Carey, Jay Z, Kanye West, Drake, and Madonna. [64]

90.    John Foley, Peloton's CEO, based in New York, emailed subscribers and notified them that Peloton was removing classes featuring the allegedly infringing songs, but failed to disclose that this would result in removal of more than half of the on-demand classes in its digital library or that it would significantly decrease the quality and quantity of popular songs and artists available for its playlists.

91.    Instead, Foley falsely promised Plaintiffs and the other Class members that "[Peloton] can assure you that this will not affect your experience with (or the cost of) [Peloton's] service, or access to the kind of music you're used to hearing behind [Peloton's] instructors in the thousands of classes in [Peloton's] library."

92.    That representation, however, is demonstrably false and Peloton never disclosed to its subscribers, including Plaintiffs and the other Class members, that it would be removing more than half of the classes from its on-demand library.

---

[63] *See* Natt Garun, *Peloton owners are pissed about bad music after copyright lawsuit*, The Verge (April 24, 2019), https://www.theverge.com/2019/4/24/18514036/peloton-music-copyright-fitness-studios-gym-on-demand-media-strategy; *see also* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider US (March 27, 2019), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3

[64] *See* Ex. 3.

93.     As of November 2019, Peloton's website continued to market its digital library as being "ever-growing" and "growing," despite knowing that the NMPA has recently amended its lawsuit alleging that it "found another 1,324 songs that have been streamed by Peloton instructors during classes without approval."[65]

94.     Therefore, despite Peloton's representations to the contrary, it knows or should know that the size of its on-demand digital library cannot legitimately be "ever-growing," but it continues to knowingly defraud its existing and potential customers—including Plaintiffs and the other Class members—for its own financial gain.

**D.    Peloton's Misrepresentations and Omissions Are Material to Consumers**

95.     Peloton's misrepresentations and omissions are material to Plaintiffs and the other Class members.  As part of Plaintiffs' and the other Class members' subscriptions, they expected and were entitled to use a class library that, as advertised by Peloton, would continue to grow as new classes were added every day.

96.     Each additional on-demand fitness class adds incremental value to Plaintiffs' and the other Class members' subscriptions and, therefore, Peloton's gutting of its digital library materially lowered the value of Plaintiffs' and the other Class members' subscriptions.

97.     When Peloton accepted Plaintiffs' and the other Class members' subscription payments in its New York bank accounts and then accepted and recorded those payments in its New York Accounting and Finance department, Peloton knew or should have known that Plaintiffs and the other Class members would not be able to use the full on-demand class library because the size of its on-demand library was materially decreasing.

---

[65] *See* https://observer.com/2019/09/peloton-music-licensing-lawsuit-ipo/ (last accessed Dec. 5, 2019).

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 200 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 200 of 465

ADD-152

Case 1:19-cv-11711-LJL   Document 106   Filed 07/26/21   Page 27 of 48

98.     Nonetheless, Peloton withheld that information from Plaintiffs and the other Class members, and its New York-based Creative and Marketing departments continued to represent to existing and potential subscribers that the on-demand digital library would be "ever-growing," and continued to charge full price for its Subscription Service, despite knowledge that subscribers would not be receiving everything Peloton represented that they would receive.

99.     These actions were outside of normal business practices and Peloton knew or should have known that its representations would harm an average consumer.  Peloton knew it could not live up to the promise it made active and prospective members.

100.     By misrepresenting that its on-demand digital library would be "ever-growing" and failing to disclose the imminent removal of over half of that library, Peloton defrauded Plaintiffs and the other Class members, deprived Plaintiffs and the other Class members of the benefit of their bargain with Peloton, and/or unjustly enriched itself at Plaintiffs' and the other Class members' expense.

## VI.    CLASS ACTION ALLEGATIONS

101.     Plaintiff Fishon brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure individually and on behalf of a class defined as:

> All purchasers of the Peloton hardware and/or corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019.

(the "Class," unless otherwise noted).

102.     Plaintiff Pearlman brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure individually and on behalf of a subclass defined as:

> All purchasers of the Peloton hardware and/or corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019 in the State of Michigan.

(the "Michigan Subclass"), unless otherwise noted and together with the Class, collectively referred to as the "Classes."

103.    Excluded from the Classes are Peloton and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; Court staff assigned to this case.  Plaintiffs reserve the right to modify or amend the Class definitions, as appropriate, during the course of this litigation.

104.    This action has been brought and may properly be maintained on behalf of the Classes proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

105.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**  The members of the Classes are so numerous and geographically dispersed that individual joinder of all Classes members is impracticable.  The precise number of Class members is unknown to Plaintiffs, but may be ascertained from Peloton's books and records and is presumed to be not less than hundreds of thousands of people.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

106.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).**  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

        a.    whether Peloton engaged in the conduct alleged herein;

        b.    whether Peloton's alleged conduct violates applicable law;

        c.    whether Peloton engaged in false or misleading advertising;

d.  whether Peloton's misrepresentations and omissions regarding the "ever-growing" nature of the Subscription Service's class library were likely to deceive Class members in violation of N.Y. Gen. Bus. Law §§ 349 and 350;

e.  whether Peloton's misrepresentations and omissions regarding the "ever-growing" nature of the Subscription Service's class library were material to a reasonable consumer;

f.  whether Class members overpaid for their Subscription Service as a result of the conduct alleged herein;

g.  whether Peloton's conduct violates public policy;

h.  whether Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

i.  the amount and nature of relief to be awarded to Plaintiffs and the other Class members.

107.  **Typicality – Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the other Class members' claims because Plaintiffs and the other Class members purchased Peloton's hardware and/or subscribed to Peloton's Subscription Service that falsely promised an "ever-growing" class library.  Each class in the on-demand library adds incremental value to Plaintiffs' and the other Class members' hardware and/or Subscription Service.  The value of Plaintiffs' and the other Class members' hardware and/or Subscription Service has therefore diminished and, as a result of Peloton's conduct, Plaintiffs and the other Class members overpaid for Peloton's hardware and/or Subscription Service.  Plaintiffs and the other Class members suffered damages as a direct and proximate result of the same wrongful conduct in which Peloton

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 203 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 203 of 465

ADD-155

Case 1:19-cv-11711-LJL    Document 106    Filed 07/26/21    Page 30 of 48

engaged.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other Class members' claims.

108.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members who they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.  Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

109.    **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Peloton has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members as a whole.

110.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Peloton, so it would be impracticable for the Class members to individually seek redress for Peloton's wrongful conduct.  Even if the Class members could afford litigation the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the

benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.   CLAIMS ALLEGED

### FIRST CLAIM FOR RELIEF

**Violation of New York General Business Law,
N.Y. Gen. Bus. Law § 349**
(brought on behalf of Plaintiff Fishon and the Class)

111.   Plaintiff Fishon repeats and realleges the allegations in Paragraphs 1-110, above, as if fully alleged herein.

112.   Plaintiff Fishon brings this claim individually and on behalf of the other Class members.

113.   Plaintiff Fishon has standing to bring this claim individually and on behalf of the other Class members because the underlying transactions at issue between Plaintiff Fishon and Peloton happened entirely, or predominantly, in New York.  The representations at issue emanated from New York, and, in exchange for payments routed to Peloton's New York bank accounts, Plaintiff Fishon was given access to a digital library of classes recorded and produced by Peloton in New York; Plaintiff Fishon's access to over half these classes was likewise revoked in New York.

114.   New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

115.   Peloton engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, by misrepresenting that its Membership and Subscription Service included access to an "ever-growing

ADD-157

library of live and on-demand studio classes" and willfully failing to disclose that it would be removing over half of its on-demand digital library.

116.    Peloton knew or should have known that it lacked the appropriate copyright licenses for the music accompanying the classes in its library, and that its library could not legitimately be "ever-growing."

117.    Peloton received a cease-and-desist letter regarding its copyright infringement on April 9, 2018, but continued to promise the "ever-growing" library to consumers.  On March 25, 2019, shortly after getting sued for copyright infringement, Peloton abruptly removed more than half of its content from its on-demand digital library.

118.    Despite knowing that the size of its on-demand digital library had decreased by more than 50%, Peloton continued to promise on its website "an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors"[66] and "unlimited access to a growing library of live streaming and on-demand Peloton classes."[67]

119.    Peloton's representations and omissions were material because they were likely to deceive reasonable consumers about the "ever-growing" nature of its on-demand digital library.

120.    Peloton acted intentionally, knowingly, and maliciously to violate New York's General Business Law, and recklessly disregarded Plaintiff Fishon's and the other Class members' rights.  Peloton had actual knowledge on April 9, 2018 that it could not provide an "ever-growing" library to consumers but it nonetheless continued to promise and represent an "ever-growing" library.

---

[66] *See* https://www.onepeloton.ca/app (last accessed Nov. 26, 2019).

[67] *See* https://www.onepeloton.com/shop/bike/subscription (last accessed Nov. 26, 2019).

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 206 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 206 of 465

ADD-158

Case 1:19-cv-11711-LJL    Document 106    Filed 07/26/21    Page 33 of 48

121.    As a direct and proximate result of Peloton's deceptive and unlawful acts and practices, Plaintiff Fishon and the other Class members suffered a real and substantial injury they could not have reasonably avoided.  Peloton deprived Plaintiff Fishon and the other Class members of the benefit of the bargain.  Plaintiff Fishon and the other Class members have suffered and will continue to suffer injury, ascertainable losses of money, and monetary and non-monetary damages because Plaintiff Fishon and the other Class members overpaid for Peloton's hardware, because they did not know the truth that Peloton would gut its on-demand digital library, shrinking it by more than 50%, and that it would not be "ever-growing."

122.    Peloton's deceptive and unlawful acts and practices complained of herein affected all purchasers of Peloton's hardware because the Peloton hardware is only as good as the app and subscription that comes with it.

123.    Peloton's above-described deceptive and unlawful practices caused substantial injury to Plaintiff Fishon and the other Class members that they could not reasonably avoid. Plaintiff Fishon and the other Class members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 per violation for each of Peloton's violations of N.Y. Gen. Bus. Law § 349 (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

124.    Each sale of the Peloton hardware to Plaintiff Fishon and the other Class members constitutes a separate, independent, and willful violation of N.Y. Gen. Bus. Law § 349 through the above deceptive acts and practices in the conduct of its business.

125.    Peloton should, therefore, be assessed a separate statutory penalty of $50 or actual damages (whichever is greater) for each independent violation, and all other such relief as may be

ADD-159

just and proper should be recovered by Plaintiff Fishon individually and on behalf of the other Class members.

## SECOND CLAIM FOR RELIEF

### Violation of New York General Business Law,
### N.Y. Gen. Bus. Law § 349.
(brought on behalf of Plaintiff Fishon and the Class)

126.   Plaintiff Fishon repeats and realleges the allegations in Paragraphs 1-110, above, as if fully alleged herein.

127.   Plaintiff Fishon brings this claim individually and on behalf of the other Class members.

128.   Plaintiff Fishon has standing to bring this claim individually and on behalf of the other Class members because the underlying transactions at issue between Plaintiff Fishon and Peloton happened entirely, or predominantly, in New York.  The representations at issue emanated from New York, and, in exchange for payments routed to Peloton's New York bank accounts, Plaintiff Fishon was given access to a digital library of classes recorded and produced by Peloton in New York; Plaintiff Fishon's access to over half these classes was likewise revoked in New York.

129.   New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

130.   Peloton engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, by misrepresenting that its Membership and Subscription Service included access to an "ever-growing library of live and on-demand studio classes" and willfully failing to disclose that it would be removing over half of its on-demand digital library, while persistently publishing marketing

34

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 208 of 465
Case 1:19-cv-11711-LGS    Document 356    Filed 09/02/25    Page 208 of 465

ADD-160

Case 1:19-cv-11711-LJL    Document 106    Filed 07/26/21    Page 35 of 48

assertions (and omissions) to the contrary.

131.    Peloton knew or should have known that it lacked the appropriate copyright licenses for the music accompanying the classes in its library, and that its library could not legitimately be "ever-growing."

132.    Peloton received a cease-and-desist letter regarding its copyright infringement on April 9, 2018, but continued to promise the "ever-growing" library to consumers.  On March 25, 2019, shortly after getting sued for copyright infringement, Peloton abruptly removed more than half of its content from its on-demand digital library.

133.    Despite knowing that the size of its on-demand digital library had decreased by more than 50%, Peloton continues to promise on its website "an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors"[68] and "unlimited access to a growing library of live streaming and on-demand Peloton classes."[69]

134.    Peloton's representations and omissions were material because they were likely to deceive reasonable consumers about the "ever-growing" nature of its on-demand digital library.

135.    Peloton acted intentionally, knowingly, and maliciously to violate New York's General Business Law, and recklessly disregarded Plaintiff Fishon's and the other Class members' rights.  Peloton had actual knowledge on April 9, 2018 that it could not provide an "ever-growing" library to consumers but it continued to promise an "ever-growing" library nonetheless.

136.    As a direct and proximate result of Peloton's deceptive and unlawful acts and practices, Plaintiff Fishon and the other Class members suffered injury.  Peloton deprived Plaintiff Fishon and the other Class members of the benefit of the bargain.  Plaintiff Fishon and the other

---

[68] See https://www.onepeloton.ca/app (last accessed Dec. 6, 2019).

[69] See https://www.onepeloton.com/shop/bike/subscription (last accessed Dec. 6, 2019).

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 209 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 209 of 465

ADD-161

Case 1:19-cv-11711-LJL    Document 106    Filed 07/26/21    Page 36 of 48

Class members have suffered and will continue to suffer injury, ascertainable losses of money, and monetary and non-monetary damages because Plaintiff Fishon and the other Class members overpaid for Peloton's Membership and Subscription Service because they did not know the truth that Peloton would gut its on-demand digital library, shrinking it by more than 50%, and that it would not be "ever-growing."

137.    Peloton's deceptive and unlawful acts and practices complained of herein affected all subscribers of the Peloton Membership and Subscription Service. The above deceptive and unlawful practices and acts by Peloton caused substantial injury to Plaintiff Fishon and the other Class members that they could not reasonably avoid. Plaintiff Fishon and the other Class members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 per violation (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

138.    Each time Peloton accepted a Membership or Subscription Service payment from Plaintiff Fishon and/or one or more of the other Class members, Peloton committed a separate, independent, and willful violation of N.Y. Gen. Bus. Law § 349 through the above deceptive acts and practices in the conduct of its business.

139.    Peloton should, therefore, be assessed a separate statutory penalty of $50 for each independent violation, and all other such relief as may be just and proper should be recovered by Plaintiff Fishon individually and on behalf of the other Class members.

### THIRD CLAIM FOR RELIEF

**Violation of New York General Business Law,**
**N.Y. Gen. Bus. Law § 350**
(brought on behalf of Plaintiff Fishon and the Class)

140.    Plaintiff Fishon repeats and realleges the allegations in Paragraphs 1-110, above,

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 210 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 210 of 465

ADD-162

Case 1:19-cv-11711-LJL    Document 106    Filed 07/26/21    Page 37 of 48

as if fully alleged herein.

141.    Plaintiff Fishon brings this claim individually and on behalf of the other Class members.

142.    Plaintiff Fishon has standing to bring this claim individually and on behalf of the other Class members because the underlying transactions at issue between Plaintiff Fishon and Peloton happened entirely, or predominantly, in New York.  The representations at issue emanated from New York, and, in exchange for payments routed to Peloton's New York bank accounts, Plaintiff Fishon was given access to a digital library of classes recorded and produced by Peloton in New York; Plaintiff Fishon's access to over half these classes was likewise revoked in New York.

143.    New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade, or commerce[.]"  False advertising includes "advertising including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light . . . representations [made] with respect to the commodity. . . ."  N.Y. Gen. Bus. Law § 350-a.

144.    Peloton caused to be made or disseminated, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known, to Peloton to be untrue and misleading to consumers, including Plaintiff Fishon and the other Class members.

145.    Peloton misrepresented through advertisements on its website that its Membership and Subscription Service included access to an "ever-growing library of live and on-demand studio classes" and, at the same time, willfully failed to disclose that it would be removing over half of its Subscription Service's on-demand digital library.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 211 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 211 of 465

ADD-163

Case 1:19-cv-11711-LJL    Document 106    Filed 07/26/21    Page 38 of 48

146.    Peloton knew or should have known that it lacked the appropriate copyright licenses for the music accompanying the classes in its library, and that its library could not legitimately be "ever-growing."

147.    Peloton received a cease-and-desist letter regarding its copyright infringement on April 9, 2018 but continued to promise the "ever-growing" library to consumers.  On March 25, 2019, shortly after getting sued for copyright infringement, Peloton abruptly removed more than half of its on-demand content from its on-demand digital library.

148.    Despite knowing that the size of its on-demand digital library had decreased by more than 50%, Peloton continues to advertise on its website "an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors"[70] and "unlimited access to a growing library of live streaming and on-demand Peloton classes."[71]

149.    Peloton has violated N.Y. Gen. Bus. Law § 350 because the misrepresentations and omissions regarding the "ever-growing" nature of its on-demand library, were material and likely to deceive a reasonable consumer.

150.    As a direct and proximate result of Peloton's false and misleading advertising, Plaintiff Fishon and the other Class members suffered injury.  Peloton deprived Plaintiff Fishon and the other Class members of the benefit of the bargain.  Plaintiff Fishon and the other Class members have suffered and will continue to suffer injury, ascertainable losses of money, and monetary and non-monetary damages.  Plaintiff Fishon and the other Class members overpaid for Peloton's Membership and Subscription Service, because they did not know the truth that Peloton

---

[70] *See* https://www.onepeloton.ca/app (last accessed Nov. 26, 2019).

[71] *See* https://www.onepeloton.com/shop/bike/subscription (last accessed Nov. 26, 2019).

would gut its on-demand digital library, shrinking it by more than 50%, and that it would not be "ever-growing."

151.    Peloton's false and misleading advertising complained of herein affected all purchasers of Peloton's hardware.

152.    The above false and misleading advertising by Peloton caused substantial injury to Plaintiff Fishon and the other Class members that they could not reasonably avoid.

153.    Plaintiff Fishon, individually and on behalf of the other Class members seeks all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $500 per violation (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

154.    Peloton committed a separate and independent violation of N.Y. Gen. Bus. Law § 350 for each false advertisement pertaining or relating to the "ever-growing" and/or growing nature of its on-demand library.

155.    Peloton should therefore be assessed statutory damages of $500 for each such violation, and all other such relief as may be just and proper.

### FOURTH CLAIM FOR RELIEF

**Violation of New York General Business Law,**
**N.Y. Gen. Bus. Law § 350**
(brought on behalf of Plaintiff Fishon and the Class)

156.    Plaintiff Fishon repeats and realleges the allegations in Paragraphs 1-110, above, as if fully alleged herein.

157.    Plaintiff Fishon brings this claim individually and on behalf of the other Class members.

158.    Plaintiff Fishon has standing to bring this claim individually and on behalf of the other Class members because the underlying transactions at issue between Plaintiff Fishon and

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 213 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 213 of 465

ADD-165

Case 1:19-cv-11711-LJL    Document 106    Filed 07/26/21    Page 40 of 48

Peloton happened entirely, or predominantly, in New York. The representations at issue emanated from New York, and in exchange for payments routed to Peloton's New York bank accounts, Plaintiff Fishon was given access to a digital library of classes recorded and produced by Peloton in New York; Plaintiff Fishon's access to over half these classes was likewise revoked in New York.

159.     New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade, or commerce[.]"  False advertising includes "advertising including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light . . . representations [made] with respect to the commodity. . . ."  N.Y. Gen. Bus. Law § 350-a.

160.     Peloton caused to be made or disseminated, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Peloton, to be untrue and misleading to consumers, including Plaintiff Fishon and the other Class members.

161.     Peloton misrepresented through advertisements on its website that its Membership and Subscription Service included access to an "ever-growing library of live and on-demand studio classes" and, at the same time, willfully failed to disclose that it would be removing over half of its Subscription Service's on-demand digital library.

162.     Peloton knew or should have known that it lacked the appropriate copyright licenses for the music accompanying the classes in its library, and that its library could not legitimately be "ever-growing."

163.     Peloton received a cease-and-desist letter regarding its copyright infringement on April 9, 2018 but continued to promise the "ever-growing" library to consumers.  On March 25,

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 214 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 214 of 465

ADD-166

Case 1:19-cv-11711-LJL    Document 106    Filed 07/26/21    Page 41 of 48

2019, shortly after getting sued for copyright infringement, Peloton abruptly removed more than half of its on-demand content from its on-demand digital library.

164.    Despite knowing that the size of its on-demand digital library had decreased by more than 50%, Peloton continues to advertise on its website "an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors"[72] and "unlimited access to a growing library of live streaming and on-demand Peloton classes."[73]

165.    Peloton has violated N.Y. Gen. Bus. Law § 350 because the misrepresentations and omissions regarding the "ever-growing" nature of its on-demand library, were material and likely to deceive a reasonable consumer.

166.    As a direct and proximate result of Peloton's false and misleading advertising, Plaintiff Fishon and the other Class members suffered injury.  Peloton deprived Plaintiff Fishon and the other Class members of the benefit of the bargain.  Plaintiff Fishon and the other Class members have suffered and will continue to suffer injury, ascertainable losses of money, and monetary and non-monetary damages because Plaintiff Fishon and the other Class members overpaid for Peloton's Membership and Subscription Service because they did not know the truth that Peloton would gut its on-demand digital library, shrinking it by more than 50%, and that it would not be "ever-growing."

167.    Peloton's false and misleading advertising complained of herein affected all purchasers of Peloton's Membership and Subscription Service.

168.    The above false and misleading advertising by Peloton caused substantial injury to Plaintiff Fishon and the other Class members that they could not reasonably avoid.

---

[72] *See* https://www.onepeloton.ca/app (last accessed Nov. 26, 2019).

[73] *See* https://www.onepeloton.com/shop/bike/subscription (last accessed Nov. 26, 2019).

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 215 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 215 of 465

ADD-167

Case 1:19-cv-11711-LJL    Document 106    Filed 07/26/21    Page 42 of 48

169.    Plaintiff Fishon, individually and on behalf of the other Class members, seeks all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $500 per violation (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

170.    Peloton committed a separate and independent violation of N.Y. Gen. Bus. Law § 350 for each false advertisement pertaining or relating to the "ever-growing" and/or growing nature of its on-demand library.

171.    Peloton should therefore be assessed statutory damages of $500 for each such violation, and all other such relief as may be just and proper.

## FIFTH CLAIM FOR RELIEF

**Violation of the Michigan Consumer Protection Act,
Mich. Comp. Laws Ann. § 445.901, *et seq.***
(brought on behalf of Plaintiff Pearlman and the Michigan Subclass)

172.    Plaintiff Alicia Pearlman repeats and realleges the allegations in Paragraphs 1-110, above, as if fully alleged herein.

173.    Plaintiff Pearlman brings this claim individually and on behalf of the other Michigan Subclass members.

174.    Michigan's Consumer Protection Act makes unlawful the use of unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce.

175.    The Act prohibits, among other things: (c) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have; (e) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; (g) Advertising or representing goods or services with intent not to dispose of those goods or services as advertised

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 216 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 216 of 465

ADD-168

Case 1:19-cv-11711-LJL    Document 106    Filed 07/26/21    Page 43 of 48

or represented; (s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; (z) Charging the consumer a price that is grossly in excess of the price at which similar property or services are sold; (bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; (cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

176.    Plaintiff Pearlman and the other Michigan Subclass members are individuals, corporations, limited liability companies, trusts, partnerships, incorporated or unincorporated associations, or another legal entity who made the purchases at issue primarily for personal, family, or household purposes.

177.    Peloton advertised, solicited, offered for sale, and sold services and personal property in Michigan to Michigan residents primarily for personal, family, or household purposes.

178.    As detailed herein, Peloton engaged in unfair, unconscionable, and deceptive practices in the advertising and sale of its Bikes, Treads, and Membership and Subscription Services, by misrepresenting that its Membership and Subscription Services included access to an "ever-growing library of live and on-demand studio classes" and willfully failing to disclose that it would be removing over half of its on-demand digital library.

179.    Peloton knew or should have known that it lacked the appropriate copyright licenses for the music accompanying the classes in its library, that it would be required to remove numerous classes as a result, and that therefore its library would shrink and could not legitimately be "ever-growing" or "growing."

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 217 of 465
Case 1:19-cv-11711-LGS    Document 536    Filed 09/02/25    Page 217 of 465

ADD-169

Case 1:19-cv-11711-LJL    Document 106    Filed 07/26/21    Page 44 of 48

180.    Peloton knew or should have known these facts because Peloton received a cease-and-desist letter regarding its copyright infringement on April 9, 2018, but continued to promise the "ever-growing" library to consumers, including Plaintiff Pearlman and the other Michigan Subclass members.

181.    Yet, Peloton did not disclose that it would remove more than half of its classes from its Membership and Subscription Services and that Peloton lacked the appropriate copyright licenses for the music accompanying the classes in its library and continued to market its library as ever-growing with the intent that Plaintiff Pearlman and the other Michigan Subclass members would believe that its library was ever-growing and would purchase its Bike, Treads, and Membership and Subscription Services.

182.    That Peloton would remove more than half of its classes from its Membership and Subscription Services and that Peloton lacked the appropriate copyright licenses for the music accompanying the classes in its library could not be reasonably known by Plaintiff Pearlman or the other Michigan Subclass members. Peloton did not disclose its intent to remove classes from its library or the status of the licensing of its copyrighted content.

183.    Given that Peloton had represented that its library was ever-growing and growing, Peloton was under a legal duty to disclose that it would remove more than half of its classes from its Membership and Subscription Services.

184.    On March 25, 2019, Peloton abruptly removed more than half of its content from its on-demand digital library.

185.    The removal of these classes diminished the value of Peloton Bikes, Treads, and Membership and Subscription Services purchased during the time Peloton was representing the Membership and Subscription Services as ever-growing and growing, because a Bike and Tread

with a Membership and Subscription Services that is shrinking is worth less than one that is ever-growing.

186.    Peloton's representations and omissions were material because the size of Peloton's library of classes is important to the transaction and would and did affect Plaintiff Pearlman's and the other Michigan Subclass members' decision to enter into the transaction. The existence and size of Peloton's library of classes are what distinguish its product from its competitors and what justifies the price premium it commands.

187.    Peloton's representations and omissions were likely to deceive reasonable consumers about the nature of its on-demand digital library because consumers must rely on Peloton as the party in sole control of the size of its library.

188.    As detailed herein, Peloton's conduct violates of Mich. Comp. Laws Ann. § 445.903(1) by, among other things:

    i.      representing that their goods have characteristics, uses, and benefits that they do not have, Mich. Comp. Laws Ann. § 445.903(1)(c);

    ii.     representing that their goods are of a particular standard or quality if they are of another, Mich. Comp. Laws Ann. § 445.903(1)(e);

    iii.    advertising or representing goods with intent not to dispose of those goods as advertised or represented, Mich. Comp. Laws Ann. § 445.903(1)(g);

    iv.     Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer, Mich. Comp. Laws Ann. § 445.903(1)(s);

    v.      making a representation or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is, Mich. Comp. Laws Ann. § 445.903(1)(bb); and

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 219 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 219 of 465

ADD-171

Case 1:19-cv-11711-LJL    Document 106    Filed 07/26/21    Page 46 of 48

vi.    failing to reveal facts that are material to the transaction in light of representations of fact made in a positive matter, Mich. Comp. Laws Ann. § 445.903(1)(cc).

189.   Plaintiff Pearlman and the other Michigan Subclass members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

190.   Instead, as a result of Defendant's misrepresentations and omissions, Plaintiff Pearlman and the other Michigan Subclass members suffered monetary losses in that (1) the actual value of the merchandise and services they received were less than the value of the merchandise services as represented denying them of the benefit of their bargain and (2) Plaintiff Pearlman and the other Michigan Subclass members paid more than the fair market value of the merchandise and services they received causing them out-of-pocket damages.

191.   As a direct and proximate result of Peloton's deceptive and unlawful acts and practices, Plaintiff Pearlman and the other Michigan Subclass members suffered a real and substantial injury they could not have reasonably avoided.  Peloton deprived Plaintiff Pearlman and the other Michigan Subclass members of the benefit of the bargain.  Plaintiff Pearlman and the other Michigan Subclass members have suffered and will continue to suffer injury, ascertainable losses of money, and monetary and non-monetary damages because Plaintiff Pearlman and the other Michigan Subclass members overpaid for Peloton's hardware and Subscription Services, because they did not know the truth that Peloton would gut its on-demand digital library, shrinking it by more than 50%, and that it would not be "ever-growing."

192.   Peloton's deceptive and unlawful acts and practices complained of herein affected all purchasers of Peloton's hardware because the Peloton hardware is only as good as the app and subscription that comes with it.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 220 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 220 of 465

ADD-172

Case 1:19-cv-11711-LJL    Document 106    Filed 07/26/21    Page 47 of 48

193.    Plaintiff Pearlman and the other Michigan Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, injunctive relief, and any other relief that the Court deems just and proper.

## VIII.    REQUEST FOR RELIEF

Plaintiffs, individually and on behalf of the other Class members, respectfully request that the Court enter judgment in their favor and against Peloton as follows:

1.    Certifying the Classes as requested herein, designating Plaintiffs as class representatives, and appointing the undersigned counsel as Class Counsel;

2.    Declaring that Peloton is financially responsible for notifying the Class members of the pendency of this suit;

3.    Awarding statutory and/or actual damages to the maximum extent allowed, in an amount to be proven at trial;

4.    Requiring restitution and disgorgement of all profits and unjust enrichment Peloton obtained from Plaintiffs and the other Class members as a result of Peloton's unlawful, unfair, and/or fraudulent business practices;

5.    Awarding injunctive relief as permitted by law or equity, including enjoining Peloton from continuing the unlawful practices as set forth herein, and ordering Peloton to engage in a corrective advertising campaign;

6.    Awarding Plaintiffs' reasonable attorneys' fees, costs, and expenses;

7.    Awarding pre- and post-judgment interest on any amounts awarded; and

8.    Awarding such other and further relief as may be just and proper.

## IX.    JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all causes of action so triable.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 221 of 465
Case 1:19-cv-11711-LGS   Document 356   Filed 09/02/25   Page 221 of 465

ADD-173

Case 1:19-cv-11711-LJL   Document 106   Filed 07/26/21   Page 48 of 48

Dated:  July 26, 2021                    /s/ Greg G. Gutzler
                                         GREG G. GUTZLER
                                         ggutzler@dicellolevitt.com
                                         **DiCELLO LEVITT GUTZLER LLC**
                                         444 Madison Avenue, Fourth Floor
                                         New York, New York  10022
                                         Telephone: (646) 933-1000

                                         ADAM J. LEVITT
                                         alevitt@dicellolevitt.com
                                         ADAM PROM
                                         aprom@dicellolevitt.com
                                         **DiCELLO LEVITT GUTZLER LLC**
                                         Ten North Dearborn Street, Sixth Floor
                                         Chicago, Illinois  60602
                                         Telephone: (312) 214-7900

                                         ASHLEY C. KELLER (*pro hac vice*)
                                         ack@kellerlenkner.com
                                         BENJAMIN J. WHITING
                                         ben.whiting@kellerlenkner.com
                                         ALEX J. DRAVILLAS (*pro hac vice* to be sought)
                                         ajd@kellerlenkner.com
                                         **KELLER LENKNER LLC**
                                         150 North Riverside Plaza, Suite 4270
                                         Chicago, Illinois  60606
                                         Telephone: (312) 741-5222

                                         AARON M. ZIGLER
                                         aaron@ziglerlawgroup.com
                                         **ZIGLER LAW GROUP, LLC**
                                         308 South Jefferson Street, Suite 333
                                         Chicago, Illinois  60661
                                         Telephone: (312) 673-8427

                                         ***Counsel for Plaintiffs and the Proposed Class***

ADD-174

Case 1:19-cv-11711-LJL   Document 110   Filed 08/25/21   Page 1 of 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

ERIC FISHON and ALICIA PEARLMAN, individually    :
and on behalf of all others similarly situated,

                                Plaintiffs,    :

         -v-    :

PELOTON INTERACTIVE, INC.,    :

                              Defendant.    :

-------------------------------------------------------------------X

| |
|---|
| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #:_____ |
| DATE FILED:   8/25/2021 |

19-cv-11711 (LJL)

NOTICE

LEWIS J. LIMAN, United States District Judge:

     I previously provided notice that I had become aware that my wife held shares in Defendant Peloton Interactive, Inc. Dkt. No. 63. My wife divested herself of the shares shortly thereafter. Dkt. No. 64. Earlier this month, I became aware that an investment advisor bought a total of 550 shares, split between an account for my wife and a joint account. Those purchases were made in the period between April 2021 and May 2021. I was not aware of the purchases at the time they were made, I did not make any decisions or issue any orders in this case at any time I was aware of the share ownership, and my wife and I are in the process of divesting ourselves of the position.

     SO ORDERED.

Dated: August 25, 2021
      New York, New York

                                    LEWIS J. LIMAN
                              United States District Judge

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 223 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 223 of 465

ADD-175

Case 1:19-cv-11711-LJL    Document 112    Filed 08/31/21    Page 1 of 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
ERIC FISHON and ALICIA PEARLMAN, individually                     :
and on behalf of all others similarly situated,                   :
                                                                  :
                                    Plaintiffs,                   :
                                                                  :
              -v-                                                 :
                                                                  :
PELOTON INTERACTIVE, INC.,                                        :
                                                                  :
                                    Defendant.                    :
                                                                  :
------------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  8/31/2021
```

19-cv-11711 (LJL)

NOTICE

LEWIS J. LIMAN, United States District Judge:

       The Court has disposed of the securities that were the subject of the Notice at Dkt. No.
110.

       SO ORDERED.

Dated: August 31, 2021
       New York, New York
                                                    _____
                                                          LEWIS J. LIMAN
                                                      United States District Judge

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 224 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 224 of 465

ADD-176

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------------------------X
                                                       :
ERIC FISHON, et al.,                                   :
                                                       :
                           Plaintiffs,                 :
                                                       :           19-cv-11711 (LJL)
            -v-                                         :
                                                       :           OPINION AND ORDER
PELOTON INTERACTIVE, INC.,                             :
                                                       :
                           Defendant.                  :
                                                       :
----------------------------------------------------------------------X
```

```
+--------------------------------------+
| USDC SDNY                            |
| DOCUMENT                             |
| ELECTRONICALLY FILED                 |
| DOC #:_____            |
| DATE FILED:   1/19/2022              |
+--------------------------------------+
```

LEWIS J. LIMAN, United States District Judge:

Defendant Peloton Interactive, Inc. ("Peloton") moves, pursuant to Federal Rule of Civil

Procedure 12(b)(6), to dismiss the complaint of plaintiff Alicia Pearlman ("Pearlman") for

failure to state a claim for relief.  Plaintiffs Pearlman and Eric Fishon ("Fishon" and together

with Pearlman, "Plaintiffs") move for class certification of two classes, one of New York

customers and one of Michigan customers.  Peloton moves to exclude expert testimony relied on

by Plaintiffs in their motion for class certification.  For the following reasons, Peloton's motion

to dismiss Pearlman's claims is granted, Plaintiffs' motion for class certification is denied, and

Peloton's motion to exclude the expert testimony of J. Michael Dennis, Ph.D. and Colin B. Weir

is denied as moot.

## BACKGROUND

For the purposes of the motion to dismiss, the Court accepts as true the well-pleaded

allegations of the second amended complaint (the "Complaint")—the operative complaint in this

action.

Peloton is an exercise equipment and media company that sells stationary bicycles

("Peloton Bike") and treadmills ("Peloton Tread").  Dkt. No. 106 ("Compl.") ¶ 3.  Peloton also offers a subscription service that allows users of the Peloton Bike and Peloton Tread (together, "Peloton hardware") to watch live or pre-recorded "on-demand" fitness classes, as well as a subscription-only app, called Peloton Digital, that allows people without Peloton hardware to access this library of live and on-demand of classes.  *Id.*  Purchasers of Peloton hardware may buy this subscription—which contains library access, advanced metrics, and a feature that allows users to compete against each other—for $39 per month, while subscribers to the Peloton Digital app pay $19.49 for access to the library.  *Id.* ¶ 5.

Peloton incorporates music into its classes, in that "[e]very on-demand and studio class includes a themed playlist curated by the instructor to match the tempo and intensity of the class."  *Id.* ¶ 18.  Some of the music played in the classes was used without permission, *id.* ¶ 19, and Peloton was thus "building its on-demand library with copyrighted material for which it did not have the proper licenses," *id.* ¶ 20.  In April 2018, Peloton received a cease-and-desist letter alleging copyright infringement of songs appearing in certain of the on-demand classes in its library.  *Id.* ¶ 21. In March 2019, members of the National Music Publishers Association filed a lawsuit against Peloton alleging that, for years, Peloton had been using their music in its fitness-class videos without proper licensing and that this copyright infringement was knowing and reckless.  *Id.* ¶ 22.  Shortly thereafter, Peloton "abruptly removed every class from its on-demand library that contained one or more of the allegedly copyright infringing songs . . . result[ing] in the removal of more than half of the classes from its on-demand library."  *Id.* ¶ 23.  This "purge of Peloton's on-demand library has . . . significantly decreased the quality and quantity of popular music available on Peloton's workout class playlists."  *Id.* ¶ 27.

Peloton has described its library of fitness classes as "ever-growing" or "growing," *see*

*id.* ¶¶ 16–17, and Plaintiffs assert that "Peloton's 'ever-growing' on-demand library is central to its marketing." *Id.* ¶ 15. Even after receiving notice that it was building its library of classes with infringing songs, Peloton continued to market "an expansive, ever-growing library of live and on-demand studio classes," *id.* ¶ 30,[1] and to refer to its subscriptions as including "unlimited access to a growing library of live streaming and on-demand Peloton classes," *id.* It also continued to accept subscription payments and charge full price for its subscription payments notwithstanding that it knew or should have known that subscribers "would not be able to use the full on-demand class library because the number of on-demand classes was materially decreasing due to Peloton's wrongful conduct," *id.* ¶ 31 and knew that they "would necessarily not be receiving everything that Peloton represented they would receive," *id.* ¶ 32.

Plaintiffs bring a class action complaint against Peloton, alleging that its statements that its library of classes was "ever-growing" were misrepresentations and that, through these misrepresentations and the failure to disclose the "imminent removal of over half of its on-demand library," Peloton defrauded them and other members of a proposed class, deprived them of the benefit of their bargain, and unjustly enriched itself at their expense. *Id.* ¶ 34. They allege that, as a result, they overpaid for Peloton's goods and services, *id.* ¶ 41, and that:

> Peloton's representations and material omissions were part of the basis of the bargain, in that Plaintiffs attributed value to Peloton's promises regarding the nature and characteristics of its on-demand digital library and would not have purchased the hardware and corresponding [subscription], or would not have purchased it on the same terms, if they knew the truth that Peloton's on-demand digital library would shrink by more than 50%.

*Id.* ¶ 42.

Plaintiffs bring claims under New York and Michigan consumer-protection statutes. Fishon brings the action individually and on behalf of a class defined in the Complaint as "[a]ll

---

[1] Plaintiffs cite Peloton's Canadian website for this statement. *See id.* n.26.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 227 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 227 of 465

ADD-179

Case 1:19-cv-11711-LJL    Document 168    Filed 01/19/22    Page 4 of 27

purchasers of the Peloton hardware and/or corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019." *Id.* ¶ 101.  Pearlman also brings the action individually and on behalf of a class, with the proposed subclass defined in the Complaint as "[a]ll purchasers of the Peloton hardware and/or corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019 in the State of Michigan." *Id.* ¶ 102.

This is the second amended complaint in this action.  The first complaint was filed by Pearlman, Fishon, and Patrick Yang, individually and on behalf of all others similarly situated, in December 2019, bringing claims for violations of New York General Business Law ("NYGBL") §§ 349 and 350, which relate to deceptive acts or practices and false advertising.  Dkt. No. 1.  On August 4, 2020, and pursuant to an unopposed request, the Court ordered the voluntary dismissal of Patrick Yang.  Dkt. No. 61.  On November 9, 2020, the Court granted a motion to dismiss the claims of Pearlman—a Michigan resident—because of her lack of statutory standing under the New York statute but denied the motion to dismiss Fishon's claims.  *See Fishon v. Peloton Interactive, Inc.*, 2020 WL 6564755 (S.D.N.Y. Nov. 9, 2020).  On January 21, 2021, Plaintiffs filed a first amended complaint.  Dkt. No. 81.  Peloton again moved to dismiss Pearlman's claims, again contending that Pearlman did not plead facts sufficient to show that she had statutory standing to sue under Sections 349 and 250 of the NYGBL.  The Court, once again, dismissed Pearlman's claims under the NYGBL, explaining that her amendment failed to cure the deficiencies identified in the original complaint.  *Fishon v. Peloton Interactive, Inc.*, 2021 WL 2941820, at *5 (S.D.N.Y. July 12, 2021).  The Court did, however, grant leave for Pearlman to amend her complaint to plead her cause under Michigan law.  *Id.*  On July 26, 2021, Plaintiffs filed the instant complaint, with Fishon bringing claims under NYGBL §§ 349 and 350 and Pearlman bringing a claim under the Michigan Consumer Protection Act ("MCPA"), Mich.

Comp. Laws Ann. § 445.901, *et seq.*

**I.**    **Alicia Pearlman and the Motion to Dismiss**

The Complaint alleges that Pearlman is a citizen of Michigan who, "relying on Peloton's uniform representations about its 'ever-growing' on-demand library of fitness classes, entered into a transaction with New York-based Peloton, resulting in her purchase of Peloton's hardware and the [accompanying subscription] in November 2018, and has paid all required hardware, software, and subscription fees relating thereto."  *Id.* ¶ 37.  She brings a claim under the MCPA, alleging that "Peloton engaged in unfair, unconscionable, and deceptive practices in the advertising and sale of its Bikes, Treads, and Membership and Subscription Services, by misrepresenting that [these services] included access to an 'ever-growing library of live and on-demand studio classes' and willfully failing to disclose that it would be removing over half of its on-demand digital library."  *Id.* ¶ 178.  She further alleges that "Peloton's representations and omissions were material because the size of Peloton's library of classes is important to the transaction and would and did affect Plaintiff Pearlman's and the other Michigan Subclass members' decision to enter into the transaction," *id.* ¶ 186, and that she and the other subclass members "were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products," *id.* at ¶ 189.

Pearlman alleges that Peloton's conduct violates the MCPA's prohibition against the following "unfair, unconscionable, or deceptive methods, acts, or practices":

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 229 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 229 of 465

ADD-181

(c) Representing that goods have . . . characteristics, . . . uses, [or] benefits . . . that they do not have . . .;
(e) Representing that goods or services are of a particular standard, [or] quality, . . . if they are of another . . .;
(g) Advertising or representing goods or services with intent not to dispose of those goods or services as advertised or represented . . .;
(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer . . .;
(bb) Making a misrepresentation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; [and]
(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

Mich. Comp. Laws Ann. § 445.903(1).

Peloton moves to dismiss Pearlman's claims arguing, among other things, that Pearlman did not plead her MCPA claims with the requisite particularity and that two of the claims she pleads are "facially inapplicable to the facts alleged" in the Complaint. Dkt. No. 108 at 7; *see also id.* at 7–12.[2] Plaintiffs respond that the allegations in the Complaint are sufficient to state the claims pleaded, including because they "detail the who, what, where, when, and how of Peloton's deceptive, fraudulent, and unfair practices," Dkt. No. 108 at 8, and have otherwise alleged adequately that Pearlman relied on Peloton's misrepresentations, *see id.*

## II.    Eric Fishon

According to the Complaint, Fishon is a citizen of New York, who "relying on Peloton's uniform representations about its 'ever-growing' on-demand library of fitness classes, entered into a transaction with New York-based Peloton, resulting in his purchase of a Peloton Bike and

---

[2] In the Complaint, Plaintiffs allege that the MCPA also prohibits "[c]harging the consumer a price that is grossly in excess of the price at which similar property or services are sold," Compl. ¶ 175 (citing Mich. Comp. Laws Ann. § 445.903(1)(z)), but lists only subsections (1)(c), (e), (g), (s), (bb), and (cc) in alleging the subsections that, "among other things," Peloton's conduct violates, *id.* ¶ 188.  Despite assertions in the briefs to the contrary, *see* Dkt. No. 108 at 5; Dkt. No. 109 at 5, Pearlman does not explicitly allege that Peloton's conduct violated Section 3(1)(z) of the MCPA, and thus there is no claim of violation of that subsection for the Court to address.

the Peloton Membership in January 2018, and a Peloton Tread in November 2018, and has paid

all required hardware, software, and subscription fees relating thereto." *Id.* ¶ 35.  Fishon brings

claims, on behalf of himself and the class, for violations of NYGBL § 349, which makes

unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce," and

§ 350, which makes unlawful "[f]alse advertising in the conduct of any business, trade or

commerce."  As noted above, the Court has already denied a motion to dismiss Fishon's claims.

### III.    The Motion for Class Certification

Plaintiffs Fishon and Pearlman are the proffered representatives for two proposed classes,

which Plaintiffs now move to be certified.  Fishon moves for certification of a class slightly

different from the class defined in the Complaint: "All purchasers of the Peloton hardware and/or

the corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019

in the State of New York," which is referred to in the motion for class certification as the "New

York Class."  Dkt. No. 119 at 9.  Pearlman moves for certification of a similar class but

composed of purchasers in the state of Michigan.  *Id.*  Plaintiffs argue that they are adequate and

typical representatives of the proposed classes.

In its opposition to Plaintiffs' motion for class certification, Peloton highlights conduct

on the part of Fishon that, it argues, casts doubt on his integrity and credibility and his ability to

serve as an adequate class representative.  In particular, Peloton submits emails sent to Peloton

shortly before Fishon filed this action from an address that they say—and Plaintiffs appear to

admit, *see* Dkt. No. 151 at 9—was operated by Fishon masquerading as a lawyer,

"lawyerabco@gmail.com."  Dkt. No. 136 at 9–10.  In an email chain from April 2019, Fishon

complains to Peloton about the problems he is having with his Peloton Tread and asks "[w]hat's

the compensation for the third tread and time I have spent on lost workouts, more emails, more

phone calls."  Dkt No. 142-3.  That email is followed by another one from Fishon in which he

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 231 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 231 of 465

ADD-183

requests "a call ASAP as soon as a manager gets in this morning," explaining that "[o]nce again

Peleton [sic] has messed with me and my schedule" and that "continuously having issues

compounded . . . is why [he] continues to relate [sic] and ask for a corporate response ultimately

after this is finished." *Id.*  An email then follows from "lawyerabco@gmail.com" to

"ericfishon@aol.com," cc'ing a number of Peloton-affiliated email addresses, including

"concierge@onepeloton.com," and "support@onepeloton.com," complaining about a delayed

delivery of Fishon's Peloton Tread, stating "I'm sitting home all day now missing work which

wasn't planned . . . ." *Id.*  A follow-on email message, dated May 24, 2019, was sent under the

signature of a "Barbara Diperio LLP ABCO Attorney" and purports to complain on behalf of her

"client" Eric Fishon about Peloton's service.  Dkt. No. 142-1.  It complains that "after two tread

swaps, 14 hours of phone calls logged in our office with dates and times and people, email

correspondence, and missed deliveries and work it seems Peleton [sic] has fallen short" and asks

for Peloton's response to a "request for corporate intervention" and for "FULL resolution on

matter [sic] from corporate." *Id.*  It conveys the not-so-subtle threat that Peloton should "pls

[sic] respond to my client sooner than later as we'd like this matter to be resolved between

member and company if possible," *id.*, suggesting that that if Peloton did not address the

concerns, Fishon would resort to litigation.

 Peloton's attorney questioned Fishon about these emails at his deposition. *See* Dkt. No.

140-13 at 40–45.  When asked who "lawyerabco@gmail.com" was and why that person was

included on an email sent by Fishon to Peloton, Fishon initially testified that it is "somebody

who works as an advisor within [his] family business," naming Erol Fishon—a retired technician

at ABCO Pest Control—as that person. *Id.* at 25.  Fishon then explained that he did not recall

who created that email address or why and that he did not recall if he created it. *Id.* at 26, 28.

8

ADD-184

He denied that the email was sent to suggest that counsel had become involved for Fishon in his complaint to Peloton for the purpose of conveying the seriousness of Fishon's message and ensuring a response, stating—implausibly, in the Court's view—that the email address was used by ABCO Pest Control for correspondence, that Erol Fishon had access to the email address, and that Fishon himself could "probably" get access to it. *Id.* at 29–30.  Fishon testified that Barbara Diperio is someone who used to work with his family company, ABCO Pest Control, and that she is not a lawyer. *Id.* at 43, 45.  When asked if Barbara Diperio LLP was an actual law firm, he testified that he did not "know for sure." *Id.* at 43.

Ultimately, in response to a question about who wrote the April 2019 email from "lawyerabco@gmail.com" complaining that "I'm sitting home all day now missing work," Fishon said that it "might have been" written and sent by him. *Id.* at 35–36.  When repeatedly pressed about who else it would have been, Fishon was evasive and just repeated "it might have been me" multiple times. *Id.* at 35–37.  Fishon's response to questions regarding the May 24, 2019 email from "Barbara Diperio LLP" was similarly evasive.  When questioned whether he wrote the email, Fishon repeatedly responded "I do not recall writing that" and stated that he did not recall who sent the email if it was not him. *Id.* at 41–42.  At one point, he finally admitted that he "might have" tried to tell Peloton that he had a lawyer involved to get them to respond quicker to him. *Id.* at 40.

Peloton contends that Fishon's integrity and credibility issues—rooted in impersonating a lawyer and then "obfuscat[ing] if not outright perjur[ing] himself" while answering questions about the "lawyerabco@gmail.com" emails—renders him an inadequate class representative. Dkt. No. 136 at 10.  Plaintiffs respond that any concerns are "irrelevant" and that, in any event, other individuals who have already been deposed in the matter "are willing to serve as a class

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 233 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 233 of 465

ADD-185

Case 1:19-cv-11711-LJL    Document 168    Filed 01/19/22    Page 10 of 27

representative."  Dkt. No. 151 at 9.

## DISCUSSION

Because the Court's disposition of Peloton's motion to dismiss Pearlman's MCPA claim
could affect its analysis of the pending motion for class certification, the Court will first consider
whether dismissal of Pearlman's claim is warranted.

### I.    Motion to Dismiss

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a
complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that
is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic
Corp. v. Twombly*, 550 U.S. 554, 557 (2006)).  "A claim has facial plausibility when the plaintiff
pleads factual content that allows the court to draw the reasonable inference that the defendant is
liable for the misconduct alleged."  *Id.* at 678.  Generally, a complaint need not allege "detailed
factual allegations," but "a plaintiff's obligation to provide the grounds of his entitlement to
relief requires more than labels and conclusions, and a formulaic recitation of the elements of a
cause of action will not do."  *Twombly*, 50 U.S. at 555.

However, "[c]laims for fraud must . . . satisfy the heightened pleading requirements of
Rule 9(b) and be plead 'with particularity.'"  *Budhani v. Monster Energy Co.*, 527 F. Supp. 3d
667, 687 (S.D.N.Y. 2021) (citation omitted).  "Courts generally have held that the provisions of
the MCPA," including the provisions alleged to be violated here, "are to be construed with
reference to the common-law tort of fraud."  *Rosipko v. FCA US, LLC*, 2015 WL 8007649, at *4
(E.D. Mich. Dec. 7, 2015) (internal quotation marks and citation omitted) (alteration adopted);
*see also Mayhall v. A.H. Pond Co., Inc.*, 341 N.W.2d 268, 270 (Mich. Ct. App. 1983)
(explaining that, while the MCPA has a "somewhat broader scope" than just fraud-based claims
in that "[i]t prohibits not only 'deceptive' business practices but also those which are 'unfair' and

ADD-186

'unconscionable' . . . the great majority of the specific prohibited practices enumerated in the statute . . . involve fraud" and citing Section 3(1)(a) through (cc) of the MCPA). Thus, when a plaintiff's MCPA claim "is based on both affirmative misrepresentations and alleged omissions," thus "suggest[ing] fraudulent conduct," *Rosipko*, 2015 WL 8007649, at *4, the plaintiff must "state with particularity the circumstances constituting fraud or mistake, consistent with [Rule] 9(b)," *Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580, 612 (E.D. Mich. 2015). The parties appear to agree that Rule 9(b) governs the pleading standards in this case. *See* Dkt. No. 108 at 6–10; Dkt. No. 109 at 8–11.

The Second Circuit has explained that "in order to comply with Rule 9(b), '[a] complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)); *see also Kerrigan*, 112 F. Supp. 3d at 612–13 (dismissing MCPA claim as insufficiently plead under Rule 9(b) requirements where plaintiff did not identify, among other things, the speaker of each allegedly fraudulent statement "or when and where the statements were made"). "Rule 9(b) also requires a plaintiff to 'allege facts that give rise to a strong inference of fraudulent intent.'" *Budhani*, 527 F. Supp. 3d at 687 (quoting *Lerner*, 459 F.3d at 290). This "strong inference" can be established by either (a) "alleging facts to show that defendants had both motive and opportunity to commit fraud," or (b) "alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner*, 459 F.3d at 290 (internal quotation marks omitted) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

Moreover, in order to establish a claim for fraud or misrepresentation under Michigan

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 235 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 235 of 465

ADD-187

law, "a plaintiff must establish: 1) that the defendant made a material misrepresentation that was false; 2) the defendant knowingly made the false representation with the intent that the plaintiff would act upon it; 3) that the plaintiff acted in reliance upon it; and 4) resulting damages." *In re OnStar Contract Litig.*, 278 F.R.D. 352, 376 (E.D. Mich. 2011) (citing *Baker v. Arbor Drugs, Inc.*, 544 N.W.2d 727, 732 (Mich. Ct. App. 1996)). "A material fact for the purposes of the MCPA is 'one that is important to the transaction or affects the consumer's decision to enter into the transaction.'" *Id.* (quoting *Zine v. Chrysler Corp.*, 600 N.W.2d 384, 398 (Mich. Ct. App. 1999)). And "at the outset of a lawsuit," a plaintiff ordinarily must plead "what the plaintiff must prove in the trial at its end." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 303, (2d Cir. 2021) (quoting *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned* Media, 140 S. Ct. 1009, 1017 (2020)). Thus, Pearlman "must allege actual reliance on [defendant's] alleged deceptive conduct with specificity under Rule 9(b)." *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 997 (S.D. Cal. 2014).

Peloton argues that Pearlman's MCPA claim should be dismissed because she does not plead facts with the requisite specificity to meet Rule 9(b)'s heightened pleading requirements with respect to her reliance on any of Peloton's alleged misrepresentations. Plaintiffs respond that the Complaint does allege sufficient detail to meet the requirements of Rule 9(b) and point to allegations: that "Peloton's marketing and website touted its 'ever-growing' and 'growing' library"; that Peloton knew such representations were false because it knew of copyright infringement allegations, but it nevertheless continued to make these representations and promises; that Peloton purged its class library and caused the library "to materially *shrink*"; and that Peloton did not inform Plaintiffs that they would not be receiving an "ever-growing" and "growing" library of classes, instead falsely informing them that the class purge would not affect

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 236 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 236 of 465

ADD-188

their experience with Peloton's service. Dkt. No. 109 at 8 (citing Compl. ¶¶ 17, 75–77, 80–83,

85–89, 90–92, 97–100). With respect to Pearlman's reliance on Peloton's statements

specifically, Plaintiffs point to the Complaint's allegation that "Pearlman, relying on Peloton's

uniform representations about its 'ever-growing' on-demand library of fitness classes, entered

into a transaction . . ." *Id.* at 9 (citing Compl. ¶ 37).[3]

  Pearlman's conclusory allegation that she entered into a transaction with Peloton "relying

on Peloton's uniform representations about its 'ever-growing' on-demand library of fitness

classes" is insufficient to meet the Rule 9(b) standard. While Plaintiffs have identified the

statement that they allege to be in violation of the MCPA—that the on-demand library was

"ever-growing"— and have alleged with adequate specificity how that statement could be

misleading, Pearlman does not allege the facts giving rise to her reliance on that statement with

any level of specificity.

  Nowhere in the Complaint does Pearlman specify "where and when the statements [on

which she relied] were made." *Lerner*, 459 F.3d at 290. Rather, the Complaint alleges that the

"ever-growing" statements appeared on Peloton's website and that this claim was "central to

Peloton's marketing," Compl. ¶ 79, suggesting that it appeared elsewhere as well. The

Complaint then separately alleges that Pearlman relied on representations about Peloton's

"ever-growing" library, but it does not allege where or when Pearlman was exposed to or viewed

the alleged misstatement or any other facts specifying the circumstances surrounding her

reliance. *See Kerrigan*, 112 F. Supp. 3d at 612–13 (dismissing MCPA claim as insufficiently

---

[3] Plaintiffs also cite to Pearlman's deposition testimony in support of its argument that she
adequately alleged reliance on Peloton's statements. This testimony was not included or
otherwise incorporated by reference in the Complaint and is not properly before the Court on a
motion to dismiss. *See Goel v. Bunge, Ltd.*, 820 F.3d 554, 559–60 (2d Cir. 2016).

plead under Rule 9(b) requirements where plaintiff did not identify, among other things, the

speaker of each allegedly fraudulent statement "or when and where the statements were made");

*Williams v. Scottrade, Inc.*, 2006 WL 2077588, at *7 (E.D. Mich. 2006) (explaining that

requirements of Rule 9(b) were not met where, though plaintiff referred to defendant's website,

he did not "allege with any specificity where or when [defendant] made the alleged

misrepresentations" nor did he allege the specific statements on which he relied); *Rosipko*, 2015

WL 8007649, at *3 (dismissing MCPA claim where complaint was "devoid of [among other

things] any averments regarding . . . when or where any purported affirmative representations

were made . . . [or] when, where, or how Plaintiffs ever heard or saw any purported

representation"); *Home Owners Ins. Co. v. ADT LLC*, 109 F. Supp. 3d 1000, 1008 (E.D. Mich.

2015) (concluding that complaint did not meet Rule 9(b)'s heightened pleading requirements

where plaintiff did not allege, among other things "the time, the place, or the person making the

misrepresentation"); *cf. In re Gen. Motors Air Conditioning Marketing & Sales Practices Litig.*,

406 F. Supp. 3d 618, 642 (E.D. Mich. 2019) (concluding that reliance was plausibly alleged for

purposes of MCPA claim where plaintiff "specifically allege[d] that he viewed and relied upon

the window sticker of his vehicle prior to purchasing it" where the window sticker did not

disclose a defect.  The Complaint contains some information from which the Court can glean

the general timeframe of when the statements appeared on Peloton's website—some time before

April 9, 2018, when Peloton received a cease-and-desist letter regarding copyright infringement,

Compl. ¶ 117, until at least the filing of the lawsuit—but there are no allegations with respect to

when Pearlman encountered it (if she even did encounter it on the website).  *Cf. Cambridge*

*Capital LLC v. Ruby Has LLC*, 2021 WL 4481183, at *26 (S.D.N.Y. Sept. 30, 2021) (holding

that allegations were insufficiently specific about when statements were made and thus failed to

plead fraud with particularity where allegations were that the counterclaim-defendant made misrepresentations "throughout the negotiations"). It is not sufficient to say that statements were posted and a plaintiff therefore must have at some point seen them—the particularity requirement mandates that a plaintiff plead with particularity "the circumstances constituting [the] fraud" which, in this case, includes Pearlman's reliance on a statement. Fed. R. Civ. P. 9(b). Because Pearlman's allegations do not state the "who, what, where, when, and how" of the statement on which she supposedly relied, she has not sufficiently stated a claim under Rule 9(b)'s heightened pleading standard. *Antigenics Inc. v. Bancorp Piper Jaffray, Inc.*, 2004 WL 51224, at *3 (S.D.N.Y. Jan. 9, 2004) (internal quotation marks and citation omitted).

Plaintiffs briefly argue that Pearlman does not need to allege that she actually relied on Peloton's misrepresentations because she "can establish reliance on a class-wide basis under Michigan law using a reasonable consumer standard." In support, she cites *Dix v. American Bankers Life Assurance Company of Florida*, 429 Mich. 410 (1987). In *Dix,* the Michigan Supreme Court held that "members of a class proceeding under the [MCPA] need not individually prove reliance on the alleged misrepresentations. It is sufficient if the class can establish that a reasonable person would have relied on the representations." *Id.* at 418. Following *Dix*, federal district courts considering whether a named plaintiff in a class representative must plead actual reliance under the MCPA have concluded that they must. *See, e.g.*, *In re Sony*, 996 F. Supp. at 997 (explaining that "although class allegations can be based on what a reasonable person would have relied upon, a named plaintiff bringing a putative class action under the MCPA must still allege actual reliance"); *Kussy v. Home Depot U.S.A.*, 2006 WL 3447146, at *7 (E.D. Mich. Nov. 28, 2006) (explaining that plaintiff bringing claims on behalf of himself and all others similarly situated "still must show reliance, and for the class

action allegations, must show that a reasonable person would have relied on the marked price").

Indeed, as a court in the Eastern District of Michigan pointed out, relieving someone from the

obligation to plead reliance in the class-action context, where that person would be required to do

so in an individual action, would enlarge the rights of a class-action plaintiff relative to a plaintiff

in an individual action in contravention of the Supreme Court's direction in *Wal-Mart Stores,*

*Inc. v. Dukes*, 564 U.S. 338, 367 (2011).  *See In re Onstar*, 278 F.R.D. at 378 (explaining that

applying a "'reasonable person' standard to determine reliance on a class-wide basis . . . would

prevent [the defendant] from asserting a statutory defense that it would be able to assert in an

individual action," which "would go against" *Wal-Mart*'s direction that "'a class cannot be

certified on the premise that [the defendant] will not be entitled to litigate its statutory defenses

to individual claims'" (quoting *Wal-Mart*, 564 U.S. at 367)).  The Court is persuaded that

excusing Pearlman's failure to adequately plead reliance—a failure that would be fatal to her

individual claim—because she is choosing to plead the claim on behalf of others as well would

be inappropriate and contrary to the Supreme Court's decision in *Wal-Mart.*

Plaintiffs also state that the Court has previously acknowledged that Pearlman "has in

fact alleged her reliance on Peloton's 'ever-growing' and 'growing' representations."  Dkt. No.

109 at 11 (citing *Fishon v. Peloton Interactive, Inc.*, 2021 WL 2941820, at *1 (S.D.N.Y. July 12,

2021)).  To the extent that they argue this acknowledgement is somehow dispositive, or even

persuasive, of the Court's determination of whether Pearlman has adequately alleged reliance for

the purposes of the MCPA, that argument is misplaced.  No issue was before the Court regarding

the sufficiency of Pearlman's allegation of fraud or reliance.  The recitation that Pearlman

"alleges that she relied upon Peloton's representation was 'ever-growing' when she purchased

her hardware and her subscription" was in the background section of that opinion, and merely

ADD-192

repeated the conclusory allegation of the complaint.  The Court did not address whether that

conclusory allegation was supported by allegations of fact or whether it would be sufficient to

withstand scrutiny under Rule 9(b) or even under Rule 8(a).  *Fishon v. Peloton*, 2021 WL

2941820, at *1.  Indeed, at most, the Court's prior analysis in this case suggests that general

allegations that a plaintiff relied on a statement and was injured by that reliance was sufficient in

the context of a statute for which reliance was not an element of the cause of action and where it

was analyzed under the pleading standards for Rule 8(a) but not Rule 9(b).  In upholding

Fishon's NYGBL claims in the face of a motion to dismiss, the Court explained:

> The conclusion that a plaintiff need not state explicitly in her complaint that she
> saw the misleading advertisement is consistent with *Twombly/Iqbal* and the Second
> Circuit's holding in *Pelman ex rel. Pelman v. McDonald's Corp.*, that Section 349
> claims are subject only to the "bare-bones notice-pleading requirements of Rule
> 8(a)" and not "the pleading-with-particularity requirements of Rule 9(b)."  396 F.3d
> 508, 511 (2d Cir. 2005).

*Fishon v. Peloton Interactive, Inc.*, 2020 WL 6564755, at *9.  Because, unlike here, reliance was

not an essential element of the causes of action alleged, the Court noted that a general statement

that a plaintiff was injured by relying on a misleading statement to her detriment was "not a

threadbare recital of the elements of a cause of action," *id.* (internal quotation marks omitted)

(alterations adopted) (quoting *Iqbal*, 556 U.S. at 678), and the complaint did not need to plead, in

detail, "[t]he manner in which the plaintiff came to rely upon the deceptive act" in order for it

complaint to proceed, *id.*  Any previous reference to Pearlman's allegations of reliance under the

NYGBL is plainly irrelevant to her MCPA claim.

Because Pearlman has not plead her MCPA claim with adequate specificity, the Court

will dismiss it.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 241 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 241 of 465

ADD-193

Case 1:19-cv-11711-LJL    Document 168    Filed 01/19/22    Page 18 of 27

## II.    Motion for Class Certification

Federal Rule of Civil Procedure 23 governs class certification.  Fed. R. Civ. P. 23.  There are four prerequisites to a class action, and a party seeking to certify a class must demonstrate that:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see also Wal-Mart*, 564 U.S. at 345.  These "familiar requirement[s] of Rule 23(a)[] [are] commonly referred to as numerosity, commonality, typicality, and adequacy of representation . . ." *In re Monster Worldwide, Inc. Secs. Litig.*, 251 F.R.D. 132, 134 (S.D.N.Y. 2008).  A party seeking class certification must also demonstrate that one of three requirements in Rule 23(b) have been met; one such requirement mandates the court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  If a court certifies a class, it must appoint class counsel, and, in doing so, it must consider the adequacy of counsel.  Fed. R. Civ. P. 23(g).

In support of their motion for class certification, Plaintiffs argue that the Rule 23(a) factors have been met.  They contend that the proposed classes consist of thousands of customers and thus meets the numerosity requirement of the Rule.  They also argue that the case involves common issues of fact and law such that they are capable of class-wide resolution, including: whether Peloton's alleged misrepresentations and omissions were material; whether Peloton had a duty to disclose that it was using unlicensed music in its on-demand library that could result in

the removal of classes in its library and, if so, when that duty arose; whether Peloton's alleged

misrepresentations and omissions were deceptive; and whether Peloton's conduct injured all

class members.  Plaintiffs further argue that these common questions predominate over

individual questions and that a class action is superior to other methods of adjudication because

of the high costs associated with individual adjudications, and thus Rule 23(b)(3) has been met.

Plaintiffs assert that each of the named plaintiff's claims are typical of other class

members' claims because each of them "paid for Peloton hardware, and then continued to pay

for subscription membership[s] during the Class period, during which time Peloton represented

that its on-demand class library would be 'ever growing'" and because price inflation resulting

from deceptive advertising harms "any consumer who purchases that product . . . in the same

manner, and by the same conduct, as any other consumer."  Dkt. No. 119 at 21.  Finally,

Plaintiffs contend that Plaintiff will adequately represent the class because both Fishon and

Pearlman have interests that are aligned with those of the absent class members, and both have

demonstrated a commitment to actively participating in the case and vigorously pursuing the

claims of their respective classes.  Thus, according to Plaintiffs, the Rule 23(a) factors have been

met.

In support of its commonality and predominance arguments, Plaintiffs submit

declarations by two proposed experts, Dr. J. Michael Dennis and Colin B. Weir.  Dr. Dennis

designed, conducted, and reported on a consumer survey to measure the materiality to consumers

of Peloton's claim that its library was 'ever-growing' and the existence and amount of any price

premium this claim would command.  *See* Dkt. No. 119 at 6–7; Dkt. No. 120.  Based on Dr.

Dennis's survey results, Weir calculated price-premium damages on a class-wide basis.  *See* Dkt.

No. 121.  According to Plaintiffs, "Dr Dennis's and Weir's reports support Plaintiff's contention

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 243 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 243 of 465

ADD-195

Case 1:19-cv-11711-LJL    Document 168    Filed 01/19/22    Page 20 of 27

that there is a price premium attributable to Peloton's misrepresentations and omissions that can be shown with class-wide evidence." Dkt. No. 119 at 19.  Peloton moves to exclude Dr. Dennis's and Weir's testimony.  Dkt. Nos. 135, 137.

Peloton opposes Plaintiffs' motion for class certification.  It contends that: Fishon and Pearlman do not satisfy the typicality and adequacy requirements set by Rule 23(a); Plaintiffs have not established that common issues predominate over individualized questions, as necessary to satisfy Rule 23(b); class counsel do not meet the Rule 23(g) adequacy requirement; and Fishon and Pearlman lack standing to assert certain of their claims and thus cannot bring those as class claims.  Peloton does not contest that the proposed classes satisfy the numerosity requirement.  Because the Court has dismissed Pearlman's claim pursuant to Rule 12(b)(6), it will consider the motion for class certification only as to the New York class, with Fishon as the named plaintiff.

"[A] district court may not grant class certification without making a determination that all of the Rule 23 requirements are met."  *In re Initial Public Offerings Secs. Litig.* ("*In re IPO*"), 471 F.3d 24, 40 (2d Cir. 2006); *see also id.* at 41 ("[A] district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met.").  "The preponderance of the evidence standards applies to evidence proffered to establish Rule 23's requirements."  *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201 (2d Cir. 2008).  Before certifying a class, a district court must therefore "find, by a preponderance of the evidence, that [a class representative] is both an adequate and typical representative of the class and not subject to any unique defenses which threaten to become the focus of the litigation."  *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009) (internal quotation marks and citation omitted).

"The adequacy of the proposed class representative . . . directly implicates the due process rights of absent class members who will be bound by the judgment." *Gordon v. Sonar Capital Mgmt. LLC*, 92 F. Supp. 3d 193, 198 (S.D.N.Y. 2015) (citations omitted). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *AmChem Prods., Inc.*, 521 U.S. at 625. "To judge the adequacy of representation, courts may consider the honesty and trustworthiness of the named plaintiff." *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (citing *Kline v. Wolf*, 702 F.2d 400, 402–03 (2d Cir. 1983)); *cf. Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549 (1949) (explaining that, when a representative sues on behalf "of a class comprising all who are similarly situated[,] [t]he interests of all in the redress of the wrongs are taken into his hands, dependent upon his diligence, wisdom and integrity"). "Such considerations of trustworthiness and credibility . . . are restricted to their relevance to issues in the litigation." *In re NYSE Specialists Secs. Litig.*, 240 F.R.D. 128, 144 (S.D.N.Y. 2007). Thus, "[t]o defeat class representation, any allegations concerning the representative's adequacy must be relevant to the claims in the litigation, such that the problems could become the focus of cross-examination and unique defenses at trial, to the detriment of the class. Plaintiffs' testimony or credibility that is subject to attack must be on an issue critical to one of their . . . causes of action." *German v. Federal Home Loan Mortg. Corp.*, 168 F.R.D. 145, 154 (S.D.N.Y. 1996) (internal quotation marks and citations omitted) (alteration adopted). If there are "serious concerns" about a named plaintiff's credibility and these concerns bear on an issue critical to a cause of action in the litigation, a district court may deny class certification on the basis that the plaintiff is not an adequate class representative. *Savino*, 164 F.3d at 87; *see also Koenig v. Benson*, 117 F.R.D.330, 338 (E.D.N.Y. 1987) ("In the Second Circuit a proposed class

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 245 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 245 of 465

ADD-197

representative can be ruled inadequate under Rule 23(a)(4) if he is vulnerable to attacks on his credibility concerning the key facts at issue in the case."); *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 177 (S.D.N.Y. 2008) ("[O]nly when attacks on the credibility of the representative party are so sharp as to jeopardize the interests of absent class members should such attacks render a putative class representative inadequate." (quoting *In re Colonial P'ship Litig.*, 1993 WL 306526, at *5 (D. Conn. Feb. 10, 1993)).

Peloton contends that Fishon lacks credibility and is therefore not an adequate plaintiff. It points out that, prior to initiating the current lawsuit, Fishon impersonated a lawyer by sending Peloton multiple emails from "lawyerabco@gmail.com" and then, when questioned about these emails at his deposition, he gave ambiguous, inconsistent, and incredible testimony.  Dkt. No. 136 at 9–11.  Plaintiffs respond that "[s]ervice as a class representative is not a test of piety," and while Fishon "impersonat[ing] an attorney was undoubtedly ill advised," it "does not show that he will not vigorously represent the absent class members in pursuit of redress for Peloton's misconduct."  Dkt. No. 151 at 9.  Plaintiffs also request that, if the Court determines that Fishon is an inadequate class representative, two currently absent class members be substituted as named plaintiffs and proposed class representatives.

The Court finds that Fishon misrepresented his identity to Peloton and was the person who sent the emails from "lawyerabco@gmail.com" and Barbara Diperio LLP.  It also finds that Fishon did so in order to extract something of value from Peloton in the months leading up to the lawsuit—better service and compensation for what he complained was poor service.  It bases those conclusions on the emails themselves and on Fishon's answers during deposition, as well

ADD-198

as its observation of Fishon's credibility during the videotaped deposition, a copy of which was provided to the Court. [4]

The Court views the credibility issues related to Fishon as sufficiently serious as to render him an inadequate representative. As Plaintiffs admit, Fishon repeatedly impersonated an attorney in correspondence with the very company he is now suing on behalf of a class only months before initiating this lawsuit. [5] The complaints, which were wide-ranging and over a period of months, were related to problems with Fishon's Peloton hardware and customer service experiences but did not reference any concerns he had about the reduced content in Peloton's on-demand library. He then gave testimony regarding those emails that was evasive at best and, based on the Court's review of video of relevant portions of the deposition, approach the perjurious at worst.

Fishon's misconduct is not peripheral to the allegations in the lawsuit but bears on issues that are central to those allegations. The evidence that Fishon lied to Peloton in the months

---

[4] At a conference held on January 11, 2022, the Court offered counsel for Fishon the opportunity for Fishon to testify regarding the emails, indicating that in the absence of such testimony, the Court would consider the record closed and make a judgment on the record. The Court further informed counsel for the Plaintiffs that the Court would assume, for the purposes of the motion for class certification, that Fishon impersonated a counsel and that the emails from "lawyerabco@gmail.com" and ostensibly signed by Barbara Diperio were authored and sent by him. *See* Dkt. No. 166 at 9. Counsel for Plaintiffs agreed that a hearing was not necessary and that if the Court wanted to "assume that the result of an evidentiary hearing on this would ultimately result in a conclusion that he did that, . . . that's a fair characterization." *Id.* at 9–11. At that conference, the Court explained that "unless [counsel asks] for a hearing, [the Court is] prepared to make a finding that, based upon [its] review of the testimony . . . Mr. Fishon was Ms. Diperio." *Id.* at 10. The Court reiterates its finding, in light of the video deposition provided to the Court, that Fishon impersonated a lawyer and that the emails in the record sent from "lawyerabco@gmail.com" and signed by Barbara Diperio LLP were drafted and sent from Fishon.

[5] The Court observes that New York state criminalizes similar conduct, including "impersonat[ing] another person with the intent to obtain a benefit or defrauding someone else," and "[p]retending to be a representative of an organization or corporation and acts in that way." N.Y. Penal Law § 190.25(1), (2).

23

ADD-199

leading up to the lawsuit and that he did so in order to get service from Peloton without

mentioning any concern about the size of the library undercuts a central allegation of Plaintiffs.

It could well suggest to the jury that Fishon's purported later concern about the size of the library

was contrived and that the entire basis for the lawsuit was his pique at the company's poor

customer service.[6]  The underlying evidence and Fishon's misleading answers at deposition

would be admissible both as "specific instances" of conduct to undermine his character for

truthfulness or untruthfulness, *see, e.g.*, Fed. R. Evidence 608(b) (explaining that a court may, on

cross-examination, allow specific instances of a witness's conduct "to be inquired into if they are

probative of the character for truthfulness or untruthfulness" of the witness) and as substantive

evidence of prior statements inconsistent with what a jury might conclude is his later feigned

concern about the size of the library, *see* Fed. R. Evid. 613; *see also Kline*, 702 F.2d at 403

(affirming inadequacy determination where proposed class plaintiffs gave inaccurate deposition

testimony or "refus[ed] to proper discovery questions" in the face of disputed relevant testimony

that "cast a shadow over [her] case" and the plaintiffs' testimony on critical issues was thus

"subject to sharp attack"); *cf. Stewart v. Hudson Hall LLC*, 2021 WL 6285227, at *13 (S.D.N.Y.

Nov. 29, 2021) (concluding that concerns about plaintiff's credibility, due to his admission to

criminal conduct involving deception, "render him an inadequate class representative").

Furthermore, that he communicated with Peloton about these concerns while impersonating a

lawyer suggests that he is willing to lie to the defendant to obtain a certain outcome.  That he

also impersonated a lawyer to further his own interests in his communications with Peloton

---

[6] This also raises questions about Fishon's typicality, with which "[t]he adequacy-of-representation requirement 'tends to merge.'"  *AmChem Prods. Inc.*, 521 U.S. at 626, n.20.  The Court has serious doubts that Fishon would be a sufficiently typical plaintiff such that class certification would be appropriate, but in light of its conclusion that Fishon is not an adequate representative, it need not make an express determination of typicality.

ADD-200

shortly before bringing this putative class action calls into serious question his capability to act in

a disinterested fashion on behalf of all members of the class and whether he is sufficiently

antagonistic toward the defendant that there is a "risk that his animus toward the defendants

would prevent him from acting in the class's best interests." *Finocchiaro v. NQ Mobile, Inc.*,

2016 WL 7031613, at *3 (S.D.N.Y. Dec. 1, 2016) (concluding that plaintiff was not an adequate

class representative when he, among other things, sent profane and aggressive emails to

defendant's executives and, after filing the complaint, used a fake name and alias email address

to communicate with defendant's executives).  Finally, that he lied about being a lawyer—not

just once but multiple times—and then gave at best misleading testimony about that conduct at

deposition gives rise to the concern whether he can be trusted to be candid with the Court, a

critical characteristic for anyone who is to be trusted with the rights of absent class members.  In

light of the above, the Court believes that the success of Fishon's—and thus, the class's—legal

claims are "substantively jeopardized" by Fishon's conduct.  *Hua Mui v. Union of Needletrades,*

*Indus. & Textile Emps.*, 1999 WL 4918, at *4 (S.D.N.Y. Jan. 5, 1999).

The problems associated with Fishon's credibility issues makes this case unlike those

where minor discrepancies in a plaintiff's statements were found not to render that plaintiff

inadequate to represent the proposed class or jeopardize the interests of absent class members,

*see Lapin*, 254 F.R.D. at 177–78 (citing cases), or where "the credibility concerns are general in

nature, and do not specifically relate to the [issues] . . . central to th[e] lawsuit," *Hua Mui*, 1999

WL 4918, at *4.  Indeed, the credibility concerns outlined above "reflect plaintiff['s] conduct in

prosecuting this action," *Koppel v. 4987 Corp.*, 191 F.R.D. 360, 369 (S.D.N.Y. 2000), and are in

fact "directed at improper or questionable conduct arising out of or touching upon the very

prosecution of the lawsuit," *id.* at 368 (citing *Jane B. by Martin v. N.Y.C. Dep't of Soc. Servs.*,

ADD-201

117 F.R.D. 64, 71 (S.D.N.Y. 1987)).  Fishon's pre-litigation conduct in communicating with

Peloton, as well as his evasive and inconsistent testimony at his deposition "creates serious

concerns as to his credibility at any trial."  *Savino*, 164 F.3d at 87.  Fishon has not met his burden

to show that he is an adequate class representative.

Because Fishon—the only named plaintiff left in this case given the Court's dismissal of

Pearlman's claim—does not satisfy the adequacy requirement of Rule 23(a), the motion for class

certification fails.  *See In re IPO*, 471 F.3d at 40.  The Court therefore need not consider the

remaining factors under Rule 23(a) at this juncture.  *See, e.g.*, *Gordon*, 92 F. Supp. 3d at 205

(denying class certification on the grounds that proposed class representatives were inadequate,

declining to rule definitively on the other objections to class certification, and allowing renewal

of the motion for class certification with new lead plaintiffs); *cf. In re Canon Cameras*, 237

F.R.D. 357, 359 (S.D.N.Y. 2006) ("Here, while the Court harbors doubt that plaintiffs have

satisfied all the requirements of Rule 23(a), it need not reach that question because it is plain that

they do not begin to satisfy the requirements of Rule 23(b).").

Plaintiffs' suggestion, made in a footnote on reply, that the Court should substitute two

currently absent class members—thus salvaging any defect caused by Fishon's inadequacy as a

class representative—is inappropriate at this stage of the proceedings.  The two individuals are

putative class members.  They have not filed complaints, are not yet parties before the Court, and

are not represented by counsel who has filed a notice of appearance.  Plaintiffs have not

represented that the proposed substitutes have reviewed the class-certification motion, and

Peloton has not had the opportunity to depose them as proposed class representatives or to

address their specific allegations.  Plaintiffs may have the opportunity to propose new class

representatives, but they must do so in a way that respects the principle that a class representative

should "not simply lend his name to a suit controlled entirely by the class attorney," *In re Monster*, 251 F.R.D. at 135 (internal quotation marks, citation, and alteration omitted), and should provide a significant enough role in the litigation to "fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a), including "against the possibly competing interests of the attorneys," *Baffa v. Donaldson, Lufkin, & Jenrette Secs. Corp.*, 222 F.3d 52, 61 (2d. Cir. 2000).

In order for any person to step forward as a putative class representative, Plaintiffs must file an amended complaint with allegations specific to the new class representative(s), Peloton must have the opportunity to answer or move against the amended complaint, and Peloton must also have the opportunity to depose the proposed class representative(s) on issues that were not addressed in the prior depositions.

## CONCLUSION

For the foregoing reasons, Peloton's motion to dismiss plaintiff Pearlman's claim is GRANTED, and Pearlman's complaint is dismissed without prejudice. Plaintiffs' motion for class certification is DENIED. In light of the Court's denial of the motion for class certification, Peloton's pending motion to exclude the testimony of Plaintiffs' experts is DENIED as moot.

Any amended complaint must be filed on or before February 18, 2022. Assuming that an amended complaint is filed, the Court will hold a case management conference to discuss the schedule for any remaining discovery and for renewed motions for class certification.

The Clerk of Court is respectfully directed to close Dkt. Nos. 107, 117, and 135.

SO ORDERED.

Dated: January 19, 2022
New York, New York                          _____
                                                    LEWIS J. LIMAN
                                            United States District Judge

ADD-203

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIC PASSMAN and ISHMAEL ALVARADO, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PELOTON INTERACTIVE, INC.,<br><br>Defendant. | Case No. 1:19-CV-11711-LJL<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Eric Passman and Ishmael Alvarado (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (collectively, the "Class," as more fully defined below), bring this Third Amended Class Action Complaint ("Complaint") against Defendant Peloton Interactive, Inc. ("Peloton" or "Defendant"). Plaintiffs make the following allegations upon personal knowledge as to their own acts, upon information and belief, and their attorneys' investigation as to all other matters, alleging as follows:

### I.    NATURE OF THE ACTION

1. This action arises out of Peloton's misrepresentations and material omissions to Plaintiffs and the other Class members regarding the "ever-growing" size of its on-demand fitness class library and its subsequent removal of more than 50% of the classes in that library.

2. Peloton is an exercise equipment and media company that was founded in 2012 and is headquartered at 125 West 25th Street, 11th Floor, New York, New York 10001. Peloton has claimed that it is "reinventing fitness with live & on-demand boutique studio classes you can take anytime with the Peloton Bike, Peloton Tread & Peloton digital."[1]

---

[1] *See* https://twitter.com/onepeloton (as accessed Dec. 6, 2019).

3.      Peloton's main products are its luxury stationary bicycle ("Peloton Bike") and luxury treadmill ("Peloton Tread") (collectively, "Peloton Hardware") that, through their built-in interactive touchscreens, allow users to watch live and pre-recorded (or "on-demand") fitness classes through a monthly subscription service associated with the Peloton Hardware, aiming to provide the experience of a live fitness class from the comfort of users' homes.

4.      Peloton's business initially started with its Peloton Bike, which offers live streaming and on-demand "spinning" classes from the comfort of consumers' homes.  "Spinning" classes are popular indoor cycling instruction classes, initially popularized in the mid-1990s, that consist of professional coaches providing real-time instruction, guidance, and encouragement to riders, over a soundtrack of popular and other songs.  Peloton has expanded this concept of interactive instructional fitness classes over soundtracks of popular music; e.g., to Peloton Tread and other weightlifting, strength training, outdoor running, yoga, meditation, stretching, and cardio-fitness classes.

5.      Peloton markets and sells its subscription-based, on-demand fitness library for a monthly price of $39 to purchasers of Peloton Hardware ("Peloton Membership").  In addition to the live and on-demand classes, the Peloton Membership provides, among other features, advanced metrics and a live interactive leaderboard that allows users to compete against each other.  The Peloton Membership's content is coextensive across all platforms and includes the same live and on-demand bike, treadmill, free weight, yoga, and other fitness classes on both the Peloton Hardware and other devices.

6.      On information and belief, all Peloton members must keep a credit card on file with Peloton in order to access the Peloton Membership.

7.      Peloton sees itself as a uniquely New York company.  Peloton's co-founder and former CEO, John Foley,[2] stated that "New York City is where Peloton started, and it will continue to be our home as we scale our business globally," while noting that New York City is where the best talent can be found at the "intersection of fitness, technology and media[.]"[3]  Peloton's executive offices, accounting and finance department, marketing departments, studios, content production, and all of its other significant operations, including its banking operations, are headquartered or otherwise based in New York.  In fact, New York is so central to Peloton's identity that, in its uniform contract with members from around the world, it requires that New York law apply to all aspects of those contractual relationships, to the exclusion of other states' laws.

8.      Any time a member purchases Peloton Hardware or a Peloton Membership, that member's payment is routed to Peloton's bank accounts in New York.

9.      These payments are recorded and managed by Peloton's Accounting and Finance department, located at Peloton's New York headquarters.

10.     Upon information and belief, Peloton does not accept cash as a form of payment.

11.     In exchange for these payments, the member gets access to the classes recorded, produced, and issued from Peloton's New York studios located at 140 West 23rd Street, New York, New York 10011 and 152 Christopher Street, New York, New York 10014.  During the Class Period, Peloton's classes were filmed in New York.

---

[2] On February 8, 2022, Mr. Foley announced that he would be stepping down as Peloton's CEO, and that he would be replaced by Barry McCarthy (former CFO at Spotify).

[3] *See* https://www.prnewswire.com/news-releases/peloton-to-expand-nyc-footprint-with-new-corporate-headquarters-at-hudson-commons-in-2020-300752307.html (last accessed Feb. 17, 2022).

12.     In order to acquire and retain members, Peloton purposefully and affirmatively engages in a variety of advertising and marketing campaigns originating from and/or approved by its Creative, Acquisition Marketing, Brand Marketing, and Retention Marketing departments, all located at Peloton's New York headquarters.

13.     In order to differentiate itself from other fitness companies that market and sell similar fitness hardware, in-studio workout classes, and instructional home workout media, Peloton's marketing departments aided in developing a campaign to promote access to an "ever-growing" digital library of fitness classes led by professional instructors, available on-demand 24 hours per day, 7 days per week, from the comfort of one's home, for a flat monthly subscription fee.  Approval for Peloton's "ever-growing library" representations occurred in New York, as well as, on information and belief, the formulation of Peloton's entire business model, including its "ever-growing" library.

14.     The purpose and effect of this marketing campaign is that Peloton members and prospective members choose Peloton over competing fitness products, at least in part, because of access to a constantly growing number of digital classes, helping to replicate the same experience of an in-person exercise studio where a class can never be the same twice.

15.     Peloton's "ever-growing" on-demand library is central to its marketing, because Peloton needs to ensure that customers spending thousands of dollars on the Peloton Hardware and Peloton Membership will not run out of new classes over time and will also be able to take and retake older classes.  The size of Peloton's on-demand digital library has always been, and

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 255 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 255 of 465

ADD-207

continues to be, central to Peloton's marketing[4] because "the hardware is only as good as the app and subscription that comes with it."[5]

16.    The importance of Peloton's "ever-growing" on-demand library to its business model is demonstrated by the company's pre-IPO filing, classifying Peloton as a "technology," "media," and "software" company.[6]  John Foley even described Peloton as a "media company" with "*10,000 classes on-demand*" (emphasis added).[7]  The company also invested $45 million to build the "best digital television streaming studio in the world."[8]

17.    Peloton's website touted its "thousands of boutique classes," and "ever-growing library of live and on-demand studio classes."[9]  Its website likewise represented that the Peloton Membership grants "unlimited access to a growing library of live streaming and on-demand classes, scenic rides, real-time performance tracking, and unlimited accounts for family and friends.  No classes offered by Peloton are off limits."[10]

18.    Music has been central to the Peloton class experience from the beginning.  Every on-demand and studio class includes a themed playlist curated by the instructor to match the tempo and intensity of the class.  Peloton recognizes that "[m]usic is an important element of the overall

---

[4] *See* https://onepeloton.com/bike/classes (as accessed Dec. 6, 2019).

[5] *See* https://www.forbes.com/sites/bizcarson/2019/09/26/peloton-ceo-john-foley-faces-the-skeptics-again-this-time-buyers-in-its-8-billion-ipo/#3b8f0f6f4349 (last accessed Dec. 6, 2019).

[6] *See* https://fortune.com/2019/09/25/peloton-ipo-filing-media-company/ (last accessed Feb. 17, 2022).

[7] *See* https://www.bizjournals.com/newyork/news/2018/08/03/peloton-ceo-were-becoming-a-media-company.html (last accessed Dec. 6, 2019).

[8] *Id.*

[9] https://www.onepeloton.com/digital (as accessed Apr. 25, 2019); *see also* https://www.onepeloton.com/bike/classes.
("Thousands of On-Demand Rides. Take a class anytime, with our daily-updated, extensive on-demand library"); *id.* ("Thousands of rides on-demand. Rider anytime with thousands of classes to choose from on-demand.") (last accessed Dec. 6, 2019).

[10] *See* https://support.onepeloton.com/hc/en-us/articles/201039338-Rides-included-with-the-Peloton-subscription.

content that [it] make[s] available to [its] Members,"[11] and, in May 2017, Peloton introduced a new feature allowing members to find on-demand classes based on the type of music featured therein.[12]

19.    Peloton is a sophisticated software company that provides content protected by various intellectual property laws.  Peloton fully understands what the copyright laws require, having entered into sync licenses with certain other copyright holders, while, at the same time, using other musical works for free and without permission.[13]

20.    Peloton knew that it was, in part, building its on-demand library with copyrighted material for which it did not have the proper licenses.  Peloton thus knew or should have known that because it lacked the appropriate licenses for the music accompanying the classes in its on-demand digital library, its library cannot legitimately be "ever-growing" and was actually knowingly built, in material part, on an illegal foundation.

21.    In April 2018, Peloton received a cease-and-desist letter regarding its alleged copyright infringement of many songs appearing in classes in its on-demand class library.[14] Notwithstanding being placed on notice of its alleged copyright infringement, Peloton continued to promise an "ever-growing" class library to consumers and to heavily market that fact to its customers and prospective customers as a key Peloton selling point.

---

[11] SEC Form S-1 Registration Statement at 18, available at https://www.sec.gov/Archives/edgar/data/1639825/000119312519230923/d738839ds1.htm.

[12] *See Find Your Favorite Genres with Our Brand-New Music Filtering Feature*, Cadence (May 26, 2017), https://cadence.pelotoncycle.com/find-favorite-genres-brand-new-music-filtering-feature/1907/ (as accessed Dec. 6, 2019).

[13] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 76, ¶ 1 (S.D.N.Y. Sept. 27, 2019).

[14] Peloton's classes consist of coaches providing real-time instruction, guidance, and encouragement to riders, over a soundtrack of popular and other songs.

22.     In March 2019, several members of the National Music Publishers Association ("NMPA") collectively filed a lawsuit against Peloton, seeking more than $150 million in damages, alleging that Peloton has been using their musical works for years in its workout videos without proper licensing, resulting in lost income for songwriters.  The lawsuit further alleged that "Peloton's infringement was and continues to be knowing and reckless" and that "Peloton fully understood what the copyright law required, having entered into sync licenses with certain other copyright holders, while trampling the rights of Plaintiffs by using their musical works for free and without permission."[15]

23.     Although Peloton denied that it was violating copyright laws and asserted counterclaims against the NMPA for antitrust violations and tortious interference with prospective business relations, on March 25, 2019, in the face of the NMPA's copyright infringement lawsuit, Peloton—for its own economic advantage and to the financial detriment of its customers—abruptly removed every class from its on-demand library that contained one or more of the allegedly copyright infringing songs.  In total, this resulted in the removal of more than half of the classes from its on-demand library.[16]

24.     The decision to remove the majority of Peloton's on-demand library was made in New York and effectuated in New York.

25.     Prior to March 25, 2019, the Peloton Membership made available more than 12,000 on-demand classes to its users.  Following Peloton's March 2019 purge of its on-demand library

_____

[15] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 76, ¶ 1 (S.D.N.Y. Sept. 27, 2019).

[16] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 31, Counterclaims ¶ 59 (S.D.N.Y. Apr. 30, 2019); *see also id.*, Counterclaims ¶¶ 10, 42, 46, 52, 57.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 258 of 465
Case 1:19-cv-11711-LGS    Document 595    Filed 09/02/25    Page 258 of 465

ADD-210

Case 1:19-cv-11711-LJL    Document 195    Filed 02/18/22    Page 8 of 42

from its New York headquarters, fewer than half that many on-demand classes remained available to users.[17]

26.    Peloton's abrupt removal of the infringing songs led to the removal of many thousands of classes—more than 50% of its on-demand digital library—greatly reduced the on-demand options upon which Peloton bases its marketing and uses as a differentiating factor to garner more customers and market share for both the Peloton Hardware and the Peloton Membership.[18]

27.    The copyright infringement lawsuit and subsequent purge of Peloton's on-demand library also significantly decreased the quality and quantity of popular music available on Peloton's workout class playlists, thus materially diminishing users' experience with both the Peloton Hardware and Peloton Membership.[19]  The infringing works included songs from popular artists such as Beyoncé, Michael Jackson, Madonna, Kanye West, Jay Z, Luke Bryan, and Justin Timberlake, to name a few.[20]  In addition to losing more than 50% of their on-demand classes, users lamented that the workouts in the new classes (those without the removed songs) don't "flow

---

[17] *See* https://imgur.com/XxdUOJn; *see also* https://docs.google.com/spreadsheets/d/1LAE9kDqxkj4CkZ7TzS7ce6g5cxkMUOMdDssxKWpS0ak/edit?usp=sharing.

[18] *See* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider (Mar. 27, 2019), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3

[19] *See* Natt Garun, *Peloton owners are pissed about bad music after copyright lawsuit*, The Verge (April 24, 2019, 1:47 p.m.), https://www.theverge.com/2019/4/24/18514036/peloton-music-copyright-fitness-studios-gym-on-demand-media-strategy (last accessed Feb. 17, 2022); *see also* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider US (March 27, 2019), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3 (last accessed Feb. 17, 2022).

[20] *See* Non-Exhaustive List of Works Infringed by Peloton, by Publisher (Ex. 1).  Tellingly, years later, Peloton has reintroduced classes with some of these same artists, having finally secured rights to use their music. For example, Peloton now markets that it has classes with music entirely from Beyoncé.  *See* https://blog.onepeloton.com/beyonce-collaboration/ (last accessed Feb. 17, 2022).

like they used to" and struggled to "find a playlist with 50 percent decent songs" after Peloton's removal of the infringing works.[21]

28.    Peloton's then-CEO, John Foley, falsely promised Peloton Membership subscribers that the removal of "classes" would "not affect your experience with (or the cost of) [Peloton's] service, or access to the kind of music you're used to hearing behind [Peloton's] instructors in the thousands of classes in [Peloton's] library."[22]  That representation, however, is demonstrably false, and Peloton never disclosed to its subscribers, including Plaintiffs and the other Class members, that it would be removing over half of the classes from its on-demand library.

29.    The NMPA later amended its complaint against Peloton alleging that it "found another 1,324 songs that have been streamed by Peloton instructors during classes without approval," which will likely result in Peloton's removal of additional classes from its on-demand library.[23]  The NMPA then sought over $300 million in damages for Peloton's knowing, widespread copyright infringement.[24]  Peloton later settled the lawsuit.[25]

30.    Despite being put on actual notice as early as April 9, 2018 that it was using infringing songs to build its digital library, Peloton's website—which Peloton knows is its primary source for marketing its Peloton Hardware and Peloton Membership—continued to market "an

---

[21] *See* Natt Garun, *Peloton owners are pissed about bad music after copyright lawsuit*, The Verge (April 24, 2019), https://www.theverge.com/2019/4/24/18514036/peloton-music-copyright-fitness-studios-gym-on-demand-media-strategy (last accessed Feb. 17, 2022).

[22] *See* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider (Mar. 27, 2019), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3 (last accessed Feb. 17, 2022).

[23] *See* https://observer.com/2019/09/peloton-music-licensing-lawsuit-ipo/ (last accessed Feb. 17, 2022).

[24] If Peloton removes additional classes from its on-demand library due to the expanded scope of the infringement allegations, the class alleged herein will increase commensurately.

[25] *See* https://www.prnewswire.com/news-releases/nmpa-and-peloton-announce-settlement-of-litigation-joint-collaboration-agreement-301012233.html  (last accessed Feb. 17, 2022).

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 260 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 260 of 465

ADD-212

Case 1:19-cv-11711-LJL   Document 195   Filed 02/18/22   Page 10 of 42

expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors."[26]  It also notified consumers during the purchasing process that its "Bike packages" require a monthly Peloton Membership,[27] which includes "unlimited access to a growing library of live streaming and on-demand Peloton classes."[28]

31.     As part of Plaintiffs' and the other Class members' Peloton subscriptions, they expected and were entitled to use a substantial, on-demand class library that would continue to grow, as Peloton repeatedly represented.  Yet, when Peloton accepted Plaintiffs' and the other Class members' subscription payments, Peloton knew or should have known that Plaintiffs and the other Class members would not be able to use an ever-growing on-demand class library because the number of on-demand classes would be materially decreasing due to Peloton's wrongful conduct.

32.     Nonetheless, Peloton misrepresented and/or omitted that information from Plaintiffs and the other Class members, continued to represent to existing and potential subscribers that its on-demand digital library would be "ever-growing," and continued to charge full price for its Peloton Membership, despite knowing that its subscribers would necessarily not be receiving everything that Peloton represented they would receive.

33.     In a November 19, 2018 press release—months after Peloton received the cease and desist letter from the NMPA—Peloton represented that "Peloton produces nearly 24 hours of live content per day from its Peloton Bike and Peloton Tread Studios in NYC, *and has more than 10,000 live and on-demand instructor-led indoor cycling, running, bootcamp, yoga and*

---

[26] *See* https://www.onepeloton.ca/app (as accessed Dec. 6, 2019).

[27] *See* https://www.onepeloton.com/shop/bike (as accessed Dec. 6, 2019).

[28] *See* https://www.onepeloton.com/shop/bike/subscription (as accessed Dec. 6, 2019).

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 261 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 261 of 465

ADD-213

Case 1:19-cv-11711-LJL    Document 195    Filed 02/18/22    Page 11 of 42

*stretching classes for its Peloton Bike, Peloton Tread and Peloton Digital platforms.*  To date, Peloton has nearly one million Members, comprising Peloton Bike and Peloton Tread owners, iOS app users and in-studio riders, and expects to add millions more in the coming years." (emphasis added).[29]

34.    By misrepresenting that its on-demand digital library would be "ever-growing" and failing to disclose the imminent removal of over half of its on-demand library, Peloton—from and through its New York headquarters—entered into contractual relationships with Plaintiffs and the other Class members, engaged in financial transactions and accepted payments from Plaintiffs and the other Class members, and defrauded Plaintiffs and the other Class members, depriving them of the benefit of their bargain with Peloton, and/or unjustly enriching itself at Plaintiffs' and the other Class members' expense, as a result of Peloton's wrongful conduct alleged herein.  Plaintiffs, individually and on behalf of the other Class members they seek to represent, seek monetary damages, statutory penalties, and injunctive relief, asserting claims for Peloton's violation of New York's consumer protection and false advertising statutes, N.Y. Gen. Bus. Law §§ 349 and 350.

## II.    PARTIES

### A.    Plaintiffs

35.    Eric Passman is a citizen of New York, residing in Nassau County, New York. Plaintiff Passman, relying on Peloton's uniform representations about its "ever-growing" or "growing" on-demand library of fitness classes, entered into a transaction with New York-based Peloton, resulting in his purchase of a Peloton Bike and the Peloton Membership in February 2017, and has paid all required hardware, software, and subscription fees relating thereto.

---

[29] *See* https://www.prnewswire.com/news-releases/peloton-to-expand-nyc-footprint-with-new-corporate-headquarters-at-hudson-commons-in-2020-300752307.html (as accessed Dec. 5, 2019).

36.    Eric Passman's purchase of his Peloton membership subscription was made electronically, as were all his monthly fee payments.

37.    Ishmael Alvarado is a citizen of New York, residing in New York County, New York.  Plaintiff Alvarado, relying on of Peloton's uniform representations about its "ever-growing" or "growing" on-demand library of fitness classes, entered into a transaction with New York-based Peloton, resulting in the purchase in January 2019 of a subscription for a Peloton Bike that he and his wife purchased from a friend in New York.  Mr. Alvarado has paid all required software and subscription fees relating thereto.

38.    Ishmael Alvarado's purchase of his Peloton Membership subscription was made electronically, as were all his monthly fee payments.

39.    Plaintiff Passman and Plaintiff Alvarado (collectively "Plaintiffs") have continued to pay Peloton for subscription services since they acquired the Peloton hardware, and Plaintiffs have continued to pay those services electronically with their respective credit cards.

40.    Prior to purchasing the Peloton Hardware and commencing payment for the Peloton Membership subscription, neither Peloton nor its agents or representatives informed Plaintiffs that Peloton had been accused of violating any laws or that a substantial portion of its Peloton Membership's on-demand digital library would be (or might be) removed.

41.    Peloton's representations and material omissions regarding its on-demand library caused Plaintiffs to pay increased costs for the Peloton Hardware and corresponding Peloton Membership, which was worth less than represented because Peloton's representations and/or omissions regarding its on-demand digital library were deceptive and misleading and constituted false advertising.

ADD-215

42.    Peloton's representations and material omissions were part of the basis of the bargain, in that Plaintiffs attributed value to Peloton's promises regarding the nature and characteristics of its on-demand digital library and would not have purchased the Peloton Hardware and corresponding Peloton Membership, or would not have purchased it on the same terms, if they knew the truth that Peloton's on-demand digital library would shrink dramatically, by more than 50%.

**B.    Defendant**

43.    Peloton is a Delaware corporation, with its corporate headquarters and principal place of business located in New York City, New York.  Peloton is subject to the jurisdiction of this Court and may be served with process at its principal executive office located at 125 West 25th Street, 11th Floor, New York, New York.

44.    Peloton, from its New York headquarters, markets and sells its apparel, hardware accessories, hardware, and Subscription Service throughout the United States including in this District.  Peloton is registered with the New York State, Department of State to conduct business in New York.

45.    Peloton bills itself as "the largest interactive fitness platform in the world," claiming, as of June 30, 2021, to have more than 5.9 million members, and annual revenue of over $4 billion.  Peloton is publicly-traded on NASDAQ ("PTON") and as of the date of this Third Amended Complaint, had a market cap exceeding $10 billion.[30]

---

[30] Peloton's market capitalization has dropped significantly in recent months (approximately 75%) for various reasons, including increased competition.

ADD-216

### III.    JURISDICTION AND VENUE

46.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action, there is minimal diversity, and the amount in controversy exceeds $5 million, exclusive of interest and costs.

47.    The Court has personal jurisdiction over Peloton because it resides and is subject to general jurisdiction in this District.  The Court also has personal jurisdiction over Peloton, because it markets, distributes, and sells its apparel, hardware, accessories, and Subscription Service throughout the United States, including in this District, and the conduct complained of occurred in or was targeted at this District.  Additionally, Peloton's Terms of Service provides that all disputes not required to be arbitrated be adjudicated in New York, New York and are to be governed by New York law.[31]

48.    Venue is proper in this District, because Defendant resides in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. 28 U.S.C. § 1391(b)(1)-(2).

### IV.    PELOTON'S ARBITRATION CLAUSE

49.    Peloton has categorically denied that it used infringing songs in its on-demand classes and that it continues to violate copyright laws.[32]  Notwithstanding its contention that it had done nothing wrong, Peloton nonetheless chose to unilaterally gut its on-demand library for its own economic advantage and financial benefit to the material detriment of Plaintiffs and the other Class members.

---

[31] *See* Peloton Terms of Service at 21-22 (Ex. 2).

[32] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 87, ¶ 1 (S.D.N.Y. Oct. 11, 2019).

ADD-217

50. Peloton felt empowered to cheat Plaintiffs and the other Class members by gutting its on-demand library for its own commercial protection and advantage because its Terms of Service contains a highly restrictive arbitration clause that provides that "any dispute, claim or controversy arising out of or relating to these Terms or the breach, termination, enforcement, interpretation or validity thereof or the use of the Services or Content (collectively, 'Disputes') will be resolved **solely by binding arbitration**. . . ." (emphasis added).[33] Peloton's Terms of Service in effect during the Class Period were drafted by its outside legal counsel, Fenwick & West LLP, in New York.

51. By stripping Plaintiffs and other Class members of their Seventh Amendment right to a jury trial and forcing them into individual arbitrations, Peloton believed it could advantage itself at consumers' expense without material legal consequences or exposure. Pelton believed that very few, if any, of its customers would pursue arbitration because it knew that claimants are "highly unlikely to slog through a protracted arbitration process over a relatively low amount of money."[34]

52. Peloton did not anticipate, however, that in the face of its misconduct more than 2,700 customers would file arbitration demands arising out of its self-serving purge of its on-demand library.

53. Peloton's arbitration clause obligated it to pay "all filing, administration and arbitrator fees and expenses" associated with its customers' demands for arbitration.[35]

---

[33] *See* Ex. 2 at 18.

[34] *See* David Dayen, *Tech Companies Big Reveal: Hardly Anyone Files Arbitration Claims*, The American Prospect (Nov. 26, 2019), https://prospect.org/power/tech-companies-hardly-anyone-files-arbitration-claims/ (last accessed Feb. 17, 2022).

[35] *See* Ex. 2 at 19-20.

ADD-218

54.    Peloton, however, faced with far more arbitration demands than it expected when it instituted its anti-consumer arbitration clause, *refused to abide by the terms of its own arbitration clause*, ignoring the American Arbitration Association's ("AAA") requirement—and Peloton's contractually-mandated obligation—to pay filing fees for demands seeking less than $10,000.

55.    As a result, on November 14, 2019, AAA wrote a letter to Peloton, notifying it that AAA "decline[d] to proceed with administration of the parties' disputes" and that "either party may choose to submit its dispute to the appropriate court for resolution."[36]  Additionally, AAA notified Peloton that "AAA will decline to accept future consumer matters submitted  against or by [Peloton]" and requested that Peloton "remove AAA from its consumer arbitration agreements so that there is no confusion to Peloton's consumer customers."[37]

56.    When this action was first filed, Peloton had still not complied with AAA's request to remove AAA from its arbitration agreements, continuing instead to represent to its customers that they were subject to binding arbitration with AAA in order to deter customers from filing lawsuits.

57.    The arbitration clause, and all provisions contained therein, is an inextricable part of Peloton's Terms of Service with Plaintiffs and the other Class members.  Accordingly, as a result of Peloton's failure to comply with the terms of its arbitration clause and AAA's Consumer Arbitration Rules, Peloton's arbitration clause, including its class action waiver provision and all other provisions, is invalid as to all its customers—including Plaintiffs and the other Class members.[38]

---

[36] *See* November 14, 2019 AAA Letter to Peloton (Ex. 3).

[37] *Id.*

[38] *See* Ex. 3.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 267 of 465
Case 1:19-cv-11711-LGS   Document 536   Filed 09/02/25   Page 267 of 465

ADD-219

## V.   FACTUAL ALLEGATIONS

**A.     Peloton's "Ever-Growing" On-Demand Library Claim Is Essential To Its Business Model.**

58.     Peloton is an exercise equipment and media company that was founded in 2012. John Foley, its co-founder and former CEO, describes Peloton as a "fitness platform" where "fitness meets technology, meets media."[39]  Peloton has claimed that it "is reinventing fitness with live & on-demand boutique studio classes you can take anytime with the Peloton Bike, Peloton Tread & Peloton digital."[40]

59.     As of June 2021, Peloton claimed to have more than 5.9 million members.[41]  The company was valued at $4 billion after it closed a $550 million financing round in August 2018.[42] In late August 2019, Peloton filed to go public and in its Initial Public Offering ("IPO") it roughly doubled its private market valuation, being valued at about $8 billion.[43]  Peloton's value continued to grow, reaching a peak market capitalization of approximately $50 billion.[44]  More recently,

---

[39] *See* http://media.licdn.com/embeds/media.html?src=https%3A%2F%2Fwww.youtube.com%2Fembed%2FFWXadxuOuSQ%3Ffeature%3Doembed&amp;url=https%3A%2F%2Fwww.youtube.com%2Fwatch%3Fv%3DFWXadxuOuSQ&amp;type=text%2Fhtml&amp;schema=youtube (last accessed Dec. 6, 2019).

[40] *See* https://twitter.com/onepeloton (as accessed Dec. 6, 2019).

[41] *See* https://investor.onepeloton.com/static-files/d84f3085-8c04-45d0-b6ab-0550de50c7ad (last accessed Feb. 17, 2022).

[42] *See* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider (Mar. 27, 2019, 10:30 a.m.), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3 (last accessed Feb. 17, 2022).

[43] *See* Jeremy C. Owens, *Peloton IPO: 5 things to know about the interactive exercise-machine company*, Market Watch (Sept. 28, 2019), https://www.marketwatch.com/story/peloton-ipo-five-things-to-know-about-the-interactive-exercise-machine-company-2019-08-28 (last accessed Feb. 17, 2022).

[44] *See* Svea Herbst-Bayliss, *Some big investors loaded up on Peloton as stock tumbled* (Feb. 14, 2022), https://www.reuters.com/business/retail-consumer/prominent-investors-stocked-up-peloton-stock-stumbled-late-2021-2022-02-14/ (last accessed Feb. 17, 2022).

faced with increasing competition and market changes, Peloton experienced a significant drop in its stock price, placing its current market cap at approximately $10 billion.[45]

60.    Peloton's business initially started with its Peloton Bike, which offers live streaming and on-demand "spinning" classes from the comfort of consumers' homes.  "Spinning" classes are popular indoor cycling instruction classes, initially popularized in the mid-1990s, that consist of professional coaches providing real-time instruction, guidance, and encouragement to riders, over a soundtrack of popular and other songs.  Peloton has expanded this concept of interactive instructional fitness classes, over soundtracks of popular music, to Peloton Tread and other weightlifting, strength training, outdoor running, yoga, meditation, stretching, and cardio-fitness classes.

61.    In 2014, Peloton released its eponymous stationary exercise bike at a price of $2,245.  The bike includes a 22-inch interactive touchscreen, which allows riders to watch live or pre-recorded classes, aiming to provide the experience of a spin class from the comfort of the users' homes.

62.    In January 2018, Peloton announced the release of its treadmill known as "Tread" for $4,295.  Similar to its stationary bike, Tread has a 32-inch interactive touchscreen, which allows runners to watch live or pre-recorded classes led by professional trainers.

63.    For consumers who purchase Peloton's Hardware, Peloton offers its Peloton Membership, which in addition to its live and on-demand fitness classes, includes Connected Fitness options such as instructor-curated training programs, live workout metrics, a detailed workout performance dashboard, and live and on-demand class interactive leaderboards.  Peloton Membership subscribers pay $39 per month for this service.  Peloton refers to customers that

---

[45] *See id.*

purchase the Peloton Hardware and corresponding Peloton Membership as "Connected Fitness Subscribers."

64.     On information and belief, all Peloton Hardware and Peloton Membership packages require electronic payment, with the proceeds deposited into Peloton's New York bank accounts.  As alleged herein, Peloton processed, deposited, and accounted for these payments in New York.

65.     Demonstrating the importance of its "ever-growing" library of on-demand fitness classes to its business model, the company's pre-IPO filing classifies Peloton as a "media" company and John Foley, Peloton's former CEO and co-founder, has described the company as a "media company" with "10,000 classes on-demand" and the "best digital television streaming studio in the world."[46]

66.     Peloton differentiates itself and its more expensive fitness hardware from other fitness companies by offering unlimited access to its "ever-growing" on-demand library of professional fitness classes available at the users' convenience.

67.     The purpose of this representation is to induce consumers into purchasing Peloton products, believing they will have a constantly growing catalogue of digital classes to choose from for their exercise routines.

68.     In its pre-IPO filings, Peloton claimed to have "disrupted the fitness industry by developing a first-of-its-kind subscription platform that seamlessly combines the best equipment, proprietary networked software, and world class streaming digital fitness and wellness content."[47]

---

[46] *Id.*

[47] *See* SEC Form S-1 Registration Statement, available at
https://www.sec.gov/Archives/edgar/data/1639825/000119312519230923/d738839ds1.htm.

69.     Peloton has claimed that 92% of its Hardware ever sold still had an active Peloton Membership subscription attached as of June 30, 2019,[48] a percentage which, on information and belief, has remained consistent.  Thus, it is the subscription model that Peloton hopes will keep the company growing and allow its business model to scale.[49]  In order to maintain its subscriber retention rate, however, Peloton knows that it must make it "easy for Members to find a class that fits their interests based on class type, instructor, music genre, length, available equipment, area of physical focus, and level of difficulty.[50]

70.     Peloton's "continued business and revenue growth is dependent on [its] ability to continuously attract and retain Subscribers. . . ."[51]

**B.     Peloton's "Ever Growing" On-Demand Library Is Central to Its Marketing**

71.     While other fitness companies market and sell similar fitness hardware for in-home use, provide in-studio classes where users pay on a per class basis, and home workout programs, Peloton has dominated the marketplace by aggressively marketing access to an "ever-growing" library of fitness classes led by professional instructors, available on-demand 24 hours per day, 7 days per week, from the comfort of the users' own homes for a flat monthly subscription fee.

72.     The "ever-growing" nature of Peloton's on-demand library is central to its marketing because Peloton must ensure that consumers spending thousands of dollars on Peloton Hardware and the Peloton Membership will be able to take and retake older classes without running out of new classes over time.

---

[48] *Id.*

[49] *See* https://www.pymnts.com/subscriptions/2019/pelotons-ipo-to-test-subscription-models-fitness/

[50] *See* SEC Form S-1 Registration Statement, available at https://www.sec.gov/Archives/edgar/data/1639825/000119312519230923/d738839ds1.htm (last accessed Feb. 17, 2022).

[51] *Id.*

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 271 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 271 of 465

ADD-223

73.    Peloton began representing on its website the "ever-growing" and "growing" nature of Peloton's on-demand class library at least as early as 2016.  Peloton included those representations on website pages about the Peloton Bike, the Peloton Tread, the Peloton Membership, classes, FAQs, financing, and possibly others.

74.    Peloton's marketing departments prominently touted its "thousands of boutique classes," and "ever-growing library of live and on-demand studio classes" on the Peloton website.[52]  Peloton's website likewise represented that its Subscription Service grants "unlimited access to a growing library of live streaming and on-demand classes, scenic rides, real-time performance tracking, and unlimited accounts for family and friends.  No classes offered by Peloton are off limits."[53]

75.    Peloton's marketing on its website is vital, because that is the central location where consumers obtain information about Peloton's products and services, and where most transactions occur.

76.    It is thus unsurprising that Pelton included its promises of an "ever-growing" or "growing" library on its website.  For example, as of October 26, 2017, Peloton's website, specifically the financing page, represented the following:[54]

---

[52] https://www.onepeloton.com/digital (as accessed Apr. 25, 2019); *see also* https://www.onepeloton.com/bike/classes ("Thousands of On-Demand Rides. Take a class anytime, with our daily-updated, extensive on-demand library"); *id.* ("Thousands of rides on-demand. Rider anytime with thousands of classes to choose from on-demand.") (as accessed Dec. 6, 2019).

[53] *See* https://support.onepeloton.com/hc/en-us/articles/201039338-Rides-included-with-the-Peloton-subscription.

[54] *See* https://web.archive.org/web/20171026044106/https://www.onepeloton.com/financing (last accessed February 11, 2022).

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 272 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 272 of 465

ADD-224

Case 1:19-cv-11711-LJL    Document 195    Filed 02/18/22    Page 22 of 42

**UNLIMITED CLASSES**

Enjoy unlimited access to the world's
best instructors anytime, anywhere with
up to 14 daily live classes and an
evergrowing library of 6,000+
on-demand classes.

77.    As of November 2019, Peloton's website continued to market its digital library as
"ever-growing" and "growing."  For example, the website for Peloton's app continued to market
"an expansive, ever-growing library of live and on-demand studio classes taught by world-class
instructors"[55]:

The power of Peloton at your fingertips.

Explore an expansive, ever-growing library of live and on-demand studio classes taught by
world-class instructors. Immerse yourself in our breathtaking studio experience anytime
you want. Find a new favourite class just around the corner.

---

[55] *See* https://www.onepeloton.ca/app (as accessed Dec. 6, 2019).

22

ADD-225

78.    Further, in marketing its "Bike package" to consumers, Peloton continued to notify consumers that all packages "require a monthly Peloton Membership,"[56] which includes "unlimited access to a growing library of live streaming and on-demand Peloton classes"[57]:

## UNLIMITED ACCESS TO PELOTON CLASSES

With a Peloton Membership, you'll gain unlimited access to a growing library of live streaming and on-demand Peloton classes (cycling, running, bootcamp, floor, yoga and more), as well as performance tracking and unlimited profiles for family and friends.

Membership includes full access on a single Peloton Bike in one household, plus on-the-go access to Peloton Digital using our app. You may pause or cancel your membership at any time. See our Membership Terms for more details.

LEARN MORE

79.    Peloton's promise of an "ever-growing" and "growing" on-demand library of classes drives sales of not only monthly subscriptions, but also its flagship Peloton Bike and Peloton Tread products.

80.    The size and "ever-growing" nature of Peloton's on-demand digital library has always been, and continues to be, central to Peloton's marketing[58] because "the hardware is only as good as the app and subscription that comes with it."[59]

81.    Peloton's "ever-growing" and "growing" representations remained on Peloton's website for years, until late 2020, after this action was initially filed, when most instances appear to have been removed.

---

[56] *See* https://www.onepeloton.com/shop/bike (as accessed Dec. 6, 2019).

[57] *See* https://www.onepeloton.com/shop/bike/subscription (as accessed January 7, 2021).

[58] *See* https://onepeloton.com/bike/classes (last accessed Dec. 6, 2019).

[59] *See* https://www.forbes.com/sites/bizcarson/2019/09/26/peloton-ceo-john-foley-faces-the-skeptics-again-this-time-buyers-in-its-8-billion-ipo/#3b8f0f6f4349 (last accessed Dec. 6, 2019).

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 274 of 465
Case 1:19-cv-11711-LGS    Document 536    Filed 09/02/25    Page 274 of 465
ADD-226

Case 1:19-cv-11711-LJL    Document 195    Filed 02/18/22    Page 24 of 42

C.      **Peloton Knew That Its "Ever Growing" and "Growing" On-Demand Library Claims Were False And Misleading**

82.      Peloton is a sophisticated, multi-billion dollar company that specializes in providing consumers with digital content that is protected by various intellectual property laws. Peloton therefore knew or should have known that it was building its on-demand library with infringing songs and violating applicable copyright laws.

83.      Peloton fully understands what the copyright law requires, having entered into sync licenses with certain other copyright holders, while, at the same time, using other musical works for free and without permission.[60]  Peloton's knowing violation of copyright laws was part of "a strategy to build a music-centric brand that is now worth in excess of $6 billion" without having to pay for all the required licenses.[61]

84.      On April 9, 2018, Peloton was put on actual notice of its copyright infringement when it received a cease and desist letter from the NMPA notifying it of copyright infringement claims for Peloton's failure to receive proper licenses for some of the music playing in its on-demand fitness classes.

85.      Notwithstanding that fact, Peloton continued to promise an "ever-growing" library to consumers and to heavily market that fact to its customers and prospective customers as a key Peloton selling point.

86.      Implicit in Peloton's promise to provide an "ever-growing" on-demand library was that it would only place classes in the library that complied with applicable copyright law or that

---

[60] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 76, ¶ 1 (S.D.N.Y. September 27, 2019).

[61] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 90, at 1 (S.D.N.Y. Oct. 25, 2019).

ADD-227

it would pay back damages to copyright holders to ensure that the size of the on-demand library would not shrink.

87.    On March 25, 2019, in contravention of its promise to provide an "ever-growing" or "growing" library, Peloton abruptly removed more than half of its on-demand classes from its digital library.[62]  This decision to remove over half of Peloton's classes happened at Peloton's New York offices.

88.    Prior to March 25, 2019, Peloton's Membership made available more than 12,000 on-demand classes for its users.  Following Peloton's gutting of that on-demand library, fewer than half remained.[63]  All told, the abrupt removal of the infringing soundtracks led to Peloton's removal of many thousands of classes.[64]

89.    After Peloton's purge, the number of available on-demand classes was roughly equal to the number of on-demand classes that were available to consumers way back in January 2017.  Accordingly, contrary to its representations, Peloton's on-demand library, rather than being "ever-growing," was actually materially shrinking.

90.    Music is a central component of Peloton's workout classes and Peloton has deeply integrated music into the Peloton Membership interface—allowing users to search for workouts by music genre, as well as artist-specific playlists.  Users can also preview playlists for specific classes, "like" songs or playlists during their workouts, and save songs and playlists to their user

---

[62] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 31, Counterclaims ¶ 59 (S.D.N.Y. Apr. 30, 2019); *see also id.*, Counterclaims ¶¶ 10, 42, 46, 52, 57.

[63] *See* https://imgur.com/XxdUOJn (last accessed Dec. 5, 2019); *see also* https://docs.google.com/spreadsheets/d/1LAE9kDqxkj4CkZ7TzS7ce6g5cxkMUOMdDssxKWpS0ak/edit ?usp=sharing (last accessed Dec. 5, 2019).

[64] *See* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider (Mar. 27, 2019), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3 (last accessed Feb. 17, 2022).

25

profiles.  Music is thus critical to consumers' use and enjoyment of the Peloton Hardware and Peloton Membership, and its loss was a real and actual injury to consumers.

91.    The copyright infringement lawsuit and Peloton's subsequent purge of its on-demand library significantly decreased the quality and quantity of popular artists and songs available on Peloton's workout class playlists, which in turn materially diminished subscribers' experience with the Peloton Hardware and Peloton Membership.[65]  The infringing works include some of the most popular artists and songs, both currently and of all time.  Peloton has removed songs by a wide array of popular artists including, without limitation, Beyoncé, Brittany Spears, Michael Jackson, Ariana Grande, Snoop Dogg, Dr. Dre, Katy Perry, Rihanna, Miley Cyrus, Motley Crue, Pink Floyd, Justin Bieber, David Bowie, Rascal Flatts, Bruno Mars, Selena Gomez, Maroon 5, Adele, Lady Gaga, Nicki Minaj, Whitney Houston, Justin Timberlake, Luke Bryan, Mariah Carey, Jay Z, Kanye West, Drake, and Madonna.[66]

92.    John Foley, Peloton's former CEO, based in New York, emailed subscribers and notified them that Peloton was removing classes featuring the allegedly infringing songs, but failed to disclose that this would result in removal of more than half of the on-demand classes in its digital library or that it would significantly decrease the quality and quantity of popular songs and artists available for its playlists.

93.    Instead, Mr. Foley falsely promised Plaintiffs and the other Class members that "[Peloton] can assure you that this will not affect your experience with (or the cost of) [Peloton's]

---

[65] *See* Natt Garun, *Peloton owners are pissed about bad music after copyright lawsuit*, The Verge (April 24, 2019), https://www.theverge.com/2019/4/24/18514036/peloton-music-copyright-fitness-studios-gym-on-demand-media-strategy (last accessed Feb. 17, 2022); *see also* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider US (March 27, 2019), https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3 (last accessed Feb. 17, 2022).

[66] *See* Ex. 1.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 277 of 465
Case 1:19-cv-11711-LGS   Document 556   Filed 09/02/25   Page 277 of 465

ADD-229

Case 1:19-cv-11711-LJL   Document 195   Filed 02/18/22   Page 27 of 42

service, or access to the kind of music you're used to hearing behind [Peloton's] instructors in the thousands of classes in [Peloton's] library."

94.     That representation, however, is demonstrably false and Peloton never disclosed to its subscribers, including Plaintiffs and the other Class members, that it would be removing more than half of the classes from its on-demand library.

95.     As of November 2019, Peloton's website continued to market its digital library as being "ever-growing" and "growing," despite knowing that the NMPA has recently amended its lawsuit alleging that it "found another 1,324 songs that have been streamed by Peloton instructors during classes without approval."[67]

96.     Therefore, despite Peloton's representations to the contrary, it knew or should have known that the size of its on-demand digital library could not legitimately be "ever-growing," but it continued to knowingly defraud its existing and potential customers—including Plaintiffs and the other Class members—for its own financial gain.

**D.      Peloton's Misrepresentations and Omissions Are Material to Consumers**

97.     Peloton's misrepresentations and omissions are material to Plaintiffs and the other Class members.  As part of Plaintiffs' and the other Class members' subscriptions, they expected and were entitled to use a class library that, as advertised by Peloton, would continue to grow as new classes were added every day.

98.     Had a reasonable consumer known that Peloton would (or might) remove a substantial number of classes from its on-demand class library, he/she would have been concerned about purchasing Peloton's products or services.

---

[67] *See* https://observer.com/2019/09/peloton-music-licensing-lawsuit-ipo/ (last accessed Dec. 5, 2019).

99.    Each additional on-demand fitness class adds incremental value to Plaintiffs' and the other Class members' subscriptions and, therefore, Peloton's gutting of its digital library materially lowered the value of Plaintiffs' and the other Class members' subscriptions.

100.    Peloton's emphasis on the importance of its content continues to this day, when, in the midst of laying off more than 2,800 employees, Peloton—in a move clearly intended to calm its subscriber base watching Peloton's downward spiral—announced that its roster of instructors and breadth and depth of its content would not be impacted.[68]

101.    Peloton further confirmed the importance and value of its content by offering each of its 2,800 terminated employees a free year of Peloton Membership.[69]

102.    When Peloton accepted Plaintiffs' and the other Class members' subscription payments in its New York bank accounts and then accepted and recorded those payments in its New York Accounting and Finance department, Peloton knew or should have known that Plaintiffs and the other Class members would not be able to use the full on-demand class library because the size of its on-demand library was materially decreasing.

103.    Nonetheless, Peloton withheld that information from Plaintiffs and the other Class members, and its New York-based Creative and Marketing departments continued to represent to existing and potential subscribers that the on-demand digital library would be "ever-growing," and continued to charge the same full price for its Peloton Membership, despite knowledge that subscribers would not be receiving everything Peloton represented that they would receive.

---

[68] *See* https://investor.onepeloton.com/news-releases/news-release-details/peloton-announces-comprehensive-program-reduce-costs-and-drive (last accessed February 10, 2022).

[69] *See* Kim Lyons, *Peloton fired 2,800 employees and gave them free Peloton memberships*, The Verge (Feb. 8, 2022) https://www.theverge.com/2022/2/8/22923480/peloton-severance-package-membership-layoffs (last accessed February 17, 2022).

104.    These actions were outside of normal business practices and Peloton knew or should have known that its representations would harm an average consumer.  Peloton knew it could not live up to the promise it made active and prospective members.

105.    By misrepresenting that its on-demand digital library would be "ever-growing" and failing to disclose the imminent removal of over half of that library, Peloton defrauded Plaintiffs and the other Class members, deprived Plaintiffs and the other Class members of the benefit of their bargain with Peloton, and/or unjustly enriched itself at Plaintiffs' and the other Class members' expense.

## VI.    CLASS ACTION ALLEGATIONS

106.    Plaintiffs Passman and Alvarado bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure individually and on behalf of a class defined as:

> All purchasers of the Peloton hardware and/or corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019.

(the "Class," unless otherwise noted).[70]

107.    Plaintiffs Passman and Alvarado also bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure individually and on behalf of a subclass defined as:

> All purchasers of the Peloton Hardware and/or the corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019 in the State of New York.

(the "New York Subclass").

---

[70] Plaintiffs recognize that this Court has already dismissed claims brought under New York General Business Law §§ 349 and 350 by non-New York plaintiffs. Plaintiffs are not presently looking to relitigate that issue, but include the assertion of a nationwide class in this Third Amended Complaint to preserve the issue for appeal.

108.    Excluded from the Classes are Peloton and any of its affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; Court staff assigned to this case.  Plaintiffs reserve the right to modify or amend the Class definitions, as appropriate, during the course of this litigation.

109.    This action has been brought and may properly be maintained on behalf of the Classes proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

110.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**  The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  The precise number of Class members is unknown to Plaintiffs, but may be ascertained from Peloton's books and records and is presumed to be not less than tens of thousands, if not hundreds of thousands, of people.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

111.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).**  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

　　　　a.  whether Peloton engaged in the conduct alleged herein;

　　　　b.  whether Peloton's alleged conduct violates applicable law;

　　　　c.  whether Peloton engaged in false or misleading advertising;

　　　　d.  whether Peloton's misrepresentations and omissions regarding the "ever-growing" nature of the Peloton Membership's class library were likely to deceive Class members in violation of N.Y. Gen. Bus. Law §§ 349 and 350;

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 281 of 465
Case 1:19-cv-11711-LGS    Document 536    Filed 09/02/25    Page 281 of 465

ADD-233

Case 1:19-cv-11711-LJL    Document 195    Filed 02/18/22    Page 31 of 42

    e.  whether Peloton's misrepresentations and omissions regarding the "ever-growing" nature of the Peloton Membership's class library were material to a reasonable consumer;

    f.  whether Class members overpaid for their Peloton Hardware and/or Peloton Membership as a result of the conduct alleged herein;

    g.  whether Peloton's conduct violates public policy;

    h.  whether Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

    i.  the amount and nature of relief to be awarded to Plaintiffs and the other Class members.

112.  **Typicality – Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the other Class members' claims because Plaintiffs and the other Class members purchased Peloton's Hardware and/or subscribed to the Peloton Membership that falsely promised an "ever-growing" class library.  Each class in the on-demand library adds incremental value to Plaintiffs' and the other Class members' Peloton Hardware and/or Peloton Membership.  The value of Plaintiffs' and the other Class members' Peloton Hardware and/or Peloton Membership has therefore diminished and, as a result of Peloton's conduct, Plaintiffs and the other Class members overpaid for their Peloton Hardware and/or Peloton Membership.  Plaintiffs and the other Class members suffered damages as a direct and proximate result of the same wrongful conduct in which Peloton engaged.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other Class members' claims.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 282 of 465
Case 1:19-cv-11711-LGS    Document 536    Filed 09/02/25    Page 282 of 465

ADD-234

113.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**
Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members who they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.   Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

114.    **Declaratory and Injunctive Relief** – **Federal Rule of Civil Procedure 23(b)(2).**
Peloton has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members as a whole.

115.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).**   A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Peloton, so it would be impracticable for the Class members to individually seek redress for Peloton's wrongful conduct.   Even if the Class members could afford litigation the court system could not.   Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 283 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 283 of 465

ADD-235

## VII.    CLAIMS ALLEGED

### FIRST CLAIM FOR RELIEF

**Violation of New York General Business Law,
N.Y. Gen. Bus. Law § 349
(brought on behalf of Plaintiffs Passman and Alvarado,
the Class, and the New York Subclass)**

116.    Plaintiffs Passman and Alvarado repeat and reallege the allegations in Paragraphs

1-115 above, as if fully alleged herein.

117.    Plaintiffs Passman and Alvarado bring this claim individually and on behalf of the

other Class members, including the New York Subclass members.

118.    Plaintiffs Passman and Alvarado have standing to bring this claim individually and

on behalf of the other Class members, because the representations at issue emanated from New

York, and, in exchange for payments routed to Peloton's New York bank accounts, Plaintiffs

Passman and Alvarado were given access to a digital library of classes recorded and produced by

Peloton in New York; Plaintiffs Passman and Alvarado's access to over half these classes was

likewise revoked in New York.  Further, Plaintiffs Passman and Alvarado have standing to bring

this claim individually, on behalf of other Class members, and, specifically, on behalf of the New

York Subclass members, because the underlying transactions at issue between Plaintiffs and

Peloton happened entirely, or predominantly, in New York.

119.    New York's General Business Law § 349 makes unlawful "[d]eceptive acts or

practices in the conduct of any business, trade or commerce."

120.    Peloton engaged in deceptive acts or practices in the conduct of its business, trade,

and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, by

misrepresenting that its Peloton Membership included access to an "ever-growing library of live

and on-demand studio classes" and willfully failing to disclose that it would be removing over half

of its on-demand digital library, while persistently publishing marketing assertions (and omissions) to the contrary.

121.    Peloton knew or should have known that it lacked the appropriate copyright licenses for the music accompanying the classes in its library, and that its library could not legitimately be "ever-growing."

122.    Peloton received a cease-and-desist letter regarding its copyright infringement on April 9, 2018, but continued to promise the "ever-growing" library to consumers.  On March 25, 2019, shortly after getting sued for copyright infringement, Peloton abruptly removed more than half of its content from its on-demand digital library.

123.    Despite knowing that the size of its on-demand digital library had decreased by more than 50%, Peloton continued to promise on its website "an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors"[71] and "unlimited access to a growing library of live streaming and on-demand Peloton classes."[72]

124.    Peloton's representations and omissions were material because they were likely to deceive reasonable consumers about the "ever-growing" nature of its on-demand digital library.

125.    Peloton acted intentionally, knowingly, and maliciously to violate New York's General Business Law, and recklessly disregarded Plaintiffs Passman and Alvarado's rights, and the other Class members' (including the New York Subclass members') rights.  Peloton had actual knowledge on April 9, 2018 that it could not provide an "ever-growing" library to consumers but it nonetheless continued to promise and represent an "ever-growing" library.

---

[71] *See* https://www.onepeloton.ca/app (as accessed Nov. 26, 2019).

[72] *See* https://www.onepeloton.com/shop/bike/subscription (as accessed Nov. 26, 2019).

126.    As a direct and proximate result of Peloton's deceptive and unlawful acts and practices, Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members suffered a real and substantial injury they could not have reasonably avoided.

127.    Peloton deprived Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members, of the benefit of the bargain.  Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members, have suffered and will continue to suffer injury, ascertainable losses of money, and monetary and non-monetary damages because Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members, overpaid for Peloton's Hardware, because they did not know the truth that Peloton would gut its on-demand digital library, shrinking it by more than 50%, and that it would not be "ever-growing."

128.    Peloton's deceptive and unlawful acts and practices complained of herein affected all purchasers of Peloton's Hardware because the Peloton Hardware is only as good as the app and subscription that comes with it.

129.    Peloton's deceptive and unlawful acts and practices complained of herein affected all Peloton Membership subscribers.  The above deceptive and unlawful practices and acts by Peloton caused substantial injury to Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members, that they could not reasonably avoid.

130.    Plaintiffs Passman and Alvarado, individually and on behalf of the other Class members, including the New York Subclass members, seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 per violation (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

131.     Peloton's above-described deceptive and unlawful practices caused substantial injury to Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members, that they could not reasonably avoid. Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members, seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 per violation for each of Peloton's violations of N.Y. Gen. Bus. Law § 349 (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

132.     Each sale of the Peloton Hardware to Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members, constitutes a separate, independent, and willful violation of N.Y. Gen. Bus. Law § 349 through the above deceptive acts and practices in the conduct of its business.

133.     Each time Peloton accepted a Peloton Membership payment from Plaintiffs Passman and Alvarado, and/or one or more of the other Class members, including the other New York Subclass members, Peloton committed a separate, independent, and willful violation of N.Y. Gen. Bus. Law § 349 through the above deceptive acts and practices in the conduct of its business.

134.     Peloton should , therefore, be assessed a separate statutory penalty of $50 or actual damages (whichever is greater) for each independent violation, and all other such relief as may be just and proper that should be recovered by Plaintiffs Passman and Alvarado individually and on behalf of the other Class members, including the New York Subclass members.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 287 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 287 of 465

ADD-239

Case 1:19-cv-11711-LJL   Document 195   Filed 02/18/22   Page 37 of 42

## SECOND CLAIM FOR RELIEF

**Violation of New York General Business Law,**
**N.Y. Gen. Bus. Law § 350**
**(brought on behalf of Plaintiffs Passman and Alvarado,**
**the Class, and the New York Subclass)**

135.    Plaintiffs Passman and Alvarado repeat and reallege the allegations in Paragraphs 1-115, above, as if fully alleged herein.

136.    Plaintiffs Passman and Alvarado bring this claim individually and on behalf of the other Class members, including the New York Subclass members.

137.    Plaintiffs Passman and Alvarado have standing to bring this claim individually and on behalf of the other Class members because the representations at issue emanated from New York, and, in exchange for payments routed to Peloton's New York bank accounts, Plaintiffs Passman and Alvarado were given access to a digital library of classes recorded and produced by Peloton in New York; Plaintiffs Passman and Alvarado's access to over half of these classes was likewise revoked in New York.  Further, Plaintiffs Passman and Alvarado have standing to bring this claim individually, on behalf of other Class members, and specifically on behalf of the New York Subclass members, because the underlying transactions at issue between Plaintiffs and Peloton happened entirely, or predominantly, in New York.

138.    New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade, or commerce[.]"   False advertising includes "advertising including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light . . . representations [made] with respect to the commodity. . . ."  N.Y. Gen. Bus. Law § 350-a.

139.    Peloton caused to be made or disseminated, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which

37

by the exercise of reasonable care should have been known, to Peloton to be untrue and misleading to consumers, including to Plaintiffs Passman and Alvarado and other Class members, including New York Subclass members.

140.    Peloton misrepresented through advertisements on its website that its Peloton Membership included access to an "ever-growing library of live and on-demand studio classes" and, at the same time, willfully failed to disclose that it would be removing over half of its Peloton Membership's on-demand digital library.

141.    Peloton knew or should have known that it lacked the appropriate copyright licenses for the music accompanying the classes in its library, and that its library could not legitimately be "ever-growing."

142.    Peloton received a cease-and-desist letter regarding its copyright infringement on April 9, 2018 but continued to promise the "ever-growing" library to consumers.  On March 25, 2019, shortly after getting sued for copyright infringement, Peloton abruptly removed more than half of its on-demand content from its Peloton Membership's on-demand digital library.

143.    Despite knowing that the size of its on-demand digital library had decreased by more than 50%, Peloton continues to advertise on its website "an expansive, ever-growing library of live and on-demand studio classes taught by world-class instructors"[73] and "unlimited access to a growing library of live streaming and on-demand Peloton classes."[74]

144.    Peloton has violated N.Y. Gen. Bus. Law § 350 because the misrepresentations and omissions regarding the "ever-growing" nature of its on-demand library, were material and likely to deceive a reasonable consumer.

---

[73] *See* https://www.onepeloton.ca/app (as accessed Nov. 26, 2019).

[74] *See* https://www.onepeloton.com/shop/bike/subscription (as accessed Nov. 26, 2019).

145.    As a direct and proximate result of Peloton's false and misleading advertising, Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members suffered a real and substantial injury they could not have reasonably avoided.

146.    Peloton deprived Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members, of the benefit of the bargain.  Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members, have suffered and will continue to suffer injury, ascertainable losses of money, and monetary and non-monetary damages.

147.    Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members, overpaid for Peloton's Hardware because they did not know the truth that Peloton would gut its on-demand digital library, shrinking it by more than 50%, and that it would not be "ever-growing."

148.    Peloton's false and misleading advertising complained of herein affected all purchasers of Peloton's Hardware because the Peloton Hardware is only as good as the app and subscription that comes with it.

149.    Peloton's false and misleading advertising complained of herein affected all purchasers of Peloton's Membership.

150.    Peloton's above-described false and misleading advertising caused substantial injury to Plaintiffs Passman and Alvarado, and the other Class members, including the New York Subclass members that they could not reasonably avoid.

151.    Plaintiffs Passman and Alvarado, individually and on behalf of the other Class members, including the New York Subclass members seek all monetary and non-monetary relief

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 290 of 465
Case 1:19-cv-11711-LGS    Document 536    Filed 09/02/25    Page 290 of 465

ADD-242

Case 1:19-cv-11711-LJL    Document 195    Filed 02/18/22    Page 40 of 42

allowed by law, including actual damages or statutory damages of $500 per violation (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

152.    Peloton committed a separate and independent violation of N.Y. Gen. Bus. Law § 350 for each Peloton Hardware it sold while it made false advertisements pertaining or relating to the "ever-growing" and/or growing nature of its on-demand library.

153.    Each time Peloton accepted a Peloton Membership payment from Plaintiffs Passman and Alvarado, and/or one or more of the other Class members, including the other New York Subclass members, Peloton committed a separate and independent violation of N.Y. Gen. Bus. Law § 350 while it made false advertisements pertaining or relating to the "ever-growing" and/or "growing" nature of its on-demand library.

154.    Peloton should therefore be assessed statutory damages of $500 for each such violation, and all other such relief as may be just and proper.

### VIII.    ALLEGATIONS AND CLAIMS PRESERVED FOR APPEAL

155.    Plaintiffs and counsel for the putative Class do not intend to forfeit any right to appeal the dismissal of former plaintiff Alicia Pearlman's claims under Michigan or New York law, but are not repleading them here in an effort to avoid unnecessary duplicative litigation.

### IX.    REQUEST FOR RELIEF

Plaintiffs, individually and on behalf of the other Class members, including the New York Subclass members, respectfully request that the Court enter judgment in their favor and against Peloton as follows:

1.    Certifying the Classes as requested herein, designating Plaintiffs as class representatives, and appointing the undersigned counsel as Class Counsel;

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 291 of 465
Case 1:19-cv-11711-LGS    Document 536    Filed 09/02/25    Page 291 of 465

ADD-243

2.      Declaring that Peloton is financially responsible for notifying the Class members

of the pendency of this suit;

3.      Awarding statutory and/or actual damages to the maximum extent allowed, in an

amount to be proven at trial;

4.      Requiring restitution and disgorgement of all profits and unjust enrichment Peloton

obtained from Plaintiffs and the other Class members as a result of Peloton's unlawful, unfair,

and/or fraudulent business practices;

5.      Awarding injunctive relief as permitted by law or equity, including enjoining

Peloton from continuing the unlawful practices as set forth herein, and ordering Peloton to engage

in a corrective advertising campaign;

6.      Awarding Plaintiffs' reasonable attorneys' fees, costs, and expenses;

7.      Awarding pre- and post-judgment interest on any amounts awarded; and

8.      Awarding such other and further relief as may be just and proper.

## X.    JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all causes of action so triable.

Dated:  February 18, 2022              */s/ Greg G. Gutzler*
                                       GREG G. GUTZLER
                                       ggutzler@dicellolevitt.com
                                       **DiCELLO LEVITT GUTZLER LLC**
                                       444 Madison Avenue, Fourth Floor
                                       New York, New York  10022
                                       Telephone: (646) 933-1000

                                       ADAM J. LEVITT
                                       alevitt@dicellolevitt.com
                                       ADAM PROM
                                       aprom@dicellolevitt.com
                                       **DiCELLO LEVITT GUTZLER LLC**
                                       Ten North Dearborn Street, Sixth Floor
                                       Chicago, Illinois  60602
                                       Telephone: (312) 214-7900

ASHLEY C. KELLER (*pro hac vice*)
ack@kellerlenkner.com
BENJAMIN J. WHITING
ben.whiting@kellerlenkner.com
ALEX J. DRAVILLAS (*pro hac vice* to be sought)
ajd@kellerlenkner.com
**KELLER LENKNER LLC**
150 North Riverside Plaza, Suite 4270
Chicago, Illinois  60606
Telephone: (312) 741-5222

AARON M. ZIGLER
aaron@ziglerlawgroup.com
**ZIGLER LAW GROUP, LLC**
308 South Jefferson Street, Suite 333
Chicago, Illinois  60661
Telephone: (312) 673-8427

***Counsel for Plaintiffs and the Proposed Classes***

ADD-245

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:   8/11/2022
```

-------------------------------------------------------------------X
:
ERIC FISHON, et al.,                                               :
:
                                  Plaintiffs,                      :
:
                     -v-                                           :            19-cv-11711 (LJL)
:
PELOTON INTERACTIVE, INC.,                                         :            OPINION AND ORDER
:
                                  Defendant.                       :
:
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

 Defendant Peloton Interactive, Inc. ("Peloton" or "Defendant") moves, pursuant to

Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), to dismiss the Third Amended Complaint

(the "Complaint"). For the following reasons, Peloton's motion to dismiss is denied.

## BACKGROUND

 Familiarity with the Court's prior opinions resolving previous motions to dismiss in this

case is assumed, and the relevant facts are reviewed here only in brief. For the purposes of this

motion to dismiss, the Court accepts as true the well-pleaded allegations of the Complaint.

 Peloton is an exercise equipment and media company that sells stationary bicycles

("Peloton Bike") and treadmills ("Peloton Tread"). Dkt. No. 195 ¶¶ 2–3. Peloton also offers a

monthly subscription service that allows users of the Peloton Bike and Peloton Tread (together,

"Peloton Hardware") to watch live or pre-recorded "on-demand" fitness classes. *Id.* ¶ 3.

Purchasers of Peloton Hardware may buy this subscription—which contains library access,

advanced metrics, and a feature that allows users to compete against each other—for $39 per

month. *Id.* ¶ 5.

 Peloton incorporates music into its classes, in that "[e]very on-demand and studio class

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 294 of 465
Case 1:19-cv-11711-LGS    Document 536    Filed 09/02/25    Page 294 of 465

ADD-246

Case 1:19-cv-11711-LJL    Document 207    Filed 08/11/22    Page 2 of 40

includes a themed playlist curated by the instructor to match the tempo and intensity of the class." *Id.* ¶ 18.  Peloton obtained licenses from certain copyright holders, but some of the music played in the classes was used without permission, *id.* ¶ 19; Peloton was thus "building its on-demand library with copyrighted material for which it did not have the proper licenses," *id.* ¶ 20.  In April 2018, Peloton received a cease-and-desist letter regarding alleged copyright infringement of songs appearing in certain of the on-demand classes in its library.  *Id.* ¶ 21.  In March 2019, members of the National Music Publishers Association filed a lawsuit against Peloton alleging that, for years, Peloton had been using their music in its fitness-class videos without proper licensing and that this copyright infringement was knowing and reckless.  *Id.* ¶ 22.  Peloton denied that it was violating copyright laws and asserted counterclaims in that action for antitrust violations and tortious interference with prospective business relations.  *Id.* ¶ 23.  Notwithstanding this denial, on March 25, 2019, Peloton "abruptly removed every class from its on-demand library that contained one or more of the allegedly copyright infringing songs . . . result[ing] in the removal of more than half of the classes from its on-demand library." *Id.*  This "purge of Peloton's on-demand library . . . significantly decreased the quality and quantity of popular music available on Peloton's workout class playlists, . . . materially diminishing users' experience with both the Peloton Hardware and Peloton Membership."  *Id.* ¶ 27.

Peloton has described its library of fitness classes as "ever-growing" or "growing," *see id.* ¶¶ 16–17, and Plaintiffs assert that "Peloton's 'ever-growing' on-demand library is central to its marketing," *id.* ¶ 15.  Even after receiving notice via the cease-and-desist letter that Peloton was building its library of classes with infringing songs, Peloton continued to market "an expansive, ever-growing library of live and on-demand studio classes," *id.* ¶ 30 (internal

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 295 of 465
Case 1:19-cv-11711-LGS    Document 536    Filed 09/02/25    Page 295 of 465

ADD-247

Case 1:19-cv-11711-LJL    Document 207    Filed 08/11/22    Page 3 of 40

quotation marks omitted), and to refer to its subscriptions as including "unlimited access to a growing library of live streaming and on-demand Peloton classes," *id.* (internal quotation marks omitted). Peloton also continued to accept subscription payments and charge full price for its subscription services notwithstanding that it knew or should have known that subscribers "would not be able to use the full on-demand class library because the number of on-demand classes was materially decreasing due to Peloton's wrongful conduct," *id.* ¶ 31 and knew that they "would necessarily not be receiving everything that Peloton represented they would receive," *id.* ¶ 32.

Plaintiffs Eric Passman ("Passman") and Ishmael Alvarado ("Alvarado" and together with Passman, "Plaintiffs") bring a class action complaint against Peloton, alleging that its statements that its library of classes was "ever-growing" were misrepresentations and that, through these misrepresentations and the failure to disclose the "imminent removal of over half of its on-demand library," Peloton defrauded them and other members of a proposed class, deprived them of the benefit of their bargain, and unjustly enriched itself at their expense. *Id.* ¶ 34. They allege that, as a result of Peloton's representations and material omissions, they overpaid for Peloton's goods and services, *id.* ¶ 41, and that:

> Peloton's representations and material omissions were part of the basis of the bargain, in that Plaintiffs attributed value to Peloton's promises regarding the nature and characteristics of its on-demand digital library and would not have purchased the hardware and corresponding [subscription], or would not have purchased it on the same terms, if they knew the truth that Peloton's on-demand digital library would shrink by more than 50%.

*Id.* ¶ 42.

Plaintiffs bring claims under New York consumer-protection statutes individually and on behalf of a class defined in the Complaint as "[a]ll purchasers of the Peloton Hardware and/or the corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019 in

3

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 296 of 465
Case 1:19-cv-11711-LGS    Document 538    Filed 09/02/25    Page 296 of 465

ADD-248

the State of New York." *Id.* ¶ 107.[1]

## PROCEDURAL HISTORY

This is the third amended complaint in this action.  The first complaint was filed in

December 2019 by Eric Fishon ("Fishon"), Alicia Pearlman ("Pearlman"), and Patrick Yang,

individually and on behalf of all others similarly situated, bringing claims for violations of New

York General Business Law ("NYGBL") §§ 349 and 350, which relate to deceptive acts or

practices and false advertising.  Dkt. No. 1.  On August 4, 2020, and pursuant to an unopposed

request, the Court ordered the voluntary dismissal of Patrick Yang.  Dkt. No. 61.  On November

9, 2020, the Court granted a motion to dismiss the claims of Pearlman—a Michigan resident—

because she lacked statutory standing under the New York statute, but it denied a motion to

dismiss Fishon's claims.  *See Fishon v. Peloton Interactive, Inc.* (*"Fishon I"*), 2020 WL

6564755 (S.D.N.Y. Nov. 9, 2020).  In denying the motion to dismiss Fishon's claims, the Court

explained that a plaintiff bringing a claim under Sections 349 and 350 need not specifically

allege that the plaintiff saw the misleading statements because "[r]eliance is not an element of a

private cause of action under either statute."  *Id.* at *9.  Because reliance is not an element of the

claim, alleging that a plaintiff was injured by "rel[ying] on the misleading statement to her

detriment is not a '[t]hreadbare recital[] of the elements of a cause of action'" but rather "an

allegation of fact as to how she came to be injured."  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009)); *see also id.* at *10.

On January 21, 2021, Plaintiffs filed a first amended complaint.  Dkt. No. 81.  Peloton

---

[1] In the Complaint, Plaintiffs also state that they are bringing claims on behalf of "[a]ll
purchasers of the Peloton hardware and/or corresponding Peloton Membership subscription from
April 9, 2018 through March 25, 2019," *id.* ¶ 106, but clarify that they are not pursuing claims on
behalf of this nationwide class but "includ[ing] the assertion of a nationwide class in this Third
Amended Complaint to preserve the issue for appeal," *id.* n.70.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 297 of 465
Case 1:19-cv-11711-LGS    Document 536    Filed 09/02/25    Page 297 of 465

ADD-249

again moved to dismiss Pearlman's claims, again contending that Pearlman did not plead facts

sufficient to show that she had statutory standing to sue under Sections 349 and 250 of the

NYGBL.  The Court, once again, dismissed Pearlman's claims under the NYGBL, explaining

that her amendment failed to cure the deficiencies identified in the original complaint.  *Fishon v.*

*Peloton Interactive, Inc.* (*"Fishon II"*), 2021 WL 2941820, at *5 (S.D.N.Y. July 12, 2021).  The

Court did, however, grant leave for Pearlman to amend her complaint to plead her cause of

action under Michigan law.  *Id.*

On July 26, 2021, Plaintiffs filed a second amended complaint, with Fishon bringing

claims under NYGBL §§ 349 and 350 and Pearlman bringing a claim under the Michigan

Consumer Protection Act ("MCPA"), Mich. Comp. Laws Ann. § 445.901, *et seq.*  On August 9,

2021, Defendant moved to dismiss Pearlman's claim in that complaint.  Dkt. No. 107.  On

September 16, 2021, Fishon and Pearlman moved to certify the putative classes; Fishon moved

for certification of a class of "[a]ll purchasers of the Peloton hardware and/or the corresponding

Peloton Membership subscription from April 9, 2018 through March 25, 2019 in the State of

New York," while Pearlman sought certification of a class of "[a]ll purchasers of the peloton

hardware and/or the corresponding Peloton Membership subscription from April 9, 2018 through

March 25, 2019 in the State of Michigan."  Dkt. No. 118 at 9.  The Court granted Defendant's

motion to dismiss Pearlman's claim under the MCPA, concluding that Pearlman did not allege

with the requisite specificity facts giving rise to her reliance on Peloton's statements that its on-

demand library of fitness classes were "ever-growing," as was required under the Federal Rule of

Civil Procedure Rule 9(b) standard applicable to her MCPA claim for which reliance was an

essential element.  *Fishon v. Peloton Interactive, Inc.*, 2022 WL 179771, at *8 (S.D.N.Y. Jan. 19,

2022).  The Court also denied the motion for class certification by Fishon on the grounds that

ADD-250

Fishon was not an adequate class representative. *Id.* at *11–12.

Plaintiffs Passman and Alvarado, previously absent class members, filed the Complaint—the fourth in this action—on February 18, 2022. Dkt. No. 195. As before, Defendant has moved to dismiss the Complaint, and Plaintiffs oppose dismissal.

## LEGAL STANDARD

Defendant moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).

"A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate it,' . . . such as when . . . the plaintiff lacks constitutional standing to bring the action." *Cortlandt Street Recovery Corp. v. Hellas Telecomm., S.À.R.L.*, 790 F.3d 411, 417 (2d Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). "A motion to dismiss for lack of subject matter jurisdiction may 'raise a facial challenge based on the pleadings, or a factual challenge based on extrinsic evidence.'" *U.S. Airlines Pilots Ass'n ex rel. Cleary v. US Airways, Inc.*, 859 F. Supp. 2d 283 (E.D.N.Y. Mar. 16, 2012) (quoting *Guadango v. Wallack Ader Levithan Assoc.*, 932 F. Supp. 94, 95 (S.D.N.Y. 1996)). In either event, the plaintiff bears the burden of establishing standing and "must allege facts that affirmatively and plausibly suggest that it has standing to sue." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). Where the jurisdictional challenge is facial, a court "draw[s] all facts—which [it] assume[s] to be true unless contradicted by more specific allegations or documentary evidence—from the complaint and from the exhibits attached thereto" and "construe all reasonable inferences to be drawn from those factual allegations in [the plaintiff's] favor." *Id.*

"Where the jurisdictional challenge is fact-based, the defendant may 'proffer[] evidence beyond the [p]leading,' and the plaintiff 'will need to come forward with evidence of [its] own to

6

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 299 of 465
Case 1:19-cv-11711-LGS    Document 536    Filed 09/02/25    Page 299 of 465

ADD-251

Case 1:19-cv-11711-LJL    Document 207    Filed 08/11/22    Page 7 of 40

controvert that presented by the defendant if the affidavits submitted on a 12(b) motion . . . reveal the existence of factual problems in the assertion of jurisdiction.'" *Monegro v. Street Insider Dot Com Inc.*, 2022 WL 445797, at *2 (S.D.N.Y. Feb. 11, 2022) (internal quotation marks and citation omitted) (quoting *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016)).  Where jurisdictional facts are in dispute, "the party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.'" *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (quoting *Makarova*, 201 F.3d at 113).  "If the extrinsic evidence presented by the defendant is material and controverted, the district court will need to make findings of fact in aid of its decision as to standing."  *Carter*, 822 F.3d at 57; *see also APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) ("[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." (quoting *LeBlanc v. Cleveland*, 198 F.3d 353, 356 (2d Cir. 1999))).  "However, the plaintiffs are entitled to rely on the allegations in the [complaint] if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing."  *Carter*, 822 F.3d at 57.

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 557 (2006)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Generally, a complaint need not allege "detailed factual allegations," but "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than

ADD-252

labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 50 U.S. at 555.

## DISCUSSION

Defendant argues that dismissal is warranted pursuant to Federal Rule of Civil Procedure 12(b)(1) because neither Passman nor Alvarado have standing since "they have not pled and cannot credibly plead that they suffered an injury fairly traceable to any of the allegedly misleading misstatements or omissions at issue in this case," *id.* at 1, and "there are no well-pled allegations that either Plaintiff suffered an injury caused by the allegedly deceptive advertisements," *id.* at 2.  Defendant contends that dismissal also is appropriate under Rule 12(b)(6) because the Complaint does not plead causation or allege that Peloton omitted material information by failing to disclose to its customers, before March 25, 2019, that it would remove classes, *id.*; and because Plaintiffs' claims are barred by the voluntary-payment doctrine, *id.* at 3.[2]  Plaintiffs disagree with Defendant's view of the merits and, as to standing, argue that they have adequately pleaded the injury necessary for standing in that they alleged that they paid price premiums for Peloton's products when they purchased those products before the "purge" of the music classes—injuries that the Court has already found to be sufficient to sustain the NYGBL claims—and that these injuries are fairly traceable to Peloton's misleading advertisements.  Dkt. No. 201 at 6–16.

---

[2] Defendant also argues that Plaintiffs have repleaded claims with respect to Pearlman that have already been dismissed and that the Court should dismiss those claims to the extent they are alleged in the Complaint.  In their opposition, Plaintiffs clarify that they are not asserting any claims that were previously dismissed.  Dkt. No. 201 at 23 n.14.  In light of this concession, the Court need not consider whether to dismiss such claims involving Pearlman; those claims are dismissed.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 301 of 465
Case 1:19-cv-11711-LGS    Document 536    Filed 09/02/25    Page 301 of 465

ADD-253

I.      **Article III Standing**

"Article III of the Constitution limits federal courts to deciding 'Cases' and 'Controversies.'  For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019).  "To have standing, a plaintiff must 'present an injury that is concrete, particularized and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling.'"  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  "If a plaintiff fails to satisfy any of those elements, a federal court lacks subject-matter jurisdiction to hear the case and it must be dismissed."  *Ross v. AXA Equitable Life Ins. Co.*, 115 F. Supp. 3d 424, 432 (S.D.N.Y. 2015).

The Court must resolve the question whether Plaintiffs have Article III standing before it considers Defendant's argument that Plaintiffs have not pleaded causation sufficient to state a claim under the NYGBL.  *See Coan v. Kaufman*, 457 F.3d 250, 256 (2d Cir. 2006) ("Article III standing . . . ordinarily should be determined before reaching the merits . . ."); *Borenkoff v. Buffalo Wild Ings, Inc.*, 2018 WL 502680, at *2 (S.D.N.Y. Jan. 19, 2018) ("Generally, a court must determine whether it has subject matter jurisdiction before proceeding to evaluate the merits of a plaintiff's cause of action.").  Defendant contends that Plaintiffs lack Article III standing for two independent reasons: Plaintiffs have not pleaded a cognizable injury, and Plaintiffs have not adequately plead that their alleged injuries are fairly traceable to the allegedly misleading advertisements.[3]

[3] Defendant also argues that Plaintiffs lack standing to bring a claim for injunctive relief, Dkt. No. 197 at 14, but in their opposition to the motion to dismiss, Plaintiffs withdrew this claim. Defendant's argument with respect to Plaintiffs' standing to seek injunctive relief is therefore moot, and the claim for injunctive relief will be dismissed.

9

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 302 of 465
Case 1:19-cv-11711-LGS    Document 53-1    Filed 09/02/25    Page 302 of 465

ADD-254

Case 1:19-cv-11711-LJL    Document 207    Filed 08/11/22    Page 10 of 40

The Court independently analyzes whether Plaintiffs have Article III standing.[4]  That inquiry is analytically distinct from the question whether the plaintiff has pleaded facts sufficient to sustain a claim under NYGBL §§ 349 and 350.  *See Axon v. Florida's Natural Growers, Inc.*, 813 Fed. App'x 701, 703–04 (2d Cir. 2020) (summary order) (analyzing separately whether a plaintiff had Article III standing and statutory standing under NYGBL §§ 349 and 350); *Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562, 576 (S.D.N.Y. 2021) (stating that while the plaintiff adequately pleaded an injury-in-fact for purposes of Article III standing, the question "whether [p]laintiff has properly alleged an injury for his N.Y.G.B.L. §§ 349 and 350 claims requires a separate inquiry"); *DaCorta v. AM Retail Group, Inc.*, 2018 WL 557909, at *6–7 (S.D.N.Y. Jan. 23, 2018) (holding that the plaintiff's allegation that she would not have made the purchase or would not have paid the amount she did if not for the alleged deception was sufficient to confer Article III standing but that plaintiff had failed to properly plead an injury for the purposes of NYGBL §§ 349 and 350); *Borenkoff*, 2018 WL 502680, at *3–4 (holding that, while the plaintiff had Article III standing—a conclusion the court reached with "serious reservations"—she had not stated a claim).  Holdings and statements regarding what allegations—made by other plaintiffs—were adequate to state a claim under Sections 349 and 350 may be instructive.  However, they are not dispositive with respect to whether these Plaintiffs have Article III standing.

---

[4] As Judge Furman wrote in evaluating a putative class action brought pursuant to New York law:

> it is insufficient for Plaintiffs to argue . . . that [a state law], standing alone, confers upon them an 'injury' sufficient to establish Article III standing.  Instead, Plaintiffs must establish that at least one of them has otherwise suffered an injury sufficient to entitle him to sue in federal court—namely, the 'invasion of a legally protected interest which is . . .  concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'

*Id.* (quoting *Lujan*, 504 U.S. at 560).

### A.    Injuries Alleged

Plaintiffs allege that, by misrepresenting that its on-demand digital library would be "ever-growing" and not disclosing "the imminent removal of over half its on-demand library," Peloton "defrauded Plaintiffs and the other Class members, depriving them of the benefit of their bargain with Peloton and/or unjustly enriching itself at Plaintiffs' and the other Class members' expense."  Dkt. No. 195 ¶ 34.  Plaintiffs allege that they entered into transactions with Peloton "relying on Peloton's uniform representations about its 'ever-growing' or 'growing' on-demand library of fitness classes."  *Id.* ¶¶ 35, 37.  Plaintiffs further allege they were harmed in two separate ways:  First, that "Peloton's representations and material omissions regarding its on-demand library caused Plaintiffs to pay increased costs for the Peloton Hardware and corresponding Peloton Membership, which was worth less than represented because Peloton's representations and/or omissions regarding its on-demand digital library were deceptive and misleading and constituted false advertising," *id.* ¶ 41; and second, "Peloton's representations and material omissions were part of the basis of the bargain, in that Plaintiffs attributed value to Peloton's promises regarding the nature and characteristics of its on-demand digital library and would not have purchased the Peloton Hardware and corresponding Peloton Membership, or would not have purchased it on the same terms, if they knew the truth that Peloton's on-demand digital library would shrink dramatically, by more than 50%," *id.* ¶ 42; *see also id.* ¶¶ 127, 146 (alleging that "Peloton deprived Plaintiffs . . . of the benefit of the bargain").

Stated otherwise, Plaintiffs allege they were harmed in two distinct but overlapping ways. First, regardless whether they personally relied on or even saw Defendant's misrepresentations, Defendant's misleading statements made consumers believe that there was value in Defendant's Hardware and/or subscriptions that was not there, thereby permitting Defendant to charge Plaintiffs a price for the Hardware and/or subscriptions that Defendant would not have been able

to command in the marketplace but for the misrepresentations.  Second, Plaintiffs personally
were misled by Peloton's misrepresentations and as a result of those misrepresentations agreed to
purchase their Hardware and/or subscriptions at a price they would not have—if they had
purchased them at all—had they not been misled by Peloton's misrepresentations.  The second
theory clearly implicates the Plaintiffs' personal reliance on the representations—by alleging that
they would not have purchased their Hardware and/or subscription memberships at all or on the
same terms "if they knew the truth that Peloton's on-demand digital library would shrink
dramatically," *id.* ¶ 42, the complaint assumes that Plaintiffs knew something other than "the
truth"—that is, that they were aware of Peloton's alleged misrepresentations and believed that
the digital library would not shrink.  *See Sharpe v. A&W Concentrate Co.*, 2021 WL 3721392, at
*2 (E.D.N.Y. July 23, 2021) (characterizing "an allegation that, absent the misrepresentation, the
plaintiff 'would not have paid the same amount' for the product" as an allegation of reliance
(quoting *Colpitts*, 2021 WL 981455, at *5)).

The Court first considers the argument there are insufficient allegations to support an
"overpayment" theory of injury, which relates to Plaintiffs' first theory of injury—that they paid
increased costs for products that were worth less than was represented—which the Court will
refer to as a "price premium" injury.  Next, the Court will consider Defendant's argument that
any injury alleged by Plaintiffs is not fairly traceable to Peloton's alleged misrepresentation.  As
Defendant frames this argument, it is primarily based on the evidence in the record that Plaintiffs
either were not aware of the relevant misrepresentations prior to making their purchases or did
not rely on those representations in making their purchasing decisions and thus cannot sustain a
claim under Plaintiffs' second theory of injury—that they were injured by buying a product on
terms that they would not otherwise have agreed to had they personally not been deceived and

had access to fewer classes than they reasonably believed they would have at that time.  But it is also based on Passman's date that he purchased his bike and initially purchased his membership in February 2017, which Defendant argues is well before Peloton's representations allegedly became false in April of 2018.

### B.    Cognizable Injury

Defendant contends that Plaintiffs have not pleaded a cognizable injury sufficient to support standing.  It argues that Plaintiffs "have not included any specific factual allegations supporting an 'overpayment' theory of injury—including what price they paid for their Bikes, how the advertisements affected the price of Peloton's products, or how much any competitors charged for similar alternatives."  Dkt. No. 197 at 13.  It also argues that, to the extent Plaintiffs assert theories of injuries like a "diminished user experience" or failure to receive the "benefit of the bargain" after classes were purged in March of 2019, such injuries cannot support standing. *Id.*  Plaintiffs do not appear to press these theories of standing injury in their opposition.  Rather, Plaintiffs respond that they were injured when they paid price premiums for Peloton's products and cite the Court's prior Opinion in support of its position that the complaint need not provide details about how the plaintiffs overpaid in order to sustain a claim under the NYGBL.  Dkt. No. 201 at 6–8.[5]

As Plaintiffs correctly point out, multiple courts have held that allegations that a plaintiff suffered a price premium injury is sufficient to support Article III standing at the motion to dismiss stage.  Dkt. No. 201 at 6–7 (citing *Guariglia v. Procter & Gamble Co.*, 2018 WL

---

[5] Plaintiffs also point to a conjoint analysis and associated damages report previously submitted to the Court in connection with a motion for class certification—reports which were challenged by Defendant and where the challenge was ultimately deemed to be moot—as "showi[ing] that the injury caused by Peloton's misrepresentations was . . . actual, concrete, and measurable."  *Id.* at 9.  These reports are not properly before the Court on a motion to dismiss, and the Court will not consider them.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 306 of 465
Case 1:19-cv-11711-LGS    Document 536    Filed 09/02/25    Page 306 of 465

ADD-258

Case 1:19-cv-11711-LJL    Document 207    Filed 08/11/22    Page 14 of 40

1335356, at *12 (E.D.N.Y. Mar. 14, 2018) (noting, in the context of class standing, "that courts in this circuit 'have construed the payment of a premium price to be an injury in and of itself.'" (quoting *Belfiore v. Proctor & Gamble Co.*, 94 F. Supp. 3d 440, 447 (E.D.N.Y. 2015))); and *Sharpe*, 2021 WL 3721392, at *2); *see also Axon*, 813 Fed. App'x at 703–04 ("As for Article III standing, Axon has suffered an injury-in-fact because she purchased products bearing allegedly misleading labels and sustained financial injury—paying a premium—as a result."); *Gold v. Eva Naturals, Inc.*, --- F. Supp. 3d ---, 2022 WL 566230, at *2 (E.D.N.Y. Feb. 16, 2022) ("[B]ased . . . on the allegations, the putative class members have all suffered a concrete injury because they paid a price premium for a purportedly 'natural' product."); *Kacocha v. Nestle Purina Petcare Co.*, 2016 WL 4367991, at *7 (S.D.N.Y. Aug. 12, 2016) (explaining that "the law is clear that economic injury—including that caused by paying a premium—is sufficient to establish injury for standing purposes" and holding that plaintiff has pleaded an "adequate injury for purposes of standing" where he "allege[d] that he 'paid a premium price' that he would not have had he 'known the truth'" (alteration adopted) (citation omitted)).  Those courts, however, have not addressed the precise question raised by Plaintiffs' first theory of injury—whether evidence that a consumer paid more than the market otherwise would have demanded in the absence of a misrepresentation can support standing in the absence of evidence of individualized reliance by the consumer on the representation.

    *Sharpe v. A&W Concentrate Company* is instructive on this point.  In that case, the plaintiffs testified that the allegedly false claim did not influence their decision to purchase the product at issue, but they also alleged that they paid a premium for the product.  *Sharpe*, 2021 WL 3721392, at *2; *see also Sharpe v. A&W Concentrate Company*, 1:19-cv-768-BMC (E.D.N.Y.), ECF No. 35 ¶ 64.  In concluding that the plaintiffs had Article III standing

14

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 307 of 465
Case 1:19-cv-11711-LGS    Document 536    Filed 09/02/25    Page 307 of 465

ADD-259

notwithstanding the fact that the misrepresentations "did not mislead the plaintiffs," Judge Cogan

explained:

> [D]efendants misapprehend the injury.  True, a plaintiff "comfortably satisfies the
> injury-in-fact prong" with an allegation that, absent the misrepresentation, the
> plaintiff "would not have paid the same amount" for the product.  *Colpitts v. Blue
> Diamond Growers*, No. 20-cv-2487, 2021 WL 981455, at *5 (S.D.N.Y. March 16,
> 2021).  But even though this sort of reliance satisfies Article III, it does not follow
> that Article III requires this sort of reliance.
>
> For instance, "a manufacturer's misrepresentation may allow it to command a price
> premium and to overcharge customers systematically."  *Carriuolo v. Gen. Motors
> Co.*, 823 F.3d 977, 987 (11th Cir. 2016).  A manufacturer can do so when a product
> with the misrepresentation will "attract greater market demand" than a product
> without the misrepresentation.  *Id.*  A plaintiff thus suffers an injury when "a
> company marketed a product as having a 'unique quality' . . . the marketing allowed
> the company to charge a price premium for the product, and . . . the plaintiff paid
> the premium and later learned that the product did not, in fact, have the marketed
> quality."  *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 350 (S.D.N.Y. 2020).
> *That injury doesn't involve reliance, but it still satisfies Article III.*

*Sharpe*, 2021 WL 3721392, at *2 (emphasis added).

Judge Furman took a similar view in *In re AXA Equitable Life Insurance Company COI

Litigation* (*"In re AXA"*), 2020 WL 4694172 (S.D.N.Y. Aug. 13, 2020).  In evaluating whether a

person was "aggrieved" within the meaning of New York Insurance Law § 4226(a)(1)—an

inquiry that is co-extensive with the injury-in-fact requirement of Article III—the court

explained that "someone can be 'aggrieved'—that is, harmed—by a misrepresentation without

necessarily having relied on it."  *Id.* at *10.  It explained that "a misrepresentation can artificially

inflate the market price of a product, causing a plaintiff to pay more for it than she otherwise

would have—regardless of whether she even saw the misrepresentation."  *Id.*  The court offered

an example of this sort of harm:

> Imagine, for example, that a company sells a pen and advertises that it is a rugged
> writing instrument that can survive any environment, all the while knowing that the
> pen will break the first time it falls onto a hard surface.  Before it is released, the
> pen generates significant buzz due to its alleged ruggedness and, because the initial
> supply is limited, the company charges a high price.  One customer purchases the

15

pen at that high price not because it can withstand abuse, but because it looks just like a pen that a cherished relative used, and the customer intends to frame it. That customer is surely "aggrieved," even though the misrepresentation was irrelevant to the customer's decision to purchase the pen. But for the misrepresentation, the price of the pen may have been lower, and the customer would have paid less for it.

*Id.* n.7.

The logic of *Sharpe* and *In re AXA* apply with equal force here. Peloton allegedly misrepresented what Plaintiffs allege is a unique quality about its products—that they enabled access to a "growing" library of on-demand fitness classes—and this representation allegedly led to an "increased cost" that Plaintiffs paid for those products over and above what they were worth. Dkt. No. 195 ¶ 41; *see McNulty v. Polar Corp.*, 2020 WL 5658667, at *5 (S.D.N.Y. Sept. 23, 2020) ("Allegations that a product had significantly less value than it warranted constitute a classic price premium theory of injury that is plausible and cognizable." (internal quotation marks and citation omitted)). This quality is what Peloton used "to differentiate itself from other fitness companies that market and sell similar fitness hardware, in-studio workout classes, and instructional home workout media," Dkt. No. 195 ¶ 13, and "[t]he purpose and effect of this marketing campaign is that Peloton members and prospective members choose Peloton over competing fitness products, at least in part, because of access to a constantly growing number of digital classes," *id.* ¶ 14. By marketing its Hardware and subscription service as having this quality, Defendant was able to charge a price premium because "[e]ach additional on-demand fitness class adds incremental value to Plaintiffs' and the other Class members' subscriptions." *Id.* ¶ 99; *see also id.* ¶ 26 (alleging that Peloton uses its on-demand options "as a differentiating factor to garner more customers and market share for both the Peloton Hardware and the Peloton Membership"); *id.* ¶ 71 (alleging that "Peloton has dominated the marketplace by aggressively marketing access to an 'ever-growing' library of fitness classes"); ¶ 85 (alleging that,

16

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 309 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 309 of 465

ADD-261

Case 1:19-cv-11711-LJL    Document 207    Filed 08/11/22    Page 17 of 40

notwithstanding its receipt of the cease-and-desist letter, Peloton continued "to heavily market

[an 'ever-growing' library] to its customers and prospective customers as a key Peloton selling

point"). It is immaterial for the purposes of Article III standing whether Plaintiffs themselves

relied on the representation that drove up the prices of the Hardware and subscription services or

valued those representations; Plaintiffs' allegations that they paid increased costs—a "price

premium"—for these products as a result of the misrepresentation is sufficient to plead a

cognizable injury for the purposes of constitutional standing.[6]

Defendant attempts to avoid this conclusion by pointing to what it says Plaintiffs did not

plead—the price they paid for their bikes, how advertisements affected the price of Peloton's

products, or how much competitors charged for similar products. This argument is unavailing at

this stage. Plaintiffs need not plead that level of detail in order to have standing. As the Second

Circuit has explained, a plaintiff's "failure to identify the prices of competing products to

establish the premium she paid 'is not fatal to [her] claim' at this stage of the proceedings."

*Axon*, 813 Fed. App'x at 704 (quoting *Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F.

Supp. 3d 467, 481–82 (S.D.N.Y. 2014)); *Brown v. Kerry Inc.*, 2021 WL 5446007, at *4 n.4

(S.D.N.Y. Nov. 22, 2021) (explaining, in the context of Article III standing, that "a plaintiff is

not required to point to *any* comparator products in order to successfully allege a price premium

theory of injury"); *cf. Goldemberg*, 8 F. Supp. 3d at 482 ("[W]hile identifying the prices of

---

[6] Of course, general awareness of a misrepresentation is not irrelevant to a "price premium"
injury. To establish an injury on a price premium basis, Plaintiffs will have to prove that
sufficient consumers were aware of the advertised but false "unique quality" and assigned value
to it such that the misrepresentation affected the price. Plaintiffs have pleaded facts that suggest
there was value in an "ever-growing" on-demand library and that widespread misrepresentations
regarding that quality inflated the price of the products. Nothing more is required at the motion
to dismiss stage.

competing products in the Complaint would strengthen Plaintiff's allegation of injury [for the purposes of stating a claim under NYGBL § 349], . . . the failure to do so is not fatal to Plaintiff's claim.").  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim."  *Duchimaza v. Niagara Bottling, LLC*, 2022 WL 3139898, at *4 (S.D.N.Y. Aug. 5, 2022) (quoting *Lujan*, 504 U.S. at 561).  And, contrary to Defendant's assertion, Plaintiffs *have* pleaded facts that speak to how the alleged misrepresentation affected the price of Peloton's products; Plaintiffs allege that each additional class in Peloton's on-demand library adds value to the subscription service and that Peloton's representations caused Plaintiffs to pay increased costs for the Hardware and the subscription service, which were "worth less than represented" because of the misrepresentations about the on-demand library.  Dkt. No. 195 ¶ 41; *see also id.* ¶ 99.  It is a reasonable inference from the pleaded facts that the products were subject to a price premium because Peloton's representations that the on-demand library would be "ever-growing" indicated to the market that there would be value associated with the products that resulted in an increased price when that value was not actually there.  *Cf. DaCorta*, 2018 WL 557909, at *9 (concluding that, although plaintiff properly pleaded injury for standing purposes, she did not properly plead injury under NYGBL §§ 349 and 350 where "allegations, alone do not, demonstrate *why* a premium was paid for the product or *how* the product failed to live up to its advertising).

For the above reasons, Defendant's argument that Plaintiffs failed to plead a cognizable injury based on their "overpayment" theory fails.

**C.    Injuries Fairly Traceable**

Defendant next argues that "in order to show an injury-in-fact fairly traceable to the challenged conduct, Plaintiffs must show that the allegedly misleading advertisements caused

their purported injuries—which cannot occur as a matter of law if Plaintiffs did not see the advertisements prior to their purchases." Dkt. No. 197 at 9. Defendant contends that the "bare-bones allegations" that Plaintiffs "purchased Bikes and/or Membership subscriptions 'relying on' Peloton's representations" "cannot confer standing on *these* two Plaintiffs because they are directly undermined by other allegations specific to these Plaintiffs and by Plaintiffs' own deposition testimony" and that even the allegations of the Complaint regarding the link between Peloton's alleged misconduct and the Plaintiffs' injuries "are directly undermined by other allegations specific to these Plaintiffs and by Plaintiffs' own deposition testimony." *Id.* at 10.

Defendant is incorrect that the only way to demonstrate standing is to show that Plaintiffs saw and relied on the misrepresentations at issue. Just as the consumer who purchases a pen whose price is inflated by the false characterization of it as being rugged is injured as a result of the misrepresentation to the market even if he personally is oblivious to it, so too the consumer who purchases a Peloton subscription whose price is inflated as a result of a false marketing campaign suffers an injury traceable to that campaign even if the misrepresented fact was not important to her. Plaintiffs alleged both a sufficient injury in that they paid "increased costs"—a price premium—for Peloton products and that this injury was caused by Peloton's representations to the market about the size of its on-demand library. The Complaint alleges—and Defendant does not dispute—that both Plaintiffs have continued to pay for their monthly subscriptions "since they acquired the Peloton hardware," Dkt. No. 195 ¶ 39; *see also id.* ¶¶ 30 (explaining that "monthly" membership includes access to library of on-demand classes); 71 (referring to subscription fee as a "monthly" fee). Though Passman purchased his bike and initially purchased his membership subscription in February of 2017, this fact is immaterial for Article III standing purposes when Passman continuously made purchases of his subscription

from February 2017 until at least the filing of the Complaint in February 2022.  Thus, from the

time Passman purchased his bike and membership in February 2017 until at least the filing of the

Complaint in February of 2022 Passman made payments for his Peloton subscription.  *Id.* ¶ 41.

The same holds true for Alvarado, who purchased a subscription in January 2019.  *Id.* ¶ 37.  This

includes the class period that Plaintiffs allege Peloton was engaging in allegedly deceptive

practices: from at least April 9, 2018, when "Peloton had actual knowledge . . . that it could not

provide an 'ever-growing' library to consumers," *id.* ¶ 125, until at least March 25, 2019, when

Peloton removed the classes from the on demand digital library.  It is at least during this time

period that Plaintiffs allege they paid "increased costs" due to Peloton's misrepresentations.  *Id.* ¶

41.  Paying a price premium is a sufficient injury for Article III standing, whether it is paid for a

piece of Hardware or a subscription.  Nothing more is required for standing.

    The parties spill much ink on the question whether Plaintiffs can support standing on a

theory that they purchased Peloton products based on the alleged misrepresentation and would

not have purchased those products or purchased the products on the same terms had they known

the truth.  If Plaintiffs' entitlement to standing rested solely on a theory of injury for which

reliance was required, the Court would find that Plaintiffs do not have standing to pursue these

claims.  When a plaintiff purchases a product in reliance on an alleged misrepresentation and

would have either not purchased the product or paid less for it if she had known the truth about

the product, she suffers an injury sufficient to confer Article III standing.  *See Colpitts*, 527 F.

Supp. 3d at 575 ("Such an allegation that a plaintiff would not have purchased a product or

would not have paid the same amount comfortably satisfies the injury-in-fact prong of Article III

standing."); *DaCorta v. AM Retail Grp., Inc.*, 2018 WL 557909, at *6 (S.D.N.Y. Jan. 23, 2018)

("The allegation that Plaintiff would not have made this purchase, or would not have paid the

amount she did, is sufficient for Article III injury." (internal quotation marks omitted)).

However, the deposition testimony of both Passman and Alvarado contradict the Complaint's

allegations in a material way, *see Carter*, 822 F.3d at 57, in that the testimony compels a finding

that they did not rely on the misrepresentations at issue when making their purchasing decisions.

Alvarado alleges that he relied on Peloton's representations only with respect to his

subscription purchase and not with respect to the purchase of his Peloton bike. *See* Dkt. No. 195

¶ 37; *cf. id.* ¶ 127. Even with respect to the membership, however, Alvarado's testimony read as

a whole undermines any claim that he relied on Peloton's alleged misrepresentations when

making his Peloton purchases. Alvarado conveyed—both in his deposition and in a declaration

submitted in support of Plaintiffs' opposition to the instant motion to dismiss—in a conclusory

way that the "growing" nature of the library was important to his purchase of the bike and

subscription. *See* Dkt. No. 198-1 at 86; Dkt. No. 201-2 ¶¶ 13–14. But during his deposition,

Alvarado testified that his wife, whose idea it was to get the bike, "organized the whole thing"

and that he "couldn't say yes or no" to the purchase. Dkt. No. 198-1 at 35, 39. Alvarado

testified that "it was implied that [Peloton is] forever having a growth of products," *id.* at 72, and

that he had heard the term "forever growing" "from probably one of the advertisements," *id.* at

85. However, he also testified that "[n]o one ever promised [him] anything, like, from Peloton in

reference to their library and catalog of products." *Id.* at 72. He also declared that his deposition

"testimony was given under oath, and remains accurate." Dkt. No. 201-2 ¶ 5. When asked at the

deposition if "any advertisement informed [his] decision to purchase a subscription," Alvarado

responded with an unequivocal "[n]o." Dkt. No. 198-1 at 79. The Court credits Alvarado's

testimony that no advertisement informed his decision to purchase a subscription, that he did not

make the decision to purchase the Peloton bike or the subscription, and that no one ever

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 314 of 465
Case 1:19-cv-11711-LGS    Document 536    Filed 09/02/25    Page 314 of 465

ADD-266

Case 1:19-cv-11711-LJL    Document 207    Filed 08/11/22    Page 22 of 40

promised him anything in reference to Peloton's library and finds—for the purposes of the Rule

12(b)(1) motion only—that he did not purchase Peloton's products in reliance on Peloton's

representations. *See APWU*, 343 F.3d at 627 (explaining that "where jurisdictional facts are

placed in dispute, the court has the power and obligation to decide issues of fact by reference to

evidence outside the pleadings" (quoting *LeBlanc*, 198 F.3d at 356)).

  Passman's testimony also belies any assertion that he relied on Peloton's representations

in making his purchases.  In his deposition, Passman testified that he purchased his bike and

subscription in February of 2017 after speaking to a sales representative in a Peloton storefront

who told him that the library is "going to get bigger and bigger 'cause you know, all—all the

rides that they do are—are recorded and on-demand" and that Passman would have "more and

more" which was a "big selling point" for him.  Dkt. No. 198-2 at 46.  Passman testified that

none of the commercials that he saw prior to buying his bike mentioned anything about music,

Peloton's library, or the specific size of Peloton's library.  *Id.* at 81.  And whether or not

Passman relied on representations that Peloton's library was "growing" at the time he purchased

his bike—when he began purchasing Peloton products—is immaterial because there are no well-

pleaded allegations that such statements were false at the time he made this purchase, and so he

could not state a claim for that time period.[7]  When asked whether any of Peloton's

---

[7] Plaintiffs do not allege when precisely Peloton knew it was building its on-demand library
without proper licenses, alleging that Peloton was put on "actual notice" of its copyright
infringement on April 9, 2018, *id.* ¶ 84, and that "when Peloton accepted Plaintiffs' and the other
Class members' subscription payments, Peloton knew or should have known that Plaintiffs and
the other Class members would not be able to use an ever-growing on-demand class library
because the number of on-demand classes would be materially decreasing due to Peloton's
wrongful conduct," *id.* ¶ 31.  And Plaintiffs allege that *someone else* alleged that Peloton had
been using musical works "for years" without proper licensing.  *Id.* ¶ 22.  But the Court is not
required to credit another entity's allegations where Plaintiffs do not make the same allegations
themselves—to do so would require the Court to assume the truth of the facts asserted in that
litigation instead of the facts asserted in this one.  *See Lonstein Law Office, P.C. v. Evanston Ins.*

advertisements, which he sees "all the time now," affected [his] decision to continue to pay for

[his] Peloton subscription," Passman answered "[n]o, not at all." *Id.* at 82. This testimony is

supported by Passman's declaration that he relied on representations about the size of the on-

demand library "to begin" purchasing Peloton products. Dkt. No. 201-1 ¶ 10. Thus, Passman's

testimony establishes that he did not personally rely on any of the statements alleged to be

false—the statements that he did rely upon are not alleged to be false when they were made, and

the statements that were false when made were not relied upon by him. Dkt. No. 198-2 at 82.

As with Alvarado, the Court must conclude that Passman did not rely on Peloton's alleged

misrepresentations when purchasing his Peloton products.

For the reasons previously stated, however, Plaintiffs' personal reliance on the alleged

misrepresentation is irrelevant to their individual constitutional standing when they alleged—as

they do here—that they were injured as a result of the effect that Defendant's misrepresentations

had on the market and the price premium that those misrepresentations caused them to pay.

## II.    Failure to State a Claim

Defendant also moves for dismissal pursuant to Rule 12(b)(6), arguing that the Plaintiffs

have failed to plead that any of their alleged injuries were caused by Peloton's allegedly

misleading statements or omissions.

### A.    Affirmative Misrepresentations

Defendant argues that the Complaint does not support an inference that either Plaintiff

was injured as a result of a deceptive practice, act, or advertisement by Defendant because

---

*Co.*, 2022 WL 72302, at 3 n.3 (Jan. 6, 2022) (explaining that the contents of complaints referred to and relied upon by the complaint in that action "are properly before the Court for what they allege, *but not for their truth*"). Without an allegation that Peloton was using material for which it did not have a license at the time of Passman's purchase, there can be no inference that any statements made by Plaintiffs at that time were deceptive or misleading in a material way.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 316 of 465
Case 1:19-cv-11711-LGS    Document 536    Filed 09/02/25    Page 316 of 465

ADD-268

Case 1:19-cv-11711-LJL    Document 207    Filed 08/11/22    Page 24 of 40

neither saw the advertisements at issue prior to their purchases.  Acknowledging that the Court

previously has held that it is not necessary for a plaintiff specifically to allege that she saw an

advertisement if she can allege that she nonetheless relied upon it (in some other way),

Defendant contends that the Complaint "does not allege that *any* of the advertisements

reproduced in the pleading appeared on the website during the class period."  Dkt. No. 197 at 22.

Defendant points to three allegedly misleading advertisements made in the Complaint, appearing

in October 2017, November 2019, and December 2019 or January 2021, and argues that there is

no basis to infer that any of these advertisements could have influenced the Plaintiffs' purchasing

decisions given the timing and circumstances of their purchases.  *Id.* at 16.  It thereby attempts to

distinguish the Court's prior holding that a plaintiff can be exposed to a misrepresentation

without having seen it.  *Id.* at 15.  Defendant states that without "a plausible inference that either

Plaintiff would have stumbled upon any of the quoted representations . . . Plaintiffs have not pled

any facts sufficient to allege that they were injured by reason of the misleading advertisements."

*Id.*

Plaintiffs respond that they have alleged that Peloton began its "ever-growing" marketing

campaign in 2016,[8] which is before Passman or Alvarado purchased their products, and that

these representations—which were central to Peloton's marketing—were made "for years, until

late 2020."  Dkt. No. 201 at 17–18 (citing Dkt. No. 195 ¶¶ 73, 80, 81).  They also contend that,

even though the price premium theory of injury does not require allegations of exposure, they

have alleged that Plaintiffs were exposed to the misrepresentations; they cite to the portions of

---

[8] For the reasons explained in footnote 7, *supra*, there are no well-pleaded allegations that the
statements made by Peloton were misrepresentations prior to April of 2018.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 317 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 317 of 465

ADD-269

Case 1:19-cv-11711-LJL   Document 207   Filed 08/11/22   Page 25 of 40

the Complaint where Alvarado and Passman allege they relied on misrepresentations in

purchasing their products.  *Id.* at 18–19 (citing Dkt. No. 195 ¶¶ 35, 37).

Plaintiffs have the better of the argument.  "Under Sections 349 and 350, plaintiffs must

show that they were 'injured as a result of the deceptive practice, act or advertisement.'"  *Fishon*

*I*, 2020 WL 6564755, at *10 (quoting *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 525

(S.D.N.Y. 2003)).  Although a plaintiff "must show that the defendant's 'material deceptive act'

caused [her] injury," she need not show reliance.  *Stutman v. Chemical Bank*, 731 N.E.2d 608,

612 (N.Y. 2000) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*,

647 N.E.2d 741, 745 (N.Y. 1995)).  "[R]eliance is *not* an element of a section 349 claim."  *Id.*

Nor is it an element of a Section 350 claim.  *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d

675, 676 (N.Y. 2012) ("To the extent that the Appellate Division order imposed a reliance

requirement on General Business Law §§ 349 and 350, it was error.  Justifiable reliance by the

plaintiffs is not an element of the statutory claim.").  Thus, a plaintiff can plead both injury and

causation under GBL §§ 349 and 350, by alleging that defendant engaged in an "act or practice

[that was] deceptive or misleading in a material way and that plaintiff has been injured by reason

thereof."  *Oswego*, 647 N.E.2d at 744

A plaintiff can plead injury and causation for purposes of Sections 349 and 350 in at least

one of two ways.  First, the plaintiff can plead that she was exposed to a material deceptive act

and relied on that misrepresented fact to her detriment.  The plaintiff is directly injured when she

pays a higher price than she otherwise would have paid based on her belief in the fact that is

misrepresented.  *See Rodriguez v. Hanesbrands Inc.*, 2018 WL 2078116, at *4–5 (E.D.N.Y. Feb.

20, 2018), *report and recommendation adopted*, 2018 WL 1686105 (E.D.N.Y. Mar. 30, 2018)

(explaining that injuries caused by deceptive practices may be alleged "in one of two ways: by

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 318 of 465
Case 1:19-cv-11711-LGS    Document 536    Filed 09/02/25    Page 318 of 465

ADD-270

Case 1:19-cv-11711-LJL    Document 207    Filed 08/11/22    Page 26 of 40

alleging that (1) a plaintiff overpaid or paid a 'price premium' . . .; or (2) plaintiff did not receive the product she bargained for" and concluding that plaintiffs adequately alleged second theory of injury where they alleged that they were injured because "they did not receive the . . . product that defendant led them to believe they were buying," thereby purchasing a product with "considerably less value than was warranted" (internal quotation marks omitted)); *Lazaroff v. Paraco Gas Corp.*, 2011 WL 9962089, at *6 (Sup. Ct. Kings Cnty. Feb. 25, 2011) ("Plaintiff alleges that, had he understood the true amount of the product, he would not have purchased it, and that he and the purported members of the class paid a higher price per gallon/pound of propane and failed to receive what was promised and/or the benefit of his bargain . . . . Thus, plaintiff has properly alleged an injury."). That is the theory of injury pressed by Plaintiffs in *Fishon I*, which the Court addressed in that case. Under it, a plaintiff must plead injury that she saw the misrepresentation or was exposed to it in some other way. *See Fishon I*, 2020 WL 6564755, at *9–10. In the absence of an allegation—and at the summary judgment stage, proof—that the Plaintiff was aware of the misrepresentation, she cannot establish that she relied upon it to her detriment.

Second and importantly, however, a plaintiff can also plead both injury and causation under GBL §§ 349 and 350, by alleging that the defendant's misleading or deceptive advertising campaign caused a price premium, that the price premium was charged both to those who saw and relied upon the false representations and those who did not, and that, as a result of the price premium, plaintiff was charged a price she would not otherwise have been charged but for the false campaign. *See Eidelman v. Sun Prods. Corp.*, 2022 WL 1929250, at *1 (2d Cir. June 6, 2022) (summary order) ("One method of demonstrating actual injury in the consumable goods context is by showing that the plaintiff paid a 'price premium'—that is, as a result of the

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 319 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 319 of 465

ADD-271

Case 1:19-cv-11711-LJL    Document 207    Filed 08/11/22    Page 27 of 40

defendant's deception, the plaintiff paid more for a product than he otherwise would have." );

*Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 288 (S.D.N.Y. 2014) ("A plaintiff

adequately alleges injury under [NY]GBL § 349 by claiming that he paid a premium for a

product based on the allegedly misleading representations."); *Greene v. Gerber Prods. Co.*, 262

F. Supp. 3d 38, 68 (E.D.N.Y. 2017) (holding that "allegations [were] sufficient to state an injury

under GBL sections 349 and 350 because they claim that [p]laintiff paid a premium for a product

based on [d]efendant's inaccurate representations" (alterations adopted) (internal quotation

marks and citation omitted)); *Ackerman v. Coca-Cola Co.*, 2010 WL 2925955, at *23 (E.D.N.Y.

July 21, 2010) (plaintiffs pleaded an injury as a result of a defendant's allegedly deceptive act or

practice where those plaintiffs alleged that they "paid a premium for a product based on

defendants' inaccurate representations"); *Zottola v. Eisai Inc.*, 564 F. Supp. 3d 302, 310 & n.6

(S.D.N.Y. 2021) (concluding that plaintiffs failed to plead a cognizable injury for the purposes of

NYGBL §§ 349 and 350 claims where there was no allegation that a misrepresentation affected

the product's price and explaining that "[t]o be sure, '[i]njury is adequately alleged under

NYGBL §§ 349 and 350 by a claim that a plaintiff paid a premium for a product based on

defendants' inaccurate representations.'" (quoting *Ackerman*, 2010 WL 2925955, at *23)

(alteration adopted)).

        "Where … 'the consumer protection statute at issue supplies an objective test,' . . .

liability turns on what a *reasonable* consumer, not a particular consumer, would do."  *Sharpe*,

2021 WL 3721392, at *4 (quoting *Ackerman v. Coca-Cola Co.*, 2013 WL 7044866, at *10

(E.D.N.Y. July 18, 2013)).  Because the test is objective and turns upon the reasonable

consumer, "reliance is not at issue, [and] the individual reason for purchasing a product becomes

irrelevant and subsumed under the reasonable consumer standard, i.e., whether the deception

could likely have misled someone, and not, whether it in fact did." *Hasemann v. Gerber Prods. Co.*, 331 F.R.D. 239, 266 (E.D.N.Y. 2019) (stating proposition in context of considering theory of injury that putative class members paid a price premium); *cf. Randolph v. Mondelēz Global LLC*, 2022 WL 953301, at *3 (S.D.N.Y. Mar. 30, 2022) (explaining that "since the test for deception under sections 349 and 350 is an objective one, and because reliance is not an element of the claims, the plaintiff's personal expectations do not establish that 'a reasonable consumer acting reasonably under the circumstances' would be misled by the label." (quoting *Oswego*, 647 N.E.2d at 745)).

The Court thus disagrees with the statements that appear in some cases that suggest that the only way a consumer can be injured as a result of a false marketing campaign is if she was personally exposed to that campaign and believed and relied to her detriment on the allegedly misrepresented fact.  *See Goldemberg*, 8 F. Supp. 3d at 480 ("To properly allege causation, a plaintiff must state in his complaint that he has seen the misleading statements of which he complains before he came into possession of the products he purchased."); *Dash v. Seagate Tech. (U.S.) Holdings, Inc.*, 27 F. Supp. 3d 357, 361 (E.D.N.Y. 2014) (same).  The principle cited in these cases predates more recent authority and finds its genesis in *Gale v. International Business Machines Corp.*, 781 N.Y.S.2d 45 (2d Dep't 2004) ("*Gale*"), in which the Appellate Division considered a claim by a plaintiff—who experienced a disk-drive failure and a loss of data—that the defendant made misrepresentations that the disk drive was reliable and safe for storing data.  *Id.*; *see also Gale v. Int'l Bus. Machines Corp.*, 2003 WL 26134558 (Sup. Ct. Suffolk Cnty. Mar. 7, 2003).  The Appellate Division held that "the plaintiff failed to plead causation with sufficient specificity to withstand dismissal" where "he nowhere state[d] in his complaint that he saw any of these statements before he purchased or came into possession of his

hard drive." *Gale*, 781 N.Y.S. 2d at 47. The court continued "[i]f the plaintiff did not see any of these statements, they could not have been the cause of his injury, there being no connection between the deceptive act and the plaintiff's injury." *Id.* [9]

The rationale of *Gale* (if not a precise "eyeball" requirement) makes good sense and is binding where a plaintiff alleges she was injured because she relied to her detriment on the misleading fact. In that circumstance, her injury—the difference between the value of what she received and what he thought she was receiving—does not exist if she did not believe the two were different. And any such injury that did exist would not be caused by the defendant's misrepresentation if the misrepresentation did not form the basis for that belief. But neither *Gale* nor the subsequent cases that relied upon it considered whether an injury that implicates "reliance" is the *sole* basis upon which causation can be established much less whether it can be established on a market-based price premium theory.

More recent cases have considered that question and, in light of the New York Court of

---

[9] In *Bibicheff v. PayPal, Inc.*, 844 Fed. App'x 394 (2d Cir. Feb. 8, 2021), the Second Circuit affirmed the district court's dismissal of a Section 349 complaint, in part, because the plaintiff there did not allege that she saw the defendant's alleged misrepresentations until after the fraudulent activity and the resulting harm had occurred. *Id.* at 396. But that case cannot be read to impose an absolute standard that in every case a Section 349 plaintiff have seen the allegedly misleading representation in order to bring a claim. The plaintiff in *Bibcheff* was a business owner who claimed that the defendant PayPal had engaged in misleading practices by failing to monitor and investigate twelve fake accounts created under her name by her office manager who used the accounts to defraud her. *Id.* at 395. She sought to hold PayPal to the representation that was on its website that customers were protected against unauthorized transactions. *See Bibicheff v. PayPal, Inc.*, 2020 WL 2113373, at *1–2 (E.D.N.Y. May 4, 2020). But the plaintiff did not allege that she had purchased products or services from PayPal. *Id.* at *4. The only theory of relief thus could have been that the plaintiff used PayPal's services based on the representation of protection against unauthorized transactions. There thus would have been no occasion for the Second Circuit to consider *sua sponte* whether there was an alternative source of injury and of causation and in particular whether exposure is required in every case. It was sufficient to affirm the district court's order that the only theory of injury—one based upon reliance on the truth of the misrepresented fact—was not supported by the allegations of the complaint.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 322 of 465
Case 1:19-cv-11711-LGS    Document 356    Filed 09/02/25    Page 322 of 465
ADD-274

Case 1:19-cv-11711-LJL    Document 207    Filed 08/11/22    Page 30 of 40

Appeals' holding in *Stutman* that reliance is not required under Section 349 and 350 and its caution not to conflate the two, *see Stutman*, 731 N.E.2d at 612–13; *Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D.125, 147 (S.D.N.Y. 2014), have concluded that reliance and therefore exposure are not critical to establishing causation.  In *Sharpe*, for example, the court confronted and rejected the identical argument framed in terms of whether the proposed class presented common questions of fact.  2021 WL 3721392, at *4.  Defendants argued that no class could be certified because each class member would have to show that he or she was exposed to the misleading misrepresentation.  *Id.*  The court rejected that claim and thereby the argument that for any individual exposure was a *sine qua non* for maintenance of a Section 349 and 350 claim:  "The argument is another attempt to sneak in reliance.  Where, as here, 'the consumer protection statute at issue supplies an objective test,' … liability turns on what a *reasonable* consumer, not a particular consumer, would do."  *Id.* (quoting *Ackerman*, 2013 WL 7044866, at *10).

Likewise, in *Hasemann*, the court held that a class could be certified notwithstanding that each individual member of the class was not uniformly exposed to the alleged misleading representation because the theory of injury was that each individual class member paid a price premium.  331 F.R.D. at 266.  The court stated "where reliance is not at issue, the individual reason for purchasing a product becomes irrelevant and subsumed under the reasonable consumer standard, i.e., whether the deception could likely have mislead someone, and not, whether it in fact did."  *Id.*  The claim that Section 349 and Section 350 required "an individual inquiry" into whether the plaintiff was deceived by the misrepresentations was "mistaken[]" and "incorrect due to the less individualistic and more objective nature of the statutory elements."  *Id.*  The court concluded that "some amount of discovery is necessary"—in the absence of evidence that the misrepresentation received wide exposure, it would be difficult to show that the

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 323 of 465
Case 1:19-cv-11711-LGS    Document 536    Filed 09/02/25    Page 323 of 465

ADD-275

consumer suffered actual harm. *Id.* However, to require that a particular plaintiff have actually been exposed to the representation "would impermissibly depart from the objective standards of sections 349 and 350 of the GBL, and would impermissibly read a seeing and a reliance requirement into the statue." *Id.* at 267.

In *In re AXA*, 2020 WL 4694172, at *11, as well, in analyzing a statute, Section 4226 of the New York Insurance Law, that the court considered to be "substantially similar" to NYGBL §§ 349 and 350, in that it did not require reliance but did require causation, the court concluded that the plaintiff was not required "to prove that she reviewed and relied upon a misrepresentation" and "must only do so if it is required by the particular injury and theory of causation alleged." *Id.* If the "misrepresentation . . . artificially inflate[s] the market price of a product, causing a plaintiff to pay more for it than she otherwise would have—regardless of whether she even saw the misrepresentation," the plaintiff was "harmed [] by a misrepresentation without necessarily having relied on it." *Id.* at *10. The court ultimately concluded that "given the nature of the harms alleged in [that] case, each [p]laintiff may recover only if she actually read, received, or became aware of a misrepresentation" because "people generally have no right to the benefit of a promise of which they were completely unaware." *Id.* at *11. But in so doing, he expressly distinguished such a "promise-based" theory of injury from the sort of price-premium injury at issue here. He called a "theory of causation . . . that 'the advertising and labeling practice allowed a price premium to be charged'" a "market-price-based theory of causation" and explained that such a theory, "unlike a promise-based theory, does not depend on the consumer's awareness of the representation." *Id.*

Finally, and most recently, the Second Circuit explained in *Eidelman*:

> The presence or absence of a price premium attributable to a defendant's alleged deception is objective and does not depend on whether a plaintiff could have or

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 324 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 324 of 465

ADD-276

would have in fact, purchased a lower-priced, truthfully marketed alternative.  To the contrary, the New York Court of Appeals has held that "reliance is *not* an element of a section 349 claim."  *Stutman*, 95 N.Y.2d at 30; *see also Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324 n.1 (2002) ("The standard for recovery under General Business Law § 350, while specific to false advertising, is otherwise identical to section 349.").

2022 WL 1929250, at *1.  Under this theory of injury, an individual's awareness of an alleged misrepresentation plays no role in the causation analysis because reliance plays no role in it.  On the basis of evidence of internal communications "implying that [d]efendants could charge a higher price because of the allegedly misleading claim . . . and reflecting that [d]efendants assigned considerable value to the claim that they allegedly used in a deceptive manner," the *Eidelman* court held that "a reasonable jury could conclude that some of the price premium which Eidelman paid was attributable to [d]efendant's alleged deception and Eidelman was therefore injured within the meaning of §§ 349 and 350."  *Id.* at *2.  Neither the plaintiff's awareness of the misrepresentation nor his reliance on it played a role in the conclusion that the facts could support a cognizable injury attributable to the defendant's conduct.

These cases persuade the Court that, while a reliance- or exposure-based theory of injury is one way to plead that a defendant's misrepresentation caused harm, it is not the only way.[10] The operative question is whether a plaintiff suffered an injury because of a defendant's misrepresentation; it is not whether that injury was tied to plaintiff's reliance on the misrepresentation.  Plaintiffs have alleged that Defendant made misrepresentations that would have mislead a reasonable consumer, that those misrepresentations were consumer-facing and

---

[10] The Court's Opinion in *Fishon I* does not require a contrary conclusion.  In that decision, the Court explained that an individual may allege that she was harmed by stating that she relied on a defendant's claim to her detriment and that an explicit allegation that she saw a misrepresentation was not necessary to sustain a claim *on that theory* because such awareness was implied.  *Fishon I*, 2020 WL 6564755, at *9.  The Court nowhere stated that this was the only way by which an individual could allege an injury caused by Defendant's actions.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 325 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 325 of 465

ADD-277

Case 1:19-cv-11711-LJL    Document 207    Filed 08/11/22    Page 33 of 40

had broad impact, and that as a result of those widespread misrepresentations that mislead

reasonable consumers, they paid higher costs.  By alleging that they paid a higher price—

"increased costs"—for their products because of Defendant's widespread misrepresentations

about the value of the product, Plaintiffs have pleaded an injury that was attributable to

Defendant's alleged misrepresentation, regardless whether they ever personally saw the

representation.  It may be difficult in the end for Plaintiffs to prove those claims (or even to

present sufficient facts to create a jury question), but Plaintiffs have pleaded enough to be

permitted to try.

### B.    Materially Deceptive Omissions

Defendant also moves to dismiss the Complaint to the extent it relies upon a theory of

actionable omission.  The Complaint alleges that Defendant made both material

misrepresentations and deceptive omissions.  As Defendants put it, Plaintiffs allege "that,

starting on April 9, 2018, Peloton deceptively failed to disclose that it (i) had been accused of

violating 'any laws'; and therefore (ii) would be (or might be) removing over half of the classes

in the on-demand library."  Dkt. No. 197 at 17 (citing Dkt. No. 195 ¶¶ 21, 30, 34, 40, 102–103,

120, 140).

Defendant argues that Plaintiffs cannot sustain a claim based on an omission theory

because: (i) omissions are only actionable where a defendant had knowledge of material

information and either failed to disclose or actively concealed such information at the time it

made the alleged misstatements and there are no such allegations here; (ii) the omission did not

make representations about Peloton's "growing" library false because those representations did

not speak to "whether anyone had accused Peloton of violating any laws";  (iii) Peloton had no

duty to disclose potential litigation from the cease-and-desist letter since such litigation was not

substantially certain to occur and any such omission did not occur until April of 2019, after

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 326 of 465
Case 1:19-cv-11711-LGS    Document 558    Filed 09/02/25    Page 326 of 465

ADD-278

Passman purchased his bike; and (iv) Peloton was entitled to investigate the issues giving rise to the cease-and-desist letter. Dkt. No. 197 at 18; *see id.* at 17–19. Those arguments lack merit at this stage.

Defendant is mistaken in its contention that an omission becomes a misrepresentation only in a situation in which it renders other statements made by a defendant misleading. That assertion is based on the statement to that effect in *Henry v. Rehab Plus Inc.*, 404 F. Supp. 2d 435, 445 (E.D.N.Y. Dec. 13, 2005). But that statement was made without considering the New York Court of Appeals' decision in *Oswego* and was based solely on citation to an inapposite opinion under the federal securities laws. *Id.* (citing *Fogarazzo v. Lehman Bros.*, 341 F. Supp. 2d 274 (S.D.N.Y. 2004)). In *Oswego*, however, the New York Court of Appeals stated that a Section 349 case could be based upon an omission "where the business alone possesses material information that is relevant to the consumer and fails to provide this information." 647 N.E.2d at 745. "[T]he statute surely does not require businesses to ascertain consumers' individual needs and guarantee that each consumer has all relevant information specific to its situation." *Id.* Moreover, even where the information is such that it would be important to the reasonable consumer, the defendant's "liability under the statute will depend, in part, on whether plaintiffs possessed or could reasonably have obtained the relevant information they . . . claim the [defendant] failed to provide." *Id.*

Thus, as the weight of authority now understands the law, where a defendant fails to supply a consumer information that it alone possesses, and where that information would be material or important to a reasonable consumer and where the consumer could not have reasonably obtained the information other than through the defendant, Sections 349 and 350 provide a basis for relief. *See, e.g.*, *In re Sling Media Slingbox Advertising Litig.*, 202 F. Supp.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 327 of 465
Case 1:19-cv-11711-LGS    Document 558    Filed 09/02/25    Page 327 of 465

ADD-279

Case 1:19-cv-11711-LJL    Document 207    Filed 08/11/22    Page 35 of 40

3d 352, 359 (E.D.N.Y. Aug. 12, 2016) ("Omissions are actionable 'where the business alone

possesses material information that is relevant to the consumer and fails to provide this

information.'"); *Dixon v. Ford Motor Co.*, 2015 WL 6437612, at *9 n.8 (E.D.N.Y. Sept. 30,

2015) (declining to follow *Henry* for the proposition that "omission based GBL § 349 claims are

only viable if the omission renders other affirmative statements made by a defendant

misleading"); *Tomassini v. FCA U.S. LLC*, 2015 WL 386343, at *7 n.3 (N.D.N.Y. June 23,

2015) (explaining that the *Henry* court's "interpretation of the requirements of an omissions

claim under § 349 runs contrary to the New York Court of Appeals' decision in *Oswego*");

*Woods v. Maytag Co.*, 2010 WL 4314313, at *15 (E.D.N.Y. Nov. 2, 2010) ("[W]hen a defendant

exclusively possesses information that a reasonable consumer would want to know and could not

discovery without difficulty, failure to disclose can constitute a deceptive or misleading

practice.").

   Plaintiffs thus have stated a claim for relief.  Plaintiffs allege that Defendant failed to

disclose information that was material to the reasonable consumers, that Defendant alone

possessed, and that consumers did not have a means of obtaining.  They also allege that these

elements were present at some point during the relevant time period.  Plaintiffs allege that

Peloton, fully understanding what copyright law requires, committed a "knowing violation of

copyright laws," Dkt. No. 195 ¶ 83, and "was put on actual notice of its copyright infringement"

on April 9, 2018, *id.* ¶ 84.  As Plaintiffs put it, "on the facts, the copyright infringement claims

brought against Peloton did not amount to some vague potentiality for litigation—Peloton failed

to obtain licensing for music in more than half of its on-demand class library" and there is

therefore "nothing speculative" about the potential for litigation.  Dkt. No. 201 at 20.  Plaintiffs

allege that Peloton defrauded them in part by "failing to disclose the imminent"—*i.e.*, at some

time before the actual—"removal of over half of its on-demand library," *id.* ¶ 34, and, when

accepting Plaintiffs' subscription payments, Peloton knew or should have known that Plaintiffs

would not be able to use the entire on-demand class library because the size of it was materially

decreasing but withheld that information from Plaintiffs, *id.* ¶¶ 102–103.  The Complaint alleges

facts that suggest the size of the on-demand library is material; the value of the on-demand

library is tied to the size of it.  *Id.* ¶ 99.  It thus alleges that, at some point during the class period

when Passman and Alvarado made subscription payments, Peloton possessed information

material to a reasonable consumer—that it was using unlicensed material that would be removed

from the library—and failed to provide that information to Plaintiffs.  Whether or not the facts

ultimately support Plaintiffs' theory, this is sufficient to state an omission-based claim for that

period and those payments.

### C.    Voluntary-Payment Doctrine

Defendant briefly argues that Plaintiffs' claims based on their subscription services fail

because Plaintiffs "have continued to pay Peloton for subscription services."  Dkt. No. 197 at 20

(quoting Dkt. No. 195 ¶ 39)).  Defendant invokes the "voluntary payment doctrine" to contend

that, because Plaintiffs continued to use their Peloton products and pay for their subscriptions for

years after learning that Peloton had removed certain classes, their claims are precluded.

The "voluntary payment doctrine" is a "common-law doctrine [that] bars recovery of

payments voluntarily made with full knowledge of the facts, and in the absence of fraud or

mistake of material fact or law."  *Spiro v. Healthport Techs., LLC*, 73 F. Supp. 3d 259, 276

(S.D.N.Y. 2014) (quoting *Dillon v. U-A Columbia Cablevision of Westchester, Inc.*, 790 N.E.2d

1155, 1156 (N.Y. 2003)).  "[T]his is a doctrine of New York common law . . . as well as an

affirmative defense, the application of which 'may be inappropriate at the motion to dismiss

stage.'" *Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 197 (S.D.N.Y. 2019) (quoting

*Wurtz v. Rawlings Co., LLC*, 2014 WL 4961422, at *6 (E.D.N.Y. Oct. 3, 2014)).  "The doctrine

can bar both statutory claims under GBL § 349 and common law claims."  *Shelton v. CIOX*

*Health, LLC*, 2018 WL 4211447, at *2 (E.D.N.Y. July 20, 2018)).

     The Complaint cannot be dismissed on the basis of the voluntary payment doctrine.

Plaintiffs have not pleaded facts that would suggest they knew that the classes would be removed

at the time they paid for their subscriptions.  "The pleadings . . . do not establish whether

[Plaintiffs] knew or should have known that the [product prices] were not based on current . . .

values, and [Plaintiffs were] not required to preemptively plead facts refuting the voluntary

payment doctrine."  *Spagnola v. Chubb Corp.*, 574 F.3d 64, 73 (2d Cir. 2009).  Whether the

doctrine will limit the recovery of Plaintiffs for payments made during certain time periods is a

question not fit for resolution at this stage of the proceeding.

     **D.    Nationwide Class Allegations**

     Peloton also briefly argues that claims brought on behalf of a putative "nationwide" class

should be dismissed as that "class includes consumers who did not transact in New York and

thus lack statutory standing to bring such claims."  Dkt. No. 197 at 22.  It contends that the

claims brought by a putative nationwide class "should be dismissed for the same reasons the

Court dismissed Pearlman's NYGBL claims—as defined, the putative 'nationwide' class

includes consumers who did not transact in New York and thus lack statutory standing to bring

such claims."  Dkt. No. 197 at 22.  Plaintiffs respond that striking the nationwide class claims

would be premature and that dismissing absent class members at this stage of the proceedings—

as opposed to named plaintiffs—is not within the Court's purview; since nonnamed class

members are not parties to litigation before certification, they cannot be dismissed.  Dkt. No. 201

at 23–25.  In the Complaint, however, Plaintiffs include a footnote that states that:

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 330 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 330 of 465

ADD-282

> Plaintiffs recognize that this Court has already dismissed claims brought under New York General Business Law §§ 349 and 350 by non-New York plaintiffs. Plaintiffs are not presently looking to relitigate that issue, but include the assertion of a nationwide class in this Third Amended Complaint to preserve the issue for appeal.

Dkt. No. 195 ¶ 106 n.70.

The Court has the authority to address the question whether class members who did not purchase Peloton Hardware and/or the corresponding subscription in the State of New York can maintain a claim for violations of the NYGBL on a motion to dismiss or a motion to strike even though it "is usually addressed on a class certification motion." *In re Frito-Lay N. Am., Inc. All Natural Litig.*, 2013 WL 4647512, at *18 (E.D.N.Y. Aug. 29, 2013); *see also Szymczak v. Nissan N. Am., Inc.*, 2011 WL 7095432, at *12 (S.D.N.Y. Dec. 16, 2011) ("States have no interest in applying their consumer protection statutes to buyers who live out of state and whose purchases occur out of state. This issue, however, is usually resolved at the Rule 23 class certification stage, not on a motion to dismiss. . . . Courts, nonetheless, can address this claim in response to a Rule 12(b)(6) motion.").

The Court previously held that allegations virtually identical to those made now by these Plaintiffs regarding the location of Peloton's bank accounts and various departments were not sufficient to support statutory standing for a plaintiff who did not specify where the relevant transactions are processed, that she purchased her products in New York, or that she made any payment in New York. *Fishon II*, 2021 WL 2941820, at *3. The Court explained that allegations that a plaintiff "paid electronically and that all payments ultimately end up in a bank account in New York, . . . without more, is not sufficient to allege that any part of the transaction took place in New York." *Id.* at *4. The allegations of the Complaint are indistinguishable from those the Court considered in 2021 in connection with the first amended complaint. Just as the first amended complaint did, the Complaint alleges that: "Peloton sees itself as a uniquely New

ADD-283

York company" and its "significant operations, including its banking operations, are headquartered or otherwise based in New York," Dkt. No. 195 ¶ 7; Dkt. No. 81 ¶ 7; "[a]ny time a member purchases Peloton Hardware or a Peloton Membership, that member's payment is routed to Peloton's bank accounts in New York," Dkt. No. 195 ¶ 8; *see also* Dkt. No. 81 ¶ 8; that such "payments are recorded and managed by Peloton's Accounting and Finance department, located at Peloton's New York headquarters," Dkt. No. 195 ¶ 9; Dkt. No. 81 ¶ 9; that "Peloton does not accept cash as a form of payment," Dkt. No. 195 ¶ 10; Dkt. No. 81 ¶ 10; that the classes consumers get in exchange for their payments are "recorded, produced, and issued from Peloton's New York studios," Dkt. No. 195 ¶ 11; Dkt. No. 81 ¶ 11; that its "advertising and marketing campaigns originat[ed] from and/or [were] approved by its Creative, Acquisition Marketing, Brand Marketing, and Retention Marketing departments, all located at Peloton's New York headquarters," Dkt. No. 195 ¶ 12; Dkt. No. 81 ¶ 12; and that "[t]he decision to remove the majority of Peloton's on-demand library was made in New York and effectuated in New York," Dkt. No. 195 ¶ 24; Dkt. No. 81 ¶ 24.

The Complaint is clear that although the causes of action are said to be brought on behalf of "the Class," defined as "all purchasers of the Peloton hardware and/or corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019," Dkt. No. 195 at ¶ 106; *see also id.* at 33–40 (bringing causes of action on behalf of "the Class" and "New York Subclass" and requesting certification of "the Classes as requested herein"), Plaintiffs "include the assertion of a nationwide class in this Third Amended Complaint to preserve the issue for appeal" and not to "relitigate" the dismissal of claims brought by non-New York plaintiffs, *id.* ¶ 106 n.70.  Accordingly, the Court will adhere to its prior ruling regarding what is required for statutory standing and will strike the class allegations to the extent that they include consumers

ADD-284

who did not transact in New York.  Assuming all of the other requirements for Rule 23 are

satisfied, the class will be limited to those persons who have statutory standing under the

NYGBL as the Court has previously set forth those requirements and will not include consumers

nationwide who did not purchase in New York.

## CONCLUSION

For the foregoing reasons, Peloton's motion to dismiss is DENIED except as otherwise

set forth in this Opinion.

The Clerk of Court is respectfully directed to close Dkt. No. 196.


SO ORDERED.


Dated: August 11, 2022
       New York, New York                          _____
                                                          LEWIS J. LIMAN
                                                    United States District Judge

40

# No. 25-_____

IN THE

## United States Court of Appeals
## for the Second Circuit

*IN RE* PELOTON INTERACTIVE, INC.,

*Petitioner.*

ON PETITION FOR A WRIT OF MANDAMUS TO THE
UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK
NO. 1:19-CV-11711-LGS, THE HONORABLE LORNA G. SCHOFIELD

## ADDENDUM TO PETITION FOR A WRIT OF MANDAMUS
## Volume 2 of 2 (Pages ADD-285 to ADD-412)

Mark W. Mosier
Andrew Soukup
Abby Wright
Alexander J. Cave
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Tel: 202-662-6000
mmosier@cov.com
asoukup@cov.com
awright@cov.com
acave@cov.com

*Attorneys for Petitioner*

i

# TABLE OF CONTENTS

**Page**

Original Complaint, Dated December 23, 2019 (Dkt. 1)...……………………………….... ADD-1

First Stock Disclosure Order, Dated October 15, 2020 (Dkt. 63)...……………………….... ADD-41

First Order Regarding Notice of Stock Disposal, Dated November 2, 2020 (Dkt. 64)…………... ADD-42

Opinion and Order Regarding Defendant's Motion to Dismiss Original Complaint, Dated November 9, 2020 (Dkt. 65)………………… ADD-43

First Amended Complaint, Dated January 21, 2021 (Dkt. 81)………………...................... ADD-73

Opinion and Order Regarding Defendant's Motion to Dismiss First Amended Complaint, Dated July 12, 2021 (Dkt. 102)……………… ADD-115

Second Amended Complaint, Dated July 26, 2021 (Dkt. 106)……………………………… ADD-126

Second Stock Disclosure Notice, Dated August 25, 2021 (Dkt. 110)…………………………... ADD-174

Second Notice of Stock Disposal, Dated August 31, 2021 (Dkt. 112)…………………………... ADD-175

ii

**Page**

Opinion and Order Regarding Defendant's Motion to Dismiss Second Amended Complaint and Plaintiffs' Motion for Class Certification, Dated January 19, 2022 (Dkt. 168)…………………………………….. ADD-176

Third Amended Complaint, Dated February 18, 2022 (Dkt. 195)………………………………… ADD-203

Opinion and Order Regarding Defendant's Motion to Dismiss Third Amended Complaint, Dated August 11, 2022 (Dkt. 207)…………… ADD-245

Opinion and Order Regarding Plaintiffs' Motion for Class Certification, Dated May 2, 2023 (Dkt. 284)……………………………….….. ADD-285

Second Circuit Mandate Denying Plaintiffs' Rule 23(f) Petition, Dated September 15, 2023 (Dkt. 287)……………………………….. ADD-359

Letter from the Clerk of Court Regarding Waiver of Judicial Disqualification, Dated July 30, 2024 (Dkt. 332)………………………………… ADD-360

Defendant's Opposition to Plaintiffs' Motion to Vacate and Retain Jurisdiction, Dated November 6, 2024 (Dkt. 340)……………….... ADD-364

Letter to Court Regarding Notice of Supplemental Authority, Dated January 17, 2025 (Dkt. 342)……………………………… ADD-395

**iii**

**Page**

Opinion and Order Regarding Plaintiffs' Motion
to Vacate and Retain Jurisdiction, Dated May
2, 2025 (Dkt. 345)…………………………….   ADD-397

Notice of Appeal, Dated May 30, 2025
(Dkt. 348)…………………………………..   ADD-410

ADD-285

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| USDC SDNY | |
| DOCUMENT | |
| ELECTRONICALLY FILED | |
| DOC #: _____ | |
| DATE FILED: _05/02/2023_ | |

-------------------------------------------------------------------X
                                :

ERIC PASSMAN and ISHMAEL ALVARADO,  :
*individually and on behalf of all others similarly situated,*  :
                                :

               Plaintiffs,  :         19-cv-11711 (LJL)
                                :

        -v-                    :       <u>OPINION AND ORDER</u>
                                :

PELOTON INTERACTIVE, INC.,  :
                                :

               Defendant.  :

-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

    Named Plaintiffs Eric Passman ("Passman") and Ishmael Alvarado ("Alvarado" and,

together with Passman, "Named Plaintiffs") move, pursuant to Federal Rule of Civil

Procedure 23, for an order certifying this case as a class action, appointing Named Plaintiffs as

class representatives, and appointing the law firms of Keller Postman LLC, DeCello Levitt LLC,

and Ziglar Law Group, LLC, as class counsel. Dkt. No. 226. Defendant Peloton Interactive, Inc.

("Peloton" or "Defendant"), moves for an order excluding the expert reports and testimony of J.

Michael Dennis and Colin B. Weir pursuant to Federal Rule of Evidence 702 and *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Dkt. No. 240.

    For the following reasons, the motion to exclude the expert reports and testimony of

Dennis and Weir is denied and the motion for class certification is denied.

**BACKGROUND**

    The parties engaged in discovery for the purpose of filing and contesting the present

motion for class certification and the related motion to strike. *See* Dkt. No. 212. The following

facts are taken from the parties' submissions in connection with the motion for class certification

and the motion to strike "and the Court resolves factual disputes as necessary for the disposition

of" the motions.  *See Loc. 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of*

*New York*, 2022 WL 17175798, at *1 (S.D.N.Y. Nov. 22, 2022) (quoting *Kassman v. KPMG*

*LLP*, 416 F. Supp. 3d 252, 258 (S.D.N.Y. 2018)).

    Named Plaintiffs bring this action against Defendant alleging violations of New York's

consumer fraud statutes, New York General Business Law ("NYGBL") Sections 349 and 350.

Defendant is an exercise equipment and media company that sells stationary bicycles ("Peloton

Bike") and treadmills ("Peloton Tread") online, over the phone, and in showrooms.  Dkt.

No. 250-2 at 5, 7–8.  In addition to selling the Peloton Bike and Peloton Tread (collectively,

"Peloton Hardware"), Defendant also sells monthly subscriptions ("Peloton Memberships"),

which allow subscribers to watch live and pre-recorded (or "on-demand") fitness classes through

Peloton Hardware's built-in interactive touchscreens.  *Id.* at 5–6.  Peloton also sells a digital

application that allows users to take classes on non-Peloton Hardware.  Dkt. No. 250-3.  Passman

purchased a Peloton Bike and one-year Peloton Membership directly from Defendant in early

2017.  Dkt. No. 257-6 at 4–5, 7.  Alvarado purchased a used Peloton Bike with his wife from a

friend in January 2019 and purchased a Peloton Membership.  Dkt. No. 250-4 at 36–37, 40–41;

Dkt. No. 257-1 ¶ 3.

    The action stems from statements made by Defendant on its website and other media that

it offered subscribers an "ever-growing" or "growing"[1] library of live and on-demand studio

classes (the "Challenged Statement").  *See, e.g.*, Dkt. Nos. 232-14, 232-15, 232-15, 232-16,

_____

[1] The Court previously found that these two terms conveyed functionally identical messages.
Dkt. No. 65 at 15.  Thus, the Court analyzes both terms together as the "Challenged Statement."
Neither Named Plaintiffs nor Defendant propose, at least for the purposes of this motion, that
they be treated separately.

ADD-287

232-17; *see also* Dkt. No. 253-3 at 1–3. The Challenged Statement appeared in only a subset of

Peloton's advertisements, *see* Dkt. No. 253-4 (appendix of sample advertisements), and did not

appear in any television advertisements, *see* Dkt. No. 250-10 at 136. In April 2018, while it was

making the Challenged Statement, Defendant received a cease-and-desist letter regarding its

alleged copyright infringement of songs appearing in classes in its on-demand class library. Dkt.

No. 232-22. In March 2019, several members of the National Music Publishers' Association

collectively filed a lawsuit against Defendant. *See* Dkt. No. 232-23. On March 25, 2019, in

response to that lawsuit, Defendant removed approximately 6,500 on-demand classes from its

library, leaving approximately 7,000 classes available to its members. *Id.*; Dkt. No. 255-10.

Named Plaintiffs bring this action on behalf of a class defined as "[a]ll purchasers of the

Peloton Hardware and/or the corresponding Peloton Membership subscription from April 9,

2018 through March 25, 2019 [(the "Class Period")] in the State of New York." Dkt. No. 195

("Third Amended Complaint") ¶ 106. As currently pleaded, Named Plaintiffs allege that

Defendant's representation that its library was "ever-growing" was false and misleading,

because, at the time it made the Challenged Statement, it knew that it would be removing a large

proportion of its on-demand digital library. *See generally* Third Amended Complaint ¶¶ 116–54.

As a result, each of the putative class members suffered injury caused by the Challenged

Statement by overpaying for Peloton Hardware and Peloton Memberships. *See id.*

## PROCEDURAL HISTORY

This case was initiated by complaint in December 2019 by Eric Fishon, Alicia Pearlman,

and Patrick Yang, individually and on behalf of all others similarly situated, bringing claims for

violations of NYGBL Sections 349 and 350. Dkt. No. 1. On August 4, 2020, and pursuant to an

unopposed request, the Court ordered the voluntary dismissal of Yang. Dkt. No. 61. On

November 9, 2020, the Court granted a motion to dismiss the claims of Pearlman—a Michigan

resident—without prejudice because she lacked statutory standing under the New York statute, but it denied a motion to dismiss Fishon's claims.  *See Fishon v. Peloton Interactive, Inc.*, 2020 WL 6564755 (S.D.N.Y. Nov. 9, 2020).

On January 21, 2021, plaintiffs Fishon and Pearlman filed a first amended complaint. Dkt. No. 81.  Peloton again moved to dismiss Pearlman's claims, contending that Pearlman had not pleaded facts sufficient to show that she had statutory standing to sue under NYGBL Sections 349 and 350.  Dkt. Nos. 88–89.  The Court, once again, dismissed Pearlman's claims under the NYGBL, explaining that the amendment failed to cure the deficiencies identified in the original complaint.  *Fishon v. Peloton Interactive, Inc.*, 2021 WL 2941820, at *5 (S.D.N.Y. July 12, 2021).  The Court, however, granted leave for Pearlman to amend her complaint to plead her cause of action under Michigan law.  *Id.*

On July 26, 2021, Plaintiffs filed a second amended complaint, with Fishon bringing claims under NYGBL Sections 349 and 350 and Pearlman bringing a claim under the Michigan Consumer Protection Act ("MCPA"), Michigan Compiled Laws § 445.901, *et seq.*  Dkt. No. 106.  On August 9, 2021, Defendant moved to dismiss Pearlman's claims in that complaint. Dkt. No. 107.  On September 16, 2021, Fishon and Pearlman moved to certify the putative classes; Fishon moved for certification of a class of "[a]ll purchasers of the Peloton hardware and/or the corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019 in the State of New York," while Pearlman sought certification of a class of "[a]ll purchasers of the Peloton hardware and/or the corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019 in the State of Michigan."  Dkt. No. 118 at 9.  The Court granted Defendant's motion to dismiss Pearlman's claim under the MCPA, concluding that Pearlman did not allege with the requisite specificity facts supporting her reliance on

4

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 341 of 465
Case 1:19-cv-11711-LGS    Document 538    Filed 09/02/25    Page 341 of 465

ADD-289

Case 1:19-cv-11711-LJL    Document 284    Filed 05/02/23    Page 5 of 74

Peloton's statements that its on-demand library of fitness classes was "ever-growing," as was required under the Federal Rule of Civil Procedure Rule 9(b) standard applicable to her MCPA claim for which reliance was an essential element. *Fishon v. Peloton Interactive, Inc.*, 2022 WL 179771, at *8 (S.D.N.Y. Jan. 19, 2022). The Court also denied the motion for class certification by Fishon on the grounds that Fishon was not an adequate class representative. *Id.* at *11–12.

On February 18, 2022, Named Plaintiffs Passman and Alvarado, previously absent class members, filed the Third Amended Complaint. Dkt. No. 195. Defendant moved to dismiss the Third Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), Dkt. Nos. 196–97, 202, and Plaintiffs opposed that motion, Dkt. No. 201. On August 11, 2022, the Court denied the motion to dismiss the Third Amended Complaint. Dkt. No. 207; *see Fishon v. Peloton Interactive, Inc.*, 2022 WL 3284670 (S.D.N.Y. Aug. 11, 2022).

On October 17, 2022, Named Plaintiffs filed this motion to certify the class, supported by the declaration of Alex J. Dravillas, the expert declarations of Dennis and Weir, and a memorandum of law. Dkt. Nos. 226–33. On November 14, 2022, Defendant filed a memorandum of law in opposition to the motion for class certification and its motion to strike Plaintiff's expert declarations and supporting memoranda of law; the motion and the opposition to the motion for class certification were supported by the declarations of Megan A. Behrman and the expert declarations of Joel H. Steckel, PhD, Rebecca Kirk Fair, and Bruce A. Strombom, PhD. Dkt. Nos. 241–59. On November 30, 2022, Plaintiffs filed a reply memorandum of law in further support of its motion for class certification, an affidavit of Dravillas, and reply affidavits of Charles F. Dender and Benjamin F. Whiting. Dkt. Nos. 263–66. Named Plaintiffs also filed a response to the motion to strike the expert reports along with declarations of Dravillas and reply declarations of Dennis and Weir. Dkt. Nos. 268–73. On December 16, 2022, Defendant filed a

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 342 of 465
Case 1:19-cv-11711-LGS    Document 536    Filed 09/02/25    Page 342 of 465

ADD-290

supplemental memorandum of law in opposition to the motion for class certification and a

supporting declaration, Dkt. Nos. 274–75, to which Named Plaintiffs responded and filed

opposing declarations on December 27, 2022, Dkt. Nos. 277–79.  On December 22, 2022,

Defendant filed a reply memorandum of law in further support of its motion to strike the expert

reports.  Dkt. No. 276.

On April 12, 2023, the Court heard oral argument on the motions.  *See* Minute Entry,

April 12, 2023.

**DISCUSSION**

The Court first considers Defendant's *Daubert* motion.  Having resolved the *Daubert*

motion, the Court then turns to the question of whether a class can be certified.

### I.    Defendant's *Daubert* Motion

Defendant argues that the opinions of Dennis and Weir are not helpful to the trier of fact,

irrelevant, and unreliable.  Dkt. No. 252 at 1–2.  Defendant thus moves to exclude the testimony

of Dennis and Weir at the class-certification stage.  *Id.* at 2.  Named Plaintiffs counter that the

expert testimony of Dennis and Weir is relevant, helpful to the trier of fact, and reliable, and that

the issues that Defendant raises about their testimony go to the weight of the evidence at the

merits stage, not the admissibility of the evidence at the class-certification stage.  Dkt. No. 267 at

1–2.

Under Federal Rule of Evidence 702, a witness who is qualified as an expert by

knowledge, skill, experience, training, or education may testify in the form of an opinion if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the
> trier of fact to understand the evidence or to determine a fact in issue; (b) the
> testimony is based on sufficient facts or data; (c) the testimony is the product of
> reliable principles and methods; and (d) the expert has reliably applied the
> principles and methods to the facts of the case.

ADD-291

Fed. R. Evid. 702. "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)). That rule requires the proponent to establish and the trial judge to find "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. This "gatekeeping obligation" applies "to all expert testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

"The objective of [the gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. Relevancy is determined by whether the proffered evidence "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." *Amorgianos v. Amtrak*, 303 F.3d 256, 265 (2d Cir. 2002). Reliability is determined by considering if (1) "the testimony is based on sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods;" and (3) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Amorgianos*, 303 F.3d at 266 (citing this standard).

Courts are to adhere to a "liberal standard of admissibility for expert opinions," *Nimely v. City of New York*, 414 F.3d 381, 395–96 (2d Cir. 2005), beginning with "a presumption that expert evidence is admissible," *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015) (citing *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995)). However, a court still must determine that the evidence is "sufficiently reliable so as to be admissible."

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 344 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 344 of 465

ADD-292

Case 1:19-cv-11711-LJL    Document 284    Filed 05/02/23    Page 8 of 74

*Amorgianos*, 303 F.3d at 268. "In deciding whether a step in an expert's analysis is unreliable,

the district court should undertake a rigorous examination of the facts on which the expert relies,

the method by which the expert draws an opinion from those facts, and how the expert applies

the facts and methods to the case at hand." *Id.* at 267. "[I]t is critical that an expert's analysis be

reliable at every step." *Id.* Even "[i]f the witness is relying solely or primarily on experience,

[she still] must explain how that experience leads to the conclusion reached, why that experience

is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."

*Alto v. Sun Pharmaceutical Indus., Inc.*, 2021 WL 4803582, at *2 (S.D.N.Y. Oct. 13, 2021)

(internal quotation marks omitted) (quoting *Pension Comm. of Univ. of Montreal Pension Plan v.

Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 473 n.148 (S.D.N.Y. 2010)).

Though there is some question of whether a *Daubert* analysis is appropriate at the class-

certification stage, *see Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387,

393 (S.D.N.Y. 2018) ("[T]he Second Circuit has not resolved whether and to what extent

*Daubert* applies at the class certification stage."), "the heavy weight of authority militat[es]

towards a *Daubert* inquiry at class certification," *In re Namenda Indirect Purchaser Antitrust

Litig.*, 2021 WL 100489, at *8 (S.D.N.Y. Jan. 12, 2021); *see also Wal-Mart Stores, Inc.*, 564

U.S. 338, 354 (2011) (noting in dicta that the Court "doubt[s] that" "*Daubert* did not apply to

expert testimony at the certification stage of class-action proceedings" but not settling the

question). However, the *Daubert* "inquiry is guided by the purpose for which the evidence is

introduced—establishing the various class certification requirements." *In re LIBOR-Based Fin.

Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 471 (S.D.N.Y. 2018). "In other words, '[t]he

question is not . . . whether a jury at trial should be permitted to rely on [the expert's] report to

find facts as to liability, but rather whether [the Court] may utilize it in deciding whether the

ADD-293

requisites of Rule 23 have been met.'" *Ge Dandong v. Pinnacle Performance Ltd.*, 2013 WL

5658790, at *13 (S.D.N.Y. Oct. 17, 2013) (alterations in original) (quoting *In re Visa

Check/Mastermoney Antitrust Litig.*, 192 F.R.D. 68, 77 (S.D.N.Y. 2000)). Thus, a court's

decision to consider an expert report at the class-certification stage is not dispositive of the

question whether the report will be received at the merits stage.

The Court first addresses the challenges to Dennis's surveys and declaration and then

addresses the challenges to Weir's declaration.

### A.    Dr. J. Michael Dennis

Dennis is Senior Vice President at the National Opinion Research Center, a survey

research organization. Dkt. No. 227 ¶ 8.  He holds bachelor's and master's degrees from the

University of Texas, Austin, and a PhD in political science from the University of Chicago. *Id.*

¶ 17.  He has worked as a survey research expert for more than twenty years, and authored more

than sixty articles, conference and seminar papers, and book chapters. *Id.* ¶ 14.  He has

published articles in a number of academic journals. *Id.* ¶ 15.

Dennis conducted a consumer perceptions survey to analyze whether Defendant's alleged

misstatement and omission would be important to consumers. *Id.* ¶ 22.  He also conducted a

price premium survey, also known as a conjoint survey,[2] to measure the extent to which the

market-clearing price for Peloton Bikes and Memberships would have been different in the but-

for scenario where Defendant did not use the "ever-growing library" representation in its

advertising and marketing. *Id.* ¶ 23.  Defendant seeks to exclude Dennis's conjoint analysis

---

[2] In a conjoint survey, participants are presented with a "choice exercise" in which they are
typically shown a set of three-to-four hypothetical products, which are comprised of several
different attributes, including the product's brand, features, and price. Dkt. No. 227 ¶ 44.  The
survey participants are then asked to choose which of the products, if any, they would purchase.
*Id.* Each participant reveals her preference for specific attributes through these choices, which
provide data from which a price premium for these attributes can be calculated. *Id.* ¶¶ 46–47.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 346 of 465
Case 1:19-cv-11711-LGS    Document 538    Filed 09/02/25    Page 346 of 465

ADD-294

Case 1:19-cv-11711-LJL   Document 284   Filed 05/02/23   Page 10 of 74

because it fails to isolate the price premium associated with the Challenged Statement. Dkt.

No. 252 at 7. Defendant further argues that Dennis's analysis only focuses on the demand side

of the equation and does not account for supply-side factor. *Id.* at 11. As a result, Defendant

argues, Dennis's "analysis is not consistent with Plaintiffs' theory of liability and should be

excluded" under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). Dkt. No. 252 at 7–10.

Defendant challenges Dennis's perception survey as methodologically flawed. *Id.* at 18–19.

Named Plaintiffs argue that this analysis is better suited to the Rule 23(b)(3) context, Dkt. No.

267 at 9, and that any alleged flaws in Dennis's methodology should go to the weight of the

evidence, not the admissibility of the surveys, *see id.* at 19–22. The Court agrees with Named

Plaintiffs.

      The Supreme Court in *Comcast Corp. v. Behrend* held that Rule 23(b)(3) requires that the

proposed methodology for calculating damages be consistent with the class's theory of liability

and capable of measuring these damages on a classwide basis. 569 U.S. at 36–38; *see also In re*

*U.S. Foodservice Pricing Litig.*, 729 F.3d 108, 123 n.8 (2d Cir. 2013). District courts must thus

"entertain arguments against [a plaintiff's] damages model that [bear] on the propriety of class

certification" in its Rule 23(b)(3) analysis. *Comcast Corp.*, 569 U.S. at 34. It follows that, even

if the Court were ultimately to conclude that Dennis's model was inconsistent with Named

Plaintiffs' theory of liability, the model nonetheless is relevant at the class-certification stage.

The relevant question at the class-certification stage is not the exact amount of damages suffered

by each putative class member as a result of Defendant's conduct. *See id.* at 35 ("Calculations

need not be exact."); *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017)

(same); *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 550 (E.D.N.Y. 2017) ("Plaintiffs need

not prove exactly what their damages will be."). Rather, the relevant question is whether Named

Plaintiffs have presented a model for damages that is consistent with their theory of liability.  *See In re U.S. Foodservice Pricing Litig.*, 729 F.3d at 123 n.8 ("[C]ourts should examine the proposed damages methodology at the certification stage to ensure that it is consistent with the classwide theory of liability and capable of measurement on a classwide basis.").  Dennis's analysis is helpful in that regard; it permits the Court to address the question of whether Named Plaintiffs have put forward a workable model for calculating damages and thus to determine whether Named Plaintiffs have carried their burden of establishing predominance under Rule 23(b)(3).  The Court thus accepts Dennis's testimony regarding his price-premium survey for that purpose.  *See McMorrow v. Mondelez Int'l, Inc.*, 2021 WL 859137, at *9 (S.D. Cal. Mar. 8, 2021) ("The criticism that 'the methodology does not satisfy the requirement articulated in *Comcast . . . i.e.*, that damages be capable of measurement on a classwide basis . . . does not affect the admissibility of [an expert's] opinions.'" (alterations in original) (citation omitted)); *In re 5-Hour Energy Mktg. & Sales Pracs. Litig.* ("*In re 5-Hour Energy*"), 2017 WL 2559615, at *5 (C.D. Cal. June 7, 2017) ("Because the issue of whether [the expert] has put forward a workable model to assess damages on a class-wide basis is closely intertwined with the Rule 23(b) predominance analysis, the Court declines to address the reliability of [the expert]'s methodologies in a *Daubert* motion, and instead accepts [the expert]'s expert report and testimony for the limited purpose of deciding the predominance issue."); *Forth Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 130 (S.D.N.Y. 2014) (the question of "whether the method that [plaintiffs' expert] uses to assess the damages will be applicable on a classwide basis . . . is properly considered as part of the Rule 23(b) issue of whether questions common to the class predominate over individual issues, not to the validity of

ADD-296

[the expert's] methods as a matter of the admissibility of his expert testimony under the Federal Rules of Evidence.").

Defendant also challenges Dennis's consumer perception survey as "inherently unreliable" because it suffers from methodological errors. Dkt. No. 252 at 18. Among the issues that Defendant identifies with the survey are (1) the perception survey does not reflect a realistic marketplace, *id.* at 18; and (2) the instructions were "vague, leading, and prone to biased responses in favor of [Named] Plaintiffs' theory of the case," *id.* at 19. Named Plaintiffs counter that these issues go to the weight that the Court should afford the evidence, not its admissibility. Dkt. No. 267 at 18.

The Court finds it unnecessary to address these issues on this motion. To resolve this motion, the Court need not determine that Dennis's survey is sufficiently reliable for a jury to hear it; the pertinent question is whether it is sufficiently reliable for the Court to consider it in determining whether the Rule 23 criteria are met. Thus, the posture of *Daubert* motions at the class-certification stage is similar to the posture of *Daubert* motions at a bench trial. That is, the judge is acting both as gatekeeper and factfinder. *See* 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 702.02 (2d ed. 2021) ("In a bench trial, the judge acts as both gatekeeper and factfinder. The judge must determine both whether expert evidence is admissible under Rule 702 and whether it is credible."). "When the gatekeeper and the trier of fact are the same, the court may admit evidence subject to the ability later to exclude it or disregard it, if the evidence turns out not to meet the standard of reliability under Rule 702." *Id.* Under those circumstances, "the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702." *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006); *see also Howard University v.*

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 349 of 465
Case 1:19-cv-11711-LGS    Document 356    Filed 09/02/25    Page 349 of 465

ADD-297

Case 1:19-cv-11711-LJL    Document 284    Filed 05/02/23    Page 13 of 74

*Borders*, 2022 WL 3568477, at *5 (S.D.N.Y. Aug. 17, 2022); *Town & Country Linen Corp. v.*

*Ingenious Designs LLC*, 2022 WL 2757643, at *2–3 (S.D.N.Y. July 14, 2022).  The Court thus is

able to assess the weaknesses, or lack thereof, of Dennis's survey without determining whether

to formally exclude it.  As the Honorable Judge Valerie E. Caproni cogently put it, "there is no

need for the Court to 'gate-keep expert testimony from [itself].'"  *Matter of Manhattan by Sail*,

436 F. Supp.3d 803, 810 (S.D.N.Y. 2020) (quoting *Joseph S. v. Hogan*, 2011 WL 2848330, at *2

(E.D.N.Y. July 15, 2011)); *see also Bic Corp. v. Far E. Source Corp.*, 23 F. App'x 36, 39 (2d

Cir. 2001) (summary order) ("[T]he admission of evidence in a bench trial is rarely ground for

reversal, for the trial judge is presumed to be able to exclude improper inferences from his or her

own decisional analysis.").

### B.    Colin B. Weir

Weir is Plaintiffs' damages expert.  He holds a Master of Business Administration degree

from Northeastern University and is the President of Economics and Technology, Inc.  Dkt.

No. 228 at ECF p. 2; *id.* ¶ 1.  Weir worked with Dennis to develop parts of his price-premium

survey.  *Id.* ¶ 32.  He also uses Dennis's survey data and the historical sales of Peloton products

to calculate damages.  *Id.* ¶¶ 51–61.

Defendant argues that Weir's testimony is inadmissible for two reasons.  First, Defendant

argues that Weir's testimony "should be excluded because it derives from Dr. Dennis' flawed

analysis."  Dkt. No. 252 at 22 (cleaned up).  Second, Defendant claims that "Weir's damages

calculations . . . do not require 'expertise' beyond third-grade arithmetic."  *Id.* at 7; *see also id.* at

17 (noting that Weir's damages calculations "does not assist the trier of fact . . . [and] should be

excluded").  The Court rejects both arguments at this stage.

The Court already found that Dennis's testimony will be helpful in its predominance

analysis.  Because the Court will consider Dennis's testimony, it will also consider Weir's

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 350 of 465
Case 1:19-cv-11711-LGS    Document 256    Filed 09/02/25    Page 350 of 465

ADD-298

Case 1:19-cv-11711-LJL    Document 284    Filed 05/02/23    Page 14 of 74

testimony for the limited purpose of determining whether Named Plaintiffs have carried their

burden of establishing predominance under Rule 23(b)(3).  As to Defendant's second argument,

courts distinguish between damages calculations that are so simple as to be unhelpful to the trier

of fact from those that, although simple, rely on more complex analysis not otherwise accessible

to the factfinder.  *Compare FPP, LLC v. Xaxis US, LLC*, 2017 WL 11456572, at *2 (S.D.N.Y.

Feb. 13, 2017) ("By drawing solely on figures that would be in evidence before the trier of fact

and then performing simple arithmetic on those figures, [the proposed expert] is not deploying

'specialized knowledge' to 'help the trier of fact' in any way." (citation omitted)), *and Valley v.*

*Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2023 WL 2918982, at *9 (S.D.N.Y. Apr. 12, 2023)

(same), *with Perez v. Rash Curtis & Assocs.*, 2019 WL 1491694, at *4 (N.D. Cal. Apr. 4, 2019)

(concluding that "[w]hile a juror may be able to do simple math calculations, it would be

unreasonable to expect jurors to" gather the inputs necessary for those calculations), *and In re*

*Scotts EZ Seed Litig.*, 2017 WL 3396433, at *11 (S.D.N.Y. Aug. 8, 2017) (recognizing that

although expert's statutory damage calculations under NYGBL Sections 349 and 350 is "hardly

a complicated analysis, [the expert's] testimony and explanation of his calculations will assist the

trier of fact in understanding how he calculated the number of 'violations' . . . and how that

translates into a total damages amount").  Here, the Court finds that Weir's testimony falls into

the latter category; although his damages calculations reflect basic arithmetic, his testimony

provides the Court with analysis and data that is necessary to explain this arithmetic and that

would not otherwise be available.  Weir explains what a conjoint analysis is and some of the

economic principles behind it, Dkt. No. 228 ¶¶ 16–29; he expresses his opinion on the validity of

the survey, including its incorporation of supply-side considerations, *id.* ¶¶ 35–50; he estimates

total sales for the Peloton Bike and Tread using data provided by Defendant, *id.* ¶¶ 51–53; and he

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 351 of 465
Case 1:19-cv-11711-LGS    Document 536    Filed 09/02/25    Page 351 of 465

ADD-299

Case 1:19-cv-11711-LJL    Document 284    Filed 05/02/23    Page 15 of 74

uses Dennis's survey results and the sales data to calculate damages, *id.* ¶¶ 51–61. It is thus not
the case that Weir "simply adopted the opinions of others and performed grade-school arithmetic
counsel can do on an easel." *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 5148390, at *5 (N.D.
Cal. Nov. 6, 2017). Weir compiled data that the Court would need to conduct this grade-school
arithmetic. For the reasons stated above and discussed further below in the discussion of
predominance, the Court need not conclude that Weir's damages testimony would be admissible
at trial in order for it to consider Weir's report for purposes of class certification. Thus, the
Court will not preclude Weir's testimony on that basis.

## II.    The Motion for Class Certification

Named Plaintiffs move to certify a class defined as "[a]ll purchasers of the Peloton
Hardware and/or the corresponding Peloton Membership subscription from April 9, 2018
through March 25, 2019." Dkt. No. 230 at 7. Defendant challenges the motion, arguing that
(1) Named Plaintiffs are inadequate and atypical class representatives; (2) Named Plaintiffs have
failed to establish that common issues predominate; and (3) proposed class counsel is inadequate.
*See* Dkt. No. 251 at 1–2; Dkt. No. 274 at 1–3.

Under Federal Rule of Civil Procedure 23(a), plaintiffs may sue on behalf of a class
where: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are
questions of law or fact common to the class; (3) the claims or defenses of the representative
parties are typical of the claims or defenses of the class; and (4) the representative parties will
fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). These "familiar
requirement[s] of Rule 23(a)[ ] [are] commonly referred to as numerosity, commonality,
typicality, and adequacy of representation." *In re Monster Worldwide, Inc. Secs. Litig.*, 251
F.R.D. 132, 134 (S.D.N.Y. 2008).

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 352 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 352 of 465

ADD-300

Case 1:19-cv-11711-LJL    Document 284    Filed 05/02/23    Page 16 of 74

A party seeking class certification must also demonstrate compliance with one of the three requirements of Rule 23(b).  *See Wal-Mart Stores, Inc.*, 564 U.S. at 345.  One such requirement mandates "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "The 'predominance' requirement of Rule 23(b)(3) 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"  *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 594 (1997)).  If a court certifies a class, it must appoint class counsel, and, in doing so, it must consider the adequacy of counsel.  Fed. R. Civ. P. 23(g).

"[A] district court may not grant class certification without making a determination that all of the Rule 23 requirements are met."  *In re Initial Public Offerings Secs. Litig.*, 471 F.3d 24, 40 (2d Cir. 2006).  "Rule 23 does not set forth a mere pleading standard."  *Wal-Mart Stores, Inc.*, 564 U.S. at 350.  Instead, the party moving for class certification "must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc."  *Id.*; *see also Johnson v. Nextel Comms., Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) ("The party seeking class certification bears the burden of establishing by a preponderance of the evidence . . . each of Rule 23's requirements.").  Accordingly, a court must only certify a class "after a rigorous analysis" reveals that the "prerequisites of Rule 23(a) [and the relevant prerequisites of Rule 23(b)] have been satisfied."  *Wal-Mart Stores, Inc.*, 564 U.S. at 350–51 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).  This analysis often requires courts to touch on "aspects of the merits in order to resolve preliminary matters . . . [because a] 'class determination generally

ADD-301

involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *id.* at 351 (quoting *Falcon*, 457 U.S. at 160). Thus, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). "[F]ailure to prove any element [of Rule 23] precludes certification." *Ansari v. N.Y. Univ.*, 179 F.R.D. 112, 114 (S.D.N.Y. 1998).

The Court addresses each of Rule 23's requirements in turn and concludes that Named Plaintiffs have not carried their burden of demonstrating that the requirements for class certification have been met.

**A.    Rule 23(a) Requirements**

**1.    Rule 23(a)(1): Numerosity**

The parties do not dispute that the numerosity requirements of Rule 23(a) have been satisfied. *Compare* Dkt. No. 230 at 8 (arguing that the class "consists of many thousands of consumers" and thus that the numerosity requirement has been met), *with* Dkt. No. 251 (not addressing the numerosity requirement). The numerosity inquiry focuses on whether the class is so large "that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although "'numerosity' is not simply a numbers game," "[c]ourts have long applied a presumption that a class of forty members is sufficiently numerous that joinder of all members would be impracticable." *Huang v. Shanghai City Corp*, 2022 WL 1468450, at *5 (S.D.N.Y. May 10, 2022) (citing *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)); *see also Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014), *as amended* (Nov. 12, 2014) ("Numerosity is presumed for classes larger than forty members."). Here, the proposed class numbers in the thousands, *see* Dkt. No. 232-27; joinder of all class

members would thus be impracticable, *see, e.g.*, *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 546 (S.D.N.Y. 2021) (finding that joinder of class in "the thousands" was impracticable).

### 2.    Rule 23(a)(2): Commonality

The "commonality" inquiry requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  The inquiry depends upon there being "a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350.  "[W]hat matters to class certification is not the raising of common questions . . .  but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Barrows v. Becerra*, 24 F.4th 116, 131 (2d Cir. 2022) (quoting *Wal-Mart*, 564 U.S. at 350 (emphasis in original)).  "[F]or purposes of Rule 23(a)(2) even a single common question will do."  *Wal-Mart Stores, Inc.*, 564 U.S. at 359 (cleaned up).  Here, the Court finds that there are at least two common questions—materiality and falsity—and thus that Named Plaintiffs have satisfied the Rule 23(a)(2) requirement.

The materiality prong of NYGBL Sections 349 and 350 requires an objective inquiry. The relevant question is whether the alleged act is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007))); *see also Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) (stating that under Section 349, "'[d]eceptive acts' are defined objectively as acts likely to mislead a reasonable consumer acting reasonably under the circumstances." (alteration accepted) (quoting *Boule v. Hutton*, 328 F.3d 84, 94 (2d Cir. 2003))); *cf. Amgen Inc.*, 568 U.S. at 459 ("[M]ateriality is judged according to an

18

ADD-303

objective standard.").  Defendant argues that "the circumstances" under which a court must analyze materiality include how individual consumers purchased the product in question, from whom, and with what exposure to the allegedly misleading advertisement.  Defendant argues that, because the class of consumers includes individuals "who purchased different products, in different ways, from different suppliers, for different amounts, and after exposure to different (or no) ads," there is no single "reasonable consumer."  Dkt. No. 251 at 18.

Defendant's argument confuses the question of whether a *reasonable* consumer would likely be misled by an allegedly false advertisement with the separate question—relevant where reliance is at issue—of whether an individual consumer was misled by the advertisement.  The former question rests on an analysis of the "challenged advertisement as a whole, including disclaimers and qualifying language."  *Mantikas v. Kellogg Co.*, 910 F.3d 633, 636 (2d Cir. 2018); *see also Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 53 (E.D.N.Y. 2015) ("Courts view each allegedly misleading statement in light of its context on the product label or advertisement as a whole.  The entire mosaic is viewed rather than each tile separately." (internal quotation marks and citations omitted)); *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 288 (S.D.N.Y. 2014) (citing *Frito–Lay N. Am., Inc. All Natural Litig.*, 2013 WL 4647512, at *16 (E.D.N.Y. Aug. 29, 2013) for the proposition that "in resolving the reasonable consumer inquiry, one must consider the entire context of the label" (alteration, internal quotation marks, and citation omitted)).  The inquiry demands an objective analysis of the understandings a reasonable consumer would draw from a challenged statement, not the significance of that challenged statement to an individual consumer's purchasing decision.  *See Rivera v. Navient Solutions, LLC*, 2020 WL 4895698, at *10 (S.D.N.Y. Aug. 19, 2020) ("A Section 349 claim asks whether

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 356 of 465
Case 1:19-cv-11711-LGS   Document 336   Filed 09/02/25   Page 356 of 465

ADD-304

Case 1:19-cv-11711-LJL   Document 284   Filed 05/02/23   Page 20 of 74

the language . . . would have been . . .  misleading to a reasonable consumer, and not to the

plaintiff before the Court based on his or her own idiosyncratic facts.").

   To be sure, the nature of the product can influence how a reasonable consumer is

expected to interact with the allegedly false statement.  In *Mantikas v. Kellogg Co.*, 910 F.3d

633, for example, the Second Circuit analyzed whether the statements "WHOLE GRAIN" and

"MADE WITH WHOLE GRAIN" on the box of Cheez-It crackers were misleading.  *See id.* at

634–35.  The plaintiffs argued that the statements were misleading "because they communicate

to the reasonable consumer that the grain in the product is predominantly, if not entirely, *whole*

grain," when in fact the crackers are made with "predominantly enriched white flour."  *Id.* at 637

(emphasis in original).  The defendant countered that the statements could not be misleading

because the ingredients list, on the side of the box, made clear that the crackers were not

predominantly whole grain.  *Id.*  The Circuit rejected this argument, holding that "a reasonable

consumer should not be expected to consult the Nutrition Facts panel on the side of the box to

correct misleading information set forth in large bold type on the front of the box."  *Id.*

   Defendant, instead, would have the Court focus on the point at which the consumer

purchases the product; Defendant points to the fact that class members "purchased different

products, in different ways, from different suppliers, for different amounts, and after exposure to

different (or no) ads."  Dkt. No. 251 at 18.  However, Defendant does not identify any way in

which these factors would affect a reasonable consumer's understanding of the Challenged

Statement.  To adopt Defendant's argument would be to conflate the materially misleading

nature of the Challenged Statement with the injury resulting from the alleged statement.  The

factors Defendant identifies may be relevant to a finding of whether and the degree to which

class members were injured, but Defendant has not demonstrated that they shape how a

reasonable consumer would interact with the Challenged Statement such that Named Plaintiffs should be deemed atypical of the class.[3]

Taken to its logical conclusion, few if any consumer fraud class actions brought under New York law—or any fraud classes for that matter—would survive the class-certification stage. In nearly every false advertising case, consumers purchase "different products, in different ways, from different suppliers, for different amounts, and after exposure to different (or no) ads." Dkt. No. 251 at 18. Individuals purchase products with credit cards and cash, from stores and online, in bulk and individually, on sale and for full price. The circumstances under which a purchasing decision are made are various. As described above, what is relevant to the analysis is not the number of products purchased, their exact identity, or the circumstances under which they were purchased; what matters is the nature of the allegedly false statement and how consumers interact with the false statement and therefore understand it. Thus, courts generally have no difficulty finding named plaintiffs typical of a class so long as the challenged statement is consistent across the class.

---

[3] Defendant cites *Fink v. Time Warner Cable*, 714 F.3d 739 (2d Cir. 2013), for the proposition that the reasonable consumer test must consider the intricacies of each consumer's purchasing decision. *See* Dkt. No. 251 at 14 (the relevant reasonable consumer for Alvarado is one who "saw no ads, made no decision to purchase, and whose wife received a 'pretty good deal'" (citation omitted)). However, the language that Defendant draws from *Fink* does not reach as broadly as Defendant would have the Court believe. In *Fink*, the Second Circuit held: "[I]n determining whether a reasonable consumer would have been misled by a particular advertisement, context is crucial." *Fink*, 714 F.3d at 742. However, the opinion makes clear that the Second Circuit is referring to the *context* of the advertisement itself, not the broader context in which the consumer viewed the advertisement and purchased the product. The very next sentence reads: "For example, under certain circumstances, the presence of a disclaimer or similar clarifying language may defeat a claim of deception." *Id.* Thus, the Circuit, in upholding a district court's grant of a motion to dismiss under NYGBL Section 349, admonished the plaintiffs for failing selectively quoting language from the offending advertisement and failing to submit the advertisement in full. *See id.* at 741–42.

The cases that Defendant cites are inapposite; each focuses on the allegedly false statement, not on the purchasing decision of the individual class members.  In *Singleton v. Fifth Generation, Inc.*, 2017 WL 5001444, at *17 (N.D.N.Y. Sept. 27, 2017), the court held that the question of whether the representation that Tito's vodka was "handmade," a statement that appeared on its labels, was misleading was an objective question subject to common proof. However, the court rejected the inclusion of representations that "varied significantly" and that therefore were not suitable for class treatment.  *Id.* at *17 n.17; *see also Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002) ("Where there are material variations in *the nature of the misrepresentations made to each member* of the proposed class, however, class certification is improper because plaintiffs will need to submit proof of the statements made to each plaintiff, the nature of the varying material misrepresentations, and the reliance of each plaintiff upon those misrepresentations in order to sustain their claims." (emphasis added)).  At most, these cases support the proposition that when there are different allegedly false statements, there can be no single "reasonable consumer" for materiality purposes across all different statements. Here, however, there is only a single allegedly false statement at issue, the Challenged Statement.  Thus, these cases are inapplicable.

Defendant also argues that the falsity of the Challenged Statement is not a common question susceptible to classwide proof because Named Plaintiffs have not demonstrated "that there is [a] controlling definition of the term 'ever-growing.'"  Dkt. No. 251 at 16.  Defendant highlights the survey of Dennis, which found that 76.5% of respondents thought that "ever growing" meant "increase over time."  *Id.* (citing Dkt. No. 227 ¶¶ 88, 90).  Named Plaintiffs counter that whether the Challenged Statement is false—that is whether it is misleading or

deceptive—is an objective question and thus subject to classwide proof. Dkt. No. 230 at 11–12;

Dkt. No. 263 at 4–5. Defendant's argument misunderstands what the falsity analysis demands.

Whether or not a statement is misleading, like whether or not a statement is material,

requires an objective inquiry. *See Orlander*, 802 F.3d at 300. Thus, the inquiry is susceptible to

classwide proof: In order for a plaintiff to prevail in a consumer fraud case, she must establish

that the statement at issue was misleading to a reasonable consumer. *See Hasemann v. Gerber*

*Prod. Co.*, 331 F.R.D. 239, 265 (E.D.N.Y. 2019) (noting that the relevant question under

Sections 349 and 350 is "whether the deception could likely have misled someone, and not,

whether it in fact did"). Evidence that actual consumers, in fact, interpreted the challenged

statement in line with "the plaintiffs' proffered theory of deception" is relevant to, and may be

necessary for, the ultimate conclusion that a reasonable consumer would have been deceived.

*See In re KIND LLC "Healthy & All Natural" Litig.*, 2022 WL 4125065, at *7 (S.D.N.Y. Sept.

9, 2022) (holding that at summary judgment, plaintiffs must offer evidence of a reasonable

consumer's understanding of challenged statement). It would not be "enough for a plaintiff to

assert, based on his or her own subjective belief that [defendant]'s statement . . . conveyed the

alleged implied [false] message," if there were not also evidence that that same understanding

was shared by a reasonable consumer. *Hughes v. Ester C Co.*, 220 F. Supp. 3d 862, 871

(E.D.N.Y. Sept. 4, 2018); *see also Morales v. Conopco, Inc.*, 2016 WL 6094504, at *4 (E.D. Cal.

Oct. 18, 2016) ("[Plaintiffs'] individual testimony is insufficient to establish whether defendant's

representations on its products would deceive a reasonable consumer"). By the same token, a

plaintiff need not show that she understood the statement in a misleading way to demonstrate

ADD-308

that a reasonable consumer would have been misled.[4]  Thus, the fact that consumers may have

interpreted the statement differently does not preclude certification.

Differences in understanding among class members might bear on the question whether

Named Plaintiffs can establish that the Challenged Statement caused the class members an

injury.  If there is no common understanding of a statement, then it might be difficult for a class

to prove that it suffered an injury in the form of a price premium or the individual plaintiff to

prove that she relied on the demonstrably false understanding of the statement when relying on

the statement in her purchasing decision.  But the answer to the question whether a statement is

false cannot differ from case to case or be based upon whether the case is prosecuted on an

individual or a class basis; it turns upon an objective analysis that applies across cases.  To hold

otherwise, would require courts to relitigate the question of objective falsity in every case and

allow for individual plaintiffs to bring serial litigation, thereby undermining the very reason why

the New York Court of Appeals adopted an objective standard for materiality and falsity.  *See*

*Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745

(N.Y. 1995) (noting that "an objective definition of deceptive acts and practices" under Section

349 avoids "the potential for a tidal wave of litigation against businesses that was not intended

by the Legislature").

Defendant cites a single, out-of-circuit case to support its proposition that a lack of

uniform definition of an allegedly false statement would preclude class certification.  *See In re 5-*

*Hour Energy*, 2017 WL 2559615, at \*8–9.[5]  In *In re 5-Hour Energy*, the court stated that

---

[4] Evidence that the individual plaintiff did not have a misleading understanding of the challenged statement would of course be relevant to other questions, including causation and injury and (where applicable) reliance.

[5] Although *In re 5-hour Energy* did not specifically analyze New York law, the court there concluded that "Plaintiffs have shown, and Defendants do not dispute, that the state consumer

ADD-309

"[p]redominance . . . fails for lack of a common definition of the term 'energy.'"  *Id.* at *8. The

decision is not persuasive here.  The court in *In re 5-Hour Energy* was considering whether the

allegedly false statement was *material* to the purported class, not whether falsity was a common

issue.  *See id.* ("Where plaintiffs fail to establish a controlling definition for a key term in an

alleged misstatement, courts have found that materiality is not susceptible to common proof.");

*see also id.* at *9 ("Without a common definition or common understanding of the term, the

Court cannot conclude that materiality is susceptible to common proof.").[6]  Nor does the decision

call into question this Court's holding that materiality is an objective question that is common

across all class members.  The court there surveyed the evidence that different consumers took

different understandings from the same challenged statements in the course of reaching its

conclusion that plaintiffs had not established what the court called "a class-wide presumption of

materiality" that was necessary to "establish reliance or causation with common proof."  *Id.*  The

case is thus best understood to address the evidence necessary to show that reliance or causation

is a common question—a question that the Court addresses under the rubric of predominance.

*See infra* pp. 46–65.  It is not best understood as a case regarding the meaning of either falsity or

materiality in a consumer fraud statute.

---

laws remaining in this case follow a reasonable consumer standard and so a class-wide inference
of reliance and causation is available to Plaintiffs."  2017 WL 2559615, at *7.  Thus, the analysis
is relevant to NYGBL Sections 349 and 350, which, as discussed, also follow a reasonable
consumer standard for materiality.

[6] Even if the court's analysis were relevant to the falsity question, the analysis would undermine,
not support, Defendant's contention.  The court in *In re 5-Hour Energy* also found that "some
plaintiffs have even shown a specific rate of acceptance of the proposed definition of a disputed
term in the consumer marketplace."  2017 WL 2559615, at *8 (collecting cases).  Notably, the
"specific rates" that the court highlighted in those cases are significantly below the 76.5% of
respondents who, Dennis found, thought that "ever growing" meant "increase over time."  Thus,
even if the Court accepts the propositions underlying that case, they do not lend support to
Defendant's argument.

ADD-310

Because the Court finds that questions of both materiality and falsity are common to the class, Named Plaintiffs have satisfied the Rule 23(a)(2) requirement.

### 3.      Rule 23(a)(3): Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "The typicality requirement is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees."  *Georgine v. Amchem Prod., Inc.*, 83 F.3d 610, 631 (3d Cir.1996), *aff'd sub nom.*, *Amchem Prod., Inc.*, 521 U.S. 591.  Thus, typicality "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."  *Robidoux*, 987 F.2d at 936; *see also Barrows*, 24 F.4th at 131 ("Typicality requires that the claims of the class representatives be typical of those of the class, and is satisfied when each member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." (quoting *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001), *abrogated on other grounds by Wal-Mart Stores, Inc.*, 564 U.S. 338)).  Typicality, however, "does not require a showing that the named plaintiffs' claims are identical to those of the class members."  *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 209 F.R.D. 353, 356 (S.D.N.Y. 2002).  "Since the claims only need to share the same essential characteristics, and need not be identical, the typicality requirement is not highly demanding."  *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 155 (S.D.N.Y. 2002).

The parties contest whether typicality has been satisfied.  Named Plaintiffs argue that the typicality requirement is satisfied because "[l]ike all Class members, [Named Plaintiffs] paid for Peloton [H]ardware, and then continued to pay for subscription membership during the Class [P]eriod, during which time Peloton represented that its on-demand class library would be 'ever

growing.'" Dkt. No. 230 at 16. Defendant counters that there is no typical plaintiff in this action

because the proposed class includes persons who purchased three different products (the Peloton

Bike, Peloton Tread, and Peloton Membership) at different prices and in different ways using

different payment methods, having seen different ads. Dkt. No. 251 at 12. For example,

Alvarado's wife purchased a used Peloton Bike from a friend at a discount while Passman

purchased his Peloton Bike and Peloton Membership at a store in early 2017, before the Class

Period, and paid for a full year Peloton Membership in advance. *Id.* at 12–13. Defendant also

argues that Named Plaintiffs are subject to unique defenses. *Id.* at 13–15. Plaintiff has the better

argument; both Alvarado and Passman satisfy Rule 23's typicality requirement.

      As a general matter, courts have consistently held in consumer fraud cases that

"[p]laintiffs may have been exposed to different advertisements or labels, and purchased

different amounts of different . . . products, does not defeat typicality." *Hasemann v. Gerber*

*Prod. Co.*, 331 F.R.D. at 269 (collecting cases); *see also In re Sumitomo Copper Litig.*, 182

F.R.D. 85, 94 (S.D.N.Y. 1998) (collecting cases to support the court's conclusion that, in a

commodities fraud case, "the simple fact that Class members may have purchased and sold

copper futures at different times, for different purposes," does not make plaintiffs atypical). This

is because the core question in consumer fraud cases is whether the allegedly false statement

caused the class members an injury; while the precise identity and number of items purchased

may affect the magnitude of a class member's injury, those factors alone generally do not affect

the existence of the injury so long as the challenged statement is consistent across products. *See*

*de Lacour v. Colgate-Palmolive Co.*, 338 F.R.D. 324, 337 (S.D.N.Y. 2021), *leave to appeal*

*denied*, 2021 WL 5443265 (2d Cir. Sept. 16, 2021) (finding that the named plaintiffs, who only

purchased deodorant, were typical of the potential class members, purchasers of deodorant *and*

toothpaste, because, under New York law, "each class member's claim arises from the same course of events: the purchase of a product that is advertised as 'natural.' Because Plaintiffs allege that they paid a price premium as a result of this claim, the alleged injury is the same as that of toothpaste purchasers." (citation omitted)).

Here, too, the fact that Named Plaintiffs purchased different products would not, standing alone, defeat typicality. The price-premium theory of liability in this case rests on the falsity and materiality of the Challenged Statement and its effect on the price of the Peloton products. Thus, the nature of the alleged injury for all class members who purchased a Peloton product during the Class Period, whether the product was a Peloton Bike, Peloton Tread, or Peloton Membership, and regardless of how they purchased the relevant Peloton product, would be the same, though the extent of their injuries and damages may vary. Stated differently, each class member's claims "arise[] from the same course of events and each class member [will] make[] similar legal arguments to prove the defendant's liability." *Robidoux*, 987 F.2d at 936. This is enough for typicality.[7]

---

[7] The one case that Defendant cites in support of its proposition that there is "no typical plaintiff," *Solomon v. Bell Atlantic Corp.*, 777 N.Y.S.2d 50, 55 (1st Dep't 2004), is inapplicable to this case. *See* Dkt. No. 251 at 19. There, the First Department held that NYGBL Sections 349 and 350 required proof of individualized reliance. *See Solomon*, 777 N.Y.S.2d at 55 ("[C]ertification of a class for purposes of an action brought under GBL §§ 349 and 350 may be appropriate where the plaintiffs allege that all members of the class were exposed to the same misrepresentations."). Thus, the court concluded that the parallel typicality requirement under New York CPLR § 901(a)(3) was not satisfied because "[t]he record reflects differences among the individual plaintiffs as to which advertisements they saw, whether they saw any ads or obtained information by which to evaluate DSL service from other sources, whether they received billing credits, whether they read the terms and conditions and agreed to them, the nature and extent of their injuries, and the damages they claim." *Id.* at 57. This Court, however, explicitly rejected Defendant's argument that individualized reliance is required under NYGBL Sections 349 and 350 and permitted Named Plaintiffs to proceed on a price-premium theory. *See* Dkt. No. 207 at 23–32. Thus, it is irrelevant for typicality purposes, whether there are individualized differences among the Plaintiffs here concerning the advertisements they saw and other information they received. Additionally, as discussed above and contrary to the court's

ADD-313

Defendant presents a slightly more nuanced argument as to why typicality is defeated in this case: Because the purchasing decisions and circumstances of the potential class members differed so widely, Named Plaintiffs cannot be typical as to the materiality requirement of NYGBL Sections 349 and 350, which, Defendant argues, requires a consideration of each plaintiff's individual circumstances. *See* Dkt. No. 251 at 13. As Defendant implicitly notes, the typicality requirement of Rule 23(a)(3) is related to the commonality requirement of Rule 23(a)(2). "The crux of both requirements is to ensure that 'maintenance of a class action is economical and [that] the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (internal citations omitted) (quoting *Falcon*, 457 U.S. at 157 n.13). In this way, Defendant's argument that there is no typical plaintiff merges with its argument that materiality is not a common question susceptible to class wide proof. As Defendant's frame the issue, "[t]hese differences [among the Named Plaintiffs and class members] preclude a finding of typicality because the materiality of Peloton's conduct is assessed by asking whether it would be 'likely to mislead a reasonable consumer acting reasonably'" under each Plaintiff's individual circumstances. *See* Dkt. No. 251 at 13 (quoting *Solomon*, 777 N.Y.S.2d at 54). Because, as Defendant argues, the class of consumers include individuals "who purchased different products, in different ways, from different suppliers, for different amounts, and after exposure to different (or no) ads," there is no single "reasonable consumer" and, as a result, neither Named Plaintiff can be typical of a reasonable consumer. Dkt. No. 251 at 12–13, 18.

---

holding in *Solomon*, the extent of Named Plaintiffs' injuries is not relevant in the typicality analysis here, so long as the cause of the injury arise from the same course of events, which the Court concludes it does.

As previously noted, however, whether or not a statement is material is an objective question, subject to a reasonable consumer standard. *See supra* pp. 18–19. It does not turn upon what would be important to the named plaintiff coming before the Court. That holding, made in the context of the Court's commonality findings, is equally applicable in connection with the typicality analysis. Named Plaintiffs' idiosyncrasies—and the idiosyncrasies of their purchasing decisions—are irrelevant to the typicality of the Named Plaintiffs with respect to the materiality of the Challenged Statement.

Defendant also argues that both Named Plaintiffs are subject to unique defenses. Defendant contends that Alvarado is subject to two unique defenses: First, because Alvarado's wife purchased the Peloton Bike using her Venmo account, Defendant argues that the litigation will focus on whether Alvarado has standing to bring this case. Dkt. No. 251 at 14. Second, Defendant argues that because Alvarado purchased the Peloton Bike secondhand, the litigation will thus focus on whether the price-premium theory applies to secondhand purchases.[8] *Id.* at 14–15. Defendant also contends that because Passman purchased his Peloton Bike and year-long Peloton membership prior to the Class Period, "he cannot establish that the alleged misstatement caused him to suffer an injury or were material to a reasonable person in his circumstances." *Id.* at 15. Defendant's arguments lack merit.

"[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Gary Plastic Packaging*

---

[8] Defendant also argues that Alvarado's unique position—he "saw no ads, made no decision to purchase, and [his] wife received a 'pretty good deal'"—will make another unique defense a focus of litigation concerning questions of materiality for a "reasonable person" like him. Dkt. No. 251 at 14. But as described above, these factors are not relevant to the reasonable-consumer materiality analysis. Thus, this does not reflect a unique defense that would make Alvarado atypical.

*Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990), *abrogated on other grounds by Microsoft Corp. v. Baker*, 582 U.S. 23 (2017); *see Bowling v. Johnson & Johnson*, 2019 WL 1760162, at *4 (S.D.N.Y. Apr. 22, 2019) (Nathan, J.) (noting that the issue of unique defenses is "relevant to both Rule 23's typicality and adequacy of representation requirements" (citation omitted)).  "The relevant inquiry is not whether a unique defense ultimately will succeed on the merits.  Rather, courts consider whether any unique defenses will 'unacceptably detract from the focus of the litigation to the detriment of absent class members.'"  *de Lacour*, 338 F.R.D. at 338 (quoting *In re Omnicom Grp., Inc., Sec. Litig.*, 2007 WL 1280640, at *4 (S.D.N.Y. Apr. 30, 2007)); *see also Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000) ("[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.").  However, "if the proffered unique defenses 'seem to rest on little more than speculation'" the Court need not consider them in its Rule 23(a) analysis.  *See Bowling*, 2019 WL 1760162, at *4 (citation omitted).

Alvarado acknowledges that his wife was the motivating factor behind the purchase of the Peloton Bike and that funds for the Peloton Bike came from his wife's Venmo account, which was linked to her bank account.  Dkt. No. 250-4 at 39; Dkt. No. 257-1 ¶ 7.  However, Alvarado declares that the money for the Peloton Bike came from a joint account funded by his income.  Dkt. No. 257-1 ¶¶ 4–10.  To establish standing, a "plaintiff must allege 'a personal stake in the outcome of the controversy' and 'cannot rest [a] claim to relief on the legal rights or interests of third parties.'"  *Meimaris v. Royce*, 2021 WL 5170725, at *2 (2d Cir. Nov. 8, 2021) (summary order) (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)); *see also Warth*, 422 U.S. at 499 ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 368 of 465
Case 1:19-cv-11711-LGS    Document 536    Filed 09/02/25    Page 368 of 465

ADD-316

Case 1:19-cv-11711-LJL    Document 284    Filed 05/02/23    Page 32 of 74

rest his claim to relief on the legal rights or interests of third parties."). As the Second Circuit has held, "a spouse does not have standing merely on the basis of her marital status to sue for an injury suffered by her spouse." *Meimaris*, 2021 WL 5170725 at *2 (citing *Leonhard v. United States*, 633 F.2d 599, 618 (2d Cir. 1980)). Under New York law, items purchased with marital funds are marital property. *See Spathis v. Spathis*, 960 N.Y.S.2d 384, 387 (1st Dep't 2013). Additionally, "[p]roperty acquired during the marriage is presumed to be marital property and the party seeking to overcome such presumption has the burden of proving that the property in dispute is separate property." *Hymowitz v. Hymowitz*, 991 N.Y.S.2d 57, 62 (2d Dep't 2014) (citation omitted). It would seem, that Alvarado would have standing if he could establish that the funds used to purchase the Peloton Bike were marital property, whereas he would not have standing if Defendant can demonstrate that Alvarado's Peloton Bike was purchased with the separate property of his wife. *See Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976) (noting that a named plaintiff must have standing as an individual to sue on behalf of a class). There is no reason to believe, however, that this issue is likely to become a focus of the litigation or to detract either from the ardor with which Named Plaintiffs would prosecute the case or the jury's understanding of the case. The issue is relatively confined and will lend itself to a straightforward resolution. It thus hardly "threaten[s] to become the focus of the litigation." *Baffa*, 222 F.3d at 59; *see also In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 406 (S.D.N.Y. 2015) (finding that arguably unique defenses did not defeat typicality because neither would become the focus on the litigation). Moreover, it is undisputed that Alvarado purchased a Peloton Membership during the class period. Thus, he at least has standing to bring this lawsuit as a purchaser of a Peloton Membership.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 369 of 465
Case 1:19-cv-11711-LGS    Document 336    Filed 09/02/25    Page 369 of 465

ADD-317

The fact that Alvarado purchased his Peloton Hardware secondhand presents somewhat of a closer question.  As Defendant persuasively argues, whether or not, and how, "the 'price premium' theory applies to . . . [the] secondhand purchase" of Peloton Hardware could become a focus of the litigation.  However, the class is defined broadly enough to include purchasers of secondhand Peloton Hardware.  Thus, this question will not be atypical of other class members; other secondhand purchasers will be subject to identical defenses.  Defendant's argument goes better to the question whether there would be conflicts between claims of the secondhand purchasers of Peloton Hardware and those who purchase from Peloton itself and whether the Court should appoint a subclass.  Rule 23(c)(5) states that "[w]hen appropriate, a class may be divided into subclasses that are each treated as a class under this rule"; *see also Cnty. of Suffolk v. Long Island Lighting Co.*, 710 F. Supp. 1407, 1417 (E.D.N.Y. 1989), *aff'd*, 907 F.2d 1295 (2d Cir. 1990) (Weinstein, J.) ("The court has considerable discretion to create subclasses in order to manage intra-class conflicts if and when they should arise.").  Any conflict here would arise in the context of damages and the proportion of the damages attributable to the primary purchase of Peloton Hardware that secondhand purchasers are entitled to.  However, "[c]ourts in this district have found that potential issues related to differential damages does not preclude class certification." *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 276 (S.D.N.Y. 2008); *see also In re J.P. Morgan Stable Value Fund ERISA Litig.*, 2017 WL 1273963, at *10 (S.D.N.Y. Mar. 31, 2017) (same); *Long Island Lighting Co.*, 710 F. Supp. at 1417 ("The fact that conflicts among class members may arise at the settlement or damages stage of the litigation does not require that class certification be denied.").  If conflicts do arise, the Court can address those conflicts by appointing damage subclasses at that point.

Passman's supposed unique defense is anything but.  Defendant argues that because Passman purchased his bike and a year-long membership before the Class Period, he will not be able to establish injury and materiality.  Dkt. No. 251 at 21.  However, Defendant does not dispute that Passman paid for his monthly Peloton Membership during the Class Period.  *See id.* at 21 n.15.  As the Court found in its August 11, 2022 Opinion and Order, this fact alone established that Passman suffered the requisite injury for Article III standing purposes.  Dkt. No. 207 at 19–20.  It is no different here:  Defendant's contention that Passman cannot establish that the Challenged Statement caused him an injury or that it was material is not a unique defense because it is directly rebutted by the fact that he purchased the monthly memberships— at an allegedly inflated cost as a result of the Challenged Statement—during the Class Period.  Anticipating this argument, Defendant contends that "his claims are still subject to unique defenses because it is unlikely that the challenged representation would be material to someone who had already purchased his [Peloton] Bike and [Peloton] Membership prior to the proposed class period."  Dkt. No. 251 at 21 n.15.  But this argument misses the point:  The class is defined as "All purchasers of the Peloton Hardware and/or the corresponding Peloton Membership subscription from April 9, 2018 through March 25, 2019 in the State of New York."  Third Amended Complaint ¶ 106.  Thus, the class, by definition, includes individuals who purchased Peloton Hardware before the Class Period, and continued to purchase the Membership during the Class Period.  Contrary to Defendant's contention, whether or not the Challenged Statement was material to the purchasers of monthly memberships is "not unique"; it "is a central, not atypical, issue in this action."  *Cross v. Dickstein Partners, Inc.*, 172 F.R.D. 108, 113 (S.D.N.Y. 1997).[9]

_____

[9] Nor does the fact that neither Alvarado nor Passman purchased new Peloton Hardware during the Class Period preclude certification.  Though there may be tension between those seeking to recover for overpaying for Peloton Memberships and those seeking to recover for overpaying for

Because the Court finds that Named Plaintiffs' claims arise from the same course of events and will make similar legal arguments as the other class members, the Court concludes that the typicality requirement of Rule 23(a)(3) has been satisfied.

### 4.    Rule 23(a)(4): Adequacy

Rule 23(a)(4) requires that the Named Plaintiffs "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "[T]wo factors generally inform [the inquiry]" of whether a named class representative is adequate under Rule 23: "(1) absence of conflict and (2) assurance of vigorous prosecution."  *Irvin v. Harris*, 944 F.3d 63, 71 (2d Cir. 2019) (quoting *Robinson*, 267 F.3d at 170); *see also In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) ("Adequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." (citation omitted)).  "In evaluating [the adequacy] requirement, courts consider whether the class representatives are familiar with the action and 'whether they are of sufficient moral character to represent a class.'"  *Zivkovic v. Laura Christy LLC*, 329 F.R.D. 61, 71–72 (S.D.N.Y. 2018) (quoting *Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 125 (S.D.N.Y. 2011)).  Typicality "tend[s] to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about . . . conflicts of interest."[10]  *Falcon*, 457 U.S. at 158 n.13.

---

the significantly more expensive Peloton Hardware, these conflicts go to damages and, as discussed, thus do not bear directly on the issue of certification.

[10] Issues concerning the adequacy of class counsel are analyzed pursuant to Rule 23(g).  *See Kalish v. Karp & Kalamotousakis, LLP*, 246 F.R.D. 461, 463 (S.D.N.Y. 2007) ("The 2003 Amendments to Rule 23 changed [the adequacy of class counsel] framework somewhat, shifting the court's examination of the adequacy of counsel to coincide with its new duty to appoint class counsel under Rule 23(g).").

"The adequacy of the proposed class representative . . . directly implicates the due process rights of absent class members who will be bound by the judgment." *Gordon v. Sonar Capital Mgmt. LLC*, 92 F. Supp. 3d 193, 198 (S.D.N.Y. 2015) (citations omitted); *see also Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 519 (2d Cir. 2020) ("Rule 23's requirements of adequacy and typicality are intended to protect the due process rights of absent class members."); *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2d Cir. 1968) ("[C]ourts have expressed particular concern for the adequacy of representation in a class suit because the judgment conclusively determines the rights of absent class members."). Thus, "[t]he adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *AmChem Prods., Inc.*, 521 U.S. at 625. "To judge the adequacy of representation, courts may consider the honesty and trustworthiness of the named plaintiff." *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (citing *Kline v. Wolf*, 702 F.2d 400, 402–03 (2d Cir. 1983)); *cf. Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549 (1949) (explaining that, when a representative sues on behalf "of a class comprising all who are similarly situated[,] [t]he interests of all in the redress of the wrongs are taken into his hands, dependent upon his diligence, wisdom and integrity"). "Such considerations of trustworthiness and credibility . . . are restricted to their relevance to issues in the litigation." *In re NYSE Specialists Secs. Litig.*, 240 F.R.D. 128, 144 (S.D.N.Y. 2007). *See generally Fishon*, 2022 WL 179771, at *10.

Courts also consider the knowledge and involvement of class representatives in the adequacy analysis. "[T]he Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). "A class representative must 'not simply lend[] his name to a

ADD-321

suit controlled entirely by the class attorney,' as the class is 'entitled to an adequate

representative, one who will check the otherwise unfettered discretion of counsel in prosecuting

the suit.'"  *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. at 135 (quoting *Beck v. Status

Game Corp.*, 1995 WL 422067, at *4, 6 (S.D.N.Y. 1995)).  "To discharge this duty of control,

the class representative must possess a minimal degree of knowledge regarding the action and

also have a general understanding of the nature of class-action litigation."  *Scott v. New York City

Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 355 (S.D.N.Y. 2004) (citations

omitted).  Thus, "a class representative must be aware of the basic facts underlying the lawsuit

and not likely to abdicate his obligations to fellow class members."  *Gordon*, 92 F. Supp. 3d at

200 (internal quotation marks and citation omitted).  The Second Circuit has expressed a

"general disfavor of 'attacks on the adequacy of a class representative based on the

representative's ignorance.'"  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 42 (2d

Cir. 2009) (quoting *Baffa*, 222 F.3d at 61).  Only "where the class representatives have so little

knowledge of and involvement in the class action that they would be unable or unwilling to

protect the interests of the class against the possibly competing interests of the attorneys" can

"class certification . . . properly be denied."  *Maywalt v. Parker & Parsley Petroleum Co.*, 67

F.3d 1072, 1077–78 (2d Cir. 1995) (citation omitted); *see also Hawaii Structural Ironworkers

Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 212 (S.D.N.Y. 2021)

(Nathan, J.) ("[D]enial of class certification on the grounds of inadequacy should only occur in

the most extreme instances.").

### a.    Ishmael Alvarado

Defendant argues that Alvarado is inadequate because he has been uninvolved in the

lawsuit, lacks a basic understanding of his claims and responsibilities as a class representative,

and is dishonest, as evidenced by his inconsistent statements in this case and his criminal record.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 374 of 465
Case 1:19-cv-11711-LGS    Document 336    Filed 09/02/25    Page 374 of 465

ADD-322

Case 1:19-cv-11711-LJL    Document 284    Filed 05/02/23    Page 38 of 74

Dkt. No. 251 at 7. Named Plaintiffs counter that Alvarado has demonstrated that he understands

his role in the case and has a basic understanding of the claims. Dkt. No. 263 at 8–9. Further,

Named Plaintiffs argue that Alvarado's criminal history does not bear on his adequacy and the

inconsistencies in his testimony merely reflect the fallibility of memory. *Id.* at 9–10.

Alvarado's criminal history does not alone disqualify him from acting as class

representative. It is undisputed that Alvarado has a lengthy criminal history, including at least

seven convictions spanning thirty-five years. *See* Dkt. No. 256-4 at 5–6. He has been convicted

of peeping, breaking or entering, simple assault, first degree burglary, third-degree rape, second-

degree criminal trespass, third degree attempted burglary, public lewdness, and unlawful

surveillance. *Id.* However, as this Court has already noted, a person who has been convicted of

a crime is not, by virtue of that fact, forever disabled from acting as a class representative. *See*

Dkt. No. 220 at 2. Certain types of class actions could never be prosecuted if status as a

convicted criminal made a representative inadequate. Instead, a "clear nexus" must exist

between the conviction and the class claims. *Jones v. Ford Motor Credit Co.*, 2005 WL 743213,

at *19 (S.D.N.Y. Mar. 31, 2005). For example, courts have held proposed class representatives

to be inadequate where they have had convictions for fraud or other forms of dishonesty or

deception, or who had extensive and recent criminal histories. Dkt. No. 220 at 2 (collecting

cases). Defendant, acknowledging that Alvarado's criminal history "does not *alone* render him

inadequate," seeks to establish a "clear nexus" between Alvarado's criminal history and his role

as a class representative by arguing that this history reflects a "pattern of deception and false

statements." Dkt. No. 251 at 11 (emphasis in original). Defendant's argument might have some

force if Alvarado's convictions were more current and they spoke directly to whether Alvarado

could be entrusted with protecting the interests of the absent class members. However, the

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 375 of 465
Case 1:19-cv-11711-LGS    Document 336    Filed 09/02/25    Page 375 of 465

ADD-323

convictions that Defendant highlights are all from at least sixteen years ago and none appear to have required proof of any false statements. *Cf.* Fed. R. Evid. 609. As a result, Alvarado's criminal history does not make him inadequate.

However, Alvarado is an inadequate class representative for another reason. His demonstrated lack of understanding of the case and of his role and responsibilities make him an inadequate fiduciary for the interests of the absent class members. The record establishes that Alvarado's knowledge of these issues was wholly deficient. Though Alvarado understood that he was "representing other consumers of this product, which is our membership with Peloton," Dkt. No. 256-2 at 66, he did not understand what representing a class involves. He testified at his second deposition that he does not know what the responsibilities of a class representative involve. When asked whether he had "any responsibilities as a class representative," he responded "I don't understand the question. What do you mean 'responsibilities'? I'm responsible for providing food for my kids, paying rent, going to work, providing service to my clients. I don't know what it means to be responsible as a class action representative." *Id.* at 73. When he was again asked whether there are "any duties . . . that you're supposed to fulfill as a class representative," he answered flatly, "no." *Id.* at 74.

Named Plaintiffs try to minimize the impact of this deposition testimony. They point to the fact that Alvarado also testified that he has spoken to his lawyers at least a dozen times, *id.* at 89, and Alvarado's lawyer, Charles F. Dender, in a declaration, confirms these phone calls and attests to a vibrant texting relationship between the two of them, Dkt. No. 265 ¶¶ 4–8. But the due process concerns related to class representatives are not ameliorated by the quantity of communications between a named plaintiff and his counsel; if that were so, any attorney could satisfy these concerns through frequent contact with named plaintiffs, irrespective of the nature

of those contacts.  *See Baffa*, 222 F.3d at 62 (noting that district courts must not focus on "how many times" a named plaintiff meets with his attorneys and instead must focus on "the substance of these meetings . . . [and] what was accomplished during [these] meetings").  And in key respects, Alvarado's testimony suggests that his communications with his lawyers did not engage with the substance of the case.  He admitted that he has never reviewed the Third Amended Complaint or any other documents in this case.  Dkt. No. 256-2 at 77–79, 82–83.  And he testified that he submitted a signature page for his interrogatories before reviewing them and reviewed his interrogatories only "very briefly . . . [for] five minutes."  *See id.* at 49–52.  And he testified that his involvement in the lawsuit was primarily related to preparing for his two depositions.  *Id.* at 64–65.

   This is not a situation, as Dender suggests, where "had questions . . . been clarified to account for [Alvarado's] background as a non-lawyer, it would have revealed that [] Alvarado was familiar with all the documents he signed and that he can serve as a class representative in this matter."  Dkt. No. 265 ¶ 12.  Alvarado's lack of familiarity with legal concepts is not disabling; Alvarado is permitted to rely on his attorneys to understand important legal intricacies of the case.  *See Hawaii Structural Ironworkers Pension Tr. Fund, Inc.*, 338 F.R.D. at 212 (noting that in more complex cases, like securities actions, a named plaintiff "may properly depend on class counsel to understand the details of the case").  However, the deposition reveals that Defendant did ask Alvarado questions about his responsibilities as a class representative and the legal documents filed in this case in multiple ways and in plain English.  And yet Alvarado indicated that he did not know of his responsibilities and had not reviewed any of the legal documents.  Dender declares the opposite—that he and Alvarado "reviewed materials relevant to these proceedings and discussed in detail his duties as a class representative."  Dkt. No. 265

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 377 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 377 of 465

ADD-325

¶¶ 8–9.  In fact, Dender declares that they discussed these topics the day before Alvarado's

deposition.  *Id.*  But the fact that Dender discussed these topics with Alvarado does not suggest

that Alvarado is adequate to represent the interests of the class and to hold his lawyers to

account.  If anything, they suggest the opposite; at his deposition, Alvarado, who the day before

was apparently shown key documents and discussed his duties as a class representative, was

unable to recall his responsibilities or ever having reviewed the documents.

      "Once the action has been certified to proceed as a class action, it is incumbent on the

class representatives to be alert for, and to report to the court, any conflict of interest on the part

of class counsel, as for example, counsel's greater concern for receiving a fee than for pursuing

the class claims."  *Maywalt*, 67 F.3d at 1078.  Alvarado has not demonstrated that he understands

this weighty responsibility or that he has the willingness or ability to monitor class counsel.[11]

His deposition demonstrates the opposite.  The Court thus finds his representation inadequate.

### b.    Eric Passman

      The same, however, cannot be said about Passman.  Defendant argues that Passman is

inadequate because he has not reviewed key documents, lacks an understanding of the

allegations, and has given inconsistent answers at his deposition and in his declarations and

interrogatories.  Dkt. No. 274 at 1–3.  Named Plaintiffs counter that Passman is "an exceedingly

adequate class representative" who has demonstrated involvement in this case and adequately

understands the claims.  Dkt. No. 277 at 1–3.  The Court agrees with Named Plaintiffs that

Passman is adequate.

---

[11] Alvarado's inability to monitor counsel is supported by the fact that Alvarado was the
purported class representative in another action, *Alvarado v. Messerli & Kramer, P.A.*, No. 06-
cv-6197 (S.D.N.Y. Aug. 15, 2006), apparently without his knowledge.  *See* Dkt. No. 256-2 at
99–100.

ADD-326

Passman has demonstrated an adequate understanding of the facts of this case.  Although Passman at first said that the case was about music infringement, Dkt. No. 275-1 at 48, he understands how Peloton's alleged infringement is related to this case.  As he described it, Peloton removed "a lot of music from the Peloton library" and "the people that bought Peloton was expecting a whole library of music.  And they did not get that."  *Id.* at 48–49.  As a result, Passman testified, individuals suffered an injury because "[t]hey paid with the idea of getting X amount of music, X amount of songs, and they didn't get it."  *Id.* at 49.  Though perhaps not the most detailed or nuanced understanding of the claims in this case, Passman has demonstrated an understanding of the "basic facts underlying the lawsuit," *Gordon*, 92 F. Supp. 3d at 200 (internal quotation marks and citation omitted).  Thus, this is not a "flagrant case[], where the putative class representative[s] display[s] an alarming unfamiliarity with the suit."  *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 51 (S.D.N.Y. 2012) (internal citation omitted); *cf. Scott*, 224 F.R.D. at 356 (finding purported class representative inadequate because, *inter alia*, "he did not know what allegations were contained in the complaint").

Like Alvarado, Passman suggested that he has not reviewed key documents in this case.  *See* Dkt. No. 275-1 at 53–54 (acknowledging that he has not reviewed the Third Amended Complaint and other key filings or his declarations).  However, unlike Alvarado, Passman has demonstrated a knowledge of his responsibilities as a class representative.  Alvarado testified that his "role in this lawsuit . . . would be to ensure that the attorneys are, for lack of a better word, doing their jobs and involved in it and [to] keep other people abreast of what's happening, if that's necessary."  *Id.* at 43.  Nor do the minor inconsistencies between Passman's deposition and his declarations that Defendant identifies indicate that Passman is "so lacking in credibility that [he is] likely to harm the[] case," *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. at 51 (citation

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 379 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 379 of 465

ADD-327

Case 1:19-cv-11711-LJL    Document 284    Filed 05/02/23    Page 43 of 74

omitted).  *See Cazares v. AVA Rest. Corp.*, 2017 WL 1229727, at *6 (E.D.N.Y. Mar. 31, 2017)

("[I]nconsistencies or inaccuracies in the named plaintiff's statements may reflect either a

misunderstanding, or may raise an issue as to plaintiff's credibility, but do not necessarily

disqualify him as an adequate class representative.").  Thus, the Court concludes that Passman is

an adequate class representative under Rule 23(a)(4).  *See Hawaii Structural Ironworkers*

*Pension Tr. Fund, Inc.*, 338 F.R.D. at 213 (finding purported class representative adequate,

despite Federal Rule of Civil Procedure 30(b)(6) deponent's acknowledgment that he did not

read the complaint and inability to answer "important questions about the case," because he

demonstrated "an understanding of the basic facts that gave rise to this action as well [as] the

basic nature of the claims in this case" and "[m]ost importantly, he evinced an understanding of

how a class action works, the fact that [the named plaintiff] is a representative of this class action

and [the named plaintiff's] duties in that role, and affirmed [the named plaintiff's] willingness to

carry out those duties").

### B.    Rule 23(b) Requirements: Predominance

Two requirements must be satisfied before a class is certified under Rule 23(b)(3).  First,

common issues must predominate over individual issues.  "The 'predominance' requirement of

Rule 23(b)(3) 'tests whether proposed classes are sufficiently cohesive to warrant adjudication

by representation.'"  *Scott*, 954 F.3d at 512 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S.

at 623).  "The predominance inquiry is a core feature of the Rule 23(b)(3) class mechanism . . . .

Where individualized questions permeate the litigation, those 'fatal dissimilarit[ies]' among

putative class members 'make use of the class-action device inefficient or unfair.'"  *In re*

*Petrobras Secs.*, 862 F.3d 250, 270 (2d Cir. 2017) (quoting *Amgen Inc.*, 568 U.S. at 470).  It "is

satisfied 'if resolution of some of the legal or factual questions that qualify each class member's

case as a genuine controversy can be achieved through generalized proof, and if these particular

**ADD-328**

issues are more substantial than the issues subject only to individualized proof.'" *Id.* (quoting

*Moore*, 306 F.3d at 1252). "Predominance is not simply an exercise in tallying up issues; it is a

qualitative inquiry that entails 'careful scrutiny' of the nature and significance of a case's

common and individual issues." *Haley v. Tchrs. Ins. & Annuity Ass'n of Am.*, 54 F.4th 115, 121

(2d Cir. 2022) (quoting *In re Petrobras Secs.*, 862 F.3d at 271); *see also In re Petrobras Secs.*,

862 F.3d at 271 ("This analysis is 'more qualitative than quantitative,' and must account for the

nature and significance of the material common and individual issues in the case." (citations and

alteration omitted)). Second, a court must find that "a class action is superior to other available

methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"[T]he superiority determination involves, either explicitly or implicitly, a comparison of the

class action—representative litigation—as a procedural mechanism to available alternatives." 2

Newberg and Rubenstein on Class Actions § 4:64 (6th ed. 2022).

Named Plaintiffs argue that all core issues in this case—including the materiality of

Peloton's misrepresentations and omissions, whether these misrepresentations and omissions

were false, whether Peloton had a duty to disclose that it might remove classes from its library,

and whether Peloton injured the class members and the damages resulting from that injury—are

susceptible to common proof. *See* Dkt. No. 230 at 9–16. As a result, Named Plaintiffs contend

that the "common issues are more numerous and important—*i.e.*, they predominate—over any

hypothetical individual issues." *Id.* at 23. Defendant counters that individual issues predominate

with respect to falsity, materiality, injury, and damages. Dkt. No. 251 at 16–24. The Court finds

that because the questions of causation and injury and of damages are not common among the

putative class members, individual questions predominate and a Rule 23(b)(3) class cannot be

certified.

### 1.    Materiality and Falsity

As discussed, Defendant argues that the issue of materiality of the alleged misstatements and omissions is not susceptible to common proof because class members purchased different products, in different ways.  Dkt. No. 251 at 18.  The Court largely addressed Defendant's argument in its analysis of commonality and found that materiality is an objective inquiry subject to classwide proof.  *See supra* pp. 18–22; *see also Amgen Inc.*, 568 U.S. at 459 ("Because materiality is judged according to an objective standard, the materiality of . . . alleged misrepresentations and omissions is a question common to all members of the class.").  Defendant argues that the materiality of the Challenged Statement cannot be resolved on a common basis for all putative class members because Named Plaintiffs have not explained "how materiality can be measured with common proof."  Dkt. No. 251 at 18.  But Named Plaintiffs are not required to proffer at this stage the evidence that they will offer at trial to show that the Challenged Statement would be material to a reasonable consumer.  It is sufficient that the answer to the question of whether the Challenged Statement was material with respect to one member of the class will be identical with respect to every member of the class.  The "reasonable consumer" standard does not differ depending on which purchaser brings suit.  The question of materiality can thus be resolved "in one stroke."  *Wal-Mart Stores*, 564 U.S. at 350.  If the evidence offered by Named Plaintiffs fails to persuade the factfinder that the Challenged Statement would be material to a reasonable consumer, that conclusion will be binding on all putative class members.  "[W]hat [Peloton] alleges is a fatal similarity—an alleged failure of proof as to an element of the plaintiffs' cause of action."  *Amgen Inc.*, 568 U.S. at 470 (cleaned up); *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 457 (2016).  These questions are properly addressed to the factfinder at summary judgment or during a trial, not on a motion to certify the class.  *Amgen Inc.*, 568 U.S. at 470.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 382 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 382 of 465

ADD-330

The same is true of falsity, which the Court has also found demands an objective inquiry common to the purported class.  *See supra* pp. 22–25.  Thus, the falsity analysis also represents a question common to the class, which will stand or fall based on the proof the Named Plaintiffs are able to muster at summary judgment and trial.

### 2. Misrepresentation: Causation and Injury Resulting From the Challenged Statement

Named Plaintiffs argue that both the purported class's injury and its damages are common questions susceptible to common proof.  *See* Dkt. No. 230 at 12–16.  Specifically, they contend that Dennis's conjoint analysis establishes that there was a "price premium attributable to Peloton's misrepresentations and omissions that can be shown with class-wide evidence" and that damages can be established solely by reference to the statutory damage provisions of Sections 349 and 350.  *Id.* at 15–16 (citing NYGBL §§ 349(h), 350-e(3)).  Defendant counters that Dennis's and Weir's analyses do nothing to establish that "a price premium actually existed"—that is, that the class members were injured—because they do not consider the class's exposure to the alleged misrepresentation and the damages model suffers from irreconcilable flaws, including a failure to consider supply side factors and to isolate the impact of the Challenged Statement.  Dkt. No. 251 at 19–20 (citation omitted).  The Court agrees with Defendant and finds that Named Plaintiffs' failure to offer evidence that the Challenged Statement caused a price premium—or to propose a methodology which could be used to demonstrate a price premium—and their failure to propose a model capable of measuring the damages attributable to their theory of liability demonstrate that they have not carried their burden of establishing that causation, injury, and damages are common issues susceptible to common proof.  As a result, predominance is defeated.  In this subsection, the Court addresses

the parties' arguments with respect to causation and injury; in the following subsection, it
addresses their arguments with respect to damages.

A plaintiff in an action brought under NYGBL Sections 349 and 350 can plead injury and
causation "in at least one of two ways."  Dkt. No. 207 at 25.  First, she "can plead that she was
exposed to a material deceptive act and relied on that misrepresented fact to her detriment."  *Id.*
In such a case, the "plaintiff is directly injured when she pays a higher price than she otherwise
would have paid based on her belief in the fact that is misrepresented."  *Id.* (citing *Rodriguez v.
Hanesbrands Inc.*, 2018 WL 2078116, at *4–5 (E.D.N.Y. Feb. 20, 2018), *report and
recommendation adopted*, 2018 WL 1686105 (E.D.N.Y. Mar. 30, 2018)).  Alternatively, a
plaintiff can pursue a "price premium" theory of injury and causation "by alleging that the
defendant's misleading or deceptive advertising campaign caused a price premium, that the price
premium was charged both to those who saw and relied upon the false representations and those
who did not, and that, as a result of the price premium, plaintiff was charged a price she would
not otherwise have been charged but for the false campaign."  *Id.* at 26.  Under the price-
premium theory, the plaintiff is injured by purchasing products in a market where costs are
artificially inflated by defendant's false or misleading representations.  These two theories of
injury are alternatives to one another; a plaintiff who has purchased at a price that has been
inflated by defendant's statement need not also show that she personally relied on the
misrepresentation.  Under the price-premium theory, however, the plaintiff must still show that
the alleged misstatement *caused* the price premium.  *See Weiner*, 2010 WL 3119452, at *5 ("[A]
private action brought under § 349 does not require proof of actual reliance.  The plaintiff,
however, must show that the defendant's material deceptive act caused the injury." (alteration in
original and internal quotation marks omitted) (first quoting *Pelman ex rel. Pelman v.*

ADD-332

*McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) and then quoting *Stutman v. Chem. Bank*, 731 N.E.2d 608, 612 (N.Y. 2000))); *see also In re AXA Equitable Life Ins. Co. COI Litig.*, 2020 WL 4694172, at *11 (S.D.N.Y. Aug. 13, 2020) (concluding, when analyzing a statute "substantially similar" to the one at issue here, that the price-premium theory of liability is a "theory of causation").

Named Plaintiffs in this case pleaded sufficient facts to allege that they suffered an injury as a result of a price premium charged by Defendant. The Court accordingly refused to dismiss their Sections 349 and 350 claims for Defendant's affirmative misrepresentation on those grounds.[12] Dkt. No. 207 at 32–33. The existence of a price-premium thus is critical to Named Plaintiffs' motion for class certification, as Named Plaintiffs acknowledge. *See* Dkt. No. 230 at 21–22. If Named Plaintiffs can demonstrate that a price premium existed, then whether or not any individual class member saw and relied on the Challenged Statement in purchasing Peloton products becomes irrelevant. Each putative class member would suffer an injury by virtue of purchasing at a price that was artificially inflated by the market-wide impact of the Challenged Statement and this injury might be susceptible to common proof and calculation. If, on the other hand, there was no price premium or there is no way to show that there was a price premium, then individual questions would predominate. However, the price-premium theory does not absolve Named Plaintiffs of the obligation to demonstrate that at least some class members saw the alleged misrepresentation and paid a price greater than what they otherwise would have been willing to pay based on the misrepresentation. If the misrepresentation did not affect the

---

[12] Named Plaintiffs thus assert a price-premium theory of liability at the class-certification stage. *See* Dkt. No. 230 at 12 ("Plaintiffs' theory of liability is that Defendant's misrepresentations caused consumers to pay a price premium for its bikes, treads, and subscriptions. In other words, Plaintiffs allege that all Class members were harmed, because they paid a premium for an 'ever-growing' library that they did not receive.").

purchasing decision of any member of the putative class, then there could not have been a price

premium that affected all members of the class.  Thus, the members of the putative class whom

Named Plaintiffs seek to represent would have the right to show that she actually relied on the

Challenged Statement to her detriment and Defendant would have the right to show, as to that

individual purchaser, that she did not actually take notice of or rely on it when purchasing

Peloton products.  *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283 (2014)

(finding, in the securities class action context, that "[t]here is no dispute that at least such indirect

proof of price impact [which, as discussed below, is analogous to the "price premium" advanced

by Named Plaintiffs here] is needed to ensure that the questions of law or fact common to the

class will predominate." (internal quotation marks omitted) (quoting *Amgen Inc.*, 568 U.S. at

467)); *Marotto v. Kellogg Co.*, 2020 WL 509035, at *2 (S.D.N.Y. Jan. 31, 2020) (refusing to

certify a class when the offending statement appeared in "microscopic text . . . on the back of

only 20% of released labels" because the plaintiff "provided no evidence that a price premium

exists based on the alleged misrepresentations"); *Weiner v. Snapple Beverage Corp.*, 2010 WL

3119452, at *10 (S.D.N.Y. Aug. 5, 2010) (holding that predominance requirement not met when

plaintiffs failed to offer appropriate methodology to demonstrate price-premium theory of

causation and injury because, as a result, "individual issues concerning causation and injury

would be so substantial and burdensome that it cannot be said that common issues

predominate").

Defendant has presented both affirmative evidence that the Challenged Statement did not,

in fact, cause a price premium and it has presented compelling evidence that Named Plaintiffs

have failed to carry their burden in the predominance analysis of demonstrating that a price

premium existed.  Unlike in many false advertising cases, where the allegedly false statement

ADD-334

appears directly on the product label or packaging and the consumer thus would inevitably be exposed to the statement at the point of purchase, *see, e.g.*, *Mantikas*, 910 F.3d at 634 (Cheez-It crackers package labeled with "whole grain" or "made with whole grain"), no purchaser of a Peloton product need have been exposed to the Challenged Statement and the evidence suggests that many of the purchasers were not exposed to the Challenged Statement.  The Challenged Statement did not appear in every Peloton advertisement and did not appear on all of Peloton's marketing materials.  Rather, the Challenged Statement appeared in a relatively small subset of Peloton's advertisements, *see* Dkt. No. 253-4 (appendix of sample advertisements), and did not appear in any television advertisements, *see* Dkt. No. 250-10 at 136, which represented Defendant's largest advertising channel during the Class Period, *see* Dkt. No. 253-9.  The Challenged Statement also appeared on only four of the 269 pages of Pelton's website, onepeloton.com, the primary place where consumers purchase Peloton products.  *See* Dkt. No. 232-41; Dkt. No. 232-4 at ECF p. 25.

Moreover, even when the Challenged Statement appeared in Defendant's advertising or marketing materials, it did not appear alone or as the most prominent marketing message.  It appeared in the context of other marketing messages.  Named Plaintiffs point, for example, to one of Peloton's webpages that contained the Challenged Statement, but that webpage read: "Experience unlimited access to the world's best instructors anytime, anywhere, with 15+ daily live classes and an ever-growing library of 9,000+ classes available on-demand."  Dkt. No. 230 at 2; *see also, e.g.*, Dkt. Nos. 232-14, 232-15, 232-15, 232-16, 232-17.  Through this one example, the breadth of the messages that Defendant portrayed in each advertisement becomes apparent.  It is true that Defendant conveyed the Challenged Statement (that there was an "ever-growing" library), but Defendant also communicated that a Peloton Membership offered

ADD-335

unlimited access to instructors anytime and anywhere, that the instructors were the "world's best," that a purchaser of a Peloton product would gain access to over fifteen live classes each day and an existing library of over 9,000 classes on-demand.  Each of those statements conveyed a marketing message of potential value to Peloton purchasers, and Named Plaintiffs do not assert that any of those statements were, at the time they were made, false.  There is no inherent reason why a potential Peloton purchaser would have notice and ascribed value to the statement that the library was "growing," in the face of all the other features available to those who purchase Peloton Memberships.

In fact, Defendant has offered persuasive expert evidence that very few viewers of the Peloton website (where the Challenged Statement appeared) actually noticed the Challenged Statement and that there is no reason to believe that they ascribed any significance to it.  Defendant's expert Rebeca Kirk Fair conducted a survey in an attempt to measure "whether and to what extent consumers notice the at-issue 'ever-growing' language of Peloton's on-demand class library."  Dkt. No. 247 ¶ 18.  Kirk Fair is a Managing Principal at the Analysis Group, Inc., a consulting firm.  *Id.* ¶ 4.  She received a Bachelor of Arts from Middlebury College and a Master of Business Administration in finance and applied economics from the MIT Sloan School of Management.  *Id.*  She has worked on 350 intellectual property, false advertising, class certification, and antitrust litigations and investigations, and has served as an expert witness in matters involving the design, implementation, and analyses of consumer surveys, studying usage, preferences, and perceptions among businesses and consumers, and statistical sampling.  *Id.* ¶¶ 5, 7.  For this case, Kirk Fair conducted two surveys, one for the Peloton Bike and the other for the Peloton Membership.[13]  *Id.* ¶¶ 28, 39.  The test and control groups in the Peloton Bike survey

---

[13] Kirk Fair refers to the survey for the Peloton Membership as a survey for "the Peloton App."

were shown webpages advertising the Peloton Bike and the test and control groups in the Peloton

Membership survey were shown webpages advertising the Peloton Membership. *Id.* ¶ 28. The

webpages shown to the test and control group in each survey were identical in every respect,

except the control group was shown a webpage without the Challenged Statement, while the test

group was shown the same webpage with the Challenged Statement. *Id.* ¶¶ 27–28, 31–32.

Named Plaintiffs have not challenged either Kirk Fair's credentials or her methodology.[14]

        The results of her analysis are powerful. Kirk Fair found that only 0.7% of the Peloton

Bike test group and 1.3% of the Peloton Membership test group noticed the Challenged

Statement and that there was no statistically significant difference between the two groups with

respect to their conclusions about the Peloton products after viewing the webpages. *Id.* ¶ 43.

Kirk Fair's analysis thus suggests that even if a large proportion of Peloton consumers saw the

_See, e.g._, Dkt. No. 247 ¶ 22. However, in context, it is clear that the Peloton App that Kirk Fair
references is the Peloton Membership that Named Plaintiffs identify in their Third Amended
Complaint. _Compare id._ ¶ 32 (showing webpage for library of classes, including strength, yoga,
and outdoor running classes), _with_ Third Amended Complaint ¶ 5 ("The Peloton Membership's
content is coextensive across all platforms and includes the same live and on-demand bike,
treadmill, free weight, yoga, and other fitness classes on both the Peloton Hardware and other
devices.")

[14] Named Plaintiffs present evidence, through a reply declaration of Dennis, that Kirk Fair's
survey is flawed. _See_ Dkt. No. 271 ¶¶ 120–73. In summary, Dennis argues that (1) survey
participants are not as attentive to language as those actually considering purchasing Peloton
products, _id._ ¶ 130; (2) the respondents already had formed beliefs about Peloton products and
thus were not receptive to new messages, _id._ ¶¶ 131–32; and (3) Kirk Fair's filtering
methodology depressed the number of respondents that would have indicated they noticed the
"ever-growing" claim, _id._ ¶¶ 133–37. He thus concludes that these "flaws . . . render her data
useless for assessing [Named] Plaintiffs' allegations." _Id._ ¶ 129. Notably, Named Plaintiffs do
not seek to exclude Kirk Fair's survey under _Daubert_. The critiques thus go to the weight of
Kirk Fair's analysis and not to whether her analysis should be considered at all. _See Gucci Am.,
Inc. v. Guess?, Inc._, 831 F. Supp. 2d 723, 739 (S.D.N.Y. 2011) ("[E]rrors in survey methodology
usually go to weight of the evidence."). And, as discussed, Named Plaintiffs have not carried
their burden and provided no evidence to the contrary that would suggest that consumers would
have recognized and assigned value to the Challenged Statement in context.

Challenged Statement on Peloton's website, as Named Plaintiffs contend, they did not focus on the Challenged Statement and ascribe any value to it.

Finally, as previously noted, Named Plaintiffs' own survey suggests that individuals who saw the Challenged Statement ascribed different meanings to that statement. Dennis, Named Plaintiffs' expert, conducted a consumer perceptions survey that measured how respondents interpreted the Challenged Statement. *See* Dkt. No. 227 ¶¶ 83–94. The survey found that 76.5% of respondents interpreted the Challenged Statement to mean that the number of classes in the Peloton library would increase over time. *Id.* ¶¶ 86, 88. Of these respondents, 61.8% expected the number of classes to increase because no classes would be removed from the library, while 31.4% believed that more classes would be added than removed. *Id.* ¶¶ 89–90. Finally, the 76.5% of respondents differed as to whether they thought that the number of classes would increase each day, week, month, or year: 79.8% interpreted the statement to mean the number of classes would increase each day, week, or month, while 3.7% thought the increase would be annual (the remainder had no view). *Id.* ¶¶ 92–93. The Court has found that this evidence is not fatal to the question of whether materiality presents a common question at this stage; materiality is an objective inquiry and thus subject to common proof. *See supra* at 18–22. But this evidence does bear on whether the Challenged Statement could have caused a price impact. That many had differing views over what the Challenged Statement meant and took different meaning from it suggests both that the statement did not have a powerful marketing impact and that those who saw the Challenged Statement may not have interpreted it in such a way as to give rise to a price premium. In summary, to establish that there was a price premium, Named Plaintiffs would have to demonstrate: (1) that advertising and marketing materials containing the Challenged Statement were seen by sufficient consumers; (2) that those consumers recognized the Challenged

Statement among the other messages communicated by the advertising and marketing materials; (3) that the consumers who recognized the Challenged Statement interpreted it in such a way that it was false or misleading; and (4) that the consumers assigned value to the Challenged Statement.  Defendant has presented compelling evidence that none of these conditions hold, which Named Plaintiffs have not adequately refuted.

In fact, Defendant has presented evidence that there could not have been a price premium as a result of the Challenged Statement.  The price of each of the Peloton Membership, Peloton Bike, and the Peloton Tread remained constant both before, during, and for almost eighteen months after the Class Period.  *See* Dkt. No. 244 ¶ 98.  In particular, the price for the Peloton Membership, the Peloton Bike, and the Peloton Tread did not increase after Defendant first made the Challenged Statement in May 2016.  *See id.* ¶ 99 & fig. 6.  Nor did the price decrease for eighteen months after Defendant removed the classes in March 2019 and for the five months after Defendant ceased to make the Challenged Statement in April 2020.  *Id.*  Defendant added monthly subscribers to its Peloton Hardware products at approximately the same rate both before and after the classes were removed from the library.  *Id.* ¶ 100 & fig. 7.  Those results could perhaps be explained away if there were other confounding factors, including if Defendant offered something additional of value to consumers after the takedown or if sales fell markedly. *See* Dkt. No. 272 ¶ 77 (statement of Named Plaintiff's expert, Weir, that data is unreliable because Defendant did not "control[] for . . . confounding factors.").  But, contrary to the assertion by Named Plaintiffs, Defendant's expert analysis looked to whether there were any such confounding factors and found none.  *See id.* ¶ 96 ("[T]here is no evidence of offsetting impacts from other economic factors, such as changes in Peloton's advertising expenditures and changes in the prices of products of key competitors, that would mask the claimed price

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 391 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 391 of 465

ADD-339

premium.").  Named Plaintiffs argue that Defendant could have presented a more robust

methodology.  However, it is not Defendant's burden to demonstrate that there was no price

premium.  The burden of demonstrating that there was a price premium (and thus that the

predominance requirements of Rule 23(b)(3) have been met) falls squarely on Named Plaintiffs.

*See Johnson*, 780 F.3d at 137 ("The party seeking class certification bears the burden of

establishing by a preponderance of the evidence . . . each of Rule 23's requirements.").  And

Named Plaintiffs have not presented any evidence that suggests that there were confounding

factors that would have affected the price of Peloton products in such a way as to precisely offset

the price impact of the Challenged Statement.  Defendant's analysis is strongly suggestive of the

conclusion that there was no price impact.

The evidence that Named Plaintiffs do offer to support the argument that there was a

price premium as a result of the Challenged Statement is not convincing.  Named Plaintiffs point

to Dennis's conjoint analysis and to data from a web-traffic analytics provider to support their

claim that a price premium existed for Peloton products.  But, while Dennis's survey may have

sufficient analytic rigor for the Court to consider it on the motion for class certification (and thus

for it to have been found relevant and reliable under *Daubert* at this stage), it is not sufficient to

show that there was a price premium and does not represent to a methodology by which a price

premium could be demonstrated.  Dennis conducted a conjoint survey, to measure the extent to

which the market-clearing price for Peloton Bikes and Memberships would have been different

in the but-for scenario in which Defendant did not use the "ever-growing library" representation

in its advertising and marketing.  Dkt. No. 227 ¶ 23.  He used the conjoint survey, which reveals

a participant's willingness to pay for specific attributes of the Peloton products, including those

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 392 of 465
Case 1:19-cv-11711-LGS    Document 536    Filed 09/02/25    Page 392 of 465

ADD-340

Case 1:19-cv-11711-LJL    Document 284    Filed 05/02/23    Page 56 of 74

referenced in the Challenged Statement, to calculate a price premium for the Peloton Bike and Peloton Membership of 15.4% and 27.7%, respectively.  *Id.* ¶ 78.

Dennis's analysis, however, does not show that there was a price premium associated with or caused by the Challenged Statement because he presumed that individuals who purchased Peloton products saw and noticed the Challenged Statement such that a price premium could have existed.  Dennis's survey presumes that consumers noticed the Challenged Statement in advertisements and marketing materials and used this assumption to calculate a price premium based on the Challenged Statement.  *See id.* ¶ 74 (noting that his calculation of the price premium measured "the straightforward scenario whereby a consumer makes a purchase between two products—one with the challenged 'ever-growing library' representation and the identical product without the representation").  And, as discussed, this presumption is not supported by the evidence.  If an insufficient number of consumers saw or noticed the Challenged Statement, there would not have been a price premium at all and Dennis's model (which assumes, by design, that individuals saw the Challenged Statement) could not be used to demonstrate that a price premium existed.  Dennis contends that

> [T]o the extent continued discovery requires me to duplicate my methodology with different inputs regarding the then-known percentage of plaintiffs that did see the challenged language, that is something that can be done.  That is, research questions regarding the percentage of Peloton customers that did see the challenged language does not constitute a criticism of the reliability of my conjoint survey analysis.  It is merely one of adjusting the input for that percentage as the case develops.

*Id.* ¶ 29.  But whether or not the faulty assumption that Peloton consumers noticed the Challenged Statement is a valid "criticism" of Dennis's *methodology* is beside the point.  Dennis's methodology does not, and cannot, demonstrate whether Peloton customers were exposed to the Challenged Statement and, if they were exposed to the Challenged Statement, noticed it among the other advertising and marketing materials.  Thus, while Dennis's model

might be used to demonstrate the size of the price premium if a price premium exists, it says nothing about the threshold question of whether sufficient consumers recognized the Challenged Statement such that a price premium existed.  As Defendant's expert Strombom put it, "neither Mr. Weir nor Dr. Dennis provides any reliable methodology to determine what portion, if any, of the putative class was exposed to and aware of the Challenged Statement, let alone demonstrate that a sufficient number of the putative class were exposed to and aware of the Challenged Statement such that there could be any measurable price premium associated with the Challenged Statement at all."  Dkt. No. 244 ¶ 92.

Dennis argues in his reply declaration that he was not required to determine if a sufficient number of consumers saw the Challenged Statement for there to have been a price premium.  *See* Dkt. No. 271 ¶ 26 ("I am not obligated as the consumer survey research expert to prove that class members were exposed to and considered the challenged 'ever-growing library' claim.  As I understand the scope of my assignment as testifying consumer survey research expert, I am justified in assuming that the Defendant committed the harmful act of using the 'ever-growing library' language in its marketing and advertising.").  While it might not have been Dennis's responsibility based on his contract with Named Plaintiffs to determine whether sufficient class members were exposed to the Challenged Statement such that a price premium existed, it was Named Plaintiffs' burden to do so.  Named Plaintiffs have not met that burden, either with Dennis's testimony or with the testimony of another expert.

Dennis's conjoint analysis suffers from another fatal flaw; even assuming that the Challenged Statement was seen by all Peloton customers, Dennis's model does not establish that the price premium he calculates is attributable to the Challenged Statement.  Dennis's survey analyzed the price premium resulting from the statement "Ever-Growing Library of Classes."

ADD-342

*See* Dkt. No. 227 ¶ 60; *see also* Dkt. No. 258-2 at 153 ("My survey clearly does what it does. I test the phrase 'ever-growing library of class.' . . . I'm not testing the specific phrase 'ever-growing.'"). It thus measured the value that a consumer would place on two different representations: The fact that a purchaser of a Peloton product will have access to a library of classes and the fact that this library of classes will be "ever-growing." However, Named Plaintiffs do not dispute that Defendant's library of classes offers its customers significant value. *See, e.g.*, Third Amended Complaint ¶ 5 (acknowledging that the very purpose of a Peloton Membership, and by extension Peloton Hardware, is to access Peloton's "on-demand fitness library"); *id.* ¶¶ 1, 15. To the degree that Named Plaintiffs' theory is that consumers derive additional value from the fact that the library is "ever-growing," Dennis's model does not prove that theory because it does not disentangle the library of classes that was Peloton's innovation from the fact that this library was "ever-growing." Thus, from the model that Named Plaintiffs have offered, it is impossible to determine what portion, if any, of the price premium it calculates for the Peloton Bike and Peloton Membership is attributable to the Challenged Statement. The model thus cannot carry Named Plaintiffs' burden of demonstrating that a price premium exists as a result of the Challenged Statement, and thus that injury and causation are susceptible to common proof.

In their briefing and at argument, Named Plaintiffs sought to cure this deficiency in their analysis with evidence of website traffic data, which they argue "supports . . . a finding" that "a sufficient number of putative class members have been exposed to Peloton's misrepresentation to warrant a price premium." Dkt. No. 267 at 14–15. Specifically, Named Plaintiffs present data from Semrush, Inc., a data analytics provider that monitors, compiles, and analyzes website traffic data. *See* Dkt. No. 232 ¶ 41; Dkt. No. 232-41. The data suggests that between July 2017

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 395 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 395 of 465

ADD-343

Case 1:19-cv-11711-LJL    Document 284    Filed 05/02/23    Page 59 of 74

through June 2019, a period that does not correspond to the Class Period, there were

approximately 4.5 million unique visitors to Defendant's webpages that contained the

Challenged Statement.  Dkt. No. 232-41.  During this time, Defendant sold approximately

360,000 Peloton Bikes and Peloton Treads.  Dkt. No. 250-9.  Named Plaintiffs thus argue that

they have met their burden that a sufficient number of consumers were aware of the Challenged

Statement for the Court to conclude that a price premium existed.  *See* Dkt. No. 230 at 22.

The Semrush, Inc. data, however, does not establish that any individuals who purchased a

Peloton product saw the Challenged Statement, much less that they noticed the Challenged

Statement, before making the purchase.  The Semrush, Inc. data suggests that between

approximately 5.5% and 10.99% of the individuals who visited Defendant's website between

July 2017 and June 2019 viewed the four webpages that contained the Challenged Statement:

5.55% individuals who visited Peloton's website visited www.onepeloton.com/shop/bike, 2.62%

persons visited www.onepeloton.com/tread, 1.64% persons visited www.onepeloton.com/digital,

and 1.18% visited www.onepeloton.com/financing.  Thus, assuming that no two individuals

visited more than one of these webpages, at most, 10.99% of those who visited Defendant's

website could have been exposed to the Challenged Statement.  But that evidence does not

establish that these individuals were actually exposed to the Challenged Statement, and, if they

did, that they noticed the Challenged Statement among the other marketing and advertising

messages such that they assigned it any value.  The data also does not establish whether any of

the individuals who visited the websites purchased a Peloton product or did so proximate to the

visit, such that the Challenged Statement would have made a difference in the purchasing

decision.  Thus, even if the data could be established that some number of individuals who

purchased a Peloton product during the Class Period visited one of the four webpages in advance

ADD-344

of the purchasing decision, it does not establish that the Challenged Statement was at all relevant to the purchasing decision such that the Challenged Statement caused a price premium for Peloton products.

In response, Named Plaintiffs argue that "Peloton's criticisms of Plaintiffs' experts—including that, in Peloton's view, not enough people were exposed to the misrepresentation to impact price—are more appropriately reserved for trial." Dkt. No. 263 at 7. They note that fact discovery in this case is still open. Dkt. No. 282 at 20. The Court rejects that argument on both factual and legal grounds.

As a matter of fact, Named Plaintiffs have had ample time and opportunity to develop the evidence of that there was a price premium as a result of the Challenged Statement, if such evidence exists. On February 20, 2020, the Court approved a two-stage fact-discovery process, including roughly six months of discovery geared towards "threshold issues related to class certification and the scope of the case." Dkt. No. 25 at 2. The Court recognized that the discovery would be extensive and would "require the collection, review, and production of Peloton's corporate records and likely will involve multiple Peloton custodians." *Id.* On July 9, 2020, the Court extended the time allowed for class-certification discovery significantly to "be completed by 12 weeks after ruling on Defendant's Motion to Dismiss." Dkt. No. 53 at 2. The Court granted two more extensions of fact discovery for class certification until August 16, 2021. *See* Dkt. No. 95. After the Court denied class certification on January 19, 2022, it stayed further discovery pending its decision on the motion to dismiss the Third Amended Complaint. *See* Minute Entry, May 9, 2022. After its August 11, 2023 Opinion and Order, the Court permitted limited additional class discovery of the two Named Plaintiffs. Dkt. No. 212.

Case 1:19-cv-11711-LJL    Document 284    Filed 05/02/23    Page 61 of 74

Named Plaintiffs would have known that the Court expected evidence to be presented in the motion for class certification that there was a price premium and generally what form that evidence would need to take.  In its August 11, 2022 Opinion and Order, the Court foreshadowed the showing required to establish that there was a price premium and thus that Named Plaintiffs suffered an injury caused by Defendant's misrepresentation.  As the Court held, Named Plaintiffs must show that "Defendant made misrepresentations that would have mislead a reasonable consumer, that those misrepresentations were consumer-facing and had broad impact, and that as a result of those widespread misrepresentations that mislead reasonable consumers, they paid higher costs."  Dkt. No. 207 at 32–33; *see also id.* at 17 n.6 ("To establish an injury on a price premium basis, Plaintiffs will have to prove that sufficient consumers were aware of the advertised but false 'unique quality' and assigned value to it such that the misrepresentation affected the price.").  But Named Plaintiffs did not present this evidence in its motion for class certification despite having roughly two years of discovery to gather it.  If Named Plaintiffs miscalculated by not submitting discovery requests geared towards demonstrating a price premium, the Court cannot save them from this miscalculation.  *Cf. Ritchie Risk-Linked Strategies Trading (Ir.), Ltd. v. Coventry First LLC*, 282 F.R.D. 76, 79 (S.D.N.Y. 2012) ("A party seeking to reopen expert discovery must show that the tardy submission of its desired expert report was not caused by the party's own lack of diligence."); *see also Rubik's Brand Ltd. v. Flambeau, Inc.*, 329 F.R.D. 55, 58 (S.D.N.Y. 2019) (same); *Fournier v. Erickson*, 253 F. Supp. 2d 664, 665 (S.D.N.Y. 2003) (refusing to reopen discovery because "no suitable explanation as to why [the requested] deposition was not pursued at the appropriate time has been provided").

ADD-346

More fundamentally, as a matter of law, Named Plaintiffs were required to offer evidence that there are common questions of fact and law under Rule 23(a) and that these questions predominate under Rule 23(b)(3), not merely a theory on which common issues could be based. This requirement is not new; as the Supreme Court reiterated in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Id.* at 250 (quoting *Falcon*, 457 U.S. at 160). Specifically, the Court held that Rule 23(a) requires a "rigorous analysis" that "[f]requently . . . will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc.*, 564 U.S. at 350–51 (citation omitted). "The same analytical principles govern Rule 23(b)." *Comcast Corp.*, 569 U.S. at 34. Although "[m]erits questions may . . . only [be considered] to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied," *Amgen Inc.*, 568 U.S. at 466, as this Court found, whether or not a price premium exists goes to the heart of whether individualized questions of fact and law predominate over common ones, and thus whether certification is appropriate. It should have come as no surprise to Named Plaintiffs that the Court would have to examine the merits with respect to whether a price premium existed for Peloton products at the class-certification stage, and that they bore the burden of demonstrating that a price premium existed.

Nor is the requirement to demonstrate a price premium at the class-certification stage unique to NYGBL claims. Securities-fraud class actions represent an analogous context where the Supreme Court has squarely held that this determination is appropriate at the class-certification stage. In securities-fraud class actions members of the class claim that they have been defrauded into purchasing securities based on a market-wide price impact resulting from a defendant's misrepresentation  Although the framing of the issue and the nature of the analysis

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 399 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 399 of 465

ADD-347

Case 1:19-cv-11711-LJL    Document 284    Filed 05/02/23    Page 63 of 74

differs in the two contexts, the factual question presented is essentially the same: whether the

misrepresentation or omission infected market prices such that injury can be demonstrated by a

market-wide increase in price.[15]   In *Basic v. Levinson*, 485 U.S. 224 (1988), the Court held that

plaintiffs could demonstrate reliance in securities class actions brought under Rule 10b–5 either

by demonstrating direct, individualized reliance on a misrepresentation, *see id.* at 242; *see also*

*Amgen Inc.*, 568 U.S. at 461 ("'The traditional (and most direct) way' for a plaintiff to

demonstrate reliance 'is by showing that he was aware of a company's statement and engaged in

a relevant transaction . . . based on that specific misrepresentation.'" (citation omitted)), or by

asserting a rebuttable "presumption of reliance" based on the notion that the fraud impacted the

market and caused a price increase, *id.* at 248–50; *see also Halliburton Co.*, 573 U.S. at 269

(rejecting defendant's contention that "plaintiffs should *always* have to prove direct reliance and

that the *Basic* Court erred in allowing them to invoke a presumption of reliance instead"

(emphasis in original)).   This rebuttable presumption of a price impact is similar to the price-

premium theory that Named Plaintiffs advance here.   The fraud-on-the-market presumption is

premised on there being a market-wide "price impact" caused by the alleged misrepresentation.

*See Basic*, 485 U.S. at 247.   Because "[a]n investor who buys or sells stock at the price set by the

market does so in reliance on the integrity of [a] price" that reflects publicly available

---

[15] Securities fraud cases are based on principles of the common law of fraud.  *See Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*, 747 F. Supp. 2d 406, 414 (S.D.N.Y. 2010), *aff'd sub nom. Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 F. App'x 636 (2d Cir. 2012) ("Courts in the Second Circuit have found that the elements of common law fraud are 'essentially the same' as those that must be pleaded to establish a claim under Section 10(b) and Rule 10b–5." (citation omitted)).  There are also important similarities between New York's consumer-fraud statute and common-law fraud.  *See Gaidon v. Guardian Life Ins. Co. of Am.*, 725 N.E.2d 598, 603, 606 (1999) (noting that "[a]lthough General Business Law § 349 claims have been aptly characterized as similar to fraud claims," they are "critically different" because common-law fraud requires a plaintiff to prove scienter).

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 400 of 465
Case 1:19-cv-11711-LGS   Document 536   Filed 09/02/25   Page 400 of 465

ADD-348

Case 1:19-cv-11711-LJL   Document 284   Filed 05/02/23   Page 64 of 74

information, "reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b–5 action." *Id.* But, as the Supreme Court made clear in *Halliburton Co. v. Erica P. John Fund, Inc.*, it is both appropriate and necessary at the class-certification stage for courts to examine indirect evidence that a defendant's misrepresentation had a price impact, and direct evidence[16] that no such price impact existed, even "though such proof is also highly relevant at the merits stage." *Halliburton Co.*, 573 U.S. at 283. That is because the question of whether there is a price impact is fundamental to the predominance analysis under Rule 23(b) and thus the existence of a price impact "must . . . be proved at the class certification stage." *Id.* at 282; *see also id.* at 283 (noting that whether a price impact exists "has everything to do with the issue of predominance at the class certification stage").

A similar conclusion follows here. Named Plaintiffs rely on a price-premium theory to overcome what would otherwise be an individualized inquiry requiring each member of the putative class to demonstrate actual reliance on the Challenged Statement. That individualized inquiry would defeat predominance under Rule 23(b)(3) and thus class certification. *See supra* pp. 48–49; *Marotto*, 2020 WL 509035, at *2; *Weiner*, 2010 WL 3119452, at *10. If the Court is to saddle Defendant with the potentially *in terrorem* effect of class certification, *see AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011) (noting "the risk of 'in terrorem' settlements that class actions entail" (citation omitted)); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d at 545 (noting, in the context of Rule 23(b)(3)'s superiority requirement, that arguments for superiority are "properly evaluated against a concern regarding

---

[16] This direct evidence includes "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, [which is] sufficient to rebut the presumption of reliance." *Halliburton Co.*, 573 U.S. at 269 (alteration in original) (quoting *Basic*, 485 U.S. at 248).

ADD-349

the *in terrorem* effect that a certified class may have"), and with the "hydraulic pressure" to

settle such lawsuits, *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 148 (2d Cir.

2001) (Jacobs, J., dissenting),[17] and if the Court is to saddle members of the putative class with

the binding effect of an opt-out only class action which would preclude them from pursuing their

claims on an individual basis, Named Plaintiffs must demonstrate to the Court that there existed

a price premium for Peloton products caused by the Challenged Statement.  *See Ault v. J.M.*

*Smucker Co.*, 310 F.R.D. 59, 67 (S.D.N.Y. 2015) (noting that a plaintiff must offer "evidence

that a price premium actually existed" as a result of the allegedly false statement).  They have

failed to do so.  For that reason alone, the motion for class certification fails.

### 3.    Misrepresentation: Damages Resulting From the Challenged Statement

Named Plaintiffs also have not demonstrated that there exists a model capable of

measuring the damages attributable to their theory of liability.  In *Comcast*, the Supreme Court

held that a model presented as evidence that damages are susceptible to classwide proof at the

class-certification stage "must measure only those damages attributable to" a plaintiff's "theory"

of injury.  *Comcast Corp.*, 569 U.S. at 35; *see also In re U.S. Foodservice Pricing Litig.*, 729

F.3d at 123 n.8 ("[C]ourts should examine the proposed damages methodology at the

certification stage to ensure that it is consistent with the classwide theory of liability and capable

of measurement on a classwide basis."); *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82

(2d Cir. 2015) ("[T]he plaintiffs must be able to show that their damages stemmed from the

defendant's actions that created the legal liability." (citation omitted)); *Roach v. T.L. Cannon*

*Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) ("Comcast held that a model for determining classwide

---

[17] Judge Jacobs's dissent in *In re Visa Check/MasterMoney Antitrust Litig.* was cited with approval in *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 81 (2d Cir. 2004).

ADD-350

damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury."). "[T]he fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification." *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008); *see also Roach*, 778 F.3d at 407, 409. But "it is nonetheless a factor that we must consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues." *McLaughlin*, 522 F.3d at 231; *see also Roach*, 778 F.3d at 408 ("*Comcast* reiterated that damages questions should be considered at the certification stage when weighing predominance issues.").

Here, Named Plaintiffs' model does not measure the damages attributable to the Challenged Statement and thus runs afoul of the dictates of *Comcast*. Named Plaintiffs argue that Dennis's conjoint analysis and Weir's damages calculations based on the conjoint analysis "prove[]" that "damages can be calculated for each class member with common proof." Dkt. No. 263 at 6. But, as discussed above, Dennis's conjoint analysis does not isolate the price premium resulting from the Challenged Statement; rather, Dennis's survey measures the value of the Challenged Statement and the fact that Defendant maintains a library of classes. Thus, the damages model does not measure "only those damages attributable to" Named Plaintiffs' "theory" of injury. *Comcast Corp.*, 569 U.S. at 35.

"Courts routinely reject price premium methodologies under *Comcast* when the proposed methodologies do not attempt to isolate the premium due only to the allegedly misleading marketing statement." *Famular v. Whirlpool Corp.*, 2019 WL 1254882, at *11 (S.D.N.Y. Mar. 19, 2019) (collecting cases); *see also Price v. L'Oreal USA, Inc.*, 2021 WL 4459115, at *4 (S.D.N.Y. Sept. 29, 2021) (same); *McMorrow v. Mondelez Int'l, Inc.*, 2020 WL 1157191, at *8–

9 (S.D. Cal. Mar. 9, 2020).  Dennis's model has not isolated the premium due to the Challenged

Statement and Named Plaintiffs have not presented a model that suggests doing so is possible.[18]

The Court rejects Named Plaintiffs' model for a second, independent reason: it does not

consider the impact of supply-side factors.  Under New York law, "the fair market value is the

price for which the [item] would sell if there was a willing buyer who was under no compulsion

to buy and a willing seller under no compulsion to sell."  *Keator v. State*, 244 N.E.2d 248, 249

(N.Y. 1968); *see also Arthur Properties, S.A. v. ABA Gallery, Inc.*, 2011 WL 5910192, at *3

(S.D.N.Y. Nov. 28, 2011) ("By definition, the fair market value of an asset such as a work of art,

a used car, a piece of real estate, and many other assets is 'the price that a willing buyer and a

willing seller would agree to in an arm's length transaction.'" (quoting *United States v. Broad.*

*Music, Inc.*, 426 F.3d 91, 95 (2d Cir. 2005))).  As described, Dennis performed a conjoint

analysis to calculate the price premium allegedly caused by the Challenged Statement and Weir

used this conjoint analysis to calculate damages.  Dennis's survey "measure[d] the extent which

the market-clearing price for the Peloton-branded bikes and for the 'All-Access Membership'

subscription for the live and on-demand classes would have been any different in the but-for

---

[18] Named Plaintiffs argue that *McMorrow* and *Price* are distinguishable.  *See* Dkt. No. 267 at 10
(first citing *McMorrow v. Mondelez Int'l, Inc.*, 2020 WL 1157191 (S.D. Cal. Mar. 9, 2020), and
then citing *Price*, 2021 WL 449115).  In those cases, the damages expert exposed survey
participants to a statement that contained two descriptions of the product, one of which was
allegedly false and the other of which accurately described the product.  *Id.*  Here, by contrast,
Named Plaintiffs argue that the "ever-growing library of classes" statement contains both an
adjective—the Challenged Statement—which is allegedly false, and a noun—"library"—which
is unchallenged.  *Id.*  As a result, it is impossible to "isolate the adjective 'ever-growing' from
'library of classes,' for consumers could not decipher what is 'ever-growing.'"  *Id.*  But Named
Plaintiffs fail to explain why the fact that the misleading phrase is contained in an adjective
rather than a noun should make a difference in the ability to isolate the impact of the Challenged
Statement.  Named Plaintiffs' expert plainly could have surveyed consumers to determine
whether the difference between a library of thousands of classes and a library of thousands of
classes that was "ever-growing" would make a difference to the consumers' purchasing
decisions.  He did not.

scenario that Defendant did not use the 'ever-growing library' representation in its advertising and marketing." Dkt. No. 227.  However, Dennis's and Weir's analyses assumed that supply would have been fixed, or perfectly inelastic; that is, they did not consider the fact that Defendant would have been willing to sell fewer Peloton products at decreased prices.  Dkt. No. 244 ¶¶ 68, 71; Dkt. No. 272 (acknowledging that "Dr. Dennis and I [Weir] calculate . . . the *willingness to pay of the marginal consumer*" (emphasis in original)); *see also In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 235 (S.D.N.Y. 2019) (noting that a conjoint analysis "focuses only on changes to the demand side of the equation . . . [*i.e.*,] how *consumers' willingness to pay* would be affected by the disclosure" of the omission or the falsity of the misrepresentation (emphasis in original)).  As a result, the model only measures the putative class members' willingness to pay, not Defendant's willingness to sell, and thus does not measure the market price in the "but for" world in which the misleading elements of the Challenged Statement were not made.  Because Defendant might have responded to the decreased demand by producing fewer Peloton products, the damages of the putative class members would presumably be less than Dennis and Weir calculated.  *See* Dkt. No. 244 ¶ 69.  Thus, the model proposed by Named Plaintiffs does not measure the damages recoverable under their theory of liability.  *See, e.g.*, *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015) (refusing to certify a class in part because conjoint analysis did not consider market supply); *cf. In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 500 F. Supp. 3d 940, 949 (N.D. Cal. 2020), *aff'd sub nom. Schell v. Volkswagen AG*, 2022 WL 187841 (9th Cir. Jan. 20, 2022) ("[D]istrict courts across the country have excluded choice-based conjoint analyses [under Federal Rule of Evidence 702] that fail to accurately account for supply-side considerations." (citation omitted)).

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 405 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 405 of 465

ADD-353

Named Plaintiffs argue that they did include supply-side factors in their analysis; their model considers both the known quantity supplied of Peloton's products and the actual historical pricing of those products.  Dkt. No. 272 ¶ 13.  Named Plaintiffs are correct that these are "supply-side factors."  However, as Defendant's expert persuasively argues, they are not the supply-side factors in the but-for world where Defendant did not use the Challenged Statement.  Dkt. No. 244 ¶ 81 ("By definition, historical prices reflect the influence of supply-side factors in the actual world, *not* the influence of supply-side factors in the but-for world where Peloton removed the Challenged Statement.").  Nor do they consider how competitors would have reacted to a decrease in demand for Peloton products, which could in turn affect the supply of Peloton products.  *Id.* ¶¶ 75–76.  By neglecting to account for changes in supply, Named Plaintiffs have failed to present a model that measures only damages attributable to their theory of injury.

Weir claims that considering the willingness to sell will underestimate the degree of damages because it ignores the fact that the items "*have already been sold.*"  Dkt. No. 272 at ¶¶ 41–42 (emphasis in original); *see also id.* ¶¶ 43–46.  Weir gives as an example a product that was advertised as curing joint pain that did not actually cure joint pain.  *Id.* ¶ 41.  If a producer's willingness to sell is considered in the analysis, the producer would argue that it would never sell the product for anything less than the cost to produce it, limiting the recovery of consumers to the difference between the product's price and the cost of production, even though the consumers received zero dollars of value from the faulty joint cream.  *Id.*  This argument, however, proves too much.  It presumes that each individual purchased the joint cream for its ability to relieve pain.  In the hypothetical world where the product has only one feature and it is purchased solely because of that feature, there would be no need for plaintiffs to pursue relief on a price-premium

ADD-354

theory.  The product advertises itself.  Each consumer would have actually relied on the promise that the product was what it claimed to be and thus each consumer would be able to recover for the full price it paid for the product.

The price-premium theory of injury and damages proceeds on a different basis.  It provides a basis for recovery for all consumers, whether or not they were aware of the product feature that was falsely advertised, on the notion that each consumer paid more for the product than she would have in the but-for world, even though that consumer received exactly what she bargained for and her willingness to pay would be identical in the but-for situation.  In other words, it assumes that the price of the product was artificially inflated for all purchasers as a result of the misleading statement.  It is on that basis that the Named Plaintiffs pursue relief here.  Neither can claim that he received less than what he bargained for or that he would not have been willing to part with the same sum of money if the Challenged Statement were not made.  In that but-for world, each Named Plaintiff still would not have seen the Challenged Statement and would have been just as willing to pay the price he had for the Peloton products.  It is only on the theory that Named Plaintiffs would not have had to pay the amount that they did—that Defendant would have offered its product at a lower price—that Named Plaintiffs would be entitled to recover any damages.  But, if that is the theory of recovery, it inherently asks what price the seller (here, Peloton) would have been willing to sell its products for in the but-for world in which it had not made the Challenged Statement.  And that question, in turn, inherently rests both on the marginal buyer's willingness to pay and Defendant's willingness to sell.  If, in the world where Defendant did not make the Challenged Statement, it would have offered fewer Peloton products for sale, then the effect on price of removing the Challenged Statement would have been at least partially offset by the decrease in quantity supplied.  It is still possible that

Named Plaintiffs, and others who seek to recover on a price-premium theory and who suffered no injury as a result of their actual reliance on the Challenged Statement, would have paid more than they otherwise would have had the Challenged Statement not been made, but Dennis's and Weir's analysis does not measure the degree to which they overpaid in this but-for world because it holds supply fixed.

Though individualized damage assessments need not defeat predominance under Rule 23(b)(3), the Second Circuit has emphasized that courts must consider whether damages are ascertainable on a common basis. *See Roach*, 778 F.3d at 408.  That Named Plaintiffs' model does not "actually measure damages that result from the class's asserted theory of injury," *id.* at 407, provides additional support for the Court's conclusion that individual issues predominate over common ones and thus that Named Plaintiffs have not satisfied the requirements of Rule 23(b)(3).[19]

---

[19] Named Plaintiffs also argue that they have demonstrated that "[p]roof of damages for these claims . . . will be straightforward and uniform" because NYGBL Sections 349 and 350 have statutory damages provisions.  However, Sections 349 and 350 require the Court to compare Named Plaintiffs' actual damages to the statutory award.  *See* NYGBL § 349(h) (private right of action for "actual damages or fifty dollars, whichever is greater"); *id.* § 350-e(3) (private right of action "to recover his or her actual damages or five hundred dollars, whichever is greater").  Even if the Court were to conclude that it need not determine the actual damages suffered by the putative class members, common questions would not predominate over individual ones because Named Plaintiffs would still have to demonstrate injury and causation.  *See Ackerman v. Coca-Cola Co.*, 2013 WL 7044866, at *20 n.32 (E.D.N.Y. July 18, 2013) ("In order to receive the statutory amount, each class member would still have to prove causation, i.e., that he or she paid a premium for vitaminwater."); *Pagan v. Abbott Lab'ys, Inc.*, 287 F.R.D. 139, 149 (E.D.N.Y. 2012) ("The existence of a minimum amount of statutory damages does not assist the Plaintiffs in overcoming the hurdle of affirmatively demonstrating commonality, because, as explained above, the Plaintiffs need to first show that the class members have been injured or harmed in the same way.").

ADD-356

**4.    Omission: Causation, Injury, and Damages Resulting From the Material Omission**

Named Plaintiffs also allege that Defendant caused the purported class injury by "failing to disclose the imminent removal of over half of its on-demand library."  Third Amended Complaint ¶ 34.  The Court's August 11, 2022 Opinion and Order permitted this theory of liability to proceed because "as the weight of authority now understands [New York] law, where a defendant fails to supply a consumer information that it alone possesses, and where that information would be material or important to a reasonable consumer and where the consumer could not have reasonably obtained the information other than through the defendant, Sections 349 and 350 provide a basis for relief."  Dkt. No. 207 at 34; *see also Oswego*, 647 N.E.2d at 745 (stating that a Section 349 case could be based upon an omission "where the business alone possesses material information that is relevant to the consumer and fails to provide this information").  However, the Rule 23(b)(3) analysis for this theory of liability demonstrates that individual issues will predominate for much the same reasons as Named Plaintiffs' misrepresentation theory of liability:  Defendant has not demonstrated that a price premium existed as a result of the omission or that damages are susceptible to common proof.

The only data that Named Plaintiffs present with respect to Defendant's alleged omission is a consumer perception survey conducted by Dennis, which was designed to measure the materiality of Defendant's alleged omission.  *See* Dkt. No. 230 at 10.  This survey asked participants whether they would be "concerned" if "a legal action would cause [Defendant] to remove" between 10% and 50%, selected at random "of their on-demand classes in their library."  Dkt. No. 227 ¶¶ 95–96.  Dennis's survey revealed that 48.9% of respondents would be either extremely or moderately concerned if Defendant were forced to remove 50% of their classes, a figure that approximates the number of classes that were actually removed by Defendant as a

72

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 409 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 409 of 465

ADD-357

result of a legal action.  *Id.* ¶¶ 95, 97.  Based on this data, Dennis concludes that "a substantial

share of consumers would have considered this information—that is, about the possibility that

the number of classes might be reduced—as part of their purchase decision making of the

products."  *Id.* ¶ 97 (cleaned up).  However, this survey, which was designed to measure

materiality, says little about whether a price premium existed based on the Challenged

Statement.  If a consumer is "concerned" by the removal of the on-demand classes from

Peloton's library, it does not necessarily follow that these concerns would have caused

consumers not to purchase Peloton products, resulting in a price premium.  Dennis

acknowledged that his survey was not designed to measure "a purchase likelihood of whether

these consumers would purchase this product"; he was "measuring something else."  Dkt.

No. 258-2 at 73.  The Court thus finds Dennis's survey unreliable insofar as Named Plaintiffs

would seek to use it to demonstrate that a price premium existed as a result of Defendant's

misrepresentation.

     In fact, the only data that was presented to the Court suggests that there was no price

premium as a result of the omission.  As discussed, the price of Peloton products stayed the same

for nearly eighteen months after the Class Period, *see* Dkt. No. 244 ¶ 98, and, according to

Defendant's designated witness on the issue of the consumers to the removal of the classes, there

were only "a single-digit number of subscription cancellations that were directly attributable

to . . . the on-demand classes removed from [Peloton's] library in March 2019," Dkt. No. 255-8

at 201.  Nor does Dennis's conjoint model and Weir's damages analysis purport to measure the

price impact of Defendant's omission; at most, they measure the price impact of the "ever-

growing library" statement, which is not tantamount to an alleged omission that the number of

classes in the library would shrink by approximately 50%.

**ADD-358**

Because the Court finds the individual issues predominate over common ones, it

concludes that Named Plaintiffs have not established that the purported class satisfies the

predominance requirement of Rule 23(b)(3).[20]

## CONCLUSION

Defendant's motion to strike is DENIED and Named Plaintiffs' motion for class

certification is DENIED.  Because the Court finds that the parties' letter motions to seal are

consistent with the Court's prior sealing orders, *see* Dkt. Nos. 169, 193, 222, the motions to seal

are GRANTED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 225, 226, 239, 240, 262.


SO ORDERED.

Dated: May 2, 2023
      New York, New York                    _____
                                                  LEWIS J. LIMAN
                                            United States District Judge

---

[20] "[A] court that certifies a class must appoint class counsel" at the same time it certifies the class, and the court is thus required to consider the adequacy of class counsel in its class certification decision.  Fed. R. Civ. P. 23(g); *see also* 1 Newberg and Rubenstein on Class Actions § 3:84.  The Second Circuit "has also 'recognized an implied requirement of ascertainability in Rule 23,' which demands that a class be 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'"  *In re Petrobras Sec.*, 862 F.3d at 260 (citations omitted).  Because the Court finds that common issues of fact and law do not predominate over individual issues, it does not appoint, or address the adequacy of, class counsel and does not address the ascertainability of the proposed class.

ADD-359

# MANDATE

S.D.N.Y. – N.Y.C.
19-cv-11711
Liman, J.

## United States Court of Appeals

### FOR THE
### SECOND CIRCUIT

_____

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 15th day of September, two thousand twenty-three.

Present:

Jon O. Newman,
José A. Cabranes,
Maria Araújo Kahn,
*Circuit Judges.*

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: Sep 15 2023

_____

Eric Passman, individually and on behalf of all others similarly situated, et al.,

*Petitioners,*

v.

23-809

Peloton Interactive, Inc.,

*Respondent.*

_____

Petitioners request, pursuant to Federal Rule of Civil Procedure 23(f), leave to appeal the district court's order denying class certification.  Upon due consideration, it is hereby ORDERED that the petition is DENIED because an immediate appeal is not warranted.  *See Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139–40 (2d Cir. 2001).

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

*Catherine O'Hagan Wolfe*

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

*Catherine O'Hagan Wolfe*

MANDATE ISSUED ON 09/15/2023

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 412 of 465
Case 1:19-cv-11711-LGS    Document 336    Filed 09/02/25    Page 412 of 465

ADD-360

Case 1:19-cv-11711-LJL    Document 332    Filed 07/30/24    Page 1 of 4



UNITED STATES DISTRICT COURT
**SOUTHERN DISTRICT OF NEW YORK**
**OFFICE OF THE CLERK**
**500 PEARL STREET**
**NEW YORK, NEW YORK 10007**

DANIEL ORTIZ
ACTING CLERK OF COURT

July 30, 2024

**<u>BY ECF AND OVERNIGHT MAIL</u>**

Greg G. Gutzler
DiCello Levitt LLC
485 Lexington Ave.
Suite 1001
New York, NY 10017

Andrew Soukup
Covington & Burling, LLP (DC)
850 10th Street NW
Washington, DC 20001

Re: <u>Fishon et. al v. Peloton Interactive, Inc.</u>, 1:19-cv-11711-LJL
Notice Concerning Waiver of Judicial Disqualification

Greetings.

I have been contacted by Judge Lewis J. Liman, U.S.D.J., who has presided over the above-named case since it was re-assigned to him on February 4, 2020.

As the parties are aware, on October 15, 2020, Judge Liman informed the litigants that it had come to his attention that his wife held shares in Peloton Interactive, Inc. Dkt. No. 63. At that time, Judge Liman explained that under Canon 3C(4) of the <u>Code of Conduct for United States Judges,</u> recusal was not required in that situation if divestment was made and it would not be in the public interest for him to recuse himself. *Id*. Judge Liman informed the parties that the divestment had been completed on November 2, 2020. Dkt. No. 64. The notice was provided and, as the parties were informed, the shares were divested, while a motion to dismiss was pending before the Court but before it was decided. *See* Dkt. Nos. 63–64. Since that time, no parties have suggested that Judge Liman's impartiality might be questioned, nor has anyone objected to Judge Liman's continuing to preside over this case or suggested that he should disqualify himself.[1] Judge

---

[1] On August 25, 2021, the Court provided notice that earlier that month, he had become aware that an investment advisor purchased a total of 550 shares of the stock of Peloton Interactive,

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 413 of 465
Case 1:19-cv-11711-LGS    Document 336    Filed 09/02/25    Page 413 of 465

ADD-361

Case 1:19-cv-11711-LJL    Document 332    Filed 07/30/24    Page 2 of 4

July 30, 2024
Page 2

Liman has since devoted substantial judicial resources to this case, in which a motion for summary judgment is currently pending.

Judge Liman is bound by the Code of Conduct to perform the duties of his office fairly and impartially. When he issued his October 15, 2020 Order, Judge Liman did not believe that his wife's former stock ownership had affected or impacted his decisions in the case up to that point nor that it would do so in the future. Judge Liman continues to believe that the former share ownership has not affected or impacted his decisions in this case and that it will not do so in the future. As described in the October 15, 2020 Order, under Canon 3C(4) of the Code of Conduct, a judge need not disqualify himself if he divests from an interest that provides the grounds for disqualification, which has been done in this case.

Nevertheless, judges must still disqualify themselves if their impartiality might reasonably be questioned. Under Canon 3D of the Code of Conduct, in cases where a "judge's impartiality might reasonably be questioned," the judge may participate in the proceeding only if all the parties and lawyers, after notice of the basis for the disqualification, have an opportunity to confer outside of the presence of the judge and all agree in writing or on the record to waive the disqualification under a procedure independent of the judge's participation. Although Judge Liman informed the parties of the share ownership and of his divestment of those shares, the parties were not asked at the time whether they would waive any claim that the share ownership would have required his disqualification.

Given the substantial time that has passed since Judge Liman's disclosures and the lack of objection or request for recusal from any party, the parties may have impliedly waived any argument that Judge Liman should recuse himself from the case.

Nonetheless, Judge Liman has directed that I provide the parties an opportunity to execute, or decline to execute, a formal waiver.

If you and your client(s) wish to waive the judge's disqualification, a letter to that effect from you and from your client(s) must be sent to Daniel Ortiz, Acting Clerk of Court, within twenty (20) days of the date of this Notice. A sample letter is enclosed. The letter should be signed and submitted by the attorney of record only after consultation with all of his or her clients in the above-styled and numbered cause.

---

Inc., split between an account for his wife and a joint account, that he was not aware of the purchases at the time they were made, that he did not make any decisions or issue any orders in the case at the time he was aware of the share ownership, and that he and his wife were in the process of divesting themselves of the position. Dkt. No. 110. No party asked Judge Liman to recuse himself or suggested that the ownership presented a conflict of interest requiring recusal.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 414 of 465
Case 1:19-cv-11711-LGS    Document 336    Filed 09/02/25    Page 414 of 465

ADD-362

Case 1:19-cv-11711-LJL    Document 332    Filed 07/30/24    Page 3 of 4

July 30, 2024
Page 3

**THE LETTERS SHOULD NOT BE SENT TO THE JUDGE AND COPIES SHOULD NOT BE SENT TO OTHER COUNSEL. DO NOT E-FILE YOUR LETTER(S). SUBMIT LETTERS DIRECTLY TO THE CLERK OF COURT**.

If all parties submit such letters, all responses will be made part of the record, as required by Canon 3D, and the judge will continue participation in the proceeding.

If a waiver is not received on behalf of all parties and their respective counsel, any responses to this Notice will be kept under seal by the clerk and not shown to the judge, nor will the judge be informed of the identity of any party or lawyer who declined to waive the potential disqualification. If a waiver is not received on behalf of all parties, Judge Liman may recuse himself from this matter and request that the matter be assigned to another judge.

Signed,

Daniel Ortiz
Acting Clerk of Court

cc: Hon. Lewis J. Liman, U.S.D.J.

July 30, 2024
Page 4

### ***SAMPLE*** Waiver of Disqualification Letter

NOTICE TO PARTIES: DO NOT E-FILE THIS FORM
SUBMIT DIRECTLY TO THE CLERK OF COURT

From:  [***Insert Name and Address of Attorney or pro se party***]

To:    Daniel Ortiz
       Acting Clerk of Court
       United States District Court
       Southern District of New York
       Daniel Patrick Moynihan Courthouse
       500 Pearl Street
       New York, NY 10007

Date:  [***Insert date***]

Re: <u>Fishon et. al v. Peloton Interactive, Inc.</u>, 1:19-cv-11711-LJL

Dear Mr. Ortiz:

I have consulted with my client(s), [***Insert client name(s)***] which are all of the clients that I represent in the above-styled and numbered cause, concerning the Clerk's Notice that Judge Liman may disqualify himself from this case because his impartiality might reasonably be questioned.

My client(s) and I hereby waive any potential disqualification. We are willing to proceed forward with Judge Liman presiding.

Pursuant to Canon 3D of the Code of Conduct, I am submitting this letter to the Clerk of Court, but I am not copying Judge Liman, nor am I copying the other counsel of record or the other parties.

Yours truly,

_____
Signature
[***Insert attorney's name***]
Attorney of Record, on behalf of
[***Insert client name(s)***]

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ERIC PASSMAN and ISHMAEL ALVARADO, *individually and on behalf of all others similarly situated*, <br><br> *Plaintiffs*, <br><br> v. <br><br> PELOTON INTERACTIVE, INC., <br><br> *Defendant*. | Civil Action No. 1:19-cv-11711-LGS |

**PELOTON INTERACTIVE, INC.'S OPPOSITION**
**TO PLAINTIFFS' MOTION TO VACATE AND RETAIN JURISDICTION**

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS....................................................................................................i

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................... 3

      A.    In March 2019, Peloton Removed Classes from Its On-Demand Library............. 3

      B.    In December 2019, Plaintiffs Fishon and Pearlman Sued on Behalf of a
          Nationwide Class of Peloton Users Challenging the Class Removal. ................... 4

      C.    In February 2022, Plaintiffs Passman and Alvarado Joined the Case
          Pending Before Judge Liman to Assert Claims on Behalf of a New York
          Class. ....................................................................................................................... 5

      D.    In September 2024, the Case Is Reassigned to This Court. .................................... 7

ARGUMENT .................................................................................................................... 8

I.     The Filing of the Third Amended Complaint Divested the Court of Jurisdiction. ............. 8

II.    Alternatively, the Court Should Decline to Exercise Supplemental Jurisdiction. ........... 11

      A.    The Court Need Not Revisit the Class Certification Denial. ................................ 12

          1.    Plaintiffs Waived Any Violation of Section 455(a)................................. 12

          2.    Recusal Was Not Required under Section 455(b) or (c).......................... 15

      B.    The Court Should Decline Jurisdiction Over the Remaining State Law
          Claims. ................................................................................................................. 18

III.   If the Court Retains Jurisdiction, It Should First Rule on Peloton's Motion for
     Summary Judgment. .......................................................................................................... 23

CONCLUSION................................................................................................................ 25

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 418 of 465
Case 1:19-cv-11711-LGS    Document 356    Filed 09/02/25    Page 418 of 465

ADD-366

## TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Apple v. Jewish Hosp. & Med. Ctr.*,
   829 F.2d 326 (2d Cir.1987)...................................................................12, 13, 14

*Brookman & Brookman P.C. v. MCI Telecomms. Corp.*,
   1991 WL 107421 (S.D.N.Y. 1991)........................................................25

*Brzak v. United Nations*,
   597 F.3d 107 (2d Cir. 2010)...................................................................20

*Carnegie-Mellon Univ. v. Cohill*,
   484 U.S. 343 (1988)................................................................................20

*In re Certain Underwriter*,
   294 F.3d 297 (2d Cir. 2002)...............................................................16, 17

*Cunningham Charter Corp. v. Learjet, Inc.*,
   592 F.3d 805 (7th Cir. 2010) ...................................................................9

*ExxonMobil Oil Corp. v. TIG Ins. Co.*,
   44 F.4th 163 (2d Cir. 2022) ..............................................................23, 24

*F5 Capital v. Pappas*,
   856 F.3d 61 (2d Cir. 2017)...........................................................18, 19, 20, 21

*In re Frito-Lay N. Am., Inc. All Natural Litig.*,
   2013 WL 4647512 (E.D.N.Y. Aug. 29, 2013).....................................10

*Gale v. Chi. Title Ins. Co.*,
   2017 WL 4366959 (D. Conn. Sept. 30, 2017) .....................................20

*Gale v. Chicago Title Ins. Co.*,
   929 F.3d 74 (2d Cir. 2019)...............................................................20, 22

*Health Servs. Acquisition Corp. v. Liljeberg*,
   796 F.2d 796 (5th Cir. 1986) ...............................................................23

*Horton v. Dow Jones & Co.*,
   2019 WL 952314 (S.D.N.Y. Feb. 27, 2019)....................................19, 21

*Horton v. Dow Jones & Co.*,
   804 F. App'x 81 (2d Cir. 2020) .......................................................19, 22, 23

*In Touch Concepts, Inc. v. Cellco P'ship*,
   788 F.3d 98 (2d Cir. 2015).............................................................8, 21, 22

*In re Int'l Bus. Machs. Corp.*,
   45 F.3d 641 (2d Cir. 1995)...........................................................................................13, 14

*Kidder, Peabody & Co. v. Maxus Energy Corp.*,
   925 F.2d 556 (2d Cir. 1991).........................................................................................16, 17

*Kolari v. New York-Presbyterian Hosp.*,
   455 F.3d 118 (2d Cir. 2006).................................................................................................19

*In re Literary Works in Elec. Databases Copyright Litig.*,
   509 F.3d 136 (2d Cir. 2007).................................................................................................16

*Litovich v. Bank of America Corp.*,
   106 F.4th 218 (2d Cir. 2024) .....................................................................................7, 17, 24

*LoCascio v. United States*,
   473 F.3d 493 (2d Cir. 2007).................................................................................................14

*Metz v. Unizan Bank*,
   649 F.3d 492 (6th Cir. 2011) ......................................................................................9, 10, 11

*Oneida Indian Nation of N.Y. v. Madison County*,
   665 F.3d 408 (2d Cir. 2011).................................................................................................20

*Oskar v. IDS Prop. Cas. Ins. Co.*,
   2011 WL 1103905 (E.D.N.Y. 2011).....................................................................................20

*Petitt v. Celebrity Cruises, Inc.*,
   153 F. Supp. 2d 240 (S.D.N.Y. 2001)...................................................................................25

*Plotnick v. Comput. Scis. Corp.*,
   875 F.3d 160 (4th Cir. 2017) ...............................................................................................25

*Polizzi v. United States*,
   926 F.2d 1311 (2d Cir. 1991)...............................................................................................14

*Rockwell Int'l Corp. v. United States*,
   549 U.S. 457 (2007)..............................................................................................................22

*St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply*,
   409 F.3d 73 (2d Cir. 2005)....................................................................................................11

*State Farm Fire & Casualty Co. v. Tashire*,
   386 U.S. 523 (1967)................................................................................................................8

*Swan v. Stoneman*,
   635 F.2d 97 (2d Cir.1980).....................................................................................................25

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 420 of 465
Case 1:19-cv-11711-LGS   Document 556   Filed 09/02/25   Page 420 of 465

**ADD-368**

*Szymczak v. Nissan N. Am., Inc.*,
  2011 WL 7095432 (S.D.N.Y. Dec. 16, 2011) ........................................................10

*Union Carbide Corp. v. U.S. Cutting Serv., Inc.*,
  782 F.2d 710 (7th Cir. 1986) ..............................................................................17

*United States v. Bayless*,
  201 F.3d 116 (2d Cir. 2000)..........................................................................12, 13

*United States v. Yonkers Bd. Of Educ.*,
  946 F.2d 180 (2d Cir. 1991)................................................................................14

*United States v. Yu-Leung*,
  51 F.3d 1116 (2d Cir. 1995)..........................................................................14, 15

*Weber v. Quest Diagnostics of Pa., Inc.*,
  2020 WL 6372382 (W.D.N.Y. Oct. 29, 2020) ...............................................20, 22

*Wright Transp., Inc. v. Pilot Corp.*,
  841 F.3d 1266 (11th Cir. 2016) .............................................................9, 10, 11, 22

**Statutes**

28 U.S.C. § 455(a) ............................................................................................ *passim*

28 U.S.C. § 455(b) ............................................................................................ *passim*

28 U.S.C. § 455(c) ...........................................................................12, 15, 17, 18

28 U.S.C. § 455(e) ...............................................................................................13

28 U.S.C. § 455(f) ....................................................................................16, 17, 18

28 U.S.C. § 1332(d) .................................................................................2, 7, 8, 22

28 U.S.C. § 1367(c) ......................................................................................20, 21

**Other Authorities**

Charles Gardner Geyh and Krus Markarian, *Judicial Disqualification: An
  Analysis of Federal Law* (3rd ed.).............................................................18

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 421 of 465
Case 1:19-cv-11711-LGS     Document 5.1     Filed 09/02/25     Page 421 of 465

ADD-369

## INTRODUCTION

Eric Passman and Ishmael Alvarado—both New York residents—became plaintiffs in this case in February 2022, more than two years after it was filed and after Judge Liman issued several significant rulings.  If Passman and Alvarado (hereinafter, "Current Plaintiffs") were concerned about whether Judge Liman could preside over the case fairly and impartially, they could have brought their claims before a different judge.  Since they intended to seek certification only of a New York class on New York law claims against a New York defendant, they could have—and, indeed, should have—filed suit in state court.  If they wanted to certify a nationwide class, they could have filed a new lawsuit and been randomly assigned to any judge of this Court.  And even if their case ended up before Judge Liman, they could have immediately sought to disqualify him based on his and his wife's stock ownership, a potential conflict that Judge Liman had resolved months earlier by divesting any financial interest in Defendant Peloton Interactive, Inc.

Instead, Current Plaintiffs chose to join this suit as putative class representatives and litigate their claims before Judge Liman.  Current Plaintiffs did so for strategic reasons—*e.g.*, to avail themselves of Judge Liman's favorable rulings and a favorable procedural posture.  Judge Liman had already denied Peloton's motion to dismiss on the same claims asserted under New York law by another New York resident, Eric Fishon; the parties and Court had already spent two years on discovery and briefing on class certification; and Judge Liman had denied class certification of a New York-only class only because Fishon was not an adequate class representative.  As a result, by replacing Fishon and Alicia Pearlman—a Michigan resident who unsuccessfully pursued claims under New York and Michigan law—Current Plaintiffs certainly expected that their claims would survive a motion to dismiss and that they could quickly move to certify a New York-only class by leveraging all of the work that Fishon and Pearlman (hereinafter, "Former Plaintiffs") had done.

1

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 422 of 465
Case 1:19-cv-11711-LGS    Document 356    Filed 09/02/25    Page 422 of 465

ADD-370

Case 1:19-cv-11711-LGS    Document 340    Filed 11/06/24    Page 7 of 31

That is precisely how the case proceeded. Judge Liman denied Peloton's motion to dismiss Current Plaintiffs' claims in August 2022, and just two months later, Current Plaintiffs moved to certify a New York-only class. After Judge Liman denied class certification, Current Plaintiffs petitioned the Second Circuit for an interlocutory appeal on that ruling. After their request was denied, Current Plaintiffs participated in briefing and oral argument on Peloton's motions for summary judgment and to exclude certain testimony of Current Plaintiffs' experts. In so doing, Current Plaintiffs never suggested that Judge Liman should recuse himself from the case. For good reason: Former Plaintiffs had already waived any objection to Judge Liman's involvement in the case by not moving for disqualification after he disclosed his potential conflict of interest.

Current Plaintiffs now seek an opportunistic and eleventh-hour "re-do," and ask this Court to start this case over, undoing nearly five years of litigation, including nearly three years of litigation in which they never objected to Judge Liman presiding over the case. The Court should deny that request and instead dismiss the case for lack of subject-matter jurisdiction. When plaintiffs' counsel filed the Third Amended Complaint—replacing Former Plaintiffs with Current Plaintiffs—they divested the Court of jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the Third Amended Complaint sought certification of a New York class under New York law by New York plaintiffs against a New York defendant. But even if the allegations in the Third Amended Complaint were sufficient to create CAFA jurisdiction, Judge Liman's denial of class certification reduced this case to individual claims by two New York residents seeking roughly $1,000 in statutory penalties under New York law from a New York defendant. The Court can—and should—decline to exercise supplemental jurisdiction over this purely local dispute.

## BACKGROUND

### A.     In March 2019, Peloton Removed Classes from Its On-Demand Library.

Peloton is a technology-enabled fitness company that offers connected fitness equipment and classes through streaming and on-demand media available on a subscription basis.  ECF 300 ¶¶ 2, 4.  Peloton's website highlights the many benefits of its equipment and membership.  For example, Members receive "access to Peloton's complete live and on-demand library of classes" at the relevant time, which allows them to "[t]rain at home, at the gym or on the go."  *Id.* ¶ 18.  As relevant here, between May 2016 and April 2020, four of the 269 pages on the Peloton website described Peloton's library of online classes as "growing" or "ever-growing."  *Id.* ¶ 10.

On March 25, 2019, Peloton's then-CEO sent an email to every Member of the Peloton community informing them that Peloton was removing certain classes from its library.  *Id.* ¶¶ 44–47.  The email told Members that Peloton was engaged in discussions with music publishers, and that, while Peloton would continue to negotiate licensing agreements to provide a "broad catalog of music" for its classes, it was removing some classes from its library "out of an abundance of caution."  *See id.*  Peloton's decision to remove classes still left more than 7,000 classes available to users, and Peloton continued to add classes thereafter.  *Id.* ¶ 47.

The removal of classes had little impact on Peloton's Members. Given the number of classes remaining, many Members said that the removal of these classes did not affect them, and only a "single digit number of subscription cancellations" were attributed to the removal.  *Id.* ¶¶ 50, 53.  Peloton continued to add monthly subscribers at "approximately the same rate before and after the March 2019 class removal."  *Id.* ¶ 55.  By the end of 2019, "sentiments for Peloton classes were at an all-time high."  *Id.* ¶ 52.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 424 of 465
Case 1:19-cv-11711-LGS    Document 340    Filed 09/02/25    Page 424 of 465

ADD-372

    **B.**    **In December 2019, Plaintiffs Fishon and Pearlman Sued on Behalf of a Nationwide Class of Peloton Users Challenging the Class Removal.**

In December 2019, Eric Fishon and Alicia Pearlman ("Former Plaintiffs") filed this putative class action.  ECF 1.[1]  The suit alleged that Peloton violated General Business Law ("NYGBL") §§ 349 and 350 because, by removing classes from its on-demand library, Peloton had "misrepresent[ed]" and made "material omissions" about the "'ever-growing' size of its on-demand library."  *Id.* ¶ 1.  In January 2020, the case was assigned to Judge Liman.  ECF 16.

Peloton filed its first motion to dismiss two months later.  ECF 29–30.  Several weeks before ruling on this motion, Judge Liman discovered that his wife owned stock in Peloton.  ECF 63.  He notified the parties about the discovery on October 15, 2020, and informed the parties that his wife would promptly divest her interest, which she did.  ECF 63, 64.  He also shared his belief that this divestment would allow him to continue presiding over the case.  *Id.* at 64.  Despite receiving this notice, Former Plaintiffs did not move for Judge Liman to recuse himself or otherwise raise any objection to Judge Liman continuing to preside over the case.

In November 2020, the Court denied Peloton's motion to dismiss as to Fishon and granted the motion with leave to amend as to Pearlman.  ECF 65.  The Court held that Fishon, a New York resident, had stated claims sufficient to survive the motion even though he did not allege that he had even seen the "ever-growing" statement.  *Id.* at 16.  The Court held that Pearlman, a Michigan resident, had not stated a claim under New York law because she did not allege that any part of her transactions with Peloton took place in New York.  *Id.* at 29.

Following this ruling, Former Plaintiffs did not seek to disqualify Judge Liman.  Instead, discovery continued while Former Plaintiffs filed a First Amended Complaint in which Pearlman

---

[1] Another individual plaintiff named in the original complaint voluntarily dismissed his claims early in the case.  ECF 61.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 425 of 465
Case 1:19-cv-11711-LGS    Document 336    Filed 09/02/25    Page 425 of 465

ADD-373

attempted establish her standing to bring claims under New York law. ECF 78–81. Peloton moved to dismiss Pearlman's claims, a motion the district court granted. ECF 88, 102. Two weeks later, Former Plaintiffs filed a Second Amended Complaint, now asserting claims under New York law for a purported class represented by Fishon, and claims under Michigan law for a purported class represented by Pearlman. ECF 106 ¶¶ 102, 111–93.

While Peloton's motion to dismiss the Second Amended Complaint was pending, in August 2021, Judge Liman discovered that a broker had purchased Peloton stock and "split [it] between an account for [his] wife and a joint account." ECF 110. Judge Liman informed the parties about this inadvertent purchase and that he and his wife were disposing of the stocks. *Id.* Once again, after learning this information, Former Plaintiffs did not move for Judge Liman to recuse himself or otherwise raise any objection to Judge Liman continuing to preside over the case.

Instead, three weeks later, Former Plaintiffs filed a motion to certify New York and Michigan classes. ECF 117. On January 19, 2022, the Court dismissed Pearlman's claims under Michigan law, denied Peloton's motion to exclude Former Plaintiffs' experts, and denied Former Plaintiffs' motion for class certification. ECF 168. The Court held that Pearlman's allegations failed to satisfy the heightened pleading standards under Rule 9(b), as required by Michigan law. ECF 168, at 10–17. And the Court denied certification of the New York class because Fishon had "misrepresented his identity" to Peloton, which meant that he would not be an adequate class representative. ECF 168, at 22–27.

### C.    In February 2022, Plaintiffs Passman and Alvarado Joined the Case Pending Before Judge Liman to Assert Claims on Behalf of a New York Class.

Following the Court's January 2022 order dismissing Pearlman's Michigan claims and denying certification of a New York class, Former Plaintiffs once again did not ask for Judge Liman to recuse himself or otherwise raise any objection to Judge Liman continuing to preside

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 426 of 465
Case 1:19-cv-11711-LGS    Document 55.1    Filed 09/02/25    Page 426 of 465

ADD-374

over the case. Instead, in February 2022, plaintiffs' counsel filed a Third Amended Complaint, which dropped Fishon and Pearlman from the case and added, for the first time, Eric Passman and Ishmael Alvarado as plaintiffs ("Current Plaintiffs"). ECF 195.

In the Third Amended Complaint, Current Plaintiffs added a new allegation seeking to certify a class limited to purchasers "in the State of New York." *Id.* ¶ 107. The Third Amended Complaint retained the allegation of a nationwide class from the prior complaints, but Current Plaintiffs disclaimed any intent to seek certification of that class. *Id.* ¶ 106 & n.70. They instead recognized in a footnote the Court's earlier ruling that Pearlman had not stated a claim under NYGBL, and they informed the Court that they would not "relitigate that issue." *Id.* ¶ 106 n.70. In joining this case more than two years after it was filed, and after Judge Liman had disclosed his past ownership of Peloton stock, Current Plaintiffs raised no objection to Judge Liman continuing to preside over the case.

Six months later, Current Plaintiffs defeated Peloton's third motion to dismiss. ECF 207. Although Current Plaintiffs were permitted to proceed on their claims and pursue their New York-only class, the Court "str[uck] the class allegations to the extent that they include[d] consumers who did not transact [with Peloton] in New York." ECF 207, at 39–40. In striking the nationwide class allegations, the Court expressly relied on Current Plaintiffs' disclaimer of any intent to certify a class of non-New York purchasers. *Id.* (citing ECF 195 ¶ 106 n.70).

Just two months later, Current Plaintiffs moved to certify a New York-only class. ECF 226. In May 2023, the Court denied that motion. ECF 284. The Court held that Alvarado was an inadequate representative because of his "demonstrated lack of understanding of the case and of his role and responsibilities" as a class representative. *Id.* at 39. The Court also held that the class could not be certified because common questions did not predominate. *Id.* at 44.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 427 of 465
Case 1:19-cv-11711-LGS    Document 356    Filed 09/02/25    Page 427 of 465

ADD-375

Following the denial of class certification, Current Plaintiffs still did not move for Judge Liman to recuse himself or otherwise raise any objection to Judge Liman continuing to preside over the case. They instead filed a Rule 23(f) petition in the Second Circuit seeking an immediate appeal of the class certification denial. ECF 286. In their filings, Current Plaintiffs did not suggest that the class certification ruling should be vacated based on Judge Liman's prior ownership of Peloton stock. The Second Circuit denied the Rule 23(f) petition in September 2023. ECF 287.

In the months following this denial, the parties briefed summary judgment and Rule 702 motions addressing Current Plaintiffs' individual claims. ECF 294–302, 305–14. In that briefing, Current Plaintiffs did not object to Judge Liman deciding the motions. In May 2024, the Court held oral argument on these motions and, again, Plaintiffs raised no objection to Judge Liman presiding over the case. ECF 332.

**D.    In September 2024, the Case Is Reassigned to This Court.**

On July 2, 2024, the Second Circuit issued its decision in *Litovich v. Bank of America Corp.*, 106 F.4th 218 (2d Cir. 2024). The Second Circuit held that, under 28 U.S.C. § 455(a), Judge Liman should have recused himself from that case based on his wife's ownership of Bank of America stock. *Id.* at 226. Following the *Litovich* ruling, Current Plaintiffs did not file a motion for Judge Liman to recuse himself from their case.

Instead, on July 30, 2024—four weeks after *Litovich* was decided—the Clerk's Office of the Southern District of New York sent a letter to the parties regarding Judge Liman's prior stock ownership. ECF 332. The letter recounted how Judge Liman had informed the parties that he and his wife owned shares in Peloton and that the shares were divested. *Id.* And in the years since that happened, "no parties ha[d] suggested that Judge Liman's impartiality might be questioned, nor ha[d] anyone objected to Judge Liman's continuing to preside over this case or suggested that he should disqualify himself." *Id.* As the letter explained, "Given the substantial time that has passed

since Judge Liman's disclosures and the lack of objection or request for recusal from any party, the parties may have impliedly waived any argument that Judge Liman should recuse himself from the case." *Id.* Nevertheless, Judge Liman directed the Clerk to "provide the parties an opportunity to execute, or decline to execute, a formal waiver." *Id.*

When Current Plaintiffs did not execute a formal waiver, the case was reassigned to this Court on September 5, 2024. ECF 333, 338.

## ARGUMENT

### I. The Filing of the Third Amended Complaint Divested the Court of Jurisdiction.

When this case began, the Court had jurisdiction under CAFA because Former Plaintiffs sought to certify a nationwide class. That changed with the filing of the Third Amended Complaint. Because this case was filed in federal court, the Court looks to the Third Amended Complaint—the operative complaint—to determine whether jurisdiction exists. *See In Touch Concepts, Inc. v. Cellco P'ship*, 788 F.3d 98, 101 (2d Cir. 2015). In that pleading, Current Plaintiffs—both New York residents—entered the case for the express purpose of pursuing a New York-only class asserting claims under New York law against a New York defendant. CAFA does not—and could not—confer jurisdiction over this purely local dispute.

Article III of the U.S. Constitution authorizes Congress to extend the judicial power of the United States to any controversies "between Citizens of different States." U.S. Const. art. III, § 2. The Supreme Court has interpreted this provision to permit "the legislative extension of federal jurisdiction, founded on diversity, so long as any two adverse parties are not co-citizens"—a requirement known as minimal diversity. *State Farm Fire & Casualty Co. v. Tashire*, 386 U.S. 523, 531 (1967). In enacting CAFA, Congress ensured that the statute complied with the constitutional minimal diversity requirement by conferring jurisdiction to "a class action in which

8

any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A).

Given that CAFA jurisdiction depends on the claims of foreign putative class members, jurisdiction is lacking where the named plaintiffs do not adequately allege a class that includes such claims. Current Plaintiffs concede that "if the jurisdictional allegations are frivolous or defective from the outset, then jurisdiction never existed in the first place, regardless of the plaintiff's invocation of a class action under CAFA." Mem. at 8 (quoting *Metz v. Unizan Bank*, 649 F.3d 492, 501 (6th Cir. 2011)). Other courts have held that CAFA jurisdiction is lacking where the named plaintiff "lack[ed] the expectation that a class may be eventually certified." *Wright Transp., Inc. v. Pilot Corp.*, 841 F.3d 1266, 1271 (11th Cir. 2016); *see also Cunningham Charter Corp. v. Learjet, Inc.*, 592 F.3d 805, 806 (7th Cir. 2010) (same).

This Court lacks jurisdiction over the Third Amended Complaint because its allegations regarding a nationwide class are defective, and Current Plaintiffs had no expectation that such a class would be certified. Former Plaintiffs previously pleaded a nationwide class, ECF 106 ¶ 101, but they did not seek certification of that class. They instead sought certification of two other classes: a Michigan-only class asserting claims under Michigan law with Plaintiff Pearlman (a Michigan resident) as class representative, and a New York-only class asserting claims under New York law with Plaintiff Fishon (a New York resident) as class representative. ECF 118 at 9. The proposed Michigan class may have invoked CAFA jurisdiction, but the decision to seek certification of classes involving only two states shows that Former Plaintiffs (and their counsel) had no expectation that the court could certify a true nationwide class. They instead expected that any class would be limited based on a claim asserted—e.g., a Michigan class for a claim under Michigan law, and a New York class for a New York claim.

ADD-378

After the Court denied class certification, Former Plaintiffs abandoned their claims.  With the filing of the Third Amended Complaint, they were replaced by Current Plaintiffs, New York residents asserting claims under New York law against a New York Defendant.  Consistent with Former Plaintiffs' strategy of pursuing state-specific class certification, the Third Amended Complaint pleaded only New York claims and—for the first time—a New York-only class.  ECF 195 ¶ 107.  Although the Third Amended Complaint retained the allegation of a nationwide class from the earlier complaints, it added a footnote disclaiming any intent to pursue certification of that class.  *Id.* ¶ 106 n.70.  Relying on that footnote, the court struck the nationwide class allegations from the complaint.  ECF 207, at 39–40.

Current Plaintiffs cannot establish CAFA jurisdiction in these circumstances.  CAFA jurisdiction does not exist when a plaintiff "lack[s] the expectation" that a CAFA-compliant class could be certified.  *See, e.g.*, *Wright*, 841 F.3d at 1271.  In the Third Amended Complaint, Current Plaintiffs expressed their view that the Court's prior rulings precluded a nationwide class, and they expressly disavowed any attempt to "relitigate" that issue.  ECF 195 ¶ 106 n.70.  As the subsequent litigation confirms, Current Plaintiffs sought only to certify a New York class.  ECF 231, at 7.  Moreover, as Current Plaintiffs concede, there is no CAFA jurisdiction when the class allegations are "defective."  Mem. at 8 (quoting *Metz*, 649 F.3d at 501).  The nationwide class allegations that potentially could have given rise to CAFA jurisdiction were necessarily defective because Current Plaintiffs conceded that they failed.  That those allegations were struck from the complaint at the pleading stage confirms the point.  ECF 207 at 38 (noting that court can dismiss or strike at the pleading stage class allegations that fail as a matter of law) (citing *In re Frito-Lay N. Am., Inc. All Natural Litig.*, 2013 WL 4647512, at *18 (E.D.N.Y. Aug. 29, 2013); *Szymczak v. Nissan N. Am., Inc.*, 2011 WL 7095432, at *12 (S.D.N.Y. Dec. 16, 2011)).

10

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 431 of 465
Case 1:19-cv-11711-LGS    Document 336    Filed 09/02/25    Page 431 of 465

ADD-379

Current Plaintiffs may contend that they sufficiently pleaded CAFA jurisdiction because they purported to reserve the right to challenge on appeal the court's dismissal of Plaintiff Pearlman's claims.  ECF 195 ¶ 106 n.70, ¶ 155.  But Peloton is aware of no case holding that a plaintiff's plan to raise an issue on appeal is sufficient to create CAFA jurisdiction.  Instead, Current Plaintiffs' Third Amended Complaint precludes CAFA jurisdiction because it shows that the allegations in it are limited to only New York residents and there is no expectation of a diverse class being certified.  *See, e.g.*, *Wright*, 841 F.3d at 1271; *Metz*, 649 F.3d at 501.  That is especially true when there is no reason to think Current Plaintiffs even *could* appeal the dismissal of another plaintiff's claim.  *See St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply*, 409 F.3d 73, 83 (2d Cir. 2005) ("A party ordinarily has no standing to appeal from part of a judgment that dismisses a claim to which it was not a party.").

In short, the Court can dismiss this case without reaching the disqualification issues that Current Plaintiffs raise (now, for the first time) in their motion.  This Court never had jurisdiction over Current Plaintiffs' claims because Current Plaintiffs did not sufficiently plead CAFA jurisdiction.  From the time they entered the case as plaintiffs, these New York residents asserted claims under New York law against a New York Defendant allegedly on behalf of a New York Class.  CAFA does not purport to confer jurisdiction over that putative class action, and Article III would not permit Congress to extend diversity jurisdiction over such a suit.

## II.    Alternatively, the Court Should Decline to Exercise Supplemental Jurisdiction.

Even if Current Plaintiffs had sufficiently pleaded a nationwide class to support CAFA jurisdiction, the Court can—and should—decline to exercise supplemental jurisdiction now that the class claims have been dismissed.  The remaining individual claims, which seek roughly $1,000 in statutory penalties and lack even minimal diversity, should not be resolved in a federal forum.  Current Plaintiffs contend that the Court must vacate the class certification rulings based on Judge

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 432 of 465
Case 1:19-cv-11711-LGS    Document 356    Filed 09/02/25    Page 432 of 465

ADD-380

Liman's financial conflicts, but Current Plaintiffs have waived any right to seek recusal under Section 455(a) and they have not established a violation of any other provision in Section 455. The Court does not need to revisit the class certification rulings and can instead decline to exercise supplemental jurisdiction and dismiss the case.

### A.    The Court Need Not Revisit the Class Certification Denial.

Current Plaintiffs contend that the Court should vacate Judge Liman's class certification rulings because he issued those rulings after he should have recused himself under 28 U.S.C. § 455(a), (b), and (c). Mem. 15–17. But the Court need not vacate the class certification rulings based on Section 455. Parties seeking to recuse a judge for a violation of Section 455(a) must do so immediately after the potential violation is known. Because neither Former Plaintiffs nor Current Plaintiffs did so, they waived any objection to Judge Liman remaining on the case. As for Section 455(b), a potential violation of that section can be cured by divesting the financial interest that creates the conflict. That is precisely what Judge Liman did here. And Section 455(c), by its terms, does not require disqualification; it merely imposes a duty on judges to monitor their potential conflicts.

### 1.    Plaintiffs Waived Any Violation of Section 455(a).

A party seeking to recuse a judge for a violation of Section 455(a) must file a recusal motion "at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." *Apple v. Jewish Hosp. & Med. Ctr.,* 829 F.2d 326, 333 (2d Cir.1987) (citation omitted). This strict time limitation imposes a "significant limit[ation]" on a parties' right to seek to recuse a potentially conflicted judge. *United States v. Bayless*, 201 F.3d 116, 127 (2d Cir. 2000). And it serves two important objectives: it "affords the district judge an opportunity to assess the merits of the application before taking further steps that may be inappropriate," and it ensures that parties do not hedge their bets by raising a recusal issue only after an adverse ruling. *In re Int'l*

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 433 of 465
Case 1:19-cv-11711-LGS    Document 536    Filed 09/02/25    Page 433 of 465

ADD-381

Case 1:19-cv-11711-LGS    Document 340    Filed 11/06/24    Page 18 of 31

*Bus. Machs. Corp.*, 45 F.3d 641, 643 (2d Cir. 1995).  Failure to timely move for recusal results in waiver of any objection to the judge's continued participation in the matter.  *See* 28 U.S.C. § 455(e) (explaining that parties may waive Section 455(a) violations after a judge's "full disclosure on the record").

Where, as here, the timeliness of a Section 455(a) objection is challenged, courts typically "first consider whether the procedural requirements have been met" "[b]efore reaching the merits of a recusal motion."  *Apple*, 829 F.2d at 333; *see also Bayless*, 201 F.3d at 127  (explaining that same).  In so doing, the court should examine a number of factors: (1) the extent of a movant's participation in trial or pre-trial proceedings; (2) whether granting the motion would waste judicial resources; (3) the movant's demonstration of "good cause for delay"; and (4) whether the motion was made after entry of judgment.  *Apple*, 829 F.2d at 333–34.  Current Plaintiffs do not even try to provide this Court with relevant reasons under *Apple* for not seeking to recuse Judge Liman.  And for good reason.  All of the relevant considerations support a finding of waiver.

*First*, Former Plaintiffs fully participated in pre-trial proceedings in this litigation and were informed of the inadvertent stock ownership and divestment both times.  They had multiple opportunities to move for disqualification and did not do so.  Accordingly, any objection to Judge Liman's participation in the case was likely waived before Current Plaintiffs even joined the case. But in any event, Current Plaintiffs have been involved in this litigation for almost three years— even longer than Former Plaintiffs.  They have participated in depositions, challenged Peloton's experts, sought class certification, argued dispositive motions, and so much more.  *See e.g.*, ECF 261, 302–12, 316.  And there is no evidence that the Judge Liman owned Peloton stock *at all* during their participation in this case.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 434 of 465
Case 1:19-cv-11711-LGS    Document 356    Filed 09/02/25    Page 434 of 465

ADD-382

*Second*, granting Current Plaintiffs' motion will waste significant judicial resources. *United States v. Yonkers Bd. Of Educ.*, 946 F.2d 180, 183 (2d Cir 1991) ("The timeliness requirement is necessary to prevent waste of judicial resources . . . ."). This case has been ongoing for nearly five years. The Court has seen three amended complaints, resolved two class certification motions, managed substantial discovery leading to summary judgment and *Daubert* briefing, and is now adjudicating a motion to vacate all prior orders. Granting Current Plaintiffs' motion will waste the significant resources already invested in resolving this case for no other reason than Current and Former Plaintiffs' failure to act sooner.

*Third*, Current Plaintiffs have presented no good cause for delay. Former Plaintiffs could have moved to disqualify Judge Liman, but chose not to. Current Plaintiffs could have filed suit in state court, filed a new suit that would have been randomly assigned to a new judge, or sought to recuse Judge Liman after they were added to this case. They did none of these things.[2]

The Second Circuit has found waiver where a party waited just a few months to move to recuse a judge. *See, e.g., Apple*, 829 F.2d at 334 (disqualification motion untimely when the party "waited for two months before it made its recusal motion"); *Yonkers,* 946 F.2d at 181-83 (finding waiver based on three-month delay). The Second Circuit has also found waiver where, as here, the party never moved to disqualify the judge. *See, e.g., Polizzi v. United States*, 926 F.2d 1311, 1321 (2d Cir. 1991) ("[h]aving never moved for [the judge's] recusal" party was "poorly positioned" to "take issue with the court's role" at such a "late date"); *United States v. Yu-Leung*,

---

[2] It is irrelevant that final judgment has yet to be entered. Former Plaintiffs were notified of the facts Current Plaintiffs now rely on years before filing this motion. *See supra*, pp. 4–5. Granting Current Plaintiffs' motion notwithstanding their "protracted" delay undermines the goal of avoiding such motions being raised as a "fall-back position" in the event of adverse outcomes. *LoCascio v. United States*, 473 F.3d 493, 497 (2d Cir. 2007); *see also In re Int'l Bus. Machs. Corp.*, 45 F.3d at 643. That is exactly what is happening here.

51 F.3d 1116, 1119 (2d Cir. 1995) (waiver where defendant failed to move for disqualification when there was an opportunity to do so before the judge he sought to disqualify).

Current Plaintiffs contend that they could not move to disqualify Judge Liman because he told the parties he would remain on the case. Mem. 3. That argument has several flaws. *First*, Judge Liman merely informed the parties that he *intended* to continue handling the case. ECF 64. He did not forbid the parties from moving to disqualify him or even suggest that such a motion would be futile. *Second*, only the second notification in 2020 contained that statement. ECF. 64. When Judge Liman informed the parties of his divestment in 2021, he did not repeat that statement. ECF 110, 112. Former Plaintiffs could have filed a motion to disqualify Judge Liman at any time. *Third*, these events all occurred before Current Plaintiffs even joined the case. There is no reason they could not have brought their claims before a different judge if they so desired.

Current Plaintiffs also argue that they could not have waived an objection because they promptly responded to the letter from the Clerk's Office in late July 2024. Mem. at 20. But the Clerk's letter did not restart the clock for raising objections to Judge Liman's participation in the case. It instead noted that Current Plaintiffs may have already waived any objection by not asking Judge Liman to recuse. ECF 332. The case's reassignment simply means that this Court must decide if Current Plaintiffs have waived their Section 455(a) argument. By litigating for nearly three years without moving to disqualify Judge Liman, Current Plaintiffs have clearly done so.

### 2.    Recusal Was Not Required under Section 455(b) or (c).

Current Plaintiffs also contend that Judge Liman's orders should be vacated because he issued them after being required to recuse himself from the case under Sections 455(b)(4) and (c). But neither of those provisions required recusal. Judge Liman cured any potential Section 455(b)(4) violation by divesting his financial interest in the matter, and Section 455(c) does not require recusal.

15

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 436 of 465
Case 1:19-cv-11711-LGS    Document 356    Filed 09/02/25    Page 436 of 465

ADD-384

*First*, recusal is not necessary under Section 455(b)(4) when a judge divests his financial interest in a proceeding pursuant to Section 455(f).  *See, e.g.*, *In re Certain Underwriter*, 294 F.3d 297, 303 (2d Cir. 2002) (describing Section 455(f) as an "exception" to the general rule that a judge's "financial interest in[] a proceeding" requires recusal).  In order "to conserve judicial resources," *In re Literary Works in Elec. Databases Copyright Litig.*, 509 F.3d 136, 143 (2d Cir. 2007), Section 455(f) permits a judge to continue handling a case after divesting his financial interest if "substantial judicial time has been devoted to the matter."  28 U.S.C. § 455(f).[3]

That is precisely what Judge Liman did here.  Upon learning that he or his wife owned Peloton stock, Judge Liman promptly notified the parties of this discovery and sold the stock.  ECF 63, 64, 110, 112.  Former Plaintiffs did not object at the time to Judge Liman's curing any potential conflict through divestiture.  Indeed, even now, Current Plaintiffs do not argue that Section 455(f) was inapplicable because Judge Liman had not spent significant time on the matter.  They instead concede that he had spent substantial time on the matter.  Mem. 2–6.  Judge Liman thus cured any potential violation of Section 455(b) when he and his wife sold the Peloton stock that a broker had purchased for them.  *See In re Certain Underwriter*, 294 F.3d at 304  (Section 455(f) applied where judge "quickly divested herself of the conflicting interest"); *Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 561 (2d Cir. 1991) (applying Section 455(f) where judge made a "forthright divestiture" and the parties and the court had dedicated nearly three years to the litigation); *In re Literary Works*, 509 F.3d at 139–44 (Section 455(f) permitted two Second Circuit judges to disclaim a financial interest and decide the appeal).

---

[3] Section 455(f) contains an exception where the judge has "an interest that could be substantially affected by the outcome," but the Second Circuit has not applied this exception where, as here, the judge or his spouse merely owned shares in a publicly traded company.  *See Kidder, Peabody*, 925 F.2d at 561.  And Current Plaintiffs do not argue that this exception applies here.

16

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 437 of 465
Case 1:19-cv-11711-LGS    Document 356    Filed 09/02/25    Page 437 of 465

ADD-385

Current Plaintiffs contend that Judge Liman violated Section 455(b) because, in October 2020, he "must have been considering his dismissal order" during the period between when he learned of his wife's stock ownership and when she sold the stock. Mem. at 16. But Current Plaintiffs' speculation about what Judge Liman must have been considering before the stock sale was completed provides no basis to hold Section 455(f) inapplicable. Instead, a judge may invoke Section 455(f) so long as he "made no rulings between the date of discovery and the date of divestment." *Union Carbide Corp. v. U.S. Cutting Serv., Inc.*, 782 F.2d 710, 714 (7th Cir. 1986). There is no evidence that Judge Liman made rulings between when he learned of his financial interest and divested that interest, and Current Plaintiffs do not argue otherwise.

Current Plaintiffs also contend that "*Litovich* makes it plain that the recused judge erred in applying § 455(f) and determining that his conflict could be purged." Mem. at 14. That is incorrect. *Litovich* held only that divestiture under Section 455(f) cannot cure a conflict that arises under Section 455(a)—the only provision that *Litovich* held was violated there. *Litovich* did not purport to overrule—nor could it—the Second Circuit decisions holding that divestiture under Section 455(f) *does* cure a potential conflict under Section 455(b)(4). *In re Certain Underwriter*, 294 F.3d at 304; *Kidder, Peabody*, 925 F.2d at 561. Simply put: Recusal in this case was not necessary under Section 455(a) because Current Plaintiffs waived any objection to Judge Liman's participation in the case, *see supra*, Part II.A.1, and recusal was not necessary under Section 455(b)(4) because Judge Liman divested his financial interest pursuant to Section 455(f).

*Second*, Current Plaintiffs assert that Judge Liman also violated Section 455(c), but they offer no evidence to support that assertion. In any event, the Court need not decide whether Judge Liman complied with Section 455(c), because that provision does not provide a basis for disqualification.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 438 of 465
Case 1:19-cv-11711-LGS    Document 356    Filed 09/02/25    Page 438 of 465

ADD-386

Case 1:19-cv-11711-LGS    Document 340    Filed 11/06/24    Page 23 of 31

Section 455(c) states that "[a] judge should inform himself about his personal . . . financial interests, and make a reasonable effort" to do the same about his spouse's interests.  28 U.S.C. § 455(c).  Unlike Sections 455(a) and (b), which expressly state that a judge must "disqualify himself" in certain circumstances, Section 455(c) makes no reference to disqualification.  That is because Section 455(c) is not a basis for disqualification; it is only "directed at implementing subsections (a) and (b)."  Charles Gardner Geyh and Krus Markarian, *Judicial Disqualification: An Analysis of Federal Law,* (3rd ed.), 2020 WL 13401932.

In sum, the Court need not revisit Judge Liman's class-certification rulings because of the alleged Section 455 violations.  Current Plaintiffs waived any objection based on Section 455(a), Judge Liman cured any potential violation of Section 455(b) through divestiture under Section 455(f), and Section 455(c) does not mandate recusal.

### B.    The Court Should Decline Jurisdiction Over the Remaining State Law Claims.

If the Court had CAFA jurisdiction over the Third Amended Complaint, it was only because of the alleged claims of the non-New York putative class members, because those claims brought the case within CAFA's grant of jurisdiction.  Now that the class claims have been dismissed, all that is left of the case are two claims brought by New York plaintiffs against a New York defendant under New York law seeking roughly $1,000 in statutory penalties.  The Court can—and should—decline to exercise supplemental jurisdiction over those state-law claims.

The Second Circuit confronted a similar situation in *F5 Capital v. Pappas*, 856 F.3d 61 (2d Cir. 2017).  There, the court of appeals held that, where CAFA jurisdiction existed when a suit was removed to federal court, denial of class certification did not divest the district court of jurisdiction such that the case had to be remanded to state court.  *Id.* at 77.  But in so holding, the Second Circuit acknowledged that, after dismissal of the class claims, a district court *could* decline

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 439 of 465
Case 1:19-cv-11711-LGS    Document 556    Filed 09/02/25    Page 439 of 465

ADD-387

to exercise jurisdiction over the remaining state-law claims. *Id.* at 77 n.14. The court explained: "Nor do we conclude that the district courts, on finding that a case cannot proceed as a class action, must adjudicate state law claims rather than remand them to state court. They can also, of course, dismiss them without prejudice for consideration in state courts." *Id.*

District courts—including this Court—have relied on *F5 Capital* to dismiss the named plaintiffs' state-law claims after dismissing the class claims. *See, e.g.*, *Horton v. Dow Jones & Co.*, 2019 WL 952314 (S.D.N.Y. Feb. 27, 2019) (Schofield, J.), *aff'd*, 804 F. App'x 81, 85 (2d Cir. 2020). In *Horton*, this Court determined that a plaintiff's class claim was not arbitrable, and thus the plaintiff had to proceed as an individual with his state-law statutory claim. *See id.* at *3. This Court acknowledged that it did "have—and retain[ed] despite the dismissal of the class claim— original subject matter jurisdiction over [the] action under CAFA." *Id.* But, citing Second Circuit precedent, this Court observed that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors … will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* at *4 (quoting *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006)) (cleaned up). For that reason, this Court "decline[d] to exercise supplemental jurisdiction over Plaintiff's state law claim." *Id.*

The Second Circuit affirmed that ruling. *See Horton*, 804 F. App'x at 85. Citing *F5 Capital*, the court of appeals noted that it had "previously rejected the position that 'district courts, on finding that a case cannot proceed as a class action, must adjudicate state law claims rather than remand them to state court.'" *Id.* (quoting *F5 Capital v. Pappas*, 856 F.3d at 77 n.14). Accordingly, this Court "appropriately dismissed [the *Horton* plaintiff's] individual state-law

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 440 of 465
Case 1:19-cv-11711-LGS    Document 356    Filed 09/02/25    Page 440 of 465

ADD-388

claim without prejudice after holding that the class-waiver provision barred him from seeking class relief." *Id.*[4]

The Court should follow the same approach here. Now that this Court "dismissed all claims over which it has original jurisdiction," it "may decline to exercise supplemental jurisdiction over" the remaining claims. 28 U.S.C. § 1367(c). The Second Circuit has "repeatedly said that 'if a plaintiff's federal claims are dismissed before trial, the state law claims should be dismissed as well.'" *Oneida Indian Nation of N.Y. v. Madison County*, 665 F.3d 408, 437 (2d Cir. 2011) (quoting *Brzak v. United Nations*, 597 F.3d 107, 113–14 (2d Cir. 2010). That is because "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . — judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

That is true here. Now that the claims that gave rise to federal jurisdiction—the class claims—have been dismissed, judicial economy, convenience, fairness, and comity point toward dismissal. On judicial economy, the remaining claims are of the kind that both Congress and the Constitution itself determined that federal courts should not adjudicate. As to convenience and

---

[4] *See, e.g.*, *Weber v. Quest Diagnostics of Pa., Inc.*, 2020 WL 6372382, at *5 (W.D.N.Y. Oct. 29, 2020) ("[The Second Circuit] has never held that withdrawal of class action allegations compels the federal court to retain jurisdiction over related state claims. A federal court therefore has the discretion to either remand or exercise supplemental jurisdiction notwithstanding the dismissal of the CAFA-triggering claim.") (emphasis omitted); *Gale v. Chi. Title Ins. Co.*, 2017 WL 4366959, at *3 (D. Conn. Sept. 30, 2017) *aff'd*, 929 F.3d 74 (2d Cir. 2019) ("The [Second Circuit] recently noted that when a district court finds that a CAFA case cannot proceed as a class action, jurisdiction over the individual claims continues to exist but the court has discretion to dismiss the individual claims without prejudice to refiling in state court. *See F5 Capital*, 856 F.3d at 77 n.14. This suggests that in deciding the present motion, the Court may be guided by the factors relevant to a determination whether to exercise supplemental jurisdiction."); *Oskar v. IDS Prop. Cas. Ins. Co.*, 2011 WL 1103905, at *7 (E.D.N.Y. 2011) (applying § 1367(c)(3) to remand state law claims because "the basis for federal jurisdiction in this matter rests on" CAFA and "all class claims have been dismissed").

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 441 of 465
Case 1:19-cv-11711-LGS    Document 356    Filed 09/02/25    Page 441 of 465

ADD-389

fairness, both the defendant and the remaining plaintiffs are based in New York, so Plaintiffs would not be prejudiced by having to avail themselves of the New York state court system. Finally, comity concerns suggest that this case—which involves New York state-law claims and solely New York parties—should not be in federal court.

Current Plaintiffs resist this conclusion by arguing that the Court is powerless to dismiss their state-law claims because they were pleaded as class claims. Mem. 8–13. That argument is foreclosed by *F5 Capital* and *Horton*, which recognized that courts have discretion to decline jurisdiction over individual claims after class certification is denied. Current Plaintiffs respond by arguing that the Second Circuit and this Court (among others) are "incorrect" in reading *F5 Capital* "as authorizing the dismissal of claims over which the court has original jurisdiction after denial of class certification." Mem. 12 n.6. But that is precisely what *F5 Capital* says: "[O]n finding that a case cannot proceed as a class action," courts "can also, of course, dismiss [state-law claims] without prejudice for consideration in state courts." 856 F.3d at 77 n.14.

Current Plaintiffs contend that dismissal following denial of class certification is improper because "[o]nce jurisdiction has attached, it cannot be ousted by subsequent events." Mem. 12. That is incorrect. Indeed, Current Plaintiffs effectively concede that there is no such categorical rule by acknowledging that jurisdiction can be ousted by some subsequent events, such as the filing of an amended complaint. Mem. 13 n.7. And Section 1367 plainly contemplates that a court may decline to exercise jurisdiction over state-law claims after other subsequent events, such as the dismissal of federal law claims. 28 U.S.C. § 1367(c)(3).

In arguing for a "once-jurisdiction, always-jurisdiction" rule, Current Plaintiffs rely extensively on cases that were filed in state court and then removed to federal court. Mem. 9–13 (discussing *F5 Capital*, 856 F.3d at 75 (removal case), and *In Touch Concepts, Inc. v. Cellco*

*P'ship*, 788 F.3d 98, 101 (2d Cir. 2015) (removal case)).  But the Second Circuit has made clear that removal cases are different.  When a case is originally filed in federal court—as this case was—then the general rule is that the court must ensure it has subject-matter jurisdiction after every step of the case.  *In Touch*, 788 F.3d at 101.  But "this rule would not apply to cases that were removed to federal court." *Gale v. Chicago Title Ins. Co.*, 929 F.3d 74, 78 n.2 (2d Cir. 2019)  The "time-of-filing rule" applies "only to removal cases because 'removal cases raise forum-manipulation concerns that simply do not exist when it is the plaintiff who chooses a federal forum . . . .'" *Id.* (quoting *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473–74 (2007)); *see also Wright*, 841 F.3d at 1272 (distinguishing "suits filed in state court and then removed to federal court under CAFA" from suits "first filed directly in federal court").

Current Plaintiffs also contend that the Court cannot decline to exercise supplemental jurisdiction because both of their claims were pleaded as class claims under CAFA and thus "[t]here are no 'other claims' over which it has supplemental jurisdiction, even after the denial of class certification." Mem. 13.  But that argument overlooks the critical role that the claims of the diverse class members play in a jurisdictional analysis.  CAFA could not confer diversity jurisdiction over Current Plaintiffs' claims because Current Plaintiffs do not satisfy the constitutional requirement of minimal diversity.  *See supra*, Part I.  It is the claims of the putative class members that brought this case within CAFA, 28 U.S.C. § 1332(d), and once those claims were removed from the case, the only remaining claims—Current Plaintiffs' individual claims— are claims not otherwise subject to the Court's jurisdiction.  These individual state-law claims are thus properly treated as "other claims" under Section 1367(a).  *See, e.g.*, *Horton*, 2019 WL 952314, at *4; *Weber*, 2020 WL 6372382, at *5.

ADD-391

Finally, Current Plaintiffs acknowledge that this Court declined to exercise supplemental jurisdiction in *Horton* based on Section 1367(c)(3), but they argue that the Court cannot invoke that provision here "because the recused judge in this matter was in violation of 28 U.S.C. § 455." Mem. at 24. Even putting aside Current Plaintiffs' waiver of any Section 455(a) violation, Judge Liman *denied* the motion to dismiss Current Plaintiffs' claims. ECF 207. A denial of a motion to dismiss does not prevent a court from declining to exercise supplemental jurisdiction under Section 1367(c)(3). Rather, Judge Liman's denial of the motion is the reason why the individual state-law claims are still pending, and thus the reason why the Court can—and should—dismiss them under Section 1367(c)(3). *See, e.g.*, *Horton*, 2019 WL 952314, at *4.

### III.    If the Court Retains Jurisdiction, It Should First Rule on Peloton's Motion for Summary Judgment.

Current Plaintiffs contend that the Court should vacate all of Judge Liman's rulings and effectively start this case over. Indeed, Current Plaintiffs suggest that vacatur should extend to rulings addressing Former Plaintiffs. Current Plaintiffs do not even attempt to justify turning the clock back to before they joined the case, but in any event, there is no reason for this Court to take such a drastic step.

Even if the Court finds that Current Plaintiffs did not waive their objections to Judge Liman continuing to preside over the case despite the passage of years, or that Judge Liman violated Section 455(b), the Court need not vacate any of Judge Liman's rulings. "When a judge violates § 455, a new, unconflicted judge may*, but is not required to*, vacate the judgment or any decisions rendered by the conflicted judge." *ExxonMobil Oil Corp. v. TIG Ins. Co*., 44 F.4th 163, 172 (2d Cir. 2022), *cert. dismissed*, 143 S. Ct. 480 (2022) (emphasis added) (citing *Health Servs. Acquisition Corp. v. Liljeberg*, 796 F.2d 796, 802 (5th Cir. 1986)). To determine whether vacatur is appropriate, courts must assess three factors: (1) injustice to the parties before the Court, (2)

23

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 444 of 465
Case 1:19-cv-11711-LGS    Document 536    Filed 09/02/25    Page 444 of 465

ADD-392

whether a denial will produce injustice in other cases, and (3) the potential to undermine public confidence in the judicial proceeding. *Litovich*, 106 F.4th at 226–27 (citation omitted).

None of these factors warrant vacating the prior orders in this case. *First*, Current Plaintiffs would suffer no injustice. They chose to enter this case after Judge Liman had disclosed his and his wife's stock ownership and then they litigated their claims for years without objecting to Judge Liman presiding over the case. If any party would be prejudiced, it would be Peloton. Peloton has defended itself against these claims for close to five years, and after twice prevailing on class certification, it now faces the prospect of potentially starting the case over, despite no objection from the Former Plaintiffs or Current Plaintiffs to Judge Liman staying on the case. *Second*, declining to vacate the prior orders will also not produce injustice in other cases. Instead, allowing the orders to stand will demonstrate to parties in other cases that they must timely seek to recuse a judge if they object to that judge's continued participation in the case. Put another way, "[t]he risk of harm in future cases is minimal . . . because the district court disclosed the conflict as soon as [the judge] became aware of it, and because [Plaintiffs] ha[ve] had ample opportunity to challenge [the judge's] rulings . . . ." *ExxonMobil*, 44 F.4th at 174. *Third*, declining to vacate the orders will not undermine public confidence in the judicial process. Instead, public confidence will be furthered by ensuring that parties do not game the judicial system by failing to bring disqualification motions early and waste substantial judicial resources.[5]

Rather than vacating any order—or even reviewing prior orders *de novo*—if the Court retains jurisdiction, it should first resolve Peloton's motions for summary judgment and to exclude

---

[5] Plaintiffs also contend that this Court should use its "inherent power to reconsider and modify interlocutory orders." Mot. 19. But because Plaintiffs fail to show that vacatur is warranted under the three-part test that this Court must apply, the Court need not resort to its inherent powers to circumvent this result.

Current Plaintiffs' expert testimony. ECF 294–314. Plaintiffs and their counsel cannot complain that after years of litigation they need further discovery to defend against these motions—and if they do, Rule 56(d) sets forth the process they must follow to make that showing. If the Court grants summary judgment for Peloton, that ruling would moot Current Plaintiffs' challenges to Judge Liman's class certification rulings. *See, e.g.*, *Petitt v. Celebrity Cruises, Inc.*, 153 F. Supp. 2d 240, 267 (S.D.N.Y. 2001) ("Because the Court has found against the named plaintiffs on the merits, their motion for class certification must be denied."); *Brookman & Brookman P.C. v. MCI Telecomms. Corp.*, 1991 WL 107421, at *1 (S.D.N.Y. 1991) ("If defendants' motion for summary judgment is well founded, plaintiff's motion for class certification becomes moot.").[6] A ruling for Peloton on summary judgment would obviate the need to consider class certification because plaintiffs that lack viable claims, necessarily cannot be adequate class representatives. *See, e.g.*, *Swan v. Stoneman*, 635 F.2d 97, 102 n.6 (2d Cir.1980) ("As a general rule, a class action cannot be maintained unless there is a named plaintiff with a live controversy both at the time the complaint is filed and at the time the class is certified.").

## CONCLUSION

For the foregoing reasons, the Court should dismiss this case for lack of jurisdiction.

---

[6] *See also Plotnick v. Comput. Scis. Corp.*, 875 F.3d 160, 164 (4th Cir. 2017) ("Because affirmance of the district court's grant of summary judgment disposes of [plaintiffs'] claims, we decline to address the district court's denial of class certification."); 3 Newberg and Rubenstein on Class Actions § 7:10 (6th ed. 2024) ("If the defendant prevails on the summary judgment motion, in most circumstances, the court will be relieved of the need to rule on the issue of class certification.").

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 446 of 465
Case 1:19-cv-11711-LGS     Document 556     Filed 09/02/25     Page 446 of 465

ADD-394

Case 1:19-cv-11711-LGS     Document 340     Filed 11/06/24     Page 31 of 31


By:     /s/ *Mark W. Mosier*

Mark W. Mosier, *pro hac vice*
Andrew Soukup, *pro hac vice*
Phyllis A. Jones, *pro hac vice*
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
mmosier@cov.com
asoukup@cov.com
pajones@cov.com

*Counsel for Peloton Interactive, Inc.*

26

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 447 of 465
Case 1:19-cv-11711-LGS Document 336 Filed 09/02/25 Page 447 of 465

ADD-395

# COVINGTON

BEIJING  BOSTON  BRUSSELS  DUBAI  FRANKFURT
JOHANNESBURG  LONDON  LOS ANGELES  NEW YORK
PALO ALTO  SAN FRANCISCO  SEOUL  SHANGHAI  WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 6000

**Via Electronic Mail**                               January 17, 2025

The Honorable Lorna G. Schofield
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, New York 10007-1312

Re: ***Passman et al. v. Peloton Interactive, Inc.***, Case No. 1:19-cv-
     1171 (LGS) – Notice of Supplemental Authority in Support
     of Peloton's Brief in Opposition to Plaintiffs' Motion to
     Vacate and Retain Jurisdiction (Dkt. 340)

Dear Judge Schofield:

Defendant Peloton Interactive, Inc. ("Peloton") respectfully submits the recent decision of the United States Supreme Court in *Royal Canin U.S.A., Inc. v. Wullschleger*, No. 23-677 (U.S. Jan. 15, 2025) (**Exhibit A**) as supplemental authority in support of its Brief in Opposition to Plaintiffs' Motion to Vacate and Retain Jurisdiction (Dkt. 340).

In *Royal Canin*, the Supreme Court held that federal courts may not exercise supplemental jurisdiction over a case when a class-action plaintiff amends her complaint to "eliminate[] the basis for federal jurisdiction." Ex. A at 8–9. The Supreme Court explained that whether originally filed in federal court or removed there from state court, when plaintiffs amend their complaint, "[t]he amended complaint becomes the operative one," and that amendment "can either create or destroy jurisdiction" depending on "the claims and parties that the plaintiff includes in a complaint." *Id.* at 14, 15 n.5.

*Royal Canin* provides further support to dismiss this case for lack of subject matter jurisdiction. As Peloton has explained, Plaintiffs divested this Court of jurisdiction when they filed their Third Amended Complaint seeking certification of a New York class, under New York law, by New York plaintiffs, against a New York defendant. Peloton's Brief in Opposition (Dkt. 340), 2, 8–11. As *Royal Canin* holds, "Section 1367 contemplates that when an amended complaint is filed, the jurisdictional basis for the suit is reviewed anew." Ex. A at 13. Having withdrawn the claims asserted on behalf of non-New York class members, Plaintiffs here ensured that "nothing in the amended complaint now falls 'within [the federal court's] original jurisdiction, [so] neither does anything fall within the court's 'supplemental jurisdiction.'" *Id.* (quoting 28 U.S.C. § 1367(a)) (first alteration in original).

**COVINGTON**

The Honorable Lorna G. Schofield
January 17, 2025
Page 2

Sincerely,

Mark Mosier

*Counsel for Defendant*
*Peloton Interactive, Inc.*

ADD-397

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                :

ERIC PASSMAN, et al.,               :
                       Plaintiffs,  :
                                :        19 Civ. 11711 (LGS)
             -against-         :
                                :

PELOTON INTERACTIVE, INC.,    :        **OPINION & ORDER**
                    Defendant.  :
                                :
-------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

      Plaintiffs commenced this action on behalf of themselves and a putative class alleging

that Defendant Peloton Interactive, Inc. had made material misrepresentations and omissions

regarding Defendant's fitness class library. After reassignment of the case due to financial

conflicts of interest of the prior assigned judge (the "recused judge"), Plaintiffs moved for the

court to vacate or review de novo certain rulings made by the recused judge and to retain

jurisdiction over this matter. Defendant opposed the motion. As explained below, Plaintiffs'

motion is granted.

    **I.**      **BACKGROUND**

      The following facts appear to be undisputed and are taken from the docket in this case or

the parties' submissions, and largely are matters of which the court may take judicial notice. *See*

Fed. R. Evid. 201; *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d

66, 70 (2d Cir.1998); *Ng v. Sedgwick Claims Mgmt. Servs. Inc.*, No. 23 Civ. 10380, 2024 WL

4827574, at *4 (S.D.N.Y. Nov. 19, 2024).

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 450 of 465
Case 1:19-cv-11711-LGS    Document 356    Filed 09/02/25    Page 450 of 465

ADD-398

Case 1:19-cv-11711-LGS    Document 345    Filed 05/02/25    Page 2 of 13

### A. Procedural History

This action was filed in December 2019 by Eric Fishon, Alicia Pearlman and Patrick Yang, individually and on behalf of a putative nationwide class of purchasers of Peloton hardware or subscriptions for a period of approximately one year beginning in April 2018. The Complaint relied on 28 U.S.C. § 1332(d)(2), or so-called CAFA jurisdiction, as the basis for the Court's subject matter jurisdiction. The Complaint alleged violations of N.Y. General Business Law, sections 349 and 350, which relate to deceptive business acts or practices and false advertising, respectively.

Defendant filed a motion to dismiss the Complaint on March 13, 2020. Plaintiff Yang was voluntarily dismissed on August 4, 2020. On November 9, 2020, the recused judge granted Defendant's motion in part, dismissing the claims of Plaintiff Pearlman -- a Michigan resident whose transaction had no connection to New York -- because she lacked statutory standing under New York's statutes, but allowing the claims of Fishon. *Fishon v. Peloton Interactive, Inc.* ("*Fishon I*"), 2020 WL 6564755, at *13-14 (S.D.N.Y. Nov. 9, 2020).

Plaintiffs Fishon and Pearlman filed a First Amended Complaint ("FAC") on behalf of themselves and a putative nationwide class on January 21, 2021. On February 4, 2021, Defendant moved again to dismiss Pearlman's claims on the basis that she did not have statutory standing. On July 12, 2021, the recused judge again dismissed Pearlman's New York claims for lack of statutory standing, finding that she had failed to cure the deficiencies identified in the original complaint. *Fishon v. Peloton Interactive, Inc.* ("*Fishon II*"), 2021 WL 2941820, at *5 (S.D.N.Y. July 12, 2021). The opinion granted Pearlman leave to amend the complaint to plead her claims under Michigan law. *Id.*

2

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 451 of 465
Case 1:19-cv-11711-LGS     Document 536     Filed 09/02/25     Page 451 of 465

ADD-399

Plaintiffs Fishon and Pearlman filed a Second Amended Complaint ("SAC") on July 26, 2021.  In the SAC, Fishon again asserted claims under New York's General Obligations Law, while Plaintiff Pearlman brought claims under the Michigan Consumer Protection Act ("MCPA"), Mich. Comp. Laws Ann. §§ 445.901, *et seq*.  On August 9, 2021, Defendant moved to dismiss Plaintiff Pearlman's claims under the MCPA.  On September 16, 2021, Plaintiffs moved to certify two classes of Peloton purchasers -- a New York class and a Michigan class -- pursuant to Federal Rule of Civil Procedure 23.  On January 19, 2022, the recused judge decided both Defendant's motion to dismiss the SAC and Plaintiffs' motion for class certification.  The decision dismissed Pearlman's claims under the MCPA because they were not pleaded with the requisite specificity under Federal Rule of Civil Procedure 9(b).  *Fishon v. Peloton Interactive, Inc.*, 2022 WL 179771, at *7-8 (S.D.N.Y. Jan. 19, 2022) ("*Fishon III*").  The decision denied Plaintiffs' motion for class certification on the grounds that Pearlman's claim had been dismissed and Fishon was not an adequate class representative.  *Id*. at *11-12.  The decision permitted the filing of a fourth complaint that might remedy these infirmities.  *Id*. at *12-13.

The Third Amended Complaint ("TAC") was filed in February 2022 by two new Plaintiffs, Eric Passman and Ishmael Alvarado, both New York citizens, on behalf of themselves, a putative nationwide class and a New York sub-class.  Defendant moved to dismiss the TAC, arguing that Plaintiffs lacked standing and that the TAC failed to state a claim.  On August 11, 2022, the recused judge substantially denied the motion to dismiss, but struck the class allegations of class members who did not transact with Peloton in New York for lack of statutory standing to assert claims under the New York General Obligations Law.  *Fishon v. Peloton Interactive, Inc.*, 620 F. Supp. 3d 80, 107 (S.D.N.Y. 2022) ("*Fishon IV*").

3

In October 2022, Plaintiffs moved to certify a class of all purchases of Peloton hardware or subscriptions in New York during the putative class period. Defendant opposed the motion. Oral argument was held on April 12, 2023. On May 2, 2023, the recused judge denied class certification on the basis that Plaintiff Alvarado was not an adequate class representative and that common issues did not predominate over individual issues with respect to causation, injury and damages. *Passman v. Peloton Interactive, Inc.*, 671 F. Supp. 3d 417, 448-49, 451-67 (S.D.N.Y. 2023). Plaintiffs sought leave to appeal the denial of class certification to the Second Circuit Court of Appeals, which was denied.

Plaintiffs Passman and Alvarado continued to pursue their claims as individuals, rather than on behalf of a class. In December 2023, Defendant moved for summary judgment and to preclude the expert reports and testimony of Plaintiffs' experts. Plaintiffs opposed both motions. Oral argument was held on the motions on May 29, 2024, but they were not decided because of intervening events.

**B. Conflicts and Reassignment**

On October 15, 2020, while the first motion to dismiss was pending, the recused judge informed the parties that his spouse owned shares in Defendant and determined that recusal was not required because the shares were being divested and recusal would not be in the public interest. The recused judge notified the parties on November 2, 2020, that the shares at issue had been sold and that he intended to continue to preside over the case. On November 9, 2020, the recused judge issued the decision in *Fishon I*.

A financial advisor, acting for the recused judge and his spouse, then made several purchases of Peloton stock, on April 15, April 19, May 11, May 12, May 13 and May 14, 2021. On July 12, 2021, the recused judge issued the decision in *Fishon II*. On August 25, 2021, the

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 453 of 465
Case 1:19-cv-11711-LGS    Document 345    Filed 09/02/25    Page 453 of 465

ADD-401

Case 1:19-cv-11711-LGS    Document 345    Filed 05/02/25    Page 5 of 13

recused judge again disclosed the purchases of Peloton stock and notified the parties that the

shares were being divested.  The disclosure stated, "Earlier this month, I became aware that an

investment advisor bought a total of 550 shares, split between an account for my wife and a joint

account . . . .  I was not aware of the purchases at the time they were made, I did not make any

decisions or issue any orders in this case at any time I was aware of the share ownership, and my

wife and I are in the process of divesting ourselves of the position."  On August 31, 2021, the

recused judge notified the parties that the divestment was complete.

On July 2, 2024, the Second Circuit issued its decision in *Litovich v. Bank of Am. Corp.*,

106 F.4th 218 (2d Cir. 2024), regarding similar conflicts in another case before the recused

judge.  The Second Circuit held that recusal had been required and vacated the district court's

decision dismissing the case.  *Litovich*, 106 F.4th at 228.

On July 30, 2024, at the request of the recused judge, the Clerk of Court issued a letter to

the parties here providing them the opportunity to execute or decline to execute a formal waiver

of the recused judge's conflict.  Plaintiffs did not waive the conflict.  On September 5, 2024, the

case was reassigned to the undersigned presiding judge (the "presiding judge").

After reassignment, the presiding judge denied the pending motion for summary

judgment without prejudice to renewal and ordered briefing on two issues: whether the exercise

of supplemental jurisdiction over the remaining claims in the action was appropriate and whether

waiver of judicial conflicts had occurred or whether vacatur of prior orders was appropriate.

Plaintiffs then filed the instant motion for the Court to vacate prior rulings and retain jurisdiction.

Defendant opposed the motion, arguing that the Court either lacks subject matter jurisdiction or

should decline to exercise supplemental jurisdiction, and that objections to the conflicts were

ADD-402

waived.  Defendant subsequently filed a notice of supplemental authority regarding *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22 (2025), to which Plaintiff responded.

## II.    DISCUSSION

Plaintiffs move to vacate or review de novo the rulings made by the recused judge, including on the motions to dismiss, the motions for class certification and discovery rulings regarding the scope of discovery.  Plaintiffs argue that the rulings were made improperly by a judge who instead should have recused himself pursuant to 28 U.S.C. § 455.  As explained below, vacatur is required.

### A.  Standard

The framework for the disqualification of a judge when the judge's impartiality may reasonably be questioned or where a conflict of interest arises is set forth in 28 U.S.C. § 455. Section 455(a) states that any federal judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  "Section 455(a) has been described as a catchall recusal provision, that governs circumstances that constitute an appearance of partiality, even though actual partiality has not been shown." *Litovich,* 106 F.4th at 224.[1]  The purpose of the provision is "to promote public confidence in the integrity of the judicial process, which does not depend upon whether or not the judge actually knew of facts creating an appearance of impropriety, so long as the public might reasonably believe that he or she knew." *Id*.  As a result, "the test for whether an appearance of partiality exists is an objective one based on what a reasonable person knowing all the facts would conclude." *Id*.

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 455 of 465
Case 1:19-cv-11711-LGS    Document 356    Filed 09/02/25    Page 455 of 465

ADD-403

In addition to this catchall recusal provision in § 455(a), § 445(b) calls for recusal in particular circumstances, including, as relevant here, if the judge knows that he or his spouse has a financial "interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding."  This provision, unlike § 455(a), expressly requires actual knowledge of a conflict.  28 U.S.C. § 455(b)(4).  A judge's discovery of a financial interest in a party after the matter was assigned to him does not require disqualification if the judge has already spent "substantial judicial time" on the matter and "divests himself . . . of the interest."  *Id.* § 455(f).

Even if a financial interest conflict is excused by § 455(f), the circumstances may nevertheless require recusal under the catchall provision of § 455(a), as occurred in *Litovich.* The Second Circuit explained, "Section 455(a) applies when a reasonable person would conclude that a judge was violating Section 455(b)(4) due to a conflict of financial interest" and "[e]ven where the facts do not suffice for recusal under § 455(b), . . . those same facts may be examined as part of an inquiry into whether recusal is mandated under § 455(a)."  *Litovich*, 106 F.4th at 226.  Applying that analysis here, the recused judge in this case was required to disqualify himself under § 455(a), rather than adjudicate the motions before him.

**B.  Application of § 455(b)(4) and § 455(f)**

The recused judge knew of financial conflicts that required recusal under § 455(b)(4) but that were cured by disclosure and divestment under § 455(f).  At issue here are two occurrences of stock ownership.  First, the recused judge's spouse owned Peloton stock; the judge disclosed that ownership on October 15, 2020, while Defendant's motion to dismiss the Complaint was fully briefed and pending; the stock was divested by November 2, 2020, and the judge decided *Fishon I* one week later, dismissing Plaintiff Pearlman's claim.  The disclosure states, "I have

ADD-404

become aware that my wife holds shares in Defendant," without specifying when the judge became aware or how long his wife had held the shares prior to the disclosure.

In the second instance, the recused judge and his spouse purchased Peloton stock in April and May 2021, while Defendant's second motion to dismiss was fully briefed and pending; in July 2021, the judge decided the motion in *Fishon II*, dismissing Plaintiff Pearlman's repleaded claims in the FAC; on August 9, 2021, Defendant filed a third motion to dismiss, aimed at Pearlman's new Michigan claims in the SAC; the judge disclosed the stock ownership on August 25, 2021; the stock was divested by August 31, 2021. In January 2022, in *Fishon III*, the judge dismissed Pearlman's claims and denied Plaintiffs' motion for class certification, which had been filed after the divestiture of stock. The disclosure notice, from August 25, 2021, states, "Earlier this month [i.e., after *Fishon II*], I became aware that an investment advisor bought" shares of Defendant's stock.

In both instances, the recused judge had a conflict as described in § 455(b)(4) -- the judge or his spouse had a financial interest in a party, and the judge knew of that financial interest for a period of time while he presided over the case and a motion to dismiss was pending. In the first instance, Defendant's first motion to dismiss was pending. In the second instance, Defendant's third motion to dismiss was pending. In both instances, the conflict was cured pursuant to § 455(f) -- the recused judge disclosed and divested the interests each time he became aware of them, and the conflicts arose after substantial judicial time had been devoted to the case.

### C.  Analysis under § 455(a)

The financial conflicts here must also be analyzed under § 455(a). Section 455(a) requires disqualification in any proceeding in which a judge's impartiality might reasonably be questioned, and unlike § 455(b)(4), does not require the judge's knowledge of the circumstances

giving rise to the question.  The record does not include information on exactly when the recused judge acquired the Peloton stock he owned and disclosed in 2020, or precisely when he became aware of that stock.  A court should focus "on § 455(a), rather than § 455(b)(4) itself, [if] the record lacks clarity on precisely when the district judge learned of the conflict," which, as described above, is the case for both conflicts at issue.  *See Litovich*, 106 F.4th at 226.  Here, as confirmed by the recused judge, for each of the two conflicts, there was a period when he was unaware of the conflict.

In *Litovitch*, the Second Circuit held that recusal was necessary in circumstances that created a lesser appearance of impartiality than in this case.  Here, the recused judge held Defendant's stock during two periods when three dispositive motions were pending.  All three motions were decided, at least in part, in favor of Defendant.  The first motion was decided just one week after the stock was sold.  The second motion was briefed and decided while the judge held Peloton stock.  The third motion was filed and pending while the judge held the stock, which he sold five months later.  In *Litovich*, there was one period of holding a party's stock, and a single motion fully briefed and pending during that period, with a decision on the motion three months after divestment.  *See id*.  The Second Circuit in *Litovich* found a violation of § 455(a), concluding that, "[l]ooking at these facts fully from the perspective of an objective, disinterested observer, . . . it is reasonable to question the partiality of a judge presiding over a case in which his spouse holds an ownership interest in a party."  *Id*.  The same is true in this case.

Defendant argues that Plaintiffs waived any violation of § 455(a) by not moving for recusal within a reasonable time after either disclosure.  As a threshold matter, Plaintiffs declined to waive recusal when explicitly invited to do so.  Defendant's suggestion of an implied waiver is beside the point, as the recusal and reassignment process has already occurred.  The cases that

Defendant cites all concern situations where a recusal motion was made and was being analyzed for procedural propriety.  *See Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 333 (2d Cir. 1987) (holding recusal motion was untimely where intervenor knew of facts giving rise to motion for months before moving); *In re Int'l Bus. Machs. Corp.*, 45 F.3d 641, 643 (2d Cir. 1995) (finding no undue delay in recusal motion filed years after facts became known where case had been dormant in the intervening period); *United States v. Bayless*, 201 F.3d 116, 127 (2d Cir. 2000) (discussing the distinction between an untimely recusal motion, which does not preclude appellate review of the issue, and implied waiver of recusal, which would preclude review).  In contrast, recusal and reassignment have already occurred.  The question is not whether recusal is required, but rather what is the proper remedy for the § 455 violation that led to recusal.

### D.  Vacatur

Vacatur of the prior rulings is the appropriate remedy in this case.  "[I]n determining how best to address a violation of § 455(a)," courts consider three factors: "(i) the risk of injustice to the parties in the particular case; (ii) the risk that the denial of relief will produce injustice in other cases, and (iii) the risk of undermining the public's confidence in the judicial process." *Litovich*, 106 F.4th at 226-27.  "Although a judge must recuse when there is a disqualifying conflict, the proper remedy varies when such a conflict is discovered after the judge's ruling." *Id.*  If warranted by the circumstances, a court may grant vacatur of prior rulings in a case where a judge has been disqualified.  *Litovich*, 106 F.4th at 226-27.  In the alternative, an unconflicted court can review the conflicted rulings de novo.  *ExxonMobil Oil Corp. v. TIG Ins. Co.*, 44 F.4th 163, 173-74 (2d Cir. 2022).

The first factor, risk of injustice to the parties in this case, favors vacatur.  There is no indication that the conflicts had any influence on the recused judge's adjudication of this case,

nor is there any suggestion that the recused judge's rulings were based on anything other than his reasoned analysis and application of the law. However, consistent with the focus of § 455(a) on avoiding the appearance of impropriety, and to avoid questions as to the impartiality of the rulings, this factor weighs in favor of vacatur. *See Litovich*, 106 F.4[th] at 227.

The second factor, the risk of injustice in other cases, supports vacatur. The risk presented by implementing a lesser remedy is that "judges will fail to recuse themselves in future cases, which . . . may increase the likelihood that conflicts go unnoticed and unremedied." *Id.* at 227. As in *Litovich*, adherence to the strictures of § 455 and vacatur of rulings that violate § 455(a) encourage compliance with the statute and reasonable diligence in avoiding cases that present a conflict. *See id.*

Finally, the third factor, the risk of undermining public trust, also weighs in favor of vacatur. This motion arose partially in response to *Litovich*, which addresses similar conflicts and explains the need to encourage public trust in the judiciary. *Litovich*, 106 F.4th at 227-28 (discussing media coverage of recent § 455 violations and the need to minimize recurrent controversies that undermine public confidence in "the fair adjudication of the law"). Again, because the conflicts at issue here raise the appearance of impropriety, measures must be taken to maintain public trust and discourage similar issues in future cases. Vacatur is therefore an appropriate remedy.

The rulings on the first three motions to dismiss, decided when the recused judge was in violation of § 455(a), are vacated. Plaintiffs' amended pleadings, which followed each of these in an effort to accommodate the dismissal ruling, are stricken. The ruling on the fourth motion to dismiss, addressed to the now-stricken TAC is vacated. The ruling on the first motion for class certification is vacated because it relied, in part, on the now-vacated ruling dismissing

11

Pearlman's claims.  The ruling on the second motion for class certification is vacated because it relied on the now-stricken TAC to assess the predominance of common issues.  Discovery and other orders will be reviewed de novo as necessary.  In light of the foregoing, the issue of supplemental jurisdiction, to the extent it ever was relevant, is moot.  Similarly, Defendant's request to adjudicate its motion for summary judgment, presumably as to the claims in the TAC, is denied as moot.

### III.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion is **GRANTED**.  The following orders are **VACATED**:

- the November 9, 2020, Opinion and Order granting in part and denying in part Defendant's motion to dismiss the Complaint (i.e., *Fishon I*) at Docket No. 65;

- the July 12, 2021, Opinion and Order granting Defendant's motion to dismiss the FAC (i.e., *Fishon II*) at Docket No. 102;

- the January 19, 2022, Opinion and Order granting Defendant's motion to dismiss the SAC and denying Plaintiffs' motion to certify a class (i.e. *Fishon III*) at Docket No. 168;

- the August 11, 2022, Opinion and Order denying in part and granting in part Defendant's motion to dismiss the TAC (i.e., *Fishon IV*) at Docket No. 207 and

- the May 2, 2023, Opinion and Order denying Plaintiffs' motion to certify a class at Docket No. 284.

The following pleadings are **STRICKEN**:

- the First Amended Complaint, filed January 21, 2021, at Docket No. 81,

- the Second Amended Complaint, filed July 26, 2021, at Docket No. 106 and

- the Third Amended Complaint, filed February 18, 2022, at Docket No. 195.

Case 1:19-cv-11711-LGS    Document 345    Filed 05/02/25    Page 13 of 13

Plaintiffs' motion for oral argument is **DENIED** as moot.

By **May 16, 2025**, the parties shall file a joint letter proposing next steps in this action. To the extent the parties cannot agree, the letter shall state their respective positions.

A case management conference will be held on **May 20, 2025, at 3:30 pm**, in Courtroom 1106 at the Thurgood Marshall Courthouse, 40 Foley Square, New York, NY 10007.

The Clerk of Court is respectfully directed to terminate the motion at Dkt. Nos. 337 and 339.

Dated: May 2, 2025
    New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

13

Case: 25-2098, 09/02/2025, DktEntry: 5.1, Page 462 of 465
Case 1:19-cv-11711-LGS    Document 356    Filed 09/02/25    Page 462 of 465

ADD-410

### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

ERIC PASSMAN and ISHMAEL
ALVARADO, individually and on behalf of
all others similarly situated,

          Plaintiffs,


      v.

                                 Civil Action No. 1:19-cv-11711-LGS

PELOTON INTERACTIVE, INC.,

          Defendant.

### <u>NOTICE OF APPEAL</u>

    Notice is given that Defendant Peloton Interactive, Inc., hereby appeals to the United States

Court of Appeals for the Second Circuit from the Opinion and Order issued by this Court on May

2, 2025 (ECF No. 345), which vacated this Court's November 9, 2020, Opinion and Order granting

in part and denying in part Defendant's motion to dismiss the Complaint (ECF No. 65); July 12,

2021, Opinion and Order granting Defendant's motion to dismiss the First Amended Complaint

(ECF No. 102); January 19, 2022, Opinion and Order granting Defendant's motion to dismiss the

Second Amended Complaint and denying Plaintiffs' motion to certify a class (ECF No. 168);

August 11, 2022, Opinion and Order denying in part and granting in part Defendant's motion to

dismiss the Third Amended Complaint (ECF No. 207); and May 2, 2023, Opinion and Order

denying Plaintiffs' motion to certify a class (ECF No. 284); and struck the First Amended

Complaint, filed January 21, 2021 (ECF No. 81); Second Amended Complaint, filed July 26, 2021

(ECF No. 106); and Third Amended Complaint, filed February 18, 2022 (ECF No. 195).


May 30, 2025                                    Respectfully submitted,


                                               */s/ Mark W. Mosier*
                                               Mark W. Mosier (admitted *pro hac vice*)
                                               Andrew Soukup (admitted *pro hac vice*)
                                               Phyllis A. Jones (admitted *pro hac vice*)
                                               COVINGTON & BURLING LLP
                                               One CityCenter
                                               850 Tenth Street, NW
                                               Washington, DC 20001
                                               Tel: (202) 662-6000
                                               Fax: (202) 662-6291
                                               mmosier@cov.com
                                               asoukup@cov.com
                                               pajones@cov.com

                                               Neha Jaganathan
                                               COVINGTON & BURLING LLP
                                               The New York Times Building
                                               620 Eighth Avenue
                                               New York, NY 10018
                                               Tel: (212) 841-1000
                                               njaganathan@cov.com

                                               *Counsel for Peloton Interactive, Inc.*

2

**CERTIFICATE OF SERVICE**

I hereby certify that on May 30, 2025, a copy of the foregoing Notice of Appeal was filed electronically with the Court using the CM/ECF system.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.

*/s/ Mark W. Mosier*
Mark W. Mosier (admitted *pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Tel: (202) 662-6000
Fax: (202) 662-6291
mmosier@cov.com

*Counsel for Peloton Interactive, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Petition and Addendum with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system on August 28, 2025. In addition, I hereby certify that on August 28, 2025, the foregoing Petition and Addendum was served on the counsel listed below by FedEx Overnight Mail:

Aaron M. Zigler
Zigler Law Group, LLC
308 S. Jefferson St., Suite 333
Chicago, IL 60661
aaron@ziglerlawgroup.com

Charles Francis Dender
DiCello Levitt LLP
485 Lexington Ave, Ste 10th Floor
New York, NY 10017
cdender@dicellolevitt.com

Adam J. Levitt
DiCello Levitt Gutzler LLC
Ten North Dearborn Street, Ste 11th Floor
Chicago, IL 60602
alevitt@dicellolevitt.com

Benjamin J Whiting
Keller Postman LLC
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
ben.whiting@kellerlenkner.com

Alex J Dravillas
Keller Postman LLC
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
ajd@kellerpostman.com

I further certify that on August 28, 2025, a copy of the foregoing Petition and Addendum was served on the following by FedEx Overnight Mail:

The Honorable Lorna G. Schofield
United States District Court Southern District of New York
500 Pearl Street
New York, New York 10007

*/s/ Mark W. Mosier*
Mark W. Mosier